1:24-CV-01512-DAE
Plaintiff
EXHIBIT
I
_____

CAUSE NO. _____

| | | |
|---|---|---|
| **BIG THIRST, INC.** | § | IN THE DISTRICT COURT |
| *Plaintiff* | § | |
| | § | |
| v. | § | _____ JUDICIAL DISTRICT |
| | § | |
| **LAUREN WYLIE DONOHO** | § | |
| *Defendant* | § | TRAVIS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER, AND REQUEST FOR TEMPORARY AND PERMANENT INJUNTION

TO THE HONORABLE JUDGE OF THIS COURT:

An officer, director, and minority shareholder of Big Thirst, Inc. demanded a majority interest of the company and to be made CEO. In an act of revenge for her demands not being met, she has stopped Plaintiff's ability to access its core intellectual property and has routed critical company information to her personal email address – Defendant's acts should be enjoined:

### I - DISCOVERY CONTROL PLAN

1.01    Plaintiff intends for discovery to be conducted under TEXAS RULE OF CIVIL PROCEDURE 190.3 (Level II).

### II - PARTIES

2.01    Plaintiff Big Thirst, Inc. (Plaintiff) is a Delaware corporation whose principal office is located in Travis County, Texas.

2.02    Defendant Lauren Wylie Donoho is an individual who can be served with process at her residence located at 1210 Lucca Drive, Dripping Springs, Texas 78620.

### III - FACTS

3.01    In December of 2016, Defendant became a contractor providing web design services

to Big Thirst Marketing, a full-service marketing agency owned and operated wholly by Matt McGinnis (McGinnis). In 2020 McGinnis developed the concept of Big Thirst, Inc.: a full service e-commerce solution for distilleries. This would provide customers with services for consulting, marketing, and sales. One important difference between Big Thirst, Inc. and its competitors would be the data analytics Big Thirst, Inc. would provide. It will provide its customers with better analytics of their advertising and sales.

3.02    McGinnis incorporated Big Thirst, Inc. in March 2021. Soon after this, McGinnis called Defendant to tell her about the venture, and asked if she would be interested in providing contractor services for web design and other technical aspects, especially developing a data dashboard that would be the main component of Big Thirst, Inc. The customers would use this dashboard for their marketing, for their sales, and for their analysis. Essentially, use of the data dashboard is what would be sold to customers and what differentiates Big Thirst, Inc. from its competitors.

3.03    Instead of being a contractor, Defendant asked for an equity stake in the company and a position as an officer of Big Thirst, Inc. The bargain was struck that Defendant would create the company's website and data dashboard in exchange for a 27% stake in the company.

3.04    Defendant became the Chief Operating Officer of the company. Her duties were to oversee technical aspects of the business operations. In that role for Big Thirst, Inc., she developed the data dashboard. To do so, she subscribed to a variety of third-party software applications to both create the functionality of the data dashboard, and to operate in conjunction with the dashboard to process orders, payments, and manage product fulfillment. Some of the software isn't integrated into Big Thirst Inc.'s dashboard, but feeds into it. For example, Shopify is the software that creates the

shopping cart. The orders from it are then recognized in our dashboard, but the Shopify software is not an actual element of the dashboard. There are several software licenses that make Big Thirst, Inc.'s e-commerce, payment processing, inventory and fulfillment management, etc. possible, but they are not actual elements of the data dashboard. Defendant has sole control over the data dashboard and the related software. Without access to all of these items, Big Thirst, Inc. is not able to run its business.

3.05    To fund this operation, Big Thirst, Inc. was to secure a loan. Defendant secured a loan from her father. It was always clear that the loan was to be exclusively for the use of Big Thirst, Inc.'s start-up costs. The loan was to be re-paid by Big Thirst, Inc. At the last minute, Defendant insisted that she alone be the borrower. However, the agreement was still that the funds would be used exclusively for Big Thirst, Inc., and that Big Thirst, Inc. was still to be responsible for re-payment of the loan. A portion of the loan funds were in fact used to secure software applications and to the develop the data dashboard.

3.06    Big Thirst, Inc. also began working on securing a larger SBA loan. The loan was to be used to hire four employees, to pay outstanding invoices, to purchase equipment, and to pay Defendant and McGinnis for their efforts to date. On March 15, 2022, two days before the SBA loan was scheduled to close, Defendant sent a list of demands before she would sign for the SBA loan.

3.07    Essentially, Defendant demanded: (1) a majority ownership interest in Big Thirst, Inc., rather than the 27% she had agreed to and accepted, and (2) exclusive control over Big Thirst, Inc. The demand was coupled with a serious threat - either McGinnis and Big Thirst, Inc. agree, or she would shut down the data dashboard. Shutting down the data dashboard shuts down all consumer

orders for Big Thirst, Inc.'s customers. For all intents and purposes, it shuts down the company, and destroys Big Thirst, Inc.'s relationships with its customers and its reputation.

3.08         The parties went to mediation to try to work out a solution, it did not work.

3.09         On April 4, 2022, Defendant threatened to shut down the data dashboard unless she is made CEO of Big Thirst, Inc. with majority ownership interest. Unless that happens, Defendant said: **"The remaining authored technology (data and analytics dashboards) will not be transferred to the company and will be shut off immediately."** *See* **Exhibit B**.

3.10         The next day, on April 5, 2022, Defendant agreed to hold off shutting down the data dashboard until the Board of Directors had an opportunity to meet. That meeting was to occur on April 13, 2022. *See* **Exhibit C**.

3.11         On March 7, 2022, Defendant again made her threat to shut down the data dashboard unless she is made CEO of Big Thirst, Inc. with majority ownership interest. She said that despite her earlier email, she was no longer willing to wait for the board of directors to meet. *See* **Exhibit D**.

3.12         On April 7, 2022 Matt McGinnis, Big Thirst, Inc.'s CEO, could not access the dashboard. Defendant is the sole holder of administrative access to the data dashboard. Fearing that the data dashboard was shut down, McGinnis logged in using a customer's credentials. He found that the data dashboard was still operational, but that he, the CEO, was locked out. Further, all emails with information regarding the data dashboard were no longer going to a Big Thirst, Inc. email address. These emails contain important information regarding the operation of the data dashboard, and are vital for the successful operation of Big Thirst, Inc.'s business. Defendant has re-routed those emails to her personal email address.

3.13     Defendant has the only administrative access to Big Thirst, Inc.'s dashboard and the supporting software.

3.14     Defendant's emails attached hereto clearly show the malicious, self-serving nature of Defendant's actions.

## IV - CAUSES OF ACTION

4.01     **Breach of Fiduciary Duties:** As an officer of Big Thirst, Inc., Defendant owed it fiduciary duties. By locking Big Thirst, Inc.'s CEO out of the data dashboard and re-routing the information emails generated, Defendant has violated those duties. She took actions against Big Thirst, Inc. because the company would not give her a majority equity share or make her CEO. Her acts clearly breached her fiduciary duties to:

    a.   place the company's interests above her interests,

    b.   refrain from self-dealing,

    c.   loyalty,

    d.   utmost good faith, fairness, and honesty,

    e.   full disclosure of all matters affecting the company,

    f.   account for the property of the company,

    g.   refrain from competition with the company,

    h.   utmost good faith in her relations with the company,

    i.   due care, and

    j.   obedience.

4.02     Her breaches of her fiduciary duties are proximately causing injury to Plaintiff, at

Plaintiff's expense and to the attempted sole benefit of Defendant.

## V - REQUEST FOR INJUNCTIVE RELIEF

5.01    **Status Quo:** The last peaceable status that preceded the controversy at issue in this case is that Big Thirst, Inc.'s had access to the data dashboard and supporting software, and the emails generated by the data dashboard were being routed to a Big Thirst, Inc. email. That is all the Plaintiff seeks by way of this request for injunctive relief.

5.02    Defendant's actions are directly causing irreparable harm to Plaintiff. Big Thirst, Inc. is a small start-up. It is unable to support its customers and their use of the data dashboard. Its reputation is just being formed. Its ability to provide services to its customers as promised is key to its reputation, and its ability to operate and generate revenue. No amount of damages can re-establish Plaintiff's reputation, or re-establish its customers' trust, if Plaintiff is not able to continue operating. The harm to Plaintiff is imminent, ongoing, and irreparable. Once the damage to Plaintiff's reputation is done, and once Plaintiff's customers lose faith in Plaintiff, there is no remedy at law to adequately remedy the damage Defendant is doing. A money judgment cannot make this right. By key emails generated from the data dashboard going to Defendant's personal email rather than to Big Thirst, Inc., Plaintiff is unable to operate its business and fulfill its obligations to its customers.

5.03    **Requested Injunction:** For these reasons, Plaintiff seeks a temporary restraining order pursuant to TEX. R. CIV. P. 680 ordering that Defendant:

   a.    Restore Big Thirst, Inc.'s data dashboard to fully functioning status as it was on April 1, 2022;

   b.    Forward all emails that Defendant re-routed from a Big Thirst, Inc. email account to her personal email account to Plaintiff at matt@bigthirst.com; and

  c. To provide Big Thirst, Inc. with all administrative log-in credentials for all software and intellectual property used by Big Thirst, Inc.

5.04 Plaintiff has a probable right of recovery as described in the paragraphs above and as evidenced by the exhibits attached to this Original Petition and Request for Temporary and Permanent Injunction.

5.05 In order to preserve the status quo and Plaintiff's rights during the pendency of this action, Defendant should be cited to appear and show cause why they should not be temporarily enjoined as requested.

5.06 Plaintiff is willing to post bond.

5.07 There is not enough time to serve notice on Defendants and to hold a hearing on this application as Defendants have already taken, and continue to take, the action that must be enjoined.

5.08 **Request for Temporary Restraining Order:** Plaintiff's application for a temporary restraining order is authorized by TEX. CIV. PRAC. & REM. CODE §65.011(1), (2), (3), and (5). Defendant's actions must be restrained as they are prejudicial to Plaintiff.

5.09 **Request for Temporary Injunction:** Plaintiff asks the Court to set its application for temporary injunction for a hearing and, after the hearing, issue a temporary injunction against Defendant.

5.10 **Request for Permanent Injunction:** Plaintiff asks the Court to set their request for a permanent injunction for a full trial and, after the trial, issue a permanent injunction against Defendant. Upon final trial, this Court should enter an order permanently enjoining Defendant from the same behavior.

## VI - EVIDENCE

6.01   Plaintiffs provide the following evidence in support of their request for injunctive relief:

    a.   Affidavit of Matt McGinnis, a true and correct copy of which is attached hereto as **Exhibit A**;

    b.   April 4, 2022 email from Defendant, a true and correct copy of which is attached hereto as **Exhibit B**;

    c.   April 5, 2022 email from Defendant, a true and correct copy of which is attached hereto as **Exhibit C**; and

    d.   April 7, 2022 email from Defendant, a true and correct copy of which is attached hereto as **Exhibit D**.

## VII - CONDITIONS PRECEDENT

7.01   All conditions precedent to maintaining this suit have been performed or have occurred.

## VIII - DAMAGES

8.01   The damages sought are within the jurisdictional limits of the Court. At this time, Plaintiff seeks monetary relief of $250,000 or less and non-monetary relief.

## IX - REQUEST FOR DISCLOSURE

9.01   Plaintiffs requests that Defendants timely disclose the information or material described in TEXAS RULES OF CIVIL PROCEDURE 194.2, 194.3, 194.4, and 195.

## X - ATTORNEY FEES

10.01   Plaintiffs are entitled to recover reasonable attorney's fees against Defendant.

## XI - PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs ask that Defendants be cited to appear

and answer, and that Plaintiffs have judgment for:

    a.    Costs of court and attorney fees;

    b.    Damages within the jurisdictional limits of this court;

    c.    Attorney's fees and costs;

    d.    Prejudgment and post-judgment interest; and

    e.    A temporary restraining order, temporary injunction, and permanent injunction be issued as set forth above; and

    f.    Such other and further relief in law and in equity to which Plaintiffs may show itself to be justly entitled.

Respectfully Submitted,

HAJJAR | PETERS, LLP
3144 Bee Cave Road
Austin, Texas 78746
Telephone: (512) 637-4956
Facsimile: (512) 637-4958


By:   */s/ Doran D. Peters*
       Doran D. Peters
       State Bar No. 24027615
       Eric C. Dowdy
       State Bar No. 24082929
       service@legalstrategy.com
ATTORNEYS FOR PLAINTIFF

VERIFICATION

STATE OF TEXAS  §
§
TRAVIS COUNTY §

  Before me, the undersigned notary, on this day personally appeared Matt McGinnis, a person whose identity is known to me. After being duly sworn on her oath by me, Mr. McGinnis stated that he is over eighteen years of age, is of sound mind and competent to make this verification for and on behalf of Plaintiff. Mr. McGinnis further stated that he is the Chief Executive Officer (CEO) of Big Thirst, Inc., and that he has read the foregoing petition and that each and every factual statement contained in petition is within his personal knowledge and is true and correct.

_____
Matt McGinnis

  Subscribed and sworn to before me, the undersigned Notary Public, in and for the County of Travis, this 11 day of April, 2022.

_____
Notary Public ★ State of Texas

JESSICA LOYOLA-HERNANDEZ
Notary Public, State of Texas
Comm. Expires 05-22-2022
Notary ID 131578719

PLAINTIFFS' ORIGINAL PETITION, APPLICATION
FOR TEMPORARY RESTRAINING ORDER, AND
REQUEST FOR TEMPORARY AND PERMANENT INJUNCTION    PAGE 10 OF 11

WYLIE 170

## CERTIFICATE OF ATTEMPTED NOTICE

To the best of the applicants' knowledge, the parties against whom relief is sought are not represented by counsel in the matter that forms the basis of this lawsuit.

However, Defendant did copy Brian O'Toole, an attorney with Griffith Davison, P.C. to an email. Presuming that Mr. O'Toole is Defendant's attorney, I called Mr. O'Toole on April 7, 2022 and left him voice messages on both his office phone and his cell phone. I have not received a response. Out of an abundance of caution, this petition is being emailed to Mr. O'Toole at botoole@griffithdavison.com and to Defendant at wylie@bigthirst.com.

*Doran D. Peters*
Doran D. Peters

## NOTICE OF DUTY JUDGE

The Duty Judge for Travis County District Court on April 11, 12, 13, 14, and 15 is Judge Catherine A. Mauzy of the 419th Judicial District Court.

*Doran D. Peters*
Doran D. Peters

## AFFIDAVIT OF MATT McGINNIS

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

On this date, Matt McGinnis, personally appeared before me, the undersigned Notary Public, and after being duly sworn, stated the following under oath:

1. "My name is Matt McGinnis. I am over the age of 18 and I am fully competent to make this affidavit. The statements contained in this affidavit are made based on my personal knowledge. The facts set forth below and contained in the attached records are true and correct, based upon my personal knowledge formed from my involvement in this case.

2. I am the Chief Executive Officer of Big Thirst, Inc. and have been from its inception.

3. In December of 2016, Lauren Wylie Donoho became a contractor providing web design services to Big Thirst Marketing, a full-service marketing agency owned and operated wholly by me. In 2020 I developed the concept of Big Thirst, Inc.: a full service e-commerce solution for distilleries. This would provide customers with services for consulting, marketing, and sales. One important difference between Big Thirst, Inc. and its competitors would be the data analytics Big Thirst, Inc. would provide. It would provide its customers with better analytics of their advertising and sales.

4. I incorporated Big Thirst, Inc. in March 2021. Soon after this, I called Donoho to tell her about the venture, and asked if she would be interested in providing contractor services for web design and other technical aspects, especially developing a data dashboard that would be the main component of Big Thirst, Inc. The customers would use this dashboard for their marketing, for their sales, and for their analysis. Essentially, use of the data dashboard is what would be sold to customers and what differentiates Big Thirst, Inc. from its competitors.

5. Instead of being a contractor, Donoho asked for an equity stake in the company and a position as an officer of Big Thirst, Inc. The bargain was struck that Donoho would create the company's website and data dashboard in exchange for a 27% stake in the company.

6. Donoho became the Chief Operating Officer of the company. Her duties were to oversee technical aspects of the business operations. In that role for Big Thirst, Inc., she developed the data dashboard. To do so, she subscribed to a variety of third-party software applications to both create the functionality of the data dashboard, and to operate in conjunction with the dashboard to process orders, payments, and manage product fulfillment. Some of the software isn't integrated into Big Thirst Inc.'s dashboard, but

feeds into it. For example, Shopify is the software that creates the shopping cart. The orders from it are then recognized in our dashboard, but the Shopify software is not an actual element of the dashboard. There are several software licenses that make Big Thirst, Inc.'s e-commerce, payment processing, inventory and fulfillment management, etc. possible, but they are not actual elements of the data dashboard. Donoho has sole control over the data dashboard and the related software. Without access to all of these items, Big Thirst, Inc. is not able to run its business.

7. To fund its operation, Big Thirst, Inc. was to secure a loan. Donoho secured a loan from her father. It was always clear that the loan was to be exclusively for the use of Big Thirst, Inc.'s start-up costs. The loan was to be re-paid by Big Thirst, Inc. At the last minute, Donoho insisted that she alone be the borrower. However, the agreement was still that the funds would be used exclusively for Big Thirst, Inc., and that Big Thirst, Inc. was still to be responsible for re-payment of the loan. A portion of the loan funds were in fact used to secure software applications and to the develop the data dashboard.

8. Big Thirst, Inc. also began working on securing a larger SBA loan. The loan was to be used to hire four employees, to pay outstanding invoices, to purchase equipment, and to pay Donoho and me for our efforts to date. On March 15, 2022, two days before the SBA loan was scheduled to close, Donoho sent a list of demands before she would sign for the SBA loan.

9. Essentially, Donoho demanded: (1) a majority ownership interest in Big Thirst, Inc., rather than the 27% she had agreed to and accepted, and (2) exclusive control over Big Thirst, Inc. The demand was coupled with a serious threat - either I and Big Thirst, Inc. agree, or she would shut down the data dashboard. Shutting down the data dashboard shuts down all consumer orders for Big Thirst, Inc.'s customers. For all intents and purposes, it shuts down the company, and destroys Big Thirst, Inc.'s relationships with its customers and its reputation.

10. The parties went to mediation to try to work out a solution, it did not work.

11. On April 4, 2022, Donoho threatened to shut down the data dashboard unless she was made CEO of Big Thirst, Inc. with majority ownership interest. Unless that happens, Donoho said: **"The remaining authored technology (data and analytics dashboards) will not be transferred to the company and will be shut off immediately."** A true and correct copy of that email is attached hereto as **Exhibit B**.

12. The next day, on April 5, 2022, Donoho agreed to hold off shutting down the data dashboard until the Board of Directors had an opportunity to meet. A true and correct copy of that email is attached hereto as **Exhibit C**. That meeting was to occur on April 13, 2022.

---

AFFIDAVIT OF MATT MCGINNIS                                                                                  PAGE 2 OF 4

Exhibit "A"

WYLIE 173

13. On March 7, 2022, Donoho again made her threat to shut down the data dashboard unless she is made CEO of Big Thirst, Inc. with majority ownership interest. She said that despite her earlier email, she was no longer willing to wait for the board of directors to meet. A true and correct copy of which is attached hereto as **Exhibit D**.

14. On April 7, 2022 I, Big Thirst, Inc.'s CEO, could not access the dashboard. Donoho is the sole holder of administrative access to the data dashboard. Fearing that the data dashboard was shut down, I logged in using a customer's credentials. I found that the data dashboard was still operational, but that I was locked out. All emails with information regarding the data dashboard were no longer going to a Big Thirst, Inc. email address. These emails contain important information regarding the operation of the data dashboard, and are vital for the successful operation of Big Thirst, Inc.'s business. Donoho has re-routed those emails to her personal email address.

15. Donoho has the only administrative access to Big Thirst, Inc.'s dashboard and the supporting software.

16. The last peaceable status that preceded the Ms. Donoho's actions were that Big Thirst, Inc. had access to the data dashboard and supporting software, and the emails generated by the data dashboard were being routed to a Big Thirst, Inc. email. That is all Big Thirst, Inc. seeks by way of this request for injunctive relief.

17. Donoho's actions are directly causing irreparable harm to Big Thirst, Inc.. Big Thirst, Inc. is a small start-up. It is unable to support its customers and their use of the data dashboard. Its reputation is just being formed. Its ability to provide services to its customers as promised is key to its reputation, and its ability to operate and generate revenue. No amount of money can re-establish Big Thirst, Inc.'s reputation, or re-establish its customers' trust. All of that will be lost if Big Thirst, Inc. is not able to continue operating. The harm to Big Thirst, Inc. is imminent, ongoing, and irreparable. Once the damage to Big Thirst, Inc.'s reputation is done, and once Big Thirst, Inc.'s customers lose faith in Big Thirst, Inc., there is no amount of money to adequately remedy the damage Donoho is doing, because Big Thirst, Inc.'s reputation will be be ruined. A money judgment cannot make this right. By key emails generated from the data dashboard going to Donoho's personal email rather than to Big Thirst, Inc., Big Thirst, Inc. is unable to operate its business and fulfill its obligations to its customers.

18. To continue to operate, Big Thirst, Inc. needs the data dashboard to be returned to fully functioning status, which it was on April 1, 2022. Further, to properly service its customers and operate its business, Big Thirst, Inc. needs all emails generated from or through the data dashboard that were re-routed to Donoho's business address. Finally, Donoho is holding all administrative log-in credentials for software and intellectual

property used by Big Thirst, Inc. and Big Thirst, Inc. needs that administrative access to operate its business.

Further affiant sayeth naught."

_____
Matt McGinnis

SWORN TO and SUBSCRIBED before me by Matt McGinnis on this, the 11th day of April, 2022.

_____
Notary Public ★ State of Texas

> JESSICA LOYOLA-HERNANDEZ
> Notary Public, State of Texas
> Comm. Expires 05-22-2022
> Notary ID 131578719