**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **HUNTER WYLIE,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO. 1:24-cv-01512-ADA** |
| | § | |
| **BIG THIRST, INC. AND MATT MCGINNIS,** | § | |
| | § | |
| **Defendants.** | § | |

---

**APPENDIX TO**
**DEFENDANTS' REPLY BRIEF IN SUPPORT**
**OF THEIR MOTION FOR SUMMARY JUDGMENT**

---

Defendants Big thirst, Inc. and Matt McGinnis files this Appendix to their Reply Brief in support of their Motion for Summary Judgment. The Appendix contains annotations to the Exhibits that Plaintiff provided in support of Plaintiff's Response to Defendants' motion. Defendants file this Appendix not as evidence supporting their motion, but to easily illustrate for the Court how the evidence cited by Plaintiff in his response fails to raise a defense to Defendants' summary judgment motion.

**TABLE OF CONTENTS**

Exhibit 1 - Declaration of Hunter Wylie........................................ 1-7

Exhibit 2 - Declaration of Lauren Wylie Donoho .................................. 8-16

Exhibit A - Loan Agreement and Promissory Note.................................. 17-23

Exhibit B - July 9, 2021 Email.................................................24

Exhibit C - July 13, 2021 Emails ........ 25-26

Exhibit D - July 20, 2021 Email ........ 27

Exhibit E - Texts ........ 28

Exhibit F - August 24, 2021 Email ........ 29

Exhibit G - Texts ........ 30

Exhibit H - Hearing Transcript-Application for Temporary Injunction ........ 31-166

Exhibit I - Plaintiff's Original Petition, Application for TRO and Request for TI and PI ........ 167-181

Exhibit J - Frost Bank Certification of Beneficial Owners ........ 182-183

Exhibit K – Big Thirst Business Plan ........ 184-212

Exhibit L – Depo Transcript of M. McGinnis ........ 213-568

Exhibit M – Confidential Settlement Agreement ........ 569-582

Exhibit N – November 5-6, 2021 Email ........ 583-586

Dated: December 3, 2025

Respectfully Submitted,

*/s/John W. Thomas*

JOHN W. THOMAS
State Bar No. 19856425
THOMAS WILLIAMS MCCONNELL PLLC
2104 San Antonio Street
Second Floor
Austin, Texas 78701
Telephone: (512) 495-1447
Email: jt@twmattorneys.com

***ATTORNEY FOR DEFENDANTS***

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing document has been forwarded to all counsel of record listed below via e-mail and through the Court's e-filing portal on December 3, 2025.

Lema Mousilli
MOUSILLI LAW, PLLC
11807 Westheimer Road
Suite 550, PMB 624
Houston, TX 77077
Telephone: (281) 305-9313
Email: lema@mousillilaw.com
*Attorney for Plaintiff*

*/s/ John W. Thomas*
John W. Thomas



1:24-CV-01512-DAE
Plaintiff
EXHIBIT
1

se 1:24-cv-01512-DAE Document 42-2 Filed 11/26/25 Page 1 of 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **HUNTER WYLIE,** *Plaintiff,* | § § § | |
| **V.** | § | **CIVIL CASE NO. 1:24-CV-01512-DAE** |
| | § § | **(JURY DEMANDED)** |
| **BIG THIRST, INC. and MATT MCGINNIS,** *Defendants,* | § § § | |

**DECLARATION OF HUNTER WYLIE IN SUPPORT OF
PLAINTIFF'S RESPONSE TO (D.I. 39)
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Hunter Wylie, hereby declare the following, which is true and correct based on my personal knowledge, or, where stated, based on information and belief:

1. My name is Hunter Wylie, and I am a party to this action ("**Plaintiff**"). I assert the facts set forth herein, which are true and correct based on my personal knowledge, unless specifically stated as based on information and belief, and, if called as a witness, I could, and would, competently testify thereto.

2. I am the Plaintiff in the case of *Hunter Wylie vs. Big Thirst Inc. and Matt McGinnis*, Case No. 1:24-cv-01512 currently pending in the Western District of Texas. I submit this declaration in support of Plaintiff's Response to (D.I. 39) Big Thirst, Inc. and Matt McGinnis's Motion for Summary Judgment ("**Motion**").

3. In late 2020, my daughter, Lauren Wylie Donoho ("**Mrs. Donoho**") approached Mr. McGinnis about developing an innovative platform that could be used to better support an e-commerce solution in the liquor industry after installing a competitor's inferior e-commerce

Page **1** | **7**

[DECLARATION OF HUNTER WYLIE IN SUPPORT OF PLAINTIFF'S RESPONSE TO (D.I. 39) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT] Case No.: 1:24-CV-01512-DAE

• This page contains no statements supporting any promise by McGinnis or Big Thirst.
• No representation of a guarantee or assumption appears here.
• Nothing suggests any communication between Plaintiff and Defendants.

1

solution. During her time at Big Thirst, Mrs. Donoho was both a director and officer—the Chief Operations Officer—of Big Thirst. Mr. McGinnis is the Chief Executive Officer (**"CEO"**) and minority shareholder of Big Thirst.

4. Specifically, on or about July 19, 2021, after numerous discussions between Mrs. Donoho and Mr. McGinnis, Mrs. Donoho relayed the agreement with Mr. McGinnis to me regarding a loan on behalf of Big Thirst, and I loaned Big Thirst the sum of $50,000 via promissory note signed by Mrs. Donoho as agent for Big Thirst in order to serve as the initial capital investment in Big Thirst and finance all of its initial operations. *See* Exhibit A. I executed the Note on or about July 19, 2021 reflecting the terms of the $50,000 Note, including its repayment and interest terms, with the parties to the Note agreeing that the Note would be effective July 22, 2021. *Id.*

The loan speaks for itself. Plaintiff is "Lender" and Lauren Donoho is "Borrower." Neither McGinnis nor Big Fish is ever mentioned. Ex. A.

5. The $50,000 Note was always made with the parties' express understanding that the $50,000 would be used solely to finance Big Thirst's operations during its initial phase of business. Notably, it was made clear that the $50,000 loan was needed in order to secure the additional funding, including the $250,000 SBA loan. In fact, prior to the initiation of the Note, on July 9, 2021, Mr. McGinnis, as a representative of Big Thirst, expressly stated "[w]e [Big Thirst] are getting a loan for $50[k]." *See* Exhibit B at 1. Mr. McGinnis, as representative of Big Thirst, sent an additional email on July 13, 2021 which expressly acknowledges an "[u]nsecured: $50k loan" as funding for Big Thirst, with Plaintiff as the lender. *See* Exhibit C at 1-2. Further, Mr. McGinnis, on behalf of Big Thirst, expressly assumed the Note the day after it was signed via both email and text message with Mrs. Donoho. *See* Exhibit D at 1; Exhibit E at 1.

Plaintiff had no communication with Defendants at all.

These communications are not addressed to Plaintiff. They contain no statement made to Plaintiff, no promise to Plaintiff, and no words of assumption of Plaintiff's Note.

No express assumption as required by Texas law.

6. Further, Mr. McGinnis, both for himself and on behalf of Big Thirst, did promise—both orally and in writing—that Big Thirst would repay the loan, knowing I was relying on those statements. Although Mr. McGinnis never made such payments, the agreement that was the subject of the oral promise (the contract between Mrs. Donoho and myself) was in writing at the time Mr.

Plaintiff had no communication with Defendants. No promises were made to Plaintiff. Also, statement is speculative.

There was no oral promise; no communication between Plaintiff and Defs.

No oral promise was made to Plaintiff. No communication between Plaintiff and Defendants. There were no statements made by Defs. to Pl.

McGinnis's oral promise was made. *See* Exhibit L at 98:5-101:15 & 282:2-15; Exhibit I at 13, ¶ 7. I explicitly relied on these statements by Mr. McGinnis in funding Big Thirst's startup costs. Additionally, at the time of the Note, Mrs. Donoho was both an officer and director of Big Thirst, and I expressly relied on this, in addition to Mr. McGinnis's statements, in loaning the money for use by Big Thirst. *See* Ex. I at 2, ¶ 3.04 & 12, ¶ 6; Ex. L at 187:4-188:8 & 282:2-15.

But she signed the loan as "Borrower," individually. The note does not mention Defendants.

7. These acknowledgements to pay continued, including when, a month later, Mr. McGinnis, again, acknowledged that the Note was part of monies used "[t]o fund [Big Thirst's] start-up costs" when clarifying to Frost Bank that the $50,000 was a loan subrogated to the SBA loan (which was not a part of the terms of the agreement), not an equity investment and noting "[t]he funds borrowed by [Mrs. Donoho] from [Plaintiff] are to cover start-up operational costs for Big Thirst [] for legal expenses, subscriptions, and contractor services." *See* Exhibit F at 1. Mr. McGinnis further confirmed this in a text with Mrs. Donoho, when he asked to list the loan as an investment not a gift. *See* Exhibit G at 1. Indeed, according to Mr. McGinnis, the funds "in the amount of $50,000 [were] to be used for startup expenses for Big Thirst" and were partially "deposited into the Big Thirst [], bank account with Frost Bank" and partially used "for business things." Exhibit H at 29:1-33:23. Additionally, in the Big Thirst Business Plan dated August 2021, Defendants acknowledge the "$50,000 in a family loan." *See* Exhibit K at 4 & 9. At the very least, according to Mr. McGinnis, himself, at least $43,000 in funds went "[e]ither in expenditures directly for the company or deposited into the bank account of [the company]." Ex. L at 98:2-24. However, the $50,000 loan funds were deposited in the account of Mrs. Donoho because Big Thirst did not have a bank account until a month after the Note was signed and funds delivered.

This could not be reasonably interpreted to be construed as a promise by Defs to pay Plaintiff.

None of this was directed to Plaintiff and none of this contained any words of promise or assumption as required under Texas law.

8. Moreover, Defendants further confirmed their assumption of the Note and Big Thirst's obligation to repay the $50,000 loaned by me, under oath on or about April 11, 2022. *See* Ex. I at 3, ¶ 3.05 & 7, ¶¶ 7-8. Mr. McGinnis, on behalf of Big Thirst, again confirmed the assumption of

Plaintiff misleadingly frames what McGinnis testified to in 2022 in his affidavit in the prior lawsuit. He stated that the loan was to be re-paid by Big Thirst, but then "[a]t the last minute, Donoho insisted that she alone be the borrower."

Further, nothing in the prior lawsuit or McGinnis' affidavit reflects an undertaking to pay Plaintiff back or to be primarily responsible for Ms. Donoho's note.

Page 3 | 7

[DECLARATION OF HUNTER WYLIE IN SUPPORT OF PLAINTIFF'S RESPONSE TO (D.I. 39) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT] Case No.: 1:24-CV-01512-DAE

3

Again, Plaintiff mis-characterizes the evidence. Ex. H is a transcript from an unrelated hearing in the prior lawsuit involving Big Thirst and Donoho. McGinnis was asked who was to repay the loan and he answered "Big Thirst, Incorporated, was to repay ***Ms. Donoho*** for the loan."

The testimony confirms that Donoho was the one responsible for the note.

There are no words of assumption, no promise to pay Plaintiff, and no evidence sufficient to defeat the statute of frauds.

the Note, and Big Thirst's obligation to repay the $50,000 loaned by me, under oath on or about April 21, 2022. *See* Ex. H at 32:5-8. Further, Mr. McGinnis specifically testified that the funds were used for start up costs, including, *inter alia*, acquiring software licenses and a web domain, and paid from Big Thirst's account with Frost Bank. *See id.* at 34:1-36:21. No other loan was finalized until much later, such that this initial loan was the majority of the monies provided as startup monies for Big Thirst. *See id.*; Ex. I at 3, ¶ 3.06 & 7, ¶¶ 7-8.

9. Accordingly, Defendants were obligated to repay the principal amount due under the Note, plus any other interest, fees, and charges under the terms and conditions set forth in the Note. Pursuant to the terms of the Note, monthly installments of $1,048.90 were to be made beginning on August 1, 2023. Yet, Defendants have failed to make a single payment under the Note. Thus, Defendants have defaulted under the Note by failing to pay the amounts due thereunder.

10. I have drafted an amortization schedule based upon the terms and conditions of the Note, which evidences the total amount owed to me by Defendants pursuant to the Note, including all interest and late fees. Pursuant to the terms of the Note, the interest rate is 5.25% per annum and there is also a late payment penalty of 2% assessed each month for any late payment, calculated based upon the amount of principal and any accrued interest under the contract. The amortization schedule includes what the original loan payout would have been if payments were made on time and the current amount owed with penalties on the first of the month when the loan remains in default.

11. As of February 7, 2025, Defendants are indebted to me in the amount of $80,488.82, plus any and all charges, interest, attorneys' fees, and costs and any other fees and amounts owed

If there were any obligation of Defendants to pay the note, it was an obligation to pay Donoho, not Plaintiff.

Plaintiff has not one iota of evidence that Defendants promised to pay Plaintiff or assumed the note.

As for Donoho, she has already been paid in settlement of the prior lawsuit multiple times the amount of the debt she took on to fund her equity in the company.

There is no evidence that Defendant ever promised to pay Plaintiff.

Plaintiff has never been able to present evidence of any assignment satisfying the statute of frauds.

These statements are legal conclusions lacking in any evidentiary basis.

Defendants had no contractual obligations to Plaintiff.

Defendants never even communicated with Plaintiff.

pursuant to the Note or by law. The Note specifically provides for attorney's fees to be paid to the prevailing party.

12. Mrs. Donoho and I attempted to settle this matter directly with Defendants, however they refused to abide by their contractual obligations.

13. As a result, on December 9, 2024, I filed the instant lawsuit alleging claims for breach of contract and unjust enrichment in order to protect his interests.

14. On November 12, 2025 Defendants filed a Motion for Summary Judgment on my claims.

15. Attached hereto as Exhibit A is a true and correct copy of the Loan Agreement and Promissory Note signed by Mrs. Donoho and myself for a $50,000 loan for startup costs for Big Thirst, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE154-WYLIE160.

16. Attached hereto as Exhibit B is a true and correct copy of an email exchange between Matt McGinnis, Mrs. Donoho, and Big Thirst's corporations advisor, Kareem Hajjar, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE001-WYLIE001.

17. Attached hereto as Exhibit C is a true and correct copy of an email exchange between Matt McGinnis, Mrs. Donoho, and Big Thirst's corporations advisor, Kareem Hajjar, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE002-WYLIE002.

18. Attached hereto as Exhibit D is a true and correct copy of an email exchange between Matt McGinnis and Mrs. Donoho acknowledging that the Note had been signed to fund Big Thirst, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE004-WYLIE004.

The attached exhibits are part of the "haystack" strategy. Plaintiff hopes the Court will assume the existence of a needle among all this hay.

A review of the haystack shows that there is no needle -- the email Plaintiff claimed over and over again existed, doesn't.

And not one of these exhibits contain any evidence creating a genuine issue of material fact defeating Defendants' motion for summary judgment.

Page 5 | 7

[DECLARATION OF HUNTER WYLIE IN SUPPORT OF PLAINTIFF'S RESPONSE TO (D.I. 39) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT] Case No.: 1:24-CV-01512-DAE

5

None of the referenced exhibits—whether text messages, emails, prior pleadings, bank records, or hearing transcripts—contain any writing signed by Defendants agreeing to repay Plaintiff, nor do they contain any communication to Plaintiff reflecting such a commitment. Accordingly, these exhibits do not raise a genuine issue of material fact on any element necessary to avoid summary judgment, including contract formation, an assumption of debt, satisfaction of the statute of frauds, or any applicable exception to the statute of frauds.

19. Attached hereto as Exhibit E is a true and correct copy of a screenshot of text messages exchanged on July 20, 2021 between Mrs. Donoho and Mr. McGinnis, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE005-WYLIE005.

20. Attached hereto as Exhibit F is a true and correct copy of an email exchange between Matt McGinnis, Mrs. Donoho, and Big Thirst's advisors at Frost Bank, Jacquelyn Tomlinson and Danielle Quintero, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE014-WYLIE014.

21. Attached hereto as Exhibit G is a true and correct copy of a screenshot of text messages exchanged on November 17, 2021 between Mrs. Donoho and Mr. McGinnis, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE015-WYLIE015.

22. Attached hereto as Exhibit H is a true and correct copy of the transcript from the hearing for Application of Temporary Injunction held on April 21, 2022 in the case *Big Thirst, Inc. v. Lauren Wylie Donoho*, No. D-1-GN-22-001678, in the 459th Judicial District Court of Travis County, Texas, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE016-WYLIE151.

23. Attached hereto as Exhibit I is a true and correct copy of the verified original petition and supporting affidavit of Mr. McGinnis filed on April 11, 2022 in the case *Big Thirst, Inc. v. Lauren Wylie Donoho*, No. D-1-GN-22-001678, in the 459th Judicial District Court of Travis County, Texas, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE161-WYLIE175.

24. Attached hereto as Exhibit J is a true and correct copy of a Certification of Beneficial Owners for Big Thirst's Frost Bank account dated July 2, 2021 listing both Mr.

None of the referenced exhibits—whether text messages, emails, prior pleadings, bank records, or hearing transcripts—contain any writing signed by Defendants agreeing to repay Plaintiff, nor do they contain any communication to Plaintiff reflecting such a commitment. Accordingly, these exhibits do not raise a genuine issue of material fact on any element necessary to avoid summary judgment, including contract formation, an assumption of debt, satisfaction of the statute of frauds, or any applicable exception to the statute of frauds.

McGinnis and Mrs. Donoho as owners, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE187-WYLIE188.

25. Attached hereto as Exhibit K is a true and correct copy of the Big Thirst, Inc. Business Plan dated August 2021, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE189-WYLIE217.

26. Attached hereto as Exhibit L is a true and correct copy of the transcript from the videotaped deposition of Matt McGinnis on March 28, 2024 in the case *Big Thirst, Inc. v. Lauren Wylie Donoho*, 1:22-CV-00467-RP, in the Austin Division of the United States District Court for the Western District of Texas, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE268-WYLIE623.

27. Attached hereto as Exhibit M is a true and correct copy of the Confidential Settlement Agreement between both Defendants and Mrs. Donoho, acknowledging Mrs. Donoho's status as an officer and director of Big Thirst, confirming I was not part of the settlement, and resolving the dispute in *Big Thirst, Inc. v. Lauren Wylie Donoho*, 1:22-CV-00467-RP, in the Austin Division of the United States District Court for the Western District of Texas, as produced by Defendants and served on Plaintiff in this case on March 18, 2025 as documents Bates labeled D000007-D000020.

28. Attached hereto as Exhibit N is a true and correct copy of an email exchange between Matt McGinnis and Mrs. Donoho, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE260-WYLIE263.

I declare under penalty of perjury under the laws of the State of Texas and the United States of America that the foregoing is true and correct, and that this declaration is executed on November 26, 2025, at St. Paul, Marion County, Oregon.

Hunter Wylie

None of Lauren Donoho's declaration offers any evidence of a promise by Defendants to pay Plaintiff. There is no evidence of an assumption of the debt in compliance with the statute of frauds.

1:24-CV-01512-DAE
Plaintiff
EXHIBIT
2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **HUNTER WYLIE,** *Plaintiff,* | § § § | |
| **V.** | § § | **CIVIL CASE NO. 1:24-CV-01512-DAE** |
| | § | **(JURY DEMANDED)** |
| **BIG THIRST, INC. and MATT MCGINNIS,** *Defendants,* | § § § | |

**DECLARATION OF LAUREN WYLIE DONOHO IN SUPPORT OF PLAINTIFF'S RESPONSE TO (D.I. 39) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Lauren Wylie Donoho, hereby declare the following, which is true and correct based on my personal knowledge, or, where stated, based on information and belief:

1. My name is Lauren Wylie Donoho, I am a founder, owner, and was the Chief Operating Officer of Defendant, Big Thirst, Inc. ("**Plaintiff**"). I assert the facts set forth herein, which are true and correct based on my personal knowledge, unless specifically stated as based on information and belief, and, if called as a witness, I could, and would, competently testify thereto.

2. I submit this declaration in support of Plaintiff's Response to (D.I. 39) Big Thirst, Inc. and Matt McGinnis's Motion for Summary Judgment ("**Motion**").

3. Since 2010, I have been in website design, digital marketing, solutions development, and project management. I have built and managed over fifty (50) websites of all sizes as an independent contractor for creative agencies and personal clients. Twenty-five (25) of them are Shopify stores. The largest is a multi-site WordPress site for a publicly-traded company valued at $1.5 billion, where I managed multiple agency and client-side teams.

Page **1 | 9**

[DECLARATION OF LAUREN WYLIE DONOHO IN SUPPORT OF PLAINTIFF'S RESPONSE TO (D.I. 39) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT] Case No.: 1:24-CV-01512-DAE

8

All this background is irrelevant to the issues presented in Defendants' Motion for Summary Judgment.

4. I am a co-founder of Big Thirst, Inc. ("**Big Thirst**") along with additional co-founder Matt McGinnis ("**Mr. McGinnis**"). I am familiar with the creation and organization of Big Thirst, an e-commerce company for clients in the liquor industry.

5. In late 2020, I approached Mr. McGinnis about developing an innovative platform that could be used to better support an e-commerce solution in the liquor industry after installing a competitor's inferior e-commerce solution.

6. In late 2020, I approached Mr. McGinnis about developing the innovative platform. During January 2021, Mr. McGinnis and I agreed to a 50/50 partnership to form Big Thirst and began working together on its development. In January 2021, we contracted a financial advisor to build out a 3-year projections for Big Thirst. As part of the payment, I built the advisor's website and logo, as the plan was to trade work as payment for her financial planning services.

7. From January 2021 to October 6, 2021, I worked full-time on developing the tech stack, including the website bigthirst.com, the source code for the order management and fulfillment system, and all of Big Thirst's operations. On February 3, 2021, I provided Mr. McGinnis with a prototype of an e-commerce environment built on the same Shopify instance that Big Thirst's current bigthirst.myshopify.com ran on.

8. Unbeknownst to me, on March 3, 2021, Mr. McGinnis formed Big Thirst with himself as sole director and shareholder. I later learned he did so using funds generated by my work during the trade deal with the financial advisor noted in paragraph 6, despite my being directly involved in its formation, operation, and funding. After I discovered that Mr. McGinnis had created Big Thirst with himself as sole owner behind my back, I confronted him about it, and we eventually agreed that I would own 45% of the company. Mr. McGinnis later diluted this percentage to 27%, as represented by the 2,700,000 shares of Big Thirst's common stock given to me.

Page **2 | 9**

[DECLARATION OF LAUREN WYLIE DONOHO IN SUPPORT OF PLAINTIFF'S RESPONSE TO (D.I. 39) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT] Case No.: 1:24-CV-01512-DAE

9

9. Prior to leaving Big Thirst, I made repeated requests for shareholder and corporate governance information and documents; however, none of that information was provided to me. On December 13, 2022, I sent Big Thirst a formal demand for inspection of books and records. After a six-month delay, I finally received information in response to my request from June of 2023. After reviewing the information I received, I found that the documents reflected that my interest in Big Thirst had been improperly and substantially reduced to 19.29%, which is a sizeable difference from my promised 27%.

10. Mr. McGinnis is the Chief Executive Officer (**"CEO"**) and majority shareholder of Big Thirst. As such, Mr. McGinnis is the principal operator of Big Thirst and personally makes decisions regarding, participates in, directs, exercises control over, and benefits from Big Thirst's unlawful activities. However, neither Mr. McGinnis, nor any of the other Board members, which consist of Mr. McGinnis's wife and best friend, have ever operated any e-commerce platforms, developed data and analytics reports, built websites, merchant systems, or set up technical solutions for any scale of operations. Although Mr. McGinnis made himself the majority owner of Big Thirst, again using my funds, all he did was name it and incorporate it. He built none of it and contributed 10% of the working capital, whereas I worked with my father to contribute 90% of the working capital ($50,000), managed every aspect of the organization including all of the day-to-day operations, and built all of the operations and tech stack. In fact, Mr. McGinnis did not open a bank account for Big Thirst until August 23, 2021.

She acknowledges that the money from her father was her contribution to the company's working capital.

But no evidence, again, of any promise by Defendants to pay Plaintiff.

There is no dispute that Plaintiff loaned money to Lauren Donoho. What is disputed is that Defendants ever promised to assume that day and pay Plaintiff.

11. Specifically, on or about July 19, 2021, Plaintiff loaned me, an officer and director of Big Thirst, via promissory note, the sum of $50,000 in order to serve as the initial capital investment in Big Thirst and finance all of its initial operations and secure a $250,000 SBA loan. *See* Exhibit A. I executed the Note on or about July 19, 2021 after receiving approval from Mr.

The failure to specifically identify "the parties to the Note" here seems like deliberate obfuscation. The parties to the note were Plaintiff and Donoho. Neither McGinnis nor Big Thirst were ever even mentioned in the note. Donoho signed the note in her individual capacity.

McGinnis via email, reflecting the terms of the $50,000 Note, including its repayment and interest terms, with the parties to the Note agreeing that the Note would be effective July 22, 2021. *Id.* The funds were originally deposited into my personal account since Mr. McGinnis failed to open a corporate bank account until late August 2021, five and a half months after he incorporated the company and two months prior to our public launch in October. All funds were approved by Mr. McGinnis prior to purchasing.

None of these representations were to Plaintiff. None constitute a promise to repay.

12. The $50,000 Note was always made with the parties' express understanding that the $50,000 would be used solely to finance Big Thirst's operations during its initial phase of business. In fact, prior to the initiation of the Note, on July 9, 2021, Mr. McGinnis, as a representative of Big Thirst, expressly stated "[w]e [Big Thirst] are getting a loan for $50[k]." *See* Exhibit B at 1. Mr. McGinnis, as representative of Big Thirst, sent an additional email on July 13, 2021 which expressly acknowledges an "[u]nsecured: $50k loan" as funding for Big Thirst, with Plaintiff as the lender. *See* Exhibit C at 1-2. Further, Mr. McGinnis, on behalf of Big Thirst, expressly assumed the Note the day after it was signed via both email and text message with me. *See* Exhibit D at 1; Exhibit E at 1.

Ms. Donoho misconstrues the evidence here. There was never an express assumption of the Note.

Ex. D is an email which confirms that the debt belongs to Donoho. Nothing in the email suggests Defendants assumed the debt.

Ex. E similarly is a text message where all McGinnis says is "Thank you." There is nothing to suggest that Defendants assumed the debt.

This is the best they can rely on to show "express assum[ption]"? Plaintiff has no evidence.

Further, this is an unsubstantiated legal conclusion.

13. Further, Mr. McGinnis, both for himself and on behalf of Big Thirst, did promise—both orally and in writing—that Big Thirst would repay the loan, knowing Plaintiff was relying on those statements. Although he never did, the agreement that was the subject of the oral promise (the contract between Plaintiff and myself) was in writing at the time Mr. McGinnis's oral promise was made. *See* Exhibit L at 98:5-101:15 & 282:2-15; Exhibit I at 13, ¶ 7. Plaintiff relied on these statements by funding Big Thirst's startup costs. Additionally, at the time of the Note, I was both an officer and director of Big Thirst, and Plaintiff relied on this, in addition to Mr. McGinnis's

Defendants never promised, not in writing or orally, to pay Plaintiff. Defendants did plan on paying Ms. Donoho back for the money she invested in the company, but never agreed to pay Plaintiff back. Donoho is being misleading when she says Big Thirst "would repay the loan," when she knows that if there was any agreement to "repay the loan" it was to pay Donoho, not Plaintiff.

It is also pure speculation that McGinnis "kn[ew] Plaintiff was relying on those statements." McGinnis never even spoke to Plaintiff.

In light of the lack of evidence, this statement is an objectionable legal conclusion.

Ex. L is the deposition transcript of McGinnis' deposition in the prior lawsuit involving Donoho. McGinnis' testimony is entirely consistent with what Defendants have been arguing all along in this case. McGinnis makes clear that there was no agreement -- oral or written -- with Donoho's father, the Plaintiff in the present case. 98:25-99:6. Instead, there was a verbal agreement with Donoho. 99:16-21.

Donoho misleadingly frames the "oral agreement" as one to "repay the loan," but it was -- if anything -- an agreement to pay Donoho, *not* an agreement to pay *Plaintiff*.

Paragraph 14 contains no evidence of any promise—written or oral—by Defendants to Plaintiff to assume or repay the Note.

Every statement cited reflects only (i) how the borrowed funds were used, (ii) that Donoho told others the funds were for Big Thirst's startup costs, or (iii) Defendants' understanding that Donoho, as borrower, would be repaid for her capital contributions. None of this creates a contract with Plaintiff or satisfies the statute of frauds.

Plaintiff repeatedly conflates "acknowledging that Donoho borrowed money and used it for the company" with "promising to repay Plaintiff." They are not the same.

The cited exhibits contain no communication directed to Plaintiff, no assumption language, and no written promise by Defendants to pay Plaintiff.

Even the business-plan reference ("$50,000 in a family loan") merely describes the source of Donoho's contribution—not any obligation by Big Thirst to repay her father. And the transcript cites say only that funds were used for startup expenses—not that Defendants undertook personal liability to Plaintiff.

These assertions are therefore legally irrelevant to contract formation, assumption, promissory estoppel, or any statute-of-frauds exception and do not raise a genuine issue of material fact.

statements, in loaning the money for use by Big Thirst. *See* Ex. I at 2, ¶ 3.04 & 12, ¶ 6; Ex. L at 187:4-188:8 & 282:2-15.

14. These acknowledgements continued, including when, a month later, Mr. McGinnis, again, acknowledged that the Note was part of monies used "[t]o fund [Big Thirst's] start-up costs" when clarifying to Frost Bank that the $50,000 was a loan, not an equity investment and noting "[t]he funds borrowed by [Mrs. Donoho] from [Plaintiff] are to cover start-up operational costs for Big Thirst [] for legal expenses, subscriptions, and contractor services." *See* Exhibit F at 1. Mr. McGinnis further confirmed this in a text with me, when he asked to list the loan as an investment not a gift. See Exhibit G at 1. Indeed, according to Mr. McGinnis, the funds "in the amount of $50,000 [were] to be used for startup expenses for Big Thirst" and were partially "deposited into the Big Thirst [], bank account with Frost Bank" and partially used "for business things." Exhibit H at 29:1-33:23. Additionally, in the Big Thirst Business Plan dated August 2021, Defendants acknowledge the "$50,000 in a family loan." *See* Exhibit K at 4 & 9. At the very least, according to Mr. McGinnis, himself, at least $43,000 in funds went "[e]ither in expenditures directly for the company or deposited into the bank account of [the company]." Ex. L at 98:2-24. All of the funds were used for the company and itemized details were sent in April 2022 prior to my resignation.

15. Moreover, Defendants further confirmed their assumption of the Note and Big Thirst's obligation to repay the $50,000 loaned by Plaintiff under oath on or about April 11, 2022. *See* Ex. I at 3, ¶ 3.05 & 7, ¶¶ 7-8. Mr. McGinnis, on behalf of Big Thirst, again confirmed the assumption of the Note, and Big Thirst's obligation to repay the $50,000 loaned by Plaintiff, under oath on or about April 21, 2022. *See* Ex. H at 32:5-8. Further, Mr. McGinnis specifically testified that the funds were used for start up costs, including, *inter alia*, acquiring software licenses and a web domain, and paid from Big Thirst's account with Frost Bank. *See id.* at 34:1-36:21. No other

Page **5** | **9**

[DECLARATION OF LAUREN WYLIE DONOHO IN SUPPORT OF PLAINTIFF'S RESPONSE TO (D.I. 39) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT] Case No.: 1:24-CV-01512-DAE

Plaintiff again mischaracterizes the evidence. The transcript pages cited do not show Defendants assuming Plaintiff's Note. They show only that:

- Defendants confirmed Donoho used the loan proceeds for Big Thirst's startup costs.
- Defendants acknowledged that Donoho sought reimbursement for her expenditures.
- Defendants explained how the funds flowed—NOT that Defendants agreed to repay Plaintiff.
- No cited testimony includes any statement by McGinnis agreeing to be primarily responsible for Plaintiff's debt, as required for the main-purpose doctrine.

Plaintiff's repeated assertion that Defendants "confirmed assumption of the Note" is flatly contradicted by the transcript itself. No witness testified that Defendants promised Plaintiff anything, orally or in writing. No assumption language appears on any cited page.

As with ¶14, these facts—accepted as true—do not create a contract with Plaintiff, do not constitute an assumption, and do not satisfy any exception to the statute of frauds. They therefore cannot raise a genuine issue of material fact.

This paragraph contains pure legal conclusion and misstates the record. Defendants never signed the Note, never agreed to assume the Note, and never made any written or oral promise to Plaintiff to pay the Note. The Note itself contains no language binding Defendants, and Plaintiff cites no communication in which Defendants agreed to be liable. Plaintiff's unilateral assertion that Defendants were "obligated" is insufficient to create a genuine issue of material fact under Rule 56.

loan was finalized until much later, such that this initial loan was the majority of the monies provided as startup monies for Big Thirst. *See id.*; Ex. I at 3, ¶ 3.06 & 7, ¶¶ 7-8.

16. Accordingly, Defendants were obligated to repay the principal amount due under the Note, plus any other interest, fees, and charges under the terms and conditions set forth in the Note. Pursuant to the terms of the Note, monthly installments of $1,048.90 were to be made beginning on August 1, 2023. Yet, Defendants have failed to make a single payment under the Note. Thus, Defendants have defaulted under the Note by failing to pay the amounts due thereunder.

Again, Plaintiff asserts liability without identifying any evidence establishing privity, assumption, or agreement. An unsupported damages calculation does not create liability. The declaration cites no document demonstrating Defendants ever agreed to repay Plaintiff, and the referenced "indebtedness" arises solely under a Note to which Defendants are strangers. Unsupported ipse dixit statements do not defeat summary judgment.

17. As of February 7, 2025, Defendants are indebted to Plaintiff in the amount of $80,488.82, plus any and all charges, interest, attorneys' fees, and costs and any other fees and amounts owed pursuant to the Note or by law. The Note specifically provides for attorney's fees to be paid to the prevailing party.

18. Plaintiff and myself attempted to settle this matter directly with Defendants, however they refused to abide by their contractual obligations.

19. As a result, on December 9, 2024, Plaintiff filed a lawsuit alleging claims for breach of contract and unjust enrichment in order to protect his interests.

20. On November 12, 2025 Defendants filed a Motion for Summary Judgment on all of Plaintiff's claims.

Plaintiff's Exhibit A confirms that the Note is strictly between Plaintiff and Donoho, not between Plaintiff and Defendants. The document contains no signatures or obligations of Big Thirst or McGinnis, and no language binding them. This exhibit actually negates Plaintiff's claim by proving that Defendants were not parties to the Note. It does not create any fact issue regarding assumption or promise by Defendants.

21. Attached hereto as Exhibit A is a true and correct copy of the Loan Agreement and Promissory Note signed by Plaintiff and myself for a $50,000 loan for startup costs for Big Thirst, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE154-WYLIE160.

22. Attached hereto as Exhibit B is a true and correct copy of an email exchange

The email exchange in Ex. B contains no statement by Defendants agreeing to repay Plaintiff, no reference to assuming the Note, and no promissory language directed to Plaintiff. At most, the emails show discussion of Big Thirst's internal financing and operations. None of this satisfies the statute of frauds or the elements of contract formation or assumption. The exhibit is irrelevant to the question of whether Defendants ever agreed to repay the Note.

Page **6 | 9**

[DECLARATION OF LAUREN WYLIE DONOHO IN SUPPORT OF PLAINTIFF'S RESPONSE TO (D.I. 39) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT] Case No.: 1:24-CV-01512-DAE

13

The exhibits identified in ¶¶ 23–27 consist of emails and text messages that do not contain any promise by Defendants to repay Plaintiff, any assumption of the Note, or any communication directed to Plaintiff creating contractual liability. At most, they reflect internal discussions about company operations and the fact that Donoho obtained a loan from her father.

None of these documents include language satisfying the statute of frauds, none create a contract with Plaintiff, and none raise a genuine issue of material fact on any element of Plaintiff's claims.

between Matt McGinnis, myself, and our corporations advisor, Kareem Hajjar, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE001-WYLIE001.

23. Attached hereto as Exhibit C is a true and correct copy of an email exchange between Matt McGinnis, myself, and our corporations advisor, Kareem Hajjar, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE002-WYLIE002.

24. Attached hereto as Exhibit D is a true and correct copy of an email exchange between Matt McGinnis and myself acknowledging that the Note had been signed to fund Big Thirst, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE004-WYLIE004.

25. Attached hereto as Exhibit E is a true and correct copy of a screenshot of text messages exchanged on July 20, 2021 between myself and Defendant McGinnis, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE005-WYLIE005.

26. Attached hereto as Exhibit F is a true and correct copy of an email exchange between Matt McGinnis, myself, and our advisors at Frost Bank, Jacquelyn Tomlinson and Danielle Quintero, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE014-WYLIE014.

27. Attached hereto as Exhibit G is a true and correct copy of a screenshot of text messages exchanged on November 17, 2021 between myself and Defendant McGinnis, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE015-WYLIE015.

Page 7 | 9

[DECLARATION OF LAUREN WYLIE DONOHO IN SUPPORT OF PLAINTIFF'S RESPONSE TO (D.I. 39) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT] Case No.: 1:24-CV-01512-DAE

14

The exhibits referenced in ¶¶ 28–33—including prior litigation transcripts, pleadings, affidavits, a Frost Bank beneficial-owner form, the Business Plan, and excerpts from a separate deposition—do not contain any promise by Defendants to repay Plaintiff, any assumption of Plaintiff's Note, or any writing satisfying the statute of frauds. These materials relate to prior disputes, corporate governance, ownership, or the company's use of startup funds—not to any agreement with Plaintiff. None of these exhibits create contractual liability, establish an exception to the statute of frauds, or raise a genuine issue of material fact relevant to Plaintiff's claims.

28. Attached hereto as Exhibit H is a true and correct copy of the transcript from the hearing for Application of Temporary Injunction held on April 21, 2022 in the case *Big Thirst, Inc. v. Lauren Wylie Donoho*, No. D-1-GN-22-001678, in the 459th Judicial District Court of Travis County, Texas, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE016-WYLIE151.

29. Attached hereto as Exhibit I is a true and correct copy of the verified original petition and affidavit of Mr. McGinnis filed on April 11, 2022 in the case *Big Thirst, Inc. v. Lauren Wylie Donoho*, No. D-1-GN-22-001678, in the 459th Judicial District Court of Travis County, Texas, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE161-WYLIE175.

30. Attached hereto as Exhibit J is a true and correct copy of a Certification of Beneficial Owners for Big Thirst's Frost Bank account dated July 2, 2021 listing both Mr. McGinnis and myself as owners, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE187-WYLIE188.

31. Attached hereto as Exhibit K is a true and correct copy of the Big Thirst, Inc. Business Plan dated August 2021, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE189-WYLIE217.

32. Attached hereto as Exhibit L is a true and correct copy of the transcript from the videotaped deposition of Matt McGinnis on March 28, 2024 in the case *Big Thirst, Inc. v. Lauren Wylie Donoho*, 1:22-CV-00467-RP, in the Austin Division of the United States District Court for the Western District of Texas, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE268-WYLIE623.

33. Attached hereto as Exhibit M is a true and correct copy of the Confidential

Page **8** | **9**

[DECLARATION OF LAUREN WYLIE DONOHO IN SUPPORT OF PLAINTIFF'S RESPONSE TO (D.I. 39) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT] Case No.: 1:24-CV-01512-DAE

15

Settlement Agreement between both Defendants and myself, acknowledging my status as an officer and director of Big Thirst and resolving the dispute in *Big Thirst, Inc. v. Lauren Wylie Donoho*, 1:22-CV-00467-RP, in the Austin Division of the United States District Court for the Western District of Texas, as produced by Defendants and served on Plaintiff in this case on March 18, 2025 as documents Bates labeled D000007-D000020.

Ex. N does not appear to have been mentioned by Plaintiff in the response. It is part of the apparent "haystack" strategy, but it's no needle. The email is no evidence of any agreement between Defendants and Plaintiff or Defendants' assumption of the Note.

34. Attached hereto as Exhibit N is a true and correct copy of an email exchange between Matt McGinnis and myself, as produced by Plaintiff and served on Defendants in this case on October 9, 2025 as documents Bates labeled WYLIE260-WYLIE263.

I declare under penalty of perjury under the laws of the State of Texas and the United States of America that the foregoing is true and correct, and that this declaration is executed on November 26, 2026, at Newberg, Yamhill County, Oregon.

Lauren Wylie Donoho

• Shows only the terms of Plaintiff's own loan to Donoho.
• No indication Defendants were part of the transaction.
• Supports that it was her debt, not theirs.

1:24-CV-01512-DAE
Plaintiff
EXHIBIT
A

## LOAN AGREEMENT AND PROMISSORY NOTE

THIS LOAN AGREEMENT AND PROMISSORY NOTE (the "Note"), is made this 19th day of July, 2021, by and among Hunter Wylie (hereinafter, known as "LENDER") and Lauren Wylie Donoho (hereinafter, known as "BORROWER"). BORROWER and LENDER shall collectively be known herein as "the Parties". In determining the rights and duties of the Parties under this Loan Agreement, the entire document must be read as a whole.

### PROMISSORY NOTE

FOR VALUE RECEIVED, BORROWER promises to repay to the order of LENDER, the sum of $50,000.00 dollars together with interest thereon at a rate of 5.25 percent (%) per annum.

### ADDITIONAL LOAN TERMS

The BORROWER and LENDER, hereby further set forth their rights and obligations to one another under this Loan Agreement and Promissory Note and agree to be legal bound as follows:

A. **Principal Loan Amount $50,000.00**
B. **Loan Repayment Terms.**
   a. BORROWER will make payment(s) to LENDER in monthly payments according to the following schedule starting August 1, 2023.

| Loan Amount | Interest Rate | Term in Years | Monthly Payment | Extra Monthly | Deferred | |
|---|---|---|---|---|---|---|
| $50,000.00 | 5.25% | 7 | **$1,048.90** | 0 | $0 | |

| Month | StartingBalance | You Paid | Interest | Principal | EndingBalance | TotalInterest |
|---|---|---|---|---|---|---|
| 1 | $50,000.00 | $0.00 | $218.75 | | | $218.75 |
| 2 | $50,000.00 | $0.00 | $218.75 | | | $437.50 |
| 3 | $50,000.00 | $0.00 | $218.75 | | | $656.25 |
| 4 | $50,000.00 | $0.00 | $218.75 | | | $875.00 |
| 5 | $50,000.00 | $0.00 | $218.75 | | | $1,093.75 |
| 6 | $50,000.00 | $0.00 | $218.75 | | | $1,312.50 |
| 7 | $50,000.00 | $0.00 | $218.75 | | | $1,531.25 |
| 8 | $50,000.00 | $0.00 | $218.75 | | | $1,750.00 |
| 9 | $50,000.00 | $0.00 | $218.75 | | | $1,968.75 |
| 10 | $50,000.00 | $0.00 | $218.75 | | | $2,187.50 |

WYLIE 154

LOAN AGREEMENT AND PROMISSORY NOTE

| | | | | | | |
|---|---|---|---|---|---|---|
| 11 | $50,000.00 | $0.00 | $218.75 | | | $2,406.25 |
| 12 | $50,000.00 | $0.00 | $218.75 | | | $2,625.00 |
| 13 | $50,000.00 | $0.00 | $218.75 | | | $2,843.75 |
| 14 | $50,000.00 | $0.00 | $218.75 | | | $3,062.50 |
| 15 | $50,000.00 | $0.00 | $218.75 | | | $3,281.25 |
| 16 | $50,000.00 | $0.00 | $218.75 | | | $3,500.00 |
| 17 | $50,000.00 | $0.00 | $218.75 | | | $3,718.75 |
| 18 | $50,000.00 | $0.00 | $218.75 | | | $3,937.50 |
| 19 | $50,000.00 | $0.00 | $218.75 | | | $4,156.25 |
| 20 | $50,000.00 | $0.00 | $218.75 | | | $4,375.00 |
| 21 | $50,000.00 | $0.00 | $218.75 | | | $4,593.75 |
| 22 | $50,000.00 | $0.00 | $218.75 | | | $4,812.50 |
| 23 | $50,000.00 | $0.00 | $218.75 | | | $5,031.25 |
| 24 | $50,000.00 | $0.00 | $218.75 | | | $5,250.00 |
| 25 | $55,250.00 | $1,048.90 | $241.72 | $807.18 | $54,442.82 | $5,468.75 |
| 26 | $54,442.82 | $1,048.90 | $238.19 | $810.71 | $53,632.11 | $5,710.47 |
| 27 | $53,632.11 | $1,048.90 | $234.64 | $814.26 | $52,817.85 | $5,948.66 |
| 28 | $52,817.85 | $1,048.90 | $231.08 | $817.82 | $52,000.03 | $6,183.30 |
| 29 | $52,000.03 | $1,048.90 | $227.50 | $821.40 | $51,178.63 | $6,414.37 |
| 30 | $51,178.63 | $1,048.90 | $223.91 | $824.99 | $50,353.64 | $6,641.87 |
| 31 | $50,353.64 | $1,048.90 | $220.30 | $828.60 | $49,525.03 | $6,865.78 |
| 32 | $49,525.03 | $1,048.90 | $216.67 | $832.23 | $48,692.81 | $7,086.08 |
| 33 | $48,692.81 | $1,048.90 | $213.03 | $835.87 | $47,856.94 | $7,302.75 |
| 34 | $47,856.94 | $1,048.90 | $209.37 | $839.53 | $47,017.41 | $7,515.78 |
| 35 | $47,017.41 | $1,048.90 | $205.70 | $843.20 | $46,174.22 | $7,725.16 |
| 36 | $46,174.22 | $1,048.90 | $202.01 | $846.89 | $45,327.33 | $7,930.86 |
| 37 | $45,327.33 | $1,048.90 | $198.31 | $850.59 | $44,476.74 | $8,132.87 |
| 38 | $44,476.74 | $1,048.90 | $194.59 | $854.31 | $43,622.42 | $8,331.18 |
| 39 | $43,622.42 | $1,048.90 | $190.85 | $858.05 | $42,764.37 | $8,525.76 |
| 40 | $42,764.37 | $1,048.90 | $187.09 | $861.81 | $41,902.57 | $8,716.61 |
| 41 | $41,902.57 | $1,048.90 | $183.32 | $865.58 | $41,036.99 | $8,903.70 |
| 42 | $41,036.99 | $1,048.90 | $179.54 | $869.36 | $40,167.63 | $9,087.03 |
| 43 | $40,167.63 | $1,048.90 | $175.73 | $873.17 | $39,294.46 | $9,266.56 |
| 44 | $39,294.46 | $1,048.90 | $171.91 | $876.99 | $38,417.48 | $9,442.30 |
| 45 | $38,417.48 | $1,048.90 | $168.08 | $880.82 | $37,536.65 | $9,614.21 |

WYLIE 155 2



LOAN AGREEMENT AND PROMISSORY NOTE

| | | | | | | |
|---|---|---|---|---|---|---|
| 46 | $37,536.65 | $1,048.90 | $164.22 | $884.68 | $36,651.98 | $9,782.29 |
| 47 | $36,651.98 | $1,048.90 | $160.35 | $888.55 | $35,763.43 | $9,946.51 |
| 48 | $35,763.43 | $1,048.90 | $156.47 | $892.43 | $34,871.00 | $10,106.86 |
| 49 | $34,871.00 | $1,048.90 | $152.56 | $896.34 | $33,974.66 | $10,263.33 |
| 50 | $33,974.66 | $1,048.90 | $148.64 | $900.26 | $33,074.40 | $10,415.89 |
| 51 | $33,074.40 | $1,048.90 | $144.70 | $904.20 | $32,170.20 | $10,564.53 |
| 52 | $32,170.20 | $1,048.90 | $140.74 | $908.15 | $31,262.05 | $10,709.23 |
| 53 | $31,262.05 | $1,048.90 | $136.77 | $912.13 | $30,349.92 | $10,849.97 |
| 54 | $30,349.92 | $1,048.90 | $132.78 | $916.12 | $29,433.80 | $10,986.74 |
| 55 | $29,433.80 | $1,048.90 | $128.77 | $920.13 | $28,513.67 | $11,119.53 |
| 56 | $28,513.67 | $1,048.90 | $124.75 | $924.15 | $27,589.52 | $11,248.30 |
| 57 | $27,589.52 | $1,048.90 | $120.70 | $928.20 | $26,661.33 | $11,373.05 |
| 58 | $26,661.33 | $1,048.90 | $116.64 | $932.26 | $25,729.07 | $11,493.75 |
| 59 | $25,729.07 | $1,048.90 | $112.56 | $936.33 | $24,792.74 | $11,610.39 |
| 60 | $24,792.74 | $1,048.90 | $108.47 | $940.43 | $23,852.30 | $11,722.96 |
| 61 | $23,852.30 | $1,048.90 | $104.35 | $944.55 | $22,907.76 | $11,831.43 |
| 62 | $22,907.76 | $1,048.90 | $100.22 | $948.68 | $21,959.08 | $11,935.78 |
| 63 | $21,959.08 | $1,048.90 | $96.07 | $952.83 | $21,006.25 | $12,036.00 |
| 64 | $21,006.25 | $1,048.90 | $91.90 | $957.00 | $20,049.26 | $12,132.07 |
| 65 | $20,049.26 | $1,048.90 | $87.72 | $961.18 | $19,088.07 | $12,223.97 |
| 66 | $19,088.07 | $1,048.90 | $83.51 | $965.39 | $18,122.68 | $12,311.69 |
| 67 | $18,122.68 | $1,048.90 | $79.29 | $969.61 | $17,153.07 | $12,395.20 |
| 68 | $17,153.07 | $1,048.90 | $75.04 | $973.85 | $16,179.22 | $12,474.49 |
| 69 | $16,179.22 | $1,048.90 | $70.78 | $978.12 | $15,201.10 | $12,549.53 |
| 70 | $15,201.10 | $1,048.90 | $66.50 | $982.39 | $14,218.71 | $12,620.32 |
| 71 | $14,218.71 | $1,048.90 | $62.21 | $986.69 | $13,232.02 | $12,686.82 |
| 72 | $13,232.02 | $1,048.90 | $57.89 | $991.01 | $12,241.01 | $12,749.03 |
| 73 | $12,241.01 | $1,048.90 | $53.55 | $995.34 | $11,245.66 | $12,806.92 |
| 74 | $11,245.66 | $1,048.90 | $49.20 | $999.70 | $10,245.96 | $12,860.47 |
| 75 | $10,245.96 | $1,048.90 | $44.83 | $1,004.07 | $9,241.89 | $12,909.67 |
| 76 | $9,241.89 | $1,048.90 | $40.43 | $1,008.47 | $8,233.42 | $12,954.50 |
| 77 | $8,233.42 | $1,048.90 | $36.02 | $1,012.88 | $7,220.54 | $12,994.93 |
| 78 | $7,220.54 | $1,048.90 | $31.59 | $1,017.31 | $6,203.24 | $13,030.95 |
| 79 | $6,203.24 | $1,048.90 | $27.14 | $1,021.76 | $5,181.48 | $13,062.54 |
| 80 | $5,181.48 | $1,048.90 | $22.67 | $1,026.23 | $4,155.25 | $13,089.68 |

3

WYLIE 156

| | | | | | | |
|---|---|---|---|---|---|---|
| 81 | $4,155.25 | $1,048.90 | $18.18 | $1,030.72 | $3,124.53 | $13,112.35 |
| 82 | $3,124.53 | $1,048.90 | $13.67 | $1,035.23 | $2,089.30 | $13,130.53 |
| 83 | $2,089.30 | $1,048.90 | $9.14 | $1,039.76 | $1,049.54 | $13,144.20 |
| 84 | $1,049.54 | $1,048.90 | $4.59 | $1,044.31 | $5.23 | $13,153.34 |

Final interest payment to be calculated as of final payment and due immediately thereto.

C. **Method of Loan Payment.**

a. The BORROWER shall make all payments called for under this loan agreement by sending check or other negotiable instrument made payable to the following individual or entity at the address indicated:

i. Hunter Wylie
21193 French Prairie Rd
St. Paul, Oregon 97137

If LENDER gives written notice to BORROWER that a different address shall be used for making payments under this loan agreement, BORROWER shall use the new address so given by LENDER.

D. **Default.**The occurrence of any of the following events shall constitute a Default by the BORROWER of the terms of this loan agreement and promissory note:

a. BORROWER'S failure to pay any amount due as principal or interest on the date required under this loan agreement.

b. BORROWER seeks an order of relief under the Federal Bankruptcy laws.

c. A federal tax lien is filed against the assets of BORROWER.

E. **Additional Provisions Regarding Default.**

a. Addressee and Address to which LENDER is to give BORROWER written notice of default: N/A

i. If BORROWER gives written notice to LENDER that a different address shall be used, LENDER shall use that address for giving notice of default (or any other notice called for herein) to BORROWER.

b. **Cure of Default.** Upon default, LENDER shall give BORROWER written notice of default. Mailing of written notice by LENDER to BORROWER via U.S. Postal Service Certified Mail shall constitute prima facie evidence of delivery. BORROWER shall have 15 days after receipt of written notice of default from LENDER to cure said default. In the case of default due solely to BORROWER'S failure to make timely payment as called for in this loan agreement, BORROWER may cure the default by making full payment of any principal and accrued interest (including interest on these amounts) whose payment to LENDER is

overdue under the loan agreement and, also, the late-payment penalty described below.

c. **Penalty for Late Payment.** There shall also be imposed upon BORROWER a 2% penalty for any late payment computed upon the amount of any principal and accrued interest whose payment to LENDER is overdue under this loan agreement and for which LENDER has delivered a notice of default to BORROWER. Payment is considered late seven days after the due date (the first of the month).

d. **Indemnification of Attorneys Fees and Out-of-Pocket Costs.** Should any party materially breach this agreement, the non-breaching party shall be indemnified by the breaching party for its reasonable attorneys fees and out-of-pocket costs which in any way relate to, or were precipitated by, the breach of this agreement. The term "out-of-pocket costs", as used herein, shall not include lost profits. A default by BORROWER which is not cured within 15 days after receiving a written notice of default from LENDER constitutes a material breach of this agreement by BORROWER.

F. **Parties That Are Not Individuals.** If any Party to this agreement is other than an individual (i.e., a corporation, a Limited Liability Company, a Partnership, or a Trust), said Party, and the individual signing on behalf of said Party, hereby represents and warrants that all steps and actions have been taken under the entity's governing instruments to authorize the entry into this Loan Agreement. Breach of any representation contained in this paragraph is considered a material breach of the Loan Agreement.

G. **Integration.** This Agreement, including the attachments mentioned in the body as incorporated by reference, sets forth the entire agreement between the Parties with regard to the subject matter hereof. All prior agreements, representations and warranties, express or implied, oral or written, with respect to the subject matter hereof, are superseded by this agreement. This is an integrated agreement.

H. **Severability.** In the event any provision of this Agreement is deemed to be void, invalid, or unenforceable, that provision shall be severed from the remainder of this Agreement so as not to cause the invalidity or unenforceability of the remainder of this Agreement. All remaining provisions of this Agreement shall then continue in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

I. **Modification.** Except as otherwise provided in this document, this agreement may be modified, superseded, or voided only upon the written and signed agreement of the Parties. Further, the physical destruction or loss of this document shall not be construed as a modification or termination of the agreement contained herein.



## LOAN AGREEMENT AND PROMISSORY NOTE

J. **Exclusive Jurisdiction for Suit in Case of Breach.** The Parties, by entering into this agreement, submit to jurisdiction in State of Oregon for adjudication of any disputes and/or claims between the Parties under this agreement. Furthermore, the Parties hereby agree that the courts of State of Oregon shall have **exclusive** jurisdiction over any disputes between the parties relative to this agreement, whether said disputes sounds in contract, tort, or other areas of the law. \

K. **State Law.** This Agreement shall be interpreted under, and governed by, the laws of the State of Oregon.

IN WITNESS WHEREOF and acknowledging acceptance and agreement of the foregoing, BORROWER and LENDER affix their signatures hereto.

**BORROWER:**

Lauren Wylie Donoho ________________
Dated: July 22, 2021

Signed by Ms. Donoho, individually. No mention of Big Thirst or McGinnis.

**LENDER:**

Hunter McCamy Wylie ________________
Dated: July 22, 2021

6

WYLIE 159



Case 1:24-cv-01512-DAE Document 42-4 Filed 11/26/25 Page 7 of 7

LOAN AGREEMENT AND PROMISSORY NOTE

J. **Exclusive Jurisdiction for Suit in Case of Breach.** The Parties, by entering into this agreement, submit to jurisdiction in State of Oregon for adjudication of any disputes and/or claims between the Parties under this agreement. Furthermore, the Parties hereby agree that the courts of State of Oregon shall have **exclusive** jurisdiction over any disputes between the parties relative to this agreement, whether said disputes sounds in contract, tort, or other areas of the law. \

K. **State Law.** This Agreement shall be interpreted under, and governed by, the laws of the State of Oregon.

IN WITNESS WHEREOF and acknowledging acceptance and agreement of the foregoing, BORROWER and LENDER affix their signatures hereto.

**BORROWER:**

Lauren Wylie Donoho ____________________
Dated: July 22, 2021

**LENDER:**

Hunter McCamy Wylie ____________________
Dated: July 22, 2021

6

WYLIE 160

This is not a communication to Plaintiff and cannot create or modify any obligation owed to him. The email concerns Big Thirst's internal financing decisions and does not reference Plaintiff's loan, the Note, or any alleged promise to repay it. It contains no words of assumption or undertaking and is legally irrelevant to Plaintiff's claims. Moreover, the parol evidence rule bars the use of extrinsic communications like this to vary or contradict the unambiguous Note, which identifies Donoho as the sole borrower and contains no obligation by Defendants.

**From:** Matt McGinnis <matt@bigthirstmarketing.com>
**Sent:** Friday, July 9, 2021 5:01 PM
**To:** Kareem Hajjar <khajjar@legalstrategy.com>
**Cc:** Lauren Wylie <wylie@bigthirstmarketing.com>
**Subject:** RE: Next Steps with Big Thirst, Inc.

1:24-CV-01512-DAE
Plaintiff
EXHIBIT
B

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Kareem,

We have decided to go in a slightly different direction for the start up of Big Thirst, Inc. Instead of raising money with equity financing in a seed round now, we are doing it all with debt financing. We are getting a loan for $50 that will be subordinated to a SBA loan of $250k and a $100k revolver. That will be enough to get up and running. We will reassess the need for a larger raise using equity financing in a few months. This decision delays the need for us to have you work on Stock Purchase Agreements in the near term.

However, we are still going to provide equity shares to board members as compensation. That brings up two questions:

1. Does it cost a lot of money to amend the Certificate of Formation to increase the number of authorized shares from 1,000,000 to 10,000,000? If not, we may do that now. If it is costly, we may choose not to do it, or delay it. If we choose to do it later, but have already issued stock to board members, how do we handle it?
2. We have prepared a draft Board Member Service Agreement (attached) that outlines duties and compensation. We intend to compensate board members with stock as outlined in this document. Please review this document and make recommendations for any changes necessary.

Once we have the Board Member agreement in place, we will immediately move into sales mode with retailers. At that point, we'll want to discuss getting agreements in place with retailers.

Thank you for your continued assistance.

Regards,

Matt

WYLIE 001

This internal financing email is not a communication to Plaintiff and cannot create any contractual duty owed to him. The reference to "Hunter Wylie (Lauren's Dad)" merely identifies him as the source of Lauren's unsecured personal loan—it is not a promise to Plaintiff, not an assumption of her debt, and not a commitment to repay the Note. The email contains no words of guaranty, assumption, or primary liability, and it is entirely about Big Thirst's capital structure, board compensation, and financing plans.Moreover, the parol evidence rule bars Plaintiff from using this extrinsic communication to alter or supplement the unambiguous Note, which names Donoho as the sole borrower and contains no obligation by Big Thirst or McGinnis. This exhibit is irrelevant to any alleged promise to Plaintiff and cannot defeat summary judgment.

DAE
Plaintiff
EXHIBIT
C

**Sent:** Tuesday, July 13, 2021 9:25 AM
**To:** Kareem Hajjar <khajjar@legalstrategy.com>
**Cc:** Lauren Wylie <wylie@bigthirstmarketing.com>
**Subject:** RE: Next Steps with Big Thirst, Inc.

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Kareem,

Thanks for getting back to us. Here is additional information.

**Funding:**
(1) First Lien: $250K SBA loan. Who will be the lender? – Frost Bank
(2) Second Lien: $100K revolving line of credit. Who will be the lender? – TBD, but most likely Frost Bank
(3) Unsecured: $50K loan. Who will be the lender? - Hunter Wylie (Lauren Wylie's Dad)

**Number of Shares**: Do you have an opinion on whether it is advantageous to increase the number of authorized shares from 1,000,000 to 10,000,000? Our intent is for it to be more appealing to investors to have a greater number of shares that should increase in value over time. If you agree that it is advantageous, we will move forward.

**Board Member Service Agreement:** We developed this using various examples we found online. Do you have a Board Service Agreement template that you prefer to use?

- Is the 500 shares of common stock awarded to each director a straight grant? Yes, it is a one-time straight grant awarded to compensate for services provided as a board member.
- Conditions and restrictions? We are open to your recommendations for typical conditions and restrictions. One condition that we would like to add is that stocks can not be exercised until the company has a liquidity event.
- Also, please explain the compensation for the sales of net bottles sold by his/her customer. I don't follow that. Our calculation for the commission is in the screen shot attached.

Thank you,

Matt
Matt McGinnis, President
Big Thirst Marketing
512-809-8712
Twitter | LinkedIn | Instagram

WYLIE 002

This email is not a communication to Plaintiff and cannot create any duty owed to him. It is an internal operational exchange between Defendants and their counsel regarding Big Thirst's financing structure and equity compensation. The mention of "Hunter Wylie (Wylie's Dad)" merely identifies him as the source of Lauren Donoho's personal loan; it is not a promise to Plaintiff, not an assumption of her debt, and not an agreement to be liable for the Note.The email contains no words of assumption, no guaranty, and no undertaking to pay Plaintiff. Nothing in this message references the Note, Plaintiff's repayment, or any obligation running to Plaintiff.Further, under the parol evidence rule, extrinsic communications like this cannot be used to alter or contradict the unambiguous Note, which identifies Donoho as the sole borrower and contains no obligation by Big Thirst or McGinnis. This exhibit is irrelevant to any alleged contract with Plaintiff and cannot satisfy the Statute of Frauds.

**Sent:** Tuesday, July 13, 2021 8:05 AM
**To:** Matt McGinnis <matt@bigthirstmarketing.com>
**Cc:** Lauren Wylie <wylie@bigthirstmarketing.com>
**Subject:** RE: Next Steps with Big Thirst, Inc.

Good morning Matt – Please see my thoughts below, and I'm sorry this took a few days:

Hi Kareem,

We have decided to go in a slightly different direction for the start up of Big Thirst, Inc. Instead of raising money with equity financing in a seed round now, we are doing it all with debt financing. We are getting a loan for $50 that will be subordinated to a SBA loan of $250k and a $100k revolver.
***KTH – Let's break this down because it's important that I am 100% on the same page as you.

1. First Lien: $250K SBA loan. Who will be the lender?
2. Second Lien: $100K revolving line of credit. Who will be the lender?
3. Unsecured: $50K loan. Who will be the lender? Hunter Wylie (Wylie's Dad)

That will be enough to get up and running. We will reassess the need for a larger raise using equity financing in a few months. This decision delays the need for us to have you work on Stock Purchase Agreements in the near term.
***KTH – Yes, it does!

However, we are still going to provide equity shares to board members as compensation. That brings up two questions:

1. Does it cost a lot of money to amend the Certificate of Formation to increase the number of authorized shares from 1,000,000 to 10,000,000? If not, we may do that now. If it is costly, we may choose not to do it, or delay it. If we choose to do it later, but have already issued stock to board members, how do we handle it?

***KTH – It's a few hundred dollars. Not much at all. Let me know if you want us to do that. And, I HIGHLY recommend doing it before you give shares to any more people.

2. We have prepared a draft Board Member Service Agreement (attached) that outlines duties and compensation. We intend to compensate board members with stock as outlined in this document. Please review this document and make recommendations for any changes necessary.

***KTH – I'm happy to review it in detail. But, I noticed that you are intending on giving 500 shares of common stock to each director. This is just a straight grant? No conditions? No restrictions? Just a straight grant? Also, please explain the compensation for the sales of net bottles sold by his/her customer. I don't follow that.

Anyway, before I take a deep dive into the Director Agreement, I want the feedback to the above.

WYLIE 003

This email is not a communication to Plaintiff and contains no promise by Defendants to repay Plaintiff or assume the Note.

Lauren Donoho tells McGinnis that she will be "paying the interest out of pocket," which affirmatively establishes that she—not Defendants—understood herself to be the borrower responsible for repayment. McGinnis merely asks why she will be paying interest; he does not undertake any obligation, make any commitment to Plaintiff, or express any agreement to assume her debt. Nothing in this exchange references Plaintiff, contains words of assumption, or satisfies the Statute of Frauds.

This exhibit defeats Plaintiff's theory rather than supporting it.

1:24-CV-01512-DAE
Plaintiff
EXHIBIT
D

**RE: Loan agreement with my dad**

Matt McGinnis <matt@bigthirstmarketing.com>
To: Lauren Wylie
Tuesday, July 20, 2021 at 3:28 PM

Hi Wylie,

This looks like it is in good order. I don't have any requested changes.

As monthly payments don't start for 2 years, why will you be paying interest out of pocket?

Matt McGinnis, President
Big Thirst Marketing
512-809-8712
Twitter I LinkedIn I Instagram

BIG THIRST Marketing

**From:** Lauren Wylie <wylie@bigthirstmarketing.com>
**Sent:** Monday, July 19, 2021 1:41 PM
**To:** Matt McGinnis <matt@bigthirstmarketing.com>
**Subject:** Loan agreement with my dad

https://docs.google.com/document/d/1xLgUDFTaq5wD0pwaJNbkWgkpD_RnS4BTBc11u3mw3CU/edit?usp=sharing

He's reviewing this doc now and sending the check via mail. It looks like I'll be paying the interest out of pocket for the time being.

Lauren Wylie
*Web Designer & Digital Advertising*
c: 503-989-7589

Twitter | LinkedIn | Instagram

WYLIE 004

This text exchange is not a communication to Plaintiff, contains no promise to Plaintiff, and includes no assumption of the Note. Every message concerns Donoho's work tasks, domain purchases, and her own loan terms. McGinnis's "Thank you" responses merely acknowledge information—they do not create contractual liability.Donoho's statement, "We are all set, no payments for 2 years," describes the terms of ***her personal loan from Plaintiff,*** not any commitment by Defendants to repay it. Nothing here references Plaintiff, the Note, or any agreement that Defendants would assume her debt. There are no promissory words, no guaranty language, and no communication capable of satisfying the statute of frauds.

1:24-CV-01512-DAE
Plaintiff
EXHIBIT
E

WYLIE 005

1:24-CV-01512-DAE
Plaintiff
EXHIBIT
F

This is ***not a communication to Plaintiff*** and contains ***no promise to Plaintiff or any assumption*** of the Note. The email is part of Big Thirst's SBA-related internal process and discusses how Lauren Donoho's personal loan from her father might be *characterized* for SBA documentation purposes. Nothing in this message states—or even suggests—that Defendants agreed to repay Plaintiff or become primarily responsible for the debt.

The highlighted SBA discussion merely reflects how Lauren's personal capital contribution might be treated for regulatory purposes. It does not convert her private loan into a corporate obligation and does not contain any words of assumption by Big Thirst or McGinnis. The SBA's references to donor or personal loans are descriptive compliance language, not contractual undertakings by Defendants.

The email confirms that the funds were Donoho's contribution, that she borrowed them, and that Defendants viewed the arrangement as her injection of capital. This document does not support—and in fact undermines—Plaintiff's claim that Defendants agreed to repay him.

1:24-cv-01512-DAE Document 42-9 Filed 11/26/25 Page 1 of 1

**Cc:** Quintero, Danielle
**Subject:** RE: Frost Bank Application for Big Thirst Inc.
**Date:** Tuesday, August 24, 2021 3:47:00 PM
**Attachments:** Big Thirst Inc. E-commerce Business Plan 08.2021.pdf
image001.png
image002.png
image003.png

Hi Jacquelyn,

We're happy to clarify! Here are responses to your questions:

Can you confirm how much you're requesting / how much equity will be contributed to the total project? I noticed the project budget on page 5 of the SBA packet outlines a budget of $300,400, but does not specify how the equity injection will be utilized. I also noticed the business plan mentions you have a $30,000 equity investment, but the loan agreement Wylie sent over references a $50,000 loan from her father.

> My apologies, but I uploaded an earlier draft of the business plan. I have attached the current version which states, "To fund our start-up costs, we are seeking a $50,000 family loan, and a loan from the Small Business Administration (SBA) of $250,000 in 1H 2021, with a revolving credit facility of $100,000 in 2H 2021. This debt financing will be used to cover one-time start-up costs such as legal fees, accounting fees, trade-mark fees, software development costs, advertising, and equipment. It will also be used to fund limited operating costs for salaries and commission for customer service and sales staff. We will begin loan repayment monthly at the earliest date set by the SBA and will service the debt with revenue generated from the business. We anticipate full repayment of the SBA loan and revolver by 2029."
>
> We have a $50,000 family loan from Wylie's father rather than a $30k equity investment. We are applying for a $250,000 SBA loan.

Angie also asked that I clarify a couple of items regarding the equity injection... Wylie has borrowed the funds for their injection – is she keeping her currently employment or is she going to draw a salary from the company? Or is her dad willing to sign a full standby agreement?

> The funds borrowed by Wylie from her father are to cover start-up operational costs for Big Thirst Inc. for legal expenses, subscriptions, and contractor services. This loan does not cover her salary, and she will not be drawing a salary from Big Thirst Inc. in 2021. She will continue contract work independently and with Big Thirst Marketing in the near term. Wylie's dad will sign a full standby agreement.

SBA requirements on source of equity injection.

ty Injection:

i) The following may be considered as equity injection:

owed.

d through a personal loan to the business owner with repayment demonstrated to come from a source other than the cash flow of the business (the salary paid to the owner by the business does not qualify). If the personal loan is made by the participating Lender, the Lender must submit the application through non-delegated 7(a) processing.

> If this is referring to the loan from Wylie's dad, then he will fill out a non-delegated 7(a) processing form. Are you able to send that to us and explain what it is?

sh – Lenders must carefully evaluate the value of assets other than cash that are injected by owners. An appraisal or other valuation by an independent third party is required if the valuation of the fixed assets is greater than the Net Book Value. A valuation of the fixed assets provided as part of a business valuation will not meet these requirements.

debt that is on full standby (no payments of principal or interest for the term of the SBA-guaranteed loan) may be considered as equity for SBA's purposes. A copy of the note must be attached to the standby agreement.

> The only debt we have is the family loan from Wylie's father. It is subrogate to the SBA loan. We are currently using it to pay for operating expenses. What format do you need this note to be in for submission? We can provide a list of expenses and receipts for payments both from this loan, and from our Big Thirst Marketing account. We have spent approximately $23,000 so far this year.

Also – I've asked our retail banking team in our lobby if they've received the FedEx back as of this morning. Still waiting to hear back but will keep you posted as I know you're ready to get that account up and running.

I received the signature card via FedEx on Saturday. I was able to open the back account in a branch. We are all set up. Thank you!

Kind regards,

Matt

Matt McGinnis, President
Big Thirst Marketing
512-809-8712
Twitter | Linkedin | Instagram

BIG THIRST Marketing

WYLIE 014

This text exchange is not a communication to Plaintiff and contains no promise by Defendants to repay Plaintiff or assume the Note. The conversation concerns how Lauren Donoho should categorize her own $50,000 personal loan from her father on business paperwork. McGinnis's comments relate only to SBA or internal documentation requirements, not repayment obligations.Nothing in this text references Plaintiff, promises repayment to Plaintiff, or includes any words of assumption, guaranty, or commitment by Defendants. To the contrary, the discussion makes clear that the $50,000 is Donoho's personal loan, being positioned as her investment into the company—not a liability of Big Thirst or McGinnis.This exhibit provides no evidence that Defendants agreed to be responsible for Plaintiff's loan.



1:24-CV-01512-DAE
Plaintiff
EXHIBIT
G

WYLIE 015

Plaintiff includes the entire 135-page transcript from the temporary injunction hearing in the Travis County case between Big Thirst and Lauren Donoho.

This transcript contains no testimony that Defendants ever promised Plaintiff they would repay the $50,000 Note, assumed Donoho's debt, agreed to be primarily liable, or undertook any obligation to Plaintiff.

None of the cited passages involve a communication to Plaintiff, reference the Note, or contain words of assumption or guaranty.

Nothing in this transcript overcomes the statute of frauds, establishes a promise to the creditor, or creates a fact issue on any required element.

Plaintiff
EXHIBIT
H

CAUSE NO. D-1-GN-22-001678

| | | |
|---|---|---|
| BIG THIRST, INC., Plaintiff, | ) | IN THE DISTRICT COURT |
| vs. | ) | TRAVIS COUNTY, TEXAS |
| LAUREN WYLIE DONOHO, Defendant. | ) | 459TH JUDICIAL DISTRICT |

**APPLICATION FOR TEMPORARY INJUNCTION**

On the 21st day of April, 2022, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Jan Soifer, Judge Presiding, held in Austin, Travis County, Texas, via videoconference.

Proceedings reported in computerized machine shorthand by a Texas Certified Shorthand Reporter, Certification Number 4471.

WYLIE 016

**APPEARANCES**

**ALL PARTIES APPEARED REMOTELY VIA ZOOM VIDEOCONFERENCE**

*APPEARING FOR THE PLAINTIFF:*

MR. DORAN D. PETERS
SBOT NO. 24047615
Hajjar | Peters, LLP
3144 Bee Cave Road
Austin, Texas 78746
Telephone: (512) 637-4956
E-mail: service@legalstrategy.com

*APPEARING FOR THE DEFENDANT:*

MS. LEMA BARAZI
SBOT NO. 24056016
MR. FERAS MOUSILLI
SBOT NO. 24043837
Lloyd & Mousilli
11807 Westheimer Road
Suite 550, PMB 944
Houston, Texas 77077
Telephone: (512) 609-0059
E-mail: lema@lloydmousilli.com

I N D E X

APPLICATION FOR TEMPORARY INJUNCTION

April 21, 2022

| | Page | Vol. |
|---|---|---|
| Announcements .......................... | 5 | 1 |
| Opening Statement by Mr. Peters ......... | 9 | 1 |
| Opening Statement by Ms. Barazi ......... | 12 | 1 |
| Closing Argument by Mr. Mousilli ........ | 129 | 1 |
| Court's Ruling ......................... | 132 | 1 |
| Adjournment ............................ | 135 | 1 |
| Court Reporter's Certificate ............ | 136 | 1 |

PLAINTIFF'S WITNESS

| | DIRECT | CROSS | VOL. |
|---|---|---|---|
| MATTHEW McGINNIS | | | |
| By Mr. Peters .......... | 18 | | 1 |
| By Ms. Barazi .......... | | 69 | 1 |
| By Mr. Peters .......... | 109 | | 1 |

DEFENDANT'S WITNESS

| | DIRECT | CROSS | VOL. |
|---|---|---|---|
| LAUREN WYLIE DONOHO | | | |
| By Ms. Barazi .......... | 110 | | 1 |
| By Mr. Peters .......... | | 126 | 1 |

I N D E X, Continued

PLAINTIFF'S EXHIBIT INDEX

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 1 | Cert of Incorp | 25 | 26 | 1 |
| 2 | Amendment to Cert of Incorp | 26 | 26 | 1 |
| 3 | Loan Agreement | 29 | 30 | 1 |
| 4 | Bank Account Statement | 33 | 33 | 1 |
| 5 | Panoply Order Form | 40 | 40 | 1 |
| 6 | Cumul.io Order Form | 41 | 41 | 1 |
| 7 | Rqst passwords 3/31/22 | 42 | 43 | 1 |
| 8 | Donoho Demand and Extend Time April 4-5, 2022 | 46 | 47 | 1 |
| 9 | Donoho Resigns as COO April 7, 2022 | 50 | 50 | 1 |
| 10 | Donoho Demand April 7, 2022 | 48 | 49 | 1 |
| 11 | Donoho Resigns from Board April 11, 2022 | 51 | 51 | 1 |
| 12 | Accept Resignation and Request Information April 12, 2022 | 51 | 52 | 1 |
| 13 | TRO April 12, 2022 | 53 | 53 | 1 |
| 14 | Dashboard Appearance | 57 | 57 | 1 |
| 15 | Requests for Credentials April 14, 2022 | 65 | 65 | 1 |
| 16 | Unfulfilled Orders as of April 15, 2022 | 56 | 56 | 1 |

WYLIE 019

Case 1:24-cv-01512-DAE Document 42-11 Filed 11/26/25 Page 5 of 136

I N D E X, Continued

PLAINTIFF'S EXHIBIT INDEX (Continued)

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 25 | 2022.04.20 Barazi-peters email | 60 | 60 | 1 |
| 26 | McGinnis Affidavit | 68 | 68 | 1 |

DEFENDANT'S EXHIBIT INDEX

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 2 | 2021-01-12 Big Thirst Ideation | 117 | 117 | 1 |

PROCEEDINGS

April 21, 2022

*****

THE COURT: Hello, everybody. Waiting for everybody to connect to the audio.

All right. Elizabeth, do you want to do the preliminary stuff?

*(Discussion off the record)*

MR. MOUSILLI: Your Honor, just a preliminary matter. My co-counsel, Lema Barazi, is having a little bit of technical issues in connecting to the Zoom link. So -- I'm on audio with her. So if we could just give her a minute or two to see if we could end up resolving this, I'd appreciate that.

THE COURT: Of course.

*(Discussion off the record)*

THE COURT: So let me just make a couple of announcements to get that out of the way.

We are here on Zoom pursuant to the Emergency Orders resulting from the pandemic, and this hearing is being livestreamed on the Court's YouTube channel pursuant to the Open Courts provision of the Texas Constitution. No one is permitted to record the proceedings other than the Official Court Reporter of this court, Ms. Williamson, who will be making a record

for us.

I will ask that everybody be cognizant of the fact that she's trying to make a record. And she is certified at 225 words a minute. She clocked somebody in my hearing this morning going 490 words a minute, and that makes her sort of cranky because she's a perfectionist and she wants to make sure to get every word. And so you may see her shaking her head from time to time. She's doing that because she's trying to signal to you you need to slow down or to not speak at the same time as someone else. So it's important that we only speak one at a time because otherwise, on Zoom, she can't get all of what either person says. And she has to write "unintelligible" in the transcript, and she hates that. So --

All right. So, Mr. Mousilli, is your colleague going to be with us in a minute? Still working on getting in?

MR. MOUSILLI: We're still working on her getting in, Your Honor. For some reason, the pass code that she's entering, which is the same one that we've shared, doesn't seem to be operating on her. So --

*(Ms. Barazi enters the Zoom proceedings)*

MR. MOUSILLI: I see her connecting over audio now through her -- through her phone.

If Ms. Barazi can confirm that she's got audio and video.

Ms. Barazi, can you confirm that you -- you've got audio connection?

MS. BARAZI: I apologize, Judge. This is the first time this has ever happened to me. I don't know why -- [Zoom audio difficulty] -- via my computer -- [Zoom audio difficulty] -- my phone.

THE COURT: No problem. But I will tell you that you're breaking up, so we didn't catch all of your words. It may be that you need to be a little bit closer to the microphone on your phone.

MS. BARAZI: Yes, Judge. I apologize. If I can just try again. I've been trying multiple ways. I've reset my computer. If I can just be allowed just a little bit of leeway.

One second, Judge.

*(Discussion off the record)*

THE COURT: So let me just say y'all have announced for three hours. We take that time and divide it in half, and Mr. Beck will keep track of your time to make sure that no one side gets more of the time than the other. And that'll put us a little past 5:00.

*(Discussion off the record)*

THE COURT: All right. And I will tell

you that it should shorten the hearing somewhat that I have read the petition, the TRO, and the notice of appearance. So I do know something about the case. You don't have to start me back at zero.

So, that said, Mr. Peters. You may proceed.

**OPENING STATEMENT**

MR. PETERS: Thank you, Your Honor.

By way of a brief introduction -- and I will take into account the fact that you've read things -- but I would like to say that today is about the survival of my client, Big Thirst, Inc.

Big Thirst, Inc. is a startup. It's proven itself to be a viable concern. Big Thirst, Inc., started with an idea from Matt McGinnis as a one-stop shop for distilleries to market and sell their product while having data to analyze their sales and the effectiveness of their advertising strategy. He approached the defendant Ms. Donoho, who had been a contractor for his marketing company since 2016, about doing some contract work. She did not want to do it on a contract basis. What she wanted was an ownership interest, and that's what she negotiated and that's what she got.

She became the Chief Operating Officer;

she became a director of the company; and she became a 27 percent stakeholder in the company. She got a 27 percent equity share to Mr. McGinnis' 33 percent. So together, as founders, they had 60 percent of the company. The founders' share was 45/55. But it's 27 percent to Ms. Donoho; 33 percent, Mr. McGinnis; and that's what was negotiated and that's what happened.

When it came time for Big Thirst to expand, they needed an SBA loan. They negotiated that. They worked hard to get there. They needed to hire additional employees. At the last minute, Ms. Donoho raised concerns that she was a minority position and she did not want to guarantee the loan in a minority position. So at the last minute, she threatened -- she said she was either going to become the CEO and the majority interest holder or she was going to shut down the technology. And, unfortunately, that's what she did. That's why we had to go before -- before the Court to get a TRO, and a TRO with which, Your Honor, she has not complied. Despite numerous requests, she has not complied with that TRO.

Today is important. If plaintiff does not get access to these technology tools, it will have to close down. From reading defendant's materials, she seems to think that because she was in charge of the

company technology, that she's entitled to the company. She seems to hold anyone without her technological know-how in contempt.

But, Your Honor, the status quo -- the status quo is that the business was operating and the business was operating using a variety of electronic tools. That is what should continue. The alternative is the business shuts down. That's not the status quo. And there is no compelling reason why this business should cease to exist.

Ms. Donoho has a 27 percent stake in the company. She has resigned as officer and director, but she is still a shareholder. And she can always seek compensation, Your Honor, for her contributions of any kind. She can seek compensation for that. So she does have an adequate remedy at law. The company -- the company that has no profit history does not have an adequate remedy at law. So it needs to survive, and today is about this company surviving.

I'm ready to call my first witness, or opposing counsel can do their opening, whatever Your Honor prefers. Thank you.

THE COURT: [Zoom audio muted.]

THE COURT REPORTER: You're on mute, Judge.

THE COURT: Would you like to make an opening statement, Ms. Barazi?

MS. BARAZI: Yes, Judge, I would.

THE COURT: Did I say that correctly, your name?

MS. BARAZI: Yes. It's Barazi. Yes, that's correct.

And if I may, Judge, I have just updated Zoom. If I can just have a final attempt to join.

Nope. It's not going to work. Okay. That's fine. We did our best.

**OPENING STATEMENT**

MS. BARAZI: May it please the Court.

THE COURT: Yes.

MS. BARAZI: Thank you, Judge.

Last Tuesday, plaintiff Big Thirst obtained -- emergency TRO against Lauren Donoho. Plaintiff's sole cause of action --

THE COURT: So you're cutting in and out, and we're missing some of your words.

Let's try it now with you a little closer.

MS. BARAZI: Okay. Would you like me to join and use my audio instead of web?

THE COURT: I don't know. If you -- right now, I can hear you. So let's --

MS. BARAZI: Okay.

THE COURT: -- see how a couple of sentences go.

MS. BARAZI: Okay.

So then last Tuesday --

No? How about now? Is this better?

THE COURT: Yes.

MS. BARAZI: Okay.

THE COURT: So far.

MS. BARAZI: Okay.

Last Tuesday, plaintiff Big Thirst, Inc., obtained an emergency TRO against Lauren Donoho. Plaintiff's sole cause of action against Mrs. Donoho was breach of fiduciary duty. However, Plaintiff's end goal in filing the lawsuit and TRO was not to legitimately pursue a claim against Ms. Donoho for breach of fiduciary duty because, as the evidence today will show, Ms. Donoho never breached her fiduciary duty to Big Thirst, Inc., which, in fact, was her brain child and of which she was the co-founder.

Instead, plaintiff filed the lawsuit for the sole purpose of obtaining a TRO which would force Ms. Donoho to give up her intellectual property to Big Thirst and Matt McGinnis without any kind of compensation. In other words, this is a sham lawsuit

filed so as to strongarm Ms. Donoho into giving up her creative work which she has spent hundreds of hours in creating without compensating for a penny.

As the evidence today will show, Ms. Donoho is a minority shareholder who has been -- [Zoom audio difficulty] -- repeatedly. Not only is this case --

THE COURT: Hang on. I know the word that we missed was "oppressed," but Ms. Williamson does not know that. So try that again.

As the evidence will show, she is a minority shareholder who has been oppressed --

MS. BARAZI: Repeatedly. Correct, Judge.

Not only is this case about minority shareholder/owner oppression, but it also involves intellectual property misappropriation by Big Thirst and Matt McGinnis. Those counterclaims, Judge, will be filed shortly after this hearing.

The evidence will show that in late 2020, Mrs. Donoho came up with an eCommerce business idea for selling alcohol online. She was very excited about this idea, and she shared it with Matt McGinnis who she wanted to partner with. Mrs. Donoho even built a prototype for her idea and shared it with Matt McGinnis in early 2021. Matt McGinnis was very excited about

Ms. Donoho's idea. Unbeknownst to Ms. Big Thirst, however, in March 2021, Matt McGinnis secretly incorporated the company and declared himself king. He made himself the sole owner of Big Thirst, Inc.

When Ms. Donoho found out, she was deeply hurt, and she asked for a 50 percent stake in the company. However, Mr. McGinnis refused. Instead, he -- [Zoom audio difficulty] -- her a minority -- [Zoom audio difficulty] -- and to make her the Chief Operating Officer.

THE COURT: No. We lost you in that sentence.

MS. BARAZI: Okay.

THE COURT: Instead --

MS. BARAZI: Instead of offering her a 50 percent stake in the company that she was -- that was her brain child, he -- Matt McGinnis offered her a minority number of shares and to make her the Chief Operating Officer.

For over a year, Mrs. Donoho contributed time and energy into running the day-to-day operations of Big Thirst. She even borrowed $50,000 from her father to loan to the company. Significantly, Ms. Donoho's 50,000-dollar loan to the company was 90 percent of the working capital of Big Thirst. While

working as the Chief Operating Officer for Big Thirst, Ms. -- Mrs. Donoho also developed intellectual property that was highly valuable. Mind you, she developed this intellectual property on her own time and using her own tools. Mrs. Donoho, till this day, has never been compensated for her work and efforts as Chief Operating Officer, nor has she been compensated for her intellectual property.

Late last year, Mr. McGinnis and Mrs. Donoho began the process of applying for SBA loans from various banks. One bank decided to extend a loan to them in amount of approximately $350,000. After reading over the terms of the loan, however, Mrs. Donoho realized that she was going to have to be a personal guarantor for a loan that she had no input into how it was spent. Mrs. Donoho approached Mr. McGinnis with questions about the loan and her concerns. She didn't think it was fair to be a personal guarantor on a loan and have no say in the way the loan was spent, given that she was a minority shareholder and represented only one voice on the board which was comprised of Mr. McGinnis, his wife, and his best friend.

When approached by Mrs. Donoho with her concerns, Mr. McGinnis became irate. In fact, he was very angry that she had consulted with an attorney to

understand the loan better. He accused Mrs. Donoho of, quote, going nuclear. When she reiterated her request for a 50 percent ownership interest in the company. Mrs. McGinnis -- Mr. McGinnis repeatedly tried to persuade Mrs. Donoho to just sign the loan. When that didn't work, he threatened her with taking away everything from her, including her intellectual property.

For the first time, however, Mrs. Donoho stood her ground and she resigned from the company as Chief Operating Officer. Scared that Mr. McGinnis would copy all of her IP and lock her out, she protected her creative work. When Mr. McGinnis realized he was having difficulty accessing Ms. Donoho's IP, he initiated this incident lawsuit.

As I stated earlier, this entire lawsuit is a sham. In order to prevail on a temporary injunction request, the movant has to establish likelihood of success of their cause of action, plus immediate and irreparable harm. Big Thirst will fall far short of that burden today as Mrs. Donoho has never breached her fiduciary duties to the company.

Thank you.

THE COURT: All right. Mr. Peters.

MR. PETERS: Yes, thank you, Your Honor.

I would call Mr. Matt McGinnis.

THE COURT: All right. Mr. McGinnis, would you please raise your right hand and be sworn?

**MATTHEW McGINNIS,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. PETERS:

Q. Mr. McGinnis, what is your relationship to Big Thirst, Inc.?

A. I am the Chief Operating Officer and founder of the company.

Q. You said Chief Operating Officer. Is that right, or --

A. I apologize. I am the Chief Executive Officer and founder of the company.

Q. Okay. And when you say "founder of the company," what do you mean?

A. So I started this company based on the work that I've been doing for eight years. I started Big Thirst Marketing in 2020 -- 2014. I had left a career in technology marketing, and left as the Executive Vice President and Managing Director of one of the world's largest agencies to start my own agency.

Q. And, Mr. McGinnis, could you -- I appreciate -- you are answering my question, but I need you to answer

it more slowly.

A. Yes.

I left a position as the Executive Vice President and Managing Director of one of the world's largest marketing agencies in 2014 to start Big Thirst Marketing. And this is because I wanted to pursue a passion in the beverage alcohol industry. And working for more than two decades to build credibility, expertise, and relationships in beverage alcohol industry, by working on weekends at a winery, by becoming a certified sommelier, a certified specialist of spirits, a freelance writer, and a number of other things that got me deeply engrained in the industry and built deep credibility, I used that credibility, those relationships, and my marketing expertise to start a marketing agency in 2014.

I then later joined forces with two partners starting to plan a consulting business for distilleries in late 2019 that we formed in 2020. Big Thirst Consulting provides consulting services to help distilleries get started or enter new markets. With those two companies, it was clear that we were looking at ways we could help distilleries in a broader way, and we began discussions of what could we do beyond the capabilities we already had.

One of the partners in Big Thirst Consulting had been selling products online through eCommerce platform.

*(Ms. Barazi no longer present in the Zoom proceedings)*

MR. PETERS: And one -- his company -- I'm sorry, Ms. William- --

THE COURT REPORTER: I'm sorry to interrupt you, Mr. McGinnis.

Did we lost Ms. Barazi? I saw someone left. I wanted to double-check.

THE COURT: Ah. You're right. We did.

All right. Let's give her a minute to come back.

MR. PETERS: Your Honor, I don't want to be nitpicky, but I do believe we're going to be up against time. I hope that this is going against her time and not mine, Your Honor.

THE COURT: Yes.

MR. MOUSILLI: We -- we can continue the line of questioning while Ms. Barazi comes on.

THE COURT: All right. Thank you, Mr. -- is it Mousilli?

MR. MOUSILLI: Correct.

THE COURT: All right.

A. And working with my partners in Big Thirst Consulting, we were exploring ways that we could expand our service offerings to help distilleries in multiple ways.

One of the partners in Big Thirst Consulting had been using an eCommerce platform to sell one of the brands that he works with successfully and looked at the data analytics of that a partner of theirs was providing and said, We should do this. In late 2019, early 2020, we started looking into how to do that. The pandemic then came about and shut down our clients' -- distillery client's route to market. And so we began exploring ways that we could, one, accelerate how we get into helping eCommerce market companies; and, two, set up our current clients on eCommerce platforms.

As Mr. Peters mentioned, I had -- at the time was employing Ms. Donoho as a -- [Zoom audio difficulty] -- to assist with digital marketing and website design. She assisted with one of our clients in on-boarding --

*(Brief audio interruption)*

A. -- a client on to --

THE WITNESS: I'm sorry. Ms. Williamson?

THE COURT REPORTER: I'm sorry. I'm just getting some audio interference, and it was making it

difficult for me to hear you, Mr. McGinnis.

THE WITNESS: Okay.

A. In 2020, we decided as Big Thirst Consulting and Big Thirst Marketing, to find ways to accelerate our development for data analytics and eCommerce. At the same time, we knew we couldn't move fast enough to help our clients for Big Thirst Marketing. And so we on-boarded one of our clients onto what is now a competitor's eCommerce platform. Ms. Donoho was involved in the digital advertising and website design for that project. However, the concepts of doing this within the Big Thirst family was well advanced before we ever mentioned it to Ms. Donoho. In fact, what was presented a moment ago as her idea is not -- if she did, she never mentioned it to me or to any of the other members of the Big Thirst family.

I incorporated Big Thirst, Incorporated, in March of 2021 and -- as the sole owner, with the knowledge that I would be building a team and putting together an executive board for it. I didn't do that to lock anyone out. We then later, after it was incorporated, had discussions about what Ms. Donoho's role would be and came to agreements that she would become an officer, a director, and a shareholder.

We agreed to the terms of a share

disbursement of which the founders would have a 60 percent pool divided with 55 percent for me and 45 percent for Ms. Donoho. Reason being is this business idea --

MS. BARAZI: Sorry.

A. -- the business plan.

MS. BARAZI: I'm going to have to object, Judge. This is a narrative.

THE COURT: All right. I'm going to ask Mr. Peters that we go back to question and answer.

MR. PETERS: Sure.

Q. (By Mr. Peters) Mr. McGinnis, let me ask you this. Do you dedicate -- so you are how you said CEO of Big Thirst, Inc. Do you dedicate time to your -- to your role as CEO of Big Thirst, Inc.?

MS. BARAZI: Objection; leading.

THE COURT: All right. Sustained. Let's reask the question.

Q. (By Mr. Peters) Mr. McGinnis, what do you do in your role as CEO of Big Thirst, Inc.?

A. I spend a considerable amount of time everyday, everyday, including weekends, working for this company to help prospect for new clients; attract new clients; do sales; do the marketing; help with all the recruitment; put together the business plan completely;

put together the financial plan with the help of a financial consultant; have been planning the growth of the company; and very actively managing the corporate responsibilities of the company since before Ms. Donoho joined.

Q. Have you been paid for your work?

A. No, sir. I have not taken a dime for my work.

Q. Why not?

A. Because the officers were granted share, and we are working as a typical startup that we don't pay ourselves until we have a decent amount of revenue coming in, or -- and with the full expectation that we're going to grow a corporation to a point where our shares are worthy of selling and having any payment back for our intense amount of work that we're both putting in at a future date.

Q. Okay. Are there other officers or directors of the company?

A. Yes, there are two other directors. One is Mr. Mark Shilling who is an industry expert who is well-known throughout the industry, not only as being a past president at the American Craft Spirits Association, but for spending a decade to modernize the federal excise tax and get that repealed for craft beverages -- or craft distilleries -- [Zoom audio

difficulty] -- incredibly well respected and incredibly well known, which is why he was added to our board to help be a -- somebody to add a lot of credibility, open doors for us, and make introductions.

In addition, my wife is a minority shareholder and a director. Brought her on because she has been the Creative Director for Big Thirst Marketing for eight years and has been instrumental in helping with the branding, the graphic design, and producing materials for the company, and not being paid.

Q. Okay. I'm going to share my screen.

Mr. McGinnis, do you see what's on the screen, and it's labeled at the bottom right, Plaintiff's Exhibit 1?

A. Yes.

Q. Okay. Is that the incorporation document you mentioned earlier from March of 2019 or 2020? March of 2021?

A. Yes.

MR. PETERS: I would offer Plaintiff's 1 to be admitted.

THE COURT: Any objection?

MS. BARAZI: Yes, Judge. I object. The proper predicate hasn't been laid.

THE COURT: Overruled.

Plaintiff's 1 is admitted.

Q. (By Mr. Peters) And, Mr. McGinnis, do you see what is on your screen as Plaintiff's Exhibit 2?

A. Yes.

Q. Do you recognize that?

A. Yes, I do.

Q. What is it?

A. This is the unanimous written consent to add shareholders and directors that was worked on by Ms. Donoho and I, with our corporate attorney, to add her as a director and officer and to provide her with shares in the company to amend that -- the original filing.

MR. PETERS: I would offer Plaintiff's 2.

MS. BARAZI: Judge, I object. The proper predicate hasn't been laid.

MR. PETERS: Your Honor, I would just point out that this is also being offered by the defendant.

THE COURT: Is there a signature on the end?

MR. PETERS: There is, Your Honor.

THE COURT: Plaintiff's Exhibit 2 is admitted.

Q. (By Mr. Peters) So, Mr. McGinnis, how did

Ms. Donoho become involved in Big Thirst, Inc.?

A. She became involved when I called her to tell her the work that we'd been doing, to tell her about the concept for it, and to ask her if she'd like to be involved as a contractor in a similar way that she had been with Big Thirst Marketing.

Q. And how did she respond about being a contractor?

A. She was excited by the opportunity, saw the possibilities for it to become a big and important company, and asked if she could be involved as a shareholder and co-founder.

Q. And is that what ultimately happened?

A. It is. As you can see by the document that you just showed, we negotiated that with our corporate attorney, and in compensation for her work, she was receiving share.

Q. What was her responsibilities as the COO or the Chief Operating Officer?

A. As the Chief Operating Officer, her role was to help develop the data dashboard, set up the technology for the company, and help onboard clients. She became a client relationship person until we could hire an account manager.

Q. Okay. And as it regards to software, was she

McGinnis describes internal financing and confirms the $50k loan was secured by Donoho from her father—not from Plaintiff and not by Defendants. No promise to Plaintiff, no assumption language, and no agreement to sign anything.

responsible for licensing software?

MS. BARAZI: Objection, Judge; leading.

THE COURT: Overruled.

A. Ms. Donoho was tasked with licensing software as an agent of our corporation.

Q. (By Mr. Peters) Do you have an employment agreement with Big Thirst, Inc.?

A. I do not.

Q. How were the operations of Big Thirst, Inc., financed?

A. We financed Big Thirst, Inc., with a loan for $50,000 that was secured by Ms. Donoho from her father. We had originally sought to go after equity financing; however, she convinced me it would be faster and less expensive to do it the way that she wanted to do it. We changed our path, let our attorney know that, let our banker know that, and let our financial planner know that we were going to go after a -- some additional debt financing to have the required 20 percent that we needed to -- to be approved for the SBA loan that we were, at the time, working on with Frost Bank.

Q. Okay. And I am going to share the screen again. This document is Plaintiff's Exhibit 3.

Do you recognize that?

A. Yes, I do.

McGinnis describes the Note as "the loan that Ms. Donoho secured with her father … to be used for startup expenses for Big Thirst" and as a "family loan" included in the business plan. This testimony confirms the loan was between Wylie and Donoho, not Big Thirst, and says nothing about any promise by Defendants to Plaintiff or any written assumption of the Note.

Q. And what is that?

A. This is the loan that Ms. Donoho secured with her father in the amount of $50,000 that was to be used for startup expenses for Big Thirst, Incorporated. We, in fact, put that amount and that it was a family loan into our business plan that we resubmitted to the bank, to our attorney, and to our financial planner.

Q. Okay. And this -- this loan agreement, you see it's signed by Ms. Donoho; is that correct?

A. Yes, it is.

Q. Okay.

MR. PETERS: I would offer Plaintiff's 3.

MS. BARAZI: Object --

THE COURT: Any objection.

MS. BARAZI: Yes, I object, Judge. We've never seen this document, and the proper predicate hasn't been laid. And, in addition, it hasn't been countersigned, so I don't know the authenticity of this document.

THE COURT: Well, I think you need to find out from your client if she's going to contend that this is not an authentic document. I assume that's her signature; but if it is not, then we need to know that.

MS. DONOHO: Am I allowed to speak?

MS. BARAZI: Judge, would you like me to

question my client about her signature?

THE COURT: Y'all are welcome to have a side conversation. We can move you into a breakout room if you'd like.

MS. BARAZI: Yes, please.

MR. PETERS: Your Honor, I would just point out that I uploaded these documents last night. It's not like this is something that couldn't have been handled before now.

THE COURT: I understand.

Ms. Barazi and Ms. Donoho, you should get an invitation to a breakout room.

MS. BARAZI: Thank you.

*(Brief recess)*

MS. BARAZI: Judge, we're back.

THE COURT: All right.

MS. BARAZI: And my client has confirmed that is her signature.

THE COURT: All right. Then Plaintiff's Exhibit 3 is admitted.

MR. PETERS: Thank you.

Q. (By Mr. Peters) And, Mr. McGinnis, are you aware how those loan proceeds were used?

A. Yes. $20,000 of that 50,000-dollar loan was deposited into the Big Thirst, Incorporated, bank

McGinnis testifies that $20,000 of the funds were deposited into Big Thirst's Frost Bank account and that Donoho chose to spend the remaining $30,000 from her personal account on "business things." At most this shows how Donoho used her loan proceeds; it does not create or evidence any contract between Plaintiff and Defendants or any promise to pay Plaintiff.

account with Frost Bank. Those were deposited in two separate 10,000-dollar amounts as Ms. Donoho said that it could only be done in that amount at a time. She, for some reason, chose not to deposit the additional $30,000 and chose to spend that directly from her personal account. And she says that she spent it for business things and produced receipts for that for things such as the sponsorship of a conference where we announced our company. She also --

MS. BARAZI: Objection, Judge.

A. -- spent it on --

*(Simultaneous crosstalk)*

MS. BARAZI: This is a narrative, and it's nonresponsive to the question asked.

THE WITNESS: He asked me -- Your Honor, he asked me if I knew how --

MR. PETERS: Mr. McGinnis? Mr. McGinnis, please allow me to speak to Her Honor. Just wait, please.

This was much easier back before Zoom, right?

So, Your Honor, I would just -- I would just say he's actually exactly answering my question, which is how was the money used.

THE COURT: He is answering the question.

Not a promise to Plaintiff. This exchange concerns who Big Thirst was supposed to repay—not who personally guaranteed repayment to Plaintiff. It does not reference McGinnis agreeing to assume Donoho's loan or to sign any writing.

Supports Defendants' position. McGinnis testifies that Big Thirst, Inc. was the entity expected to repay ***Donoho.*** "A. Big Thirst, Incorporated, was to **repay Ms. Donoho** for the loan." (32:5-8)

Irrelevant to Plaintiff's main-purpose theory. This testimony does not address (and cannot supply) any evidence of a promise by Defendants to be primarily liable for Plaintiff's Note, which is required under *Cruz.*

No statute of frauds exception shown. Nothing on this page reflects consideration to Defendants, a promise to Plaintiff, or any commitment by Defendants to sign a written assumption of the Note.

But let's break it up with questions that call for shorter answers so we --

MR. PETERS: Sure.

THE COURT: -- can go back to Q and A.

Q. (By Mr. Peters) Mr. McGinnis, who is to repay the loan?

A. Big Thirst, Incorporated, was to repay Ms. Donoho for the loan.

Q. And I'm going to share the screen again and show you what's been labeled Plaintiff's Exhibit 4. It's 24 pages.

Do you recognize this document?

A. Yes. This is our bank statements for Big Thirst, Incorporated, bank account with Frost Bank showing all transactions from August of 2021 through March of 2022.

Q. Okay.

MR. PETERS: I would offer Plaintiff's Exhibit 4, Your Honor.

MS. BARAZI: Judge, I'm going to have to object. The proper predicate hasn't been laid.

THE COURT: Sustained.

Q. (By Mr. Peters) Mr. McGinnis, how do you know that these are Big Thirst, Inc., bank records?

A. Because I am a signatory on the account, as was

WYLIE 047

McGinnis authenticates Big Thirst's Frost Bank records (Plaintiff's Ex. 4) and explains he downloaded them from the bank. The testimony goes only to the source of the records; it contains no promise to Plaintiff, no assumption language, and no agreement by Defendants to pay the Note.

Ms. Donoho, and I recognize the transactions as they came and went.

Q. How did you obtain these records?

A. I went to the bank account and downloaded them from the -- Frost Bank.

Q. Did you alter them in any way?

A. No, sir, I did not.

MR. PETERS: Your Honor, I would reoffer Plaintiff's Exhibit 4.

THE COURT: Any objection?

MS. BARAZI: Judge, these contain hearsay.

THE COURT: Overruled.

Plaintiff's Exhibit 4 is admitted.

MR. PETERS: Thank you.

Q. (By Mr. Peters) And if we look at Page; well, just the first page there of these bank accounts, there is a 10,000-dollar deposit. Is that the deposit you were just referring to?

A. Yes. It's one of the two.

Q. Okay. And if we look at Page 7, there's another 10,000-dollar deposit. Is that the other one you were referring to?

A. Yes, that is correct.

Q. Okay. And what were the funds -- well, let me ask you this.

McGinnis identifies various charges in the bank statements as Big Thirst startup expenses paid from the company account. This page addresses only how company funds were spent; it does not mention Plaintiff, any agreement with him, or any written assumption of his Note.

From looking at this statement, can you tell me some of the specifics of what the funds were used for?

A. Yes. The funds were used for acquiring software license agreements for the company to help build our data dashboard; to help put together our Shopify experience for consumers on the website -- on our clients' websites. There are also fees in there for attending a conference where we announced our company, and some legal fees.

Q. And so I'm just looking at this page, and I'm seeing there, it says "GoDaddy." What is GoDaddy?

A. GoDaddy is where we have purchased the domain name for our company as well as our e-mail accounts. So it is where we have our domain and e-mail.

Q. So that -- the payment for that came out of the Big Thirst, Inc., bank account; is that --

*(Simultaneous crosstalk)*

A. [Zoom audio difficulty] --

Q. (By Mr. Peters) -- right?

A. -- by Big Thirst, Incorporated.

Q. What is Grid Software?

A. That is a software program that is being used as part of our overall tech stack.

Q. Was that paid for by Big Thirst, Inc., from

its -- from its bank account?

A. Yes, it was.

Q. What about Panoply Technologies?

A. That is a software that is used in our data dashboard that helps with bringing in the data for the dashboard for -- that our clients use.

Q. Okay. So this is the first mention of a dashboard. What is the dashboard?

A. Our data dashboard for Big Thirst, Incorporated, is a place where we aggregate information, one, about eCommerce sales from Shopify and the -- the amount of products that our customers have, and all transactions from Shopify. Two, it aggregates information from Google Analytics, Google Ad, Facebook Ad, and Mailchimp to show how effective their marketing campaigns are. The third level is -- it's supposed to have customized data analytics.

This is what we sell to our clients on a monthly subscription basis.

Q. Okay. So -- just so I understand, the dashboard has something to do with what you sell your clients?

A. Yes. It's one of the core things that we're selling to our clients. It's where they get information about their eCommerce sales, and it's where they get

information about how well those sales are doing compared to the marketing efforts that they -- that they've undertaken.

Q. What is -- the last withdrawal down here on this page, Page 7 of Plaintiff's Exhibit 4, is Cumul.io. I'm sure I'm saying it wrong. What is that?

A. That is a software that is integral in the software stack that makes up the data dashboard.

Q. Okay.

A. The Big Thirst data dashboard is stitched together -- as Ms. Donoho has put it, stitched together various technologies.

Q. Okay. And if we looked --

*(Simultaneous crosstalk)*

A. [Zoom audio difficulty] --

Q. So I don't want to take the time --

THE COURT REPORTER: I'm --

Q. (By Mr. Peters) But if we looked through these bank records, we would see more purchases of -- or licensing of software; is that right?

A. Correct.

*(Reporter admonition)*

THE WITNESS: Yes, ma'am.

Q. (By Mr. Peters) Okay. And, Mr. McGinnis, can you see what's been labeled Plaintiff's 5?

A. Yes.
Q. What is that?
A. This is the contract to start our license agreement with Panoply.
Q. Okay. And who entered into that license agreement?
A. Wylie Donoho.
Q. Okay. Did she do it for herself?
A. No. She did it --
*(Simultaneous crosstalk)*
MS. BARAZI: Objection --
A. -- as her role --
MS. BARAZI: Objection --
A. -- as a founder --
MS. BARAZI: I'm sorry. I'm objecting. So once I object --
Judge, I object. This is leading.
THE COURT: Sorry. It takes me a minute to find the mute button.
Yes. The objection is sustained. You can reask the question.
MR. PETERS: Sure.
Q. (By Mr. Peters) Mr. McGinnis, who -- who purchased this license for Panoply Technologies, Inc.?
A. Ms. Donoho purchased this license as an agent

of Big Thirst, Incorporated.

Q. Why do you think it was as an agent of Big Thirst, Incorporated?

A. She signed her name -- or her title as founder. She's only the founder of one company, and that's Big Thirst, Incorporated.

Q. Okay. Thank you.

MR. PETERS: I would move that Plaintiff's 5 be admitted.

MS. BARAZI: Objection, Judge; the proper predicate hasn't been laid.

THE COURT: So we have a three-hour hearing here, and there are all these objections to foundation. And I'm inclined to let these documents in, but I think you do need to lay the background that this is a true and correct copy and all of those kinds of issues that you normally have to do to admit an exhibit, Mr. Peters.

MR. PETERS: Thank you, Your Honor. I'm simply trying to save time, and it's been my --

THE COURT: I know you are.

MR. PETERS: -- experience that, you know, most attorneys will see this and see their attorney -- their client's signature on it and not -- not try and waste the Court's time. But I'll be happy to do that.

MS. BARAZI: I'm sorry. Judge, I'm going to have to object to that mischaracterization of me wasting the Court's time. I am an advocate for my client, and I'm making proper objections.

So I'd like to ask opposing counsel not to engage in these sidebars attacking me.

THE COURT: All right. Well, let's stop the sidebars on both sides.

Mr. Peters, let's go back and lay the foundation on this.

MR. PETERS: Thank you.

Q. (By Mr. Peters) Mr. McGinnis, is this -- where did you get this document?

A. This document was e-mailed to me this weekend.

Q. Okay. Why was it e-mailed to you this weekend?

A. I believe that Ms. Donoho was trying to e-mail it to herself and inadvertently sent it to me.

Q. Okay. What do you -- you've already testified that you recognize this document to be your licensing agreement between Big Thirst, Inc., and Panoply, correct?

A. Correct.

Q. Okay. Is this a true and correct copy of that document?

A. Yes, it is.

Q. Have you modified this document in any way other than obviously I have put "Plaintiff's Exhibit 5, Page 1" down at the bottom?

A. I have not.

MR. PETERS: Move that Plaintiff's 5 be admitted.

MS. BARAZI: No objection, Judge.

THE COURT: P-5 is admitted.

MR. PETERS: Thank you.

Q. (By Mr. Peters) And, Mr. McGinnis, I'm hoping I'm showing you what's been labeled Plaintiff's Exhibit 6. Can you see that?

A. Yes, I can.

Q. Okay. Do you recognize this document?

A. Yes, I do.

Q. What is it?

A. This is an order form for another technology that is used in the Big Thirst, Incorporated, dashboard for Cumul.io.

Q. Okay. And who -- who ordered this?

A. This was ordered by Ms. Donoho.

Q. Okay. In what capacity was this ordered by Ms. Donoho?

A. She was ordering this as an agent of Big Thirst, Incorporated.

Q. And how do you know that?

A. Because she signed it as founder and used a Big Thirst e-mail.

Q. And have you modified this document in any way?

A. I have not modified this document in any way.

Q. Is this a true and correct copy of the license agreement between Big Thirst, Inc., and Cumul.io?

A. It is true and accurate.

MR. PETERS: Move that Plaintiff's 6 be admitted.

MS. BARAZI: No objection, Judge.

THE COURT: 6 is admitted.

Q. (By Mr. Peters) Mr. McGinnis, Plaintiff's Exhibit 7, can you see that on your screen?

A. Yes.

Q. What is that?

A. This is a letter that I sent to Ms. Donoho on the evening of March 31st following a mediation session that we attended. It was apparent that she was going to -- well, I can't say what was happening in the mediation session, I understand. But I felt the need to request that she provide access to the software owned by the company.

Q. And is this a true and correct copy of that document that you sent to her?

A. Yes, it is.

MR. PETERS: Move that Plaintiff's 7 be admitted.

MS. BARAZI: Objection, Judge; this is hearsay.

THE COURT: The purpose of --

MR. PETERS: Your Honor, the purpose of this is to show that there was a dispute between the parties and that my client asked for information. It's not being offered for the truth of anything. It's not asserting the truth of anything.

THE COURT: All right.

Yes, Ms. Barazi?

MS. BARAZI: What is it asserting then, Judge? It's asserting the truth of the matter stated. And I think this also goes into settlement negotiations, which are forbidden from --

*(Simultaneous crosstalk)*

MR. PETERS: -- settlement negotiations are not forbidden. They're forbidden for establishing liability. And that's an awfully misuse -- that's an awfully misused objection. This is not being offered for the truth of the matter asserted because there isn't one. This is being offered for showing what my client communicated to the defendant, which is completely

appropriate.

MS. BARAZI: And, Judge --

THE COURT: All --

MS. BARAZI: -- I think --

*(Simultaneous crosstalk)*

THE COURT: -- right.

MS. BARAZI: -- backdoor settlement negotiations, and --

THE COURT: I'll admit P-7 for the limited purposes of showing that he asked Ms. Donoho for certain documents.

MR. PETERS: Thank you, Your Honor.

Q. (By Mr. Peters) Okay. When did the problems arise between the company and Ms. Donoho?

A. The first real issue came on March 15th, two days before we were to close on our SBA loan. We were scheduled to close on that loan on March 17th. Ms. Donoho sent me an e-mail with a list of demands saying that she needed those to be met for her to sign the loan.

Q. Okay.

MR. PETERS: Your Honor, with your permission, I'm going to share screen. I know that that's discouraged, but it's just taking me too long to stop sharing and then going back to sharing. I'm about

WYLIE 058

to go through a lot of documents. So, with your permission, I'd like to just remain on stop [sic] share.

THE COURT: No problem. I'll just tell you that Ms. Williamson kind of needs to see your lips when you're speaking. It helps her transcribe the questions and answers. So I'll just ask that you be especially mindful of the fact that she's trying to make a transcript.

MR. PETERS: Absolutely, Your Honor. Thank you.

Q. (By Mr. Peters) Mr. McGinnis, do you see what's on your screen as Plaintiff's Exhibit 8?

A. Yes, I do.

Q. Okay. And if we look at Page 3 -- well, it starts at the bottom of Page 2, and then it moves on to Page 3. Do you recognize that?

A. Yes, I do.

Q. What is that?

A. This is a e-mail from Ms. Donoho to Mr. Shilling and to me saying this she did not want to provide additional information and did not believe the mediation went well. So she had offered two options. The first was for us to immediately pay her almost $37,000 and she would transfer some of the technology to us; and then an additional 17,467, and then she would

transfer the website. She would not transfer any of the documentation or the actual data dashboard to us no matter what under Option 1; that she would terminate her employment immediately with immediate payment or she would close down the software.

The second option was to make her CEO.

Q. Okay. And did you respond to that?

A. Yes. I responded that the requests --

MS. BARAZI: Objection; hearsay.

MR. PETERS: Your Honor --

THE COURT: Go ahead, Mr. Peters.

MR. PETERS: He has a lot to testify as to what he said to somebody. That is not hearsay.

MS. BARAZI: That's an out-of-court statement offered for the truth of the matter asserted. That's exactly what hearsay is.

THE COURT: It is; and I'll sustain the objection.

MR. PETERS: Okay.

Q. (By Mr. Peters) Mr. McGinnis, did you respond by e-mail?

A. Yes, I did.

Q. And is that your e-mail there at the top of Plaintiff's Exhibit 2 -- 8, Page 2?

A. Yes, it is.

Q. Is that a true and correct copy of that?
A. Yes, it is.
Q. And is it a true and correct copy of Ms. Donoho's e-mail down at the bottom of Page 2 and all of Page 3?
A. Yes, it is.
MR. PETERS: Okay. I would move that Plaintiff's 8 be admitted.
MS. BARAZI: Judge, I object; this is all hearsay. It also -- proper predicate hasn't been laid. Again, I just see a lot of hearsay in it, and I object on that ground.
MR. PETERS: Your Honor --
THE COURT: So the state- --
*(Simultaneous crosstalk)*
MR. PETERS: -- [Zoom audio difficulty] -- are not hearsay.
THE COURT: So the statements by Ms. Donoho -- is it Donoho or Donoho, ma'am?
MS. DONOHO: Sorry. I was muted.
It's Donoho.
THE COURT: Thank you.
The statements by Ms. Donoho are not hearsay because they fall under the exception of statements by a party opponent. The statements by

Mr. McGinnis, unless there's a hearsay exception, would appear to be hearsay.

So is there an exception, Mr. Peters?

MR. PETERS: Not off the top of my head, Your Honor. I just never had anyone object to e-mail communications between parties before. And I've been practicing for 20 years and tried many cases, and this is the first time it's come up.

MS. BARAZI: Judge, this is classic hearsay.

THE COURT: So I will -- unless there's an exception for Mr. McGinnis' statements, I will admit the statements of Ms. Donoho and disregard the statements of Mr. McGinnis.

So the statements of Ms. Donoho in Plaintiff's 8 are admitted.

Q. (By Mr. Peters) Okay. Mr. McGinnis, do you recognize the e-mail that's on Page 1 of Plaintiff's 8?

A. Yes, I do.

Q. Okay. And on Page 1, is that an e-mail from Ms. Donoho?

A. Yes, it is.

Q. And what is she telling you?

A. She's granting a little bit of time for us to hold an emergency board meeting to consider the two

options that she put forth.

Q. Okay. What was the SBA loan going to be used for?

A. It would've been used for hiring immediately four new employees; for paying a salary to Ms. Donoho and to me; and to purchase equipment and further software; and to pay some additional legal fees. You can say that is working capital.

Q. And I'm showing you what's been labeled Plaintiff's 10. Do you recognize this document?

A. Yes, I do.

Q. What is it?

A. This is a further reiteration of her two positions. However, in this point on -- two days after she granted us time to pull together a board meeting to come up with a way to figure out governance and a way to potentially figure out the money she was asking for, which was substantial, she chose then to say, no, I don't -- I don't want to give you time. So you either pay me now, or I close it down, or you make me CEO now.

Q. Okay.

MR. PETERS: Move that Plaintiff's 10 be admitted.

MS. BARAZI: Objection, Judge; this is hearsay.

MR. PETERS: This is Ms. Donoho's statement.
MS. BARAZI: I believe it also includes Mr. McGinnis' statements.
THE COURT: All right. At this point, I will admit those portions of Plaintiff's 10 that are Ms. Donoho's statements.
MR. PETERS: Right. Which is all of it. There are no other statements.
THE COURT: All right.
MR. PETERS: Thank you.
Q. (By Mr. Peters) Okay. And that was April 7th that we just saw?
A. Correct.
Q. On that -- do you recognize the document that's here on Plaintiff's Exhibit 9?
A. Yes.
Q. What is it?
A. This is her resignation as an officer of the company.
Q. And is that a true and correct copy of that resignation?
A. Yes, it is.
Q. How did you receive that?
A. In e-mail.

Q. From?
A. From Ms. Donoho.
MR. PETERS: Move that Plaintiff's 11 [sic] be admitted.
MS. BARAZI: No objection, Judge.
THE COURT REPORTER: Is this --
THE COURT: I'm sorry.
THE COURT REPORTER: -- Plaintiff's 11 or Plaintiff's 9?
MR. PETERS: Apologize.
Plaintiff's 9 be admitted, Your Honor.
THE COURT: Plaintiff's 9 is admitted.
Q. (By Mr. Peters) Okay. So she is now, as of April 7th, resigned as Chief Operating Officer. Is she still a director?
A. Yes.
Q. Okay. Does she eventually resign as a director?
A. Yes, she did.
Q. Okay. And I'm going to show you Plaintiff's 11. What is that document?
A. This is her resignation as a director.
Q. And you -- how did you receive this document?
A. I received this in e-mail from Ms. Donoho.
Q. Is that a true and correct copy of the

document?

A. Yes, it is.

MR. PETERS: Move that Plaintiff's 11 be admitted.

MS. BARAZI: No objection, Judge.

THE COURT: Plaintiff's 11 is admitted.

Q. (By Mr. Peters) Okay. Did the company accept that resignation?

A. Yes, we did.

Q. And I'm going to ask that you look at Plaintiff's 12. What is that document?

A. This is a letter of acceptance of her resignation both as a officer and a director, and also terminating her contract with Big Thirst Marketing.

Q. Okay. And is that a true and correct copy of that document?

A. Yes, it is.

MR. PETERS: Move that Plaintiff's 12 be admitted.

MS. BARAZI: I'm sorry, Judge. I'm -- I'm going to have to object to the basis of hearsay.

THE COURT: Is there a hearsay exception?

MR. PETERS: I don't know how to say -- this is not being offered for the truth -- this is being offered for -- well, it's being offered for two things:

One, to show that the company accepted her resignation; and, two, to show that the company is asking her for certain materials that it believes to belong to it.

So I'm not saying that this is -- he is saying we own this and it's being offered for the proof that they own it; it's being offered to show that they're asking for it.

MS. BARAZI: Judge, this is, again, classic hearsay.

THE COURT: I'm going to overrule the objection. Plaintiff's 12 is admitted.

Q. (By Mr. Peters) Now, Mr. McGinnis, on that date, you went to a hearing, correct, for a temporary restraining order?

MS. BARAZI: Objection; leading.

A. We had a hearing for a temporary --

MS. BARAZI: I'm sorry. Mr. McGinnis, you're going to have to wait for the judge to rule.

MR. PETERS: Your Honor, if you could ask opposing counsel not to speak directly to my client.

THE COURT: So the objection is overruled.

MR. PETERS: Thank you.

Q. (By Mr. Peters) Mr. McGinnis, Plaintiff's Exhibit 13, do you see that?

A. Yes, I do.

Q. Okay. Do you recognize that as a copy of the temporary restraining order issued in this case?
A. Yes, I do.
Q. Okay. And that's a true and correct copy of the temporary restraining order issued in this case?
A. Yes, it is.
MR. PETERS: Move that Plaintiff's 13 be admitted, Your Honor.
MS. BARAZI: No objection, Judge.
THE COURT: 13 is admitted.
Q. (By Mr. Peters) Okay. So, Mr. McGinnis, Number 1 on Page 1 orders that Ms. Donoho "Restore Big Thirst, Inc.'s data dashboard to fully functioning status as it was on April 1, 2022."
Has that happened to date?
A. No, it has not.
Q. How has it not happened?
A. Its functionality has been removed in a few ways. Number one, the data that we sell to our clients in the second and third tier with Google Analytics, Google Ad, Facebook Ad, and Mailchimp, have all been removed. They're no longer accessible to our clients. In another -- [Zoom audio difficulty] -- our clients have complained that they can no longer see the inventory. In another complaint from a client, they're

telling me that they no longer have the correct order status. And it is apparent to our clients that the dashboard has been changed.

MS. BARAZI: Objection; speculation as to what the clients believe, Judge.

THE COURT: Overruled.

Q. (By Mr. Peters) And Number 2, it orders that Ms. Donoho forward all e-mails that defendant rerouted from Big Thirst, Inc. e-mail to a personal e-mail account to help. Do you know whether or not that has happened?

A. I do not know if she's sending all e-mails to me. I started receiving e-mails from her on Friday -- Good Friday of last week. And I received a password for the help@bigthirst.com yesterday. However, I did not receive the log-in information for GoDaddy where the e-mail is hosted. So I don't know whether I'm receiving everything because I can't get in to actually forward them to myself.

Q. And is GoDaddy -- is that intellectual property that's licensed or owned by Big Thirst, Inc.?

A. Yes, it is a -- it is licensed to Big Thirst, Inc., as it is shown in the bank statement that you displayed earlier.

Q. And so did you just testify that she has not

given you the administrative log-in credentials for GoDaddy?

A. That is correct.

Q. And so Number 3, has she complied with that order?

A. No, she has not.

Q. Are there other instances that you know of that she has not provided you with log-in credentials for software owned by Big Thirst and intellectual property labeled as belonging to Big Thirst?

A. Yes, she has. She has not given log-in credentials to one particular software that we use that has caused a lot of problems, and that's called ShipStation. As of this week, on Tuesday, I was able to get in finally, but not because she allowed it after repeated requests, but finally was able to get myself into it to -- but in the interim, it caused backlog of a lot of unfill- -- over 100 unfulfilled orders, which caused a lot of problems for consumers and our clients that resulted in refunds having to be issued and very angry clients.

Q. Okay. Do you recognize Plaintiff's 16?

A. Yes, I do.

Q. What is it?

A. This is a screenshot from Shopify showing

unfulfilled orders that I could not access because she would not provide log-in credentials to ShipStation.

Q. Okay. And what was the date that you created -- did you create this document?

A. .Yes. This is a screenshot. And I believe this was done on April 15th.

Q. And is this a true and correct copy of that screenshot, or has it been changed in any way?

A. It is a true and correct copy.

Q. Okay. And is that from the records of Big Thirst, Inc.?

A. Yes. This is from a software program that we -- that is licensed to us.

Q. And you're the CEO of Big Thirst, Inc., right?

A. That is correct.

MR. PETERS: Move that Plaintiff's 16 be admitted.

MS. BARAZI: No objections, Judge.

THE COURT: P-16 is admitted.

Q. (By Mr. Peters) Mr. McGinnis, since April 15, have there been any additional unfulfilled orders?

A. Yes, there have. Since gaining access to ShipStation, I've been able to move many of them along. But there have been unfulfilled orders that have come up since then.

Q. Okay. And how does that affect the business if there are unfulfilled orders?
A. It erodes the confidence that our clients have in us to provide the services that they contracted us to provide, and it angers the consumers that they didn't get their products shipped to them in a timely way.
Q. And, Mr. McGinnis, I'm going to show you Plaintiff's 14. What is that?
A. That is a screenshot of the Big Thirst, Incorporated, data dashboard from one of our clients.
Q. Okay. And is that a true and correct copy -- is that a true and correct representation of what the data dashboard looks like?
A. Yes, it is.
Q. Okay.
MR. PETERS: Move that Plaintiff's 14 be admitted.
MS. BARAZI: No objection, Judge.
THE COURT: P-14 is admitted.
Q. (By Mr. Peters) And, Mr. McGinnis, is that how the dashboard appeared prior to April 1, 2022?
A. Well, this aspect of the view, yes.
Q. Now, you mentioned data analytics. Where are they?
A. They are not on this screen.

Q. That's a different screen.
A. It is; yes.
Q. Okay.
MR. MOUSILLI: Your Honor, if I might, just a point of order. I just want to understand our timeline here. I had understood that we had only 90 minutes allocated. So I just want to be able to structure the rest of my afternoon here.
THE COURT: It's a three-hour hearing, so an hour and a half for each side.
MR. MOUSILLI: Okay. Thank you, Your Honor.
THE COURT: But the court reporter is asking for a break since we have been at it for an hour and 15 -- 18 minutes. So we will go ahead and take a break until 3:30.
*(Recess taken)*
THE COURT: All right. Mr. Peters, you may continue.
MR. PETERS: Thank you, Your Honor.
Q. (By Mr. Peters) So, Mr. McGinnis, we've talked about a lot of -- well, let's do this. I'm going to show you -- do you see what's been labeled Plaintiff's 25?
A. Yes, I do.

Q. Okay. What is that?

A. These are log-in credentials to our website, our e-mail, and to PayPal and Stripe that were given yesterday.

Q. Okay. And, Mr. --

MR. MOUSILLI: Mr. Peters, just a point of order. This is being live broadcast, and you have credentials -- admin credentials that you're showing to the public for the Big Thirst proprietary software. I don't think that's appropriate.

MR. PETERS: Is there an objection?

MR. MOUSILLI: Yes. I'm objecting to the confidentiality of this information that you're sharing and broadcasting in public. That should be disclosed per a --

MR. PETERS: Is there a motion on file to keep this --

MS. BARAZI: There doesn't need to be a motion on file. We're objecting now regarding the confidentiality of this matter.

THE COURT: All right. So if this information is, in fact, confidential, and it does appear to be, then I would recommend that you not post it where --

MR. PETERS: Okay.

THE COURT: -- the public can see it on YouTube. We can all take a look in the documents that are in Box if that's where it's posted.

MR. PETERS: Yes, it is there. It's Plaintiff's 25. But I can do it this way.

Q. (By Mr. Peters) The credentials that are in Plaintiff's Exhibit 25, Mr. McGinnis, you received those for the first time on the 20th; is that correct?

A. That is correct.

Q. Okay. And did that provide you with the information you needed?

A. No, it does not.

MR. PETERS: And by the way, Your Honor, I would move that Plaintiff's 25 be admitted.

MS. BARAZI: No objection, Judge.

THE COURT: All right. P-25 is admitted. But I will recommend that it be redacted before it become a record.

MR. PETERS: Thank you.

MR. MOUSILLI: Your Honor, one last point of order. We -- we can see the files in Box, but apparently we don't have access to those files that have uploaded. So I'm not sure if there's some other permission that needs to be granted.

And this goes back to what Mr. Peters had

raised earlier that we'd had an opportunity to see these. We can see what -- the files, but we can't actually access or download --

THE COURT: Somebody was sent credentials. It probably wasn't both of you.

Let's go off the record.

*(Discussion off the record)*

THE COURT: All right. So is there an objection to P-25? No, we already admitted it.

Okay. Let's move on.

MR. PETERS: Thank you.

Q. (By Mr. Peters) Why -- you just testified that that did not give you what you needed, Mr. McGinnis. Why not?

A. That's correct. It does not give me the access to GoDaddy that we had requested and was covered in the TRO, because giving me a password without access to GoDaddy doesn't let me get in to see that or reroute it. Also, the same is true for the following credentials because it says access help, but I can't get to it that way. Furthermore, it didn't provide the ShipStation or the log-in for the database. None of those things that were requested in the TRO came through. It's just a few things that were essentially making it look like they were complying with the TRO.

Q. Did -- okay. So I'm just going to go through some of the technology that I believe we've discussed.
GoDaddy, do you have the -- do you have the credentials for that?
A. I do not.
Q. Have you requested it after the TRO?
A. Yes; numerous times.
Q. ShipStation, do you have the credentials for that?
A. I was able to gain access but not because Ms. Donoho. I got it separately from her.
Q. Did you request it from Ms. Donoho?
A. Numerous times.
Q. How about QuickBooks?
A. I have access; yes.
Q. Okay. Stripe?
A. Yes, I have Stripe.
Q. PayPal?
A. No, I don't.
Q. Shopify?
A. Yes, I do.
Q. Panoply?
A. No, I don't.
Q. Auth0.com?
A. No.

Q. Gobigthirst.herokuapp.com?
A. That is the data dashboard. I can view it, but I can't use it.
Q. Cumul.io?
A. No, I don't.
Q. Bigthirst.com?
A. I do not have the credentials to get into it.
Q. WIP for Bigthirst.com?
A. No.
Q. Klaviyo?
A. No.
Q. Okay. Now, in order for Big Thirst, Inc., to operate as it was operating before April 1, would you need those credentials?
A. Many of them; yes.
Q. Okay. What about Google Analytics; do you have that?
A. I do not.
Q. Google Ad analytics, do you have that?
A. I do not.
Q. Facebook Ad analytics, do you have that?
A. I do not.
Q. What about the e-mail marketing?
A. Nope.
Q. Okay. Is this all stuff that is Big Thirst,

Inc., property?

A. Yes, it is.

Q. Okay. And, as of today, you do not have it.

I'm going to show you what's been labeled as Plaintiff's Exhibit 15, Page 2. It's a picture that -- appears to be a picture. Do you recognize that picture?

A. Yes, I do.

Q. What is it?

A. This is a screenshot of the main data dashboard. And I drew a red box on this screenshot to show where the other aspects of the things that you just mentioned should be showing up. The data analytics for our clients in our Tier 2 and Tier 3 should be able to access information for Google Analytics, Google Ad, Facebook Ad, and Mailchimp. And none of those were there at the time I took that screenshot, and they have not been added back.

Q. Okay. Were they there prior to April 1?

A. Yes.

MR. PETERS: Your Honor, I would move that Plaintiff's 15, Page 2, just the picture, be admitted.

MS. BARAZI: And I apologize, Judge, but I didn't hear the date when this picture was taken.

THE COURT: All right. Do you have the

date, Mr. Peters?

MR. PETERS: I could ask.

Q. (By Mr. Peters) Mr. McGinnis, when did you take this picture?

A. To be completely sure, I would need to see the e-mail where I sent that to you. But I believe that would have been on either Thursday, the 14th, or Friday, the 15th.

Q. Well, we know it has to be before Friday the 15th, because I sent it to Mr. O'Toole, defendant's prior counsel, on April the 14th. Do you see that?

A. Thursday the 14th is when I sent it to you.

Q. Thank you.

MR. PETERS: Move that that picture be admitted.

MS. BARAZI: No objection, Judge.

THE COURT: You'll need to upload a redacted version of P-15 that just has the picture. And that is admitted.

Q. (By Mr. Peters) And, Mr. McGinnis, do you know who Brian O'Toole is?

A. Yes. He was an attorney representing Ms. Donoho.

Q. Was he at that TRO hearing?

A. Yes, he was.

Q. And since that TRO hearing, have you asked -- in writing, have you asked for Shopify --
MS. BARAZI: Objection; leading.
A. Mr. Peters, I have asked --
MS. BARAZI: I'm sorry.
*(Simultaneous crosstalk)*
A. -- for --
MS. BARAZI: I'm sorry.
THE COURT: Hang on. Hang on.
I will sustain the objection. You need to reword the question.
Q. (By Mr. Peters) Since -- Mr. McGinnis, since the TRO hearing, have you asked specifically for credentials?
MS. BARAZI: Objection; leading.
MR. PETERS: Okay. Your Honor, I'll try again.
Q. (By Mr. Peters) Mr. McGinnis, since the TRO hearing, have you asked anything of defendant?
A. Yes, Mr. Peters. I've requested numerous times that the defendant abide by the TRO.
Q. Okay. And in what way did you ask her to abide by the TRO?
A. I sent her direct e-mails requesting very specific items that not only are harming the business

but are harming our clients.

Q. How are we harming the business?

A. By restricting access to technologies, I'm not able to provide our clients with the functionality that they're paying for.

Q. What prompted you to make those requests?

A. I made requests before the TRO. I made requests after the TRO. And I made requests specifically because clients had raised concerns and complaints not only to Big Thirst, Inc., but also to Big Thirst Marketing, which is not covered by the TRO. And Ms. Donoho is still withholding important client information for that company, as well, for absolutely no reason.

Q. So you bring up client complaints. In what form did those complaints come? Did they come by phone or e-mail or text? How did they come to you?

A. I received both phone complaints and text complaints.

Q. Did you receive any by e-mail?

A. And, yes, I'm sorry, e-mail complaints, which I also forwarded to you and to Ms. Donoho and her former attorney.

Q. Do you know whether or not Ms. Donoho is still accessing Big Thirst, Inc., technology?

MS. BARAZI: Objection; leading. And objection; speculation.

THE COURT: Overruled.

A. Yes, she is. I have seen her logging in to Big Thirst Shopify as recently as this week.

Q. (By Mr. Peters) And, Mr. McGinnis, I'm going to show you what's been labeled Plaintiff's Exhibit 26. Do you recognize that?

A. It is not showing up on my screen yet.

Q. I'm sorry. That is user error.

Plaintiff's Exhibit 26, do you recognize that?

A. Yes, I do.

Q. What is it?

A. This is the affidavit I submitted for our TRO hearing.

Q. Is that a true and correct copy of that affidavit?

A. Yes, it is.

MR. PETERS: I would move that Plaintiff's 26 be admitted.

MS. BARAZI: Judge, I object because it contains hearsay.

THE COURT: Overruled.

P-26 is admitted.

MR. PETERS: I will pass the witness, Your Honor.

MS. BARAZI: Mr. Peters, if you can stop sharing your screen, please.

Thank you.

**CROSS-EXAMINATION**

BY MS. BARAZI:

Q. Mr. McGinnis, how many jobs do you have?

A. I am the CEO of Big Thirst, Incorporated; I am the president of Big Thirst Marketing; and I am a partner in Big Thirst Consulting.

Q. And approximately how many hours do you work for Big Thirst Marketing per week?

A. Per week, I probably spend about 10 to -- to 14 hours per week.

Q. And how many hours do you spend working on Big Thirst Consulting?

A. Per week, maybe an hour.

Q. An hour per week?

And how many hours per week do you work on Big Thirst, Inc.?

A. Probably 50 to 60.

Q. And are you being compensated for those other jobs as -- in Big Thirst Marketing and Big Thirst Consulting?

A. For Big Thirst Marketing, yes.

Q. And how much are you being compensated?

MR. PETERS: Objection, Your Honor; relevance.

MS. BARAZI: Judge, this was a foundational question.

MR. PETERS: Judge, Marketing is not a party to this lawsuit. What he's being paid for -- for working for a company that is not part of this lawsuit has no relevance to this dispute at all.

THE COURT: What is the relevance, Ms. Barazi?

MS. BARAZI: Judge, it goes to show that Mr. McGinnis is being compensated for his time and has other sources of revenue as compared to Mrs. Donoho who doesn't.

MR. PETERS: Your Honor, that's not relevant.

THE COURT: I'll -- I'll sustain the objection.

Q. (By Ms. Barazi) Mr. McGinnis, did you review Big Thirst's original petition and application for a temporary restraining order that your attorney, Doran Peters, drafted and filed with the Court?

A. Could you restate that question, please?

Q. Did you review Big Thirst's original petition and application for a temporary restraining order that your attorney drafted and filed with the Court?
A. Yes, I did.
Q. Okay. Do you stand by all the statements made in Big Thirst's application --
A. Yes, I do.
Q. -- for a tempo- -- I'm sorry. Let me finish my question before you answer.
Do you stand by all the statements made in Big Thirst's original petition and application for a temporary restraining order?
A. Yes, I do.
Q. And have you read the temporary restraining order the Court issued on April 12th, 2022?
A. Yes, I have.
Q. Do you fully understand the temporary restraining order?
A. I -- sometimes legalese is not my strong-suit, but I believe I understand it.
Q. Have you personally been in compliance with the temporary restraining order?
A. Yes, I have.
Q. And has Big Thirst been fully compliant with the temporary restraining order?

A. To my knowledge, yes.

Q. Why did you, as CEO of Big Thirst, apply for a temporary restraining order against Lauren Donoho?

A. Because she threatened to shut down the software that -- that is used for our -- our company to process orders and to operate our business.

Q. And let's -- let's talk a little bit about the Big Thirst data dashboard.

What is the Big Thirst data dashboard?

A. It is a repository for information of both eCommerce sales and marketing information that we sell to our clients as a way to know how they're doing in their business, both with eCommerce and in the return on investment on eMarketing.

Q. What functions does the data dashboard serve?

A. It's an information repository and visualization so that clients can understand what's going on with their business.

Q. Okay. Is the data dashboard used to place customer orders?

A. No. Customer orders show up in it, and the inventory is reflected there, as well.

Q. Okay.

MS. BARAZI: Judge, I object to everything after "no" as being nonresponsive.

MR. PETERS: Your Honor, he's just answering the question as fully as he can.

THE COURT: All right. So I'm going to sustain the objection and just instruct Mr. McGinnis to answer the question and stop. If you have additional explanation you want to give, Mr. Peters will have an opportunity to ask you about that.

MS. BARAZI: Thank you, Judge.

Q. (By Ms. Barazi) Is the data dashboard used to fulfill customer orders?

A. No.

Q. Explain to the Court how the data dashboard is necessary to run Big Thirst.

A. It is exactly what we're selling to our clients as a way to see how their orders are being -- that they're -- they're being made. They get customer information, such as e-mail. They get to see where those orders are placed. And they also get to see what -- how much inventory they have. Furthermore, it provides them with analytics on marketing aspects to help them improve their sales.

Q. Okay. In your sworn affidavit dated April 11th, 2022, that you filed with the Court, you claim Big Thirst needed all e-mails generated from or through the data dashboard that were rerouted to

Donoho's business address, correct?
A. Correct.
Q. But that wasn't true, was it?
A. I believe it to be true.
Q. Does the data dashboard generate e-mails?
A. It --
Q. It doesn't, does it?
*(Simultaneous crosstalk)*
A. -- of itself does not generate e-mails. E-mails can be sent to people on the back end of it, though.
Q. (By Ms. Barazi) Okay. The data dashboard doesn't generate e-mails, does it?
A. It, in and of itself, does not generate e-mails. People generate e-mails.
Q. Okay. And so my question is, does the dat- -- the dash -- data dashboard doesn't generate e-mails, does it?
MR. PETERS: Objection, Your Honor; asked and answered.
MS. BARAZI: Judge, he's not answering my question.
THE COURT: All right. I'll overrule the objection. But I do think we have an answer.
Q. (By Ms. Barazi) Mr. McGinnis, the data

dashboard doesn't generate e-mails, does it?

A. No.

Q. Thank you.

Mr. McGinnis, by claiming that the data dashboard does generate e-mails in your affidavit, it appears that you're not very familiar with the data dashboard.

You're not very familiar with it, are you?

A. Are you asking me a question?

Q. I am. I'm asking you, are -- I'm asking you, you're not very familiar with it, are you?

A. Ms. Barazi, my role has not been to --

MS. BARAZI: Objection, Judge; nonresponsive.

THE COURT: Sustained.

MR. PETERS: Your Honor, I'll object to the question. It's asking for a degree that is not defined in any way. The word "familiar" is not something that I think -- I think it's a very subjective term.

THE COURT: Overruled.

You may answer the question, Mr. McGinnis.

A. I have never been provided access to be able to work with the dashboard. I've only been able to view it on a shared screen from Ms. Donoho. So my level of

understanding of how it's used is nowhere near as -- as great as hers.

Q. (By Ms. Barazi) Then, Mr. McGinnis, you're not very familiar with the data dashboard, are you?

MR. PETERS: Objection --

A. I am --

*(Simultaneous crosstalk)*

MR. PETERS: -- asked and --

A. -- familiar with it --

MR. PETERS: -- answered.

THE COURT: All right. So just listen to the question and answer it, and you'll have an opportunity to explain your answer.

Q. (By Ms. Barazi) Mr. McGinnis, you're not very familiar with the data dashboard.

A. I am familiar with it.

Q. Yet you think it generates e-mails, correct?

A. I have already stated that I know it does not.

Q. However, in your affidavit, you stated it did, correct?

A. I would need to see that.

Q. You need to see your own affidavit that you earlier stated -- where you earlier stated that you did make that statement?

MR. PETERS: Objection, Your Honor. She's

badgering the witness. And it is appropriate, if she's going to ask the witness about a document, that the witness be allowed to view the document that she -- he's being asked about.

MS. BARAZI: Judge, I earlier asked -- asked Mr. McGinnis about the statement, and he acknowledged making the statement in his affidavit.

THE COURT: So I think we're getting a little far afield here. But will you read him the statement from his affidavit? And then ask him the question, please. Or show it to him.

MS. BARAZI: Judge, in -- in --

Q. (By Ms. Barazi) Mr. McGinnis, in your affidavit, you stated you -- you claim Big Thirst needed -- needed, quote, all e-mails generated from or through the data dashboard that were rerouted to Donoho's business address. Isn't that correct?

A. That is correct.

Q. Okay. Is it your contention that Mrs. Donoho shut down the Big Thirst data dashboard prior to your request for a TRO?

A. It is my contention that she restricted the functionality of it and that she precluded me from gaining access to it.

MS. BARAZI: Objection, Judge;

nonresponsive.

THE COURT: I overrule the objection.

Q. (By Ms. Barazi) Mr. -- Mr. McGinnis, is it your contention that Big Thirst -- that the Big Thirst data dashboard was not fully functioning prior to your request for a TRO?

A. Yes.

Q. The Big Thirst data dashboard was fully functioning prior to your request for a TRO, wasn't it?

A. I don't have full answer to that. However, I can tell you that I showed a screenshot of it not being fully functional since then. What -- our response was into her threat that she was going to close it down that she provided in a written statement, which is why we issued the TRO.

Q. Help us understand better. Are you contending that the data dashboard was not functioning, or are you contending that you didn't have access to the data dashboard, Mr. McGinnis?

A. The password that I had previously used to access the data dashboard no longer worked before the TRO was issued. She removed my password.

Q. Okay. So the -- the data dashboard was working; however, you didn't have access to it, correct?

MR. PETERS: Objection, Your Honor. This

misstates the testimony.

MS. BARAZI: Judge, I'm just restating what he -- what Mr. McGinnis just said.

MR. PETERS: No, you're not. That's the objection. You're misstating what he just said.

THE COURT: All right. He can answer the question; and if -- if there's a falsity in it, he can ex- -- he can tell her there is.

Q. (By Ms. Barazi) Mr. McGinnis, go ahead and answer my question, please.

A. Please restate your question.

Q. Is it your contention that the data dashboard wasn't fully functioning, or is it your contention that you didn't have access to the data dashboard?

A. When she issued the threat of shutting it down, I went to access it and was not able to access it. I quickly asked a client to check it out, and the client responded that it looked like the functionality had changed and less information was there.

Q. So this was information based on your client's access to their data dashboard.

A. Correct.

Q. Okay. So it's speculation, at best, correct?

A. I trust my clients.

Q. In fact, Lauren -- Ms. -- Mrs. Donoho never

shut down the Big Thirst data dashboard since it was implemented; isn't that correct?

A. She has not shut it down. She has reduced its functionality.

MS. BARAZI: Objection to everything after "She has not shut it down," Judge, as being nonresponsive.

THE COURT: Sustained.

MR. PETERS: I think it's a complete response.

Q. (By Ms. Barazi) In fact, the Big Thirst data dashboard has remained functioning both before your request for a TRO and afterwards through today, correct?

A. It is functioning.

Q. In the TRO, you requested for the Court to force Mrs. Donoho to restore Big Thirst data dashboard to fully functioning status as it was on April 1st, 2022; is that correct?

A. That is correct.

Q. Okay. Did you ask the Court to order the data dashboard to be restored to fully functioning status so as to make it seem like there was an emergency?

A. Having reduced functionality means that our clients aren't getting what we promised. I would like it -- to be able to fulfill the promises we made to our

clients.

MS. BARAZI: Objection; nonresponsive.

THE COURT: Overruled.

Q. (By Ms. Barazi) Mr. McGinnis, did you ask the Court to order the data dashboard to be restored to fully functioning status so as to make it seem that Mrs. Donoho was harming the company?

MR. PETERS: Objection, Your Honor; just asked and answered.

MS. BARAZI: Completely different question if opposing counsel would listen more carefully.

THE COURT: I'm going to overrule that ob- -- objection and let Mr. McGinnis answer it.

A. Could you restate your question, please?

Q. (By Ms. Barazi) Did you ask the Court to order the data dashboard to be restored to fully functioning status so as to make sure -- make it seem like Mrs. Donoho was harming the company?

A. By not having full functionality, it is harming the company.

Q. Mr. McGinnis, isn't it true that Big Thirst is able to operate without the data dashboard?

A. We sell our services as -- the core of -- the data dashboard is at the core of it.

MS. BARAZI: Objection; nonresponsive.

A. May I answer it in a different way, then?
MS. BARAZI: We're going to have to wait for the Judge to rule.
THE COURT: So I'll -- I'll sustain that objection.
MS. BARAZI: Thank you.
Q. (By Ms. Barazi) Mr. McGinnis, isn't it true that Big Thirst is able to operate without the data dashboard?
A. Our ability to operate is reduced without the data dashboard.
MS. BARAZI: Objection; nonresponsive.
Q. (By Ms. Barazi) Mr. McGinnis --
THE COURT: Overruled.
MS. BARAZI: Okay.
Q. (By Ms. Barazi) Isn't it true that Mrs. Donoho never used the data dashboard to fulfill customer orders?
A. That is true.
Q. Okay. So, in fact, the data dashboard is not needed to operate Big Thirst; isn't that correct?
A. That is not correct.
Q. How do you reconcile the fact that Mrs. Donoho never used the data dashboard to fulfill customer orders with your statement that it's -- that a data dashboard

is necessary to operate Big Thirst?

A. They are separate things.

Q. Yet Ms. Donoho was able to operate and fulfill customer orders without it, correct?

A. Those are --

MR. PETERS: Your Honor, I'm going to object. He's answered many times that you can fulfill orders without the dash -- or with the dashboard, but that the dashboard is an essential part of the company and it's what is sold to the clients.

So I understand --

*(Simultaneous crosstalk)*

MS. BARAZI: Objection --

MR. PETERS: -- what opposing counsel's --

MS. BARAZI: Judge --

MR. PETERS: -- trying to do, but there are multi- --

*(Simultaneous crosstalk)*

MS. BARAZI: Opposing counsel's testifying here. Opposing --

THE COURT: So --

MS. BARAZI: -- counsel --

THE COURT: All right. Let's keep the objections to one word unless I --

*(Simultaneous crosstalk)*

MR. PETERS: Asked and --
THE COURT: -- ask --
MR. PETERS: -- answered, Your Honor.
THE COURT: That's overruled.
You may ask the question again.
MS. BARAZI: Can the court reporter --
THE COURT: I'll read it back.
Ms. -- Ms. Donoho was able to operate and fulfill customer orders without it, correct?
A. Orders are processed separately from the dashboard. The dashboard is the information that we give to our clients about how the orders are -- are fulfilled. I'm sorry that you don't understand the technology.
Q. (By Ms. Barazi) No, sir. It's not that I don't understand the technology. It's that you're not answering the question.
MS. BARAZI: Judge, I object as nonresponsive.
THE COURT: Sustained.
MS. BARAZI: Thank you.
Judge, can you please instruct Mr. McGinnis to answer my question?
THE COURT: I believe you got the answer, ma'am. You may ask your next question.

MS. BARAZI: Thank you, Judge.

Q. (By Ms. Barazi) Mr. McGinnis, you claimed earlier that you and Big Thirst have been fully compliant with the Court's temporary restraining order, correct?

A. To my knowledge, yes.

Q. Can you read for me Paragraph 4 of the temporary restraining order? And I'll -- I'll have my paralegal pull that up.

MR. PETERS: Objection, Your Honor. The document speaks for itself.

MS. BARAZI: Marlene, if you don't mind pulling up the temporary restraining order.

Marlene, if you don't mind making it bigger so that Mr. Donoho [sic] can read for us from the document.

Thank you.

Q. (By Ms. Barazi) Mr. Donoho [sic], can you read from Paragraph 4 of the TRO?

I'm sorry. Mr. McGinnis, can you read for me Paragraph 4 of the TRO?

A. Yes. [As read] All parties are prohibited from copying, changing, modifying, selling, or providing access to third parties to any intellectual property owned or allegedly owned by the company. This

prohibition does not include [sic] use by customers used prior to April 1st.

Q. Okay. Did you contact GoDaddy.com recently and provide them with Lauren Donoho's personal identifying information so as to transfer the account to you?

A. Yes. However, that is not intellectual property. That is soft- -- it is an e-mail service that was included in -- it's not intellectual property. It is an e-mail service.

Q. It's the domain and the e-mail for the company, correct?

A. Yes. I want access to the e-mail.

Q. So you've, in fact, violated Paragraph 4 of the TRO by changing --

A. -- has access to it --

*(Simultaneous crosstalk)*

Q. -- modifying --

A. -- [Zoom audio difficulty] requested access --

Q. I'm sorry. Don't talk over me.

No, sir. Do not talk over me.

Mr. McGinnis, you have, in fact, violated Paragraph 4 of the temporary restraining order by modifying the GoDaddy account; isn't that true?

A. No, it is not. The account has not been --

MS. BARAZI: I'm sorry.

A. -- modified.

MS. BARAZI: Objection, Judge, every -- to everything after "no."

THE COURT: Sustained.

Q. (By Ms. Barazi) What personal identifying information did you provide to GoDaddy -- what personal identifying information belonging to Mrs. Donoho did you provide to GoDaddy?

A. Her e-mail address.

Q. What else?

A. I don't have any rec- -- recollection of giving them anything else.

Q. Did you tell them that you had Ms. Donoho's permission?

A. I did not.

Q. Who is Richard Plakas?

A. Richard Plakas is an employee of Big Thirst, Inc., and Big Thirst Marketing.

Q. Did you give Richard Plakas access to Big Thirst's Shopify account?

A. Yes, I did.

Q. How did you gain access to ShipStation?

A. By contacting their customer service over and over.

Q. Okay. And isn't that another violation of the

TRO, specifically Paragraph 4?

A. To gain access to a software that is owned by my company is -- no. No, it's not.

Q. You changed the credentials to ShipStation, didn't you, Mr. McGinnis?

A. Yes, I did.

Q. And that is a violation of a TRO, correct?

MR. PETERS: Objection; asked and answered.

THE COURT: Overruled.

Q. (By Ms. Barazi) You can go ahead and answer the question. Mr. McGinnis?

A. Changing credentials to a software owned by our company and used by our company, to not let somebody who's no longer employed by our company, is not in violation; no.

Q. The temporary restraining order specifically prohibits all parties from copying, changing, modifying, selling, or providing access to third parties. Isn't that correct, Mr. McGinnis?

MR. PETERS: Objection, Your Honor. The document speaks for itself.

THE COURT: Sustained.

Q. (By Ms. Barazi) Mr. McGinnis, by modifying credentials, you have violated Paragraph 4 of the

temporary restraining order; isn't that correct?

MR. PETERS: Objection, Your Honor; asked and answered.

THE COURT: Overruled.

Q. (By Ms. Barazi) Please answer, Mr. McGinnis.

A. I believe protecting the integrity of my company is important.

MS. BARAZI: Objection; nonresponsive, Judge.

THE COURT: Sustained.

MS. BARAZI: Judge, if you can please instruct the witness to answer the question.

THE COURT: So you need to just answer the question and stop. And then Mr. Peters will be able to allow you to explain it.

A. Please restate your question.

Q. (By Ms. Barazi) Mr. McGinnis, by modifying, changing, et cetera, credentials to these various accounts, you have violated the temporary restraining order; isn't that correct?

A. I do not believe so.

Q. Have you hired any -- [Zoom audio difficulty] -- to develop or replicate Mrs. Donoho's creative work?

A. I have not.

Q. What is Toptal?

A. That is a recruiting company.
Q. Have you recently hired any contractors from Toptal?
A. I have not.
Q. Have you spoken to any contractors for Toptal?
A. I have not.
Q. Has anyone from your company?
A. Let me -- reask that last question.
Q. Have you recently communicated with any contractors from Toptal?
A. No contractors, no.
Q. Have you recently communicated with anyone from Toptal?
A. Yes, I have.
Q. Who are those people?
A. I spoke with their customer service representatives and recruiters.
Q. For what purpose?
A. To hire somebody in the future for software development.
Q. You wanted to hire someone to do Mrs. Donoho's work?
A. No. I'd like to replace the current work with -- with new technology.
Q. Where is Big Thirst's primary office?

A. We are headquartered at my home office at 2101 Elton Lane, Austin, Texas.
Q. And how many physical offices does Big Thirst have?
A. We are a remote company. We don't have any physical offices.
Q. How many employees does Big Thirst have?
A. Big Thirst, Incorporated, currently has two.
Q. Okay. And let me -- let me clarify. Any time I refer to "Big Thirst," I'm, in fact, referring to Big Thirst, Inc. Can we agree on that?
A. Yes, we can.
Q. Okay. So you said Big Thirst has two employees?
A. Correct.
Q. Who are those two employees?
A. Myself and Richard Plakas.
Q. How many independent contractors does Big Thirst have?
A. Actually, I -- let me rephrase the last one.
Richard Plakas is an independent contractor. So we have one independent contractor, one employee.
Q. Okay. So -- so who are your independent contractors?

A. Richard Plakas.
Q. Okay. At any point in time, has Mrs. Donoho ever been an employee for Big Thirst, Inc.?
A. Yes, she was.
Q. When was she an employee for Big Thirst, Inc.?
A. She was an employee for Big Thirst, Inc., beginning in March -- approximately March of 2021 until April 7th of 2022.
Q. Has Ms. Donoho ever signed an employment agreement?
A. Ms. Donoho was covered by our incorporation document that we amended in -- over the summer and filed in October.
MS. BARAZI: Objection; nonresponsive. That wasn't my question.
Q. (By Ms. Barazi) Has Ms. Donoho ever signed an employment agreement with Big Thirst?
A. No.
Q. How was Ms. Donoho compensated as an employee?
A. She was given 2,700,000 shares in the company.
Q. At any point in time, has Ms. Donoho ever served as an independent contractor for Big Thirst?
A. Not -- no.
Q. Okay.
A. As an owner -- there's no reason to be an

WYLIE 107

independent contractor when you're an officer or director and an owner.

Q. Okay. So you're saying by giving Ms. Donoho 2700 -- 27,000 shares, she has become an employee of the company?

A. The same way I am; yes.

Q. Okay. Doesn't that make her -- doesn't that make her a founder -- I mean, a shareholder --

A. Yes.

Q. -- not an employee?

A. As being granted a title of officer and being compensated with stock, that makes her an employee.

Q. Okay. You believe that makes her an employee. Okay.

A. Correct. In the same way that it made me an employee.

Q. Did you ever set Mrs. Donoho's hours of work?

A. No.

Q. Did you ever oversee Ms. Donoho's work?

A. Oversee? We had regular meetings to discuss our progress.

Q. Okay. But you never oversaw her work?

MR. PETERS: Objection; asked and answered.

THE COURT: Overruled.

MS. BARAZI: Judge, Mr. McGinnis did not, in fact, answer my question.

THE COURT: I overruled the objection.

MR. PETERS: I will also object on -- I would like her to describe what she means by "oversee," because, otherwise, the question is -- is not clear.

THE COURT: That's not a proper objection.

MS. BARAZI: May I continue, Judge?

THE COURT: Yes.

Do you need to have this document up still, or can we pull it --

MS. BARAZI: No. I apologize. We can put that down.

THE COURT: No problem. I just can see everybody better that way.

MS. BARAZI: I apologize, Judge.

Marlene, can you take that down, please?

Q. (By Ms. Barazi) Okay. And while that's happening, Mr. McGinnis, did you ever oversee Mrs. Donoho's work?

A. We met regularly. So, yes, I looked at and helped and collaborated on many, many, many aspects of Ms. Donoho's work on a very much ongoing basis. We talk daily.

Q. What work specifically?

A. Do you want me to list everything for the past year?

Q. Yes. Sure.

A. It's impossible. The number of things that we've done as a company is extensive, and this line of questioning is irrelevant to me.

What did I oversee? What did we collaborate on? What did we do together as co-founders? The way you're asking the question sounds like I was a direct supervisor of an entry-level employee, and that's not how the relationship was.

Q. So tell us, how was the relationship?

A. We were co-collaborators, as co-founders, with specific roles that we both provided. We worked together very much hand in hand on some things, and I trusted her to do work on other areas that she was assigned to do.

Q. Did you ever oversee Ms. Donoho's technical work?

A. She showed me her progress on a regular basis; yes.

Q. Did you ever provide any kind of input?

A. Yes, I did.

Q. What kind of input did you provide?

A. On -- on technical -- so -- yeah. Website, for

example, if you want to call it a website technical work. I wrote the copy. I gave a lot of input to the design and layout and worked collaboratively to -- to get that launched.

Q. Did you offer any kind of technical expertise regarding the data dashboard or Shopify or ShipStation?

A. I'm not a technologist, which is why we hired Ms. Donoho.

MS. BARAZI: Objection; nonresponsive.

THE COURT: Sustained.

A. No, I did not direct her technical work.

Q. (By Ms. Barazi) Thank you, Mr. McGinnis.

Now, let's talk about the Big Thirst data dashboard. Who was responsible for developing the source code for the data dashboard?

A. Wylie put that together, the way she said, stitching together off-the-shelf software.

Q. Okay. I'm not familiar --

*(Simultaneous crosstalk)*

A. [Zoom audio difficulty] -- company.

Q. (By Ms. Barazi) And I don't believe the Court's familiar with who Wylie is.

So, again --

*(Simultaneous crosstalk)*

A. Ms. Donoho.

Q. (By Ms. Barazi) -- who is -- who is responsible --

*(Reporter admonition)*

MS. BARAZI: Certainly. I apologize about that.

Q. (By Ms. Barazi) Who was responsible for developing the source code for the data dashboard?

A. Ms. Donoho, in her words, stitched together software that was purchased for the company.

MS. BARAZI: Judge, objection to everything after "Ms. Donoho."

THE COURT: Overruled.

Q. (By Ms. Barazi) Did anyone else contribute to the development of the source code for the data dashboard?

A. She did work with a developer; yes.

Q. When you -- when you say "she," who are you referring to?

A. Ms. Donoho.

Q. And who is that developer that you're referring to?

A. I believe his name was Todd.

Q. Can you tell us who Todd is?

A. No.

Q. You can't tell us who Todd is?

WYLIE 112

A. No, I cannot.

Q. Where did Mrs. Donoho do her work when developing the source code for the data dashboard?

A. From her home office.

Q. Who was responsible for designing Big Thirst's website?

A. It was a collaborative project with Ms. Donoho leading.

Q. Who created the source code for the Big Thirst website?

A. There is no source code. It is a -- it's a WordPress theme that she helped design with graphic design input from Susan McGinnis and written content from me.

Q. Okay. So who actually created it?

A. Ms. Donoho.

Q. Thank you.

And who was -- who was -- strike that.

Where did Mrs. Donoho do her work when designing the Big Thirst website?

A. From her home office.

Q. Have you ever leased part of Ms. Donoho's home from her?

A. No, I have not.

Q. Has Big Thirst ever leased part of

Mrs. Donoho's home from her?
A. No.
Q. Have you ever paid rent to Ms. Donoho for the use of her home to perform programming or design work?
A. No.
Q. Has Big Thirst ever paid rent to Mrs. Donoho for the use of her home to perform programming or design work?
A. No.
Q. How much money has Ms. Donoho -- Mrs. Donoho loaned to Big Thirst?
A. Zero.
Q. Mr. McGinnis, earlier you stated that Mrs. Donoho loaned Big Thirst $50,000; isn't that correct?
A. Ms. Donoho secured a loan from her father to the company.
Q. Right. So how much money has Mrs. Donoho loaned to Big Thirst?
A. She puts that number at about $47,000.
Q. And how has the money Mrs. Donoho loaned to Big Thirst been used?
MR. PETERS: Objection, Your Honor; it's misstating the testimony.
THE COURT: Overruled.

WYLIE 114

MR. PETERS: The testimony has been --

THE COURT: Overruled. Overruled.

A. The debt financing that Ms. Donoho secured for Big Thirst, Incorporated, was used to pay for legal fees, to pay for sponsorship at an event, to pay for software licensing for the company as an agent of the company.

Q. (By Ms. Barazi) So the money that Mrs. Donoho has loaned to Big Thirst is, in fact, funding this litigation against her?

MR. PETERS: Your Honor, I would just ask for a running objection to the misstatement of Ms. Donoho loaning money to the company.

THE COURT: So Mr. McGinnis can speak for himself. And if the question includes anything inaccurate, then he needs to deny the question. But I'm going to overrule the objection.

You may ask it again, Ms. Barazi.

MR. PETERS: Judge, just so I don't keep interrupting, may I have a running objection?

THE COURT: You may.

MR. PETERS: Thank you.

MS. BARAZI: Thank you, Judge.

Q. (By Ms. Barazi) Mr. McGinnis, so if I understand it correctly, the $50,000 that Mrs. Donoho

has secured for Big Thirst is being used to fund this litigation against her, correct?

A. No, that is incorrect.

Q. How is it incorrect?

A. The funding -- the debt financing that Ms. Donoho secured on behalf of Big Thirst, Incorporated, was used for prior legal fees.

Q. And who is paying the legal fees now?

MR. PETERS: Objection, Your Honor. That's getting into attorney-client information.

MS. BARAZI: I'm sorry, Judge, but that's not attorney-client privileged information. Who's paying for the bills is certainly not attorney-client privileged information.

THE COURT: Overruled.

A. The funds for these legal proceedings are not being paid for by Big Thirst, Incorporated. And they are not being paid for with any of the funds that were from the debt financing we received.

Q. (By Ms. Barazi) How are they being paid?

A. They are being paid for by Big Thirst Marketing.

Q. How much of the loan -- the 50,000-dollar loan to Big Thirst has been repaid?

A. The agreement for the loan states that

repayment begins on August 1st, 2023. At this time, it is not yet that date, so zero has been paid.

Q. What are the plans for repaying the loan?

A. There's a monthly payment that has a term of seven years.

Q. To date, approximately how many hours of work would you estimate Mrs. Donoho has dedicated to Big Thirst in her capacity as Chief Operating Officer?

A. She could answer that for you.

Q. And I'm asking you.

A. I don't have a correct or accurate accounting of the number of hours she has spent. She does not keep a time sheet.

Q. And how many hours would you estimate it to be?

MR. PETERS: Objection, Your Honor; calls for speculation.

THE COURT: If he can estimate it, he may do so.

A. I have no way of knowing.

Q. (By Ms. Barazi) Has Ms. Donoho ever been compensated for any of her work for Big Thirst as Chief Operating Officer?

A. Yes; she paid herself.

Q. How did she pay herself?

A. She used an electronic debit to pay herself on

December 2nd, 2021.

Q. How much did she pay herself?

A. $1,700.

Q. Is that the only compensation you contend that Mrs. Donoho received for her work as COO of Big Thirst?

A. No. She was also granted 2,700,000 shares in the company.

Q. Have you ever paid Mrs. Donoho for the use of her intellectual property?

A. Yes. She --

MR. PETERS: Objection --

A. -- was granted 2,700,000 shares in the company.

Q. (By Ms. Barazi) Has Big Thirst ever paid Mrs. Donoho for the use of her intellectual property?

A. Yes --

MR. PETERS: Objection --

*(Simultaneous crosstalk)*

A. -- she granted 2,700,000 shares in the company.

MS. BARAZI: At this time, Judge, I'd like to show Plaintiff's Exhibit Number 2, if we can display that, Marlene.

No. That's defendant's exhibit. Marlene, we're asking for Plaintiff's Exhibit Number 2, which has already been admitted.

MR. MOUSILLI: Point of order for Marlene,

I'm not sure if she's going to be able to share that if it's in the Box account from plaintiffs since we don't have display capabilities for that.

THE COURT REPORTER: You should be able to. The only thing you cannot do is download.

MS. BARAZI: Then, Mr. Peters, can you please display for us Plaintiff's Exhibit Number 2?

MR. PETERS: Sure. I'll need control of the screen.

What would you like again?

MS. BARAZI: Plaintiff's Exhibit Number 2.

Thank you.

Q. (By Ms. Barazi) And, Mr. McGinnis, this -- this exhibit has already been admitted. It's the -- can you identify what it is?

A. It's the Unanimous Written Consent of the Sole Director and Sole Shareholder [sic] of Big Thirst, Incorporated.

Q. And what was the purpose of this document?

A. This document was to amend the original filing to add directors and to grant stock.

MS. BARAZI: Let's go to Page 4, if you don't mind.

Thank you, Mr. Peters.

Q. (By Ms. Barazi) And what was the compensation

offered to Mrs. Donoho?

A. 2,700,000 shares of stock.

Q. For -- for what exactly?

A. For her work as the Chief Operating Officer.

Q. Okay.

A. So -- and if you'll read right there -- if you want me to continue answering -- "in exchange for consideration in the form of property, cash, and services set forth."

Q. In her capacity as Chief Op- -- Operating Officer, however, I believe "Consideration" is blank. The line for "Consideration" is blank, isn't it?

A. It is.

Q. Okay. So what was the consideration offered to Mrs. Donoho?

A. I -- I apologize. I don't understand that -- the question.

Q. In the table on -- on Page 4 under the column where it says "Consideration," all of those blanks -- all of those boxes are blank, correct?

A. Correct. So if -- you're asking for the value of the share?

Q. No, I'm not.

So, in essence, her consideration is just her being a foun- -- co-founder, correct?

A. Correct, as the C- -- as the COO.
Q. Okay. Thank you.
And, to be clear, this document doesn't talk -- doesn't have anything to do with any intellectual property assignments, correct?
A. There is no specific discussion of roles of any person in here.
Q. That wasn't my question.
There were no assignments of intellectual property in this document, correct?
A. There's no assignment of intellectual property in this contract.
Q. Have you ever entered into an agreement with Mrs. Donoho for the use of her intellectual property?
A. I have not. I --
Q. Has --
*(Simultaneous crosstalk)*
A. -- understood this intellectual property to be owned by the company as it was being developed as an agent to the company. As the --
MS. BARAZI: Objection --
A. -- Chief Operating Officer --
*(Simultaneous crosstalk)*
MS. BARAZI: Objection to everything after "no," Judge.

WYLIE 121

THE COURT: All right. Sustained. I don't actually see that he said no, but he said, "I have not." And so I take the objection to be everything after "I have not."

MS. BARAZI: Thank you, Judge.

And, Mr. Peters, if we can stop sharing, I think we're done with this document. Thank you for sharing.

Q. (By Ms. Barazi) Mr. McGinnis, has Big Thirst ever entered into an agreement with Mrs. Donoho for the use of her intellectual property?

A. No.

Q. Is there anything in writing that indicates Mrs. Donoho agreed to transfer her ownership of her IP to you or Big Thirst?

A. No.

Q. Did you ever have a Work Made for Hire Agreement with Mrs. Donoho?

A. No.

Q. Did Big Thirst ever have a Work Made for Hire Agreement with Mrs. Donoho?

A. No.

MS. BARAZI: And, again, Mr. -- Mr. Peters, if you could so kindly assist us with Plaintiff's Exhibit 25.

Actually, before -- before we get into that --

Q. (By Ms. Barazi) Mr. McGinnis, you testified earlier that you didn't have access to PayPal despite the fact that I e-mailed your opposing counsel -- your counsel the credentials to PayPal, correct?

A. You -- yes. You provided it yesterday.

Q. Okay. And you testified earlier today that you still don't have access to PayPal?

A. I did not until yesterday.

Q. Okay. So am I correct to understand that you do have access to PayPal?

A. As of yesterday, I do.

Q. Okay.

A. However, let me --

Q. No. I don't need anything --

A. No, I don't. Let me restate that then. No, I don't.

MS. BARAZI: Judge, I don't want to display Plaintiff's Exhibit 25 because it contains confidential information that I don't want to be livestreamed to the public. However --

A. -- [Zoom audio difficulty] --

*(Simultaneous crosstalk)*

MS. BARAZI: However, we are all aware of

what's in that document. And I'd like to refer the Court to that document wherein I provide credentials to PayPal -- to Big Thirst's PayPal account. I'd like the Court to take judicial notice of that.

THE COURT: Well, I've already admitted the exhibit. So if you want to bring that up in your closing argument, if you save time for a closing argument, you may do so.

MS. BARAZI: Thank you, Judge.

Q. (By Ms. Barazi) And, Mr. McGinnis, have -- has Mrs. Donoho ever signed a non-compete agreement with Big Thirst, Inc.?

A. She has not.

Q. Thank you.

MS. BARAZI: I pass the witness.

MR. PETERS: Thank you.

**REDIRECT EXAMINATION**

BY MR. PETERS:

Q. Mr. McGinnis, what happens if the TR- -- if the temporary injunction is not granted today?

A. She did not provide access to --

Q. Mr. McGinnis, let me restate the question.

Today, if the Court does not give you the relief you are asking for today, what happens?

A. Big Thirst will need to close for business.

Q. Thank you.

MR. PETERS: Pass the witness.

MS. BARAZI: Judge, I have no further questions for this witness.

THE COURT: All right.

Mr. Peters, you may call your next witness.

MR. PETERS: I do not have another witness, Your Honor.

THE COURT: All right. So you rest?

MR. PETERS: I do.

THE COURT: All right.

Ms. Barazi?

MS. BARAZI: Thank you, Judge.

At this time, I'd like to call Mrs. Donoho.

THE COURT: All right. Ms. Donoho, would you raise your right hand?

**LAUREN WYLIE DONOHO,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MS. BARAZI:

Q. Please state your full name for the record.

A. Lauren Wylie Donoho.

Q. And where do you reside?

A. Dripping Springs, Texas.

Q. Mrs. Donoho, what's your profession?

A. I am a co-founder of Big Thirst and an independent contractor for data solutions and marketing exclusions.

Q. And can you describe for us your recent work experience?

MR. PETERS: Objection; calls for a narrative.

THE COURT: I'll allow it.

A. Since 2010, I have been working in the marketing and data solutions realm. I have developed over 50 websites for a variety of different industries and client sizes, the largest being a website that I worked on and led a team of internal and external teams with a public company that val- -- is valued over $1.5 billion.

Because of that work -- along with other work that I do in the data industry and marketing industry, I have also worked for their trial company for three years that is a data and analytics company that does data modeling for the healthcare industry and was one of the leading efforts -- or leading companies in that field. During that time, I was their main contractor for all marketing efforts and helped develop

application development and implemented a lot of different solutions for them to sell specifically their data and analytics tech stack.

I also have experience in sales and hospitality from my work in the Oregon Wine Country. So my experience covers a lot of different industries and a lot of different solutions over a vast amount of time.

Q. (By Ms. Barazi) Thank you.

MS. BARAZI: Judge, if I can just get a check on my time. How much time do I have?

THE COURT: Mr. Beck?

STAFF ATTORNEY: You've got about 18 minutes left.

MS. BARAZI: Eighteen minutes for my direct of my witness?

STAFF ATTORNEY: That's correct.

THE COURT: You each had an hour and a half to start with. It's 4:35. So we've been here for two and a half hours. So all of your questioning of the other witnesses went against your time -- or the other witness, as well as your opening.

Q. (By Ms. Barazi) Mrs. --

MS. BARAZI: Thank you, Judge.

Q. (By Ms. Barazi) Mrs. Donoho, what businesses do you own?

A. Lianas Creative Company.
Q. Okay. And what kind of business is that?
A. It is a creative company that offers marketing and technical solutions for a variety of industries.
Q. Who serves as the custodian of records for that company?
A. I am.
Q. What is your relationship to Big Thirst, Inc.?
A. I am the co-founder of Big Thirst, Inc., and I -- that's -- that's my current relationship today.
Q. And for purposes of my direct, when I refer to "Big Thirst," I'm referring to Big Thirst, Inc. Can we agree on that?
A. Correct.
Q. Okay. How did you come to know Mr. McGinnis?
A. In late 2016, I was sourced from a hiring company for marketing needs that he had for a variety of his clients. I served as an independent contractor for him for six years for Big Thirst Marketing, LLC.
Q. What experience does Mr. McGinnis have in technology with --
MR. PETERS: Objection, Your Honor; did -- she's asking for speculation.
THE COURT: She may answer it --
MR. PETERS: [Zoom audio difficulty] --

THE COURT: -- if she knows.

*(Simultaneous crosstalk)*

MR. PETERS: -- that her client knows my client's background.

THE COURT: If -- she may answer it if she knows.

A. With the exception of the Microsoft Office Suite, Mr. McGinnis is not technically a bit -- able to do pretty much anything at all. He's very technically inept.

Q. (By Ms. Barazi) What projects did you and Mr. McGinnis collaborate on in 2020, if any?

A. In late 2020, one of his marketing clients needed an eCommerce platform to be installed on their website. So there was a solution presented that I installed onto the client's website, and I also onboarded them through most of the process and understood the inner workings of how that company built that technology.

Q. And based on your experience with that project, what did you do?

A. After seeing how it was made and the poor representation of how it was applied, I saw a lot of areas of opportunity for what I could do on that platform, which was Shopify. I have built about 12

other different Shopify instances and am very familiar with the entire structure of Shopify. And so I was able to present Ms. -- Matt McGinnis with a working prototype of what the technology could do around January of 2020.

And I was able to also say that because of all of this, I could also provide these additional solutions, which were not limited to the data and analytics that I have had experience with in how to data-model those things along with an entire dashboard experience that was far greater than any of the competitors out in the current landscape. And I also was able to say that we could bootstrap the marketing solutions that I provide for Big Thirst Marketing on top of Big Thirst, Inc., to provide a full eCommerce and marketing solution for the distillery and alcohol industry that they have never seen before.

Q. Okay. So when exactly did you -- did you develop this prototype?

A. I believe it was in late January or early February of 2021.

Q. And that was before Big Thirst, Inc., was incorporated, correct?

A. Yes, that is correct.

Q. After you shared this prototype with Mr. McGinnis, what did he do?

WYLIE 130

A. He was able to go and -- well, we -- we started working on different business options within the company. We reached out to a financial planner who then helped us model a three-year projection for the business to show its viability and so that we could essentially begin to develop a business plan. In order to do that project, I actually traded my work for her services in terms of building out a logo and a website.

Q. Okay. And what -- what did Mr. McGinnis do next?

A. He then formed the company without my knowledge and -- to the state of Delaware.

Q. Okay. And how did you feel about that?

A. Shocked that that was done without my knowledge. And because it was done without my knowledge, he was able to essentially wield power over the entire company without any kind of say or oversight on my part. It was a stab in the back, which I am definitely feeling today and have been feeling for months.

Q. Okay.

MS. BARAZI: Judge, I apologize. We don't have a lot of time, but there's a few exhibits that I'd like to share.

Exhibit D-2, Marlene, if you don't mind.

Q. (By Ms. Barazi) What is this, Mrs. Donoho?

A. That was an e-mail that I sent to Mark Shilling, Joseph Castillo, and two others that are not listed here that I'm not sure, sent on January 21st [sic], 2021, from my Big Thirst Marketing e-mail account. Or, no, that was actually sent from Matt McGinnis' Big Thirst Marketing e-mail account.

Q. And what is the purpose of this e-mail?

A. It was to disclose some of the other entities or the Big Thirst family, is what Matt says, that we have spoken and that I am able to provide solutions that compete with the current landscape of what's currently available, and that there is a huge market for eCommerce providers for DTC shipping.

She knows the current companies are backlogged -- I'm sorry. That was Emily Pennington. I'm sorry. At the top it says, I had a conversation with Wylie, who is included -- included in this message, about the desire to develop DTC eCommerce --

Q. Thank you, Mrs. Donoho.

MS. BARAZI: Judge, at this time, I'd like to move for Exhibit D-2 to be admitted into evidence.

MR. PETERS: No objection, Your Honor.

THE COURT: D-2 is admitted.

MS. BARAZI: Marlene, if you can display

D-3, please.

Q. (By Ms. Barazi) Mrs. Donoho, what is -- what is this exhibit?

A. This is an e-mail that I sent to Matt McGinnis on February 3rd, 2021, that outlines the details of the prototype that I built out for him to view.

Q. And what does this establish?

A. This establishes that there is a working prototype, and it was actually that -- this is the same Shopify instance that's being currently used today, was building out products prior to the corporation being formed.

Q. Were any corporate documents created indicating your were the Chief Operating Officer of Big Thirst?

A. No.

Q. Were there any corporate documents authorizing the issuance of the 27,000 [sic] shares to you?

A. There's one document that you -- that was showed earlier.

Q. Have you ever -- were you ever issued stock certificates indicating the amount you were owed?

A. No.

Q. Who are the people who make up Big Thirst's Board of Directors?

A. Myself, Matt McGinnis, Suzanne McGinnis -- that

is Matt's wife -- and Mark Shilling. And that is Matt McGinnis' best friend.

Q. Okay. Describe for us the work you did for Big Thirst.

A. Starting in -- as early as February 3rd of 2021, I built the entire tech stack and the solutions that run our entire company today. Every bit of this technology was hand-built by me and only me and hand-selected after at least a very conservative 1700 hours' worth of work.

Apart from all of the data and solutions that I have provided and built, I was also the day-to-day operation of the company. I handled all of the clients' issues. I was the core part of the sales. I met with all of our clients on multiple times to ensure their safety in our company and that their products would be safe and -- and -- with us. I handled all of every day-to-day -- every day-to-day part of this company, including customer service issues, client issues, fulfillment, logistics, retailer partnerships. Pretty much everything that has to do with this company, I was a key and integral part of it.

Q. Okay. And approximately how many hours of work have you invested in Big Thirst thus far?

A. Conservatively, 1700 hours.

Q. And have you ever been compensated for your work on behalf of the company?
A. No.
Q. Have you ever received any employee benefits from the company?
A. No. Never.
Q. Okay. What loans, if any, did you make to Big Thirst?
A. I provided a 50,000-dollar loan to Big Thirst, give or take -- it was about $47,500 to Big Thirst.
Q. How did you obtain this money?
A. On my wedding day, it was -- my father was in a very bad accident and he was compensated for it, and this was part of the compensation.
MS. BARAZI: I'm sorry to hear that, Mrs. Donoho. Do you need time?
THE WITNESS: No. I'm okay. We don't have time.
Q. (By Ms. Barazi) To date, have you been repaid for this loan?
A. No.
Q. Nothing at all?
A. No. Never.
Q. Let's jump to the SBA loan.
What kind of loans did Big Thirst apply

for?

A. We applied for a number of SBA loans from a variety of different banks starting as early as March of 2021.

Q. Okay. And can you tell us a little bit about the details of the SBA loan that you were able to not secure, ultimately, but that you-all were working on?

A. In November of 2021, two bankers came down from Commonwealth Bank to meet with Matt and myself specifically to meet the co-founders and the people behind this company in which they were looking to secure up to $350,000 worth of SBA loan to us.

During that time, they were able to see that we actually had a working and tangible product that was built by me and that they -- that we -- that I am -- what I built was a differentiator in the marketplace and was --

Okay.

Q. Okay. Were you asked to be a personal guarantor on this loan?

A. Yes.

Q. And why didn't you feel comfortable doing that?

A. When I received the loan documents in its entirety, I saw that Big Thirst Marketing was also a co-borrower. And Big Thirst Marketing is an LLC that I

am not a part of. I am only an independent contractor for that company.

Q. What kind of threats did Mr. McGinnis make to you if you didn't sign the loan?

A. He said that if I didn't sign the loan, that he would turn this company into a sole proprietorship, and he would take away all of my IP and he would figure out a way to compensate me fairly.

Q. How much do you believe the IP you developed is worth?

A. $4 million based of our company's pro forma for the -- we had a -- somebody actually built this out for us, $4 million.

STAFF ATTORNEY: Ms. Barazi, I just want to let you know you've got about five minutes left.

MS. BARAZI: Thank you.

MR. MOUSILLI: Mr. Elliott, can we get an accounting on the time real quick, if we could just pause? Because it -- my -- my calculations are not adding up for -- for -- for the time.

STAFF ATTORNEY: I'm not really sure what you want me to say.

MR. MOUSILLI: Okay. Was the late start attributed to the Zoom issues allocated to the defendant only?

STAFF ATTORNEY: No.
MR. MOUSILLI: Okay. Thank you.
I'll let you guys continue.
Q. (By Ms. Barazi) Mrs. Donoho, when did you begin work on what we are currently referring to as the Big Thirst data dashboard?
A. January 2021.
Q. That was before Big Thirst was incorporated?
A. Oh, sorry. The data dashboard? That was around April 2021.
Q. Okay. When did you begin work on the Shopify technical stack?
A. January 2021.
Q. Before Big Thirst was incorporated, correct?
A. Yes.
Q. Okay. I'm just trying to jump through stuff.
Mrs. Donoho, did you use your own tools when --
A. Yes.
Q. -- you developed --
MR. PETERS: Objection, Your Honor; leading.
THE COURT: All right. Sustained.
Q. (By Ms. Barazi) Mrs. Donoho, what tools did you use to create your intellectual property?

MR. PETERS: Objection, Your Honor; leading.

MS. BARAZI: I'm asking --

THE COURT: Overruled.

Q. (By Ms. Barazi) Go ahead, Mrs. Donoho.

A. My own.

Q. Mrs. Donoho, what harm will you suffer if this Court allows Big Thirst to use your intellectual property?

A. All of my work is gone and taken by the company, and I have no say over what happens to it. This is something that I could take elsewhere and use. And if it's taken away from me, then all of the work that I have done to date would be gone. They also have no idea how to use what I've done. So it not only --

Yeah.

Q. Mrs. Donoho, have you ever granted a license to Big Thirst to use your intellectual property?

A. No.

Q. And to what extent have you complied with the Court's TRO?

A. To the fullest extent. And I've gone above and beyond to provide additional information to -- to protect our clients.

Q. Mrs. Donoho, what are you asking of this Court?

WYLIE 139

A. I am asking them to stop stealing my IP and all of the work that I've developed and essentially stop Matt from continuing to issue and fulfill his threat that he made me on March 16th. I have done, above and beyond, everything I can do for this company and the clients that we serve. I adore the people that we work with, and I have had the greatest privilege of actually building this company from scratch myself.

And to sit here today because I wasn't able to have any kind of equality in this company is completely betrayed. Everything I've done to date was only for this company. And beyond the TRO, I continued to serve this company and the people that we promised to serve. I ask that the Court stop stealing my IP and my work product.

Q. And, Mrs. Donoho, to be clear, have you ever been compensated for your intellectual property by Mr. McGinnis or Big Thirst?

A. No.

Q. Have you ever been compensated by Mr. McGinnis or Big Thirst for your role as Chief Operating Officer of Big Thirst?

A. No.

Q. Thank you, Ms. -- Ms. Donoho.

MS. BARAZI: I pass the witness.

MR. PETERS: I'm just going to touch on a couple of things very briefly, Your Honor.

**CROSS-EXAMINATION**

BY MR. PETERS:

Q. Ms. Donoho, if it was your work that you thought you were owning, why did you license it in the name of Big Thirst?

A. It wasn't licensed in the name of Big Thirst.

Q. Okay. Well, we saw contracts earlier that it was.

A. No. It didn't say Big Thirst.

Q. And you are not a -- you don't have any training in valuation of companies, do you?

A. No. That's why we hired --

Q. Okay.

A. -- a consultant --

Q. Thank you.

A. -- to do that valuation.

MR. PETERS: Objection, Your Honor; hearsay.

MS. BARAZI: Object -- I'm sorry, Judge.

How was that hearsay?

MR. PETERS: She just said what she -- what somebody else -- or she was trying to say what somebody else had said.

WYLIE 141

MS. BARAZI: What somebody else has -- that they have hired someone else. She didn't say what they said.

THE COURT: All right. I overrule the objection.

MR. PETERS: Okay.

Q. (By Mr. Peters) I'm going to ask it again; and it's a yes-or-no question.

Ms. Donoho, are you trained at appraising valuation of companies?

A. No.

Q. Was Matt McGinnis' life insurance going to be part of the guarantee for the SBA loan?

A. Yes.

Q. How about yours?

A. No.

Q. Was Matt McGinnis' other company, the Marketing company, going to be on the hook for the SBA loan?

A. What do you refer to as a "hook"?

Q. Was it going to be a guarantor of the SBA loan?

A. Yes.

Q. Okay. And you said that you were bootstrapping marketing technology to the Big Thirst -- to the technology you were developing for Big Thirst, Inc., right? You used that term "bootstrap" marketing

technology for Big Thirst, Inc.

A. Can you clarify your question?

Q. You're using -- you used marketing technology in Big Thirst, Inc., work, correct?

A. I honestly don't understand your question.

Q. You said it, Ms. Donoho. You said --

A. Okay.

Q. -- you bootstrapped marketing technology to Big Thirst, Inc., work.

A. No. I said that we could bootstrap marketing technology -- marketing efforts with the Big Thirst technology when we were developing the -- planning the business in January of 2021 before the corporation was formed.

Q. Did you give the credentials for GoDaddy to my client?

A. No.

Q. Did you give the credentials for ShipStation to my client?

A. No.

MS. BARAZI: Objection, Judge. There's no reference to time, so -- and it's an ambiguous question.

THE COURT: All right. Well --

Q. (By Mr. Peters) Ms. Donoho, have you ever given the credentials for ShipStation to my client?

A. No.

MR. PETERS: Pass the witness, Your Honor.

MS. BARAZI: Judge, I'll save the remaining of my time for closing.

THE COURT: All right. So you rest?

MS. BARAZI: Yes, Judge, I rest. Thank you.

THE COURT: Mr. Beck, how much time do each of them have left?

STAFF ATTORNEY: Plaintiff's got about nine minutes left, and defendant's got about one.

THE COURT: Honestly, I don't feel like I really need closing argument.

MR. MOUSILLI: Your Honor, we'd like to reserve ours if at all possible.

THE COURT: I'm sorry. You want to use your one minute?

MR. MOUSILLI: Yes, Your Honor.

THE COURT: Go ahead.

**CLOSING ARGUMENT**

MR. MOUSILLI: All right. Your Honor, you'll see throughout the course of the testimony in this hearing --

MR. PETERS: Your Honor, if I may, as a point of order, I believe that your court rules require

appropriate dress, at least that's what I read and what was sent to me. I do not believe the counsel is speaking now is dressed in appropriate attire. So I think it would be more appropriate if the counsel that is did the closing.

THE COURT: So I -- there are judges in our courthouse that make a big issue out of that. I'm really not one of them. So let's -- let's hear Mr. Mousilli out.

MR. MOUSILLI: Thank you, Your Honor.

I just want to note that other than Mr. McGinnis' self-serving testimony, we have no evidence whatsoever that's been proffered that there's any irreparable harm that Big Thirst is sustaining.

You've heard from Mr. McGinnis himself that the business can continue and orders can be fulfilled for clients without use of Ms. Donoho's IP. Throughout the entire course of this hearing, no mention of breach of fiduciary duty was ever mentioned. That's the essentially thrust of this case. And as my co-counsel had pointed out, we believe that this entire suit is a sham lawsuit. There is no evidence or basis for Ms. Donoho breaching her fiduciary duty whatsoever to Big Thirst, given the fact that she is simply a shareholder now.

Your Honor, the irreparable harm that will happen if the Court was to force Ms. Donoho to have her intellectual property -- that's never been assigned, never been purchased, never been paid for, or otherwise bargained for -- to be forced into a license with Big Thirst would be a travesty of justice. We've established that there is no copyright assignment, no work for hire. Ms. Donoho was never an employee of Big Thirst. There is an absolute right under U.S. federal copyright law that all of the creations, the code, the designs that Ms. Donoho has made are retained by her individually absent an explicit agreement and assignment. We ask that this Court deny this injunction and restore Ms. Donoho's complete rights over her intellectual property and the code that she's developed and all of the software that she has written and she has amended and customized.

Your Honor, in closing, Big Thirst has failed to carry its substantial burden for this temporary injunction hearing. They have the ability to seek out licenses to all of the other software that Ms. Donoho had built herself and stitched together herself. You didn't hear once, Your Honor, that they couldn't end up obtaining their own Shopify account; that they couldn't obtain their own ShipStation account;

et cetera. All they are trying to do is misappropriate and frankly pirate the intellectual property that Ms. Donoho has spent hundreds and hundreds of hours developing.

Your Honor, we ask that you deny this temporary injunction and restore all of the rights that Ms. Donoho had prior to that temporary injunction hearing.

Thank you.

THE COURT: All right. I -- I am granting the temporary injunction. I believe the plaintiff has met their burden of proof. I believe that there is sufficient evidence of each of the elements required for a temporary injunction. I will point out under Rule 692 of this Texas Rules of Civil Procedure that disobedience of an injunction may be punished by contempt of court -- as contempt of court.

Mr. Peters, what -- what amount of bond are you proposing?

MR. PETERS: Your Honor, we've already put up a 1,000-dollar bond, and I would argue that that would be appropriate to carry through. Ms. Donoho is still a 27 percent shareholder. She is protected. She -- as they said, they're going to bring claims for her ownership interest, to the extent she has it, for

her compensation, to the extent she's entitled to it. So they're going to have their claims. So I would argue that the 1,000-dollar bond that is on file with the Court already serve for the bond as the temporary injunction.

MS. BARAZI: Judge, if I may, Mrs. Donoho has already testified that her IP is estimated at $4 million. So I'd like to ask for a bond to be commensurate with the value of her IP.

THE COURT: So the company, if the -- when the temporary injunction is in place, will be an ongoing concern. The ownership of the company will be at issue, but the CEO will continue to be the CEO of the company.

Ms. Donoho has resigned as COO and has resigned as a director, but she still has a 27 percent ownership of the shares. So I don't find that there's substantial danger as long as the company continues to be an on- -- ongoing concern.

So I will --

MS. BARAZI: If I --

THE COURT: -- approve --

MS. BARAZI: -- may, Judge?

If I may -- I don't mean to interrupt you.

THE COURT: You may.

MS. BARAZI: Thank you.

At any moment, Mr. McGinnis can dilute Mrs. Donoho's shares so they're worth less than a dollar.

THE COURT: And if he does that, then I'm certain there will be a counterclaim for having done so. But, at this point, I think a thousand-dollar bond is sufficient. And I want to --

Do -- have you provided a proposed order, Mr. Peters?

MR. PETERS: I uploaded it into the other documents, the plaintiff's other documents in the -- in the Box application.

THE COURT: All right. Have you taken a look at it, Ms. Barazi or Mr. Mousilli?

MS. BARAZI: No, Judge, I haven't.

THE COURT: All right. Well, I'm going to ask you to let me know if you have any trouble with the form of the order.

When does the TRO expire?

MS. BARAZI: On the 26th, Judge.

MR. PETERS: I believe it expires today. I believe it expires at the hearing of the temporary injunction. So TROs last for 14 days or until the temporary injunction hearing. So it's -- it expires today.

THE COURT: All right. Let me take a quick look at that.

So it says that it's a 14-day order, which is typical. It does not suggest that it expires at the time of this hearing. Obviously, it will be supplanted by a -- by a temporary injunction.

So my -- my reason for asking that is that you're still under the requirements of the temporary restraining order until the Court signs a temporary injunction.

I will give Ms. Barazi and Mr. Mousilli time to review the proposed temporary injunction and to let me know by 9:00 o'clock tomorrow morning if you have any objection to the form of it. But I will sign a temporary injunction tomorrow. And it will become effective immediately because the bond, I take it, has already been paid?

MR. PETERS: Yes, Your Honor.

THE COURT: All right.

All right. Well, that concludes our hearing. And y'all are excused.

*(Hearing concluded)*

Case 1:24-cv-01512-DAE Document 42-11 Filed 11/26/25 Page 136 of 136 

STATE OF TEXAS )
COUNTY OF TRAVIS )

I, Michelle Williamson, Official Court Reporter in and for the 345th District Court of Travis, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred remotely via videoconference in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

WITNESS MY OFFICIAL HAND this 25th day of April, 2022.

*/s/ Michelle Williamson* ____

Michelle Williamson, CSR
Texas CSR #4471
Expires: 01/31/2024
Official Court Reporter
345th District Court
Travis County, Texas
P.O. Box 1748
Austin, Texas 78767
Telephone: (512) 854-9373

WYLIE 151

This pleading describes Big Thirst's internal understanding of how Donoho's loan proceeds were to be used, and alleges that Donoho "***insisted that she alone be the borrower***."

The document does not say Defendants agreed to assume the loan, promised repayment to Plaintiff, or agreed to sign any writing.

As a party pleading drafted by Big Thirst in a different lawsuit, it reflects allegations—not evidence—and cannot substitute for proof of a promise enforceable under the statute of frauds.

The petition confirms that Donoho was the borrower, consistent with the written Note, and that any expectation of repayment was between Donoho and the company, not between Defendants and Plaintiff.

1:24-CV-01512-DAE
Plaintiff
EXHIBIT
I

**CAUSE NO. ______________**

| | | |
|---|---|---|
| **BIG THIRST, INC.**<br>*Plaintiff* | §<br>§<br>§ | **IN THE DISTRICT COURT** |
| **v.** | §<br>§ | **_____ JUDICIAL DISTRICT** |
| **LAUREN WYLIE DONOHO**<br>*Defendant* | §<br>§ | **TRAVIS COUNTY, TEXAS** |

**PLAINTIFF'S ORIGINAL PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER, AND REQUEST FOR TEMPORARY AND PERMANENT INJUNCTION**

TO THE HONORABLE JUDGE OF THIS COURT:

An officer, director, and minority shareholder of Big Thirst, Inc. demanded a majority interest of the company and to be made CEO. In an act of revenge for her demands not being met, she has stopped Plaintiff's ability to access its core intellectual property and has routed critical company information to her personal email address – Defendant's acts should be enjoined:

I - DISCOVERY CONTROL PLAN

1.01 Plaintiff intends for discovery to be conducted under TEXAS RULE OF CIVIL PROCEDURE 190.3 (Level II).

II - PARTIES

2.01 Plaintiff Big Thirst, Inc. (Plaintiff) is a Delaware corporation whose principal office is located in Travis County, Texas.

2.02 Defendant Lauren Wylie Donoho is an individual who can be served with process at her residence located at 1210 Lucca Drive, Dripping Springs, Texas 78620.

III - FACTS

3.01 In December of 2016, Defendant became a contractor providing web design services

to Big Thirst Marketing, a full-service marketing agency owned and operated wholly by Matt McGinnis (McGinnis). In 2020 McGinnis developed the concept of Big Thirst, Inc.: a full service e-commerce solution for distilleries. This would provide customers with services for consulting, marketing, and sales. One important difference between Big Thirst, Inc. and its competitors would be the data analytics Big Thirst, Inc. would provide. It will provide its customers with better analytics of their advertising and sales.

3.02        McGinnis incorporated Big Thirst, Inc. in March 2021. Soon after this, McGinnis called Defendant to tell her about the venture, and asked if she would be interested in providing contractor services for web design and other technical aspects, especially developing a data dashboard that would be the main component of Big Thirst, Inc. The customers would use this dashboard for their marketing, for their sales, and for their analysis. Essentially, use of the data dashboard is what would be sold to customers and what differentiates Big Thirst, Inc. from its competitors.

3.03        Instead of being a contractor, Defendant asked for an equity stake in the company and a position as an officer of Big Thirst, Inc. The bargain was struck that Defendant would create the company's website and data dashboard in exchange for a 27% stake in the company.

3.04        Defendant became the Chief Operating Officer of the company. Her duties were to oversee technical aspects of the business operations. In that role for Big Thirst, Inc., she developed the data dashboard. To do so, she subscribed to a variety of third-party software applications to both create the functionality of the data dashboard, and to operate in conjunction with the dashboard to process orders, payments, and manage product fulfillment. Some of the software isn't integrated into Big Thirst Inc.'s dashboard, but feeds into it. For example, Shopify is the software that creates the

shopping cart. The orders from it are then recognized in our dashboard, but the Shopify software is not an actual element of the dashboard. There are several software licenses that make Big Thirst, Inc.'s e-commerce, payment processing, inventory and fulfillment management, etc. possible, but they are not actual elements of the data dashboard. Defendant has sole control over the data dashboard and the related software. Without access to all of these items, Big Thirst, Inc. is not able to run its business.

3.05    To fund this operation, Big Thirst, Inc. was to secure a loan. Defendant secured a loan from her father. It was always clear that the loan was to be exclusively for the use of Big Thirst, Inc.'s start-up costs. The loan was to be re-paid by Big Thirst, Inc. At the last minute, Defendant insisted that she alone be the borrower. However, the agreement was still that the funds would be used exclusively for Big Thirst, Inc., and that Big Thirst, Inc. was still to be responsible for re-payment of the loan. A portion of the loan funds were in fact used to secure software applications and to the develop the data dashboard.

3.06    Big Thirst, Inc. also began working on securing a larger SBA loan. The loan was to be used to hire four employees, to pay outstanding invoices, to purchase equipment, and to pay Defendant and McGinnis for their efforts to date. On March 15, 2022, two days before the SBA loan was scheduled to close, Defendant sent a list of demands before she would sign for the SBA loan.

3.07    Essentially, Defendant demanded: (1) a majority ownership interest in Big Thirst, Inc., rather than the 27% she had agreed to and accepted, and (2) exclusive control over Big Thirst, Inc. The demand was coupled with a serious threat - either McGinnis and Big Thirst, Inc. agree, or she would shut down the data dashboard. Shutting down the data dashboard shuts down all consumer

orders for Big Thirst, Inc.'s customers. For all intents and purposes, it shuts down the company, and destroys Big Thirst, Inc.'s relationships with its customers and its reputation.

3.08        The parties went to mediation to try to work out a solution, it did not work.

3.09        On April 4, 2022, Defendant threatened to shut down the data dashboard unless she is made CEO of Big Thirst, Inc. with majority ownership interest. Unless that happens, Defendant said: **"The remaining authored technology (data and analytics dashboards) will not be transferred to the company and will be shut off immediately."** *See* **Exhibit B**.

3.10        The next day, on April 5, 2022, Defendant agreed to hold off shutting down the data dashboard until the Board of Directors had an opportunity to meet. That meeting was to occur on April 13, 2022. *See* **Exhibit C**.

3.11        On March 7, 2022, Defendant again made her threat to shut down the data dashboard unless she is made CEO of Big Thirst, Inc. with majority ownership interest. She said that despite her earlier email, she was no longer willing to wait for the board of directors to meet. *See* **Exhibit D**.

3.12        On April 7, 2022 Matt McGinnis, Big Thirst, Inc.'s CEO, could not access the dashboard. Defendant is the sole holder of administrative access to the data dashboard. Fearing that the data dashboard was shut down, McGinnis logged in using a customer's credentials. He found that the data dashboard was still operational, but that he, the CEO, was locked out. Further, all emails with information regarding the data dashboard were no longer going to a Big Thirst, Inc. email address. These emails contain important information regarding the operation of the data dashboard, and are vital for the successful operation of Big Thirst, Inc.'s business. Defendant has re-routed those emails to her personal email address.

3.13      Defendant has the only administrative access to Big Thirst, Inc.'s dashboard and the supporting software.

3.14      Defendant's emails attached hereto clearly show the malicious, self-serving nature of Defendant's actions.

## IV - CAUSES OF ACTION

4.01      **Breach of Fiduciary Duties:** As an officer of Big Thirst, Inc., Defendant owed it fiduciary duties. By locking Big Thirst, Inc.'s CEO out of the data dashboard and re-routing the information emails generated, Defendant has violated those duties. She took actions against Big Thirst, Inc. because the company would not give her a majority equity share or make her CEO. Her acts clearly breached her fiduciary duties to:

      a.      place the company's interests above her interests,

      b.      refrain from self-dealing,

      c.      loyalty,

      d.      utmost good faith, fairness, and honesty,

      e.      full disclosure of all matters affecting the company,

      f.      account for the property of the company,

      g.      refrain from competition with the company,

      h.      utmost good faith in her relations with the company,

      i.      due care, and

      j.      obedience.

4.02      Her breaches of her fiduciary duties are proximately causing injury to Plaintiff, at

Plaintiff's expense and to the attempted sole benefit of Defendant.

V - REQUEST FOR INJUNCTIVE RELIEF

5.01 **Status Quo:** The last peaceable status that preceded the controversy at issue in this case is that Big Thirst, Inc.'s had access to the data dashboard and supporting software, and the emails generated by the data dashboard were being routed to a Big Thirst, Inc. email. That is all the Plaintiff seeks by way of this request for injunctive relief.

5.02 Defendant's actions are directly causing irreparable harm to Plaintiff. Big Thirst, Inc. is a small start-up. It is unable to support its customers and their use of the data dashboard. Its reputation is just being formed. Its ability to provide services to its customers as promised is key to its reputation, and its ability to operate and generate revenue. No amount of damages can re-establish Plaintiff's reputation, or re-establish its customers' trust, if Plaintiff is not able to continue operating. The harm to Plaintiff is imminent, ongoing, and irreparable. Once the damage to Plaintiff's reputation is done, and once Plaintiff's customers lose faith in Plaintiff, there is no remedy at law to adequately remedy the damage Defendant is doing. A money judgment cannot make this right. By key emails generated from the data dashboard going to Defendant's personal email rather than to Big Thirst, Inc., Plaintiff is unable to operate its business and fulfill its obligations to its customers.

5.03 **Requested Injunction:** For these reasons, Plaintiff seeks a temporary restraining order pursuant to TEX. R. CIV. P. 680 ordering that Defendant:

a. Restore Big Thirst, Inc.'s data dashboard to fully functioning status as it was on April 1, 2022;

b. Forward all emails that Defendant re-routed from a Big Thirst, Inc. email account to her personal email account to Plaintiff at matt@bigthirst.com; and

     c.    To provide Big Thirst, Inc. with all administrative log-in credentials for all software and intellectual property used by Big Thirst, Inc.

5.04      Plaintiff has a probable right of recovery as described in the paragraphs above and as evidenced by the exhibits attached to this Original Petition and Request for Temporary and Permanent Injunction.

5.05      In order to preserve the status quo and Plaintiff's rights during the pendency of this action, Defendant should be cited to appear and show cause why they should not be temporarily enjoined as requested.

5.06      Plaintiff is willing to post bond.

5.07      There is not enough time to serve notice on Defendants and to hold a hearing on this application as Defendants have already taken, and continue to take, the action that must be enjoined.

5.08      **Request for Temporary Restraining Order:** Plaintiff's application for a temporary restraining order is authorized by TEX. CIV. PRAC. & REM. CODE §65.011(1), (2), (3), and (5). Defendant's actions must be restrained as they are prejudicial to Plaintiff.

5.09      **Request for Temporary Injunction:** Plaintiff asks the Court to set its application for temporary injunction for a hearing and, after the hearing, issue a temporary injunction against Defendant.

5.10      **Request for Permanent Injunction:** Plaintiff asks the Court to set their request for a permanent injunction for a full trial and, after the trial, issue a permanent injunction against Defendant. Upon final trial, this Court should enter an order permanently enjoining Defendant from the same behavior.

## VI -  EVIDENCE

6.01        Plaintiffs provide the following evidence in support of their request for injunctive

relief:

    a.        Affidavit of Matt McGinnis, a true and correct copy of which is attached hereto as
**Exhibit A**;

    b.        April 4, 2022 email from Defendant, a true and correct copy of which is attached
hereto as **Exhibit B**;

    c.        April 5, 2022 email from Defendant, a true and correct copy of which is attached
hereto as **Exhibit C**; and

    d.        April 7, 2022 email from Defendant, a true and correct copy of which is attached
hereto as **Exhibit D**.

## VII -  CONDITIONS PRECEDENT

7.01        All conditions precedent to maintaining this suit have been performed or have

occurred.

## VIII -  DAMAGES

8.01        The damages sought are within the jurisdictional limits of the Court. At this time,

Plaintiff seeks monetary relief of $250,000 or less and non-monetary relief.

## IX -  REQUEST FOR DISCLOSURE

9.01        Plaintiffs requests that Defendants timely disclose the information or material

described in TEXAS RULES OF CIVIL PROCEDURE 194.2, 194.3, 194.4, and 195.

## X -  ATTORNEY FEES

10.01        Plaintiffs are entitled to recover reasonable attorney's fees against Defendant.

## XI -  PRAYER

    WHEREFORE, PREMISES CONSIDERED, Plaintiffs ask that Defendants be cited to appear

and answer, and that Plaintiffs have judgment for:

    a.    Costs of court and attorney fees;

    b.    Damages within the jurisdictional limits of this court;

    c.    Attorney's fees and costs;

    d.    Prejudgment and post-judgment interest; and

    e.    A temporary restraining order, temporary injunction, and permanent injunction be issued as set forth above; and

    f.    Such other and further relief in law and in equity to which Plaintiffs may show itself to be justly entitled.

Respectfully Submitted,

HAJJAR | PETERS, LLP
3144 Bee Cave Road
Austin, Texas 78746
Telephone: (512) 637-4956
Facsimile: (512) 637-4958

By:    */s/ Doran D. Peters*
    Doran D. Peters
    State Bar No. 24027615
    Eric C. Dowdy
    State Bar No. 24082929
    service@legalstrategy.com
ATTORNEYS FOR PLAINTIFF

VERIFICATION

STATE OF TEXAS §
§
TRAVIS COUNTY §

Before me, the undersigned notary, on this day personally appeared Matt McGinnis, a person whose identity is known to me. After being duly sworn on her oath by me, Mr. McGinnis stated that he is over eighteen years of age, is of sound mind and competent to make this verification for and on behalf of Plaintiff. Mr. McGinnis further stated that he is the Chief Executive Officer (CEO) of Big Thirst, Inc., and that he has read the foregoing petition and that each and every factual statement contained in petition is within his personal knowledge and is true and correct.

Matt McGinnis

Subscribed and sworn to before me, the undersigned Notary Public, in and for the County of Travis, this 11 day of April, 2022.

Notary Public ★ State of Texas

JESSICA LOYOLA-HERNANDEZ
Notary Public, State of Texas
Comm. Expires 05-22-2022
Notary ID 131578718

CERTIFICATE OF ATTEMPTED NOTICE

To the best of the applicants' knowledge, the parties against whom relief is sought are not represented by counsel in the matter that forms the basis of this lawsuit.

However, Defendant did copy Brian O'Toole, an attorney with Griffith Davison, P.C. to an email. Presuming that Mr. O'Toole is Defendant's attorney, I called Mr. O'Toole on April 7, 2022 and left him voice messages on both his office phone and his cell phone. I have not received a response. Out of an abundance of caution, this petition is being emailed to Mr. O'Toole at botoole@griffithdavison.com and to Defendant at wylie@bigthirst.com.

*Doran D. Peters*
Doran D. Peters

NOTICE OF DUTY JUDGE

The Duty Judge for Travis County District Court on April 11, 12, 13, 14, and 15 is Judge Catherine A. Mauzy of the 419th Judicial District Court.

*Doran D. Peters*
Doran D. Peters

This affidavit—drafted by McGinnis in a different lawsuit—states only that Big Thirst internally understood the $50,000 loan "was to be re-paid by Big Thirst, Inc." It is not a promise to Plaintiff, does not contain any words of assumption, and was not communicated to Plaintiff at the time of the loan.

The statement reflects, at most, an internal expectation regarding Donoho's investment and compensation, which was fully addressed and resolved in the 2022 buyout where Big Thirst paid Donoho $370,000 plus over $80,000 in waived sanctions—repaying her far beyond any contribution she made.

Texas law requires a promise to the creditor, in writing or fitting an exception, to shift liability to a third party. This affidavit does not supply any such promise, and cannot create liability where none was communicated to or relied upon by Plaintiff.

## AFFIDAVIT OF MATT McGINNIS

**STATE OF TEXAS** §
§
**COUNTY OF TRAVIS** §

On this date, Matt McGinnis, personally appeared before me, the undersigned Notary Public, and after being duly sworn, stated the following under oath:

1. "My name is Matt McGinnis. I am over the age of 18 and I am fully competent to make this affidavit. The statements contained in this affidavit are made based on my personal knowledge. The facts set forth below and contained in the attached records are true and correct, based upon my personal knowledge formed from my involvement in this case.

2. I am the Chief Executive Officer of Big Thirst, Inc. and have been from its inception.

3. In December of 2016, Lauren Wylie Donoho became a contractor providing web design services to Big Thirst Marketing, a full-service marketing agency owned and operated wholly by me. In 2020 I developed the concept of Big Thirst, Inc.: a full service e-commerce solution for distilleries. This would provide customers with services for consulting, marketing, and sales. One important difference between Big Thirst, Inc. and its competitors would be the data analytics Big Thirst, Inc. would provide. It would provide its customers with better analytics of their advertising and sales.

4. I incorporated Big Thirst, Inc. in March 2021. Soon after this, I called Donoho to tell her about the venture, and asked if she would be interested in providing contractor services for web design and other technical aspects, especially developing a data dashboard that would be the main component of Big Thirst, Inc. The customers would use this dashboard for their marketing, for their sales, and for their analysis. Essentially, use of the data dashboard is what would be sold to customers and what differentiates Big Thirst, Inc. from its competitors.

5. Instead of being a contractor, Donoho asked for an equity stake in the company and a position as an officer of Big Thirst, Inc. The bargain was struck that Donoho would create the company's website and data dashboard in exchange for a 27% stake in the company.

6. Donoho became the Chief Operating Officer of the company. Her duties were to oversee technical aspects of the business operations. In that role for Big Thirst, Inc., she developed the data dashboard. To do so, she subscribed to a variety of third-party software applications to both create the functionality of the data dashboard, and to operate in conjunction with the dashboard to process orders, payments, and manage product fulfillment. Some of the software isn't integrated into Big Thirst Inc.'s dashboard, but

Exhibit "A"

feeds into it. For example, Shopify is the software that creates the shopping cart. The orders from it are then recognized in our dashboard, but the Shopify software is not an actual element of the dashboard. There are several software licenses that make Big Thirst, Inc.'s e-commerce, payment processing, inventory and fulfillment management, etc. possible, but they are not actual elements of the data dashboard. Donoho has sole control over the data dashboard and the related software. Without access to all of these items, Big Thirst, Inc. is not able to run its business.

7. To fund its operation, Big Thirst, Inc. was to secure a loan. Donoho secured a loan from her father. It was always clear that the loan was to be exclusively for the use of Big Thirst, Inc.'s start-up costs. The loan was to be re-paid by Big Thirst, Inc. At the last minute, Donoho insisted that she alone be the borrower. However, the agreement was still that the funds would be used exclusively for Big Thirst, Inc., and that Big Thirst, Inc. was still to be responsible for re-payment of the loan. A portion of the loan funds were in fact used to secure software applications and to the develop the data dashboard.

8. Big Thirst, Inc. also began working on securing a larger SBA loan. The loan was to be used to hire four employees, to pay outstanding invoices, to purchase equipment, and to pay Donoho and me for our efforts to date. On March 15, 2022, two days before the SBA loan was scheduled to close, Donoho sent a list of demands before she would sign for the SBA loan.

9. Essentially, Donoho demanded: (1) a majority ownership interest in Big Thirst, Inc., rather than the 27% she had agreed to and accepted, and (2) exclusive control over Big Thirst, Inc. The demand was coupled with a serious threat - either I and Big Thirst, Inc. agree, or she would shut down the data dashboard. Shutting down the data dashboard shuts down all consumer orders for Big Thirst, Inc.'s customers. For all intents and purposes, it shuts down the company, and destroys Big Thirst, Inc.'s relationships with its customers and its reputation.

10. The parties went to mediation to try to work out a solution, it did not work.

11. On April 4, 2022, Donoho threatened to shut down the data dashboard unless she was made CEO of Big Thirst, Inc. with majority ownership interest. Unless that happens, Donoho said: **"The remaining authored technology (data and analytics dashboards) will not be transferred to the company and will be shut off immediately."** A true and correct copy of that email is attached hereto as **Exhibit B**.

12. The next day, on April 5, 2022, Donoho agreed to hold off shutting down the data dashboard until the Board of Directors had an opportunity to meet. A true and correct copy of that email is attached hereto as **Exhibit C**. That meeting was to occur on April 13, 2022.

Exhibit "A"

13. On March 7, 2022, Donoho again made her threat to shut down the data dashboard unless she is made CEO of Big Thirst, Inc. with majority ownership interest. She said that despite her earlier email, she was no longer willing to wait for the board of directors to meet. A true and correct copy of which is attached hereto as **Exhibit D**.

14. On April 7, 2022 I, Big Thirst, Inc.'s CEO, could not access the dashboard. Donoho is the sole holder of administrative access to the data dashboard. Fearing that the data dashboard was shut down, I logged in using a customer's credentials. I found that the data dashboard was still operational, but that I was locked out. All emails with information regarding the data dashboard were no longer going to a Big Thirst, Inc. email address. These emails contain important information regarding the operation of the data dashboard, and are vital for the successful operation of Big Thirst, Inc.'s business. Donoho has re-routed those emails to her personal email address.

15. Donoho has the only administrative access to Big Thirst, Inc.'s dashboard and the supporting software.

16. The last peaceable status that preceded the Ms. Donoho's actions were that Big Thirst, Inc. had access to the data dashboard and supporting software, and the emails generated by the data dashboard were being routed to a Big Thirst, Inc. email. That is all Big Thirst, Inc. seeks by way of this request for injunctive relief.

17. Donoho 's actions are directly causing irreparable harm to Big Thirst, Inc.. Big Thirst, Inc. is a small start-up. It is unable to support its customers and their use of the data dashboard. Its reputation is just being formed. Its ability to provide services to its customers as promised is key to its reputation, and its ability to operate and generate revenue. No amount of money can re-establish Big Thirst, Inc.'s reputation, or re-establish its customers' trust. All of that will be lost if Big Thirst, Inc. is not able to continue operating. The harm to Big Thirst, Inc. is imminent, ongoing, and irreparable. Once the damage to Big Thirst, Inc.'s reputation is done, and once Big Thirst, Inc.'s customers lose faith in Big Thirst, Inc., there is no amount of money to adequately remedy the damage Donoho is doing, because Big Thirst, Inc.'s reputation will be be ruined. A money judgment cannot make this right. By key emails generated from the data dashboard going to Donoho 's personal email rather than to Big Thirst, Inc., Big Thirst, Inc. is unable to operate its business and fulfill its obligations to its customers.

18. To continue to operate, Big Thirst, Inc. needs the data dashboard to be returned to fully functioning status, which it was on April 1, 2022. Further, to properly service its customers and operate its business, Big Thirst, Inc. needs all emails generated from or through the data dashboard that were re-routed to Donoho's business address. Finally, Donoho is holding all administrative log-in credentials for software and intellectual

Exhibit "A"

WYLIE 174

property used by Big Thirst, Inc. and Big Thirst, Inc. needs that administrative access to operate its business.

Further affiant sayeth naught."

Matt McGinnis

SWORN TO and SUBSCRIBED before me by Matt McGinnis on this, the 11th day of April, 2022.

Notary Public ★ State of Texas

JESSICA LOYOLA-HERNANDEZ
Notary Public, State of Texas
Comm. Expires 05-22-2022
Notary ID 131578718

Exhibit "A"

This Frost Bank "Certification of Beneficial Owners" is a routine regulatory form and is wholly irrelevant to Plaintiff's claim. No one disputes that Ms. Donoho was listed as an owner/officer for banking purposes.
The document contains no promise, no assumption, and no acknowledgement by Big Thirst or McGinnis of any obligation to repay Plaintiff's personal loan to his daughter.
Identifying beneficial owners under federal compliance rules does not convert Donoho's personal borrowing into a corporate debt and does not evidence any agreement with Plaintiff.
The certification does not reference the Note, repayment terms, or any undertaking by Defendants.

1:24-CV-01512-DAE
Plaintiff
EXHIBIT
J

Frost

**Certification of Beneficial Owners**

**Legal Entity Name:** Big Thirst, Inc. **Date:** July 2, 2021
**Account Number:** **CIF Number:**
**Address:** 2101 Elton Lane, Austin, TX 78703

## Beneficial Owners

The following information is required for each individual, if any, who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25% or more of the equity interests of the legal entity listed above.

**Owner #1**
**Name:** Matthew J. McGinnis **Title:** CEO
**Address:** 2101 Elton Lane, Austin, TX 78703 **Tax ID Number:** 86-3813256
**Date of Birth:** 03/02/69 **ID Number:** 21190187 **ID Issuance:** 11/15/2020 **ID Expiration:** 03/02/2030

**Owner #2**
**Name:** Lauren M. Wylie **Title:** COO
**Address:** 1210 Lucca Dr., Dripping Springs, TX 78620 **Tax ID Number:** 86-3813256
**Date of Birth:** 12/18/82 **ID Number:** 43477541 **ID Issuance:** 12/05/2019 **ID Expiration:** 12/18/2024

**Owner #3**
**Name:** **Title:**
**Address:** **Tax ID Number:**
**Date of Birth:** **ID Number:** **ID Issuance:** **ID Expiration:**

**Owner #4**
**Name:** **Title:**
**Address:** **Tax ID Number:**
**Date of Birth:** **ID Number:** **ID Issuance:** **ID Expiration:**

## Controller

The following information is required for one individual with significant responsibility for managing the legal entity listed above, such as an executive officer or senior manager (e.g. Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, Treasurer); or any other individual who regularly performs similar functions. This individual may also be a Beneficial Owner.

**Name:** Matthew J. McGinnis **Title:** CEO
**Address:** 2101 Elton Lane, Austin, TX 78703 **Tax ID Number:** 86-3813256
**Date of Birth:** 03/02/69 **ID Number:** 21190187 **ID Issuance:** 11/15/2020 **ID Expiration:** 03/02/2030

## Certification

Certification must be completed by one of the following: a Beneficial Owner, the Controller, or a signer on the account.
The undersigned hereby certifies, to the best of my knowledge, that the information provided above is complete and correct. I also agree to immediately notify Frost Bank of any changes to the information provided above.

**Print Name:** Matthew J. McGinnis **Title:** Chief Executive Officer

**Signature:** X *Matt McGinnis* **Date:** July 2, 2021

WYLIE 187

**Instructions**

**What is this form?**
To help the government fight financial crime, Federal regulation requires certain financial institutions to obtain, verify, and record information about the beneficial owners of legal entity customers. Legal entities can be abused to disguise involvement in terrorist financing, money laundering, tax evasion, corruption, fraud, and other financial crimes. Requiring the disclosure of key individuals who ultimately own or control a legal entity (i.e., the beneficial owners) helps law enforcement investigate and prosecute these crimes.

**Who has to complete this form?**
This form must be completed by the person opening a new account on behalf of a legal entity with any of the following U.S. financial institutions: (i) a bank or credit union; (ii) a broker or dealer in securities; (iii) a mutual fund; (iv) a futures commission merchant; or (v) an introducing broker in commodities.

For the purposes of this form, a **legal entity** includes a corporation, limited liability company, or other entity that is created by a filing of a public document with a Secretary of State or similar office, a general partnership, and any similar business entity formed in the United States or a foreign country. **Legal entity** does not include sole proprietorships, unincorporated associations, or natural persons opening accounts on their own behalf.

**What information do I have to provide?**
This form requires you to provide the name, address, date of birth and Social Security number (or passport number or other similar information, in the case of Non-U.S. persons) for the following individuals (i.e., the **beneficial owners**):

(i) Each individual, if any, who owns, directly or indirectly, 25 percent or more of the equity interests of the legal entity customer (e.g., each natural person that owns 25 percent or more of the shares of a corporation); and
(ii) An individual with significant responsibility for managing the legal entity customer (e.g., a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President or Treasurer).

The number of individuals that satisfy this definition of "beneficial owner" may vary. Under section (i), depending on the factual circumstances, up to four individuals (but as few as zero) may need to be identified. Regardless of the number of individuals identified under section (i), you must provide the identifying information of one individual under section (ii). It is possible that in some circumstances the same individual might be identified under both sections (e.g. the President of Acme, Inc. who also holds a 30% equity interest). Thus, a completed form will contain the identifying information of at least one individual (under section (ii)), and up to five individuals (i.e., one individual under section (ii) and four 25 percent equity holders under section (i)).

The financial institution may also ask to see a copy of a driver's license or other identifying document for each beneficial owner listed on this form.

WYLIE 188

1:24-CV-01512-DAE
Plaintiff
EXHIBIT
K

BIG THIRST, INC.

# BUSINESS PLAN

AUGUST, 2021

BIG
THIRST

MATT MCGINNIS

WYLIE 189

184



BIG
THIRST

## TABLE OF CONTENTS

**Executive summary** .......... 2
**BIG THIRST, INC. Company Overview** .......... 4
Business Structure .......... 4
Nature of the Business .......... 4
Vision, Mission and Values .......... 4
Background Information .......... 4
Business objectives .......... 5
Team .......... 5
**Market Analysis** .......... 9
The Need .......... 9
Increasing Consumer Demand .......... 9
The Distilled Spirits Market is Growing .......... 10
Alcohol Sales Via e-Commerce Are Increasing .......... 10
Competitive analysis .......... 12
SWOT Analysis .......... 18
**Products and Services** .......... 19
**Customer segmentation** .......... 20
**Marketing Plan** .......... 22
Price .......... 22
Product .......... 22
Promotion .......... 22
Place .......... 23
**Logistics and Operations Plan** .......... 24
Suppliers .......... 24
Compliance .......... 24
Shipping and fulfilment .......... 24
Facilities .......... 27
Equipment and Equipment .......... 27
**Financial Plan** .......... 28
Inventory .......... 28
Income statement .......... 28
Balance sheet .......... **Error! Bookmark not defined.**
Cash-flow statement .......... 28

**THINK BIG! WE ACCELERATE SALES FOR SPIRITS BRANDS.**



BIG
THIRST

## EXECUTIVE SUMMARY

**BIG THIRST, INC**., headquartered in Austin, Texas, is a three-tier compliant white-label e-commerce solution for spirits brands and distilleries to sell beverage alcohol products to consumers.

**The Business Opportunity** — Consumers expect to buy anything they want online and have it delivered quickly. Until recently distilleries have had limited ability to sell distilled spirits online. The demand for e-commerce platforms which enable spirits brands to reach customers nationwide is outpacing the capacity of the current providers to keep pace. Customer service, ease of onboarding, and marketing are scant afterthoughts for current e-commerce providers. The market is growing, demanding a new e-commerce platform dedicated to spirits brands. That is where Big Thirst Inc. comes in.

**How We Will Address the Opportunity** — Led by C.E.O., Matt McGinnis, C.O.O., Lauren "Wylie" Donoho, C.F.O. Jelena Medic, and C.M.O., Suzanne McGinnis, we are a team of seasoned beverage alcohol production, distribution, sales, and marketing experts. We know the industry, understand its needs, and have addressed the challenges of spirits brands for years. Recently, especially since the pandemic, we have seen the online sales landscape change drastically. We have implemented (or strongly avoided) existing e-commerce solutions for our clients. After setting up and working with the best solutions that are currently available, we realize that they are not sufficient. Distilleries struggle with the terrible onboarding processes, the severe lack of customer service, and the paltry marketing initiatives. It is clear that there is no better time than now to step up and raise the bar.

**Our mission** is to enable and accelerate sales of beverage alcohol for spirits brands and distilleries.

By combining our passions for the spirits industry with technology, creativity, and customer service we empower distilleries with a powerful sales engine with content and analytics that will maximize their success, and help consumers discover spirits.

**Think Big! We accelerate sales for spirits brands.**
We help spirits brands expand their market reach faster and easier by:

1. **Increasing Revenue** — with **BigCart** spirits brands can expand sales nationwide by allowing consumers to conveniently place online orders and receive spirits directly at their door within days.
2. **Building Brand Awareness** — our white-label approach helps spirits companies build brand awareness with consumers and maintain their own look and feel throughout a transaction.
3. **Retaining Customers** — Treating spirits brands as partners, not clients, we build life-long partnerships. Their success is our success. **Big Success**, our customer support system, is a pilar of our culture. We leverage technology like Zendesk as part of our solution to resolve issues faster.
4. **Simplifying Pricing** — Spirits brands know exactly what they will they pay with our simple pricing tiers that cut out the complex and head-scratching costing models and hidden fees. See page (xx).
5. **Faster Time to Money** — Brands can expand sales nationwide via our retailer/fulfilment network quickly with our frictionless and simple two-week onboarding process.
6. **Reaching More Consumers** — Spirits brands can better reach consumers to propel sales with the full force of our marketing team's spirited content with public relations, social media,

Business plan, not a contract and not directed to Plaintiff.

“$50,000 in a family loan” merely identifies Donoho’s capital contribution source; it is not a promise by Defendants to repay Plaintiff.

Describes funding structure at a high level and creates no legal obligation and no assumption of debt by Big Thirst or McGinnis.

social influencers, email marketing (Mailchimp) and digital ads (Facebook, Instagram, Google Ads, LinkedIn etc.).

7. **Gaining Insights** — Spirits brands can now make better informed sales and marketing decisions based on **BigData**. Our BigData business intelligence dashboard provides access to the most robust and insightful analytics on the market, combining essential information from: Google Analytics, the Big Thirst “buy buttons,” BigThirst.com orders, digital ad performance, email marketing statistics, and more.

**We raise the bar and shake and stir things up for consumers:**

1. **Low-Cost Delivery** — More affordable (or free) delivery than competitors. We are seeking more volume of sales that in time will allow for cost effective shipping rates.
2. **Faster Shipping** — More retail locations than our competitors so products will be delivered faster. Our current competitors have retailers in one to 11 states. We are aiming at partnering with eight retailers in the first year and 20 by the end of 2022.
3. **Easy Access to Hard-to-find Craft Brands** — Find that new, small, rare batch from a distillery you never even knew about on the other side of the country in the largest library of global craft brands available to buy online and ship directly to your home.
4. **Stay In-the-Know** — Dive deeper into craft brands and enjoy custom and engaging content on BigThirst.com and our social media platforms.
5. **Problems Solved** — Get answers and expert recommendations with Big Success customer service.

## WE HAVE THE EXPERTISE

Big Thirst Inc. draws on the resources of two existing Big Thirst companies:

- Big Thirst Consulting helps distilleries get started, get into distribution, and manage on premise, off premise, and online sales.
- Big Thirst Marketing offers a complete suite of marketing services to help spirits suppliers fully develop and maintain their brand online. With deep experience building brands and implementing marketing campaigns for spirits companies, Big Thirst Marketing has the staff and capabilities to provide package design, website design, shopping cart implementation, digital advertising, email marketing, social media management, and public relations.

## WE HAVE THE PLAN

Using in-depth market analysis, we have prepared a detailed business operations and financial plan for a fast ramp to profitability. We require financial backing to get started and are pursuing, $50,000 in a family loan, $250,000 in debt funding, and a $100,000 revolving credit facility.

**THINK BIG! WE ACCELERATE SALES FOR SPIRITS BRANDS.**



BIG
THIRST

## BIG THIRST, INC. COMPANY OVERVIEW

BIG THIRST, INC. is a three-tier compliant white-label e-commerce solution for spirits brands and distilleries to sell beverage alcohol products to consumers.

## BUSINESS STRUCTURE

BIG THIRST, INC. is a C Corporation incorporated in the state of Delaware.

## NATURE OF THE BUSINESS

BIG THIRST, INC. is a three-tier compliant integrated e-commerce platform for spirits brands to conveniently expand sales and ship products to consumers. We offer website and website store design, online shopping cart technology, distribution management, customer service, digital advertising, email marketing, marketing analytics to target online marketing for conversions, and retailer partner relations for order fulfillment.

Our advantage is that our e-commerce platform is integrated with a compliance, distribution and sales consultancy, Big Thirst Consulting, and a full-service marketing agency, Big Thirst Marketing, dedicated to the beverage alcohol industry. We are particularly adept at helping distilleries build brand awareness with consumers to attract them to the website in the first place.

BIG THIRST, INC. will handle the storefront with our **BigCart** software, order fulfillment through partner retailers, and marketing for the spirits brands, while maintaining a brand's look and feel throughout a transaction so consumers feel a direct connection with the brand. With our **BigCart** shopping carts built into spirits brands' websites, we can track sales analytics and customer data with our **BigData** dashboard for remarketing digital advertising campaigns and triggered automated emails for cart abandonment and to encourage return purchases.

## VISION AND MISSION

BIG THIRST, INC. is a full-service sales and marketing engine powered by a sales and distribution consultancy, a marketing agency, and a three-tier compliant white-label e-commerce solution for spirits brands and distilleries to sell beverage alcohol products to consumers.

**Our Vision** is to help the industry grow by giving spirits brands access to new markets with distribution management, an-ecommerce solution, marketing tools, and analytics to effectively sell to consumers and pave the way to profitable growth.

**Our Mission** is to enable and accelerate sales of beverage alcohol for spirits brands and distilleries.

## BACKGROUND INFORMATION

BIG THIRST, INC. will draw heavily on the expertise, connections, and insights from its sister companies, Big Thirst Marketing and Big Thirst Consulting.

### Big Thirst Marketing

Founded in 2014, Big Thirst Marketing is a full-service marketing agency built to help its clients grow to the next level and foster relationships between brands and loyal customers. It is run by a team of marketing experts and beverage industry veterans who are passionate about telling the fascinating stories behind the process, the makers, and the creators that make every sip worthy. The agency achieves results for spirits brands with complete marketing campaigns that integrate brand

WYLIE 193



BIG
THIRST

development, graphic design & package design, content marketing, website development, digital advertising, public relations, social media& influencer marketing, and email marketing.

**Big Thirst Consulting**
Founded in 2020 Big Thirst Consulting provides complete, integrated business services for distilleries to pave the way to profitable growth. The consultancy, created by spirits industry veterans, Matt McGinnis and Mark Shilling along with advisory board member, Joseph Castillo, helps distilleries including regulatory compliance, distribution, pricing, sales, and marketing to help you grow to the next level, faster, with better margins. Big Thirst Consulting has extensive experience helping start-up and growth phase craft and major brand distilleries streamline operations, increase sales, and manage distributor relations for market growth.

## BUSINESS OBJECTIVES

Our goals are to launch the company in the second half of 2021, and to attract 20 customers generating $65,500 in total revenue by the end of this year. We will be fully operational, generating positive net income in 2022.

**2021 Goals**
- 20 Customers on Retainer
- $65,500 Total Revenue
- ($197,500) Net Income

**2022 Goals**
- 54 Customers on Retainer
- $850,600 Total Revenue
- $37,000 Net Income

**2023 Goals**
- 144 Customers on Retainer
- $2,415,000 Total Revenue
- $837,000 Net Income

## TEAM

**Executive Team**
**Matt McGinnis, Founder & Chief Executive Officer**
Matt is the lead executive of the company responsible for key decisions and managing the operations. Armed with 30 years of global marketing experience in both corporate and agency roles, Matt followed his passion for the beverage industry to found Big Thirst Marketing in 2014. He leads that agency as the marketing arm of Big Thirst Consulting bringing the strategic approach of the Fortune 500 marketing world and credible, passionate understanding of the specific nuances of the beverage industry. Matt has achieved marketing results for start-ups and world leading brands alike in the U.S. and Europe.

**Lauren "Wylie" Donoho, Founder & Chief Operations Officer**
Wylie has been a part of the Big Thirst Marketing team since 2016. She is the ultimate task master, artfully balancing complex technologies, road-mapping future tech, and addressing client needs. She will oversee the business systems and technology including spearheading the BigData dashboards



BIG
THIRST

with industry benchmarking. Wylie is passionate about the solving the modern-day challenges of small businesses as they struggle to compete with big name brands while sustaining the Big Thirst company culture. Wylie holds a BS in communications from The University of Texas and is a wife, mom, and dog mom that enjoys a killer margarita.

**Jelena Medic, Chief Financial Officer**
Drawing on her considerable experience in finance and operations leadership roles with a focus on beverage alcohol with both, small and large corporations, Jelena will provide guidance on managing pricing models, customer agreements, and fiscal management for the company. Her journey in the alcohol industry started with Edrington Americas, the parent company of brands such as Macallan, Highland Park, Brugal and Partida. Her focus and passion is launching, growing, and helping wine and spirits brands achieve profitable successful. She has a deep understanding of alcohol industry, tackling each area of the business with unique strategic and analytical approach.

**Suzanne McGinnis, Chief Marketing Officer and Creative Director**
Suzanne will oversee all marketing efforts and will manage the creative team for BIG THIRST, INC. A talented wordsmith and conceptual genius, she has created memorable brands for companies such as Tivo, Uncle Billy's Spirits, Oregon Freeze Dry, Long Creek Distilling, and Swizzle Classic Cocktails. In addition to her extensive advertising and graphic design agency experience, she has flexed her creativity by founding and operating a company that produced artistic hand-fans, as well as illustrating children's' books. Suzanne is a graduate of the Columbus College of Art & Design with a BFA in Illustration.

**Board of Directors**
**Joseph Castillo, Director**
Joseph is a partner in Big Thirst Consulting. He will manage distributor relations and assist with attracting retailers to join the BIG THIRST, INC. network. Joseph brings extensive sales, distribution, and pricing experience to the consultancy. During his 16-year career in the spirits industry, he helped launch Angels Envy, Fireball, Buffalo Trace, Treaty Oak Distilling, and Kimo Sabe Mezcal National. He is adept at developing annual unit and gross-profit plans by implementing marketing strategies, analyzing trends and results, as well as achieving sales objectives. Joe has a strong track record of bringing brands to market with strategic and successful launches to ensure positive and repetitive growth.

**Mark Shilling, Director**
Mark is a partner in Big Thirst Consulting. He will assist with compliance management and marketing our services to craft distilleries in the U.S. He has extensive relationships through his leadership roles with the American Craft Spirits Association. Mark specializes in distillery start-up operations and project management. As the founder of Revolution Spirits Distilling Company in 2013, he quickly establishing the distillery as a popular stop along the Central Texas beer, wine, and spirits trail. He is a tireless advocate for the industry, helping establish the Texas Distilled Spirits Association in 2012, and serving as president of the American Craft Spirits Association. He uses his 20 years of experience as a lobbyist to navigate regulatory bodies and assist with compliance and government affairs.

**Marketing Staff**
BIG THIRST, INC. will employ the services of Big Thirst Marketing current contractors including:

- **Joleen Jernigan** for social media and copy writing
- **Logan Lloyd** for graphic design



BIG
THIRST

- **Kristin Rice** for graphic design, email marketing, and digital advertising
- **Jennifer Swanson** for public relations

**Positions to Hire**
In the first six months of operation, we plan to hire the following full-time and contract positions:

- Customer Service Manager
- Sales Manager

**Legal Counsel**
BIG THIRST, INC. has retained the legal services of Hajjar Peters LLP, a full-service business law firm located in Austin, Texas, for business incorporation, contracts, and agreements with distributors, retailers, and spirits brands customers.

**How We Will Reach and Retain Customers**
BIG THIRST, INC. will market to three core customer categories:

1. **Spirits Brands**: Craft distilleries, domestic spirits brands, and import spirits brands are our primary customers. We will make it easy for spirits brands to get in front of a whole new crowd of digital drinkers who are shopping more online than ever. We will market to spirits brands in three phases:
   - Phase 1: Our initial marketing will include public relations launch of the company with messaging directed to craft distilleries. We will follow that with direct contact to our existing network of relationships with craft distilleries that are currently clients of Big Thirst Consulting and Big Thirst Marketing, as well as the numerous brands with whom we have relationships. These brands will form our starting customer base. Simultaneously, we will aggressively build a customer database for email marketing.
   - Phase 2: We will expand our marketing efforts to include targeted advertisements in industry publications and trade journals. In addition, we will sponsor events and organize sales calls during industry conferences such as the ACSA Distillers' Convention and Vendor Trade Show. This will be accompanied by ongoing public relations activities and email marketing.
   - Phase 3: We will establish mature campaigns to co-promote spirits brands on our platform using digital advertising, email marketing, public relations, and influencer marketing. We will continue ongoing public relations campaigns targeted at attracting spirits brands to our platform.

2. **Retailers**: We will build a network of retailers and licensed liquor stores located in states where retailers are legally permitted to ship directly to consumers including California, Connecticut, Florida, Idaho, Louisiana, Nebraska, Nevada, New Hampshire, New Mexico, North Dakota, Oregon, Virginia, Washington, D.C., West Virginia, and Wyoming. Initially we will focus on securing agreements for sales and fulfillment retailors located in states that allow for direct to retail shipping including California, Florida, New York, and Washington, D.C.

3. **Consumers**: Amazon Prime has conditioned people to expect that they can buy anything they want online quickly and shipped to their home for free. We will connect consumers with spirits brands by creating attractive, easy to use shopping carts that are seamlessly integrated into

Business plan, not a contract and not directed to Plaintiff.

“$50,000 family loan” merely identifies Donoho’s capital contribution source; it is not a promise by Defendants to repay Plaintiff.

BIG
THIRST

the websites of spirits brands. We will make it attractive and easy for customers to sign up for newsletters, letting brands nurture connections with consumers.

**Finances**

BIG THIRST, INC. is entering the market at the right time to grow along with a fast-growing segment of the industry. **Sales of alcohol through e-commerce is forecast to grow from $5.6B in 2020 to $19B by 2024**. Because e-commerce for distilleries has only been available to brands for a limited time, we are positioned for great opportunity and growth. Our beverage alcohol expertise, connections, and insight make us an attractive partner for spirits brands who want to grow big.

At the outset, the founders have self-funded start-up costs and are developing the business strategy, e-commerce capabilities, and sales network themselves. We have retained the services of a beverage alcohol industry financial expert, Jelena Medic, as our acting Chief Financial Officer to ensure we have a realistic, conservative financial plan.

We plan to launch the company in the second half of 2021, and to attract 20 customers generating $65,500 in total revenue by the end of this year. We will be fully operational, generating positive net income of $37,000 Net Income in 2022. Revenue will be derived from:

- A monthly fee-based subscription model.
- Collecting a percentage of the sale of each product.
- Fees for marketing services including digital advertising and email marketing.

**Projections**

**2021**

- 20 Customers on Retainer
- $65,500 Total Revenue
- ($197,500) Net Income

**2022**

- 54 Customers on Retainer
- $850,600 Total Revenue
- $37,000 Net Income

**2023**

- 144 Customers on Retainer
- $2,415,000 Total Revenue
- $837,000 Net Income

**The Ask**

To fund our start-up costs, we are seeking a $50,000 family loan, and a loan from the Small Business Administration (SBA) of $250,000 in 1H 2021, with a revolving credit facility of $100,000 in 2H 2021.

This debt financing will be used to cover one-time start-up costs such as legal fees, accounting fees, trade-mark fees, software development costs, advertising, and equipment. It will also be used to fund limited operating costs for salaries and commission for customer service and sales staff.

**THINK BIG! WE ACCELERATE SALES FOR SPIRITS BRANDS.**



BIG
THIRST

We will begin loan repayment monthly at the earliest date set by the SBA and will service the debt with revenue generated from the business. We anticipate full repayment of the SBA loan and revolver by 2029.

## MARKET ANALYSIS

We are not the first white-label e-commerce platform dedicated to distilled spirits, but we are the only company to provide an end-to-end online sales and marketing solution for spirits brands to succeed — from recipe development to final sale.

### THE NEED

Distilleries cannot legally sell directly to consumers online. The three-tier system requires spirits brands to sell first sell to a distributor, then a bar, restaurant, or liquor stores, and finally to consumers. This makes spirits brands overly reliant on bars, restaurants, and their tasting rooms for sales and brand building. With the onset of the COVID-19 quarantine, these spirits brands lost up to 80% of their business and were forced to find new solutions to sell their products. Many turned to the limited three-tier compliant e-commerce solutions to reach consumers to survive the pandemic but found confusing pricing models, long and indefinite lead times for signing-up, limited customer service and little to no marketing to reach out to and eager consumers desperate for home delivery solutions.

Consumer behavior has been permanently reshaped by the pandemic. People had the necessity of ordering alcohol online, and now they are accustomed to the convenience of ordering spirits online just as they do other consumer goods. E-commerce is a long-term solution to provide a sales channels for spirits brands, to differentiate, and grow market share.

### INCREASING CONSUMER DEMAND

Shopping online is commonplace, with e-commerce spending representing 21.3% of total retail sales in the U.S. in 2020. However, because of three-tier system regulations it isn't as easy to buy alcohol online. Consumers are unhappy that they are not able to purchase many locally made and craft spirits conveniently online. While e-commerce is a mainstay shopping experience for many consumer products, online sales of distilled spirits make up a tiny fraction of overall sales. In 2019 e-commerce alcohol sales in the U.S. represented approximately 1% of total alcohol sales. Alcoholic beverage analyst firm, IWSR, expects between 2019 and 2024 total alcohol e-commerce value in the US will grow six-times to make up 7% of total off-trade alcohol in the U.S. by 2024.

> *"Alcohol is not as easy online as other categories, especially in the US, given the much more significant regulations that govern the sale of alcohol compared with other categories." — Danny Brager, SVP, Beverage Alcohol Practice at Nielsen*

In contrast, wineries can sell directly to consumers online. According to Silicon Valley Bank online sales represented an average of 10% of total revenue for U.S. wineries in 2020.





* *RaboResearch US Online Alcohol Sales Reach USD 2.6bn: The 2020 Alcohol E-Commerce Playbook*

It is time for spirits brands to have greater access to three-tier compliant e-commerce solutions.

## THE DISTILLED SPIRITS MARKET IS GROWING

No matter which data source is used, it is clear that the distilled spirits industry is growing.

- The American Craft Spirits Association (ACSA) reported in fall of 2018 a total of 1,835 active craft distilleries, an increase of 15.5% from 2017. In the same time span, producers saw a 23.7% growth in retail cases sold, up to 7.2 million, and a 29.9% rise in sales, up to $3.7 billion.
- As of August 2020, there were 2,050 Distilleries (Craft Distillers, Craft Blenders, and more) in the United States, a growth of 11.7% according to the American Distilling Institute.
- The US craft spirits market is expected to reach revenues of more than $20 billion by 2023, growing at an impressive CAGR of over 32% during 2018-2023.

## ALCOHOL SALES VIA E-COMMERCE ARE INCREASING

While beverage alcohol historically has had one of the lowest e-commerce sales rates across CPG products, its acceleration in recent years has led it to become an extremely hot segment of the beverage alcohol industry. Consumers are used to purchasing items such as clothing, buy beverage alcohol like they buy their favorite whiskey online. The combination of consumer demand, an increase in the number of e-commerce platforms available to sell spirits, and relaxing laws will lead to significant growth in online spirits sales.

Rabobank estimates that U.S. online alcohol sales reached USD $2.6bn in 2019, growing by 22% YOY. Despite the strong growth of e-commerce sales, the penetration of the online alcohol category remains abysmally low, and alcohol's share of food-and-beverage spending drops by 88% online, compared to its share of wallet in brick-and-mortar stores.



BIG
THIRST

According to Nielsen data e-commerce retail sales of alcohol are up as much as 234% during the Covid-19 period compared to a year prior.

IWSR Drinks Market Analysis reports that in the US, ecommerce alcohol sales are expected to continue to increase rapidly, with average annual growth of nearly 45% in value, 2020 to 2024. Put into the wider market context, this means that online alcohol sales will jump to **1.6%** of total off-trade volume in 2020 and reach **6.9% by 2024**.

Although e-commerce structures are more complex in the US, we will start to see more alignment in the three-tier system, with a move towards easier solutions for brand owners to reach consumers online. Brand owners will also want to own the consumer experience, and we will likely see a rise of white label ecommerce platform services as well as a push toward state legislation to allow for direct-to-consumer shipping where not currently allowed. Access to consumer data will be a key consideration for brand owners evaluating their ecommerce strategies as well.

**Average industry growth 2015–2020: 12.1% (IBIS World)**
Revenue for the Online Beer, Wine and Liquor Sales industry has skyrocketed over the five years to 2020, due in part to the expansion in households with internet connections and COVID-19 (coronavirus) related measures to temporarily loosen online alcohol sales during 2020. The number of broadband connections has increased at an annualized rate of 4.5% over the past five years, creating a robust potential customer base for the industry. Furthermore, according to Nielsen's Global Connected Commerce Study, 8.0% of online consumers in the United States browsed and purchased alcoholic beverages online in 2016 (latest data available), bolstering industry revenue.

**IWSR Drinks Market Analysis' Global E-commerce Strategic Study**
About US$6.5b of spirits were sold online in 2018, a figure that represents 2% of all global spirits' value sales.

*E-Commerce Sales of Alcohol is forecast to grow from $5.6B in 2020 to $19B by 2024.*

The US is forecast to overtake China to become the world's largest online alcohol market by the end of next year. The market was previously underdeveloped, but now the channel's growth rate in the US has accelerated by several years. Between 2019 and 2024, total alcohol e-commerce value in the US will grow six-fold to nearly double China, the IWSR predicts. The IWSR expects that e-commerce will make up 7% of total off-trade alcohol in the US by 2024, compared to 6% in China. But the IWSR notes this growth will come from a low base to represent 1% of off-trade retail alcohol volume in the US in 2019.

In 2020, there was a huge increase in awareness of alcohol e-commerce among U.S. consumers, while some states have relaxed legislation to facilitate online sales and home deliveries. IWSR consumer research data shows that in the US, 44% of alcohol e-shoppers only started buying alcohol online in 2020, compared to 19% in 2019.



Case 1:24-cv-01512-DAE Document 42-14 Filed 11/26/25 Page 13 of 29

BIG THIRST

https://www.bloomberg.com/news/articles/2021-02-10/booze-delivery-online-liquor-sales-are-booming-amid-the-pandemic

"Consumers' increasing proclivity for online purchasing has been driven by necessity in recent months, but these purchasing behaviors are here to stay. As brand owners increasingly invest in the channel, markets must be assessed on their own merits with a bespoke strategy developed. This is especially important as government regulations for alcohol e-commerce may evolve as the channel continues to grow," says Guy Wolfe, Strategic Insights Manager at IWSR Drinks Market Analysis.

Growth is largely being driven by the omnichannel segment as supermarkets and traditional retailers seek to rapidly enhance their online offering. On-demand players are also expected to gain significant share.

The direct-to-consumer channel is predicted to grow by nearly US$3bn in value between 2019 and 2024, at a value compound annual growth rate (CAGR) rate of 24% over the five-year period.

## COMPETITIVE ANALYSIS

Spirits brands are not able to sell directly to consumers through e-commerce and remain in compliance with the three-tier system. However, there are options spirits brands can consider that approximate a direct-to-consumer solution including third-party marketing companies with their own platforms and audiences, and white-label store and shopping cart options that maintain a brand's look and feel throughout a transaction.

### Third-Party Marketing Platforms

Third-party marketing platforms allow for online purchase and delivery to a consumer's door. Third-party marketers have their own branded, online stores where consumers plan an order which then goes to a local retailer within a set radius of the consumer. If the retailer accepts the order, the retailer processes payment and arranges for delivery or shipment. The retailer then pays the third-party marketer a small marketing fee.



BIG
THIRST

The advantage for a brand to work with a third-party marketing platform is scalability and reach in numerous markets across the country. For example, Drizly operates in more than 180 markets in the U.S.

The drawback for spirits brands using these third-party marketer platforms is that they take consumer away from brand's website and into an online liquor store where they could be swayed into purchasing another brand based on price, availability, of simply seeing a prettier bottle. That means the work a spirits brand did to get the consumer to its site may be lost to a competitor's brand at the point of purchase.

The main third-party marketing platform competitors are:

**Caskers**

Caskers is a third-party online entity that resells high-end liquor at a discounted price. Caskers is a platform founded in New York City in 2012 with the idea to introduce people to the amazing spirits from around the world and share excitement over them with customers from across the US and Europe. It was started by two whiskey enthusiasts from Harvard Law School who realized how difficult it was to find top-shelf liquors, and how even excellent local products were reserved for only those in the know.

Caskers connects you to liquor producers and artisans who have the products you love. It's a community of people who share the same values and passion for a good whiskey. It is sort of a blend between a specialized niche retailer and online flash sale sites like Vente Privee or Rue La La. Caskers sells offbeat, rare and limited production spirits through its online store, promoting these by regular e-mailings about new products to its subscribers. Caskers works with local fulfillment companies and vendors, in that specific state, to fill the order.

**Reservebar**

Reserve Bar is a leading third-party e-commerce platform for premium and luxury spirits, which are offered for delivery to consumers. While the platform is not a licensed supplier, wholesaler, or retailer, it can connect consumers to licensed outlets. Reserve Bar provides new releases, special limited editions, celebrity-owned and influenced brands, cocktail content, and gifting, including personalized engraved bottles, spirits and accessory bundles, merchandise, and giftware.

US distributor Southern Glazer's Wine & Spirits acquired an equity stake in alcohol e-commerce platform Reserve Bar for an undisclosed sum in March 2021. The equity investment will help SGWS to 'effectively connect its supplier brands in luxury and premium segments to consumers in the fast-moving beverage alcohol digital e-commerce space'.

**Drizly**

Drizly is the leading on-demand alcohol marketplace in the United States, available and designed to be fully compliant with local regulations in more than 1,400 cities across a majority of US states. Drizly works with thousands of local merchants to provide consumers with an incredible selection of beer, wine, and spirits with competitive, transparent pricing. Drizly is its own brand with a goal of amassing their own following, rather than helping spirits companies build their own brand. When they acquire a new customer from a spirits brand, they do not share the customer data back with the spirits brand. Rather, they re-market to that consumer with not just the latest product that was purchased, but all of the products in the Drizly portfolio.



BIG
THIRST

In February 2021, Uber acquire Drizly for approximately $1.1 billion in stock and cash. After the completion of the transaction, Drizly will become a wholly owned subsidiary of Uber. Drizly's marketplace will eventually be integrated with the Uber Eats app, while also maintaining a separate Drizly app.

## White-Label Stores

White-label stores provide integrated e-commerce shopping carts that allow brands to keep their branding consistent, with a look and feel that mimics the brand's own website throughout a transaction that takes place on a third-party site. This allows spirits brands to own the customer's experience throughout the sales process. Consumers purchase directly from a spirit's brand website without the distractions of other brands or competitors.

The primary White-Label e-commerce platform companies are:

### Barcart / Mash & Grape

Barcart enables e-commerce on brands' sites, provides data-driven campaigns on Facebook, Instagram, and e-mail marketing. Barcart is the name of the e-commerce shopping cart and technology for Mash & Grape. The company operates through a network of retailers in 11 states that provide fulfillment for consumers to more than 40 states. Mash & Grape has grown quickly recently and is starting to have challenges with customer relations. Adi Pal, is CEO.

### Cask and Barrel Club

Cask and Barrel Club offers alcoholic beverage brands the opportunity to leverage your paid and owned assets to directly drive e-commerce sales through a brand specific online shop, with full access to customer & sales data and Google Analytics. Owned by industry innovators, the Shayne family has a combined 80 years' experience in the alcoholic beverage industry, both in marketing and sales. In 1993, Alan Shayne founded the first direct-to-consumer alcoholic beverage brand in the United States. Our full-service fulfillment process stays within one network of family-owned businesses and orders dispatch within 1-2 business days after order placement.

Cask and Barrel Club is currently at max capacity and not accepting any new clients. They operate a central fulfilment warehouse in Florida, from which they ship all products.

### Passion Spirits

Founded in 2009 in Fort Lauderdale, is the oldest of the existing white label stores. Passion Spirits describes itself as a "Boutique Sales and Marketing Agency" focused on managing selected wines and spirits. It operates an online storefront to assist consumers to connect to Retailers to engage in the sale, service, and delivery of alcoholic beverage products. All orders placed are reviewed, accepted and ultimately fulfilled by licensed alcohol beverage retailers. Passion Spirits assists in the fulfillment of orders through retailers across the U.S. Wine and spirits are shipped to consumers directly by a retailer, not Passion Spirits. Its corporate mission is "to be the best alternative for small to medium sized brands looking for a local sales partner." Passion Spirits maintains a boutique approach, representing a small portfolio of complementary products. Its store front is pretty basic. Its biggest advantage is that its longevity has allowed it to amass a large database of consumers to which it markets the spirits brands it represents. Alain Scheiman, is CEO.



BIG
THIRST

**Speakeasy Co.**

Speakeasy Co. seems to be the white label storefront with the most momentum and media attention in 2021. Founded in 2015 in San Diego, CA, it is a three-tier compliant e-commerce platform that enables beverage alcohol brands to now sell direct-to-consumer, currently has more than 140 craft brands on the platform. They handle It received a seed investment from Goat Rodeo Capital in October 2020. Speakeasy co-founder Josh Jacobs is well spoken and always on message in media interviews.

Speakeasy offers services for digital advertising, merchandise, cocktail kits, and gift bundle sales, and quality control for all packages with Centralized Fulfillment from one warehouse in Los Angeles, without having to rely on independent retailers to manage fulfillment.

**Thirstie**

Thirstie positions itself as the first e-commerce solution that provides alcohol brands (spirits, wine, ready-to-drink cocktails, and beer brands), complete control over their online shopping experience. Its objective is to help alcohol brands of all sizes take advantage of an underdeveloped e-commerce space by democratizing the industry. Its "Thirstie Access" solution provides brands the ability to sell "direct-to-consumer," unlock consumer data, and grow revenues, in a cost effective, turn-key manner better marketing ROI and sales performance. Thirstie's innovative solution harnesses consumer transaction, demographic and attribution data within an easy-to-use brand dashboard, securely encompassing consumer data and persona profile insights for precision marketing.

Thirstie describes its "Thirstie Access" white label solution as a way for alcohol brands to unlock e-commerce capabilities enabling "direct-to-consumer" sales via their brand website, and to connect directly with consumers. It provides a full e-commerce-enabled website for brands, synchronized with a API and an expansive retail network.

Thirstie has partnered with hundreds of retail partners who receive orders and deliver products to customers across the U.S. Thirstie retail networks operated exclusively in state, ensuring full legal and regulatory compliance. Through a unique strategic alliance, Thirstie's web-based distribution platform legally increases the number of retailers a brand is sold in. Its distribution solution enables retailers to easily purchase a brand's products across the U.S. Thirstie CEO is Devaraj Southworth.



BIG
THIRST

**BIG THIRST, INC. Competitor Comparisons**

| | Big Thirst, Inc. | Mash & Grape | Cask & Barrel Club | Passion Spirits | Speakeasy | Thirstie |
|---|---|---|---|---|---|---|
| Year Started | 2021 | 2014 | 2016 | 2009 | 2015 | 2013 |
| Client Base | 0 | 142 | | | 140 | |
| Accepting New Clients | Yes | Yes, with wait list | No | Yes, with wait list | Yes, with wait list | Yes, with wait list |
| Fulfillment centers/retailers | 15 by 2022 | 11 | 1 | 1 | 1 | Up to 20 |
| Retailer Margin | | 30% | | | | |
| Set-Up Fees | $0 | | | | $1,000 | $500-2,500 |
| Tier 1 | $299 | $199/month | $350/month | | $299/month | $500/month |
| Tier 2 | $399 | $299/month | | | | $1,000/month |
| Tier 3 | $499 | | | | | $2,500/month |
| Inventory Storage Fees | No | | $20/case/month | | | |
| Processing Fee | 2.6%+$0.30 per transaction | 2.9% | Processing fee + $1.50/order | | 2.9% | |
| Profit on sale | 12.5% | | | | 12.5% + $1.80 | |
| Email Marketing | $500 ea | $500 ea | | | | |
| Buy Buttons embedded on spirits website | Yes | Yes | No, site on separate subdomain | No | | Yes & site on separate subdomain |
| Free install of ecommerce | Included | No | Included | NA | | $1,000 |
| Abandoned Cart emails | Yes | Yes | Yes | | Yes | Yes |
| Marketing support | Yes | Only Email Marketing | | No | | |
| Promo Codes | Unlimited | 1 at a time | | No | | |
| Full-service fulfillment | Included | Included | Included | Included | Included | Included |
| External ecommerce shop | Bigthirst.com | Mashandgrape.com | NA | Passionspirits.com | NA | NA |
| Data Dashboard | Fully integrated marketing & ecommerce data | Yes, only e-commerce data | No, download data only | No | No, download data only | Yes, but only ecommerce data |
| Digital Ads | Add-on | No | No | No | Add-on | Add-on |
| **Data Integration** | | | | | | |
| Google Analytics | Integration available | No | Subdomain only | No | Subdomain only | Subdomain only |
| Google Ads | Integration available | No | No | No | Maybe | No |
| Facebook Ads | Integration available | No | No | No | Maybe | No |
| Sales Goals | Integration available | No | No | No | No | No |
| Industry Benchmarks | Integration available | No | No | No | No | Only on e-commerce sales |

**THINK BIG! WE ACCELERATE SALES FOR SPIRITS BRANDS.**



BIG
THIRST

**How We Are Different**

BIG THIRST, INC. is differentiated from its competitors in three important ways:

- **A Full Brand Solution**. We offer an end-to-end solution for emerging craft brands from recipe development to final sale. BIG THIRST, INC. draws on the expertise of Big Thirst Consulting to help distilleries get started, get into distribution, and manage on premise, off premise, and online sales. We offer a complete suite of marketing services through Big Thirst Marketing to help spirits suppliers fully develop and maintain their brand online. With deep experience building brands and implementing marketing campaigns for spirits companies, Big Thirst Marketing has the staff and capabilities to provide package design, website design, shopping cart implementation, digital advertising, email marketing, social media management, and public relations.
- **Segmentation**. We will focus on providing solutions for emerging craft spirits brands seeking a new route to market. Whereas the entrenched competitors offer their services to the macro brands, we will target the up-and-coming suppliers who do not have existing relationships with an e-commerce provider. Our deep relationship and involvement in the American Craft Spirits Association through Big Thirst Consulting puts us in regular contact and gives us high visibility with craft spirits suppliers across the U.S.
- **Pricing Clarity**. We will offer a pricing structure for spirits brands that is easier to understand, allowing them to better plan for the monthly cost of working with BIG THIRST, INC. and better visibility into expected revenue.



BIG
THIRST

## SWOT Analysis

| Strengths | Weakness |
|---|---|
| • Complete offering with distribution management, e-commerce capabilities, and marketing.<br>• Extensive relationships with craft distilleries in the U.S.<br>• Deep knowledge and experience in the beverage alcohol industry.<br>• Deep connections with media and influencers.<br>• Nimble team with diverse skills that can tackle most challenges without outsourcing.<br>• Customer service.<br>• Leveraging technology to do the work for us. | • Coming to market late.<br>• Not well-funded.<br>• Start-Up company.<br>• Time is of the essence. |
| **Opportunities** | **Threats** |
| • Provide a competitively differentiated ecommerce shopping solution and services that helps craft distilleries grow.<br>• Offer stellar customer service above and beyond current competitors.<br>• Faster on-boarding that other competitors.<br>• Competitors' lack of scalability. Right now, there are waiting lines for brands to be onboarded onto competitor sites.<br>• Competitors aim to sell product, we aim to help brands grow with BI tools, marketing, and advertising.<br>• PR, email marketing, Influencer and social media channels have not been utilized by competitors.<br>• The pandemic conditioned consumers to purchase everything online. | • Well-funded, entrenched competitors.<br>• Continually shifting state regulations on alcohol sales.<br>• New companies coming to market with more money. |



## PRODUCTS AND SERVICES

BIG THIRST, INC. is an online white-label store and shopping cart solution for spirits brands and distilleries to sell beverage alcohol products to consumers.

### Software & Tools

- **The BIG THIRST INC. BIG CART** shifts spirits brands' websites from a billboard into their own e-commerce engines enabling them to sell alcohol products and merchandise directly on their own domain while remaining three-tier compliant. The integrated shopping cart incorporates the brands' look and feel to retain consumer confidence in the purchase to increase sales and reduce cart abandonment in a seamless checkout experience. Because the shopping cart is integrated with a spirit brand's site, only its products are offered with no competitor's products to lure a customer away. This provides a new, managed avenue for sales that allows distilleries to focus on growing their business while realizing revenue. All transactions made through the Big Thirst Inc. Big Cart will be process through the three-tier system with orders fulfilled by a retailer, who has received product from a distributor partner.
- **The BIG THIRST BIG DATA Dashboard** and visualizations provides spirits brands with robust business insights that they have never been able to access before, all in one place. Gone are multiple reports with non-congruent data that act independently of each other. BIG DATA dashboards combine each individual customers data including e-commerce, Google Analytics, email marketing (Mailchimp), digital ads (Facebook & Google), individual business goals, and industry benchmarks. This data is then cross populated customizable, and digestible charts, KPIs and graphs to provide spirits brands better understanding of customer behavior with order data, demographics, and locations to help spirits brands better attract and retarget consumers for increased sales.
- **BIGTHIRST.COM** is an online storefront for all of our spirits customers products. Think amazon for brands. This digital storefront will sync with their Big Cart inventory and will be the fulfillment engine and customer support for both bigthirst.com and our spirits customers.

### Services

- **The BIG THIRST Big Success Team:** Unlike our competitors, we understand that our customers success directly impacts our revenue (we receive 12.5% profit on each product sold). Therefore, we will have a Customer Success Manager that will oversee the success of every account and will meet with them monthly to establish a solid partnership and work with their team to achieve sales goals, customize reports, or build collaborative marketing campaigns.
- **BIG THIRST Big Fulfillment Network:** Spirits brands can reach customers across the country with three tier compliant national shipping capabilities enabled by our network of retailers in key states who seamlessly handle fulfillment.

### Marketing Services

- Full website design and development for e-commerce-ready sites.
- Digital advertising and retargeting to make it easier for consumers to discover and purchase our brands' products.
- Direct to consumer marketing, email marketing, and automated cart abandonment emails.



## CUSTOMER SEGMENTATION

As a B-to-B-to-C company, our customer base is primarily craft distilleries and spirits brands located in or selling in the United States.

### Spirits Brands

Our primary customers are Spirits Brands with consist of:

- Craft Distilleries
- Domestic spirits brands, which is a spirits product company that doesn't own a distillery or even a physical location
- International spirits brands

Rather than target large, multi-national spirits producers who have well-established routes to market, we will target up-and-coming craft distilleries and smaller domestic and international spirits brands who are eager to expand their market reach to a national audience. Attributes of a craft distillery that are important to us include:

- A distillery who values the importance of transparency in distilling, and remains forthcoming regarding their use of ingredients, their distilling location and process, bottling location and process, and aging process.
- A distillery that produces fewer than 750,000 gallons annually.
- A distillery that directly or indirectly holds an ownership interest of less than 50% of the DSP.

International spirits brands that are entering the U.S. market are eager to get help navigating the complex regulations. We are well equipped to assist with distribution and e-commerce as a one-stop shop for international brands.

### Retailers

We will build a network of retailers in located in states where retailers are legally permitted to ship directly to consumers including California, Connecticut, Florida, Idaho, Louisiana, Nebraska, Nevada, New Hampshire, New Mexico, North Dakota, Oregon, Virginia, Washington, D.C., West Virginia, and Wyoming. Initially we will focus on securing agreements for sales and fulfillment retailors located in states that allow for direct to retail shipping including California, Florida, New York, and Washington, D.C.

### Consumers

Amazon Prime has conditioned people to expect that they can buy anything they want online quickly and shipped to their home for free. Craft brands are often preferred by consumers, but are purchased less frequently than the big brands because they are simply harder to find. We will connect consumers with spirits brands by creating attractive, easy to use shopping carts that are seamlessly integrated into the websites of spirits brands,

With BIG THIRST, INC. consumers will interact directly with spirits brands, rather than a noisy online store. We'll facilitate brand affinity by keeping every touchpoint linked explicitly to the spirits brand. We will help them find a brand's website through digital advertising and newsletters, and they will not need to leave the brand's website to purchase alcohol products and merchandise, just as they would from any other non-alcohol consumer goods website. We'll provide an easy-to-use shopping cart that is seamlessly integrated with the spirits brand's website, an order confirmation email with the spirits brand's logo, and follow up communication that is all branded.



**Target Consumer—Whiskey Consumers/ Whiskey Explorers**: They see the beauty in things and takes time to appreciate everything. They are bold, adventurous, captivating, worldly and comfortable with themselves and willing to be unconventional.

- Primary Age Range — 35 to 59 years old. Gen X (birth years ranging from the early-to-mid 1960s to the early 1980s) will surpass the baby boomers by around 2022 to become the largest beverage alcohol–consumer demographic in the US. By 2027, millennials will surpass Gen Xers in consumption.
- Gender — 78% Men, 22% Women
- Income — $150k and up
- Preferences—They appreciate life experiences, finer things, but are also down to Earth.
- Diverse interest, artistic, appreciate quality, farm to table, care about ingredients -it has to start with sustainable, local, fresh, healthy and organic. Has to taste great at a fair price. They're interested in the maker, the process, the story. They appreciate honesty, transparency, authenticity, and quality. They are willing to pay for quality.

**Changing Consumer Buying Habits**

The quarantine and closures of bars and restaurants caused by Covid-19 lead to seismic shifts in the way the U.S. beverage industry functioned, changing regulations also fundamentally altered the way consumers purchased and enjoyed alcoholic beverages. The shifting perceptions of "normal" and attempts to socialize safely amidst the pandemic led to unexpected trends in the beverage industry that will last long after the pandemic subsides.

These changing consumer behaviors are reflected strongly across e-commerce channels, as consumers found that purchasing alcohol online was a safe and convenient alternative to shopping in store. According to Nielsen data e-commerce retail sales of alcohol are up as much as 234% during the Covid-19 period compared to a year prior. The primary changes in consumer purchase habits that will lead people to buy from spirits brands using the BIG THIRST, INC. e-commerce platform include:

- **The rise of at-home mixology**. Consumers are accustomed to purchasing spirits and mixers to make drinks at home. The convenience of purchasing with a click of a mouse will be a persistent e-commerce driver.
- **The Pursuit of Craft**. Three out of four consumers would prefer to drink craft spirits if they could purchase them conveniently. The introduction of e-commerce in the distilled spirits industry makes it possible for people to easily find and purchase spirits brands that may not otherwise be available to them.



BIG
THIRST

# MARKETING PLAN

## PRICE

BIG THIRST, INC. has a straight-forward pricing structure allowing spirits brands know exactly what they will they pay without hidden fees. We offer a three-tier monthly retainer model offering increasing levels of capabilities, tools, and service:

Tier I — $299.00
Includes integrated shopping cart, buy buttons, basic sales reporting, product information on the Big Thirst online storefront, and basic customer support from the Big Success Team.

Tier II — $399.00
Includes integrated shopping cart, buy buttons, advanced sales reporting, and detailed brand information on the Big Thirst online storefront, and advanced customer support from the Big Success Team.

Tier III — $499.00
Includes integrated shopping cart, buy buttons, advanced and custom sales reporting, and custom brand information on the Big Thirst online storefront, and on-demand customer support from the Big Success Team.

In addition, we will assess a 12.5% fee per transaction.

## PRODUCT

BIG THIRST, INC. is an online white-label store and shopping cart solution for spirits brands and distilleries to sell beverage alcohol products to consumers. We provide a comprehensive set of Software and Tools including:

- The BIG THIRST INC. BIG CART, the e-commerce engine for spirits brands' websites
- The BIG THIRST BIG DATA Dashboard to help spirits brands better attract and retarget consumers for increased sales
- The BIGTHIRST.COM online storefront.

In addition, we offer extensive customer service and marketing services including the BIG THIRST Big Success Team, The BIG THIRST Big Help Team, Full website design and development, digital advertising, direct to consumer marketing, and Public Relations.

## PROMOTION

Big Thirst Marketing will serve as the promotional arm for BIG THIRST, INC. We will implement campaigns that employ a full marketing mix including Public Relations, Digital Advertising, Social Media Marketing, Email Marketing, and participation / sponsorship of Industry Events.

### Public Relations

We will have an initial launch with a press release distributed via wire service and by email to the Big Thirst Marketing database of more 500 journalists. We will conduct targeted outreach to specific journalists with a goal of conducting five media interviews with top trade publications that are well read by craft distillery owners. We expect the initial announcement to generate more than 100 press release stories as well as 3 to 5 in-depth profiles in national publications.

**THINK BIG! WE ACCELERATE SALES FOR SPIRITS BRANDS.**



### Digital Advertising

BIG THIRST, INC. will implement an online advertising and social media ad program to increase our brand awareness, attract brands to sign up for our email newsletter, promote our products and services, and attract customers with the following:

- Design creative ad concepts and implement ads to increase brand awareness, promote events, increase traffic to the Blanco tasting room, and increase sales.
- Refine audience targeting and the demographics to ensure top performance of different types of ads.
- Track the campaigns success and generate a summary report to show the results and how they align with our agreed upon goals set for growing audiences.

### Social Media Marketing

We will leverage the existing Big Thirst social media platforms to launch campaigns targeted to attract spirits brands, distributors, retailers, and consumers as engaged fans. We will grow our audience, and engage our fans with the following activities:

- Content Creation — Create and regularly post a mix of relevant content to increase brand awareness and entice spirits brands to sign on as customers.
- Smart Posting — Manage a social media content calendar to plan posts, selecting post times by using social media analytics to better understand the performance of your content based on time of day, frequency, geography to ensure the best results.
- Relationships Development — Engage the community to build trust with two-way dialogue to increase followers, impressions, and mentions.

### Email Marketing

We will leverage our deep experience in email marketing and our extensive industry contacts to build a broad database of spirits brands, distilleries, distributors, retailers, and consumers who are interested in receiving information about the spirits industry, and our customers' brands. We will initiate campaigns to build a database of consumers eager to purchase spirits online, and begin marketing our customers brands to these consumers. Email marketing will be a cornerstone program for our ongoing marketing programs.

### Industry Events

We will consider speaking opportunities, sponsorship, and other promotions at industry events that are well attended by craft distilleries, including:

- American Distilling Institute Conference, August 23 – 25, 2021, Louisville, KY
- Distilled Spirits Council of the United States (DISCUS) Inaugural Conference, October 6 – 8, 2021, Fairmont Hotel, Austin, TX
- American Craft Spirits Association's (ACSA) Distillers Convention & Vendor Trade Show, December 4-6, 2021, Kentucky International Convention Center, Louisville, KY

## PLACE

BIG THIRST, INC. is headquartered in Texas, and operating in several states in the U.S. We are incorporated with the address:

2101 Elton Lane

WYLIE 212



BIG
THIRST

Austin, TX 78703

# LOGISTICS AND OPERATIONS PLAN

## SUPPLIERS

BIG THIRST, INC. will serve as a marketplace facilitator for the sale of beverage alcohol products produced by spirits brands and distilleries.

## COMPLIANCE

BIG THIRST, INC. will work within compliance of the three-tier system. The BIG THIRST, INC. legal and compliance team made up of the law offices of Hajjar Peters LLP and Mark Shilling will ensure all company activities, fees, and programs operate within the law. This is particularly important in the collection of fees and payment of state taxes.

BIG THIRST, INC. will help spirits brands expand sales with an online platform that is three-tier compliant. The three-tier system regulates how beverage alcohol is distributed requiring distilleries and producers, which are the first tier, to sell to a second tier which is distributors and wholesalers, who in turn sell to the third tier, retailers. BIG THIRST, INC. will allow spirits brands to engage directly with consumers online and manage their brand relationships without being interrupted by the middlemen. While spirits brands will sell through the three-tier system as usual, our platform puts the customer relationship directly into the hands of the brand.

Licensed spirits brands must receive all funds from the sale of alcoholic beverages and control all aspects of the financial relationship between them and any third parties acting on their behalf. The payment of a marketing fee by a spirits brand to an unlicensed entity, such as a BIG THIRST, INC. operating as a white label store front, is permissible as long as the fee is reasonable and does not create the appearance that an unlicensed entity is availing the privileges of an alcohol beverage licensee.

In many states, such as New York, the marketing fee should be flat or de minimis in comparison to the retailer's proceeds from the sale of alcohol. Although a marketing fee may generally be paid to a marketing company, product prices must be independently set by the alcohol beverage licensee in each of the three tiers. BIG THIRST, INC. will serve as the sales facilitator, but will not share in the profit of the sale. Instead we will collect the funds at the point of sale on the shopping cart, retaining our fee, and pass the balance on to the licensee, as outlined in this California advisory.

## SHIPPING AND FULFILMENT

We will simplify the process of shipping for spirits brands by working with a network of retail partners that are able to ship beverage alcohol products in states permitted by law. BIG THIRST, INC. will work within compliance of the three-tier system, which in the United States operates as 50 different markets, rather than one. Each state controls its distribution, creating challenges for distillers who want to ship out-of-state and causing disparities in selection, availability, and pricing of spirits products across the country.

BIG THIRST, INC. will not maintain inventory of beverage alcohol products. The supply chain flow is:



Case 1:24-cv-01512-DAE Document 42-14 Filed 11/26/25 Page 26 of 29

- Spirits Brand sells to a distributor.
- Distributor delivers products to retailer.
- Retailer fulfills online orders placed through the BIG THIRST, INC. shopping cart and store front, shipping or delivering products to consumers.

**Distributors**
BIG THIRST, INC. will maintain relationships with small regional and large national spirits distributors as an avenue to reach additional spirits brands as customers, and additional retail partners. Distributors and wholesalers view the so-called "fourth tier" of e-commerce platforms as a new channel for us to call on and assist and drive volume. Distributors believe e-commerce platforms can provide value to suppliers as another brand-building avenue.

If needed, BIG THIRST, INC. will assist with connecting spirits brands with distributors in various states. Once spirits brands are in distribution, we will facilitate the process of finding the right retailers and licensed liquor stores and who are able to ship directly to consumers. The retailers are responsible for complying with applicable shipping and delivery rules. This reduces the time and effort required for spirits brands to navigate the state-by-state requirements for distribution.

We will pursue two methods which allow spirits brand to ship beverage alcohol products to consumers by using our white label e-commerce platform:

1. We will pursue relationships with retailers in "Direct to Retail" states including California, Florida, New Jersey, New York, and Washington D.C. where it is possible for our retail partners to buy directly from a party such as Park Street, bypassing high distribution margins. We will explore relationships with that have both Distribution and Retail License and can ship to various states across the country. This pricing model would be for all suppliers /brand owners that are selling directly to these specific retailers to bypass traditional route-to-market where distributors make 28% in Gross Profit, and retailers make 30% GP.
2. We will use our relationships with distributor such as Empire Merchants North LLC, Southern Wine and Spirits, Republic National Distribution Company, Breakthru Beverage, Young's Market, and Winebow to offer distribution in 10 to 15 states where we have a network of brick-and-mortar retail partners. We will negotiate margin share with distributor for e-commerce sales that is attractive to spirits brand owners.

**Retailers**
BIG THIRST, INC. will develop a network of retail partners that can ship beverage alcohol products in states permitted by law and have their own local delivery mechanism. We will serve as a sales arm for partner retailers to attract more craft brands, reach more consumers, increase revenues, and move more inventory. We will provide an online system for retailers to sign up, integrate with their POS system, and reconcile their inventory with our product catalog to get the BIG THIRST, INC. platform operational quickly.

Retailers with whom we will pursue relationships include:

- ABC Wine & Spirits, Orlando, FL
- AVA Family Corp, Ceres, CA
- Bacchus Wine, Millbrae, CA
- ABC Wine & Spirits, Orlando, FL



BIG
THIRST

- Benhatzel's Cordially Yours, Depew, NY
- BevMo! Concord, CA
- Broadway Spirits, New York, NY
- East Branch Organics, Keene, NY
- Grapes The Wine Company, White Plains, NY
- Half Time Beverage, Poughkeepsie, NY
- Premier Wine & Spirits, Amherst, NY
- Sherry-Lehmann Wine & Spirits, New York, NY
- Star Wines & Liquors, Monroe, NY
- Tin Woodman's Flask, Chittenango, NY
- Viscount Wines, Wappingers Falls, NY
- Wayne's Villa Park Liquor, Villa Park, CA

**State Coverage**
Through its network of retail partners BIG THIRST, INC. plans to ship to California, Colorado, Connecticut, Delaware, Illinois, Kentucky, Massachusetts, Missouri, Minnesota, Nevada, New York, Washington, and Washington D.C. at the time of our launch. We intend to expand our shipping footprint to up to 41 states within the first year of operations.

**Shipping Cost**
BIG THIRST, INC. will configure shipping costs to a flat fee on spirits brands' websites. The flat rate fee is based on the average cost of shipping across states and product mix as detailed in our three-year financial plan. Consumers will pay the flat fee. We will offer the option for our spirits brands customers to subsidize the cost of shipping for consumers and offer discounted shipping based on order amount.

**Shipping and Delivery Restrictions:**
We reserve the right to ask for proof of identity before assisting you with your purchase through a Retailer. The Retailer and its common carrier, if applicable, will require an adult signature with proof of age verification at the time of delivery. Retailers do not ship to PO Boxes.

**Shipping and Delivery Policy**
Orders placed are fulfilled by partner retailers. Retailers general ship via several courier services, such as UPS or FedEx. These companies will email a tracking number to you upon pickup from the retailer. Due to Federal Aviation Administration regulations, retailers are not able to provide overnight shipping for Products that contain 70% ABV or higher. During times of inclement weather, including extreme heat or cold, we recommend shipping overnight to reduce the time in transit or postponing until conditions improve. The purchaser assumes all liability for wines/spirits damaged en route due to weather.

**Shipping Regulations/Restrictions**
Certain states prohibit the direct importation of alcohol from certain other states. Orders will not be processed for those states. If orders are placed for address within those states, the order may be canceled, and a complete refund will be issued. It is the consumer's responsibility to know whether you may receive shipments from out-of-state Retailers. BIG THIRST, INC. makes no representation as to any laws, rules or regulations regarding the sale, service, transportation, or delivery of alcoholic



BIG
THIRST

beverages. BIG THIRST, INC. is not liable for any loss or damage arising from failure to comply with the terms set forth in our Terms and Conditions or compliance with any applicable laws.

All orders over $500, where the billing and shipping addresses do not match, including gift purchases, will require additional time for credit card authorization. Orders paid by electronic check or PayPal will be shipped after the funds have cleared. International customers who are purchasing gifts for friends and family within the United States must pay through a "confirmed" PayPal account. We are not able to accept credit cards for international transactions.

**Payments**
BIG THIRST, INC. guarantees that payments, less its fees, will be used to purchase and ship the beverage alcohol products from retailers to the address that the consumer provides.

**Refund Policy**
BIG THIRST, INC. will ask consumers to contact the company before attempting a return. All refund requests must be made within twenty (20) days of the receipt of delivery date. BIG THIRST, INC. will work with the Retailer to arrange for a return, refund or credit, but returns, refunds or credits are not accepted by all Retailers in all states. If a consumer suspects a Product is spoiled or defective, we ask that they reseal the unused portion of the bottle and contact BIG THIRST, INC., who will contact the Retailer and advise consumers of next steps. There are no refunds for empty bottles. Spoiled or defective Products may generally be exchanged for an item of equal or greater value only.

If the Retailer sent the wrong Product to a consumer, BIG THIRST, INC. will arrange for a replacement through the Retailer.

## FACILITIES
BIG THIRST, INC. will have a remote working model with principals and employees officing in their own locations at the start. We will not maintain real estate for centralized facilities in the near term, however we intend to lease office space as soon as revenue generation allows as early as 2022.

## EQUIPMENT AND EQUIPMENT
BIG THIRST, INC. will operate with little physical equipment at first. We will determine equipment needs include computers, cameras, etc. in the future. We will purchase several software subscriptions including Panoply, Trevor.io, Shopify bigthirst.com, Customer Login portal, Mailchimp, Location Based Fulfillment App, Zen Desk Customer Services, Zen Desk Sales, QuickBooks, and SproutSocial.



BIG
THIRST

Think Big! We accelerate sales for spirits brands.

# FINANCIAL PLAN

## INVENTORY

BIG THIRST, INC. will not produce, provide, or sell beverage alcohol products or transport beverage alcohol products. It will not be a licensed alcohol beverage retailer or carrier. Inventory will be held by licensed retailers doing business with BIG THIRST, INC. and its customers.

## INCOME STATEMENT

Projected revenue sources and expenses in 2021 include.

- See financial plan here.

## CASH-FLOW STATEMENT

Cash-flow forecast in 2021.

- See financial plan here.

THINK BIG! WE ACCELERATE SALES FOR SPIRITS BRANDS.

28 Big Thirst, Inc. e-Commerce Business Plan

WYLIE 217

212

1:24-CV-01512-DAE
Plaintiff
EXHIBIT
L
Planet Depos
We Make It Happen

# Transcript of Matthew John McGinnis

**Date:** March 28, 2024
**Case:** Big Thirst, Inc. -v- Donoho, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

WYLIE 268

213

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

BIG THIRST, INC.,

Plaintiff, Counter-Defendant,

v.

LAUREN WYLIE DONOHO,

Defendant, Counter-Plaintiff, Cross-Plaintiff,

v.

MATT MCGINNIS, SUZANNE MCGINNIS, AND MARK SHILLING,

Cross-Defendants.

CIVIL ACTION NO. 1:22-cv-00467-RP

Redacted

CONTAINS CONFIDENTIAL PORTIONS - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF MATTHEW JOHN MCGINNIS

AUSTIN, TEXAS
THURSDAY, MARCH 28, 2024
9:06 A.M. CST

Job No.: 526597

Pages: 1 - 295

Transcribed by: Wanda Greenlee

Transcript of Matthew John McGinnis
Conducted on March 28, 2024 2

Videotaped Deposition of Matthew John McGinnis, held at the offices of:

111 Congress Avenue
Suite 500
Austin, Texas 78701
Phone: 512.855.2100

Pursuant to agreement, before Kollin Casarez, Notary Public in and for the State of Texas.

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

WYLIE 270

215

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 4 of 356

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF, BIG THIRST, INC.:

Lessie C. Gilstrap, Esquire
Glorieni Azeredo, Esquire
GILSTRAP LAW GROUP
1801 E 51st Street
Suite 365-295
Austin, Texas 78723
(512) 813-2062
lessie@gilstraplawgroup.com

ON BEHALF OF THE DEFENDANTS, LAUREN WYLIE DONOHO, MATT MCGINNIS, SUZANNE MCGINNIS, AND MARK SHILLING:

Lema Mousilli, Esquire
Feras Mousilli, Esquire
LLOYD & MOUSILLI, PLLC
4400 Far W Blvd.
Austin, Texas 78731
(512) 609-0059
litigation@lloydmousilli.com

Also present:

Brent Kirby, Planet Depos Videographer

Lauren Wylie Donoho, Defendant

C O N T E N T S

| | PAGE |
|---|---|
| AEO DESIGNATION BEGINS | 94:4 |
| AEO DESIGNATION CONCLUDES | 97:19 |
| AEO DESIGNATION BEGINS | 134:24 |
| AEO DESIGNATION CONCLUDES | 143:8 |
| AEO DESIGNATION BEGINS | 177:21 |
| AEO DESIGNATION CONCLUDES | 179:3 |

WITNESSES

| | |
|---|---|
| MATTHEW JOHN MCGINNIS | |
| Examination by MS. MOUSILLI | 5:15 |
| Examination by MS. GILSTRAP | 292:11 |

EXHIBITS

| | |
|---|---|
| 1 | 27:8 |
| 2 | 62:3 |
| 3 | 65:14 |
| 4 | 208:8 |
| 5 | 215:23 |
| 6 | 227:25 |
| 7 | 234:16 |
| 8 | 245:20 |
| 9 | 266:4 |
| 10 | 269:3 |
| 11 | 277:19 |
| 12 | 283:10 |

WYLIE 272

P R O C E E D I N G S

(Proceedings began at 9:06 a.m.)

THE VIDEOGRAPHER: Today's date is March 28th, 2024. The approximate time, 9:06 a.m. Central Standard Time. We're recording and we're on record.

(Stipulation read and witness sworn by the court reporter.)

MS. MOUSILLI: Thank you.

Whereupon,

MATTHEW JOHN MCGINNIS,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANT

BY MS. MOUSILLI:

Q. Good morning.
A. Good morning.
Q. Please state your name for the record.
A. My name is Matthew John McGinnis.
Q. Have you ever gone by any other name?
A. I go by Matt McGinnis.
Q. Besides Matt, Matthew John McGinnis, do you go by any other name?
A. No, Matt or Matthew.
Q. Okay. And what is your date of birth?

A. March 2nd, 1969.
Q. And where do you presently reside?
A. 2101 Elton Lane, Austin Texas.
Q. And how long have you resided there?
A. 21 years.
Q. Where did you reside prior to that address?
A. Portland, Oregon.
Q. Okay. Mr. McGinnis, my name is Lema Mousilli, and I represent Ms. Lauren Wylie Donoho, the defendant in this case. You understand that you're here to take your deposition?
A. Yes, I understand.
Q. And it's in connection with this lawsuit that you've brought against Ms. Lauren Donoho?
A. I understand.
Q. Okay. She also has claims against you. Do you know what those claims are?
A. Yes, I do.
Q. What are those claims?
A. Those claims are copyright infringement for -- against the company and the -- and me personally and fraud against me.
Q. Do you understand that there's also a breach of fiduciary duty claim?
A. Correct, yes.

Q. Okay. So what do you understand this lawsuit to be about?

A. This lawsuit is about a disagreement over ownership shares that resulted in the takedown of the software that operated Big Thirst. And we needed to compel the defendant to return operations of those. She then countersued.

MS. GILSTRAP: I have a question for you before we go any further. I -- I was told yesterday by -- through -- through your assistant -- or through your associate to my colleague, that you were starting this as in his individual capacity?

MS. MOUSILLI: Correct.

MS. GILSTRAP: Okay. I just wanted to make sure. So this deposition right now -- the questioning is in his individual capacity?

MS. MOUSILLI: Correct.

MS. GILSTRAP: Okay. Just making sure.

BY MS. MOUSILLI:

Q. So, Mr. McGinnis, before I go any further, there's some ground rules that I want to lay. And I just want to make sure you know that you're under oath?

A. Correct.

Q. Okay. And that you're sworn to tell the truth?

A. Yes.
Q. And even though we're here in a very informal setting, it's as if you're in front of a judge --
A. Yes.
Q. -- or a jury and it has the same effect. Okay?
A. Yes.
Q. The court reporter is taking down everything you say. So as you saw yesterday -- because you were attending Ms. Lauren Donoho's deposition yesterday, correct?
A. Yes.
Q. Okay. So as you saw yesterday, it's proper to give a yes-or-no answer. Uh-huh or huh-huh is not going to be able to be recorded by the court reporter, so I ask you to give a verbal response to each question.
A. I will.
Q. Okay. Great. Thank you. And it's very important for us not to talk over each other, so please wait for me to finish my entire question before you answer. And I'll try to do the same. Okay?
A. Yes.
Q. Okay. Great. I also want to make sure you understand my questions. So if you don't understand a question that I've asked, please don't answer it. Ask me

to rephrase or tell me that you don't understand, and I'm more than happy to do that. Okay?

A. Yes.

Q. And from time to time your attorney might object to a question, and that's fine. But you go ahead and answer my question, after your attorney objects, unless she specifically tells you, Don't answer that question. Okay?

A. Okay.

Q. Are you prepared to answer my questions today?

A. I am.

Q. Is there any reason that you wouldn't be able to give me full and accurate answers to my questions today?

A. No.

Q. Are you taking any medications that might impair your memory?

A. No.

Q. Okay. And if we need to take any breaks, please let me know. It's just important that you don't take a break during a pending question. And we'll try to take a break every so often. Okay?

A. (Nonverbal response.)

Q. Okay. Good. So have you given your

deposition before?
A. No. This is new.
Q. This is new. This is your first time?
A. Yeah.
Q. Have you ever given any sworn testimony?
A. Yes.
Q. When was that?
A. In state court and federal court related to this case.
Q. Okay. Besides this case, have you ever given any sworn testimony?
A. No.
Q. Okay. Have you ever been in -- in court before, besides for this case?
A. For a traffic citation.
Q. Okay. Have you ever been in court for any -- a friend's case?
A. No.
Q. Family case?
A. No.
Q. Okay. What is your understanding of your role in this litigation?
MS. GILSTRAP: Objection, form. But you can answer, if you can.
THE WITNESS: My understanding of this --

of my role is, as a plaintiff, and as a cross-defendant.
BY MS. MOUSILLI:
Q. You understand that you have been sued in your individual capacity, correct?
A. Correct.
Q. Okay. Previously I cross-examined you at a hearing in state court. Do you remember that?
A. Yes.
Q. Okay. And I also cross-examined you at a hearing in federal court. Do you remember that?
A. Yes.
Q. Okay. Is there any reason that any testimony you give today is going to be different than the testimony you gave in those prior hearings?
A. No.
Q. Okay. What did you do to prepare for today's deposition?
A. I met with my legal team and we reviewed topics.
MS. GILSTRAP: Wait. You can say that you met with us, but please don't talk about anything that we discussed. Okay?
THE WITNESS: Yep.
BY MS. MOUSILLI:
Q. What documents did you review,

Mr. McGinnis?
A. Reviewed the materials we submitted.
Q. What materials did you submit?
A. Things requested for books and records.
Q. Things requested by who?
A. By you and Ms. Donoho.
Q. Okay. And what were those documents that you reviewed?
A. Financial records and corporate documents.
Q. And why did you review those documents?
A. To ensure that I knew the facts.
Q. Okay. Anything besides those financial records?
A. We had documents that showed the different discussions and -- and the shares that were authorized, and when we agreed on those for corporate records.
Q. When you agreed on those for corporate records. Can you clarify what you mean by that?
A. When we solidified our shareholders' agreement and submitted it to the State of Delaware through our attorney.
Q. Okay. And when was that?
A. The agreements were finished in June of 2021, and it was finalized with the state in October of 2021.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 14 of 356

Q. Okay. Whose shares were you focusing on?
A. The founder shares of Lauren Wylie Donoho and my own.
Q. Okay. And we'll get to that a little bit later on. Have you ever talked to anybody about this litigation?
A. I have spoken with my legal team.
Q. Who else besides your legal team?
A. The board of directors in my company.
Q. And who else besides them?
A. And my family.
Q. Your family. Who else?
A. I have responded to a journalist request that -- when Lauren Wylie Donoho sent a request to go public with this court case, I responded by saying: I have no comment, but can you share the court pleadings?
Q. Who is that journalist?
A. Her name is Sailor -- Sailor Guevera.
Q. Can you spell that?
A. S-A-I-L-O-R, G-U-E-V-E-R-A.
Q. What publication was she with?
A. She is a freelance writer, primarily writing for American Whiskey Magazine and Artisan Distiller.
Q. And what did she ask you?

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 15 of 356

A. She said, I received concerning allegations from Lauren Wylie Donoho. What do you have to say? And I said, I cannot comment on this. I cannot provide you information. I can only provide a court record.

Q. Who told you not to comment?

MS. GILSTRAP: If your answer requires you to reveal attorney-client communications, I'm instructing you not to answer.

THE WITNESS: I choose to listen to my counsel.

BY MS. MOUSILLI:

Q. Okay. Who told you not to answer?

A. That's a --

MS. GILSTRAP: Wait -- wait. I'm going to instruct you not to answer that question.

BY MS. MOUSILLI:

Q. Is it anybody besides your attorney that told you not to answer?

A. I'm not answering that question.

Q. No. You can answer that question.

MS. GILSTRAP: No, because you're -- it's implying what I had -- conversations I had. If you answer -- ask it --

MS. MOUSILLI: No. I'm asking if anybody else besides your attorney told you not to answer -- told

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 16 of 356

you to say -- not to comment anything to the journalist? That's my question.

MS. GILSTRAP: You can answer that question.

THE WITNESS: No one else has.

BY MS. MOUSILLI:

Q. Okay. Very good. And when did that call take place?

A. Approximately two weeks ago on a Saturday afternoon, National Women's Day. I don't recall the exact date.

Q. Did she call your cell phone?

A. She sent me an email and I responded to it.

Q. To what email address did Sailor Guevera email you?

A. Sailor Guevera --

Q. Guevera.

A. -- emailed me at matt@bigthirst.com, and I responded with the same email address.

Q. Okay. How long have you known Ms. Donoho?

A. I met Ms. Donoho in late 2016. She was a contractor through a temp hiring agency, and I employed her as a part-time contractor beginning in December 2016 for work for Big Thirst Marketing.

Q. What specific work did you hire her for?

A. For digital advertising and website design.
Q. You hired her for Big Thirst Marketing?
A. Correct.
Q. Okay. And so you first met in 2016, correct?
A. Correct.
Q. What kind of work did you ask for her to do?
A. She did website design, website updates, and digital advertising for various clients, as well as some email marketing.
Q. Did you pay Ms. Donoho for that work?
A. Yes. She billed hourly.
Q. And what was her hourly rate?
A. Her most recent hourly rate was $85 an hour.
Q. How long did she work for you as a contractor?
A. For approximately five years.
Q. Besides work for Big Thirst Marketing, did -- did Ms. Donoho do any other work for you at that time?
A. In 2021, we began discussions for her to provide services to help build the technology for Big Thirst, Incorporated, a new e-commerce company.
Q. What is her relationship to -- what is

Ms. Donoho's relationship to Big Thirst Marketing?

MS. GILSTRAP: Objection, form. Answer if you can.

Ms. MOUSILLI: I'm sorry. I'm going to ask you to only restrict your objections to, Objection form and not to continue with, Answer if you can. That's not --

MS. GILSTRAP: Well, your question doesn't make any sense.

MS. MOUSILLI: I don't care what you think. You are restricted to, Objection form, and I'm going to ask you to abide by that. As we discussed yesterday, the Western District requires you to only say, Objection form, and so please abide by that. Okay.

MS. GILSTRAP: I'm instructing him to answer the question.

MS. MOUSILLI: No. It's not proper --

MS. GILSTRAP: I can --

MS. MOUSILLI: -- and you're taking up time.

MS. GILSTRAP: I can tell my client --

MS. MOUSILLI: You can say, Objection form and that's all. Okay.

MS. GILSTRAP: I can tell my client to answer.

MS. MOUSILLI: That's the final time I'm going to -- say make that objection clear. Okay?

MS. GILSTRAP: I hope that is the final time you say it.

MS. MOUSILLI: And I hope that's the final time you say it as well.

MS. GILSTRAP: I will do as I please.

MS. MOUSILLI: Abide by the rules.

MS. GILSTRAP: I will. I will.

MS. MOUSILLI: Lessie, abide by the rules.

MS. GILSTRAP: I will. I am.

MS. MOUSILLI: Very good.

BY MS. MOUSILLI:

Q. Mr. -- Mr. McGinnis, what was Ms. Donoho's relationship to Big Thirst Marketing?

MS. GILSTRAP: Objection, form. Answer if you can.

MS. MOUSILLI: Okay. You know what, I'm not going to -- I'm not going to put up with this, Lessie. You say, Objection form and that's it.

MR. MOUSILLI: Lessie, you don't need to say to say, Answer if you can.

MS. GILSTRAP: You know, I'm not having two attorney's tag term -- team.

MS. MOUSILLI: We're not --

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 20 of 356

MR. MOUSILLI: There's no tag team, but we're talking about decorum here.

MS. GILSTRAP: You are not going to have two attorneys --

MR. MOUSILLI: We're having decorum here. We don't need this sidebar.

MS. MOUSILLI: I don't need the speaking objections from you. Okay.

MS. GILSTRAP: Okay. I think Ms. Mousilli can defend herself here.

MR. MOUSILLI: She can.

MS. GILSTRAP: Yeah.

MR. MOUSILLI: But you're just out of line.

MS. GILSTRAP: Okay.

MR. MOUSILLI: We don't need the sidebar.

MS. GILSTRAP: We can have tons of talk about this right now if you want to.

MS. MOUSILLI: I need you to stop. I need you to say, Objection form and stop right there.

MS. GILSTRAP: I will -- I'm instructing him to answer so that he understands.

MR. MOUSILLI: You don't need to instruct him to answer.

MS. MOUSILLI: I already told him.

MR. MOUSILLI: He's under oath to answer.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 21 of 356

MS. GILSTRAP: I am his attorney and I'm --
MR. MOUSILLI: Correct.
MS. MOUSILLI: Nobody said otherwise. We know you're his attorney.
MS. GILSTRAP: Yeah.
MS. MOUSILLI: We've known that for a while.
MS. GILSTRAP: Okay.
MS. MOUSILLI: It's not news to anybody, Lessie.
MS. GILSTRAP: Well, if you ask a better question, I won't have to --
Ms. MOUSILLI: I'm not -- I don't really care --
MR. MOUSILLI: We don't need your opinions.
MS. GILSTRAP: Well, I don't need both of you --
MR. MOUSILLI: This is your opinion. You don't need anything. You need to stop talking and let the deposition continue.
MS. GILSTRAP: Are you taking the deposition or is Lema?
MR. MOUSILLI: I'm here as attorney of record. You know that.
MS. GILSTRAP: Are you taking the

deposition? Because only one --

MR. MOUSILLI: You're not asking questions here.

MS. GILSTRAP: There is only one --

MS. MOUSILLI: You're out of line.

MR. MOUSILLI: You're not asking questions, Lessie.

MS. GILSTRAP: There is only one attorney who can ask questions.

MR. MOUSILLI: You're not asking questions, correct. She's asking the questions.

MS. GILSTRAP: Okay. Well, why are you talking?

MR. MOUSILLI: Because you're talking unnecessarily. Stop it. Just stop it.

MS. GILSTRAP: I can talk in the deposition.

MS. MOUSILLI: Okay. You know what, I'm going to -- we're going to -- we're going to go off the record, please. Lessie, we're not doing this.

THE VIDEOGRAPHER: It's 9:25 a.m.

(A recess was taken at 9:25 a.m. to 9:26 a.m.)

BY MS. MOUSILLI:

Q. Okay. Thank you. Mr. McGinnis, I had

previously asked you what Ms. Donoho's relationship was to Big Thirst Marketing?

MS. GILSTRAP: Objection, form.

BY MS. MOUSILLI:

Q. Can you please go ahead and answer that question?

MS. GILSTRAP: Objection, form.

THE WITNESS: Ms. Donoho was an hourly contractor.

BY MS. MOUSILLI:

Q. Did she have any other relationship to Big Thirst Marketing besides being an hourly contract -- contractor?

A. No.

Q. Okay. What is Big Thirst?

MS. GILSTRAP: Objection, form.

THE WITNESS: Are you asking me what is Big Thirst, Incorporated; Big Thirst Marketing?

BY MS. MOUSILLI:

Q. I understood -- I understand that there are several entities with the name Big Thirst, correct?

A. Correct.

MS. GILSTRAP: Objection, form.

BY MS. MOUSILLI:

Q. So what are those entities?

MS. GILSTRAP: Objection, form.
THE WITNESS: Big Thirst Marketing, LLC, is a marketing agency providing marketing services for primarily beverage and alcohol companies. Big Thirst, Incorporated is a company providing e-commerce marketing and consulting services to spirits brands.
BY MS. MOUSILLI:
Q. Okay. What kind of entity is Big Thirst Marketing?
A. It is an --
MS. GILSTRAP: Objection, form.
THE WITNESS: It is an LLC.
BY MS. MOUSILLI:
Q. Who are the interest holders of Big Thirst Marketing?
MS. GILSTRAP: Objection, form.
THE WITNESS: Big Thirst Marketing, LLC is a sole proprietorship owned by me.
BY MS. MOUSILLI:
Q. So it's an LLC. Does anybody own any shares in Big Thirst Marketing?
MS. GILSTRAP: Objection, form.
THE WITNESS: There are no shareholders at Big Thirst Marketing, LLC. It's a sole proprietorship.
BY MS. MOUSILLI:

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 25 of 356

Q. Any members of the LLC besides you?

A. There are no members of Big Thirst Marketing, LLC.

Q. What is your title at Big Thirst Marketing?

A. My title at Big Thirst Marketing is president.

Q. Do you hold any other titles?

MS. GILSTRAP: Objection, form.

THE WITNESS: I have referred to myself as founder of Big Thirst Marketing. However, I mostly just go by president.

BY MS. MOUSILLI:

Q. When was Big Thirst Consulting created?

A. Big Thirst Consulting was officially incorporated as an LLC in 2020.

Q. Who were the members of Big Thirst Consulting?

A. It is a partnership LLC with Joseph Castillo, Mark Shilling, and me, Matt McGinnis.

Q. And what is the purpose of Big Thirst Consulting?

MS. GILSTRAP: Objection, form.

THE WITNESS: Big Thirst Consulting, LLC, was formed and provided consulting services to help distilleries get started, be in compliance, and expand

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 26 of 356

their market reach with sales enablement and distribution management.
BY MS. MOUSILLI:
Q. What is your title at Big Thirst Consulting?
A. My title at Big Thirst Consulting, LLC, was partner.
Q. What is Joseph Castillo's title at Big Thirst Consulting?
A. Joseph Castillo's title at Big Thirst Consulting, LLC, was partner.
Q. What about Mark Shilling, what -- what was his title at Big Thirst Consulting?
A. Mark Shilling's title at Big Thirst Consulting, LLC, was partner.
Q. Who, if anyone, held any membership units at Big Thirst Consulting?
A. The three partners each held an equal share of 33 percent.
Q. Okay. Is Big Thirst Consulting still in operation?
A. Big Thirst Consulting, LLC, has ceased as an operation and closed in December of 2023, with services now being provided by Big Thirst, Incorporated.
Q. Why did Big Thirst Consulting close?

A. We chose to close Big Thirst Consulting, LLC, for numerous reasons. But the primary was duplication of efforts between two companies.
Q. Did the company officially wind down?
MS. GILSTRAP: Objection, form.
THE WITNESS: Big Thirst Consulting, LLC, officially wound down and is not registered with the State of Texas.
BY MS. MOUSILLI:
Q. Did you do the winding -- winding up or did your -- did you have attorneys do that process for you?
MS. GILSTRAP: Objection, form.
THE WITNESS: The company was wrapped up by a -- a financial consultant.
BY MS. MOUSILLI:
Q. Is Big Thirst Marketing still a viable operation?
MS. GILSTRAP: Objection, form.
THE WITNESS: Yes. Big Thirst Marketing is still a viable operation, an operation providing services to clients.
BY MS. MOUSILLI:
Q. Okay. Moving forward, when I say Big Thirst in this deposition, can we agree that I'm referring to Big Thirst, Inc.?

A. Yes.
Q. Okay.
MS. MOUSILLI: Wait. Can I get --
BY MS. MOUSILLI:
Q. Mr. McGinnis, I'm going to be handing you what's been marked as Exhibit No. 1. You can take a look at that.
(Exhibit 1 marked for identification.)
MS. GILSTRAP: Wait. I need a copy before --
MS. MOUSILLI: I'm giving you a copy.
MS. GILSTRAP: Do you have staples or anything keeping this --
MS. MOUSILLI: No, I don't.
BY MS. MOUSILLI:
Q. Mr. McGinnis, have you seen this document before?
A. Yes, I have.
Q. Okay. What is it?
A. This is an amended initial disclosure of Big Thirst, Inc. and Matt McGinnis.
Q. Okay. Very good. So do you see (A) on page 1, where it says: The name, and if known, the address and telephone number of each individual likely to have discoverable information?

A. Yes, I do see that.
Q. You see that?
A. Uh-huh.
Q. Okay. And your first response was Lauren Wylie Donoho, correct?
A. Correct.
Q. And your second response was representatives of Big Thirst, Inc., including but not limited to Matt McGinnis, Suzanne McGinnis, Mark Shilling, Rich -- Rich Plakas and Keri Emerson, correct?
A. Correct.
Q. Okay. Who is Suzanne McGinnis?
A. Suzanne McGinnis is a director with Big Thirst, Inc., and she's also my wife.
Q. How long have you known her?
A. I've known her for 26 years.
Q. When did you first meet?
A. We met in 1998 through work.
Q. What were the circumstances when you first met?
A. She was an art director at an ad agency assigned to my client -- or to me as my -- as a client. She did the work for my account.
Q. Have you worked with her prior to working with her at Big Thirst?

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 30 of 356

A. Yes, numerous times over the past 26 years.
Q. Okay. Can you tell me a little bit about how -- those different companies that you worked with her at?
A. Yes. Beginning in the late '90s, I was her client. She was at an ad agency and we worked together closely on numerous ad campaigns and projects. Following that, when we moved to Texas in 2023, she started an independent marketing agency and provided support for the agency I worked for as an independent contractor to do work for our clients. Following that, she formed another marketing company as a partnership. And with that partnership, they often called on me to work as a consultant for marketing services.
Q. Okay.
A. Following that, she started a consumer product goods company with one of the partners from the marketing agency, and I've provided marketing services to that.
Q. Okay. Who is Mark Shilling?
A. Mark Shilling is the chief operating officer of Big Thirst.
Q. How long have you known him?
A. I have know Mark Shilling for approximately 12 years.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 31 of 356

Q. When did you first meet?
A. We met through the Wine & Food Foundation of Texas in about 2010.
Q. And what were the circumstances of when you first met?
A. Mark was on the board of the Wine & Food Foundation and recruited me to the board, and he served as president of that organization.
Q. Have you worked with him prior to working -- prior to him working at Big Thirst?
A. Yes.
Q. In what capacity?
A. Mark has been a distillery consultant for a number of years. And in that capacity, he brought Big Thirst Marketing in to help his clients; and vice versa, Big Thirst Marketing hired Mark Shilling as a distillery consultant for our clients.
Q. When was Mark Shilling made chief operating officer?
A. In April of 2023.
Q. What was his position prior to that?
A. He was a director to -- for Big Thirst, Inc., and he was also a partner in Big Thirst Consulting, LLC.
Q. When Mark Shilling first joined Big Thirst,

WYLIE 298

what was his role?
A. His role was director.
Q. And what did he do as a director?
A. He provided -- Mark Shilling provided counsel on industry matters, such as compliance, distribution, retail. He also provided his industry expertise for connections to meet with various people in the industry.
Q. Who is Rich Plakas?
A. Rich Plakas is a contractor for Big Thirst, Inc.
Q. What kind of contract work does he do for Big Thirst, Inc.?
A. Rich Plakas provides digital strategies, including ad campaigns, website management, website design, and e-commerce support.
Q. How long have you known him?
A. I've known Rich Plakas for approximately 12 years.
Q. When did you first meet?
A. Let me amend that answer. I believe I met Rich Plakas in 2012. At the time, we were both freelance writers. He was a blogger under a blog, and I was a blogger and freelance writer for several publications. We met through various media events and outings.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 33 of 356

Q. Okay. What has Rich Plakas been contracted to do for Big Thirst, Inc.?
A. Rich Plakas is active in website design, digital advertising, and e-commerce setup for various clients.
Q. Why was he listed here as a person that might have information regarding this litigation in Exhibit 1?
A. Rich Plakas has intimate knowledge of the technologies that we currently use with Big Thirst, Inc. -- Incorporated.
Q. Okay. Tell me about that intimate knowledge that he has.
A. Rich Plakas is operating our website. He's operating e-commerce platforms for our clients, and he's assisting with the processing of e-commerce purchases or the setup of them.
Q. Okay. So how is he significant to this lawsuit?
A. Rich Plakas understands exactly what we do now as opposed to what was done previous to Ms. Donoho quitting her position.
Q. And who is Keri Emerson?
A. Keri Emerson is a full-time employee of Big Thirst, Incorporated.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 34 of 356

Q. What kind of employee is she? What does she do?
A. Keri Emerson is an account manager who handles client relationships, onboarding of clients, as well as the management of our data dashboard.
Q. So Keri Emerson handles the data dashboard for Big Thirst?
A. Correct.
Q. And how does she handle the data dashboard?
A. Keri Emerson onboards new clients, sets them up on the dashboard and makes necessary adjustments to it ongoing on a day-to-day basis.
Q. What is Keri Emerson's title?
A. Keri Emerson is an account manager.
Q. Does she receive a salary?
A. Keri Emerson is a salaried employee.
Q. What is her salary?
A. I don't know the exact number, but I believe it is in the neighborhood of $55,000 annually.
Q. How long have you known Keri Emerson?
A. I've known Keri for approximately six years.
Q. When did you first meet her?
A. I first met Keri while she was the direct-to-consumer manager and wine club manager at a

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 35 of 356

winery.

Q. How was she recruited?

A. Keri Emerson approached me in -- approximately in 2021 when she heard we were launching a new company and asked if we needed help. At the time, I did not have a position available for her.

Q. So when you had a position available, did you reach out to her or did she reach out to you?

A. I believe she had followed up with me very soon before I needed a position, and then I replied to her. Keri Emerson and I had an ongoing dialogue on a weekly basis because she was working at our client.

Q. Okay. So how long has she worked at Big Thirst?

A. She's worked at Big Thirst since May of 2023 -- excuse me, let me amend that -- May of 2022.

Q. And how is Keri Emerson significant to this litigation?

A. Keri Emerson, as Rich Plakas, were both involved in the original creation of our current data dashboard, and Keri manages and maintains that data dashboard on a daily basis.

Q. So the fact that she now helps onboard clients to the data dashboard, how is that related to this litigation?

A. She has direct knowledge of the changes that we implemented with a completely new platform and how we run that today in an absolutely different way than we did previous to Ms. Donoho quitting.

She, furthermore, was instrumental in reconfiguring how we process orders and how we track inventory and how we manage inventory flow, which was a complete change from what was done previous.

Q. Who is Edson Espindola?

A. Edson Espindola is a contractor that we hired through a staffing agency.

Q. He was hired to work as a contractor for Big Thirst, Inc.?

A. Correct.

Q. And again, when I say Big Thirst, I'm referring to Big Thirst, Inc. And so are you, correct?

A. Yes.

Q. Okay. How long have you known Edson Espindola?

A. I met Edson Espindola, like, in June of 2022 and had never met him prior.

Q. And what was he hired to do as a contractor for Big Thirst?

A. We contracted Edson Espindola to identify technologies, to create a new data dashboard, to build

that data dashboard and to deliver a working dashboard for us to build upon.

Q. Okay. When was he hired as a contractor to build a data dashboard for Big Thirst, Inc.?

A. I believe the account was signed on July 1st, 2022.

Q. When you say the account was signed, what does that mean?

A. Meaning we signed a contract with the staffing agency.

Q. Okay. So when did he begin work to build a data dashboard for Big Thirst?

A. In July '22.

Q. When did his work end?

A. For that project, it ended in the end of September 2022.

Q. Is he still a contractor for Big Thirst?

A. He is not currently engaged with Big Thirst.

Q. Was that his only project, to build a data dashboard for Big Thirst?

A. He completed one additional project after that.

Q. And what was that project?

A. He built an online store for Big Thirst.

Q. What kind of online store did he build?
A. It is a store where all of our clients' products are available for purchase online.
Q. Was it similar to the website and online store that Ms. Donoho had previously built for Big Thirst?
A. We did not use the template, the theme, the direction, the colors, the font, the wording, or any other aspects of what Ms. Donoho had started as an initial placeholder for a store. It was completely disregarded and built a fresh new one.
Q. Starting on what date?
A. I believe we started that project in November 2022 and completed it in December 2022.
Q. When you say that project, are you referring to the online store that --
A. His contract --
Q. I'm sorry. Okay. When you say -- okay. So Edson Espindola was contracted by Big Thirst, Inc. to build an online store for Big Thirst, correct?
A. Correct.
Q. And when did that work begin?
A. I believe that was November of 2022.
Q. And when did that work end?
A. In December of 2022.
Q. So as I understand what you said, is that

Edson Espindola no longer is a contractor for Big Thirst, Inc., correct?

A. We do not have a contractor currently.

Q. Who is Joseph Castillo?

A. Joseph Castillo was a partner in Big Thirst Consulting, LLC.

Q. What was his role at Big Thirst?

A. Joseph Castillo has no role at Big Thirst.

Q. How long have you known Joseph Castillo?

A. I met Joseph Castillo in 2015.

Q. What were the circumstances of meeting him then?

A. Joseph Castillo was the vice president of sales at one of our distillery clients.

Q. How is Joseph Castillo significant to this litigation?

A. Joseph Castillo was involved in the early ideation for the formation of Big Thirst.

Q. And why is he significant to this litigation?

MS. GILSTRAP: Objection, form.

THE WITNESS: Would you mind restating your question?

BY MS. MOUSILLI:

Q. Sure. Why is Joseph Castillo significant

to this litigation?

MS. GILSTRAP: Objection, form.

THE WITNESS: Joseph Castillo has intimate knowledge of how we went about doing our research, the information that we felt was relevant, the competitive analysis that we conducted, and the timing of when we began preparing our thought process for how we would build this company well in advance of ever discussing it with Lauren Wylie Donoho.

BY MS. MOUSILLI:

Q. So if Joseph Castillo was called as a witness in this case what, what do you think he will testify to?

MS. GILSTRAP: Objection, form.

THE WITNESS: I cannot speculate on what he would testify to.

BY MS. MOUSILLI:

Q. What would you want him to testify to?

MS. GILSTRAP: Objection, form.

THE WITNESS: I would expect that Joseph Castillo would provide relevant information based on his working with me and with Mark Shilling on crafting the concept for Big Thirst, Inc., and the work that we did for competitive analysis, understanding the industry, understanding the compliance issues, understanding

distribution channels, understanding retailers, all of the necessary fundamentals that went into place well before we talked about the technical aspects of it.

BY MS. MOUSILLI:

Q. Going back to Exhibit 1 on page 3, do you see where it says (C): A computation of each category of damages claimed by the disclosing party, who must also make available for inspection and copying as under Rule 34 the documents -- do you see what -- Section C?

A. I do.

Q. Okay. Do you see underneath it, there's a response?

A. I see the response.

Q. Okay. Can you go ahead and read that response for me?

A. Big Thirst seeks damages of $41,593.39 arising from Donoho's breach of her fiduciary duties to Big Thirst. Documentation of these damages has been previously produced as a filed exhibit. Big Thirst and McGinnis also seek to recover their attorneys' fees and costs to the extent permitted by law. Documentation of attorneys' fees has been produced as part of the discovery in this case.

Q. So you understand that you filed a lawsuit against Ms. Donoho?

A. Correct.
Q. And your claim against Ms. Donoho is for breach of fiduciary duty, correct?
A. Correct.
Q. Okay. And you have no other claim besides breach of fiduciary duty, correct?
A. Correct.
Q. And do you understand that attorney fees aren't allowed as damages for breach of fiduciary duty?
MS. GILSTRAP: Objection, form.
THE WITNESS: I go by the advice of my counsel.
BY MS. MOUSILLI:
Q. Okay. But to your knowledge, are attorney's fees allowed for a breach of fiduciary claim?
A. I'm not aware of the legal aspects of that.
Q. You might want to discuss that with your attorney.
MS. GILSTRAP: I object to the sidebar.
BY MS. MOUSILLI:
Q. So were you involved in counseling --
MS. GILSTRAP: Since we've already brought in attorney's fees for this case.
BY MS. MOUSILLI:
Q. Were you involved in calculating damages

for this --

A. Correct, yes. We've prepared a spreadsheet and attached receipts to each one.

Q. How did you arrive to this number?

A. We prepared a spreadsheet and attached receipts to each line item.

Q. Well, walk me through how you arrived to that number, based on -- based on that.

MS. GILSTRAP: Objection, form.

THE WITNESS: We arrived at that number based on adding up all receipts for engineering time, time that contractors spent on it, and software costs.

BY MS. MOUSILLI:

Q. Okay. Let's break it down. When you say engineering time, what do you mean by engineering time?

A. Do you have the spreadsheet available for me to review?

Q. I don't.

A. Okay.

Q. But if you can just -- and I'm not asking for specific numbers. I recognize you don't have the document in front of you, but if you can just give me like a ballpark figure how you arrived at these numbers.

A. We arrived at those numbers using the receipts produced by the contractor's agency, TopTal, as

well as the timesheets submitted by the other contractor, Rich Plakas, as well as the hard costs of software purchased.

Q. What did those numbers represent?

MS. GILSTRAP: Objection, form.

THE WITNESS: The numbers represent the cost of building a new data dashboard that was required to continue to provide the data analytics promised to our clients that I could no longer provide because there was a DMCA takedown issued by Ms. Donoho, which precluded the use of our prior dashboard.

BY MS. MOUSILLI:

Q. Okay. So this number, $41,593, you're telling me this is the figure for rebuilding a new data dashboard?

A. Correct.

Q. Okay.

A. We were able to build a new data dashboard at a lower cost than the previous one with using far less complexity and far -- fewer moving parts so it is more usable for our clients and easier to maintain by our staff.

Q. What is the cost of the previous one?

A. The -- I do not have those numbers in front of me, but the monthly fees added up to considerably more

than the cost of this one.

Q. Okay. When you say the previous one, are you referring to the data dashboard that Ms. Donoho built?

A. The tech stack that Ms. Donoho stitched together, is how she referred to it, is the one I'm referring to.

Q. Okay. So you're saying the data dashboard that Ms. Donoho built was more expensive than the one that you had it replaced by, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: That is correct. The monthly cost of that data dashboard that Ms. Donoho stitched together, using more parts than needed and more complexity than needed, was more expensive than what we currently have.

MS. MOUSILLI: And I'm going to object as nonresponsive to everything after, That is correct.

BY MS. MOUSILLI:

Q. Who is it, did you say, that built this new data dashboard?

A. The new data dashboard, the framework and core functionality was built by Edson Espindola.

Q. Was Edson Espindola compensated for this tech stack that he built?

A. Correct. Edson Espindola was paid for by a

staffing agency called TopTal.

Q. Okay. So Edson Espindola was paid for the tech stack that he built, yet Ms. Lauren Donoho wasn't, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: Ms. Donoho was compensated by given the title of cofounder, chief operating officer, an officer of a company, director in the company, and she was compensated richly with 2,700,000 shares in the company.

BY MS. MOUSILLI:

Q. But not a single penny went to her pocket, did it?

A. Ms. Donoho --

MS. GILSTRAP: Just hold on. Let me object. Objection, form.

THE WITNESS: Ms. Donoho was set to receive cash compensation two days before she held our funding hostage -- two days after, pardon me.

BY MS. MOUSILLI:

Q. That's pretty convenient. Okay. Who was --

MS. GILSTRAP: Object to the --

(Crosstalk between parties.)

MS. MOUSILLI: That's not a proper objection.

MS. GILSTRAP: Object to the sidebar. You said it all day yesterday.

MS. MOUSILLI: No, I never said those words.

MS. GILSTRAP: Yes, you did.

MS. MOUSILLI: Lessie, I'm not going to let you take over my deposition.

MS. GILSTRAP: I object -- I can --

(Crosstalk between parties.)

BY MS. MOUSILLI:

Q. What is -- what is Hajjar Peters?

A. Hajjar Peters, LLP, is a law firm.

Q. And how did you learn about them?

A. I began working with Hajjar Peters, LLP, first through filing a trademark when I changed the name of my marketing agency to Big Thirst Marketing, LLC.

Q. Okay. They did trademark work for you?

A. They did. Hajjar Peters, LLP is known for its work in corporate counsel for food and beverage companies. I was referred to them by many people.

Q. When did you decide to hire them?

A. I believe that I hired them in -- at the beginning of 2020.

Q. And you hired them for Big Thirst Marketing, correct?

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 48 of 356

A. Correct.

Q. When did you hire them to do any services for Big Thirst, Inc.?

A. My first conversations with Hajjar Peters, LLP for Big Thirst, Inc., I believe were in January of 2021.

Q. In January 2021 you engaged the services of Hajjar Peters for Big Thirst, Inc.?

A. Correct.

Q. What services did they provide for Big Thirst, Inc.?

A. Initially, Hajjar Peters provided services to help set up -- set up the corporation and then to set up the bylaws, to set up the -- all corporate documents for the company.

Q. Hajjar Peters initially represented Big Thirst in the instant litigation, correct?

A. Correct.

Q. Do they still represent Big Thirst?

A. They do not.

Q. Why not?

MS. GILSTRAP: Objection, form. I'm going to instruct you not to answer the question on the basis of attorney-client privilege.

BY MS. MOUSILLI:

Q. Did you fire Hajjar Peters?
MS. GILSTRAP: Objection, form.
THE WITNESS: I did not fire Hajjar Peters.
BY MS. MOUSILLI:
Q. Does Hajjar Peters still represent Big Thirst in corporate matters?
A. We do not have -- currently have any business with Hajjar Peters.
Q. Why do you no longer have business with Hajjar Peters?
A. We are actively working with a different law firm at this time.
Q. What law firm are you working with now?
A. With Gilstrap Law.
Q. Is Gilstrap Law doing your corporate work?
A. No. We are not currently doing any corporate law. Our litigation fees outstrip the ability to hire any other attorneys for any other matters at this time.
Q. So on what matters is Gilstrap Law representing you individually?
A. Gilstrap Law is representing me in litigation with Ms. Lauren Wylie Donoho.
Q. What litigation is Gilstrap Law representing Big Thirst in besides this litigation?

A. That's all.
Q. So if I understand correctly, Gilstrap Law is not representing you or Big Thirst in any capacity besides this instant litigation, correct?
A. That is correct.
Q. What was the initial organization structure of Big Thirst?
A. Big Thirst is a C-corporation filed in the State of Delaware.
Q. When was it formed?
A. March 8th, 2021.
Q. Who was involved in the formation of Big Thirst?
A. Kareem Hajjar from Hajjar Peters and me.
Q. Was there anyone else?
A. I do not know if anyone else within the law firm worked on it.
Q. No, but outside of the law firm and besides yourself, was anyone else involved in the formation of Big Thirst?
A. No.
Q. Who was involved in the decisions regarding coordination and structure of Big Thirst?
A. The initial formation was done by me.
Q. Why was Big Thirst incorporated in

Delaware?

A. I was instructed by counsel to do that.

Q. Were any shares created at that time?

A. Yes. There were 1,000 shares issued at that time.

Q. Who was involved in that determination?

A. That was the advice of Hajjar Peters to incorporate it as a sole proprietorship for -- because we had not yet worked out a full ownership structure, corporate structure, or any other aspects. And for expediency of filing, for expediency of looking to go get funding, it was their recommendation that we file as a sole proprietorship for a lower cost and amend it at a later date once we worked out the structure, which we did.

Q. How was the organization -- organization structured as far as the division of interest?

A. At that time, initially, it was a sole proprietorship.

Q. What do you mean by a sole proprietorship?

A. I was listed as the sole owner and shareholder.

Q. How many people initially worked for Big Thirst?

A. Lauren Wylie Donoho and I were the primary people organizing and running the organization with input

from Mark Shilling and Joseph Castillo, and a lot of work from Suzanne McGinnis.

Q. So what was Lauren Donoho's role at Big Thirst initially?

A. She was the chief operating officer and was responsible for developing the tech stack.

Q. What other responsibilities did Lauren Donoho have?

A. In what timeframe?

Q. Initially when Big Thirst was formed.

A. She started by identifying technologies to use for processing e-commerce orders. She then moved on to working on developing a data dashboard and then helped with the creation of the website.

Q. Anything else?

A. Those were her initial responsibilities until the launch of the company in October of 2021.

Q. What was your role at Big Thirst when it was initially created?

A. My role was to develop the business plan, the strategy of a financial plan, the direction for the company, identify routes to market, identify potential clients, identify partners for distribution, retail fulfillment, and to determine the corporate structure.

Q. What was your title?

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 53 of 356

A. Chief operating officer.
Q. Besides you and Lauren, were there any other individuals who worked for Big Thirst when it was initially formed?
A. All people who worked for Big Thirst, when it was initially formed, worked for compensation of shares, including Suzanne McGinnis who provided time for graphic design and creative direction.
Q. Were there any employees at that time?
A. There were no employees at that time.
Q. What was the original agreement for percentage split in Big Thirst?
A. The agreement that we arrived at was for me to receive 3,300,000 shares, Ms. Donoho to receive 2,700,000 shares, Mark Shilling to receive 1,000 shares and Suzanne McGinnis to receive 1,000 shares.
Q. When you say we agreed to this, who is we?
A. Ms. Donoho, Mark Shilling, Suzanne McGinnis and me.
Q. And how was that agreement reached?
A. The agreement was reached in numerous conversations, as well as meetings with our corporate attorney, Hajjar Peters.
Q. The business was formed on March 8th, 2021, correct?

A. Correct.
Q. When was the first time you met with Kareem Hajjar to begin that process of forming Big Thirst, Inc.?
A. I believe we had an initial call in January, and then we had our first meeting to discuss corporate structure and how to form it and how to get a registered agent in late February. The registered agent was secured on March 2nd, 2021. From there, the corporate papers were filed and the incorporation was on March 8th.
Q. Okay. Prior to forming Big Thirst, Inc., did you have discussions with Lauren Donoho about the creation of the entity?
A. The first documentation I could find with anything written was on January 12th, 2021.
Q. That's not what I asked you, Mr. McGinnis. I asked you: Did you have discussions with Lauren Donoho prior to creation -- creating Big Thirst, Inc.?
A. Yes. I had discussed starting a new company.
Q. When was the first date of those discussions?
A. The first evidence I can find of any discussion was in January 2021.
Q. Again, that's not what I asked you. I'm not asking you about evidence of discussions. When did

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 55 of 356

you first discuss with Ms. Lauren Donoho about creating an entity called Big Thirst, Inc.?

A. To my knowledge, it was at the very end of December 2020 or the beginning of January 2021.

Q. So maybe November of 2020 or December of 2020?

A. It's --

MS. GILSTRAP: Objection, form.

THE WITNESS: My recollection was that it was January 2021, but it's possible it was late December 2020.

BY MS. MOUSILLI:

Q. And what was the substance of those conversations between you and Ms. Lauren Donoho about forming the company?

A. That the -- the nature of the discussion was that we had been planning to launch an e-commerce platform. When I told her of it, I asked if she would be interested in creating a website for it. And she said, I think I could do more than just that. And I said, I don't have money to start this company or bootstrapping. And she suggested that she could work for shares. That was the initial conversation.

Q. What conversations were had between you and Ms. Donoho prior to you forming the company about

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 56 of 356

partnership and the entity?
A. Once we had conversations about her potentially getting shares in exchange for work to develop the website and any other aspects, then we broached the topic of her being called a cofounder.
Q. What promises did you make to Ms. Donoho regarding shares in the company?
A. There were no hard discussions of shares until May of 2021, when she broached the subject of wanting 50 percent. And she sent me an article to initiate that conversation. In that article was a founder's perspective of recommending a 50-percent split between cofounders.
Q. Okay. Let's go back -- we're -- so we're talking -- I'm going to ask you about prior to March 8th, prior to incorporating Big Thirst. You and Lauren Donoho had conversations about creating a company, right?
A. Correct.
Q. What conversations were had regarding shares that Ms. Donoho would be given of the entity?
A. They were very vague conversations that she would be compensated with shares. We did not know the number of shares. We did not know how that would work out.
Q. Did you guys discuss being cofounders?

A. We discussed being cofounders.

Q. Did you guys discuss being partners?

A. No.

Q. Did you discuss giving her an equal say into the company?

A. No.

Q. Did you ever mention to Lauren Donoho that this was a joint project between you and her?

A. No.

Q. What representations were made by you about the kind of input that Ms. Donoho would have in this entity?

A. Our discussions reflected that I hoped that she would be instrumental in creating the website and associated technologies. And her role would be similar to her role at Big Thirst Marketing where she was providing technical support.

Q. Have you heard Ms. Donoho say that she was expecting to be an equal partner with you?

A. In May of 2021, she sent me an article about a founder recommending the 50/50 split. That's the first time that had been broached.

Q. So if Ms. Donoho says that she had conversations with you as early as late 2020 about being an equal partner with you in Big Thirst, what is she

attributing that to?

MS. GILSTRAP: Objection, form.

THE WITNESS: I cannot speculate on how she would make that decision.

BY MS. MOUSILLI:

Q. What representations were made to Ms. Donoho regarding compensation?

A. We discussed that she would be compensated with shares in this new company, the details of which were not worked out.

Q. What are your obligations and responsibilities with respect to the operation of Big Thirst?

A. As the chief operating officer for Big Thirst, I am the primary decision-maker and I work with a board of directors and an advisory board for input and guidance and assistance in decision-making.

Q. When Ms. Donoho was a part of Big Thirst, what were her obligations to the operations of Big Thirst?

A. Her primary obligations were -- as the chief operating officer, were to set up the operations and primarily the technical -- technical aspects.

Q. Who handled hiring vendors at Big Thirst when Ms. Donoho was a part of Big Thirst?

A. It depended on the type of vendor.

WYLIE 325

Ms. Donoho signed the licensing agreements for software on behalf of Big Thirst for things like Panoply, signing them as a founder of Big Thirst.

Q. Okay. When Ms. Donoho was a part of Big Thirst, who was responsible for hiring employees?

A. We did not hire any employees until Ms. Donoho quit.

Q. And after Ms. Donoho quit, who was responsible for hiring employees at Big Thirst?

A. I conducted all interviews, preliminary interviews, and we had a slate of candidates ready to go upon signing and closing on our SBA loan on March 17th, 2022. I had conducted all interviews, with questionnaires provided to Ms. Donoho, who was given input to help make those selections. Following her departure, I made all decisions for hiring with input from my board members.

Q. Let's go back to the relationship with you and Ms. Donoho. Who approached who about this concept about Big Thirst?

A. I approached Ms. Donoho and asked if she would be willing to help us build a website for it.

Q. When did this occur?

A. As stated previously, I believe it was in January 2021. However, it's possible it was in late December 2020.

Q. Why did you approach Ms. Donoho about this matter?

A. I had a good working relationship with Ms. Donoho over a number of years, going back to December of 2016. I valued her work. I valued her input, and I valued her experience in the aspects of website design.

Q. So earlier you mentioned that Ms. Donoho said, No, I don't want to work as a contractor; I'd rather get shares in this company. Correct?

A. Correct.

Q. Okay. Tell me more about that conversation.

A. As this was two and a half years ago, I don't remember the specifics of a phone call. I remember feeling excited by the opportunity that, one, I would continue working with somebody I trusted and thought did good work; two, that we could share in the sweat equity for shares and the promise of the future of growing something valuable, and left with that feeling optimistic that we could be starting on a good path.

Q. So when Ms. Donoho asked for shares in exchange for sweat equity, what did you say?

A. I believe I agreed to it. But at the time, there was no discussion of numbers of shares. And in fact, I know that that was not discussed because that is

the entire reason why I was counseled by my attorney, Hajjar Peters, to file as a sole proprietorship because at the time we had not worked on any share or equity corporate responsibilities between other interested parties, including Suzanne McGinnis, Joseph Castillo, Mark Shilling and Lauren Wylie Donoho.

Q. Did you ever represent to Lauren Donoho that you would -- you and her would incorporate the entity together?

A. I do not believe so. At the time, there was also considerable discussion of whether it would be an LLC, a part of one of the existing Big Thirst entities or a new standalone company.

Q. Did you ever discuss with Ms. Donoho about creating the entity together?

A. I did not.

UNIDENTIFIED SPEAKER: Would it be possible to take a break?

MS. MOUSILLI: Certainly.

THE VIDEOGRAPHER: We're off the record at 10:15 a.m.

(A recess was taken at 10:15 a.m. to 10:26 a.m.)

THE VIDEOGRAPHER: We're back on the record at 10:26 a.m.)

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 62 of 356

BY MS. MOUSILLI:
Q. Mr. McGinnis, we're back on the record, but you're still under oath.
A. Correct.
Q. Do you understand that?
A. Yes.
Q. Okay. Prior to the break, we were talking about the conversations you were having with Ms. Donoho prior to incorporating Big Thirst?
A. Correct.
Q. And you and her talked about her building tech stacks and technology for the company, correct?
A. Correct.
Q. And in exchange, you would compensate her for her work?
A. Correct.
Q. And how would you compensate her?
A. With shares in the company.
Q. Did you ever talk to Ms. Donoho about creating the entity together?
A. We did not, at that point, talk about creating the entity together. I did make it clear that I -- it would be built -- predicated on all of the work done in my previous companies, and then I would hold the control and interest in the company.

Q. Let me hand you what's been marked as Exhibit 2.

(Exhibit 2 marked for identification.)

BY MS. MOUSILLI:

Q. Do you recognize Exhibit 2?

A. (No response.)

Q. Mr. McGinnis, I asked if you recognize Exhibit 2?

A. I'm reading this document. I believe this is the original request for a temporary and permanent injunction.

Q. And who made this request?

A. This was requested through my attorney by me.

Q. On behalf of Big Thirst?

A. On behalf of Big Thirst.

Q. If you flip through to your affidavit, it's marked as Exhibit A to the original petition. Do you see that?

A. And would you mind telling me which page number?

Q. It's marked as Page No. 4. It's after 11 pages of your original petition.

A. Okay.

Q. Do you see it?

A. Yes.
Q. Okay. Great. Can you read for me paragraph 4?
A. Yes. Paragraph -- paragraph 4: I incorporated Big Thirst, Inc. in March 2021. Soon after this, I called Donoho to tell her about the venture, and asked if she would be interested in providing contractor services for web design and other technical aspects, especially developing a data dashboard that would be the main component of Big Thirst, Inc. The customers would use this dashboard for their marketing, for their sales, and for their analysis. Essentially, use of the data dashboard is what would be sold to customers and what differentiates Big Thirst, Inc. for its -- from its competitors.
Q. Okay. And this affidavit was your sworn affidavit, correct?
A. Correct.
Q. Okay. So how do you reconcile what you just read with what you told me previously?
A. In what regard?
Q. Here you're saying you incorporated Big Thirst, and then afterwards you talked to Ms. Donoho, correct, in this affidavit?
A. Correct.

Q. And previously you told me you talked to Ms. Donoho before incorporating Big Thirst, correct?
A. Correct.
Q. Which one is correct?
A. Following the affidavit, I was able to more thoroughly review -- forced into it actually by the cross-examination -- and found evidence that there was discussion in January.
Q. So your affidavit was incorrect?
A. I believe the date in this is incorrect.
Q. Did you ever take steps to correct your affidavit?
A. I have not taken steps to correct this affidavit.
Q. Well, it's been over two and a half years, correct?
A. It has been two years.
Q. So it's been two years since you misstated facts in your affidavit and you did nothing to correct it; is that true?
MS. GILSTRAP: Objection, form.
THE WITNESS: I have not revisited this document and was unaware of that inaccuracy.
BY MS. MOUSILLI:
Q. That wasn't my question, Mr. McGinnis.

Despite the fact that it's been two years and you have a wrong affidavit with false information, and you never corrected it, did you?

MS. GILSTRAP: Objection, form.

THE WITNESS: I was unaware there was a need to correct anything.

BY MS. MOUSILLI:

Q. And you didn't correct it; is that right?

MS. GILSTRAP: Objection, form.

THE WITNESS: I have not corrected this.

BY MS. MOUSILLI:

Q. Thank you. Mr. McGinnis, I'm now handing you what's going to be marked as Exhibit 3.

(Exhibit 3 marked for identification.)

BY MS. MOUSILLI:

Q. Do you recognize this document, Mr. McGinnis?

A. This is an email exchange.

Q. Between who?

A. This is an email exchange between Lauren Wylie and me.

Q. What is the date of this email exchange?

A. February 26, 2021.

Q. Can you read from the top -- it looks like it's an email that you sent to Lauren Donoho. Can you

read from the top where it says, Hey, Wylie?
A. I am responding to the email below, in -- in which she says she found a Shopify app-building agency --
Q. I'm sorry. Mr. McGinnis, that wasn't my question. Can you please start reading where it says, Hey, Wylie, on Exhibit 3?
A. Hey, Wylie, that's a great idea to explore with another source. Let's hold off just a bit before we engage them. I want to get things buttoned down a bit more. I have another meeting with the attorney on Tuesday, and we'll get some guidance on how we incorporate and a timeline for that. Once I have that nailed down, I can apply for the loan. Then we'll have a better idea of timing and when we can actually start to get things rolling.
Q. So it says here, We'll get some guidance on how we incorporate, correct?
A. (No response.)
Q. Does it say on how we incorporate, Mr. McGinnis?
A. It does. However, we does not define --
Q. I'm sorry. That wasn't --
A. -- anybody other -- we could be a royal we, we could be my other partners. It does not say with you,

Wylie Donoho.

Q. All right. But you're responding to Ms. Lauren Donoho and you've talked about creating an entity together. And here it says, We'll get some guidance on how we incorporate and a timeline for that. It says that, correct, Mr. McGinnis?

A. I believe that we refers to --

Q. I'm sorry.

A. -- determining and to --

MS. GILSTRAP: Just answer her question.

BY MS. MOUSILLI:

Q. Please answer my question.

A. It does say we.

MS. MOUSILLI: Okay. If I can object as nonresponsive.

BY MS. MOUSILLI:

Q. I'm going to ask the question again. Here in this email, where you're writing back to Ms. Lauren Donoho, you say: And we'll get some guidance on how we incorporate it and a timeline for that, correct?

A. That is what it says.

Q. Okay. And who was the we that you referred to here?

A. I believe I was referring to the attorney.

Q. Is that how Ms. Donoho interpreted it, do

you think?

MS. GILSTRAP: Objection, form.

THE WITNESS: I can't speculate on what she believes.

BY MS. MOUSILLI:

Q. Okay. But you previously talked about incorporating -- creating a business trip together, correct?

A. (Nonverbal response.)

Q. Is that a yes?

MS. GILSTRAP: Objection, form.

THE WITNESS: I do believe we discussed it, as I had with my other partners.

BY MS. MOUSILLI:

Q. Was Ms. Donoho ever a contractor for Big Thirst, Inc.?

A. Ms. Donoho paid herself as a contractor once.

Q. How did Ms. Donoho pay for her -- herself as a contractor for the Big Thirst, Inc.?

A. Ms. Donoho chose to issue a paycheck to herself for contract work, although that's not the agreement we had.

Q. How much was that check worth?

A. I believe it was in the neighborhood of

1100 to $1500.

Q. And what was that check for?

A. For client services for a client called Santa Fe Spirits.

Q. What kind of client services?

A. We were providing marketing services for that client, as well as e-commerce.

Q. And was that the only time Ms. Donoho was compensated as a contractor by Big Thirst, Inc.?

A. Yes.

Q. Was Ms. Donoho ever considered an employee for Big Thirst?

A. Yes.

Q. When was Ms. Donoho considered an employee for Big Thirst?

A. Once we had incorporated and began working in earnest, we both considered ourselves employees of Big Thirst, Incorporated.

Q. Did Ms. Donoho, as an employee, receive a salary?

A. Neither of us received salaries.

Q. Did Ms. Lauren Donoho, as an employee, receive any kind of benefits as an employee?

A. Ms. Donoho received compensation in the form of 2,700,000 shares of stock in the company.

MS. MOUSILLI: Objection, nonresponsive.

BY MS. MOUSILLI:

Q. I asked for benefits. What kind of benefits did Ms. Lauren Donoho receive as an employee?

MS. GILSTRAP: Objection, form.

THE WITNESS: There were no benefits allotted to any employee.

BY MS. MOUSILLI:

Q. Was Ms. Donoho considered an equity partner in Big Thirst?

MS. GILSTRAP: Objection, form.

THE WITNESS: Ms. Donoho received 2,700,000 shares of stock.

MS. MOUSILLI: Objection, nonresponsive.

BY MS. MOUSILLI:

Q. Was Ms. Donoho considered an equity partner in Big Thirst?

MS. GILSTRAP: Objection, form.

THE WITNESS: There are no equity partners in Big Thirst beyond shareholders.

BY MS. MOUSILLI:

Q. Were there any written agreements between Big Thirst and Ms. Donoho?

A. We had director agreements. However, Ms. Donoho did not sign it.

Q. Besides director agreements, were there any other written agreements between Big Thirst and Ms. Donoho?

MS. GILSTRAP: Objection, form.

THE WITNESS: We had the signed written consent filed with the State of Delaware with her name on it.

BY MS. MOUSILLI:

Q. Okay. Again, if you can just please focus on this question. Were there any written agreements --

A. Yes.

Q. I wasn't finished with my question. Please wait for me to finish my question. Do remember the ground rules we set up at the very beginning?

A. Correct.

Q. Okay. I'm going to ask you to wait for me to finish my question and then answer. Okay. So are there any written agreements between Big Thirst, Inc. and Ms. Donoho?

A. Yes.

Q. Okay. What are those written agreements?

A. The written agreement is what I was just stating, the -- I'm forgetting the exact title, but the written consent of the corporation signed with -- filed with the State of Delaware.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 73 of 356

Q. A written consent filed with the State of Delaware?
A. Yes.
Q. What does a written consent filed with the State of Delaware mean?
A. It is our corporate document stating who were the officers and what should -- and what shares they owned.
Q. Besides that document, were there any written agreements between Ms. Donoho and Big Thirst?
A. No.
Q. When -- was Ms. Donoho simply listed on the written consent document that you just mentioned or did she sign?
A. I don't recall it, and I do not have the document in front of me.
Q. Okay. Were there any employment agreements between Big Thirst and Ms. Donoho?
A. No.
Q. Were there any written employment agreements between Big Thirst and Ms. Donoho?
A. No.
Q. Were there any noncompete agreements between Big Thirst and Ms. Donoho?
A. No.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 74 of 356

Q. Were there any work-for-hire agreements between Big Thirst and Ms. Donoho?
A. No.
Q. Did you ever request for Ms. Donoho to create an e-commerce site on Shopify for Big Thirst?
A. Did I specifically request that she create an e-commerce site on Shopify? We -- it was our business to create Shopify installments on client sites. We also, at the time, were thinking of creating our own store.
Q. Mr. McGinnis, did you ever request for Ms. Donoho to create an e-commerce site on Shopify for Big Thirst?
MS. GILSTRAP: Objection, form.
THE WITNESS: I do not recall making that request.
BY MS. MOUSILLI:
Q. Does Big Thirst have an e-commerce site on Shopify?
MS. GILSTRAP: Objection, form.
THE WITNESS: Big Thirst has an e-commerce site on Shopify.
BY MS. MOUSILLI:
Q. What was the purpose of this site?
A. Would you clarify the period of time when you're speaking?

Q. Certainly. At the initial formation of Big Thirst, when Ms. Donoho was still a part of Big Thirst, Inc., what was the purpose of the e-commerce site on Shopify that Big Thirst had?

A. The Shopify store acted as the way of creating buy buttons and shopping carts to add to client sites to process orders.

Q. Was there a data dashboard aspect?

A. It was linked to technologies that populated the data dashboard.

Q. What other aspects were on the site?

A. Shopify is a standalone e-commerce store.

Q. What other aspects were on the data dashboard?

A. Ms. Donoho created a data dashboard by linking together various off-the-shelf software.

Q. What off-the-shelf software did she link together on that dashboard?

A. Auth0, Panoply, Cumul.io, and Heroku.

Q. What does Panoply do?

A. Panoply, it pulls data from various sources.

Q. What kind of data?

A. Particularly, sales data from Shopify.

Q. What does Heroku do?

A. Heroku displays information in dashboard form.
Q. What was Ms. Donoho's responsibility for the data dashboard?
A. To create and maintain it.
Q. What was your responsibility for the data dashboard?
A. I had no responsibility at the time.
Q. Who else at Big Thirst, while Ms. Donoho was there, was responsible for the data dashboard?
A. It was her sole responsibility.
Q. Who else had access to the data dashboard when Ms. Donoho was at Big Thirst?
A. I had viewing rights, as did Suzanne and Mark Shilling.
Q. What other rights did Mark Shilling have?
A. Mark Shilling was also, at the time, the acting CEO of a client. And in that capacity, he had client aspect -- access to the dashboard.
Q. And what about Ms. Shilling -- Mrs. Shilling -- I'm sorry, Mrs. McGinnis. What kind of access --
A. She only could view it.
Q. -- did she have to the data dashboard?
A. Suzanne McGinnis could view the dashboard.

Q. Okay. So at the time that Ms. Donoho worked at Big Thirst, she was the only one who could operate the data dashboard?

A. Correct.

Q. Everybody else could only view it, correct?

A. Correct.

Q. Did Big Thirst ever enter into any work-for-hire agreements with anyone?

A. In what time period are you speaking?

Q. Ever.

A. Yes.

Q. Okay. Tell me about those work-for-hire agreements.

A. We have work-for-hire agreements with any contractor that we hire -- and employees, excuse me.

Q. When did this work-for-hire agreements process for having contractors and employees sign begin?

A. We had written employment agreements created by Hajjar Peters prior to Ms. Wylie Donoho departing the company. It was in place -- they were in place and presented to her initially before the company launched in October.

Q. You're saying there were work-for-hire agreements presented to Ms. Donoho before she left the company?

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 78 of 356

A. We had employment and director agreements in place provided by our attorneys.

Q. You had forms?

A. We had forms, yes.

Q. Were these forms ever signed by Ms. Donoho?

A. They were not.

Q. Okay. Who at Big Thirst has signed a work-for-hire agreement?

A. All of the employees.

Q. Can you name these employees?

A. Asher -- Asher Langston, Mark Shilling, Suzanne McGinnis, Matt McGinnis, Rich Plakas, Keri Emerson, Lataye Carr, Kristin Rice, Kristen O'Brien and Ashley Gunckel.

Q. Okay. Can you explain to the jury what your understanding is of a work-for-hire agreement?

A. My understanding is that an employee or contractor agrees that when they are employed by or contracting for the corporation that their work is owned by the corporation.

Q. Did Ms. Donoho ever sign an agreement with Big Thirst allowing for the use of her creative works?

A. No.

MS. GILSTRAP: Objection, form.

BY MS. MOUSILLI:

Q. Did Ms. Donoho ever sign a licensing agreement with Big Thirst?

A. No.

Q. Did Ms. Donoho ever verbally tell you that you could use her tech stack?

MS. GILSTRAP: Objection, form.

THE WITNESS: Ms. Donoho developed the tech stack as an officer and director of the company and with compensation provided.

MS. MOUSILLI: Objection, nonresponsive.

BY MS. MOUSILLI:

Q. Mr. McGinnis, did Ms. Donoho ever verbally tell you that you could use her tech stack?

A. Yes.

Q. When did she tell you that?

A. Ms. Donoho told me that from the beginning, that the tech stack would be used for Big Thirst.

Q. When you say from the beginning, when is that?

A. From when she began developing the data dashboard in, I believe, May of '21.

Q. Okay. Let's go back to the development of a data dashboard. When did she begin working on the data dashboard?

A. She began concepting this tech stack in

February. She licensed parts of it over time, I believe, beginning in February, March and into May. And I believe the first working prototype of anything was about summer.

Q. Let's go back and kind of digest what you said. So Ms. Donoho created a prototype for this data dashboard when?

A. I believe she began licensing parts of it that -- she scoped what she wanted to do, and I believe February or March I begin -- I think she began licensing the software, signed as a founder of Big Thirst, I believe in March. And I believe she had a prototype sometime in the spring/summer of 2021.

Q. Okay. Mr. McGinnis, if you can just pay attention to my question. So when was the first time you saw a prototype by Ms. Donoho for the data dashboard?

A. I don't believe I saw a prototype until June or July of 2021. I don't recall the exact date.

Q. Do you recall Ms. Donoho ever sending you an email informing you that she had developed a prototype for the data dashboard?

A. I do not recall the date.

Q. But do you recall an email saying something along the lines of, Look what I made?

A. I recall an email in February, Look what I made, when she put a free version of Shopify on the

WYLIE 347

bigthirstmarketing.com website. That was not a data dashboard.

Q. So is that a prototype that Ms. Donoho created in February 2021?

A. It was not a prototype of a dashboard.

Q. What was it a prototype of?

A. A store.

Q. A store. What kind of store?

A. The Shopify store.

Q. And that prototype that Ms. Donoho created preceded the formation of Big Thirst, correct?

A. She added a free install of Shopify to the Big Thirst Marketing website prior to the formation of Big Thirst, Inc.

Q. So Ms. Donoho was working on this tech stack prior to the incorporation of Big Thirst, correct?

A. Ms. Donoho explored how to use a free version of Shopify before the incorporation of Big Thirst.

Q. Ms. Donoho began work on this tech stack prior to the incorporation of Big Thirst, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: Ms. Donoho installed a free version of Shopify on the Big Thirst Marketing website before --

MS. MOUSILLI: Objection, nonresponsive.

BY MS. MOUSILLI:
Q. Mr. McGinnis, my question is pretty clear. Ms. Donoho started to work on this tech stack, but --
A. Will you define tech stack?
Q. Okay. Wait. Please don't interrupt me. Okay. So Ms. Donoho began working on a data dashboard before the incorporation of Big Thirst, correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: Incorrect.
BY MS. MOUSILLI:
Q. What was Ms. Donoho working on prior to the incorporation of Big Thirst?
A. She was exploring the use of Shopify.
Q. And what was she building?
A. An e-commerce store.
Q. And that was before the incorporate -- incorporation of Big Thirst, correct?
A. Correct.
Q. Thank you. Did Ms. Donoho ever give control of the tech stack she created to Big Thirst prior to leaving?
MS. GILSTRAP: Objection, form.
THE WITNESS: The -- I had access to aspects of the e-commerce platform, including Shopify, ShipStation, PayPal, and the data dashboard as a viewer

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 83 of 356

prior to her departure.

BY MS. MOUSILLI:

Q. Okay. So --

A. I had aspects -- or I could use Shopify, ShipStation, and PayPal as a user prior to her departure.

Q. Okay. Were you able to modify the tech stack while Ms. Donoho was at Big Thirst?

MS. GILSTRAP: Objection, form.

THE WITNESS: I did not modify the tech stack as far as the dashboard goes.

BY MS. MOUSILLI:

Q. Did you have the ability to do so?

A. I did not have the ability to modify the dashboard before she departed or after she departed.

Q. Okay. Because as I understood your testimony before, Ms. Donoho was the only person who was in control of the tech stack while she was at Big Thirst, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: Of the dashboard.

BY MS. MOUSILLI:

Q. So Ms. Donoho was the only person who was responsible and had control of the dashboard at Big Thirst before she left, correct?

A. Correct.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 84 of 356

Q. All right. Has Big Thirst ever filed for any copyright applications?
A. We have a copyright in our name.
Q. What is that copyright for?
A. The copyright is for the name Big Thirst Marketing.
Q. Is that a trademark?
A. It is the copyright.
Q. Has Big Thirst ever filed a trademark application?
A. Yes.
Q. What is that trademark for?
A. Big Thirst Marketing.
Q. Who was the person who filed these?
A. It was filed through Hajjar Peters.
Q. And who was listed as the owner for the copyright?
A. Matt McGinnis.
Q. And who was listed as the owner for the trademark?
A. Matt McGinnis.
Q. Does Big Thirst have any noncompete agreements with any of its employees?
A. Yes.
Q. Who?

A. There is a noncompete clause in employment agreements for each employee.

Q. Okay. But, again, Ms. -- there's no noncompete agreement between Big Thirst and Ms. Donoho, correct?

A. Correct.

MS. GILSTRAP: Objection, form.

BY MS. MOUSILLI:

Q. When did Big Thirst start implementing noncompete agreements?

A. We began with all employees hired after April 2022. We did not have employees other than Ms. Donoho and me prior.

Q. Following the formation of Big Thirst, were any third-party vendors or contractors commissioned for work?

A. No.

Q. Were any financial advisors hired by Big Thirst?

A. Here we go. Yes. We retained -- so let me restate -- answer the question previously. Yes. We hired a financial consultant previously.

Q. What was the name of the financial consultant?

A. Preferred Finance Solutions.

Q. Who at Preferred Financial Solutions did you work with?
A. Jelena Medic.
Q. Can you spell that for us, please.
A. Jelena, J-E-L-E-N-A, Medic, M-E-D-I-C.
Q. When was Preferred Financial Solutions hired?
A. Preferred Financial Solutions was hired in February 2021.
Q. So that's before Big Thirst, Incorporated?
A. Correct. She was hired by Big Thirst Marketing, technically.
Q. So Big Thirst Marketing hired Preferred Financial Solutions and Jelena Medic, not Big Thirst, correct?
A. Correct.
Q. Who was involved in the hiring?
A. I was, as well, as Lauren Wylie Donoho.
Q. What was Preferred Financial Solutions hired for?
A. They were hired to help us prepare a three-year financial plan.
Q. What was a three-year financial plan?
A. Jelena Medic is a financial analyst in the alcohol industry, and she prepared projections for

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 87 of 356

revenue, expenses, and other things that help us plan for how we would grow over three years.

Q. Were these three-year financial plans documented?

A. Yes.

Q. Were they produced?

A. Yes.

Q. Were they produced in discovery?

A. I believe so, yes.

Q. What payment arrangements were made with this financial advisor?

A. We made a services trade which was backed by a financial trade.

Q. Tell me about this services trade.

A. Jelena Medic had approached Big Thirst Marketing in December of 2020 and asked if we would design a website for her with Wylie Donoho providing that service, with me helping with the concept and copywriting.

We later agreed, in February, that that would be a work-for-hire trade. Rather than she paying us for a website design, she would provide us this service for the similar price -- same price, and we exchanged checks for $2,500 each.

Q. Okay. I'm confused now because previously you said that you're going to exchange services and now

you've exchanged checks. So let's kind of break this down.

A. Yeah. So for --

Q. I'm sorry. There's not a question just yet. So Jelena came to Big Thirst Marketing and said, Hey, I need a website, correct?

A. Yes.

Q. Okay. And Big Thirst Marketing said, Hey, we need a financial plan, correct?

A. Yes.

Q. We need a financial plan for Big Thirst, Inc., correct?

A. Correct.

Q. Is what Big Thirst Marketing said?

A. Correct.

Q. And so you all decided, Okay. We'll exchange services?

A. Correct.

Q. Okay. And Lauren Donoho was going to build that website for Jelena, correct?

A. Correct.

Q. And in exchange for Ms. Donoho's services, Jelena was going to provide a three-year financial projection for Big Thirst, Inc., correct?

MS. GILSTRAP: Objection, form.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 89 of 356

THE WITNESS: Correct.
BY MS. MOUSILLI:
Q. Was the three-year projection plan delivered by Jelena Medic?
A. Yes. I believe we received that in May of 2021.
Q. Did Lauren Donoho provide the website that Jelena Medic wanted in exchange for her services?
MS. GILSTRAP: Objection, form.
THE WITNESS: Yes.
BY MS. MOUSILLI:
Q. How was Ms. Donoho compensated for her work on the website?
MS. GILSTRAP: Objection, form.
THE WITNESS: Ms. Donoho was paid in cash for that.
BY MS. MOUSILLI:
Q. How much was Lauren Donoho paid?
A. She was paid $1,800 and I think -- I believe it was 1,825 that she invoiced in May of 2022.
Q. Where did Lauren Donoho send that invoice?
A. To Big Thirst Marketing.
Q. Did Big Thirst Marketing pay Lauren Donoho 1,800 and change?
A. Correct.

Q. How much did Big Thirst Marketing invoice to Jelena Medic for that website?
A. 2,500.
Q. What accounted for that markup?
A. We made an estimate, she made an estimate, we agreed to an estimate and that was it.
Q. So while Lauren Donoho was only paid about 1800 for the website, you billed Jelena Medic 2500, correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: The estimate that Lauren Wylie provided was that amount. She had said she would provide her services -- and this is in discovery -- for free and would not bill for it and would use that as a contribution toward the startup of the company.
MS. MOUSILLI: Okay. Objection, nonresponsive.
BY MS. MOUSILLI:
Q. While Ms. Donoho was paid about $1,800 for the website, Ms. Jelena Medic was invoiced about $2,500 for that website, correct?
A. Correct.
Q. Who sent -- on whose behalf was the invoice sent to Jelena Medic?
MS. GILSTRAP: Objection, form.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 91 of 356

THE WITNESS: The invoice was sent from Big Thirst Marketing.
BY MS. MOUSILLI:
Q. But the services were for Big Thirst, Inc., correct?
A. The services were for a startup. It was not yet built.
Q. Now, you said earlier that there was an exchange of checks. Jelena Medic gave you 25 -- I'm sorry, gave Big Thirst Marketing a $2,500 Check?
A. Yes.
Q. And then there was another check exchanged to her?
A. Correct.
Q. Tell me about that other check.
A. She paid us in May of 2021. We paid her in June of 2021.
Q. When you say we, who's we?
A. Big Thirst Marketing.
Q. Big Thirst Marketing paid Jelena Medic a check in 2021 for her financial projections?
A. Yes.
Q. In the amount of $2,500?
A. Correct.
Q. Were there any formal or written agreements

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 92 of 356

between Big Thirst Marketing and Jelena Medic?
A. Other than email, no.
Q. Were there any written documentation of any terms between Big Thirst Marketing and Preferred Financial Solutions?
MS. GILSTRAP: Objection, form.
THE WITNESS: Could you repeat the question, please?
BY MS. MOUSILLI:
Q. Were there any written documentations of any terms between Preferred Financial Solutions and Big Thirst Marketing?
MS. GILSTRAP: Objection, form.
THE WITNESS: No.
BY MS. MOUSILLI:
Q. Okay. After you brought on Lauren Donoho to Big Thirst, Inc., who else was brought in?
A. In what time period?
Q. Right after you brought on Lauren Donoho.
A. The only other people working on the business were Suzanne McGinnis and Mark Shilling.
Q. Who decided to bring on Suzanne McGinnis?
A. I did.
Q. And who decided to bring on Mark Shilling?
A. I did.

Q. Was anyone else involved in bringing these two individuals on to Big Thirst?

MS. GILSTRAP: Objection, form.

THE WITNESS: I do not believe so.

BY MS. MOUSILLI:

Q. What were the terms of Mark Shilling joining Big Thirst?

A. Mark Shilling was a director.

Q. And how was he to be compensated?

A. Mark Shilling was compensated in shares.

Q. How many shares?

A. 1,000.

Q. And what were the terms for bringing on Suzanne McGinnis?

A. Suzanne McGinnis is the director.

Q. And how was she compensated?

A. With shares.

Q. How many shares?

A. 1,000.

Q. Were there any formal agreements between Big Thirst and Suzanne McGinnis?

A. Yes.

Q. What are those?

A. The director's agreement written and signed.

Q. Any other agreements?
A. Not at that time, no.
Q. Any written agreements between Big Thirst and Mark Shilling?
A. Yes.
Q. What are those agreements?
A. The director's agreement.
Q. Any other agreement?
A. Not at that time.
Q. Any agreements later on?
A. Yes.
Q. What are those agreements?
A. Employment agreement.
Q. What are the terms of that employment agreement?
A. I don't have that in front of me.
Q. Okay. Generally, what does that employment agreement say?
A. It's an employment agreement written by our attorney that covers noncompete and work-for-hire.
Q. Does it discuss compensation?
A. Yes.
Q. Okay. And what is the compensation discussed in that document?
A. I'm not comfortable talking about current

Transcript of Matthew John McGinnis
Conducted on March 28, 2024 94

employment when there is a hostile competitor in the room.

Q. Okay. That's not a proper response.

A. Can I --

AEO DESIGNATION BEGINS

<-- CONFIDENTIAL

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
WYLIE 362

307

Transcript of Matthew John McGinnis
Conducted on March 28, 2024 95

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
WYLIE 363

308

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 97 of 356

Transcript of Matthew John McGinnis
Conducted on March 28, 2024 96

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
WYLIE 364

309

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 98 of 356

Transcript of Matthew John McGinnis
Conducted on March 28, 2024 97

-->

AEO DESIGNATION CONCLUDES

BY MS. MOUSILLI:

Q. So again, your -- the employees at Big Thirst have all signed a noncompete agreement?

A. Correct.

Q. And all employees at Big Thirst have signed work-for-hire agreements?

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
WYLIE 365

310

This testimony confirms only that ***Donoho personally*** borrowed $50,000 from Plaintiff and chose to use a portion of it for company expenses. It does not state or imply that Big Thirst or McGinnis agreed to assume or repay Plaintiff's loan.

McGinnis repeatedly identifies the loan as Donoho's own loan, consistent with the written Note naming only her as the borrower.

Describing Donoho's capital contribution or expenditures on behalf of the company is not evidence of any promise by Defendants to repay Plaintiff.

A. Correct.

Q. How was Big Thirst initially capitalized?

A. The initial capitalization was with a contribution from me for $5,100. And Lauren Wylie Donoho received a loan from her father for use for Big Thirst, and she deposited -- or spent about $43,000 of that toward company expenditures.

Q. So you contributed $5,100 to Big Thirst initially, correct?

A. Correct.

Q. And Lauren Donoho contributed 43k, is your testimony?

MS. GILSTRAP: Objection, form.

THE WITNESS: She chose to seek a loan from her father to help with startup costs, correct.

BY MS. MOUSILLI:

Q. And what was the amount of that loan?

A. She received a loan written to her for $50,000.

Q. How much of that $50,000 was given to Big Thirst, Inc.?

A. Either in expenditures directly for the company or deposited into the bank account of approximately $43,000.

Q. Is there a written agreement between Big

No evidence of any agreement between Big Thirst and Plaintiff. In fact, McGinnis' testimony is entirely consistent with Defendants' position in this lawsuit -- there was no agreement between Plaintiff and Big Thirst, written or oral.

Any agreement for Big Thirst to pay Donoho back is just that, not a promise to directly pay Donoho's creditor.

Thirst and Lauren Donoho's father for this loan?
A. There is not.
Q. Okay. Is there a verbal agreement?
MS. GILSTRAP: Objection, form.
THE WITNESS: There is no agreement with her father.
BY MS. MOUSILLI:
Q. Okay. Who is the agreement between?
A. There was a verbal agreement with Big Thirst and Lauren Wylie Donoho.
Q. What is the -- what was that -- what were the terms of that agreement?
A. The terms of the agreement is that we would pay back based on a payment schedule beginning in July 2023.
Q. Okay. So let's talk about this verbal agreement. There's -- so there's a verbal agreement between Big Thirst and Lauren Donoho, correct?
A. Yes.
Q. Regarding this loan, correct?
A. Yes.
Q. And the payments -- the reimbursements would begin in May of --
A. July.
Q. July of 2023?

Evidence that Big Thirst promised to pay Donoho back for her contribution is irrelevant to the issue of whether Plaintiff has presented evidence sufficient to raise a genuine issue of material fact that there is a written and signed assumption of debt satisfying the statute of frauds.

A. Correct.
Q. Okay. So we're now in March of 2024, correct?
A. Correct.
Q. Have any payments been made by Big Thirst to Lauren Donoho for this agreement?
A. No.
Q. Why not?
A. Lauren Donoho owes Big Thirst more than $80,000, and we are waiting on the payment for that.
Q. Okay. So you believe that this verbal agreement that you entered into on behalf of Big Thirst and Lauren shouldn't be repaid until you receive payment for something else?
A. Correct.
Q. Is that what the terms of the agreement were?
A. There were no written terms in the agreement.
Q. But there's a verbal agreement, correct?
A. Correct.
Q. Do you intend on ever paying back Lauren for this loan that she made to Big Thirst?
A. That is our intention.
Q. Okay. And when do you intend to start

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 102 of 356

paying Ms. Donoho back?
A. We would like to come to terms with that once we can resolve this litigation.
Q. But back when Ms. Lauren Donoho made this loan to Big Thirst, that was never a term or a condition for repayment to her, correct?
A. We did not anticipate the situation we're currently in.
MS. MOUSILLI: Objection, noresponsive.
BY MS. MOUSILLI:
Q. That wasn't part of the agreement between Lauren and Big Thirst, correct?
A. That was not --
MS. GILSTRAP: Objection, form.
THE WITNESS: That was not the agreement.
BY MS. MOUSILLI:
Q. Okay. So you contributed 5,100 to Big Thirst, and Lauren Donoho contributed a 50k loan. Did anybody else contribute any monetary amounts to Big Thirst?
A. In what time period?
Q. When it was first created.
A. No.
Q. When Big Thirst was initially created, what services were provided by yourself?

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 103 of 356

A. Could you be more explicit.
Q. What kind of sweat equity was -- or did you contribute to Big Thirst when it was first created?
A. I began working in earnest on developing the concept for Big Thirst in spring of 2020, doing market research, doing numerous meetings with people in the industry, developing the strategy, developing the relationships, develop the business plan, help shape the financial plan, help shape the entire direction for the company, and then was the lead on client acquisition.
Q. So when Big Thirst was initially created, there were monetary contributions by yourself --
A. Uh-huh.
Q. -- and by Ms. Donoho, correct?
A. Correct.
Q. Okay. Ms. Donoho contributed approximately 10 times what you did, correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: Ms. Donoho, through a loan from her father, contributed more.
BY MS. MOUSILLI:
Q. Okay. Considerably more, correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: Ms. Donoho contributed more.
BY MS. MOUSILLI:

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 104 of 356

Q. Okay. And when Big Thirst was initially created, was any sweat equity contributed?

A. Yes, considerable.

Q. By who?

A. By both of us.

Q. Was there anyone besides you and Lauren Donoho that contributed any sweat equity at the initial formation of Big Thirst?

A. Yes, Mark Shilling and Suzanne McGinnis.

Q. What sweat equity did Suzanne McGinnis provide?

A. Suzanne McGinnis provided graphic design as well as operational recommendations as a owner of a consumer product good company that sold online. She gave plenty of recommendations for helping me shape ideas of how to run the company.

Q. What sweat equity did Mark Shilling provide?

A. Mark Shilling provided connections in the industry for meetings and conversations to help shape our compliance policies, as well as direction for distribution and retail fulfillment.

Q. Did anyone else provide any initial capital to Big Thirst?

A. No.

Q. When was the first time that Big Thirst received capital injections?

MS. GILSTRAP: Objection, form.

THE WITNESS: I provided capital injections beginning in either February or March of 2021, and --

BY MS. MOUSILLI:

Q. Is that the $5,100 you were talking about?

A. Over -- over the course of the next couple months, I paid for filings and legal fees, that type of thing.

Q. Okay. But you paid for those filings from your own account or --

A. Yes.

Q. -- Big Thirst accounts?

A. From my own accounts.

Q. Okay. So what filings were you referring to?

A. Secretary of state registered agent, the EIN, and attorney fees.

Q. Who paid for any attorney fees?

A. The initial attorney fees, I did.

Q. And how much were those initial attorney fees?

A. I don't have that number in front of me.

Q. Approximately?

A. Approximately 3500.
Q. So the initial attorney fees by Big Thirst were paid by you individually?
A. Correct.
Q. That's your testimony?
A. I don't have my bank account in front of me, but I know that -- I think we carry on our books $1500 owner contribution from me.
Q. What was the next capital injection made into Big Thirst?
A. We received a new loan from Big Thirst Marketing to pay for litigation expenses.
Q. And how much was that loan for?
A. $100,000.
Q. What were the terms of that loan?
A. The terms of that loan are a repayment schedule, and I don't know that off the top of my head.
Q. Besides a 100k loan from Big Thirst, what other loans were obtained by -- I'm sorry, strike that.
Besides the $100,000 loan from Big Thirst Marketing to Big Thirst, Inc., what other loans were obtained by Big Thirst?
A. We also have three loans from the SBA through First Commonwealth Bank.
Q. Okay. Let's go through these. First

Common --

A. First Commonwealth Bank.

Q. When did this loan happen?

A. August of 2022.

Q. And how much was this loan for?

A. $350,000.

Q. What were the terms of this loan?

A. The terms of the loan are repayments monthly, and I don't know the current interest rate -- variable interest rate.

Q. So this is a loan between Big Thirst, Inc. and First Commonwealth Bank, correct?

A. Correct.

Q. For $350,000?

A. Correct.

Q. And it was initiated August 2022, correct?

A. Correct.

Q. Okay. What other loans are there?

A. Through the same entity, through First Commonwealth Bank and the SBA, we have two lines of credit.

Q. I'm sorry. I missed that. Can you repeat that?

A. Through the same agreement with First Commonwealth Bank and the SBA, we have two lines of

credit.

Q. Okay. Tell me about that first line of credit.

A. The lines of credit were a mechanism whereby we could access additional funds.

Q. How much additional?

A. I believe the first one was for $250,000.

Q. So this is a loan that you could access. Have you accessed it?

A. Yes.

Q. How much of the 250,000 have you accessed?

A. All of it.

Q. What about the second line of credit?

A. It was for $400,000.

Q. Through First Commonwealth Bank?

A. Correct.

Q. And is it under the same terms as the first line of credit?

A. The interest rate's variable, so it would be different. And obviously, the interest rates have been very high lately, so it's expensive.

Q. Have you accessed the full 400k?

A. Yes.

Q. Are there any other loans that Big Thirst has outstanding?

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 109 of 356

A. No.
Q. Are you a guarantor for the loan that is between Big Thirst, Inc. and First Commonwealth Bank, the August 2022 --
A. Yes.
Q. -- loan? Who else is a guarantor on that loan?
A. Big Marketing and Big Thirst Consulting, as well as my life insurance policy.
Q. How much is your life insurance policy for?
A. We put up $350,000 for that.
Q. Is there -- are you a personal guarantor for the first line of credit from First Commonwealth Bank?
A. Yes.
Q. Who else is a guarantor?
A. Big Thirst Marketing, Big Thirst Consulting and my life insurance, on all three.
Q. When you say on all three, what does that mean?
A. On both lines of credit and the loan.
Q. And so for all three loans, you are a personal guarantor?
A. Correct.
Q. Big Thirst Marketing is a guarantor, and Big Thirst Consulting is a guarantor, and your life

insurance policy is a guarantor, correct?

A. Correct.

Q. Okay. Who was involved in negotiating these loans?

A. Initially, Lauren Wylie Donoho and I were both involved, both in in-person meetings, in phone meetings and in an email.

Q. Okay. I'm going to kind of break this down. So let's -- let's talk about the first loan, the 350k with First Commonwealth Bank. Who was involved in negotiating that loan?

A. Lauren Wylie Donoho and Matt McGinnis.

Q. And there's a written agreement for that August 22 loan, correct?

A. Correct.

Q. When were the funds received for that August 22 loan?

A. In August.

Q. The full amount was received?

A. For the loan, yes.

Q. Who filled out any loan documents for that loan?

A. Initially, both Lauren Wylie Donoho and I did. However, this is the loan that she held hostage and we had to restructure after she resigned.

MS. MOUSILLI: Okay. I'm going to object as nonresponsive to everything after, Initially, both Lauren and I.
BY MS. MOUSILLI:
Q. After Ms. Donoho left Big Thirst, Inc., did you continue to pursue that August 22 loan?
A. Correct.
Q. Okay. And were you responsible for the documents --
A. Yes.
Q. -- related to that loan?
A. Yes.
Q. Yes. Did you approve all the documents related to that loan?
A. Yes.
Q. Did anybody else approve those documents related to that loan?
A. No.
Q. For the first line of credit through First Commonwealth Bank, who was responsible for signing any of the agreements on behalf of Big Thirst?
A. I was.
Q. Was anybody else?
A. No.
Q. Did anybody else from Big Thirst review

those documents?
A. Yes.
Q. Who?
A. The board of directors.
Q. And for the second line of credit between Big Thirst, Inc. and First Commonwealth Bank, who was responsible for signing the agreements there?
A. I was.
Q. Did you review the documents?
A. Yes.
Q. Did you approve the documents?
A. Yes.
Q. Let's go back to the first loan, the August 22 loan from First Commonwealth Bank. How were those monies allocated?
A. They were allocated primarily for business operations. However, there was a significant portion that went to pay litigation fees.
Q. How much?
A. In total and since litigation has started, we have paid more than $300,000, which has been crippling for the company.
Q. Okay. How were the funds for the first line of credit, the 250k that you said that you used all up, how were those funds allocated?

A. They were allocated -- we allocate -- we have an allocation worksheet that allocates. It was primarily to operations, some to equipment. Our equipment costs are very low, so it's mostly for operations.

Q. And how were the funds for the second line of credit, the $400,000, allocated?

A. Similarly. The allocation worksheet is primarily for operations.

Q. Were there any loans that Big Thirst applied for but didn't obtain?

A. Prior to this loan, yes.

Q. Okay. Which entities did Big Thirst apply for a loan with?

A. We initially sought a loan through Frost Bank, and the conversation started for that on February 8th of 2021, and in earnest with applications in May of 2021. The loan was rejected, as they did not believe a startup without revenue was valid for providing a loan.

Q. What other loans did Big Thirst apply for but did not receive?

A. We applied for the same type of SBA loan through Regions Bank, following the rejection from Frost Bank.

Q. When was that?

A. In October, November -- excuse me, probably

just October -- it went pretty quick -- of 2021.

Q. And why was the loan not obtained?

A. Same reason, no assets and no revenue. Regions Bank referred us to First Commonwealth Bank.

Q. Okay. What other loans were applied for by Big Thirst but not obtained?

A. That's all.

Q. Did you disclose the litigation -- the instant litigation to First Commonwealth Bank?

A. Yes.

Q. When did you disclose that ability -- when did you first disclose the instant litigation to First Commonwealth Bank?

A. In April of 2022.

Q. How did you disclose the litigation to First Commonwealth Bank?

A. It was necessary to let them know we had an owners' dispute in March of 2022, as the initial loan had to be put on hold and then cancelled.

Q. Okay. I'm sorry. You said the first loan had to be put on hold. Which first loan are we talking about?

A. We had a loan that we were set to close on on March 17th, 2022, and this is the loan that Lauren Wylie Donoho refused to be a guarantor for.

Q. So the loan was cancelled because you didn't disclose the litigation?
A. We were not in litigation at that time. It was cancelled because Lauren Wylie Donoho refused to be a guarantor.
Q. Okay. So that was the first attempt at obtaining a loan from First Commonwealth Bank, correct?
A. Yes. We rewrote it.
Q. Okay. And when you say you rewrote it, what does that mean?
A. It means the loan had to be restructured and reissued.
Q. Okay. And when you applied in -- I'm sorry, this is when you applied in April of 2022, for that -- that second attempt at First Commonwealth Bank, correct?
A. I don't recall the exact date of when the loan application went in, but I would say it was April.
Q. And at that time, you disclosed to First Commonwealth Bank the instant litigation?
A. Correct.
Q. And what was First Commonwealth Bank's response to your disclosure of the instant litigation?
A. There was clear concern, but they understood the circumstances.

Q. Who at First Commonwealth Bank did you work with?
A. Primarily, Gregory Tabron.
Q. Can you please spell his last name?
A. T-A-B-R-O-N.
Q. Did you work with anybody else at First Commonwealth Bank?
A. Yes. His senior lead is named Keith, and I don't recall his last name. And there were several other junior employees that worked on the account.
Q. So I understand your testimony today is that you disclosed the instant litigation to First Commonwealth Bank in April 2022, correct?
A. That's my understanding.
Q. Did you disclose the litigation in writing?
A. I believe on the telephone.
Q. Okay. So you only disclosed the litigation verbally, correct?
A. I don't recall whether there was any email communication, but I know they were well aware.
Q. Okay. And you understand you have an obligation to disclose the instant litigation when applying for these loans, correct?
A. Correct.
Q. Did you disclose the litigation when you

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 117 of 356

applied for the first line of credit with First Commonwealth Bank?

A. They were done at the same time, yes.

Q. And when you applied for the second line of credit, the 400k through First Commonwealth Bank, did you disclose the --

A. Yes.

Q. -- instant litigation?

A. Yes.

Q. And how did you disclose it?

A. In meetings. And I'm -- when we went through everything with all the documentation, all the paperwork, it's clear it's in there.

Q. How's it clear?

A. It's in all of our financial records.

Q. Okay. Let's go back to after you incorporated Big Thirst on your own in April -- I'm sorry, March 2021, you and Lauren Donoho worked together at Big Thirst, Inc., correct?

A. Correct.

Q. Then you alluded to a loan at First Commonwealth Bank that you tried to obtain, that you were not successful in obtaining because Ms. Donoho didn't want to be a guarantor on that loan, correct?

A. Correct.

Q. Why is it that Ms. Donoho refused to be a guarantor on that loan?
MS. GILSTRAP: Objection, form.
THE WITNESS: Her stated reason was that she did not feel comfortable with the security of her financial status.
BY MS. MOUSILLI:
Q. What did you understand that to mean?
A. That she felt vulnerable financially.
Q. And what did you do in response?
A. I offered to adjust the ownership share and -- in response.
Q. You offered to adjust the ownership shares in Big Thirst --
A. Uh-huh.
Q. -- for Ms. Donoho --
A. Yes.
Q. -- in your response? Okay. And what was your suggestion?
A. Compensate her separately.
Q. And how was that compensation to happen?
A. It didn't happen because she chose not to.
Q. Okay. So what exactly was your offer?
A. There wasn't an offer made other than a proposal in mediation on March 29th of replacing shares

with phantom shares.

Q. Okay. And what does that mean?

A. It means that she could be compensated with the same vote, same financial structure, but without the ownership.

Q. Were you upset that Ms. Donoho didn't want to be a guarantor on this loan?

A. I was upset that she chose to broach it on the eve of closing on a loan that we'd worked on for 10 months.

Q. So you were upset?

A. I was understandably upset, yes.

Q. Did you pressure Ms. Donoho to become a guarantor on this loan?

A. I offered her alternatives.

Q. Did you threaten Ms. Donoho into signing as a guarantor for this loan?

A. I offered her alternatives.

Q. Could those alternative offerings be construed as a threat?

A. I don't know her state of mind in hearing what those opportunities were.

Q. What did you tell Ms. Donoho would happen if she didn't sign as a guarantor?

A. I told her we could restructure the

company.

Q. How could you restructure the company?

A. I had -- the first conversation that she recorded without my consent, I did not know how I would do that because I didn't have legal advice on doing that. When I followed up with her, it was in mediation to offer phantom stock.

Q. Okay. So you threatened Ms. Donoho to turn Big Thirst into a sole proprietorship, correct?

A. I offered --

MS. GILSTRAP: Objection, form.

THE WITNESS: -- opportunities.

BY MS. MOUSILLI:

Q. You threatened to turn Big Thirst into an entity owned wholly by yourself if Ms. Donoho did not sign as a guarantor?

A. I disagree.

MS. GILSTRAP: Wait. Objection, form. You can answer.

THE WITNESS: I disagree with your characterization.

BY MS. MOUSILLI:

Q. What do you disagree?

A. I do not characterize it as a threat.

Q. You let Ms. Donoho know that you would

change the structure at Big Thirst on your own, correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: My offer was to let her out of her number one objection of being a guarantor on the loan to be able to move forward.
BY MS. MOUSILLI:
Q. You threatened to take away everything that Ms. Donoho had been working on up until then if she didn't sign as a guarantor, correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: I offered to restructure the loan so she wouldn't have to be a guarantor.
MS. MOUSILLI: That wasn't my question. I object as nonresponsive.
BY MS. MOUSILLI:
Q. Mr. McGinnis, you threatened to take away everything that Ms. Donoho had been working on up until then if she didn't sign as a guarantor; isn't that correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: That is not correct.
BY MS. MOUSILLI:
Q. What is incorrect about that statement?
A. I did not make a threat.
Q. You made a statement, didn't you?

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 122 of 356

A. I made a statement --

MS. GILSTRAP: Objection, form.

BY MS. MOUSILLI:

Q. You made a statement that you would take away everything that Ms. Donoho had been working up -- on up until that point, correct?

A. I --

MS. GILSTRAP: Objection, form.

THE WITNESS: I made a statement that I would compensate her fairly.

BY MS. MOUSILLI:

Q. How would you compensate her?

A. At the time, I did not know.

Q. Okay. And have you compensated her until this date?

A. Yes. She still is an owner of 2,700,000 shares of stock in Big Thirst.

Q. Has she received a penny in her pocket for any of the work that she's done thus far for Big Thirst, Inc.?

MS. GILSTRAP: Objection, form.

THE WITNESS: There has been a liquidity event for her to receive money for the shares in the ownership she has in the company, which is substantial.

BY MS. MOUSILLI:

Q. The answer is no, isn't it, Mr. McGinnis? Ms. Donoho has not received a penny to her pocket for any of the work that she's worked on for Big Thirst, Inc.; isn't that correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: Other than money she paid herself, no.

BY MS. MOUSILLI:

Q. So sign a guarantor -- sign as a guarantor or else we'll take away everything, is not, in your mind, a threat, Mr. McGinnis?

MS. GILSTRAP: Objection, form.

THE WITNESS: There was a heated discussion in the moment. I quickly followed up with requests to meet for a coolheaded conversation numerous times. I also replied coolheaded with more concrete things that we could do, and I offered mediation as a way forward. I offered numerous ways forward after a heated conversation.

BY MS. MOUSILLI:

Q. You acknowledge that heated conversation took place, don't you?

A. Yes.

MS. GILSTRAP: Objection, form.

BY MS. MOUSILLI:

Q. And you acknowledge that Ms. Donoho

received a communication from you that everything that she had been working on could be taken away from her, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: That did not happen. There was nothing taken away from her.

BY MS. MOUSILLI:

Q. Are you aware that in Texas it's perfectly legal for one party to record a conversation?

A. Legality --

MS. GILSTRAP: Objection, form.

THE WITNESS: Legality is not my -- my expertise. I do know that it seems really slimy.

BY MS. MOUSILLI:

Q. Okay. That wasn't my question. Okay. Are you aware that in Texas it's perfectly legal for one party to record a conversation?

MS. GILSTRAP: Objection, form.

BY MS. MOUSILLI:

Q. Yes or no?

MS. GILSTRAP: Objection, form.

THE WITNESS: I am aware now.

BY MS. MOUSILLI:

Q. Have you ever recorded a conversation between you and someone else without them being informed that the conversation was being recorded?

A. No.

Q. Let's talk about that mediation that happened that you alluded to earlier. What happened to initiate that mediation?

A. What led to the mediation is I had requested in-person meetings by phone, calling her and asking for it or in an email asking for ways forward. She seemed willing to discuss at first, but then stopped responding. It was clear that we were at an impasse, and I recommended we get a third party -- an impartial voice to help us try and resolve this.

I was committed to trying to fix the situation. I offered mediators and let her select one that she wanted to use. We hired and worked with a mediator of her choice.

Q. Okay. Who was that mediator?

A. Claude Ducloux -- Ducloux.

Q. And when did you meet for mediation with Ms. Donoho?

A. On March 29th of 2022.

Q. Did you come alone?

A. We drove separately, yes.

Q. I'm sorry. When you say we drove, who's we?

A. Ms. Donoho and I arrived separately.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 126 of 356

Q. Okay. Who appeared for the mediation on your behalf?
A. Just me.
Q. Just you. And who appeared on Ms. Lauren Donoho's behalf?
A. Just her.
Q. And what were the discussions at the mediation?
A. I had prepared a document in advance offering paths forward, including phantom shares. I believe she offered her -- her document, as well. Point-of-view documents were both requested ahead of time. We then met very briefly together in a conference room and then had separate discussions in separate rooms. And the mediator went back and forth between the meetings.
It was disclosed at that time that there was not going to be any resolution and that Ms. Donoho had me over a barrel and would refuse to negotiate at all and was willing to shut down the company.
Q. So you seem kind of upset that Ms. Donoho recorded your conversation, right? You refer to it as being slimy; is that correct? You referred to her --
A. I --
Q. I'm sorry. My question is: Did you refer to her recording of a conversation between you and her as

slimy?
A. I just did, yes.
Q. Okay. You were upset at the fact that she had recorded a conversation, correct?
A. She had coerced an attempt -- as a change in the corporate structure, attempted to use coercion in holding a loan hostage to get her way. And then knowing I was angry, called and recorded.
MS. MOUSILLI: Objection, nonresponsive.
BY MS. MOUSILLI:
Q. You were upset that Ms. Donoho recorded the conversation between you and her, correct?
A. I'm upset by the circumstances surrounding it.
Q. Okay. Because you took extreme measures to make sure nothing that you and her agreed on was in writing, correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: Incorrect.
BY MS. MOUSILLI:
Q. Okay. And you made sure that every time you and her had discussions about her being an equal partner, it was all verbal, correct?
A. Incorrect.
Q. And you purposely never wrote down any of

the agreements that you had with Ms. Donoho about being an equal partner, correct?
A. Incorrect. All of this is documented.
MS. GILSTRAP: Just answer the question.
THE WITNESS: Incorrect.
BY MS. MOUSILLI:
Q. Okay. So again, there are no written communications about her equal shares in the company because you did that all verbally, correct?
A. Incorrect.
Q. Yet, when she chose to record a conversation, you become upset, correct?
A. There's no causation between those two items.
Q. The fact that Ms. Donoho contributed, as a capital contribution significantly -- 10 times what you contributed -- was not sufficient to increase her shares, was it?
MS. GILSTRAP: Objection, form.
THE WITNESS: The company was built on my work, my relationships, my reputation, the reputation of the brands and the services provided by the other Big Thirst companies.
BY MS. MOUSILLI:
Q. That wasn't my question, Mr. McGinnis. The

fact that Ms. Donoho contributed 10 times the capital that you did wasn't sufficient to increase her shares, was it?

A. No.

Q. How were Ms. Donoho's services valued?

A. Ms. Donoho's services were valued highly, and she was compensated with 2,700,000 shares of stock.

Q. What went into the valuation of her services?

A. There was no formal evaluation of the contributions made by either of us.

Q. How was her monetary contribution valued?

A. We had discussions about how ownership share would shake out based on input from articles we read, input from mentors, input from people in the industry, and we came to agreement on it between May and June of 2021.

Q. And what was that agreement?

A. That I would receive 3,300,000 shares and she would receive 2,700,000 shares.

Q. What was the result of that mediation that you referred to earlier?

A. The result was that there was no agreement.

Q. What all did Ms. Donoho create while she was with Big Thirst?

A. She installed Shopify and ShipStation. She

licensed and stitched together a dashboard consisting of Auth0, Panoply, Cumul.io, and Heroku, and she assisted with the development of the website.

Q. How much time did Ms. Donoho spend on the technical aspects?

A. Ms. Donoho never submitted a timesheet.

Q. How much time do you estimate that Ms. Donoho spent on the technical aspects?

A. I have no way of knowing.

Q. How much time did Ms. Donoho spend on developing the website for Big Thirst?

A. I have no way of knowing.

Q. How much time did Ms. Donoho spend on the management system?

A. I have no way of knowing.

Q. How much time did Ms. Donoho spend on developing the software applications?

A. I have no way of knowing.

Q. How much time did Ms. Donoho spend on creating the source code for Big Thirst?

MS. GILSTRAP: Objection, form.

THE WITNESS: I am unaware of any source code created.

BY MS. MOUSILLI:

Q. Is that because you're not a technical

person, Mr. McGinnis?
A. That is because in all applications --
MS. GILSTRAP: Answer the question.
THE WITNESS: No, it is not correct.
BY MS. MOUSILLI:
Q. Okay. How is it that you don't know that there was source code created for Big Thirst, Inc.?
A. I do not believe there's any source code created for Big Thirst, Inc.
Q. Okay. And that's your testimony today?
A. Yes.
Q. How much time did you spend on the technical aspects for Big Thirst, Inc.?
A. In what time period?
Q. From its formation until today.
A. A considerable amount of time. It's a daily aspect.
MS. GILSTRAP: Answer the questions.
BY MS. MOUSILLI:
Q. How much time did you spend on developing the website for Big Thirst, Inc.?
A. I would estimate about 30 hours.
Q. From the formation of Big Thirst until today?
A. No, during the time when Ms. Donoho was

employed.

Q. Okay. So from the creation of Big Thirst, Inc. until today, how much time have you spent on developing the website?

MS. GILSTRAP: Objection, form.

THE WITNESS: In the entire life of the company, I've likely spent 60 hours on that website.

BY MS. MOUSILLI:

Q. Doing what on the website?

A. On -- the website has been revised twice since her departure. The current website is completely new. I selected all imagery for it. I wrote all the content. I helped do the layout, the concepts, the navigation, everything except for the actual adding the material to the content management system.

Q. Prior to Ms. Donoho leaving Big Thirst, how much time did you spend on the website?

A. I would estimate about 30 hours.

Q. And what did you do in those 30 hours?

A. I authored the content. I provided the graphic design and thematic input and had numerous hours with Suzanne McGinnis and Wylie Donoho to come up with what it would look like and what it sounded like.

Q. You authored the content for the website?

A. That's correct.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 133 of 356

Q. Okay. What proof do you have that you authored the content?

A. I have several documents that show that I am the author, and revision control show what I wrote both in -- in various documents.

Q. How much time did you spend on the management system for Big Thirst from creation until today?

MS. GILSTRAP: Objection, form.

THE WITNESS: Please define the management system.

BY MS. MOUSILLI:

Q. Big Thirst, Inc. uses a management system, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: Big Thirst, Inc. uses several management tools. I'm not sure what you mean.

BY MS. MOUSILLI:

Q. Okay. The management system related to the data dashboard.

MS. GILSTRAP: Objection, form.

THE WITNESS: Are you --

BY MS. MOUSILLI:

Q. Okay. How many management systems does Big Thirst, Inc. have?

A. We have project management systems.

MS. GILSTRAP: Answer her question.

THE WITNESS: We have five.

BY MS. MOUSILLI:

Q. And tell me about those five management systems.

A. We have a project management system. We have a communication management system. We have a public relations management system and social media management systems.

Q. How much time have you spent on the -- on any of those five management systems from Big Thirst's inception until today?

A. I would estimate that I spend at least an hour a day on all of those.

Q. When Ms. Donoho was a part of Big Thirst, how much time did you spend on the management systems belonging to Big Thirst, Inc.?

A. I did not work on the dashboard. However, I did maintain management systems relating to our communications.

MS. MOUSILLI: Objection, nonresponsive.

BY MS. MOUSILLI:

Q. When Ms. Donoho was part of Big Thirst, how much time did you spend on the management systems

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 135 of 356

belonging to Big Thirst?

MS. GILSTRAP: Objection, form.

THE WITNESS: I did not spend a lot of time on those.

BY MS. MOUSILLI:

Q. Okay. From its inception until today, how much time have you spent on software applications belonging to Big Thirst, Inc.?

A. I spend considerable time daily on our software systems.

Q. What do you do to the software systems?

A. I would consider this attorney privilege.

MS. GILSTRAP: Okay. We'll go AEO, if you want to ask your clients out.

MS. MOUSILLI: I don't understand how this is AEO.

MS. GILSTRAP: Well, I'm not going to have him answer it until -- he's saying these are trade secrets or confidential information about his business that he doesn't want to share with someone who's already stated under oath that she can just --

MS. MOUSILLI: Lauren, if you could just step out, please.

AEO DESIGNATION BEGINS

<-- CONFIDENTIAL

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 136 of 356

Transcript of Matthew John McGinnis
Conducted on March 28, 2024 135

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
WYLIE 403

348

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 137 of 356

Transcript of Matthew John McGinnis
Conducted on March 28, 2024
136

WYLIE 404

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 138 of 356

Transcript of Matthew John McGinnis
Conducted on March 28, 2024 137

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
WYLIE 405

350

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 139 of 356

Transcript of Matthew John McGinnis
Conducted on March 28, 2024
138
PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
WYLIE 406

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 140 of 356

Transcript of Matthew John McGinnis
Conducted on March 28, 2024 139

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
WYLIE 407

352



Transcript of Matthew John McGinnis
Conducted on March 28, 2024 140

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

WYLIE 408

353

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 142 of 356

Transcript of Matthew John McGinnis
Conducted on March 28, 2024 141

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
WYLIE 409

354

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 143 of 356

Transcript of Matthew John McGinnis
Conducted on March 28, 2024 142

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
WYLIE 410

355



-->

AEO DESIGNATION CONCLUDES

BY MS. MOUSILLI:

Q. Okay. Mr. McGinnis, you testified that Big Thirst only uses, quote, off-the-shelf source code --

MS. GILSTRAP: Objection, form.

BY MS. MOUSILLI:

Q. -- correct?

A. That's not what I said.

Q. What is it that you -- I'm sorry. I misspoke. I had understood from you that Big Thirst only uses off-the-shelf software, correct?

A. Correct. And that there is customization to that.

Q. And when you say off-the-shelf, what do you mean by that?

A. Meaning -- let's use Shopify as an example, if that's okay.

Q. Sure.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 145 of 356

A. Okay. Shopify is an e-commerce platform used by more than 4.1 million online stores around the world. It's ubiquitous. It's something that any one small business owner can download, install, and populate with products without ever knowing how to do a line of code.

However, the way we use it is highly customized beyond that. So the integrations, the payment system it links to, the inventory management, all those things are different.

Q. Okay. So what I understand you to say is Shopify, for example, is a software that millions of people use and that Big Thirst has customized, correct?

A. We have -- are we getting into sharing information that --

MS. GILSTRAP: Let's do this --

THE WITNESS: I thought we were done with software.

MS. GILSTRAP: Let's just do this on the video and --

BY MS. MOUSILLI:

Q. I'm not going to get into the specifics of how you use the software, but I'm asking you: Have you customized Shopify for Big Thirst?

MS. GILSTRAP: It's a yes-or-no question.

THE WITNESS: Yes.
BY MS. MOUSILLI:
Q. Okay. When Ms. Donoho was COO -- COO and director at Big Thirst, did she customize Shopify for Big Thirst's use?
A. In the aspects of choosing font size and placement of buttons, yes.
Q. Do you believe she did anything else to Shopify in order to customize it for Big Thirst?
A. The only other thing I know of is how it linked up to ShipStation.
Q. And what do you know about that link?
A. I know that we had to replace it. It wasn't connected correctly.
Q. Okay. So what do you know about Ms. Donoho's work in customizing Shopify for Big Thirst, Inc.?
A. In looking at the code, all I can see is that she did this straightforward formatting of changing font -- font size and colors.
Q. And is that all you believe that Ms. Donoho did in order to customize Shopify for Big Thirst's use?
A. That's my understanding.
Q. Let's kind of talk generally. What do you think it is that Ms. Donoho did in terms of creating a

tech stack for Big Thirst, Inc.?

A. What I think she did and what she did, she licensed software for Shopify and ShipStation, which takes orders and routes them for fulfillment. It is simply install them, connect them, set them up, ready to go.

For the dashboard, it was more work than that to ensure that the data from various sources, primarily Shopify for the first level of information, flowed in properly into Panoply, populated through Cumul and Heroku.

Q. Do you think Ms. Donoho's work required any kind of technical expertise?

A. In -- for that application, yes. And as she testified yesterday, some of that outstripped her ability.

Q. What outstripped her ability?

A. The ability to fully complete the project with installing Cumul.

Q. Was Cumul.io working when Ms. Donoho was a COO and director at Big Thirst?

A. Yes.

Q. And who worked on it besides Ms. Donoho?

A. Just Ms. Donoho.

Q. So did it outstrip her abilities?

A. She used tech support --

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 148 of 356

MS. GILSTRAP: So answer --
THE WITNESS: Yes.
MS. GILSTRAP: -- the question.
THE WITNESS: Yes.
BY MS. MOUSILLI:
Q. How is it that it outstripped her abilities if it was fully functioning?
A. She was not able to complete it without outside support.
Q. And who did she rely on for outside support?
A. Cumul tech support.
Q. So you're saying because she contacted customer support for an application, that outstripped her ability to work on the application?
A. She conveyed --
MS. GILSTRAP: Answer the question.
THE WITNESS: Yes.
BY MS. MOUSILLI:
Q. What were you going to say? She conveyed what?
A. She conveyed to me additional support.
Q. To who?
A. To me.
Q. And did she get that support?

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 149 of 356

A. She did.
Q. And was Cumul.io working?
A. After that, yes.
Q. Who paid invoices for services related to the technical aspects for Big Thirst when Ms. Donoho was COO and director?
A. Ms. Donoho set up the subscriptions and there were automated payments after that.
Q. What subscriptions did Ms. Donoho set up?
A. Shopify, ShipStation, Panoply, Heroku, Cumul.io.
Q. What was your involvement with these services while Ms. Donoho was COO and director at Big Thirst?
A. I was not directly involved in the setup or management of the systems.
Q. Who took over this responsibility after Ms. Donoho left Big Thirst?
A. No one took over the management of that data dashboard, as it was no longer available.
Q. What was no longer available?
A. That data dashboard was no longer available for us to manage.
Q. We'll get into that a little bit more later. Who managed the day-to-day business operations for

Big Thirst when Ms. Donoho was a COO and director at Big Thirst?

A. Ms. Donoho oversaw the operations.

Q. Can you elaborate on what you mean when you say she oversaw the operations?

A. Yes, for example, if -- when we got a new client, she set up their products in the store, got their website populated with the buy buttons, and connected to the shipping fulfillment software.

Q. What else did she do?

A. She maintained the dashboard and set up new clients on it.

Q. Okay. How much time each day do you think Ms. Donoho spent on the day-to-day business relations for Big Thirst?

A. She has never quantified that in a timesheet, so I don't know.

Q. How much time do you approximate?

A. I assume she worked eight-hour days.

Q. Okay. So these eight-hour days that Ms. Donoho worked, she was working on day-to-day business operations for Big Thirst?

A. From the time the company started. However, she has stated that Big Thirst, prior, was not her primary client and she had much more work with a

different staffing firm.

Q. How much time did you dedicate to the day-to-day operations for Big Thirst when Ms. Donoho was COO and director?

A. Approximately 45 to 50 hours a week.

Q. And what did you do in that capacity?

A. A lot of it was the relationships with the -- making sure we had set up with the retailers, working on relationships with various distributors, and a lot of customer prospecting, a lot of -- the majority of my work was on prospecting and pitching.

Q. Is there any record of the time that you spent?

A. I can produce all of my calendars and all of my communications.

MS. GILSTRAP: Answer the question.

THE WITNESS: Yes.

MS. GILSTRAP: Just answer the questions.

THE WITNESS: Yes.

MS. MOUSILLI: Okay. Lessie, if we can -- do you want to prepare your client better? Do you want to take a break? Because I don't want these kinds of interruptions when you're telling him to answer the question. Do you want to talk to him?

MS. GILSTRAP: I've never had someone to

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 152 of 356

tell me not to tell my client to -- but I'll stop and he can answer however he wants.

MS. MOUSILLI: Okay. Thank you.

BY MS. MOUSILLI:

Q. So again, is there any written record of the time you spent in day-to-day operations for Big Thirst?

A. Yes.

Q. Okay. And what are those records?

A. I have kept all of my email documentation. I have kept CRM documentation. I've kept calendar documentation.

Q. Who managed the day-to-day client relations when -- I'm sorry. Well, let me -- well, who managed the day-to-day client relations for Big Thirst when Ms. -- okay. Let me start again. Sorry. I just -- I apologize.

Okay. Who managed the day-to-day client relations when Ms. Donoho was a COO and director at Big Thirst?

A. We both had direct responsibility.

Q. Okay. How much did each person contribute? How much time did each person contribute?

A. I can't speak to her time. That was a primary aspect of my time.

Q. Did Big Thirst implement anything that

Ms. Donoho created while she was the COO and director at Big Thirst?

A. I don't understand your question. Could you restate, please?

Q. Did Big Thirst use any work that Ms. Donoho created when she was COO and director at Big Thirst?

A. Yes.

MS. GILSTRAP: Objection, form.

THE WITNESS: Yes, we used the data dashboard.

BY MS. MOUSILLI:

Q. What else did you use?

A. We uses the ShipStation and Shopify.

Q. Were there any formal agreements related to this use?

A. Other than the corporate documents, no.

Q. Is Big Thirst still using the tech stack that Ms. Donoho created?

A. No.

Q. Was Big Thirst ever told to stop using the tech stack that Ms. Donoho created?

A. Yes.

Q. When?

A. In late April of 2022.

Q. How did you receive that communication?

MS. GILSTRAP: Objection, form.

THE WITNESS: We received that communication via certified mail.

BY MS. MOUSILLI:

Q. What was that communication?

A. That Ms. Donoho issued a cease and desist.

Q. Okay. Did that communication come from my office?

A. I believe so.

Q. And what did that cease and desist letter say?

A. I don't recall it verbatim.

Q. What was the overall message about cease and desist?

MS. GILSTRAP: Objection, form.

THE WITNESS: The overall message was that you were unilaterally declaring that we were no longer allowed to use things that she had worked on.

BY MS. MOUSILLI:

Q. So you received a communication on behalf of Ms. Donoho instructing you and Big Thirst to stop using the tech stack that Ms. Donoho created, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: You said the tech stack that she created. We were not using a tech stack that she

created after we received that letter.
BY MS. MOUSILLI:
Q. At the time that you received the letter, was Big Thirst using Ms. Donoho's tech stack?
A. We were not using what you're calling a tech stack, no.
Q. What was Big Thirst using as opposed to that tech stack?
A. We used a variety of software applications that helped us get through until we could implement what we wanted to be using.
Q. Okay. And when did that happen?
A. We built a new data dashboard between July 2022 and September 2022.
Q. But in April 2022 -- prior to April 2022, what were you using?
MS. GILSTRAP: Objection, form.
THE WITNESS: We were not able to operate, update, maintain, or do anything to the data dashboard. So it was not something we used.
BY MS. MOUSILLI:
Q. You didn't use the data dashboard after Ms. Donoho resigned?
A. That's correct.
Q. You didn't use it in any capacity?

A. We used a portion -- one of the technologies in a way that was not the way it was used in the dashboard, but that software was licensed to Big Thirst and the ownership of Big Thirst and not as a part of a combined tech stack authored by Ms. Donoho.

Q. Did you use any part of the tech stack that Ms. Donoho created --

A. We --

Q. -- after she resigned?

A. -- temporarily used a program called Panoply and -- because we were given access to that by Ms. Donoho as part of the TI.

Q. What is DI?

A. The temporary injection.

Q. TI. So I just want to get the timeline that you're telling me straight. When did Ms. Donoho resign?

A. On April 7th, 2022.

Q. Okay. And after Ms. Donoho resigned, you're telling the jury that you stopped using her tech stack?

A. I had no access to that dashboard.

Q. That wasn't my question.

MS. MOUSILLI: Objection, nonresponsive.

BY MS. MOUSILLI:

Q. After Ms. Donoho resigned, did Big Thirst continue to use any aspect of the tech stack that Ms. Donoho created?
MS. GILSTRAP: Objection, form.
THE WITNESS: Are you asking if we used any software licensed to Big Thirst?
BY MS. MOUSILLI:
Q. I'm asking you if you used any aspect of the data dashboard that Ms. Donoho created after she resigned?
MS. GILSTRAP: Objection, form.
THE WITNESS: As I understand how you define tech stack -- it's a unified grouping of technologies. In that case, no.
BY MS. MOUSILLI:
Q. Did anyone at Big Thirst use any aspect of the data dashboard that Ms. Donoho created after she resigned?
A. As a unified dashboard, no.
Q. What do you mean by unified dashboard?
A. The way Ms. Donoho describes her dashboard is, it is a complex Rube Goldberg machine, I believe she called it, that works together in a very complex way to get results. We did not use that Rube Goldberg machine the way she built it. We used Panoply as a licensed

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 158 of 356

software to Big Thirst for a slightly -- well, for a different way within trying to do data results for our clients.

Q. Did any of your clients have access to the data dashboard that Ms. Donoho created after she resigned?

A. They had access to the data dashboard in a limited capacity. Meaning, that what was promised in Tier 2 and Tier 3 clients no longer worked as attributed -- as would be told to me by seven clients. And -- but there was the basic functionality of sales reports in those dashboards from the time she resigned until mid-May.

Q. To your understanding, did any of your client -- did any of Big Thirst's clients access the data dashboard that Ms. Donoho created after she resigned?

A. Yes.

Q. To your knowledge, did any of your clients -- I'm sorry. To your knowledge, did any of Big Thirst's clients access the data dashboard that Ms. Donoho created after you received the cease and desist letter from our offices?

A. I have no record of what those accesses were because I did not have visibility to the dashboard. My answer would be no.

Q. When was the first time that Ms. Donoho told you to stop using her tech stacks?

A. I believe that the copyright was filed on April 26th, and we received the letter after that.

(Sotto voce discussion.)

MS. GILSTRAP: Counsel, let's take a break.

MS. MOUSILLI: I'm sorry?

MS. GILSTRAP: We're going to take a break.

MS. MOUSILLI: Okay. So the rules are that we have to unilaterally [sic] agree to a break.

MS. GILSTRAP: We don't have to -- we -- there's no question pending. And you said, Do you need to take a break to talk to your client?

MS. MOUSILLI: Right.

MS. GILSTRAP: And I do.

MS. MOUSILLI: Okay. So --

(Crosstalk between parties.)

MS. MOUSILLI: I'm sorry. We need to agree to this together. We're still on the record. We're still on the record. Okay. So opposing counsel did not ask me for a break. She just unilaterally took the break. I want that to be clear on the record. Let's go off the record.

THE VIDEOGRAPHER: We're off the record at 1:08 p.m.

(A recess was taken at 1:08 p.m. to 1:12 p.m.)

THE VIDEOGRAPHER: Record No. 4, back on the record at 1:12 p.m.)
BY MS. MOUSILLI:
Q. Mr. McGinnis, was there ever a time that Ms. Donoho shut down the data dashboard that she had created for Big Thirst?
A. Yes.
Q. When was that?
A. April 2nd.
Q. And what was shut down?
A. My access to it, as well as functionality for Tier 2 and Tier 3 clients.
Q. Okay. When you say your access to it, are you referring to your viewing access of the data dashboard?
A. Yes.
Q. And does that mean the data dashboard was shut down just because you couldn't view it?
MS. GILSTRAP: Objection, form.
THE WITNESS: Yes.
BY MS. MOUSILLI:
Q. So just because you couldn't view it, you believe the data dashboard was shut down, correct?
A. Yes.
Q. Was Mark Shilling able to view the data

dashboard when Ms. Donoho resigned?
A. In a limited capacity.
Q. What did you do about Ms. Donoho removing your viewing access to the data dashboard?
A. I informed my attorney.
Q. And what did you do next?
A. We filed a temporary injunction.
Q. What specifically about the data dashboard was not functioning, according to you, besides your viewing access?
A. The promised aspects of having data analytics for Facebook and Google were no longer there.
Q. When you say promised, what does that mean?
A. It means that that's how we sold Tier 2 and Tier 3 subscriptions, and it was not in the data dashboards for clients after that point.
Q. Do you believe it was part of the data dashboard before Ms. Donoho resigned?
A. That is how she represented it to clients and to me, yes.
Q. Were those representations in writing anywhere?
A. Yes.
Q. Where?
A. In all agreements signed with clients.

Q. What agreements are you referring to?
A. The annual agreements of contract of what they receive for them in membership dues.
Q. Let's talk about the replacement of the data dashboard that you allege happened. Did you ever replace the data dashboard that Ms. Donoho created for Big Thirst?
A. Yes.
Q. How?
A. We built a completely new dashboard with completely different underlying technology.
Q. When?
A. Beginning July 1st, 2022.
Q. And why was a new data dashboard created?
A. Because the old one was not possible to use at all.
Q. Who was involved in creating the new data dashboard for Big Thirst on July 1st, 2022?
A. The primary architect was Edson Espindola.
Q. And is this the data dashboard that you claim you paid about $42,000 for?
A. Correct.
Q. Was Big Thirst ever asked to cease using any intellectual property by anyone?
MS. GILSTRAP: Objection, form.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 163 of 356

THE WITNESS: Ms. Donoho requested that.

BY MS. MOUSILLI:

Q. Was Big Thirst ever told to stop using a copyright by anyone?

MS. GILSTRAP: Objection, form.

THE WITNESS: Ms. Donoho requested that.

BY MS. MOUSILLI:

Q. When was the request to stop using Ms. Donoho's copyright to the website received by Big Thirst?

A. I don't have the date.

Q. Approximately?

A. Approximately, end of April, beginning of May.

Q. Did Big Thirst stop using the copyrighted website that Ms. Donoho asked for it to stop using?

A. Yes.

Q. When did Big Thirst stop using the copyrighted website that Ms. Donoho created?

A. We built a new website. It was live in June or the beginning of July.

Q. So the beginning of June of what year did you start using --

A. 2022.

Q. Okay. I'm sorry. You need to wait for my

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 164 of 356

question. Beginning of what year -- what is the month and the year that Big Thirst started to use a new website that didn't infringe on Ms. Donoho's copyright?

MS. GILSTRAP: Objection, form.

THE WITNESS: We built a new website and it was live in June or July of 2022.

BY MS. MOUSILLI:

Q. How did the website that you claim replaced the website that Ms. Donoho copyrighted differ from hers?

MS. GILSTRAP: Objection, form.

THE WITNESS: It was built with a different theme. It was built with different information and had a different navigation.

BY MS. MOUSILLI:

Q. Did it have a different logo?

A. No, it did not.

Q. Was the content different?

A. Yes.

Q. How was it different?

A. It was greatly reduced and rewritten.

Q. What fiduciary duties did Ms. Donoho have to Big Thirst when she was a -- the COO and director?

MS. GILSTRAP: Objection, form.

THE WITNESS: The fiduciary duties of officers are outlined in our bylaws.

BY MS. MOUSILLI:

Q. And what are those?

A. To uphold the fulfillment of their duties of not precluding any commerce, any sales, or to impede any customer getting their services.

Q. Are those the only duties that Ms. Donoho owed to Big Thirst, Inc.?

MS. GILSTRAP: Objection, form.

THE WITNESS: I don't know the totality without reading it in front of me.

BY MS. MOUSILLI:

Q. How did Ms. Donoho fail to meet these duties?

A. Ms. Donoho shut down my ability to manage an integral part of the business: In particular, locking me out of Shopify, which processed orders; ShipStation, routing orders, which led to numerous orders being stuck and not being able to route to retail fulfill -- fulfillment; and out of PayPal, which didn't allow me to move payments to retailers.

Q. How do you know that Ms. Donoho locked you out of these applications?

A. It's well documented in court.

Q. That wasn't my question. How do you know that Ms. Donoho locked you out of these applications?

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 166 of 356

MS. GILSTRAP: Objection, form.
THE WITNESS: Ms. Donoho changed the passwords and I no longer had access.
BY MS. MOUSILLI:
Q. Did that stop Big Thirst from being able to do any business?
MS. GILSTRAP: Objection, form.
THE WITNESS: It greatly impeded our business.
BY MS. MOUSILLI:
Q. In your claim -- in your loss, you claim Ms. Donoho placed her own interest above Big Thirst; isn't that correct?
A. Correct.
Q. Okay. And how did she do that?
A. By claiming that the Big Thirst dashboard and the software we used to operate e-commerce were her own and shutting them off for the company to use.
Q. Were they her own?
A. No, they were not.
Q. But she was able to obtain a copyright, correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: I do not know how that happened.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 167 of 356

BY MS. MOUSILLI:
Q. How did Ms. Donoho fail to refrain from self-dealing with Big Thirst?
A. Could you restate that question?
Q. In your lawsuit you claim that Ms. Donoho failed to refrain from self-dealing with Big Thirst, correct?
A. Correct.
Q. And how -- how did that self-dealing occur?
MS. GILSTRAP: Objection, form.
THE WITNESS: Ms. Donoho chose to remove access to critical software for her own use.
BY MS. MOUSILLI:
Q. And is that what you believe self-dealing is?
A. Yes.
Q. How was Ms. Donoho disloyal to Big Thirst?
MS. GILSTRAP: Objection, form.
THE WITNESS: Ms. Donoho chose to shut down the operations in spite.
BY MS. MOUSILLI:
Q. In spite of what?
A. In spite of the company. She wanted to seek retribution for not getting a larger share in the company.

Q. Okay. Do you believe that Ms. Donoho wasn't supposed to compete with Big Thirst?
A. We did not ask her not to compete.
Q. Do you believe Ms. Donoho competed with Big Thirst?
A. Yes.
Q. When?
A. Beginning in July 2022, and commencing through July 2023.
Q. Is that after she resigned from Big Thirst?
A. Yes.
Q. So earlier you said that when Big Thirst was initially formed, there were a few people on the board: Yourself, Ms. Donoho, Mark Shilling, and Suzanne McGinnis, correct?
A. Correct.
Q. Okay. Was anybody added to the board after Ms. Donoho resigned?
A. We did not add to the board of directors.
Q. After Ms. Donoho resigned, were any changes made to any person's interest in Big Thirst?
A. Yes.
Q. Who?
A. We added two advisors.
Q. Okay. And how did that affect other

people's interest in Big Thirst?
MS. GILSTRAP: Objection, form.
THE WITNESS: It allowed us to get industry expertise to improve our operations.
BY MS. MOUSILLI:
Q. Okay. Did you -- do you recall receiving a demand for inspection of Big Thirst records from Ms. Donoho?
A. Yes.
Q. Okay. When did you receive it?
A. I don't recall any dates.
Q. Approximately?
A. I don't recall any dates, and I believe it was more than once.
Q. Was it this year?
A. I believe; also, in 2023 and 2024.
Q. Okay. Did Big Thirst ever respond to Ms. Donoho's request?
A. We complied with all requests for books and records.
Q. And when did Big Thirst respond?
A. I don't recall the dates.
Q. Do you recall that there was a six-month delay between when Ms. Donoho requested the books and records and when Big Thirst provided those books and

records?

A. I rely on my attorneys to follow the procedures, and I knew that there were some discrepancies in the way things were handled and when -- the timeline for when things were done.

MS. MOUSILLI: Objection, nonresponsive.

BY MS. MOUSILLI:

Q. Mr. McGinnis, are you aware that there was a six-month delay between the time Ms. Donoho requested the books and records of Big Thirst and when they were delivered to her?

A. I don't know the timeline.

Q. Do you know that there was a several-month delay between the time Ms. Donoho requested the books and records of Big Thirst, Inc. and the time that Big Thirst, Inc. delivered those books and records?

A. I don't know what the delay is and what you consider several months.

Q. Who was involved in the collection of information that Ms. Donoho requested?

A. The law firms representing Big Thirst.

Q. And who from Big Thirst was providing those documents to the law firm?

A. I was.

Q. Okay. Anybody else?

A. No.
Q. What was Ms. Donoho's interest reflected in those books and records?
MS. GILSTRAP: Objection, form.
THE WITNESS: Ms. Donoho's shares have not changed from the inception and when they were issued to today.
BY MS. MOUSILLI:
Q. When Ms. Donoho first joined Big Thirst, what were her shares?
A. When the shares were issued to her, the allocation was 2,700,000 shares that remains today.
Q. 2.7 million shares were issued to Ms. Donoho when she first joined Big Thirst, correct?
A. They were codified, in agreement with a law firm, in June of 2022 and formally issued by the state in October of the same year.
Q. And you're saying until today, she still has 2.7 million shares in Big Thirst, Inc., correct?
A. That's correct.
Q. Okay. How has the value of Ms. Donoho's shares changed from when they were initially given to her until today?
MS. GILSTRAP: Objection, form.
THE WITNESS: The value is based on market

value, which we don't know.

BY MS. MOUSILLI:

Q. That wasn't my question. How has the value changed from when Ms. Donoho first received her 2.7 million shares until today?

MS. GILSTRAP: Objection, form.

THE WITNESS: Are you asking for what these shares are worth?

BY MS. MOUSILLI:

Q. I'm asking what the value -- or the value -- what was -- what was the value of Ms. Donoho's 2.7 million shares when she first joined Big Thirst?

MS. GILSTRAP: Objection, form.

THE WITNESS: Are you asking if that is for percentage of the company?

BY MS. MOUSILLI:

Q. Correct.

A. Okay. We issued an additional 4,000 shares in the summer of 2022 to be able to have shares to recruit top-notch advisors to our team.

Q. How many additional shares did you issue in the summer of 2022?

A. 4,000 shares.

Q. And what did that issuance do to the value of Ms. Donoho's shares?

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 173 of 356

MS. GILSTRAP: Objection, form.

THE WITNESS: It reduced the value of total ownership of my shares and her shares.

BY MS. MOUSILLI:

Q. How is Big Thirst going to compensate Ms. Donoho for her work as COO?

MS. GILSTRAP: Objection, form.

THE WITNESS: Should there be a liquidity event, the shares will be worth money and then she can collect on that.

BY MS. MOUSILLI:

Q. Okay. So there was never any actual money paid to Ms. Donoho from the inception of Big Thirst until today, correct?

A. She was --

MS. GILSTRAP: Objection -- wait. Objection, form.

THE WITNESS: She would have received her first paycheck on March 17, 2022, had she not shut down the loan.

BY MS. MOUSILLI:

Q. So because she didn't agree to be a guarantor on this loan, you punished her?

MS. GILSTRAP: Objection, form.

BY MS. MOUSILLI:

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 174 of 356

Q. Correct?
A. I did not punish Ms. Donoho, no.
Q. Then why didn't she receive compensation?
A. Because we could not apply for the loan without her.
Q. So again, as we sit here today, Ms. Donoho has not received any actual monetary compensation for her work as COO and director for Big Thirst, correct?
A. She made a choice to preclude herself from getting paid.
Q. That wasn't my question.
MS. MOUSILLI: Objection, nonresponsive.
THE WITNESS: No.
BY MS. MOUSILLI:
Q. Was Ms. Donoho ever compensated for her intellectual property by Big Thirst, Inc.?
MS. GILSTRAP: Objection, form.
THE WITNESS: She received 2,700,000 shares for compensation.
BY MS. MOUSILLI:
Q. Okay. Earlier you said she received 2.7 million shares for her role as COO and director, correct?
A. Yes. And that is in totality within that role, incorporates creating the technology for the company. That was the agreement.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 175 of 356

Q. Is that your belief?
A. Yes.
Q. Was Ms. Donoho ever repaid for her monetary capital contributions?
A. No.
Q. And that initial monetary contribution was a loan from her father to Big Thirst, correct?
MS. GILSTRAP: Objection --
THE WITNESS: No.
MS. GILSTRAP: -- form.
BY MS. MOUSILLI:
Q. How is that incorrect?
A. That was a loan to her.
Q. From?
A. From her father.
Q. Which Big Thirst promised to repay to her?
MS. GILSTRAP: Objection, form.
THE WITNESS: We would have paid it back to Lauren Wylie.
BY MS. MOUSILLI:
Q. What losses did Big Thirst allegedly suffer from the alleged loss of use of the data dashboard?
A. We had to purchase software and pay time to contractors and employees to rebuild it.
Q. Okay. And is that the 40 -- approximately

$42,000 in damages that we talked about earlier?
A. Correct.
Q. Okay. What are Big Thirst's profits for 2021?
A. We have --
MS. GILSTRAP: Objection, form.
THE WITNESS: We have no profit.
BY MS. MOUSILLI:
Q. What were Big Thirst's profits for 2022?
A. We had no profit.
Q. What were Big Thirst's profits for 2023?
MS. GILSTRAP: Objection, form.
MS. MOUSILLI: What was your objection?
MS. GILSTRAP: Objection, form.
THE WITNESS: We have no profit.
BY MS. MOUSILLI:
Q. What were Big Thirst's profits for 2024, as of today?
MS. GILSTRAP: Objection, form.
THE WITNESS: We have no profit.
BY MS. MOUSILLI:
Q. What were -- what are Big Thirst's revenues for 2021?
MS. GILSTRAP: Objection, form.
THE WITNESS: For 2021, I don't recall the

total revenue number. It was very low.

BY MS. MOUSILLI:

Q. Okay. Do you know an approximate number for the revenues in 2021 for Big Thirst?

MS. GILSTRAP: Objection, form.

THE WITNESS: I don't know an approximate number for 2021.

BY MS. MOUSILLI:

Q. Do you know the approximate revenue for Big Thirst in 2022?

MS. GILSTRAP: Objection, form.

THE WITNESS: The approximate revenue for 2022 is about $20,000 per month.

BY MS. MOUSILLI:

Q. Okay. What were the approximate revenues for Big Thirst for 2023?

MS. GILSTRAP: Objection, form.

MS. MOUSILLI: What was the basis for your objection?

MS. GILSTRAP: Because you're not identifying what kind of revenues you're talking about. I have no idea. Revenue is a very broad term that can mean a lot of different things, and you're not being specific.

MS. MOUSILLI: Okay. You can just be more concise with your answer. That's -- okay.

BY MS. MOUSILLI:
Q. Matt McGinnis, what do you understand me to say when I say revenue for Big Thirst?
A. Total revenue from all sources.
Q. Okay. So I'm going to ask you again: What is the Big -- what is the amount of revenue for Big Thirst, Inc., total revenue for 2023?
A. Approximately 20,000 per month.
Q. What are the total revenues for Big Thirst, Inc. for 2024?
A. Well, excuse me, for 2023, the approximate revenues are $46,000 per month. And for 2024, for first quarter, so far we're averaging about 20,000 per month.
Q. What are the line items included for revenue?
A. Again, I am uncomfortable answering with a competitor in the room.
MS. GILSTRAP: Counsel, so we can go AEO if you want him to answer these questions.
(Sotto voce discussion.)
AEO DESIGNATION BEGINS
<-- CONFIDENTIAL

Transcript of Matthew John McGinnis
Conducted on March 28, 2024 178

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
WYLIE 446

391

-->

AEO DESIGNATION CONCLUDES

BY MS. MOUSILLI:

Q. When did Ms. Donoho resign from Big Thirst?

A. April 7th, 2022.

Q. And what did she do when she resigned?

MS. GILSTRAP: Objection, form.

THE WITNESS: Could you restate the question?

BY MS. MOUSILLI:

Q. What did Ms. Donoho do when she resigned?

MS. GILSTRAP: Objection, form.

THE WITNESS: Do you mean did she go care for her child? I don't know any --

BY MS. MOUSILLI:

Q. Okay. Anything and everything that Ms. Donoho did, that you're aware of, what did she do --

A. To Big Thirst?

Q. To Big Thirst. Sure.

A. Okay. So she changed the passwords and locked us out of GoDaddy -- the full list is already documented in court, but to GoDaddy, to PayPal, to ShipStation, to Stripe, to Heroku, to Cumul.io, to Panoply, to Auth0 -- to pretty much all things that we

used to operate the business, she locked me out of them to preclude me from continuing business operations.

Q. And what did you do in response?

A. We sought a temporary injunction to get access back to the software that we use to operate Big Thirst.

Q. What is a lawsuit, to your knowledge? What does that term mean?

MS. GILSTRAP: Objection, form.

THE WITNESS: It's a legal term that I don't have the exact wording for. In my understanding, it is seeking remedy in court for an action taken by another party.

BY MS. MOUSILLI:

Q. Okay. Do you believe lawsuits are public?

A. They are public.

Q. Do you believe information contained in lawsuits can be seen by the public?

A. Yes, I know they can.

Q. When did you decide to file a lawsuit against Ms. Donoho?

A. When we were no longer able to operate the business based on her shutting me out of all systems.

Q. Do you remember a date?

A. I believe it was April 12th.

Q. Do you remember yesterday when your attorney was talking to Ms. Donoho and was questioning her at her deposition? Do you remember that?
A. Yes, I remember her questioning --
Q. You were present, right?
A. Yes, I was present.
Q. And do you remember your attorney telling Ms. Donoho, Oh, well, what did you expect when you filed a lawsuit for this; weren't you expecting it to be public and all over the Internet? Do you remember that line of questioning?
A. I remember that, yes.
Q. Do you remember how it seemed like your attorney was somehow blaming Ms. Donoho for making this information related to this lawsuit public?
MS. GILSTRAP: Objection, form.
BY MS. MOUSILLI:
Q. Do you remember that?
A. I don't know what she was thinking, no. I can't speculate.
Q. Okay. But do you remember that line of questioning?
A. I do.
Q. Okay. And how she somehow made Ms. Donoho -- or she tried to make Ms. Donoho feel like she initiated

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 183 of 356

this lawsuit. Do you remember that?

MS. GILSTRAP: Objection, form.

THE WITNESS: I don't know the intent of her question.

BY MS. MOUSILLI:

Q. Okay. Do you remember how she said, Well, what do you expect when you flip this -- quote, flip this lawsuit into federal court, that this -- that the public would have information related to this litigation, correct?

A. That is correct.

Q. But it is, in fact, you that initiated litigation, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: I did not initiate lawsuits in federal court.

BY MS. MOUSILLI:

Q. Who is it that initiated this -- the instant litigation?

A. I initiated the temporary injunction to get our company up and running again.

Q. Okay. That's litigation in state court, correct?

A. Correct.

Q. And that's public information, correct?

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 184 of 356

A. Correct. It was our --

Q. I'm sorry. There's no question right there.

Was -- did the Big Thirst board meet to discuss filing a lawsuit against Ms. Donoho?

A. Yes.

Q. And who was present at that meeting?

A. All three board members; Mark Shilling, Suzanne McGinnis, Matt McGinnis.

Q. And when did the board of directors meet in order to discuss filing a lawsuit against Ms. Donoho?

A. I would have to refer to my record.

Q. Well, prior to the filing of the lawsuit or after?

A. We met numerous times in emergency meetings because the situation was evolving very quickly. I don't know the exact dates.

Q. I'm not asking you for exact dates. I'm asking you when the board met to discuss filing a lawsuit against Ms. Donoho, whether it was before the lawsuit was filed or after?

A. I believe it was before.

Q. Okay. Was there a corporate resolution authorizing the lawsuit by Big Thirst against Ms. Donoho?

A. There was no formal corporate resolution.

Q. And why not?
A. It was a need of immediacy to get the company back on -- on track and operating again.
Q. To date, has there ever been a corporate resolution authorizing the lawsuit by Big Thirst against Ms. Donoho?
A. There have been board votes to move forward with the lawsuit, yes.
Q. And when was that created?
A. Each board meeting.
Q. And what was the substance of those corporate resolutions?
MS. GILSTRAP: Wait. I'm going to object and instruct you not to answer because this is going to start getting into privilege when you're asking about the substance of conversations about the lawsuit and the board.
BY MS. MOUSILLI:
Q. Okay. I'm not asking you about any conversations you had with your attorneys.
MS. GILSTRAP: Nor with the board members. It's party communications. It's going to be covered -- and we can fight about that later, but I'm not going to have him testify about the substance of communications during board meetings regarding the lawsuit.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 186 of 356

MR. MOUSILLI: They're not communications. They're resolutions that we should have already had.
MS. GILSTRAP: If they exist.
MS. MOUSILLI: Well, your client is saying they exist. So either he's lying or you are.
MS. GILSTRAP: Ask him.
BY MS. MOUSILLI:
Q. Okay. Mr. McGinnis, do corporate resolutions exist regarding the instant litigation against Ms. Donoho?
MS. GILSTRAP: Objection, form.
THE WITNESS: Decisions were made and reflected in our minutes.
BY MS. MOUSILLI:
Q. Okay. Did you provide those minutes to your attorney?
A. They have not been requested.
Q. Your attorney did not request these documents from you?
A. No.
Q. Okay. So as I understand you, you said that there were board meetings prior to the filing of the instant litigation, correct?
A. Correct.
Q. The initial filing of the instant

litigation, correct?

A. I stated that I don't know the exact date. My recollection is we met several times and we needed to move quickly because it was time -- it was of the essence to get the company up and running again. We had a planned meeting for April 12th. I don't know if that occurred before or after. I think it was concurrent with filing the lawsuit.

Q. Before you filed the lawsuit and you had these board meetings, was Ms. Donoho invited to these board meetings?

A. Ms. Donoho was invited to all board meetings while she was an officer.

Q. Including the -- the board meeting to initiate a litigation against her?

A. She was invited to a board meeting that was intended to resolve the situation. She resigned before that board meeting was held.

Q. Okay. So again, what was the date that she resigned? What date did Ms. Donoho resign from Big Thirst, Inc.?

A. She resigned as an officer on April 7th and as an -- excuse me, as a director on April 11th.

Q. And what date was the lawsuit filed?

A. I don't have that in front of me.

MS. GILSTRAP: You do.
THE WITNESS: I do. Okay.
BY MS. MOUSILLI:
Q. Was the lawsuit filed before or after Ms. Donoho resigned as COO of Big Thirst, Inc.?
A. This is on April 12th, so it was after.
Q. Yet at that time, Ms. Donoho was still a board member, correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: She resigned because she did not want to attend the board meeting.
BY MS. MOUSILLI:
Q. Okay. That wasn't my question. When the lawsuit was initiated against Ms. Donoho, she was still a board member --
MS. GILSTRAP: Objection --
BY MS. MOUSILLI:
Q. -- correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: Incorrect, no.
BY MS. MOUSILLI:
Q. What's incorrect about that statement?
A. It was the next day.
Q. What was the next day?
A. The lawsuit was filed the next day.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 189 of 356

Q. The day after Ms. Donoho resigned as a director, the lawsuit was initiated?
A. Yes, but the actions that precipitated it started on April 7th.
Q. Did you ever have any board meetings without Ms. Donoho when Ms. Donoho was COO and director at Big Thirst, Inc.?
A. No.
Q. What were you seeking to achieve from your lawsuit when you filed it initially?
A. To regain the operations of the primary technologies, to take order -- process orders and collect payment.
Q. Okay. So you really wanted the credentials to the various platforms, correct?
A. Correct.
Q. Okay. So when you filed the lawsuit, you knew the filing would be public to everyone, correct?
A. Correct.
Q. And you didn't care that it would be public to everyone, correct?
A. That's not accurate.
Q. What's not accurate?
A. I did care, but we felt forced into it.
Q. And through the filing of that lawsuit, you

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 190 of 356

didn't care that you would be marring the reputation of Ms. Donoho, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: That is not correct.

BY MS. MOUSILLI:

Q. What's not correct about that statement?

A. It was not my intention to mar the reputation of anybody. It was my intention to keep our company from failing at her hands.

Q. Okay. So as I understand you today, the monetary damages that you're seeking from Ms. Donoho is the new tech stack that was created by Big Thirst, Inc. after Ms. Donoho resigned, correct?

A. Correct.

Q. And the value of that tech stack, you believe, is about 42,000, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: The cost to create that.

BY MS. MOUSILLI:

Q. Is 42,000?

A. Correct.

Q. And that's how much you're seeking from Ms. Donoho?

A. Correct.

Q. Okay. But when Big Thirst, Inc. filed a

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 191 of 356

lawsuit against Ms. Donoho, the data dashboard was still working, correct?

A. If I'm not able to operate it and maintain it, it is not working.

Q. Okay. You're -- you were able to view the data dashboard when you filed the lawsuit against Ms. Donoho, correct?

A. Incorrect.

Q. Okay. You were unable to view the data dashboard when you initiated a lawsuit against Ms. Donoho?

A. No. It was --

Q. Which statement is correct? You were unable or were you able to see --

A. I was not able to.

Q. You were not able to see the data --

A. I was not able to --

MS. GILSTRAP: Stop. You're talking over each other.

THE REPORTER: No talking over each other, please.

BY MS. MOUSILLI:

Q. Were you able to view the data dashboard when Ms. Donoho resigned?

A. No.

Q. So in response, you filed a lawsuit,

correct?
A. Filed a lawsuit in response to being locked out of all technologies.
Q. Yet the data dashboard were still working, correct?
MS. GILSTRAP: Objection, form.
BY MS. MOUSILLI:
Q. When Ms. Donoho resigned?
MS. GILSTRAP: Objection, form.
THE WITNESS: The data dashboard was not working at the level that I could maintain it.
BY MS. MOUSILLI:
Q. In fact, after Ms. Donoho resigned, you sent her an email asking her to add another client, despite the fact that she had resigned, correct?
A. Correct.
Q. And you asked her to add that client to the data dashboard, correct?
A. Correct.
Q. So the data dashboard was working after Ms. Donoho resigned; isn't that true?
MS. GILSTRAP: Objection, form.
THE WITNESS: Without my ability to manage it, it was worthless.
BY MS. MOUSILLI:

Q. In your opinion, correct?
MS. GILSTRAP: Objection, form.
BY MS. MOUSILLI:
Q. In your opinion, without your ability to manage the data dashboard, it was valueless?
A. As the only --
MS. GILSTRAP: Objection, form.
THE WITNESS: If the only employee working for the company can't access the key piece of technology, it's worthless.
BY MS. MOUSILLI:
Q. Do you believe Ms. Donoho owed Big Thirst a fiduciary duty?
A. As an officer and a director, anybody who's an officer and a director has a fiduciary duty.
Q. Okay. So was Ms. Donoho a fiduciary to Big Thirst after she resigned in April 2022?
MS. GILSTRAP: Objection, form.
THE WITNESS: Ms. Donoho had a fiduciary duty while still an officer through April 11th.
BY MS. MOUSILLI:
Q. So again, was Ms. Donoho a fiduciary to Big Thirst after she resigned in April 2022?
MS. GILSTRAP: Objection, form.
THE WITNESS: She did not have a fiduciary

duty after she resigned on April 11th.

BY MS. MOUSILLI:

Q. So the answer is yes or no. Was Ms. Donoho a fiduciary to Big Thirst after she resigned in April of 2022?

A. Would you please arrange your question with the exact date of April 11th?

Q. Sure. Was Ms. Donoho -- was Ms. Donoho a fiduciary to Big Thirst after she resigned on April 11th, 2022?

A. No.

Q. Did Ms. Donoho still owe a fiduciary duty to Big Thirst after she resigned on April 11th, 2022?

A. I answered no.

Q. That was a different question. Did you -- do you agree that Ms. Donoho can't breach her fiduciary duty to Big Thirst if she didn't owe Big Thirst a fiduciary duty?

MS. GILSTRAP: Objection, form.

THE WITNESS: It's a circular question.

BY MS. MOUSILLI:

Q. It's a yes-or-no question. Do you agree that Ms. Donoho can't breach her fiduciary duty to Big Thirst if she didn't owe Big Thirst a fiduciary duty?

MS. GILSTRAP: Objection, form.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 195 of 356

THE WITNESS: No.
BY MS. MOUSILLI:
Q. You don't agree?
A. She doesn't have fiduciary duty, if she doesn't have fiduciary duty.
Q. Ms. Donoho is only liable to Big Thirst for breaching a fiduciary duty during the time she has a fiduciary duty, correct?
A. That is my understanding of the law.
Q. So after April 11th, 2022, Ms. Donoho did not owe Big Thirst a fiduciary duty, correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: That's correct.
BY MS. MOUSILLI:
Q. Do you allege that there are any nonmonetary damages that Big Thirst allegedly suffered due to Ms. Donoho's conduct?
MS. GILSTRAP: Objection, form.
THE WITNESS: There were -- we suffered reputation damage, considerably. We ended up losing clients because of it and word of mouth was negative because of the turmoil it created with -- through her actions.
BY MS. MOUSILLI:
Q. What clients do you -- did you allege --

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 196 of 356

did Big Thirst allegedly lose?
A. We lost Rainbow Unicorn Vodka, Twin Valley, and Little Toad Creek. They all -- all quit because they didn't have access to what they needed within the dashboard, and they couldn't fulfill the orders that were processed through ShipStation because they were stuck. And they were incredibly frustrated because those things were locked down.
Q. Okay. I have here Rainbow, Twin Valley -- and what's the third?
A. Little Toad Creek.
Q. Little Tow Creek?
A. Toad.
Q. Little Toad Creek. Besides those three clients, did Big Thirst lose any other clients, allegedly, due to Ms. Donoho's conduct?
A. We had seven other clients that we had to reduce from Tier 3 or Tier 2 clients because they didn't have access to the dashboard as they were promised.
Q. And how long were they reduced from Tier 2 to Tier 3?
A. Perpetually.
Q. Have you ever made any disparaging comments or statements about Ms. Donoho after she resigned to anyone?

MS. GILSTRAP: Objection, form.
THE WITNESS: I don't recall any.
BY MS. MOUSILLI:
Q. Did you ever talk to any customers -- did you ever talk to any Big Thirst customers about Ms. Donoho?
MS. GILSTRAP: Objection, form.
THE WITNESS: Clients asked about why things weren't happening and where she was.
BY MS. MOUSILLI:
Q. And what was your response?
A. That she had resigned and we were trying to fix things as we could.
Q. Do you ever recall telling Ms. Donoho you would convert Big Thirst into a sole proprietorship if she wouldn't sign the guarantor papers?
MS. GILSTRAP: Objection, form.
THE WITNESS: That was a thing made in frustration. It was absolutely not a possibility. I didn't have the authority to do so, and never followed through with anything like that. I followed up immediately with other resolutions.
MS. MOUSILLI: Okay. Let's go ahead and take a short break.
THE VIDEOGRAPHER: We're off the record at

1:53 p.m.
(A recess was taken at 1:53 p.m. to 2:19 p.m.)
THE VIDEOGRAPHER: This is Segment No. 5. We're back on the record at 2:19 p.m.
BY MS. MOUSILLI:
Q. Mr. McGinnis, we're back after a break, but you're still under oath. Do you understand that?
A. Yes.
Q. Was Ms. Lauren Donoho ever invited to any of Big Thirst's shareholder meetings?
A. Yes.
Q. Which meetings?
A. We had hold -- held two shareholders' meetings and she has attended both.
Q. What were the dates of those meetings?
A. The end of March of 2023 and the end of March 2024.
Q. Is there any documentation to that effect?
A. Yes.
Q. What documentation?
A. That we send out notice or that she attended?
Q. Is there -- what documentation exists that Ms. Donoho attended these two meetings that you just

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 199 of 356

referenced?
A. There's documentation in the form of her joining the Zoom meetings, showing that she has attended.
Q. Okay. Besides those two shareholder meetings, when -- at the end of March 2023 and the other at the end of March 2024, were there any other shareholder meetings that Ms. Donoho was invited to?
A. No. We have only held annual shareholder meetings.
Q. Was there an annual shareholder meeting held in 2022?
A. There was not.
Q. Was there an annual shareholder meeting held in 2021?
A. There was not.
Q. Besides annual shareholder meetings, what other meetings does Big Thirst's board -- Big Thirst's board have?
A. We have quarterly scheduled board meetings and we have biannual advisory board meetings.
Q. And when did those meetings start happening?
A. The first Big Thirst board meeting was in January 2022.
Q. Was Ms. Donoho invited to the January 2022

board meeting?
A. Yes, and she was in attendance.
Q. So is it your testimony today that Ms. Donoho has been invited to every single board meeting for Big Thirst since she joined until today?
MS. GILSTRAP: Objection, form.
THE WITNESS: No, I'm not saying that. She's been invited to every single board meeting while she was an officer.
BY MS. MOUSILLI:
Q. And after Ms. Donoho ceased being an officer, was Ms. Donoho invited to any shareholder meetings?
A. Shareholder -- all shareholder meetings, yes.
Q. Okay. After Ms. Donoho resigned, was she invited to any board meetings at Big Thirst?
A. She was invited to a board meeting that was held shortly after she resigned as a board member, but did not attend.
Q. After that board meeting, was she ever invited as a -- to a board meeting --
A. No.
Q. -- of Big Thirst? When did you first create a bank account for Big Thirst?

A. The bank account at Frost Bank was started -- I'm going to say August of 2021.
Q. That was more than five months after Big Thirst's incorporation, correct?
A. Yes.
Q. Why did you wait so long?
A. We were not operating as a company.
Q. What do you mean you weren't operating as a company?
A. We didn't begin operations of the business until October 6th, 2021. We didn't have clients. We didn't have revenue.
Q. You didn't have clients and you didn't have revenues, but did you have expenses?
A. Yes.
Q. And how were those expenses paid if there was no Big Thirst bank account?
A. We didn't have significant expenses for the company prior to that, and the expenses were paid by either Ms. Donoho or by me.
Q. From which bank account were those expenses --
A. From our personal --
Q. I'm sorry. From which bank accounts were those expenses that Big Thirst incurred paid by -- paid

from?

A. I believe by our personal accounts.

Q. Who transferred the domain, bigthirst.com from Ms. Donoho's account after she resigned?

A. I did.

Q. On what date did you do that?

A. It was in mid-May. I believe it was May 10th.

Q. Of what year?

A. 2022. On the 19th.

Q. Do you know what effect transferring the domain from Ms. Donoho's account to yours had on the data dashboard?

A. Yes.

Q. What was that effect?

A. It lost all historic connections; and therefore, the data dashboard was rendered inoperable.

Q. And who rendered it inoperable?

MS. GILSTRAP: Objection, form.

THE WITNESS: The action was taken by GoDaddy, they did not back up historical data, and that -- it rendered it inoperable.

BY MS. MOUSILLI:

Q. So isn't it because you transferred the domain from Ms. Donoho's account, the action that you

took, that rendered the data dashboard inoperable?

A. Ms. Donoho --

MS. GILSTRAP: Objection, form.

THE WITNESS: Ms. Donoho was in contempt of court by not providing that access. That access had to be done. I took it upon myself to do that to protect the integrity and growth of the company.

MS. MOUSILLI: Objection, nonresponsive.

BY MS. MOUSILLI:

Q. Mr. McGinnis, you transferred the bigthirst.com domain from Ms. Donoho's account to yours, and that rendered the data dashboard inoperable, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: A result of that was that it was rendered inoperable.

BY MS. MOUSILLI:

Q. Did you know that that caused the data dashboard to break?

MS. GILSTRAP: Objection, form.

THE WITNESS: I did not anticipate that. I learned that later.

BY MS. MOUSILLI:

Q. Did you know that also caused the website to break?

MS. GILSTRAP: Objection, form.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 204 of 356

THE WITNESS: The -- the website, to my knowledge, was -- if down, was momentarily.

BY MS. MOUSILLI:

Q. Did you know that transferring the bigthirst.com domain from Ms. Donoho's account to yours also caused the corporate emails to break?

A. That was --

MS. GILSTRAP: Objection, form.

THE WITNESS: Yes.

BY MS. MOUSILLI:

Q. Yet you told a federal judge that Ms. Donoho broke the data dashboard, didn't you?

MS. GILSTRAP: Objection, form.

THE WITNESS: That is accurate.

BY MS. MOUSILLI:

Q. Was that a misstatement?

MS. GILSTRAP: Objection, form.

THE WITNESS: No, it was not.

BY MS. MOUSILLI:

Q. How was that not a misstatement?

MS. GILSTRAP: Objection, form.

THE WITNESS: The data dashboard had been shut down previous to that.

BY MS. MOUSILLI:

Q. When was the data dashboard shut down prior

to that?

A. I was locked out of it beginning on April 7th, 2022.

Q. Okay. I thought we previously established that you were locked out of viewing the data dashboard, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: Correct.

BY MS. MOUSILLI:

Q. So the data dashboard wasn't down at the time that Ms. Donoho resigned, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: There was no way for me to manage or update for clients.

BY MS. MOUSILLI:

Q. Would that have been --

A. Therefore, it was not useful.

Q. Okay. The fact that you couldn't update the data dashboard, doesn't mean that it was broken, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: It meant that I could not use it for updating clients, adding new clients, or adding information.

BY MS. MOUSILLI:

Q. Mr. McGinnis, were there any company valuations done for Big Thirst ever?
A. Yes.
Q. When?
A. In July of 2021.
Q. Who performed that valuation?
A. Jelena Medic.
Q. What was the result of that valuation?
A. Our premoney valuation was estimated based on EBITDA that we hoped to achieve and multiples of other e-commerce companies. And she estimated it to be approximately $4 million in value.
Q. Were those valuations ever provided to your attorney?
A. Yes.
Q. Were those valuations ever produced in discovery?
A. Yes.
Q. Were there any other valuations performed for the company?
A. No valuations for investor purposes.
Q. Okay. I didn't ask just for investor purposes. Were there any other valuations besides this valuation conducted by Jelena Medic performed for Big Thirst, Inc.?

MS. GILSTRAP: I'm going to object to the extent that your answer conveys any communications or -- with your attorneys.

THE WITNESS: I am not going to answer because there's attorney-client privilege.

BY MS. MOUSILLI:

Q. Okay. I'm not asking you to talk to me or tell me what you said to your attorney. But I'm asking you: Were there any other company valuations performed for Big Thirst besides the one you just disclosed by Jelena Medic?

MS. GILSTRAP: To the extent that your answer requires any actions on behalf of your attorneys, I'm going to instruct you not to answer.

THE WITNESS: I'm not going to answer on the instruction of my counsel.

BY MS. MOUSILLI:

Q. Okay. That wasn't an instruction of your counsel.

MS. GILSTRAP: It is. He can't answer the question.

BY MS. MOUSILLI:

Q. Okay. To your knowledge, were there any internal valuations conducted by Big Thirst?

A. I'm not answering that on the instruction

of my counsel.
Q. To your knowledge, were there any third-party valuations conducted for Big Thirst?
A. I'm not answering that on the instructions from my counsel.
Q. Okay. So again, I'm not asking you about your communications with your attorney, but any third-party valuations. Were any third-party valuations conducted by Big Thirst?
MS. GILSTRAP: You can -- you can ask him about any valuations that were not conducted by his counsel.
BY MS. MOUSILLI:
Q. Were there any valuations conducted by Big Thirst -- by any third parties that were not your attorneys?
MS. GILSTRAP: And they're not hired by your attorneys.
THE WITNESS: No.
BY MS. MOUSILLI:
Q. Okay. So did your attorneys hire a third party --
MS. GILSTRAP: I'm not going to let him answer that question.
BY MS. MOUSILLI:

Q. -- to value Big Thirst, Inc.?
A. I'm not answering that question on advice from my counsel.
Q. Okay. We'll take that up in court.
Have any third parties made any offers to purchase Big Thirst, Inc.?
A. No.
(Exhibit 4 marked for identification.)
BY MS. MOUSILLI:
Q. I'm handing you what's been marked as Exhibit 4. Do you recognize this document?
A. One moment to review.
Q. Sure.
A. This appears to be a request for books and records.
Q. Have you seen Exhibit 4 before today?
A. Yes.
Q. So I'll represent to you that Exhibit 4 is your amended responses and it was -- amended objections and responses to Defendant Lauren Wylie Donoho's first request for production that your attorney submitted on Big Thirst's behalf.
Were you involved in drafting these responses?
A. I believe I've reviewed these responses.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 210 of 356

My input, I'm positive, was - was involved, but I'm not the author.

Q. Who besides yourself was involved in drafting these responses?

A. My legal team.

Q. Besides you and your legal team, who else was involved in drafting these responses?

A. No one.

Q. Okay. The first request for production asks: Any document or communication related to, derived from, or reflecting Plaintiff's financial status including, but not limited to, invoices, bank statements, reports or statements from accounting software, profit and loss statements, tax returns, credit agreements and responses -- or credit agreements and statements, balance sheets, and account ledgers.

Do you see that? Did I read that correctly?

A. I do see that.

Q. Okay. And the response on behalf of Big Thirst is: Big Thirst objects to this request as overly burdensome to the extent is seeks any document or communication responsive to this request. Big Thirst further objects that this request is overly broad and seeks materials that are neither relevant nor reasonably

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 211 of 356

calculated to lead to the discovery of admissible evidence. Moreover, Big Thirst objects that this report -- this request is not proportional to the needs of this case.

Did I read that correctly?

A. It appears so, yes.

Q. Why is this document request not relevant to this case?

MS. GILSTRAP: I'm going to object to the extent that you -- that your knowledge relies on any attorney-client communications.

THE WITNESS: I am not going to answer on the advice of my counsel.

BY MS. MOUSILLI:

Q. Does Big Thirst have invoices?

A. Does Big Thirst have invoices?

Q. Correct.

A. Yes.

Q. Have they been produced?

A. We're following the way this was written.

Q. Okay. Have you produced invoices to your counsel?

A. I have produced anything my counsel has requested.

Q. Do you know if your counsel's produced

these documents to us?
A. I do not know. I know we have produced more than 3,000 pages of documents --
Q. That wasn't my question.
A. -- in more than one request.
Q. That wasn't my question.
MS. MOUSILLI: Object to that question as -- that answer as nonresponsive.
BY MS. MOUSILLI:
Q. Does Big Thirst have bank statements?
A. Big Thirst has bank statements.
Q. Have they been produced to your attorney?
A. Yes.
Q. And has your attorney produced those documents to us?
A. I don't know that answer.
Q. Does Big Thirst have accounting software reports?
A. Yes.
Q. And have those accounting software reports been produced to your attorney?
A. Yes.
Q. And has your attorney produced those documents to us?
A. I don't know the answer.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 213 of 356

Q. Does Big Thirst have profit and loss statements?
A. Yes.
Q. And have you produced those profit and loss statements to your attorney?
A. Yes.
Q. And have they produced those to us?
A. I don't know the answer.
Q. Does Big Thirst have tax returns?
A. We have tax returns for the years filed, yes.
Q. What years were filed?
A. 2022 and 2021.
Q. So this request asks for several things, including bank statements, accounting software, profit and loss statements, tax returns, credit agreements, balance sheets, and account ledgers, correct?
A. Yeah.
Q. Okay. And have all those documents been produced to your attorneys?
A. Correct.
Q. And have your attorneys produced those documents to us?
A. I don't know.
Q. Okay. So let's go to Request for

Production No. 2: Any document or communication related to, derived from, or reflecting Plaintiff's relationship with Ms. Donoho including, but not limited to, agreements, records of payment or promises of payment, customer lists, vendor lists, and business contacts.

Did I read that correctly?

A. You read that correctly.

Q. Okay. And then Big Thirst lodges a bunch of objections, correct?

A. Correct.

Q. Okay. Do you know if you provided these documents to your attorney?

A. I --

MS. GILSTRAP: Objection, form.

THE WITNESS: I provided any documents my attorney has requested.

BY MS. MOUSILLI:

Q. Okay. Do you believe this -- this request is relevant to this lawsuit?

MS. GILSTRAP: Objection, form.

THE WITNESS: I rely on the counsel of my attorneys.

BY MS. MOUSILLI:

Q. What is that counsel?

MS. GILSTRAP: No. You're not -- I'm

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 215 of 356

instructing you not to answer as to any communications we've had regarding these requests for production.

BY MS. MOUSILLI:

Q. I'm going to ask you to take a look at all of these requests for production, and tell me -- if you can look at them, and let me know which request for production you don't believe is a request for relevant documents related to this litigation.

A. As a blanket statement, I would read each of these. And the objections lodged by my attorneys, I stand by.

Q. Okay. Request for Production No. 5: Any document or communication related to or reflecting the officers and/or executives of Plaintiff. And the response is: Big Thirst objects that this request is ambiguous because the phrase reflecting the officers and/or executives and Plaintiff is vague and ambiguous.

Do you agree with that statement?

A. Yes. I believe what our attorneys wrote.

Q. Do you have documents or communications relating to or reflecting the officers and/or executives of Big Thirst?

MS. GILSTRAP: Objection, form.

THE WITNESS: We have official documents relating to our board meetings and minutes for those.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 216 of 356

BY MS. MOUSILLI:
Q. Request for Production No. 12: Any document and correspondence by and between Matt McGinnis and Ms. Donoho prior to formation of Plaintiff.
Do you see that, No. 12?
A. I do see that.
Q. And the response is that it's overly burdensome and not reasonably calculated to lead to discovery of admissible evidence and that it's basically not relevant.
Do you see that?
A. I do see that.
Q. Okay. But have you produced documents and correspondence between you and Ms. Donoho prior to formation of Big Thirst to your attorneys?
A. There have been several documents that have been produced to my attorneys, and I stand by their objections.
Q. Okay. So are you representing to the Court that you've reviewed these requests for production?
A. I have reviewed these and I stand by the advice of my counsel.
(Exhibit 5 marked for identification.)
BY MS. MOUSILLI:
Q. Mr. McGinnis, I'm handing you what's been

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 217 of 356

marked as Exhibit 5.
A. Thank you.
(Sotto voce discussion.).
BY MS. MOUSILLI:
Q. After the green sheet is a copy for your attorney.
A. Okay.
MS. GILSTRAP: Thank you.
BY MS. MOUSILLI:
Q. Can you take a moment to look through those documents?
A. Uh-huh.
Q. Have you seen these documents before?
A. Yes, I have.
Q. Okay. The first page, which is Bates-labeled 0001, is a profit and loss sheet. Do you see that?
A. Yes.
Q. What is this document?
A. This is our profit and loss sheet for the year 2021.
Q. Okay. At the top it says income --
A. Correct.
Q. -- right? And then it says discounts given, correct?

A. Yes.
Q. What are -- what is that in reference to?
A. I believe discounts given would be to anything that we provided as a discount, for shipping fees or anything like that, broken or replacement purchases.
Q. So is this discounts given to clients?
A. Yes.
Q. And that's a total $58 for 2021?
A. Correct.
Q. Okay. What is shipping income?
A. That would be revenue that was brought in for the cost of shipping to a customer. You'll see in future statements, we don't keep that in here.
Q. And why was it included in 2021?
A. The person doing the books at that time accounted for it that way.
Q. Why is that?
A. Likely, to just track what the costs were that were being paid directly to the retailers for shipping costs.
Q. Okay. And so why did you stop including shipping income in your -- in the next few years?
A. It's not an income line for us. It's a direct pass-through from a consumer to a retailer. It is not our money to count.

Q. Okay. Let's go to the expenses section. Do you see where it says advertising and marketing?
A. Yes.
Q. And then the total was $10,287?
A. Correct.
Q. What advertising and marketing was done by Big Thirst?
A. The largest expenditure in that one line item is -- would be a sponsorship for the Distilled Spirits Council annual convention where we launched our company.
Q. And how much was that?
A. $7,500.
Q. All right. And then if you skip -- not the next one, but the one after it says contractors?
A. Correct.
Q. Who were those contractors?
A. In 2021, I believe that's the money that Donoho paid herself.
Q. And how much was that?
A. It reflects 1700.
Q. And right after it, it says legal and professional services, correct?
A. Correct.
Q. And what were -- what was the nature of

those legal and professional services?

A. That would account for fees for the corporate setup, filings with the state, all those types of things, corporate expenses.

Q. What are Stripe fees?

A. Stripe is a payment processing platform and it charges a fee for its usage.

Q. All right. Under travel -- was it accommodation --

A. Uh-huh.

Q. -- of $2,000, who is that for?

A. Lauren Wylie Donoho and me.

Q. Where did you guys travel?

A. The first was just to downtown Austin for attendance to the Distilled Spirits Council conference, and the second was for me to attend the American Craft Spirits Association convention.

Q. Okay. And if you go to the last -- second to last, it says net operating income, correct?

A. Correct.

Q. And it's a negative 33,000 --

A. Correct.

Q. -- roughly? And then below that is net income. It's a negative 33,000 again?

A. Correct.

Q. What does that mean?
A. That means we spent more than we received.
Q. Okay. Bates label 0004 is the next document that I want you to look at. What is this document?
A. This is the worksheet we were using to determine share allocation -- I believe it was June or July of 2022.
Q. This was for June or July of 2022?
A. Yeah, I believe. Yeah, one of those -- a summer month in 2022.
Q. Okay. And at the top, it says total authorized shares?
A. Correct.
Q. So the 100 percent of the total authorized shares for Big Thirst, Inc. Is that what --
A. Yes.
Q. -- that represents? And it's 14 million?
A. Yes.
Q. And here, the founders pool is what percent?
A. The founders pool is 42 percent.
Q. Not 42.86 percent?
A. Correct.
Q. Representing 6 million shares?

A. Yes.
Q. And what were your -- what was your percentage?
A. It is 23.57 percent.
Q. And Ms. Donoho's percentage?
A. 19.29 percent.
Q. Was that more or less than what was given to Ms. Donoho when she formed the company -- when she was going to be cut out of the company?
MS. GILSTRAP: Objection, form.
THE WITNESS: That's the same number of shares that she was issued originally.
BY MS. MOUSILLI:
Q. It's the same number of shares, correct?
A. Correct.
Q. But her ownership was diminished?
A. Correct.
Q. Okay. And what -- what do you attribute the diminishment of ownership to?
A. We allocated more shares.
Q. To who?
A. We added shares to board members and to advisory board members.
Q. Okay. So let's look at the board of directors. Suzanne McGinnis, she -- here, June or July of

2022, she had $150,000 -- 150,000 shares, correct?
A. Correct.
Q. And Mark Shilling had $150,000?
A. Correct. Shares.
Q. Okay. And Seat 4 had 150,000?
A. They were unallocated.
Q. That's not what I asked. Seat 4 had 150,000?
MS. GILSTRAP: Objection, form.
BY MS. MOUSILLI:
Q. Correct?
A. Correct.
Q. And then Seat 5 was given under 150,000 shares?
MS. GILSTRAP: Objection, form. You can answer.
THE WITNESS: They were unallocated shares.
BY MS. MOUSILLI:
Q. Okay. And why was that done?
A. We anticipate, and it's been written in our bylaws, that we would have five seats for board members, and we're holding those open and want to make sure that we have shares available for them.
Q. For what purpose are you holding these seats open?

A. It is not appealing to a potential board member to enter a company that's in litigation.
Q. This wasn't done just to dilute Ms. Donoho's ownership of Big Thirst, correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: This was done to recruit new advisory board members.
BY MS. MOUSILLI:
Q. When Ms. Donoho was a director and COO of Big Thirst, what were the total authorized shares?
A. I believe you misstated her title.
Q. I'm sorry. When Ms. Donoho was COO and director of Big Thirst, Inc., what were the total authorized shares for Big Thirst, Inc.?
A. 10 million.
Q. Okay. And -- and on this document that's Bates-labeled Big Thirst 0004 -- and you've represented that this is for June or July of 2022, correct?
A. Correct.
Q. What are the total authorized shares indicated in this table?
A. 14 million.
Q. Why were the shares increased from 10 million to 14 million?
A. To entice high-level advisory board members

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 225 of 356

to join.
Q. Not to dilute Ms. Donoho's ownership in Big Thirst, correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: There was a dilution of the two owners -- or two founders.
BY MS. MOUSILLI:
Q. Okay. Was it intentionally done to reduce Ms. Donoho's ownership in Big Thirst?
A. We needed to have Ms. Donoho below 20 percent so we could pursue an SBA loan.
Q. Okay. So that's why Ms. Donoho's ownership in Big Thirst was diluted, correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: It is why we authorized more shares, and mine were diluted, as well. The preservation of our company was paramount.
BY MS. MOUSILLI:
Q. And now we're getting somewhere. So when Ms. Donoho owned more than 20 percent interest in Big Thirst, you weren't able to obtain an SBA loan for Big Thirst, Inc., correct?
A. That's correct.
Q. So the dilution of Ms. Donoho's ownership in Big Thirst was intentional, correct?

MS. GILSTRAP: Objection, form.
THE WITNESS: That is correct.
BY MS. MOUSILLI:
Q. On the next page, Big Thirst 0005, at the top of this document, it says business loan agreement, correct?
A. It does.
Q. Okay. What is this document?
A. This is a business loan agreement for the SBA loan with the First Commonwealth Bank.
Q. Which loan is this?
A. This is the loan obtained -- the first loan obtained in August of 2022.
Q. Okay. I thought you had told me that that loan was for 250,000?
A. I didn't have a number in front of me and now I see that it is 257,800.
Q. Okay. So the -- the true amount is 257,800, correct?
A. Correct.
Q. If you turn to the second page of that loan agreement, Big Thirst 0006, down towards the middle of the page, it says affirmative covenants. It says: Borrower covenants and agrees with Lender that as long as -- so long as this agreement remains in effect, Borrower will:

Notices of Claims and Litigation. Promptly inform Lender in writing of all material adverse changes in Borrower's financial condition, and all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor. Correct?

A. Correct.

Q. Have you abided by that affirmative covenant?

A. Yes.

Q. Have you informed -- have you informed this bank that there is litigation against you individually?

A. Yes.

Q. They're aware that there's litigation against Big Thirst, correct?

A. Yes.

Q. And now they're aware that there's individual liability on your behalf, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: They're aware of litigation, yes. I've given them all of the information.

BY MS. MOUSILLI:

Q. If you turn to the last page of the

agreement, Big Thirst 0010 is the Bates label.

MS. GILSTRAP: What number?

MS. MOUSILLI: 0010.

BY MS. MOUSILLI:

Q. This page isn't signed, is that?

A. This page is not signed, correct.

Q. But the document -- the agreement that you submitted to the bank, I assume, was signed?

A. I'm assuming it was signed in person.

Q. Okay. Do you have a copy of that signed agreement?

A. I likely do, yes.

Q. Was that provided to your attorney?

A. I don't know if they have the signed agreement.

Q. So you received about $257,000 from the bank for this loan, correct?

A. Correct.

Q. Okay. Was any of that loan used by Big Thirst Marketing?

A. No, zero.

Q. All the funds were used by who?

A. Big Thirst, Incorporated.

Q. Okay.

(Exhibit 6 marked for identification.)

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 229 of 356

BY MS. MOUSILLI:

Q. Okay. Mr. McGinnis, I'm handing you what's been marked as Exhibit 6.

MS. GILSTRAP: Do you have one for me?

MS. MOUSILLI: Oh, yes.

BY MS. MOUSILLI:

Q. Mr. McGinnis, did you ever tell Ms. Donoho that all Big Thirst, Inc. clients that purchased marketing services would be for Big Thirst, Inc., and not for Big Thirst Marketing?

A. That we reconciled the way we do that -- that was -- the original intent was if it's signed up by Big Thirst, Inc., it's with Big Thirst, Inc. If it's signed up separately, if it was a Big Thirst Marketing client and they do not do e-commerce, they stay with Big Thirst Marketing.

MS. MOUSILLI: Objection, nonresponsive.

BY MS. MOUSILLI:

Q. Did you ever tell Ms. Donoho that all Big Thirst, Inc. clients that purchased marketing services would be for Big Thirst, Inc., and not for Big Thirst Marketing?

A. Yes, and that's what I just said.

Q. Well, what is this document that I just handed to you as Exhibit 6?

A. This is an email exchange.

Q. What is Exhibit 6?

A. This is an email exchange.

Q. Okay. Are there any Big Thirst Marketing clients that are also Big Thirst, Inc. clients?

A. The --

MS. GILSTRAP: Objection, form.

THE WITNESS: The only client we have that is with both, signed up for marketing first. And we're taking them into Big Thirst Marketing.

BY MS. MOUSILLI:

Q. What client is that?

A. Triple Dog.

Q. Triple Dog?

A. Yep, Triple Dog.

Q. Okay. In this email, in Exhibit 6, on the second page, there's an email from Ms. Donoho. It says: Let's discuss. I thought we agreed that any new marketing clients that come through Big Thirst would be baked into Big Thirst, Inc. revenue. Did I misunderstand? Though it would be financially beneficial to move my clients to BTM, I can't move my clients into a company I don't own. That doesn't feel right to me. I see Big Thirst, Inc. becoming a huge marketing powerhouse driven by both of us where all these costs would be taken on by Big Thirst's new clients

and Big Thirst Marketing would pay their share for any portions they use. Let me know when you'd like to discuss.

Do you see that?

A. I do see that, yeah.

Q. Okay. What was Ms. Donoho's concerns?

MS. GILSTRAP: Objection, form.

THE WITNESS: I don't understand her concern.

BY MS. MOUSILLI:

Q. Yet you reply to her email, correct?

A. I did.

Q. Did you reply, I don't understand what you're saying?

A. I'm saying in the first sentence I'd like to discuss it because it needs to make sense.

Q. Okay. And the second sentence you say: Yes, the intent is to grow the marketing functions of Big Thirst, Inc.?

A. Correct.

Q. And how were the marketing functions of Big Thirst, Inc. going to be grown?

A. Big Thirst, Inc. is primarily an e-commerce platform. If a client signs up for -- is a spirit brand -- it has to be a spirit brand. If it signs up for

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 232 of 356

e-commerce services and then wants us to provide marketing or consulting services, those services are within that client in Big Thirst, Incorporated.

If a company that is not a spirits brand, who's not doing e-commerce on Big Thirst, Inc., wants marketing or consulting services from us, we handle it separately.

Q. Okay. So Ms. Donoho was concerned that clients belonging to Big Thirst would be taken by Big Thirst Marketing, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: I think what her -- what she was asking -- if I'm reading this correctly, what she's asking is she had separate clients of her own that she wanted to merge into Big Thirst, Inc.

But to my knowledge, they were, like, food trucks or nonspirits brands, so it didn't fit the business model. And that's what I was saying we needed to talk through.

BY MS. MOUSILLI:

Q. Did Ms. Donoho ever express any concern to you of commingling funds between Big Thirst Marketing and Big Thirst, Inc.?

MS. GILSTRAP: Objection, form.

THE WITNESS: She may have.

BY MS. MOUSILLI:

Q. Were there any actual commingling of funds between Big Thirst Marketing and Big Thirst, Inc.?

A. The only times when there's a commingling of funds is when a client would pay a receipt to Big Thirst, Inc., and a portion of that is owed to Big Thirst Marketing or vice versa, and there's a direct transfer over.

They're separate bank accounts, separate banks. There was no way just to do a fund transfer. The accounting is separate. The bookkeeping is separate. So no, there is no commingling. They're separate.

Q. Has Big Thirst Marketing paid for any of the litigation expenses that Big Thirst, Inc. has incurred?

A. Big Thirst Marketing made a loan to Big Thirst, Inc. to pay for litigation expenses.

Q. And when was that loan documented?

A. That loan was documented in --

MS. GILSTRAP: Objection, form.

THE WITNESS: We put that in our books, I believe, in -- yeah, in April of 2022.

BY MS. MOUSILLI:

Q. Was that before or after the litigation was initiated?

WYLIE 500

A. It was to initiate the litigation.
Q. So was the loan documents from Big Thirst Marketing to Big Thirst, Inc., were they created before or after the lawsuit was initiated?
MS. GILSTRAP: Objection, form.
THE WITNESS: We had to have money to pay a retainer and we made the loan.
BY MS. MOUSILLI:
Q. That wasn't my question. I understand the loan was --
A. It was simultaneous.
Q. Okay. When was the loan agreement from Big Thirst Marketing to Big Thirst, Inc. for the litigation expenses created --
MS. GILSTRAP: Objection, form.
BY MS. MOUSILLI:
Q. -- before or after the filing of the lawsuit?
MS. GILSTRAP: Objection, form.
THE WITNESS: Likely, the day before so we had money to pay for the litigation.
BY MS. MOUSILLI:
Q. Is there documentation of this loan agreement?
A. It's in my books.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 235 of 356

Q. It's what?
A. It's carried in our books.
Q. It's carried in your books?
A. Yes.
Q. So there's written documentation of when the loan agreement between --
A. It's in the balance sheet.
Q. I'm sorry. I'm asking a question. So there is written documentation of when Big Thirst Marketing took out a loan -- it gave a loan to Big Thirst, Inc. for litigation expenses, correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: It is reflected in our balance sheet and our board meeting minutes.
(Sotto voce discussion.)
(Exhibit 7 marked for identification.)
BY MS. MOUSILLI:
Q. Okay. I'm going to hand you what's been marked as Exhibit 7. On page 1 of Exhibit 7, Big Thirst 0029, do you see that?
A. Yes.
Q. Okay. Under Liabilities and Equities -- I'm sorry, Liabilities and Equity, it says: Loan from BTC. What does that mean?
A. That would be through Big Thirst

Consulting.
Q. And what is the amount?
A. 76,491.
Q. Why did Big Thirst Consulting give a loan in this amount to Big Thirst, Inc.?
A. Essentially, that was a parking lot for a fee paid by a client that needed to park it until they could use it.
Q. I'm sorry. What?
A. They had a project coming up and they wanted to prepay it.
Q. A client for which entity?
A. It was a dual client between Big Thirst Marketing -- or excuse me, Big Thirst, Inc. and Big Thirst Consulting. And we booked it in Big Thirst, Inc., and then paid it back.
Q. So you held money for a client temporarily, and then gave it back to the client?
A. No, no, no. We -- we spent it on behalf of the client, but the way they issued the check was to the wrong entity. They wrote it to Big Thirst, Inc., so we put it here, held it. And then when we did the work, invoiced it to Big Thirst Consulting.
Q. How often does this kind of thing happen?
A. Rarely. Particularly, rarely. I mean,

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 237 of 356

there's this...

Q. The next item is a loan from BTM for legal fees?

A. Uh-huh.

Q. What is BTM?

A. Big Thirst Marketing.

Q. Is this an additional loan, aside from the 100k you had talked about earlier that Big Thirst Marketing gave to Big Thirst, Inc.?

A. I believe this is still that loan.

Q. That's a part of that loan?

A. I believe that is.

Q. And under that line, it says: Loan from Lauren?

A. That's correct.

Q. And how much is that?

A. That is $38,707. And those are the line items that she deleted from our QuickBooks.

Q. Okay. Because I am a little confused, and I hope we can clarify some things. Okay. So the loan from BTC is for how much?

A. That is $79,491.14.

Q. You meant 76,000?

A. 76.

Q. Okay. A loan from BTM for legal fees is

how much?

A. 38,707.89.

Q. And then there was a loan from Lauren. I'm assuming Lauren Donoho?

A. I just read you the wrong numbers. The loan from BTC is -- there's a zero. Sorry. I'm not doing this correctly. There is no loan from BTC.

Q. Okay.

A. The BTM is 76,000. The loan from Lauren is what we're holding on the books and the items she deleted from the QuickBooks.

Q. Okay. Clarify for me how there's a loan from Lauren for 5,150.

A. No, that's from Matt.

Q. It says one from Lauren.

(Crosstalk between parties.)

MS. GILSTRAP: It might not be straight.

MS. MOUSILLI: I know. That's why I'm asking him for the numbers.

THE WITNESS: Yeah. So you confused me earlier, but the loan from Matt is 5,150.

BY MS. MOUSILLI:

Q. I don't -- okay. I -- I don't -- I see a loan from Lauren?

A. Yes.

Q. And then next to that, you're saying is what figure?
A. The loan from Lauren --
Q. The loan from Lauren --
A. 38,000.
Q. How much is the loan from Lauren?
A. 38,707.89.
Q. Okay. So all the numbers were off that you just told me?
A. I'm sorry.
Q. No, no, no. No need to apologize. So let's just go back.
A. Uh-huh.
Q. Okay. So there's a line item that says loan from BTC?
A. Yes.
Q. Big Thirst Consulting?
A. Yes.
Q. And that amount is?
A. Zero.
Q. So why was that loan amount included?
A. I know that at one point there was a transfer of money between accounts for one client.
Q. That wanted to park their funds with --
A. Yeah, for the first project coming up, yep.

WYLIE 506

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 240 of 356

Q. Okay. And that actually -- accidentally paid Big Thirst, Inc.?
A. Right.
Q. And it was supposed to go to Big Thirst Consulting?
A. Yep, correct.
Q. Okay. And then the next line item is a loan from BTM for legal fees, correct?
A. Correct.
Q. And how much is that amount?
A. That's 7 -- 76,491.14.
Q. And was this in addition to the initial 100k thousand from --
A. That's the amount --
Q. -- Big Thirst Marketing to Big Thirst, Inc. in April of 2011?
A. I believe that is the -- what is outstanding from that original loan.
Q. And then there's a line item that says loan from Lauren, correct?
A. Correct.
Q. And it says -- what is that amount?
A. 38,707.89.
Q. Okay. So the loan that Lauren's father gave to Big Thirst, Inc. was about 50k, correct?

A. The loan --

MS. GILSTRAP: Objection, form.

THE WITNESS: The loan that Hunter Wylie gave to Lauren was 50,000. She did not deposit all of that into Big Thirst's bank account in order to spend it on Big Thirst items. For example, she bought a MacBook Pro that she claimed was her personal property with loan proceeds from her father.

BY MS. MOUSILLI:

Q. We can get into that later, who the loan was between, because I think there's a misunderstanding on your part of who that loan is between, and we can clarify that. But nonetheless, you said that Lauren had deposited 43,000 of that 50k, correct, earlier?

A. No. She deposited 20,000 and spent some of that money from the loan proceeds on other items for Big Thirst.

Q. Okay. And there's a loan from Matt for 5,150?

A. Correct.

MS. GILSTRAP: We've been going about an hour. Can we take a break?

MS. MOUSILLI: Sure.

THE VIDEOGRAPHER: We're off at 3:16.

(A recess was taken at 3:16 p.m. to

3:32 p.m.)

THE VIDEOGRAPHER: This is Segment No. 6. We're back on the record at 3:32 p.m.

BY MS. MOUSILLI:

Q. Okay. We're back after a short break, Mr. McGinnis, but you're still under oath, correct?

A. Correct.

Q. Okay. We were looking at Exhibit 7 before the break, and let's look at that again.

A. Uh-huh.

Q. Page -- the page that's Bates-labeled Big Thirst 0035 is what I'd like to look at next.

A. Okay.

Q. Do you see where it says -- in the second row, where it says common stock?

A. Yes.

Q. Do you see CS-2 common stock, October 6, 2021?

A. Uh-huh.

Q. Date of certificate not applicable. And then it says 2.7 million?

A. Uh-huh.

Q. And then it says Lauren Wylie Donoho?

A. Correct.

Q. And then it says in the comments section:

Shares requested through corporate attorney on August 16, 2021. Correct?

A. Yes.

Q. Employee resigned before issuance of certificates. Correct?

A. Correct.

Q. What does that mean?

A. It means the shares were actually printed and issued in May 19th of 2022. Because she was no longer an employee, we didn't get physical certificates at that time. They still can be issued and printed as certificates at any time, but there was no legal reason that they needed to be. They're still on record with the state.

Q. Okay. So Ms. Donoho has never received --

A. Pieces of paper.

Q. Ms. Donoho has never received stocks or certificates from Big Thirst, Inc., correct?

A. That is correct.

Q. She never received those stock certificates when they were issued by Big Thirst, Inc., correct?

A. Nobody did.

Q. That wasn't my question.

A. She did not.

Q. Ms. Donoho never received stock

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 244 of 356

certificates when she was issued stock at Big Thirst, Inc., correct?

A. Correct.

Q. To this date, Ms. Donoho has not received stock certificates for her interest in Big Thirst, Inc., correct?

A. Correct.

Q. Okay. Listed below that comment, it says: Additional 50,000 issued on May 19, 2022. Do you see that?

A. Correct.

Q. And that's in regards to Suzanne McGinnis?

A. Uh-huh.

Q. Yes?

A. Correct.

Q. Okay. And why was Ms. McGinnis issued an additional 50,000 shares of stock?

A. When we brought on two new advisors, we -- the negotiations to get them on board, because they're pretty high-powered owners of multiple companies, we needed to make it worth their while. And we didn't want advisors to have more shares than board members. So we allocated 50,000 more shares to both board members.

Q. When you say both board members, you're referring to Suzanne McGinnis and Mark Shilling, correct?

A. Correct.
Q. Were you issued an additional number of shares?
A. I was not.
Q. Okay. On the document labeled Big Thirst 0039, at the top it says U.S. Small Business Administration, correct?
A. Correct.
Q. And what is this document?
A. This is a receipt of the business loan application. I believe this is a line of credit.
Q. Okay. This is one of the two lines that you --
A. Yes.
Q. -- mentioned earlier --
A. Yeah.
Q. -- today? And it's for $400,000, correct?
A. Correct.
Q. It's for Big Thirst, Inc. and Big Thirst Marketing, correct?
A. Yes.
Q. How were the amounts to be divvied up between the two borrowers?
A. 100 percent will go to Big Thirst, Inc. and zero to Big Thirst Marketing.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 246 of 356

Q. Was that documented anywhere?
A. Yes.
Q. Where?
A. It is in our board minutes. May I add to that a little bit?
Q. Sure.
A. The rationale -- the whole reason for Big Thirst Marketing being listed as a coborrower is because it was required by the SBA, by First Commonwealth Bank, for us to qualify for the loan. We needed to present a company that had revenue and assets in the amount that qualified for it, but there was no intention to use the loan proceeds for that company. It was simply to have enough money to qualify, and that was reflected in all documents going back to May of 2021 with Frost Bank. They required the same.
(Sotto voce discussion.)
MS. MOUSILLI: This is going to labeled Bates -- Exhibit No. 8.
(Exhibit 8 marked for identification.)
MS. MOUSILLI: And this is for you.
MS. GILSTRAP: Thank you.
BY MS. MOUSILLI:
Q. I handed you what's been marked as Exhibit 8. Can you tell me what that is -- can you tell me what

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 247 of 356

this is?
A. This is an email.
Q. Okay. Between who and who?
A. From me to Mark Shilling on March 18th, 2022.
Q. At the top, it says: Yes, we have a path forward, but it is not ideal. Correct?
A. Correct.
Q. Who is -- who is the author of those words?
A. That was me.
Q. And what does that mean?
A. I have not read this, so I'm not sure.
Q. Okay. Do you want to take --
A. Give me a moment.
Q. Sure.
A. Okay.
Q. Are you ready?
A. Yes.
Q. Okay. Can you go ahead and read this email?
A. In this --
Q. Yeah, from the top, from where it says: Yes, we have a path forward.
A. I spoke with our banker on Wednesday and alerted him that Wylie had an issue with being a guarantor

and that we had to delay the closing by a week. If she would -- if she withdraws from being a guarantor, I can resubmit the loan application with just me as a guarantor. Because the paperwork is already done, the loan is already underwritten, it should be fairly straightforward to get a new deal. It would likely be a lower dollar amount and may take up to a month to complete.

The big issue is that she can no longer be an owner of the company if she chooses not to be a guarantor. That is out of my hands. However, it will require us to hold a board meeting and revise ownership structure of the company and reduce the number of shares that she has been issued. If she chooses that path, we then need to determine what her new role will be with the company.

Q. Okay. What does that mean?

A. At the time, I believed that her sole objection was to be the guarantor on the loan. And I was looking for a way to say, Okay, you don't have to be a guarantor. If that's truly only it, let's figure out a path to -- as I said in other ways, compensate you with phantom shares or some other way to make you whole, but you can't be an owner and not be a guarantor. Simple as that.

Q. Who made the determination that she can't

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 249 of 356

be an owner --

A. At 20 percent --

Q. Yeah, I'm sorry. Let me just finish my question, if you will. Who made the determination that she can't be an owner and not a guarantor?

A. To be -- anybody who is an owner of 20 percent more -- or more has to be a guarantor on the loan. And we were in very big need of getting that loan. We really desperately needed the money. To move forward, if she -- if that was her primary and only -- which I thought it was at the time -- objection, then we can find a new way forward with different compensation, but not as more than 20 percent owner.

Q. Where does it say that she can't be more than 20 percent owner?

A. It's in the loan documents.

Q. In this email does it say she can't be any more than a -- she can't -- she has -- if she is more than a 20 percent owner, she has to be a guarantor?

A. It doesn't say that in this email, but it was known.

Q. Known to who?

A. To both Mark and to me and to Ms. Donoho.

Q. And when you said: If she chooses that path, we will then need to determine what her new role

will be with the company. What did you mean by that?

A. If she did not want to be the -- you know, in an ownership position, we'd need to figure out a new compensation, a new way to structure it.

Q. A new compensation for what?

A. In lieu of shares over 20 percent.

Q. Okay. This email was written in response to Mark Shilling writing an email, correct?

A. Yes.

Q. In Mark Shilling's prior email to you, he wrote: Do we need to do some path-forward planning today in the event the Wylie situation cannot be fixed?

Did I read that correctly?

A. That is correct, yes.

Q. What does he mean there?

MS. GILSTRAP: Objection. Do you have the rest of this document because it's -- it's not the full email stream. I guess I'm concerned about him answering it without the full.

MS. MOUSILLI: That's the full thread that I have between Matt and Mark. It's obviously like a --

MR. MOUSILLI: It's in response to something --

MS. MOUSILLI: -- a forward, right? And we can't see the one below that had been forwarded. Yeah, I

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 251 of 356

-- I don't think that's necessarily important at this point.

BY MS. MOUSILLI:

Q. Mr. McGinnis, what is the Wylie situation that Mark Shilling's referring to?

MS. GILSTRAP: Objection, form.

THE WITNESS: I'm going to make an assumption that the email that he's forwarding was one from me asking for ways that we might resolve this.

BY MS. MOUSILLI:

Q. And when you say resolve this, what are you referring to?

A. Ms. Donoho had sent a list of demands which she needed to be met to become a guarantor, and they were enumerated previously. But shorthand, one was being made a 50 percent shareholder. Two was being awarded three board seats. And there were other demands that needed to be handled in governance documents.

And I responded to that in line; essentially, trying to find agreements -- or most of them. So I assume -- assume that he is saying, What if that -- none of that works.

Q. Okay. I'm going to add to Exhibit 3 a Bates label 561 to 585.

MS. GILSTRAP: Do you mean Exhibit 8?

MS. MOUSILLI: Exhibit 8. You can look at them, Lessie, and --
MS. GILSTRAP: You just have one copy?
MS. MOUSILLI: It looks like we don't have any more than two copies.
MS. GILSTRAP: Yeah. I can look over his shoulder.
MS. MOUSILLI: Okay.
(Sotto voce discussion.)
BY MS. MOUSILLI:
Q. Okay. So this email from Mark Shilling was in response to a message that you forwarded to him that included you and Wylie and Mark regarding the SBA loan, correct?
A. It's in response to -- yes. I'm trying to address -- there's many pages here -- address the concerns that were at issue.
MS. GILSTRAP: Okay. It looks like the email ends at 571 -- BTI 571. Is that what you guys -- the way -- it looks like that --
MR. MOUSILLI: No.
MS. GILSTRAP: -- there's a break and then 572 is a different --
MS. MOUSILLI: 571 --
MS. GILSTRAP: I mean, you can ask him

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 253 of 356

about whatever. I just didn't know if you wanted it all to be part of the exhibit.

(Sotto voce discussion.)

BY MS. MOUSILLI:

Q. Mr. McGinnis, you really wanted this SBA loan to go through, right?

A. I did.

Q. And you valued it more than you valued having Ms. Donoho as a part of Big Thirst, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: That's not true.

BY MS. MOUSILLI:

Q. How's it not true?

A. I made several attempts to retain her and find ways that could keep her home and keep -- we could keep her as an employee.

Q. You keep saying that she's an employee. Why do you think that she was an employee?

A. I considered myself and Ms. Donoho employees.

Q. Okay. What's your definition of employee?

A. We would have been paid a salary, the same exact salary, starting on March 17th, 2022, as full-time employees. And that's the way we have defined our roles.

Q. If you can turn to page Bates label 567 in

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 254 of 356

that same exhibit.
A. Uh-huh.
Q. It says at the top this is an email from you to whom?
A. This is Ms. Donoho's email response, and below it, you can't tell due to the different colors.
Q. So when it -- when it says: There is insufficient documentation of my financial contributions to the company, and there's virtually nothing in writing regarding any agreement between us as the founders of the company. I'm not including the bylaws because that seems to be more a boilerplate form than an actual agreement. We have both provided receipts for personal contributions to the company. If you'd like to establish a minimum buy-in number to be an officer of the company, we can discuss that?
A. Yeah. So the end of the parenthetical from: Than an actual agreement, period. That's the end of Wylie's statement. In the paragraph starting, We have both provided, that's my moderating. No response here.
Q. So you responded: We have both provided receipts for personal contributions to the company. If you'd like to establish a minimum buy-in number to be an officer of the company, we can discuss that. Correct?
A. Correct.

Q. Those are your words?
A. Uh-huh.
Q. Was she not an officer of the company?
A. No. I mean, she's saying that she didn't feel like there was proper documentation. And I was saying, Okay, well, it sounded like she wanted me to make a bigger contribution. And if that was the case, let's establish that number and I'll find a way to make that -- that was my -- I was trying to get to an amicable place.
Q. Okay. So she wanted you to contribute more to Big Thirst, Inc.?
A. That's what it sounded like, and I could be wrong.
Q. Then towards the bottom of that Bates-labeled document, Bates-labeled BTI 000567, it says: Please let me know if you're willing to move forward with the SBA loan with the provisions outlined above. If so, I'm happy to meet with you in person to discuss it further. We have been working on getting a loan since May 2021. Getting this financing is critical to the next phase of our growth and our ability to hire a team to help us operate and is predicated on closing this loan. I value your contributions to this company and know that you are an asset to our -- to our operations. I certainly hope that we can agree to a path forward.

However, I am prepared to move forward without you as a guarantor to this SBA loan. Yes, ownership comes with financial risks. If that risk is too great for you and your family, you can opt out. You're not required to be an owner of Big Thirst, Inc.

Did I read that correctly?

A. Yes.

Q. And you wrote that to Ms. Donoho, correct?

A. Correct.

Q. Okay. So you're basically telling her, Either sign the guarantor papers or you're not going to be an owner in Big Thirst, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: I believed there were -- and my attorney told me there were ways to give her phantom stock that would make two things happen; the same amount of vote and the same amount of financial reward at the end without being an owner.

MS. MOUSILLI: Okay. So that wasn't my question. So I'm going to object to nonresponsive. Can you please read back my question.

(Question played back as requested.)

BY MS. MOUSILLI:

Q. So you basically told Ms. Donoho that she either signs the guarantor papers or she won't be an owner

in Big Thirst, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: I believe the context is important here.

BY MS. MOUSILLI:

Q. Okay. But in this paragraph here, you say: Yes, ownership comes with financial risks. If that risk is too great for you and your family, you can opt out. You are not required to be an owner of Big Thirst, Inc. Correct?

A. That's correct.

Q. So it's basically saying you either be a guarantor or you're not an owner in Big Thirst, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: At the base level, yes, but it does not mean that she wouldn't be compensated.

BY MS. MOUSILLI:

Q. Did you ever write a text message to Ms. Donoho that said: You're free to go to an attorney now. And making demands at the 11th hour is unconscionable. I see three ways forward: One, be flexible with your list of demands and try to move forward with closing this loan; two, go through with the loan as is, let me buy you out with the proceeds; or three, walk away completely. Everything is in my name.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 258 of 356

Did you ever write that text message?
A. I did write that text.
Q. And what were you hoping to accomplish with this text?
MS. GILSTRAP: Objection, form.
THE WITNESS: My first goal was, hopefully, that she would negotiate with me.
BY MS. MOUSILLI:
Q. So you were trying to strong-arm Ms. Donoho?
MS. GILSTRAP: Objection, form.
THE WITNESS: I was shell shocked that literally in less than 48 hours before closing she would contact an attorney and stop a loan.
BY MS. MOUSILLI:
Q. Why were you upset that she had contacted an attorney?
A. Because it's not an amicable way or a productive way to do business with a -- a business executive you've been working with for a long time.
Q. You met with an attorney without her, didn't you?
A. But for the betterment of the company, not as a course of measure to take hostage of a loan.
Q. You met with an attorney to incorporate the

company without her, despite making representations that it was a joint project between you and her, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: I chose to -- the attorney was informed -- my intention was to include her as an owner. I chose to take his advice to file it as a sole proprietor for expediency and revise it later, which we did.

BY MS. MOUSILLI:

Q. All right. So you met with an attorney without Ms. Donoho when you created Big Thirst, Inc., correct?

MS. GILSTRAP: Objection --

(Crosstalk between parties.)

BY MS. MOUSILLI:

Q. But when she sought the counsel of an attorney, you were offended, correct?

A. When I sought the counsel of an attorney, it was with her knowledge and for the betterment of the company. When she sought counsel, it was without my knowledge to coerce me into something by taking the money hostage.

Q. When Ms. Donoho sought counsel, you were offended; isn't that correct?

A. In the way she did it, I was offended.

Q. The next page, which is Bates-labeled BTI 000568, is an email from Ms. Donoho to you titled: Re: SBA loan. That's dated Wednesday, March 16, 2022. And in this email, Ms. Donoho states: It's pretty hard to believe that you would characterize my checking with an attorney before mortgaging my family's future as unconscionable.

Did I read that correctly?

A. That is correct.

Q. I appreciate your position, but this company would not exist without my contributions. As well, I'm the one being asked to personally guarantee a loan to two borrowers that I don't control, one of which I'm not involved with at all.

Did I read that correctly?

A. You read that correctly.

Q. I've been told by an experienced attorney that I should not sign these SBA documents without additional agreements in place. I'm ready when you are to work on these additional agreements. Share ownership is one of many issues. If you don't walk -- want to talk about share percentages, let's talk about the other issues and see what we can accomplish. If we can get to a place where I have a degree of control, regardless of percentages, maybe we can get there. I hope we can.

Did I read that correctly?
A. You read that correctly.
Q. Ms. Donoho wanted to work things out, didn't she?
MS. GILSTRAP: Objection, form.
THE WITNESS: It appears that she did in this instance.
BY MS. MOUSILLI:
Q. Since it appears that Ms. Donoho wanted to work things out here, what was your response?
A. We just read it.
Q. Yeah. What was your response, generally?
A. That I would like to do it in person and discuss it.
Q. And despite this response, you told her either you're a guarantor or you don't own any shares in Big Thirst, correct?
A. We'd also had the discussion that we would find ways to compensate her. So it wasn't like we were going to leave her without any compensation.
Q. But your response was: If the risk is too great for you and your family, you can opt out. You are not required to be an owner of a Big Thirst, Inc.?
A. That's true. I believe -- and it is true that if that is her sole concern, beyond the other ones

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 262 of 356

that we can work out, if it's just that -- if it was just being a guarantor, we can fix that. We can move forward.

Q. But did Ms. Donoho say that was her only concern that she was concerned --

A. It was --

Q. -- that her concern was being a guarantor? Was that the only concern that Ms. Donoho had?

A. No.

Q. Okay. What were -- what was her true concern?

MS. GILSTRAP: Objection, form.

THE WITNESS: She also lists that two borrowers that she doesn't control -- and one of which she did, and the other which was stated starting back in May is documented throughout the loan process that we had to have other guarantors in Big Thirst listed as a borrower. It was not new. This was something that had been brought up over and over again on lots of documents.

And, you know, in February, the loan agreement document that was shared with both of us from First Commonwealth Bank, February 4th, I believe -- It's No. 2. It was not a surprise and it never came up until -- before.

And I don't know why you wouldn't say, Hey, this is an issue. I'd like to pow-wow with an attorney so

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 263 of 356

that we're all protected. Because clearly, with me putting my life insurance, my companies on the line, and myself as a personal guarantor, that is far, far more weight on my shoulders.

BY MS. MOUSILLI:

Q. So did you put your life insurance as a guarantor when --

A. I did.

Q. I'm sorry. Did you put your life insurance as a guarantor when Ms. Donoho was involved in this SBA loan?

A. I did.

Q. Didn't she also offer up her life insurance as a guarantor too?

A. After it was already written and done.

Q. So that's a yes?

A. Yes, but after it was written and done.

MS. MOUSILLI: I move to strike everything after, Yes.

BY MS. MOUSILLI:

Q. Was Big Thirst Marketing listed as a guarantor and not as a borrower at that time?

A. It was listed as both.

Q. If you can turn to Bates label 574, BTI 000574. Are you there?

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 264 of 356

A. I am.
Q. Okay. This is an email from Ms. Donoho to you, dated March 18th, 2024, where she says: Matt, this situation is being characterized as me dropping a bomb at the last minute. But to my knowledge, there is no harm in delaying the SBA closing. Absent an expiring loan commitment or something similar, which I'm not aware of, there's no hard deadline to take out the loan.
Of course, we all want to avoid unnecessary delays, but this is not an unnecessary delay. It is critical -- it is a critical piece for me moving forward; particularly, when I'm being asked to take on so much financial risk.
Did I read that correctly?
A. Yes, you read that correctly.
Q. Okay. So Ms. Donoho was making clear here that she doesn't mind being a guarantor, but she does have concerns --
MS. GILSTRAP: Objection --
BY MS. MOUSILLI:
Q. -- correct?
MS. GILSTRAP: Objection, form.
BY MS. MOUSILLI:
Q. Is that correct?
A. That's correct.

Q. Okay. And then she also mentions: There's no need for such a rush in the SBA closing. Correct?
A. That is correct.
Q. Okay. And was that right?
A. I disagree with that.
Q. Why would you disagree?
A. I disagree with that because they were traveling to Texas to do it and wouldn't be able to -- if we changed it, it'd be months again before we would do it again.
Q. Who's -- they were traveling, who's they?
A. Keith, who lives in Ohio; and Gregory, who is in Plano. So one traveling through one state and one through his state.
Q. Who are these two individuals?
A. They're loan officers.
Q. So they're traveling to Texas for this SBA loan, and so you felt you needed to rush it because they were traveling to Texas?
MS. GILSTRAP: Objection, form.
THE WITNESS: I felt that we needed to stick to our timeline because we also had pending four job applicants that we needed to hire. We were literally drowning in too much work and we needed help right away. And it was -- it was painful, and I wanted to solve that

WYLIE 532

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 266 of 356

pain.

BY MS. MOUSILLI:

Q. Was there an expiration date for the loan commitment?

A. I don't know of an expiration date.

Q. So was Ms. Donoho correct that there wasn't an expiring loan commitment that was looming?

A. Do you have documentation that there was no --

Q. That wasn't my question. That wasn't my question.

A. I don't have that -- I don't know.

Q. You don't know.

(Sotto voce discussion.).

THE WITNESS: Can we take a break?

MS. MOUSILLI: Yes.

THE VIDEOGRAPHER: We're off the record at 4:09 p.m.

(A recess was taken at 4:09 p.m. to 4:16 p.m.)

THE VIDEOGRAPHER: Segment No. 7. We're back on the record at 4:16 p.m.

MS. GILSTRAP: Before we get started, we want to read and sign.

BY MS. MOUSILLI:

Q. Okay. Mr. McGinnis, we're back from our short break, but you're still under oath, correct?
A. Yes, correct.
(Exhibit 9 marked for identification.)
(Sotto voce discussion.)
BY MS. MOUSILLI:
Q. What is Exhibit 9?
A. This is a cease and desist copyright infringement pre-suit notice sent from your law firm.
Q. Okay. And what is the date at the top?
A. May 11th, 2022.
Q. Do you recall receiving this document?
A. I do.
Q. Do you recall receiving it on a certain date?
A. I assume it was near that date.
Q. Okay. What was your response to this cease and desist?
MS. GILSTRAP: Objection, form.
THE WITNESS: I believe I called my attorney to understand what it meant.
BY MS. MOUSILLI:
Q. Okay. And in response to this cease and desist, what did they first do?
MS. GILSTRAP: Objection, form.

THE WITNESS: We evaluated that, one, we weren't --

MS. GILSTRAP: Wait, wait. To the extent that you are providing -- you are describing a conversation you've had with your attorney --

THE WITNESS: Yeah.

MS. GILSTRAP: -- I'm going to instruct you not to answer. It's privileged. I'm not sure that's what she's asking, but --

THE WITNESS: Okay.

MS. GILSTRAP: -- just --

BY MS. MOUSILLI:

Q. In response to this cease and desist letter, what did Big Thirst do?

A. We abided by the advice of our attorney.

Q. Okay. Did Big Thirst understand that -- did you understand that this cease and desist letter was instructing you and Big Thirst to refrain from infringing on Ms. Donoho's intellectual property?

A. I understood that that was the letter's intent, yes.

Q. Okay. After receiving this letter, the cease and desist, were any changes made to Big Thirst's website?

A. We did not make immediate changes to the

website.
Q. When -- when were changes made to the website?
A. Beginning in June 2022.
Q. In response to this letter, did Big Thirst stop using the tech stacks that Ms. Donoho had created?
MS. GILSTRAP: Objection, form.
THE WITNESS: We were not using the data dashboard at all.
BY MS. MOUSILLI:
Q. So when did Big Thirst stop using Ms. Donoho's data dashboard?
A. April 7th.
Q. That's your testimony today?
A. Yes.
Q. On April 8th, you had actually requested for Ms. Donoho to onboard another client to Big Thirst, Inc., correct?
A. I did.
Q. Okay. And that was via the data dashboard, correct?
A. Correct.
Q. So Big Thirst was still using the data dashboard that Ms. Donoho had created, correct?
MS. GILSTRAP: Objection, form.

THE WITNESS: Big Thirst was not, a client was.

(Exhibit 10 marked for identification.)

BY MS. MOUSILLI:

Q. Okay. I'm handing you what's been marked as Exhibit No. 10. What is this document, Mr. McGinnis?

A. This is an email.

Q. Who is it an email between?

A. Amit from Panoply.io --

Q. Uh-huh.

A. -- to Big Thirst.

Q. On what date?

A. July 25th, 2022.

Q. And who initiated this email?

MS. GILSTRAP: Objection, form.

THE WITNESS: It came from me on behalf of Big Thirst. The Shopify connection stopped working two weeks ago, unexpected writer error.

BY MS. MOUSILLI:

Q. What does that mean?

A. That means that the Panoply was no longer reading from Shopify.

Q. And why is that?

MS. GILSTRAP: Objection, form.

THE WITNESS: I don't know why it was no

longer working.

BY MS. MOUSILLI:

Q. What was the purpose of this message?

A. The message was to get it reconnected to Shopify.

Q. What was the response from Amit from Panoply?

A. As far as I can see, this is not happening anymore.

Q. Where does it say: It's not happening anymore?

A. In the first line.

Q. In the first line. Okay. So Amit from Panoply states: Hello, Matt. Sorry for the late response here. As far as I can see, this is not happening anymore. Am I correct? Is there any other thing you want me to assist you with?

A. Yes.

Q. Right?

A. Correct.

Q. So your concern was wrong here?

MS. GILSTRAP: Objection, form.

THE WITNESS: I believe in the two days it may have begun working again.

BY MS. MOUSILLI:

Q. Okay.
A. But it is possible that we figured it out.
Q. Okay. So you thought there was a problem with Shopify. You connected Panoply -- you contacted Panoply, and Panoply told you, No, there's no problem, correct?
A. Correct.
Q. Okay. So you were mistaken in your belief that Panoply had been disabled, correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: This was after we were -- had been given the help at -- Big Thirst had been given access again to Panoply.
BY MS. MOUSILLI:
Q. Okay.
A. And I don't know the date, but you may.
Q. Okay. So on July 20th, 2022, you're contacting Panoply because you couldn't access the source code for the data dashboard, correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: That's not correct.
BY MS. MOUSILLI:
Q. Okay. What were you trying to access?
A. The data from Shopify.
Q. Okay. And that was part of the tech stack

that Ms. Donoho had created, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: Would you clarify what you mean by tech stack?

BY MS. MOUSILLI:

Q. That was part of the technical work that Ms. Donoho had created while she was at Big Thirst, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: May I clarify?

BY MS. MOUSILLI:

Q. Go ahead.

A. My understanding of what is described as the tech stack is what she did to integrate various disparate components. We no longer had access to that full swath of components. However, Ms. Donoho did give access to Panoply to do the DMCA takedown of Cumul.io. So we could not use a unified tech stack at all.

Q. Okay. I'm not asking about the unified tech stack.

A. Okay.

Q. I'm talking about any aspect of the tech stack that Ms. Donoho created. You're still trying to access it as of June -- July 20th, 2020, weren't you?

MS. GILSTRAP: Objection, form.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 274 of 356

THE WITNESS: Under the ruling of the TRO, we were given rights to continue to use software licensed to Big Thirst. I abided by what the judges told me.

MS. MOUSILLI: Objection, nonresponsive.

BY MS. MOUSILLI:

Q. Mr. McGinnis, you earlier testified that you stopped using the tech stack that Ms. Donoho created on the date that she resigned. Here we have evidence that you continued to use various aspects of the tech stack well beyond the date that Ms. Donoho resigned; isn't that true?

MS. GILSTRAP: Object -- objection, form.

THE WITNESS: That is not true. I define stack as more than one item. Stack is numeral -- numerous items stacked. Using a software licensed to Big Thirst is not using a stack of any build with any IP in it.

BY MS. MOUSILLI:

Q. That's not how it works, Mr. McGinnis. I asked you when did Big Thirst, Inc. stop using any aspect of the technical stack that Ms. Donoho had created. And you stated what?

MS. GILSTRAP: Objection, form. Go ahead.

THE WITNESS: When I hear you say stack, my understanding is that you're talking about a unified group.

BY MS. MOUSILLI:
Q. I didn't say a unified group. I said any aspect of the technical stack. When did Big Thirst stop using any of Ms. Donoho's technical work?
MS. GILSTRAP: Objection, form.
THE WITNESS: Panoply, in and of itself, is not at all reflective of Ms. Donoho's work. It is a software licensed to the company.
MS. MOUSILLI: Objection, nonresponsive.
BY MS. MOUSILLI:
Q. Panoply is where all of Ms. Donoho's source code resides?
MS. GILSTRAP: Objection, form.
BY MS. MOUSILLI:
Q. Is that to your understanding?
MS. GILSTRAP: Objection, form.
THE WITNESS: That is not my understanding.
BY MS. MOUSILLI:
Q. So you don't really know how Panoply works, do you?
MS. GILSTRAP: Objection, form.
THE WITNESS: I know what it does, indeed.
BY MS. MOUSILLI:
Q. There's nothing embarrassing about saying, I don't know how Panoply works. Do you know how Panoply

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 276 of 356

works?

MS. GILSTRAP: Objection, form.

THE WITNESS: I am not deeply familiar with the inner workings of Panoply.

BY MS. MOUSILLI:

Q. Okay. So you may have used aspects of Ms. Donoho's technical work after she had resigned; isn't that correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: I cannot speculate when you say may have.

BY MS. MOUSILLI:

Q. That's an interesting response. So you may have used her technical work after the day she resigned and you may not have, correct?

MS. GILSTRAP: Objection, form.

THE WITNESS: What I've seen is we've used software licensed to Big Thirst.

BY MS. MOUSILLI:

Q. So Exhibit 10 indicates that you are contacting Panoply, correct?

A. Correct.

Q. And you were contacting Panoply for the purpose of accessing a technical aspect that Ms. Donoho had created while she worked at Big Thirst, Inc., correct?

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 277 of 356

MS. GILSTRAP: Objection, form.
THE WITNESS: Incorrect.
BY MS. MOUSILLI:
Q. Okay. I still don't understand why you were contacting Panoply then. For what purpose where you contacting Panoply?
A. I was contacting Panoply to use it in a different way than Ms. Donoho had built it.
Q. That's not what it says here. It says: Shopify connection stopped working two weeks ago, unexpected writer error. Right?
A. Correct.
Q. And the response is: As far as I can see, this is not happening anymore. Am I correct? Is there anything else you want to -- me to assist you with? Correct?
MS. GILSTRAP: Objection to form.
BY MS. MOUSILLI:
Q. Is that correct?
A. That's what the email says.
Q. Did you respond further to Amit from Panoply?
A. I don't believe I did.
Q. So your concerns were addressed, correct?
A. My concern was addressed.

Q. Okay. And you continued to use Panoply after July 28th, 2022, correct?
A. Correct.
MS. GILSTRAP: Objection, form.
BY MS. MOUSILLI:
Q. And you continued to use the source code that Ms. Donoho had created for Panoply, correct?
MS. GILSTRAP: Objection, form.
THE WITNESS: We did not use Ms. Donoho's source code.
BY MS. MOUSILLI:
Q. You never used Ms. Donoho's source code?
MS. GILSTRAP: Objection, form.
THE WITNESS: To my knowledge, there was no source code. After the dashboard was completely broken, we reconnected Shopify on our own independently, as standalone software.
(Sotto voce discussion.)
(Exhibit 11 marked for identification.)
BY MS. MOUSILLI:
Q. I'm handing you what has been marked as Exhibit 11.
MS. MOUSILLI: And Lessie, I don't have a copy of it for myself. So I'm going to ask you all to look at that document.

BY MS. MOUSILLI:
Q. Mr. McGinnis, have you ever seen that document?
MS. GILSTRAP: Wait. I'm looking at it.
(Sotto voce discussion.)
MS. GILSTRAP: Okay. This is a partial, right?
MS. MOUSILLI: That's an email.
MS. GILSTRAP: Well, but it's -- it's a -- I can see that it's part of a stream that's been created, right?
BY MS. MOUSILLI:
Q. Mr. McGinnis, what is this document?
A. This is an email.
Q. From who to who?
A. From me to Kareem Hijjar, copying Lauren Wylie.
Q. Okay. And what is the date of that email?
A. Pardon me? Say it again.
Q. What is the date of that email?
A. Friday, July 9th.
Q. Can you read that email?
A. Hi, Kareem. We have decided to go in a slightly different direction for the startup of Big Thirst, Inc. Instead of raising money with equity

financing in a seed round now, we are doing it with all debt financing. We are getting a loan for $50,000 that will be subordinated to a SBA loan 250 and a revolver of $100,000. That will be enough to get up and running. We will reassess the need for a larger raise using equity financing in a few months. This decision delays the need for us to have you work on stock purchase agreements in the near term.

Would you like me to continue?

Q. Yes, please.

A. However, we are still going to provide equity shares to board members as compensation. That brings up two questions: Does it cost a lot of money to amend a Certificate of Formation to increase the number of authorized shares from 1 million to 10 million? If not, maybe we need to do that now. Because possibly, we may choose not to do it now and delay it. If we choose to do it later, but have already issued stock to board members, how do we handle it?

Two, we have prepared a draft board member service agreement, attached, that outlines duties and compensation. We intend to compensate board members with stock as outlined in this document. Please review this document and make recommendations for any changes necessary. Once we have the board member agreement in

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 281 of 356

place, we will immediately move into sales mode with retailers. At that point, we'll want to discuss getting agreements in place with retailers.

Thank you for your continued assistance. Regards, Matt.

MS. GILSTRAP: So I'm looking at this, and it looks like there's emails before and after.

MS. MOUSILLI: Okay.

MS. GILSTRAP: But this is all just like one little piece.

MS. MOUSILLI: Okay. Lessie, that's not an appropriate --

MS. GILSTRAP: Well, that's an objection that this is inconvenient --

MS. MOUSILLI: You can say, Objection, form. We've been over this.

MS. GILSTRAP: Objection, form.

MS. MOUSILLI: Thank you. Again, that's a speaking objection. It's improper and you know that.

MS. GILSTRAP: It's improper to give a witness just a --

MS. MOUSILLI: No. Nothing is improper --

MS. GILSTRAP: -- little snippet --

MS. MOUSILLI: I'm sorry. Lessie, please stop.

MS. GILSTRAP: -- of an email that's probably 20 pages long.

MS. MOUSILLI: Lessie, please stop. Your behavior is not appropriate and not enforcing of the rules.

(Crosstalk between parties.)

MS. MOUSILLI: So please stop. Your speaking objections are improper.

(Crosstalk between parties.)

BY MS. MOUSILLI:

Q. Mr. McGinnis, we have decided to go in a slightly different direction for the startup of Big Thirst, Inc., correct? That's what it says at the top?

A. Correct.

Q. Okay. Instead of raising money with equity financing in a seed round now, we are doing it all with debt financing. Correct? That's what it says?

A. Correct.

Q. It says: We are getting a loan for 50 that will be subordinated to a SBA loan of 250k and 100k revolver. Correct?

A. Correct.

Q. Was that a typo there where it says $50?

A. Yes.

Q. What was it supposed to say?

This testimony confirms that the loan was made to Lauren Donoho, not to Big Thirst. Even Plaintiff's counsel elicited that "it got loaned to Lauren Wylie," underscoring that she—not the company—was the borrower.

McGinnis's statement that the loan "was going to be" made to Big Thirst reflects an unrealized idea, not a promise, agreement, or assumption of liability. The parties ultimately chose the opposite structure when Donoho insisted on being the sole borrower..

A. 50k.
Q. Okay. And where did that 50k come from?
A. That was the loan that Ms. Wylie Donoho had recommended that we do in lieu of going for seed money.
Q. And where was that 50k coming from?
A. From her father.
Q. Okay. To -- and who was it loaned to?
A. It was going to be loaned to Big Thirst but it got loaned to Lauren Wylie.
Q. Okay. But here it says: We're getting a loan. Who is we?
A. Big Thirst.
Q. So Big Thirst is getting a loan for 50k that will be subordinated to an SBA loan of 250k, correct?
A. That was the intention, yes.
Q. What does subordinated to an SBA loan of 250k mean?
A. It means that the loan would have been paid off after the SBA loan.
Q. Okay. So after paying off the SBA loan, your intention -- first your -- the intention was to pay off the 50k loan that Lauren's father had given to Big Thirst, correct?
A. In the case --
MS. GILSTRAP: Objection, form.

WYLIE 550

The discussion about how future SBA loan proceeds might be used does not constitute any enforceable promise to Plaintiff and cannot satisfy the statute of frauds.

Nothing in this exchange shows any communication to Plaintiff or any commitment by Defendants to repay him.

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 284 of 356

THE WITNESS: In the case of this subordinated to the SBA loan, meaning it will be paid after.

BY MS. MOUSILLI:

Q. Okay. So after the SBA loan of 250k was paid off, the 50k loan from Ms. Donoho's father would be paid off by Big Thirst, correct?

A. That's correct.

Q. Okay.

(Exhibit 12 marked for identification.)

BY MS. MOUSILLI:

Q. I'm handing you what's been marked as Exhibit 12.

MS. MOUSILLI: I'm sorry. Did I give you two copies?

MS. GILSTRAP: No. It was two pages.

(Sotto voce discussion.)

BY MS. MOUSILLI:

Q. Have you previously seen this document, Mr. McGinnis?

A. This is an email from August 24th.

Q. Okay. Who is it from?

A. This is from me to Jacquelyn Tomlinson and Wylie -- Lauren Wylie.

Q. Okay. And down towards the middle, it

says: We have a 50,000 family loan from Wylie's father, rather than a 30k equity investment. We're applying for a 250,000 SBA loan.

Did I read that correctly?

A. You did.

Q. And that's your words, correct?

A. Yes.

Q. And that's in an email dated August 24th, 2021, correct?

A. Yes.

Q. To Jacquelyn Tomlinson and Lauren Donoho, correct?

A. Correct.

Q. And Danielle Quintero is CC'd here. So here you're acknowledging that there is a loan to Big Thirst --

A. Correct.

Q. -- right? From Ms. Donoho's father, correct?

A. Yes.

Q. Okay. So this loan hasn't been repaid, has it?

A. I'm sorry?

Q. This loan, the 50k loan from Ms. Donoho's father to Big Thirst has not been repaid, has it?

MS. GILSTRAP: Objection, form.
THE WITNESS: There is no loan from Wylie's dad to Big Thirst. It was made to her.
BY MS. MOUSILLI:
Q. When you say it was made to her, why do you believe it was made to her?
A. Because it was written to her as an individual with no name of Big Thirst on it. She doesn't sign it as Big Thirst. It's not written to Big Thirst.
Q. It was the intention of everyone that it was to Big Thirst, Inc., wasn't it?
A. (Nonverbal response.)
Q. Yes?
A. Correct.
Q. Okay. And that -- and we have proof of that here where you say: We have a 50,000 family loan from Wylie's father, correct?
A. Correct.
Q. And Wylie is Lauren Donoho, correct?
A. Yes.
Q. Okay. So we have an acknowledgement that this 50k loan was to Big Thirst, Inc. from Wylie's -- or Lauren Donoho's father correct?
A. Correct.
Q. And you haven't taken any taken any steps

to repay that loan, correct?
A. None.
Q. Okay. And do you have any intention of repaying that loan?
A. Yes.
Q. When?
A. At the conclusion of litigation when we determine, one, the settlement for the sanctions that Lauren Wylie Donoho owes the company and, two, determine if we are still -- if we have to file for bankruptcy or not.
Q. Okay. Was that ever a condition of the loan when it was taken out?
MS. GILSTRAP: Objection, form.
THE WITNESS: It was not.
BY MS. MOUSILLI:
Q. Do you understand that Ms. Donoho intends to appeal that sanctions order?
A. I did hear you say that, but no.
Q. Okay. Do you understand that Mr. Donoho -- Lauren's father could file a lawsuit against Big Thirst for the loan that has not been repaid?
MS. GILSTRAP: Objection, form.
BY MS. MOUSILLI:
Q. Do you understand that?

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 288 of 356

MS. GILSTRAP: Objection, form.
THE WITNESS: I'm not a legal expert.
BY MS. MOUSILLI:
Q. Okay. Mr. McGinnis, is there any other testimony that you plan to give at trial that I haven't covered today?
MS. GILSTRAP: Objection, form.
THE WITNESS: I'm sorry. I didn't understand that.
BY MS. MOUSILLI:
Q. Is there any other testimony that we haven't gone over today that you plan to give at trial?
MS. GILSTRAP: Objection, form.
THE WITNESS: Oh, God. I don't know. I don't know. I'm sorry.
(Sotto voce discussion.)
MS. MOUSILLI: Let's take a five-minute break, please.
THE VIDEOGRAPHER: We're off the record at 4:40.
(A recess was taken at 4:40 p.m. to 4:45 p.m.)
THE VIDEOGRAPHER: Back on the record at 4:45 p.m.
BY MS. MOUSILLI:

Q. Okay. Mr. McGinnis, we took a short break and you're still under oath, correct?
A. Correct.
Q. Okay. To date, how much in legal fees has Big Thirst expended?
A. I do not have the exact number in front of me, but it is north of $300,000.
Q. And when this matter proceeds to trial, do you have any estimation of what the attorney fees will be?
A. I do not.
Q. Do you have a ballpark figure?
A. I have a guesstimate of approximately another --
MS. GILSTRAP: You know what, I'm going to -- I'm going to -- to the extent you're relying on any communications with your attorneys, I'm going to instruct you not to answer that.
THE WITNESS: I choose not to answer that.
MS. GILSTRAP: Do you have an independent --
THE WITNESS: I do not have an independent --
BY MS. MOUSILLI:
Q. So you were advised by your attorneys how much it's going to cost to proceed through trial, but you

don't want to disclose that amount, correct?

MS. GILSTRAP: Well, I'm instructing him not to answer that question.

THE WITNESS: I've been instructed not to answer that question. I choose to follow the lead of my counsel.

BY MS. MOUSILLI:

Q. Okay. So how do you anticipate Big Thirst financing the rest of the litigation?

A. At this point, we do not have a clear way forward to finance the rest of the litigation.

Q. Earlier you alluded to filing bankruptcy?

A. That is a possibility.

Q. Okay. You alluded to Big Thirst filing bankruptcy, correct?

A. That is a possibility.

Q. Okay. Why is that a possibility?

A. We do not have a sufficient cash flow to continue meeting the obligations of litigation at this point.

Q. Have any steps been taken by anyone towards bankruptcy at this point?

A. We have not.

Q. Has bankruptcy been discussed between any of the board members?

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 291 of 356

A. Yes, it has been.
Q. Who has discussed bankruptcy?
A. In our last board meeting, in our --
MS. GILSTRAP: Yeah. I'm going to -- I'm going to instruct you not to answer to the extent you're talking about legal -- taking about legal advice or anything like that, but if other -- if you can testify without it --
THE WITNESS: I choose to take the advice of my counsel and not answer that question.
BY MS. MOUSILLI:
Q. Okay. Were any board resolutions drawn relating to bankruptcy?
A. There have been no board resolutions drawn.
Q. Do you believe a less costly alternative would have been possible had you negotiated with Ms. Donoho prior to filing a lawsuit?
MS. GILSTRAP: Objection, form.
THE WITNESS: We sincerely had hoped to find a cost-effective settlement. However, the one offered was not something we could do. It was not possible for us to afford that.
BY MS. MOUSILLI:
Q. Why is that?
A. It was far too much for our monthly cash

flow.

Q. Did you offer a counteroffer?

A. We had offered counteroffers prior to that.

Q. All right. But after the last offer that Ms. Donoho made, was there a counteroffer made by Big Thirst?

A. The offer was so far out of our reach, we did not think that Ms. Donoho would accept something that was realistic to us.

Q. Okay. And what is realistic to you?

MS. GILSTRAP: Objection, form. I'm going to instruct you not to answer to the extent you're having to rely on any communications with counsel.

THE WITNESS: I'm going to rely on my counsel's recommendation and not answer.

BY MS. MOUSILLI:

Q. Okay. In your estimation, what would a fair settlement be to Ms. Donoho with regards to her claims against you and Big Thirst?

MS. GILSTRAP: I'm going to instruct you not to answer, to the extent your answer relies on counsel -- between you and your attorneys.

THE WITNESS: I'm relying on my counsel's recommendation and not answering the question.

BY MS. MOUSILLI:

Q. Okay. Your counsel didn't ask you not to answer the question. She said if your answer would rely on attorney-client communications, then you don't -- you shouldn't answer. Do you understand the distinction?

A. That does rely on that.

Q. Do you understand the distinction?

A. I do and the answer I would give would rely on -- rely on previous conversations.

MS. MOUSILLI: I pass the witness.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MS. GILSTRAP:

Q. All right. Mr. McGinnis, have you testified today about every interaction or communication you've ever had with Ms. Donoho from -- since you met her in 2016?

A. No, not at all.

Q. So there might be other things that you testify about at trial, correct?

MS. MOUSILLI: Objection, form.

MS. GILSTRAP: Okay. I'll pass the witness.

MS. MOUSILLI: We don't have any further questions.

THE VIDEOGRAPHER: We're off the record at 4:50.

THE REPORTER: Before I take us off of this

record, can I get the orders for the transcript. Would you like a copy? Do each of you need a rush?

MS. MOUSILLI: We do need a copy. We don't need a rush. We don't need anything expedited.

THE REPORTER: No rush and no rough.

MS. MOUSILLI: No.

THE REPORTER: Okay.

MS. GILSTRAP: Just a condensed and normal.

THE REPORTER: And do you want the exhibits attached to the transcripts?

MS. GILSTRAP: Yes.

MS. MOUSILLI: Yes, please.

THE REPORTER: Okay. Thank you. We're off the record.

(Proceedings concluded at 4:51 p.m.)

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 295 of 356

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Kollin Casarez, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings were fully sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Kollin Casarez

______________________________________

KOLLIN CASAREZ, NOTARY PUBLIC

FOR THE STATE OF TEXAS

CERTIFICATE OF TRANSCRIBER

I, Wanda Greenlee, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding; that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.

Wanda Greenlee

______________________________________

Wanda Greenlee, CCR

April 10, 2024

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 297 of 356

**A**

**abide**
17:12, 17:14, 18:8, 18:10
**abided**
226:10, 267:15, 273:3
**abilities**
146:24, 147:6
**ability**
48:17, 82:12, 82:13, 113:11, 146:15, 146:16, 146:17, 147:15, 164:14, 191:23, 192:4, 254:21, 294:9, 295:7
**able**
8:15, 9:14, 43:18, 64:5, 82:6, 120:5, 147:8, 154:18, 159:25, 164:18, 165:5, 165:21, 171:19, 180:22, 190:3, 190:5, 190:13, 190:14, 190:15, 190:16, 190:22, 224:21, 264:8
**about**
7:2, 7:3, 11:21, 13:5, 19:2, 19:17, 25:12, 29:2, 30:3, 32:12, 39:4, 40:3, 46:13, 53:11, 53:25, 54:1, 54:14, 54:25, 55:2, 55:15, 55:17, 56:10, 56:21, 56:24, 58:18, 58:19, 59:1, 59:11, 60:14, 61:8, 61:11, 61:19, 61:21, 63:6, 67:3, 68:6, 75:20, 76:12, 79:3, 86:14, 89:7, 89:19, 89:20, 90:15, 93:25, 98:6, 99:16, 104:7, 107:2, 107:13, 109:9, 113:22, 120:23, 124:2, 126:22, 127:1, 127:8, 128:12, 130:22, 131:18, 133:5, 134:19, 145:12, 145:15, 153:13, 160:3, 160:8, 161:4, 161:21, 175:1, 176:13, 176:21, 177:13, 184:15, 184:16, 184:19, 184:23, 184:24, 187:22, 189:6, 189:16, 195:24, 196:5, 196:8, 207:6, 207:11, 227:16, 236:8, 239:25, 240:21, 249:18, 252:1, 259:22, 272:19, 272:22, 273:24, 274:24, 290:6, 292:13, 292:17
**above**
165:12, 254:17
**absent**
263:6
**absolutely**
35:3, 196:19
**accept**
291:8
**access**
75:12, 75:19, 75:22, 81:23, 107:5, 107:8, 155:11, 155:22, 157:4, 157:6, 157:13, 157:18, 159:11, 159:13, 159:14, 160:4, 160:10, 165:3, 166:12, 180:5, 192:9, 195:4, 195:19, 202:5, 271:12, 271:18, 271:23, 272:15, 272:17, 272:24
**accessed**
107:9, 107:11, 107:22
**accesses**
157:21
**accessing**
275:24
**accidentally**
239:1
**accommodation**
219:9
**accomplish**
257:3, 259:23
**according**
160:9
**account**
28:23, 33:3, 33:14, 36:5, 36:7, 98:23, 104:12, 105:6, 115:10, 199:25, 200:1, 200:17, 200:21, 201:4, 201:12, 201:25, 202:11, 203:5, 209:16, 212:17, 219:2, 240:5
**accounted**
89:4, 217:16
**accounting**
209:13, 211:17, 211:20, 212:15, 232:11
**accounts**
104:14, 104:15, 200:24, 201:2, 232:9, 238:23
**accurate**
9:14, 188:22, 188:23, 203:14, 294:8, 295:6
**achieve**
188:9, 205:10
**acknowledge**
122:20, 122:25
**acknowledgement**
285:21
**acknowledging**
284:15
**acquisition**
102:10
**acted**
74:5
**acting**
75:18
**action**
1:9, 180:12, 201:20, 201:25
**actions**
188:3, 194:23, 206:13, 226:5
**active**
32:3
**actively**
48:11
**actual**
131:14, 172:12, 173:7, 232:2, 253:12, 253:18
**actually**
64:6, 66:15, 239:1, 242:8, 268:16
**ad**
28:21, 29:6, 29:7, 31:15
**add**
74:6, 167:19, 191:14, 191:17, 245:4, 250:23
**added**
43:25, 80:12, 167:17, 167:24, 221:22
**adding**
42:11, 131:14, 204:23

WYLIE 564

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 298 of 356

**addition**
239:12
**additional**
36:22, 107:5, 107:6, 147:22, 171:18, 171:21, 236:7, 243:9, 243:17, 244:2, 259:19, 259:20
**address**
6:6, 15:14, 15:19, 27:24, 251:16
**addressed**
276:24, 276:25
**adjust**
117:11, 117:13
**adjustments**
33:11
**administration**
244:7
**administrative**
226:4
**admissible**
210:1, 215:9
**advance**
39:8, 125:9
**adverse**
226:2
**advertising**
16:1, 16:10, 32:4, 218:2, 218:6
**advice**
41:11, 50:7, 119:5, 208:2, 210:13, 215:22, 258:6, 267:15, 290:6, 290:9
**advised**
288:24
**advisor**
86:11
**advisors**
84:18, 167:24, 171:20, 243:18, 243:22
**advisory**
57:16, 198:20, 221:23, 223:7, 223:25
**aeo**
4:3, 4:4, 4:5, 4:6, 4:7, 4:8, 94:4, 97:19, 134:13, 134:16, 134:24, 143:8, 177:18, 177:21, 179:3
**affect**
167:25, 226:6
**affecting**
226:5
**affidavit**
62:17, 63:16, 63:17, 63:24, 64:5, 64:9, 64:12, 64:14, 64:19, 65:2
**affirmative**
225:23, 226:10
**affirmed**
5:11
**afford**
290:22
**after**
9:6, 36:22, 44:17, 45:18, 58:8, 62:22, 63:5, 82:14, 84:11, 91:16, 91:19, 109:25, 110:2, 110:5, 116:16, 122:18, 148:3, 148:8, 148:17, 154:1, 154:22, 155:9, 155:19, 156:1, 156:9, 156:17, 157:5, 157:14, 157:19, 158:2, 160:16, 167:10, 167:17, 167:20, 183:14, 183:21, 186:7, 187:4, 187:6, 188:1, 189:13, 191:13, 191:20, 192:17, 192:23, 193:1, 193:4, 193:9, 193:13, 194:10, 195:24, 197:7, 199:11, 199:16, 199:19, 199:21, 200:3, 201:4, 216:5, 218:15, 218:22, 232:24, 233:4, 233:17, 241:5, 262:15, 262:17, 262:19, 267:22, 271:11, 275:7, 275:14, 277:2, 277:15, 280:7, 282:19, 282:20, 283:3, 283:5, 291:4
**afternoon**
15:10
**afterwards**
63:23
**again**
35:15, 53:24, 67:17, 71:9, 84:3, 97:21, 127:7, 151:5, 151:16, 173:6, 177:5, 177:16, 182:21, 184:3, 186:5, 186:19, 192:22, 207:6, 219:24, 241:9, 261:18, 264:9, 264:10, 270:24, 271:13, 278:19, 280:18
**against**
6:14, 6:16, 6:21, 6:22, 40:25, 41:2, 180:21, 183:5, 183:11, 183:20, 183:24, 184:5, 185:9, 186:15, 187:14, 190:1, 190:6, 190:10, 226:14, 226:17, 286:21, 291:19
**agency**
15:22, 23:3, 28:21, 29:6, 29:9, 29:10, 29:18, 35:11, 36:10, 42:25, 45:1, 46:16, 66:4
**agent**
53:7, 104:18
**ago**
15:9, 59:13, 269:18, 276:10
**agree**
26:24, 158:8, 158:16, 172:22, 193:16, 193:22, 194:3, 214:18, 254:25
**agreed**
12:16, 12:17, 52:17, 59:23, 86:19, 89:6, 126:16, 229:18
**agreement**
2:11, 12:20, 52:11, 52:13, 52:20, 52:21, 68:23, 71:22, 77:8, 77:16, 77:21, 78:2, 84:4, 92:24, 93:7, 93:8, 93:13, 93:15, 93:18, 93:19, 97:22, 98:25, 99:3, 99:5, 99:8, 99:9, 99:12, 99:13, 99:17, 100:6, 100:12, 100:16, 100:19, 100:20, 101:11, 101:15, 106:24, 109:13, 128:15, 128:17, 128:22, 170:15,

WYLIE 565

173:25, 225:5, 225:9, 225:22, 225:25, 227:1, 227:7, 227:11, 227:15, 233:12, 233:24, 234:6, 253:10, 253:12, 253:18, 261:20, 279:21, 279:25

**agreements**
12:23, 58:1, 70:22, 70:24, 71:1, 71:2, 71:10, 71:18, 71:21, 72:10, 72:17, 72:21, 72:23, 73:1, 76:8, 76:13, 76:14, 76:16, 76:18, 76:24, 77:1, 83:23, 84:2, 84:10, 90:25, 92:20, 93:1, 93:3, 93:6, 93:10, 93:12, 97:25, 110:21, 111:7, 127:1, 152:14, 160:25, 161:1, 161:2, 209:14, 209:15, 212:16, 213:3, 250:20, 259:19, 259:20, 279:7, 280:3

**agrees**
77:18, 225:24

**ahead**
9:5, 22:5, 40:14, 125:12, 196:23, 246:19, 272:12, 273:22

**alcohol**
23:4, 85:25

**alerted**
246:25

**all**
17:23, 37:2, 40:1, 42:11, 46:2, 47:14, 49:1, 52:5, 58:10, 58:13, 58:15, 61:23, 67:2, 77:9, 83:1, 84:11, 87:16, 97:22, 97:24, 107:12, 108:17, 108:18, 108:21, 110:13, 111:24, 113:7, 116:12, 116:15, 125:18, 126:23, 127:3, 127:9, 128:23, 130:2, 131:12, 133:15, 144:9, 145:18, 145:21, 150:14, 151:10, 160:25, 161:16, 168:19, 177:4, 179:25, 180:23, 181:10, 183:8, 186:12, 191:3, 195:3, 199:14, 201:16, 212:19, 214:4, 218:14, 219:3, 219:8, 226:2, 226:3, 226:23, 227:22, 228:8, 228:19, 229:24, 238:8, 240:4, 245:14, 252:1, 258:10, 259:14, 262:1, 263:9, 268:9, 272:18, 274:7, 274:11, 277:24, 279:1, 280:9, 281:16, 291:4, 292:12, 292:15

**allegations**
14:1

**allege**
161:5, 194:15, 194:25

**alleged**
174:22

**allegedly**
174:21, 194:16, 195:1, 195:15

**allocate**
112:1

**allocated**
111:15, 111:16, 111:25, 112:1, 112:6, 221:20, 243:23

**allocates**
112:2

**allocation**
112:2, 112:7, 170:12, 220:7

**allotted**
70:7

**allow**
164:19

**allowed**
41:9, 41:15, 153:18, 168:3

**allowing**
77:22

**alluded**
116:21, 124:3, 289:12, 289:14

**alone**
124:21

**along**
79:23

**already**
19:24, 41:22, 134:20, 179:22, 185:2, 247:4, 262:15, 279:18

**also**
3:32, 6:16, 6:23, 8:23, 11:9, 28:14, 30:23, 31:6, 40:7, 40:20, 60:11, 73:8, 75:17, 105:23, 122:15, 168:16, 202:23, 203:6, 229:5, 260:18, 261:12, 262:13, 264:1, 264:22

**alternative**
118:19, 290:15

**alternatives**
118:15, 118:18

**although**
68:22

**ambiguous**
214:15, 214:17

**amend**
31:21, 34:16, 50:13, 279:14

**amended**
27:20, 208:19

**american**
13:23, 219:16

**amicable**
254:9, 257:18

**amit**
269:9, 270:6, 270:13, 276:21

**amount**
89:12, 90:23, 98:17, 109:19, 130:16, 177:6, 225:18, 235:2, 235:5, 238:19, 238:21, 239:10, 239:14, 239:22, 245:11, 247:6, 255:16, 255:17, 289:1

**amounts**
101:19, 244:22

**analysis**
39:6, 39:24, 63:12

**analyst**
85:24

**analytics**
43:8, 160:12

**angry**
126:8

**annual**
161:2, 198:8, 198:10, 198:13, 198:16, 218:10

**annually**
33:19

WYLIE 566

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 300 of 356

**another**
29:11, 66:9, 66:11, 90:12, 180:12, 191:14, 268:17, 288:13
**answer**
8:14, 8:21, 8:25, 9:6, 9:7, 9:10, 10:24, 14:6, 14:8, 14:12, 14:15, 14:18, 14:20, 14:22, 14:25, 15:3, 17:2, 17:6, 17:16, 17:25, 18:16, 18:22, 19:21, 19:23, 19:25, 22:5, 31:21, 47:23, 67:10, 67:12, 71:17, 84:21, 119:19, 122:1, 127:4, 130:3, 130:18, 133:2, 134:18, 147:1, 147:17, 150:16, 150:18, 150:23, 151:2, 157:23, 176:25, 177:19, 184:14, 193:3, 206:2, 206:4, 206:13, 206:14, 206:15, 206:20, 207:24, 210:12, 211:8, 211:16, 211:25, 212:8, 214:1, 222:16, 267:8, 288:17, 288:18, 289:3, 289:5, 290:5, 290:10, 291:12, 291:15, 291:21, 292:2, 292:4, 292:7
**answered**
193:14
**answering**
14:19, 177:16, 206:25, 207:4, 208:2, 249:18, 291:24
**answers**
9:14
**anticipate**
101:7, 202:20, 222:20, 289:8
**anybody**
13:5, 14:17, 14:24, 20:9, 23:20, 66:24, 101:19, 110:16, 110:23, 110:25, 115:6, 167:17, 169:25, 189:8, 192:14, 248:6
**anymore**
270:9, 270:11, 270:15, 276:14
**anyone**
25:16, 49:15, 49:16, 49:19, 76:8, 92:1, 103:6, 103:23, 156:16, 161:24, 162:4, 195:25, 289:21
**anything**
11:21, 12:12, 15:1, 20:19, 27:13, 51:15, 53:14, 65:6, 79:3, 145:8, 151:25, 154:19, 179:17, 196:21, 210:23, 217:4, 217:5, 276:15, 290:7, 293:4
**anywhere**
160:22, 245:1
**apologize**
151:16, 238:11
**app-building**
66:3
**appeal**
286:18
**appealing**
223:1
**appeared**
125:1, 125:4
**appears**
208:14, 210:6, 260:6, 260:9
**applicable**
241:20
**applicants**
264:23
**application**
83:10, 114:18, 146:13, 147:14, 147:15, 244:11, 247:3
**applications**
83:2, 112:16, 129:17, 130:2, 134:7, 154:9, 164:22, 164:25
**applied**
112:10, 112:21, 113:5, 114:13, 114:14, 116:1, 116:4
**apply**
66:14, 112:12, 112:19, 173:4
**applying**
115:23, 284:2
**appreciate**
259:10
**approach**
59:1
**approached**
34:3, 58:18, 58:20, 86:15
**appropriate**
280:12, 281:4
**approve**
110:13, 110:16, 111:11
**approximate**
5:4, 149:18, 176:3, 176:6, 176:9, 176:12, 176:15, 177:11
**approximately**
15:9, 16:19, 29:24, 31:18, 33:21, 34:4, 98:24, 102:16, 104:25, 105:1, 150:5, 162:12, 162:13, 168:12, 174:25, 177:8, 205:12, 288:12
**april**
30:20, 84:12, 113:14, 114:14, 114:18, 115:13, 116:17, 152:24, 154:15, 155:18, 158:2, 159:9, 162:13, 179:6, 180:25, 186:6, 186:22, 186:23, 187:6, 188:4, 192:17, 192:20, 192:23, 193:1, 193:4, 193:7, 193:9, 193:13, 194:10, 204:2, 232:22, 239:16, 268:13, 268:16, 295:14
**architect**
161:19
**aren't**
41:9
**arising**
40:17
**around**
144:2
**arrange**
193:6
**arrangements**
86:10
**arrive**
42:4
**arrived**
42:7, 42:10, 42:23, 42:24, 52:13, 124:25
**art**
28:21
**article**
55:10, 55:11,

WYLIE 567

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 301 of 356

56:20
**articles**
128:13
**artisan**
13:23
**asher**
77:11
**ashley**
77:14
**aside**
236:7
**asked**
8:25, 22:1, 34:5, 53:15, 53:16, 53:24, 54:18, 58:20, 59:21, 62:7, 63:7, 70:3, 86:16, 161:23, 162:16, 191:17, 196:8, 222:7, 259:12, 263:12, 273:19
**asking**
14:24, 21:2, 21:6, 21:10, 21:11, 22:17, 42:20, 53:25, 124:7, 144:23, 156:5, 156:8, 171:7, 171:10, 171:14, 183:18, 183:19, 184:15, 184:19, 191:14, 206:7, 206:8, 207:6, 231:13, 231:14, 234:8, 237:19, 250:9, 267:9, 272:19
**asks**
209:10, 212:14
**aspect**
74:8, 75:19, 130:17, 151:24, 156:2, 156:8, 156:16, 272:22, 273:19, 274:3, 275:24
**aspects**
37:8, 40:3, 41:16, 50:10, 55:4, 57:22, 59:6, 63:8, 74:11, 74:13, 81:24, 82:4, 129:5, 129:8, 130:13, 145:6, 148:5, 160:11, 273:9, 275:6
**asset**
254:24
**assets**
113:3, 245:11
**assigned**
28:22
**assist**
270:17, 276:15
**assistance**
57:17, 280:4
**assistant**
7:10
**assisted**
129:2
**assisting**
32:16
**associate**
7:11
**associated**
56:15
**association**
219:17
**assume**
149:19, 227:8, 250:21, 266:16
**assuming**
227:9, 237:4
**assumption**
250:8
**attached**
42:3, 42:5, 279:21, 293:10
**attempt**
114:6, 114:15, 126:5
**attempted**
126:6
**attempts**
252:14
**attend**
187:11, 199:20, 219:16
**attendance**
199:2, 219:15
**attended**
197:15, 197:23, 197:25, 198:3
**attending**
8:10
**attention**
79:14
**attorney**
9:4, 9:6, 12:21, 14:17, 14:25, 20:1, 20:4, 20:23, 21:8, 41:8, 41:18, 52:23, 60:1, 62:13, 66:11, 67:24, 93:20, 104:19, 104:20, 104:21, 104:22, 105:2, 134:12, 160:5, 181:2, 181:7, 181:14, 185:16, 185:18, 205:14, 206:8, 207:7, 208:21, 211:12, 211:14, 211:21, 211:23, 212:5, 213:12, 213:16, 216:6, 227:13, 242:1, 255:15, 256:19, 257:14, 257:17, 257:21, 257:25, 258:4, 258:10, 258:17, 258:18, 259:6, 259:17, 261:25, 266:21, 267:5, 267:15, 288:9
**attorney's**
18:24, 41:15, 41:23
**attorney-client**
14:7, 47:24, 206:5, 210:11, 292:3
**attorneys**
1:26, 19:4, 26:11, 40:20, 40:22, 48:18, 77:2, 169:2, 184:20, 206:3, 206:13, 207:16, 207:18, 207:21, 212:20, 212:22, 213:22, 214:10, 214:19, 215:15, 215:17, 288:16, 288:24, 291:22
**attribute**
221:18
**attributed**
157:8
**attributing**
57:1
**audio**
294:8, 295:4
**august**
106:4, 106:16, 108:4, 109:14, 109:17, 109:18, 110:6, 111:13, 200:2, 225:13, 242:1, 283:21, 284:8
**austin**
1:3, 1:28, 2:7, 3:9, 3:20, 6:3, 219:14
**auth0**
74:19, 129:2, 179:25
**author**
132:4, 209:2, 246:9
**authored**
131:20, 131:24, 132:2, 155:5
**authority**
196:20

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 302 of 356

**authorized**
12:15, 220:13, 220:15, 223:10, 223:14, 223:20, 224:15, 279:15
**authorizing**
183:24, 184:5
**automated**
148:8
**available**
34:6, 34:7, 37:3, 40:8, 42:16, 148:20, 148:21, 148:22, 222:23
**avenue**
2:5
**averaging**
177:13
**avoid**
263:9
**awarded**
250:16
**aware**
41:16, 115:20, 123:7, 123:15, 123:21, 169:8, 179:18, 226:16, 226:19, 226:22, 263:7
**away**
120:7, 120:16, 121:5, 122:10, 123:2, 123:5, 256:25, 264:24
**azeredo**
3:5

**B**

**back**
40:5, 55:14, 58:17, 59:4, 60:24, 61:2, 67:18, 78:22, 79:4, 99:14, 100:22, 101:1, 101:4, 111:13, 116:16, 125:15, 159:1, 174:18, 180:5, 184:3, 197:5, 197:7, 201:21, 235:16, 235:18, 238:12, 241:3, 241:5, 245:15, 255:21, 255:22, 261:14, 265:22, 266:1, 287:23
**backed**
86:12
**baked**
229:19
**balance**
209:15, 212:16, 234:7, 234:14
**ballpark**
42:23, 288:11
**bank**
98:23, 105:6, 105:24, 106:2, 106:12, 106:20, 106:25, 107:15, 108:3, 108:13, 109:10, 110:20, 111:6, 111:14, 112:15, 112:22, 112:23, 113:4, 113:9, 113:13, 113:16, 114:7, 114:15, 114:20, 115:1, 115:7, 115:13, 116:2, 116:5, 116:22, 199:25, 200:1, 200:17, 200:21, 200:24, 209:12, 211:10, 211:11, 212:15, 225:10, 226:14, 227:8, 227:17, 232:9, 240:5, 245:9, 245:15, 261:21
**bank's**
114:22
**banker**
246:24
**bankruptcy**
286:10, 289:12, 289:15, 289:22, 289:24, 290:2, 290:13
**banks**
232:10
**barrel**
125:18
**base**
256:15
**based**
39:21, 42:8, 42:11, 99:14, 128:13, 170:25, 180:23, 205:9
**basic**
157:10
**basically**
215:9, 255:10, 255:24, 256:12
**basis**
33:12, 34:12, 34:22, 47:23, 176:18
**bates**
220:3, 227:1, 245:19, 250:24, 252:25, 262:24
**bates-labeled**
216:16, 223:17, 241:11, 254:15, 259:1
**because**
8:9, 14:21, 21:1, 21:14, 34:12, 43:9, 50:8, 59:25, 60:2, 82:15, 86:24, 114:1, 114:4, 116:23, 117:22, 119:5, 126:15, 127:9, 129:25, 130:2, 147:13, 150:22, 155:11, 157:22, 159:18, 159:22, 161:15, 172:22, 173:4, 176:20, 183:16, 184:14, 186:4, 187:10, 194:21, 194:22, 195:3, 195:6, 195:7, 195:18, 201:24, 206:5, 214:16, 230:16, 236:19, 240:11, 242:9, 243:19, 245:8, 247:4, 249:17, 253:11, 257:18, 262:1, 264:7, 264:18, 264:22, 271:18, 279:16, 285:7
**become**
118:13, 127:12, 250:14
**becoming**
229:23
**been**
10:13, 10:16, 11:3, 27:6, 30:13, 32:1, 40:18, 40:22, 54:17, 56:22, 62:1, 64:15, 64:17, 64:18, 65:1, 100:5, 107:20, 111:21, 120:8, 120:17, 121:5, 121:22, 123:2, 131:10, 184:4, 184:7, 185:17, 199:4, 199:8, 203:22, 204:16, 208:10, 210:19, 211:12, 211:21, 212:19, 215:16, 215:17, 215:25, 222:20, 228:3, 234:18, 240:21, 245:24, 247:13, 249:25, 252:22, 254:19, 257:20, 259:17, 261:17, 269:5,

WYLIE 569

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 303 of 356

271:9, 271:12, 277:21, 278:10, 280:16, 282:18, 283:12, 284:21, 284:25, 286:22, 289:4, 289:21, 289:24, 290:1, 290:14, 290:16
**before**
2:11, 7:9, 7:20, 8:20, 10:1, 10:14, 27:10, 27:17, 34:10, 40:2, 45:17, 64:2, 66:9, 76:21, 76:24, 80:18, 80:24, 81:7, 81:16, 82:14, 82:16, 82:24, 85:10, 160:18, 183:20, 183:22, 186:7, 186:9, 186:17, 187:4, 208:16, 216:13, 232:24, 233:3, 233:17, 233:20, 241:8, 242:4, 257:13, 259:6, 261:23, 264:9, 265:23, 280:7, 292:25, 294:3
**began**
5:2, 16:22, 39:7, 46:14, 69:16, 78:20, 78:25, 79:7, 79:9, 80:19, 81:6, 84:11, 102:4
**begin**
36:11, 37:21, 53:3, 76:17, 78:23, 79:9, 99:23, 200:10
**beginning**
15:23, 29:5, 46:23, 54:4, 71:14, 78:16, 78:18, 79:2, 99:14, 104:5, 161:13, 162:13, 162:21, 162:22, 163:1, 167:8, 204:2, 268:4
**begins**
4:3, 4:5, 4:7, 94:4, 134:24, 177:21
**begun**
270:24
**behalf**
3:3, 3:13, 58:2, 62:15, 62:16, 89:23, 100:12, 110:21, 125:2, 125:5, 153:20, 206:13, 208:22, 209:20, 226:20, 235:19, 269:16
**behavior**
281:4
**being**
5:11, 22:12, 25:24, 55:5, 55:25, 56:1, 56:2, 56:24, 120:4, 123:24, 123:25, 125:22, 126:22, 127:1, 164:17, 164:18, 165:5, 176:23, 191:2, 199:11, 217:19, 245:8, 246:25, 247:2, 250:15, 250:16, 255:18, 259:12, 261:2, 261:6, 263:4, 263:12, 263:17
**belief**
174:1, 271:8
**believe**
31:21, 33:19, 34:9, 36:5, 37:12, 37:22, 46:22, 47:5, 53:4, 58:23, 59:23, 60:10, 62:9, 64:10, 67:7, 67:24, 68:12, 68:25, 78:21, 79:1, 79:2, 79:7, 79:8, 79:10, 79:11, 79:16, 86:9, 88:5, 88:20, 92:4, 100:11, 107:7, 112:17, 115:16, 125:11, 130:8, 145:8, 145:21, 153:9, 156:22, 158:1, 159:23, 160:17, 166:14, 167:1, 167:4, 168:13, 168:16, 180:15, 180:17, 180:25, 183:22, 189:16, 192:12, 201:2, 201:7, 208:25, 213:18, 214:7, 214:19, 217:3, 218:18, 220:7, 220:10, 223:11, 232:22, 236:10, 236:12, 239:17, 244:11, 256:3, 259:5, 260:24, 261:21, 266:20, 270:23, 276:23, 285:6, 290:15
**believed**
247:17, 255:14
**believes**
68:4
**belonging**
133:18, 134:1, 134:8, 231:9
**below**
66:2, 219:23, 224:10, 243:8, 249:25, 253:6
**beneficial**
229:21
**benefits**
69:23, 70:3, 70:4, 70:6
**besides**
5:22, 10:10, 10:14, 12:12, 13:8, 13:10, 14:17, 14:25, 16:20, 22:12, 24:1, 41:5, 48:25, 49:4, 49:18, 52:2, 71:1, 72:9, 103:6, 105:18, 105:20, 146:22, 160:9, 195:14, 198:4, 198:16, 205:23, 206:10, 209:3, 209:6
**best**
294:9, 295:6
**better**
20:11, 66:14, 150:21
**betterment**
257:23, 258:19
**between**
26:3, 45:23, 46:9, 54:14, 54:24, 55:13, 56:8, 60:4, 65:19, 65:20, 70:22, 71:2, 71:18, 72:10, 72:18, 72:21, 72:24, 73:2, 84:4, 91:1, 91:4, 91:11, 92:20, 93:3, 98:25, 99:8, 99:18, 101:11, 106:11, 108:3, 111:5, 123:24, 125:15, 125:25, 126:12, 127:13,

128:15, 154:13, 158:15, 168:24, 169:9, 169:14, 215:3, 215:14, 231:22, 232:3, 234:6, 235:13, 237:16, 238:23, 240:11, 240:12, 244:23, 246:3, 249:21, 253:10, 258:2, 258:14, 269:8, 281:6, 281:9, 289:24, 291:22

**beverage**
23:4, 46:19

**beyond**
70:20, 144:8, 260:25, 273:10

**biannual**
198:20

**bigger**
254:7

**bigthirst**
201:3, 202:11, 203:5

**bigthirstmarketi-ng**
80:1

**bill**
89:14

**billed**
16:13, 89:8

**birth**
5:25

**bit**
13:4, 29:2, 66:9, 66:10, 148:24, 245:5

**blaming**
181:14

**blanket**
214:9

**blog**
31:23

**blogger**
31:23, 31:24

**blvd**
3:19

**board**
13:9, 30:6, 30:7, 57:16, 58:16, 111:4, 167:14, 167:17, 167:19, 183:4, 183:8, 183:10, 183:19, 184:7, 184:10, 184:17, 184:21, 184:25, 185:22, 186:10, 186:11, 186:12, 186:14, 186:16, 186:18, 187:8, 187:11, 187:15, 188:5, 198:17, 198:18, 198:19, 198:20, 198:23, 199:1, 199:4, 199:8, 199:17, 199:18, 199:19, 199:21, 199:22, 214:25, 221:22, 221:23, 221:24, 222:21, 223:1, 223:7, 223:25, 234:14, 243:19, 243:22, 243:23, 243:24, 245:4, 247:11, 250:17, 279:12, 279:18, 279:20, 279:22, 279:25, 289:25, 290:3, 290:12, 290:14

**boilerplate**
253:12

**bomb**
263:4

**booked**
235:15

**bookkeeping**
232:11

**books**
12:4, 105:7, 168:19, 168:24, 168:25, 169:10, 169:14, 169:16, 170:3, 208:14, 217:15, 232:21, 233:25, 234:2, 234:3, 237:10

**bootstrapping**
54:21

**borrower**
225:23, 225:25, 226:5, 226:7, 261:16, 262:22

**borrower's**
226:2

**borrowers**
244:23, 259:13, 261:13

**both**
20:16, 31:22, 34:19, 69:17, 103:5, 108:20, 109:6, 109:23, 110:2, 125:12, 132:4, 151:20, 197:15, 229:9, 229:24, 243:23, 243:24, 248:23, 253:13, 253:20, 253:21, 261:20, 262:23

**bottom**
254:14

**bought**
240:6

**brand**
230:24, 230:25, 231:4

**brands**
23:6, 127:22, 231:17

**breach**
6:24, 40:17, 41:3, 41:6, 41:9, 41:15, 193:16, 193:23

**breaching**
194:7

**break**
9:22, 9:23, 42:14, 60:18, 61:7, 87:1, 109:8, 150:22, 158:4, 158:6, 158:8, 158:11, 158:19, 196:24, 197:7, 202:18, 202:24, 203:6, 240:22, 241:5, 241:9, 251:22, 265:15, 266:2, 287:18, 288:1

**breaks**
9:20

**brent**
3:33

**briefly**
125:13

**bring**
91:22, 91:24

**bringing**
92:1, 92:13

**brings**
279:13

**broach**
118:8

**broached**
55:4, 55:9, 56:22

**broad**
176:22, 209:24

**broke**
203:12

**broken**
204:19, 217:5, 277:15

**brought**
6:14, 30:14, 41:22, 91:16, 91:17, 91:19, 217:11, 243:18, 261:17

**btc**
234:24, 236:21, 237:6, 237:7, 238:15

**bti**
251:19, 254:15, 259:1, 262:24

WYLIE 571

**btm**
229:21, 236:2, 236:5, 236:25, 237:9, 239:8
**build**
16:23, 35:25, 36:2, 36:4, 36:11, 36:20, 37:1, 37:19, 39:7, 43:18, 58:21, 87:19, 273:16
**building**
43:7, 61:11, 81:14
**built**
36:25, 37:5, 37:10, 44:3, 44:8, 44:19, 44:22, 44:24, 45:3, 61:23, 90:7, 127:20, 154:13, 156:25, 161:10, 162:20, 163:5, 163:11, 163:12, 276:8
**bunch**
213:8
**burdensome**
209:22, 215:8
**business**
48:8, 48:9, 51:20, 52:24, 68:7, 73:7, 91:21, 102:8, 111:16, 134:19, 144:4, 148:25, 149:14, 149:21, 164:15, 165:6, 165:9, 180:1, 180:2, 180:23, 200:10, 213:5, 225:5, 225:9, 231:17, 244:6, 244:10, 257:19
**buttoned**
66:10
**buttons**
74:6, 145:7, 149:8
**buy**
74:6, 149:8, 256:24
**buy-in**
253:15, 253:23
**bylaws**
47:14, 163:25, 222:21, 253:11

**C**

**c**
40:6
**c-corporation**
49:8
**calculated**
210:1, 215:8
**calculating**
41:25
**calendar**
151:11
**calendars**
150:14
**call**
15:7, 15:12, 53:4, 59:14
**called**
29:13, 39:11, 45:1, 54:2, 55:5, 63:6, 69:3, 126:8, 155:10, 156:23, 266:20
**calling**
124:6, 154:5
**came**
87:5, 128:15, 261:22, 269:16
**campaigns**
29:7, 31:15
**can't**
68:3, 151:23, 181:20, 192:9, 193:16, 193:23, 206:20, 229:22, 247:23, 247:25, 248:5, 248:14, 248:17, 248:18, 249:25, 253:6
**cancelled**
113:19, 114:1, 114:4
**candidates**
58:11
**cannot**
14:3, 39:15, 57:3, 249:12, 275:10
**capacity**
7:12, 7:16, 11:4, 30:12, 30:14, 49:3, 75:18, 150:6, 154:25, 157:7, 160:2
**capital**
103:23, 104:2, 104:4, 105:9, 127:16, 128:1, 174:4
**capitalization**
98:3
**capitalized**
98:2
**care**
17:10, 20:14, 179:14, 188:20, 188:24, 189:1
**carr**
77:13
**carried**
234:2, 234:3
**carry**
105:7
**carts**
74:6
**casarez**
2:11, 294:3, 294:15
**case**
6:10, 10:9, 10:10, 10:14, 10:17, 10:19, 13:15, 39:12, 40:23, 41:23, 156:14, 210:4, 210:8, 254:7, 282:24, 283:1, 294:11, 295:8
**cash**
45:17, 88:15, 289:18, 290:25
**castillo**
24:19, 38:4, 38:5, 38:8, 38:9, 38:10, 38:13, 38:15, 38:17, 38:25, 39:3, 39:11, 39:21, 51:1, 60:5
**castillo's**
25:8, 25:10
**category**
40:6
**causation**
127:13
**caused**
202:17, 202:23, 203:6
**cc'd**
284:14
**ccr**
295:13
**cease**
153:6, 153:10, 153:13, 157:19, 161:23, 266:8, 266:17, 266:23, 267:13, 267:17, 267:23
**ceased**
25:22, 199:11
**cell**
15:12
**central**
5:4
**ceo**
75:18
**certain**
266:14
**certainly**
60:19, 74:1, 254:24

WYLIE 572

**certificate** 241:20, 279:14, 294:1, 295:1
**certificates** 242:5, 242:10, 242:12, 242:18, 242:20, 243:1, 243:5
**certified** 153:3
**certify** 294:4, 295:3
**change** 35:8, 88:24, 120:1, 126:5
**changed** 46:15, 165:2, 170:6, 170:22, 171:4, 179:21, 264:9
**changes** 35:1, 167:20, 226:2, 267:23, 267:25, 268:2, 279:24
**changing** 145:19
**channels** 40:1
**characterization** 119:21
**characterize** 119:24, 259:5
**characterized** 263:4
**charges** 219:7
**check** 68:24, 69:2, 90:10, 90:12, 90:15, 90:21, 235:20
**checking** 259:5
**checks** 86:23, 87:1, 90:9
**chief** 29:21, 30:18, 45:7, 51:5, 52:1, 57:14, 57:21
**child** 179:15
**choice** 124:15, 173:9
**choose** 14:9, 279:17, 288:18, 289:5, 290:9
**chooses** 247:9, 247:13, 248:24
**choosing** 145:6
**chose** 26:1, 68:21, 98:14, 117:22, 118:8, 127:11, 166:11, 166:19, 258:4, 258:6
**circular** 193:20
**circumstances** 28:19, 30:4, 38:11, 114:25, 126:13
**citation** 10:15
**civil** 1:9
**claim** 6:24, 41:2, 41:5, 41:15, 161:21, 163:8, 165:11, 166:5
**claimed** 40:7, 240:7
**claiming** 165:16
**claims** 6:16, 6:17, 6:19, 6:20, 226:1, 226:4, 291:19
**clarify** 12:18, 73:24, 236:20, 237:12, 240:12, 272:3, 272:10
**claude** 124:17
**clause** 84:1
**clear** 18:2, 61:22, 81:2, 114:24, 116:13, 116:14, 124:9, 158:20, 263:16, 289:10
**clearly** 262:1
**client** 17:21, 17:24, 28:22, 29:6, 33:4, 34:12, 69:3, 69:5, 69:7, 73:8, 74:6, 75:18, 75:19, 102:10, 149:7, 149:25, 150:21, 151:1, 151:13, 151:15, 151:17, 157:13, 158:11, 185:4, 191:14, 191:17, 228:15, 229:8, 229:12, 230:24, 231:3, 232:5, 235:7, 235:12, 235:13, 235:17, 235:18, 235:20, 238:23, 268:17, 269:1
**clients** 16:10, 26:21, 29:11, 30:15, 30:17, 32:5, 32:15, 33:4, 33:10, 34:24, 37:2, 38:14, 43:9, 43:21, 51:23, 134:14, 149:12, 157:3, 157:4, 157:8, 157:9, 157:13, 157:16, 157:18, 159:12, 160:16, 160:19, 160:25, 194:21, 194:25, 195:15, 195:17, 195:18, 196:8, 200:11, 200:13, 204:14, 204:23, 217:6, 228:8, 228:20, 229:5, 229:19, 229:21, 229:22, 229:25, 231:9, 231:14
**close** 25:25, 26:1, 113:23
**closed** 25:23
**closely** 29:7
**closing** 58:12, 118:9, 247:1, 254:22, 256:23, 257:13, 263:6, 264:2
**club** 33:25
**coborrower** 245:8
**code** 129:20, 129:23, 130:7, 130:8, 143:11, 144:6, 145:18, 271:19, 274:12, 277:6, 277:10, 277:12, 277:15
**codified** 170:15
**coerce** 258:21
**coerced** 126:5
**coercion** 126:6
**cofounder** 45:7, 55:5

WYLIE 573

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 307 of 356

**cofounders**
55:13, 55:25, 56:1
**colleague**
7:11
**collect**
172:10, 188:12
**collection**
169:19
**colors**
37:7, 145:20, 253:6
**com**
3:11, 3:22, 15:18, 80:1, 201:3, 202:11, 203:5
**combined**
155:5
**come**
101:2, 124:21, 131:22, 153:7, 229:19, 282:2
**comes**
255:3, 256:7
**comfortable**
93:25, 117:5
**coming**
235:10, 238:25, 282:5
**commencing**
167:8
**comment**
13:16, 14:3, 14:5, 15:1, 243:8
**comments**
195:23, 241:25
**commerce**
164:4
**commingling**
231:22, 232:2, 232:4, 232:12
**commissioned**
84:15
**commitment**
263:7, 265:4, 265:7
**committed**
124:12
**common**
106:1, 241:15, 241:17
**commonwealth**
105:24, 106:2, 106:12, 106:20, 106:25, 107:15, 108:3, 108:13, 109:10, 110:20, 111:6, 111:14, 113:4, 113:9, 113:13, 113:16, 114:7, 114:15, 114:20, 114:22, 115:1, 115:7, 115:13, 116:2, 116:5, 116:22, 225:10, 245:9, 261:21
**communication**
115:20, 123:1, 133:8, 152:25, 153:3, 153:5, 153:7, 153:20, 209:10, 209:23, 213:1, 214:13, 292:13
**communications**
14:7, 127:8, 133:21, 150:15, 184:22, 184:24, 185:1, 206:2, 207:7, 210:11, 214:1, 214:20, 288:16, 291:13, 292:3
**companies**
23:4, 26:3, 29:3, 46:20, 61:24, 127:23, 205:11, 243:20, 262:2
**company**
6:21, 13:9, 16:24, 23:5, 26:4, 26:13, 29:12, 29:17, 34:5, 39:8, 45:8, 45:9, 47:15, 51:17, 51:22, 53:19, 54:15, 54:21, 54:25, 55:7, 55:17, 56:5, 57:9, 59:9, 60:13, 61:12, 61:18, 61:25, 69:25, 76:20, 76:21, 76:25, 78:8, 89:15, 98:7, 98:23, 102:10, 103:14, 103:16, 111:22, 119:1, 119:2, 121:24, 125:19, 127:8, 127:20, 131:7, 149:23, 165:18, 166:23, 166:25, 171:15, 173:25, 182:21, 184:3, 186:5, 189:9, 192:9, 200:7, 200:9, 200:19, 202:7, 205:1, 205:20, 206:9, 218:11, 221:8, 221:9, 223:2, 224:17, 229:22, 231:4, 245:11, 245:13, 247:9, 247:12, 247:15, 249:1, 253:9, 253:11, 253:14, 253:15, 253:22, 253:24, 254:3, 254:23, 257:23, 258:1, 258:20, 259:11, 274:8, 286:9
**compel**
7:6
**compensate**
61:14, 61:17, 117:20, 121:10, 121:12, 172:5, 247:21, 260:19, 279:22
**compensated**
44:23, 45:6, 45:9, 55:22, 57:8, 69:9, 88:12, 92:9, 92:10, 92:16, 118:3, 121:14, 128:6, 173:15, 256:16
**compensation**
45:17, 52:6, 57:7, 69:24, 78:9, 93:21, 93:23, 117:21, 173:3, 173:7, 173:19, 248:12, 249:4, 249:5, 260:20, 279:12, 279:22
**compete**
167:2, 167:3
**competed**
167:4
**competitive**
39:5, 39:24
**competitor**
94:1, 177:17
**competitors**
63:15
**complete**
35:8, 146:17, 147:8, 247:7
**completed**
36:22, 37:13
**completely**
35:2, 37:9, 131:11, 161:10, 161:11, 256:25, 277:15
**complex**
156:22, 156:23
**complexity**
43:20, 44:13
**compliance**
24:25, 31:5,

WYLIE 574

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 308 of 356

39:25, 103:21
**complied** 168:19
**component** 63:10
**components** 272:15, 272:16
**computation** 40:6
**concept** 39:23, 58:18, 86:18, 102:5
**concepting** 78:25
**concepts** 131:13
**concern** 114:24, 230:9, 231:21, 260:25, 261:4, 261:6, 261:7, 261:10, 270:21, 276:25
**concerned** 231:8, 249:18, 261:4
**concerning** 14:1
**concerns** 230:6, 251:16, 263:18, 276:24
**concise** 176:25
**concluded** 293:15
**concludes** 4:4, 4:6, 4:8, 97:19, 143:8, 179:3
**conclusion** 286:7
**concrete** 122:16
**concurrent** 186:7
**condensed** 293:8
**condition** 101:5, 226:3, 226:7, 286:12
**conduct** 194:17, 195:16
**conducted** 39:6, 58:10, 58:13, 205:24, 206:24, 207:3, 207:9, 207:11, 207:14
**conference** 125:13, 219:15
**confidential** 1:26, 94:5, 134:19, 134:25, 177:22
**confused** 86:24, 236:19, 237:20
**congress** 2:5
**connect** 146:5
**connected** 145:14, 149:8, 271:4
**connection** 6:13, 269:17, 276:10
**connections** 31:7, 103:19, 201:16
**consent** 71:6, 71:24, 72:1, 72:4, 72:13, 119:4
**consider** 134:12, 169:18
**considerable** 60:11, 103:3, 130:16, 134:9
**considerably** 43:25, 102:22, 194:20
**considered** 69:11, 69:14, 69:17, 70:9, 70:16, 252:19
**consisting** 129:1
**construed** 118:20
**consultant** 26:14, 29:14, 30:13, 30:17, 84:22, 84:24
**consulting** 23:6, 24:13, 24:14, 24:17, 24:21, 24:23, 24:24, 25:5, 25:6, 25:9, 25:11, 25:13, 25:15, 25:17, 25:20, 25:22, 25:25, 26:1, 26:6, 30:23, 38:6, 108:8, 108:16, 108:25, 231:2, 231:6, 235:1, 235:4, 235:15, 235:23, 238:17, 239:5
**consumer** 29:16, 103:14, 217:24
**contact** 257:14
**contacted** 147:13, 257:16, 271:4
**contacting** 271:18, 275:21, 275:23, 276:5, 276:6, 276:7
**contacts** 213:5
**contained** 180:17
**contains** 1:26
**contempt** 202:4
**content** 131:13, 131:15, 131:20, 131:24, 132:2, 163:17
**context** 256:3
**continue** 17:6, 20:20, 43:8, 59:16, 110:6, 156:2, 273:2, 279:9, 289:19
**continued** 273:9, 277:1, 277:6, 280:4
**continuing** 180:2
**contract** 22:12, 31:12, 36:9, 37:16, 68:22, 161:2
**contracted** 32:1, 35:24, 37:18
**contracting** 77:19
**contractor** 15:22, 15:23, 16:18, 22:9, 22:13, 29:10, 31:10, 35:10, 35:12, 35:22, 36:3, 36:17, 38:1, 38:3, 43:1, 59:8, 63:7, 68:15, 68:17, 68:20, 69:9, 76:15, 77:18
**contractor's** 42:25
**contractors** 42:12, 76:17, 84:15, 174:24, 218:15, 218:17
**contribute** 101:19, 102:3, 151:21, 151:22, 254:10
**contributed** 98:8, 98:11, 101:17, 101:18, 102:16, 102:20, 102:24, 103:2,

WYLIE 575

103:7, 127:15, 127:17, 128:1
**contribution**
89:15, 98:4, 105:8, 127:16, 128:11, 174:6, 254:7
**contributions**
102:12, 128:10, 174:4, 253:8, 253:13, 253:22, 254:23, 259:11
**control**
61:25, 81:20, 82:17, 82:23, 132:4, 259:13, 259:24, 261:13
**convenient**
45:20
**convention**
218:10, 219:17
**conversation**
54:23, 55:11, 59:12, 112:15, 119:3, 122:15, 122:18, 122:20, 123:8, 123:16, 123:23, 123:25, 125:21, 125:25, 126:4, 126:12, 127:12, 267:5
**conversations**
14:22, 47:4, 52:22, 54:14, 54:24, 55:2, 55:17, 55:19, 55:21, 56:24, 61:8, 103:20, 184:16, 184:20, 292:8
**convert**
196:15
**conveyed**
147:16, 147:20, 147:22
**conveys**
206:2
**coo**
145:3, 146:20, 148:6, 148:13, 149:1, 150:4, 151:18, 152:1, 152:6, 163:22, 172:6, 173:8, 173:22, 187:5, 188:6, 223:9, 223:12
**coolheaded**
122:15, 122:16
**coordination**
49:23
**copies**
251:5, 283:15
**copy**
27:9, 27:11, 216:5, 227:10, 251:3, 277:24, 293:2, 293:3
**copying**
40:8, 278:16
**copyright**
6:20, 83:2, 83:3, 83:4, 83:5, 83:8, 83:17, 158:1, 162:4, 162:9, 163:3, 165:21, 266:8
**copyrighted**
162:15, 162:19, 163:9
**copywriting**
86:18
**core**
44:22
**corporate**
12:9, 12:16, 12:17, 46:19, 47:14, 48:6, 48:15, 48:17, 50:10, 51:24, 52:22, 53:6, 53:8, 60:4, 72:6, 126:6, 152:16, 183:23, 183:25, 184:4, 184:12, 185:8, 203:6, 219:3, 219:4, 242:1
**corporation**
47:13, 71:24, 77:19, 77:20
**corrected**
65:3, 65:10
**correctly**
49:2, 145:14, 209:18, 210:5, 213:6, 213:7, 231:13, 237:7, 249:13, 255:6, 259:8, 259:15, 259:16, 260:1, 260:2, 263:14, 263:15, 284:4
**correspondence**
215:3, 215:14
**cost**
43:7, 43:19, 43:23, 44:1, 44:12, 50:13, 189:18, 217:12, 279:13, 288:25
**cost-effective**
290:20
**costly**
290:15
**costs**
40:21, 42:12, 43:2, 98:15, 112:4, 217:18, 217:20, 229:25
**could**
43:9, 53:13, 54:20, 54:22, 59:17, 59:20, 66:24, 66:25, 75:23, 75:25, 76:2, 76:5, 78:5, 78:13, 82:4, 91:7, 102:1, 107:5, 107:8, 118:3, 118:19, 118:25, 119:2, 122:16, 123:2, 134:22, 152:3, 154:10, 166:4, 173:4, 179:9, 191:11, 196:13, 204:22, 224:11, 226:6, 235:8, 252:15, 254:12, 272:18, 286:21, 290:21
**couldn't**
159:18, 159:22, 195:5, 204:18, 271:18
**council**
218:10, 219:15
**counsel**
5:14, 14:10, 31:5, 41:12, 46:19, 50:2, 158:4, 158:18, 177:18, 206:16, 206:19, 207:1, 207:5, 207:12, 208:3, 210:13, 210:22, 210:23, 213:21, 213:24, 215:22, 258:16, 258:18, 258:20, 258:23, 289:6, 290:10, 291:13, 291:21, 292:1, 292:10, 294:10, 295:7
**counsel's**
210:25, 291:15, 291:23
**counseled**
60:1
**counseling**
41:21
**count**
217:25
**counter-defendant**
1:8
**counter-plaintiff**
1:15
**counteroffer**
291:2, 291:5
**counteroffers**
291:3

WYLIE 576

**countersued**
7:7
**couple**
104:8
**course**
104:8, 257:24, 263:9
**court**
1:1, 5:7, 8:8, 8:15, 10:8, 10:13, 10:16, 11:7, 11:10, 13:15, 13:16, 14:4, 164:23, 179:23, 180:12, 182:8, 182:16, 182:22, 202:5, 208:4, 215:19, 294:1
**covenant**
226:11
**covenants**
225:23, 225:24
**covered**
184:22, 287:6
**covers**
93:20
**craft**
219:16
**crafting**
39:22
**create**
35:25, 73:5, 73:6, 73:8, 73:11, 75:5, 128:23, 189:18, 199:25
**created**
24:13, 50:3, 51:19, 74:15, 76:19, 79:5, 80:4, 80:10, 81:20, 101:22, 101:24, 102:3, 102:11, 103:2, 129:23, 130:7, 130:9, 152:1, 152:6, 152:18, 152:21, 153:22, 153:25, 154:1, 155:7, 156:3, 156:9, 156:17, 157:5, 157:14, 157:18, 159:6, 161:6, 161:14, 162:19, 184:9, 189:12, 194:22, 233:3, 233:14, 258:11, 268:6, 268:24, 272:1, 272:7, 272:23, 273:7, 273:20, 275:25, 277:7, 278:10
**creating**
53:17, 54:1, 54:19, 55:17, 56:14, 60:15, 61:20, 61:22, 67:3, 68:7, 73:9, 74:6, 129:20, 145:25, 161:17, 173:24
**creation**
34:20, 51:14, 53:12, 53:17, 131:2, 132:7
**creative**
52:8, 77:22
**credentials**
188:14
**credit**
106:21, 107:1, 107:3, 107:4, 107:13, 107:18, 108:13, 108:20, 110:19, 111:5, 111:24, 112:6, 116:1, 116:5, 209:14, 209:15, 212:16, 244:11
**creek**
195:3, 195:11, 195:12, 195:14
**crippling**
111:21
**critical**
166:12, 254:20, 263:11
**crm**
151:11
**cross-defendant**
11:1
**cross-defendants**
1:23
**cross-examination**
64:7
**cross-examined**
11:6, 11:9
**cross-plaintiff**
1:16
**crosstalk**
45:23, 46:9, 158:15, 237:16, 258:14, 281:6, 281:9
**cs-2**
241:17
**cst**
1:30
**cumul**
74:19, 129:2, 146:9, 146:18, 146:19, 147:12, 148:2, 148:11, 179:24, 272:17
**current**
34:20, 93:25, 106:9, 131:11
**currently**
32:10, 36:18, 38:3, 44:14, 48:7, 48:16, 101:8
**customer**
147:14, 150:10, 164:5, 213:4, 217:12
**customers**
63:10, 63:13, 196:4, 196:5
**customization**
143:19
**customize**
145:4, 145:9, 145:22
**customized**
144:8, 144:13, 144:24
**customizing**
145:16
**cut**
221:9

**D**

**dad**
285:3
**daily**
34:22, 130:17, 134:9
**damage**
194:20
**damages**
40:7, 40:16, 40:18, 41:9, 41:25, 175:1, 189:11, 194:16
**danielle**
284:14
**dashboards**
157:11, 160:16
**date**
5:3, 5:25, 15:11, 37:11, 50:14, 53:20, 64:10, 65:22, 79:17, 79:21, 114:17, 121:15, 162:11, 180:24, 184:4, 186:2, 186:19, 186:20, 186:24, 193:7, 201:6, 241:20, 243:4, 265:3, 265:5, 266:10, 266:15, 266:16, 269:12, 271:16, 273:8, 273:10, 278:18, 278:20, 288:4
**dated**
259:3, 263:3, 284:8

WYLIE 577

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 311 of 356

**dates**
168:11, 168:13, 168:22, 183:17, 183:18, 197:16
**day**
15:10, 46:2, 133:15, 149:13, 187:23, 187:24, 187:25, 188:1, 233:20, 275:14
**day-to-day**
33:12, 148:25, 149:14, 149:21, 150:3, 151:6, 151:13, 151:15, 151:17
**days**
45:17, 45:18, 149:19, 149:20, 270:23
**deadline**
263:8
**deal**
247:6
**debt**
279:2, 281:17
**december**
15:23, 25:23, 37:13, 37:24, 54:4, 54:5, 54:10, 58:25, 59:4, 86:16
**decide**
46:21, 180:20
**decided**
87:16, 91:22, 91:24, 278:23, 281:11
**decision**
57:4, 279:6
**decision-maker**
57:15
**decision-making**
57:17
**decisions**
49:22, 58:16, 185:12
**declaring**
153:17
**decorum**
19:2, 19:5
**dedicate**
150:2
**deeply**
275:3
**defend**
19:10
**defendant**
1:15, 3:34, 5:14, 6:10, 7:6, 208:20
**defendants**
3:13
**define**
66:22, 81:4, 132:10, 156:13, 273:13
**defined**
252:24
**definition**
252:21
**degree**
259:24
**delaware**
12:20, 49:9, 50:1, 71:6, 71:25, 72:2, 72:5
**delay**
168:24, 169:9, 169:14, 169:17, 247:1, 263:10, 279:17
**delaying**
263:6
**delays**
263:10, 279:6
**deleted**
236:18, 237:10
**deliver**
36:1
**delivered**
88:4, 169:11, 169:16
**demand**
168:7
**demands**
250:13, 250:17, 256:20, 256:22
**departed**
82:14
**departing**
76:20
**departure**
58:15, 82:1, 82:5, 131:11
**depended**
57:25
**depos**
3:33
**deposit**
240:4
**deposited**
98:6, 98:23, 240:13, 240:15
**deposition**
1:27, 2:1, 6:11, 7:15, 8:10, 10:1, 11:17, 20:20, 20:22, 21:1, 21:17, 26:24, 46:7, 181:3
**derived**
209:10, 213:2
**described**
272:13
**describes**
156:21
**describing**
267:4
**design**
16:1, 16:9, 31:16, 32:3, 52:8, 59:6, 63:8, 86:16, 86:21, 103:12, 131:21
**designation**
4:3, 4:4, 4:5, 4:6, 4:7, 4:8, 94:4, 97:19, 134:24, 143:8, 177:21, 179:3
**desist**
153:6, 153:10, 153:14, 157:19, 266:8, 266:18, 266:24, 267:13, 267:17, 267:23
**desperately**
248:9
**despite**
65:1, 191:15, 258:1, 260:15
**details**
57:9
**determination**
50:6, 247:25, 248:4
**determine**
51:24, 220:7, 247:14, 248:25, 286:8, 286:9
**determining**
67:9
**develop**
51:20, 55:3, 102:8
**developed**
78:7, 79:19
**developing**
51:6, 51:13, 63:9, 78:20, 102:4, 102:7, 129:11, 129:17, 130:20, 131:4
**development**
78:22, 129:3
**di**
155:13
**dialogue**
34:11
**differ**
163:9
**different**
11:13, 12:14, 29:3, 35:3, 48:11, 107:20, 144:10, 150:1, 157:2, 161:11, 163:11, 163:12, 163:13, 163:15, 163:17, 163:19,

WYLIE 578

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 312 of 356

176:23, 193:15, 248:12, 251:23, 253:6, 276:8, 278:24, 281:12
**differentiates** 63:14
**digest** 79:4
**digital** 16:1, 16:10, 31:14, 32:4, 294:7, 295:4
**dilute** 223:3, 224:2
**diluted** 224:13, 224:16
**dilution** 224:5, 224:24
**diminished** 221:16
**diminishment** 221:19
**direct** 35:1, 151:20, 217:24, 232:7
**direct-to-consumer** 33:25
**direction** 37:7, 51:21, 52:8, 102:9, 103:21, 278:24, 281:12
**directly** 98:22, 148:15, 217:19
**director** 28:13, 28:21, 30:22, 31:2, 31:3, 45:8, 70:24, 71:1, 77:1, 78:8, 92:8, 92:15, 145:4, 146:20, 148:6, 148:13, 149:1, 150:4, 151:18, 152:1, 152:6, 163:22, 173:8, 173:22, 186:23, 188:2, 188:6, 192:14, 192:15, 223:9, 223:13
**director's** 92:24, 93:7
**directors** 13:9, 57:16, 111:4, 167:19, 183:10, 221:25
**disabled** 271:9
**disagree** 119:17, 119:20, 119:23, 264:5, 264:6, 264:7
**disagreement** 7:3
**disclose** 113:8, 113:11, 113:12, 113:15, 114:2, 115:15, 115:22, 115:25, 116:6, 116:10, 289:1
**disclosed** 114:19, 115:12, 115:17, 125:16, 206:10
**disclosing** 40:7
**disclosure** 27:20, 114:23
**discount** 217:4
**discounts** 216:24, 217:3, 217:6
**discoverable** 27:25
**discovery** 40:22, 86:8, 89:13, 205:17, 210:1, 215:9
**discrepancies** 169:3
**discuss** 41:17, 53:5, 54:1, 55:25, 56:2, 56:4, 60:14, 93:21, 124:8, 183:5, 183:11, 183:19, 229:18, 230:3, 230:16, 253:16, 253:24, 254:18, 260:14, 280:2
**discussed** 11:22, 17:12, 53:18, 56:1, 57:8, 59:25, 68:12, 93:24, 289:24, 290:2
**discussing** 39:8
**discussion** 53:23, 54:16, 59:24, 60:11, 64:8, 122:13, 158:3, 177:20, 216:3, 234:15, 245:17, 251:9, 252:3, 260:18, 265:14, 266:5, 277:18, 278:5, 283:17, 287:16
**discussions** 12:15, 16:22, 53:11, 53:16, 53:21, 53:25, 55:8, 56:13, 125:7, 125:14, 126:22, 128:12
**disloyal** 166:17
**disparaging** 195:23
**disparate** 272:15
**displays** 75:1
**dispute** 113:18
**disregarded** 37:9
**distilled** 218:9, 219:15
**distiller** 13:24
**distilleries** 24:25
**distillery** 30:13, 30:16, 38:14
**distinction** 292:4, 292:6
**distribution** 25:1, 31:6, 40:1, 51:23, 103:21
**distributors** 150:9
**district** 1:1, 1:2, 17:13
**division** 1:3, 50:16
**divvied** 244:22
**dmca** 43:10, 272:17
**document** 27:16, 42:22, 62:9, 64:23, 65:16, 72:6, 72:9, 72:13, 72:16, 93:24, 125:9, 125:11, 208:11, 209:10, 209:22, 210:7, 213:1, 214:13, 215:3, 216:19, 220:4, 220:5, 223:16, 225:5, 225:8, 227:7, 228:24, 244:5, 244:9, 249:17, 254:15, 261:20, 266:12, 269:6, 277:25, 278:3, 278:13, 279:23, 279:24, 283:19
**documentation** 40:18, 40:21, 53:13, 91:3, 116:12, 151:10,

WYLIE 579

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 313 of 356

151:11, 151:12, 197:19, 197:21, 197:24, 198:2, 233:23, 234:5, 234:9, 253:8, 254:5, 265:8
**documentations**
91:10
**documented**
86:4, 127:3, 164:23, 179:23, 232:18, 232:19, 245:1, 261:15
**documents**
11:25, 12:7, 12:9, 12:10, 12:14, 40:9, 47:14, 109:21, 110:9, 110:13, 110:16, 111:1, 111:9, 111:11, 125:12, 132:3, 132:5, 152:16, 169:23, 185:19, 211:1, 211:3, 211:15, 211:24, 212:19, 212:23, 213:12, 213:15, 214:8, 214:20, 214:24, 215:13, 215:16, 216:11, 216:13, 233:2, 245:15, 248:16, 250:18, 259:18, 261:18
**dog**
229:13, 229:14, 229:15
**doing**
21:20, 39:4, 48:15, 48:16, 102:5, 102:6, 119:5, 131:9, 217:15, 231:5, 237:6, 279:1, 281:16
**dollar**
247:6
**domain**
201:3, 201:12, 201:25, 202:11, 203:5
**done**
32:21, 35:8, 49:24, 61:23, 116:3, 121:19, 144:17, 169:5, 202:6, 205:2, 218:6, 222:19, 223:3, 223:6, 224:8, 247:4, 262:15, 262:17
**donoho's**
8:10, 17:1, 18:14, 22:1, 40:17, 51:3, 75:3, 87:22, 99:1, 125:5, 128:4, 128:5, 145:16, 146:11, 154:4, 162:9, 163:3, 168:18, 170:2, 170:5, 170:21, 171:11, 171:25, 194:17, 195:16, 201:4, 201:12, 201:25, 202:11, 203:5, 208:20, 221:5, 223:4, 224:2, 224:9, 224:12, 224:24, 230:6, 253:5, 267:19, 268:12, 274:4, 274:7, 274:11, 275:7, 277:9, 277:12, 283:6, 284:18, 284:24, 285:23
**down**
8:8, 26:4, 26:7, 42:14, 66:10, 66:13, 87:2, 109:9, 125:19, 126:25, 159:5, 159:10, 159:18, 159:23, 164:14, 166:19, 172:19, 195:8, 203:2, 203:23, 203:25, 204:10, 225:22, 283:25
**download**
144:4
**downtown**
219:14
**draft**
279:20
**drafting**
208:23, 209:4, 209:7
**drawn**
290:12, 290:14
**driven**
229:24
**dropping**
263:4
**drove**
124:22, 124:23
**drowning**
264:24
**dual**
235:13
**ducloux**
124:17
**due**
194:16, 195:16, 253:6
**dues**
161:3
**duly**
5:11
**duplication**
26:3
**during**
9:22, 130:25, 184:25, 194:7
**duties**
40:17, 163:21, 163:24, 164:3, 164:6, 164:13, 279:21
**duty**
6:24, 41:3, 41:6, 41:9, 192:13, 192:15, 192:20, 193:1, 193:12, 193:17, 193:18, 193:23, 193:24, 194:4, 194:5, 194:7, 194:8, 194:11

**E**

**e-commerce**
16:24, 23:5, 31:16, 32:4, 32:15, 32:16, 51:12, 54:17, 69:7, 73:5, 73:7, 73:11, 73:17, 73:20, 74:3, 74:12, 81:15, 81:24, 144:1, 165:17, 205:11, 228:15, 230:23, 231:1, 231:5
**each**
8:16, 8:19, 25:18, 27:24, 40:6, 42:3, 42:6, 84:2, 86:23, 149:13, 151:21, 151:22, 184:10, 190:18, 190:19, 214:9, 293:2
**earlier**
59:7, 90:8, 124:3, 128:21, 167:12, 173:21, 175:1, 236:8, 237:21, 240:14, 244:15, 273:6, 289:12
**early**
38:17, 56:24
**earnest**
69:17, 102:4, 112:16
**easier**
43:21

WYLIE 580

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 314 of 356

**ebitda**
205:10
**edson**
35:9, 35:10, 35:18, 35:20, 35:24, 37:18, 38:1, 44:22, 44:23, 44:25, 45:2, 161:19
**effect**
8:5, 197:19, 201:11, 201:15, 225:25
**efforts**
26:3
**eight-hour**
149:19, 149:20
**ein**
104:19
**either**
98:22, 104:5, 128:10, 185:5, 200:20, 255:11, 255:25, 256:12, 260:16
**elaborate**
149:4
**else**
13:8, 13:10, 13:12, 14:25, 15:5, 49:15, 49:16, 49:19, 51:15, 75:9, 75:12, 76:5, 91:17, 92:1, 100:14, 101:19, 103:23, 108:6, 108:15, 110:16, 110:23, 110:25, 115:6, 122:10, 123:24, 145:8, 149:10, 152:12, 169:25, 209:6, 276:15
**elton**
6:3
**email**
15:13, 15:14, 15:15, 15:19, 16:11, 65:18, 65:20, 65:22, 65:25, 66:2, 67:18, 79:19, 79:22, 79:24, 91:2, 109:7, 115:19, 124:7, 151:10, 191:14, 229:1, 229:3, 229:16, 229:17, 230:11, 246:2, 246:20, 248:17, 248:20, 249:7, 249:8, 249:10, 249:18, 250:8, 251:11, 251:19, 253:3, 253:5, 259:2, 259:4, 263:2, 269:7, 269:8, 269:14, 276:20, 278:8, 278:14, 278:18, 278:20, 278:22, 281:1, 283:21, 284:8
**emailed**
15:18
**emails**
203:6, 280:7
**embarrassing**
274:24
**emergency**
183:15
**emerson**
28:10, 32:23, 32:24, 33:3, 33:6, 33:10, 33:14, 33:16, 33:20, 34:3, 34:11, 34:17, 34:19, 77:13
**emerson's**
33:13
**employed**
15:22, 77:18, 131:1, 294:10, 295:8
**employee**
32:24, 33:1, 33:16, 69:11, 69:14, 69:19, 69:22, 69:23, 70:4, 70:7, 77:17, 84:2, 192:8, 242:4, 242:10, 252:16, 252:17, 252:18, 252:21
**employees**
52:9, 52:10, 58:5, 58:6, 58:9, 69:17, 76:15, 76:17, 77:9, 77:10, 83:23, 84:11, 84:12, 97:21, 97:24, 115:10, 174:24, 252:20, 252:24
**employment**
72:17, 72:20, 76:18, 77:1, 84:1, 93:13, 93:14, 93:17, 93:19, 94:1
**enablement**
25:1
**end**
36:14, 36:15, 37:23, 54:3, 162:13, 197:17, 198:5, 198:6, 253:17, 253:18, 255:17
**ended**
36:15, 194:20
**ends**
251:19
**enforcing**
281:4
**engage**
66:10
**engaged**
36:18, 47:7
**engineering**
42:11, 42:15
**enough**
245:14, 279:4
**ensure**
12:11, 146:7
**enter**
76:7, 223:2
**entered**
100:12
**entice**
223:25
**entire**
8:20, 60:1, 102:9, 131:6
**entities**
22:21, 22:25, 60:12, 112:12
**entity**
23:8, 53:12, 54:2, 55:1, 55:20, 56:12, 60:8, 60:15, 61:20, 61:22, 67:4, 106:19, 119:15, 235:12, 235:21
**enumerated**
250:15
**equal**
25:18, 56:4, 56:19, 56:25, 126:22, 127:2, 127:8
**equipment**
112:3
**equities**
234:22
**equity**
59:17, 59:22, 60:3, 70:9, 70:16, 70:19, 102:2, 103:2, 103:7, 103:10, 103:17, 234:23, 278:25, 279:5, 279:12, 281:15, 284:2
**error**
269:18, 276:11

WYLIE 581

**especially**
63:9
**espindola**
35:9, 35:10, 35:19, 35:20, 35:24, 37:18, 38:1, 44:22, 44:23, 44:25, 45:2, 161:19
**esquire**
3:4, 3:5, 3:16, 3:17
**essence**
186:4
**essentially**
63:12, 235:6, 250:20
**establish**
253:14, 253:23, 254:8
**established**
204:4
**estimate**
89:5, 89:6, 89:11, 129:7, 130:22, 131:18, 133:14
**estimated**
205:9, 205:11
**estimation**
288:9, 291:17
**evaluated**
267:1
**evaluation**
128:9
**eve**
118:9
**even**
8:2
**event**
121:23, 172:9, 249:12
**events**
31:25
**ever**
5:20, 10:5, 10:10, 10:13, 10:16, 13:5, 39:8, 56:7, 60:7, 60:14, 61:19, 64:11, 68:15, 69:11, 73:4, 73:10, 76:7, 76:10, 77:5, 77:21, 78:1, 78:4, 78:12, 79:18, 81:19, 83:1, 83:9, 100:22, 123:23, 144:5, 152:20, 159:4, 161:5, 161:23, 162:3, 168:17, 173:15, 174:3, 184:4, 188:5, 195:23, 196:4, 196:5, 196:14, 197:10, 199:21, 205:2, 205:13, 205:16, 228:7, 228:19, 231:21, 256:18, 257:1, 278:2, 286:12, 292:13
**every**
9:23, 126:21, 199:4, 199:8, 292:13
**everybody**
76:5
**everyone**
188:18, 188:21, 285:10
**everything**
8:9, 44:17, 110:2, 116:12, 120:7, 120:17, 121:5, 122:10, 123:1, 131:14, 179:17, 256:25, 262:18
**evidence**
53:22, 53:25, 64:7, 210:2, 215:9, 273:8
**evolving**
183:16
**exact**
15:10, 33:18, 71:23, 79:17, 114:17, 180:11, 183:17, 183:18, 186:2, 193:7, 252:23, 288:6
**exactly**
32:20, 117:23
**examination**
4:13, 4:14, 5:14, 292:10
**examined**
5:13
**example**
143:23, 144:12, 149:6, 240:6
**except**
131:14
**exchange**
55:3, 59:22, 61:14, 65:18, 65:20, 65:22, 86:25, 87:17, 87:22, 88:8, 90:9, 229:1, 229:3
**exchanged**
86:22, 87:1, 90:12
**excited**
59:15
**excuse**
34:16, 76:15, 112:25, 177:11, 186:23, 235:14
**executive**
257:20
**executives**
214:14, 214:17, 214:21
**exhibit**
27:6, 27:8, 32:8, 40:5, 40:19, 62:2, 62:3, 62:5, 62:8, 62:18, 65:13, 65:14, 66:7, 208:8, 208:11, 208:16, 208:18, 215:23, 216:1, 227:25, 228:3, 228:25, 229:2, 229:16, 234:16, 234:19, 241:8, 245:19, 245:20, 245:24, 250:23, 250:25, 251:1, 252:2, 253:1, 266:4, 266:7, 269:3, 269:6, 275:20, 277:19, 277:22, 283:10, 283:13
**exhibits**
4:16, 293:9
**exist**
185:3, 185:5, 185:9, 259:11
**existing**
60:12, 226:3
**exists**
197:24
**expand**
24:25
**expect**
39:20, 181:8, 182:7
**expecting**
56:19, 181:9
**expediency**
50:11, 258:7
**expedited**
293:4
**expended**
288:5
**expenditure**
218:8
**expenditures**
98:7, 98:22
**expenses**
86:1, 105:12, 200:14, 200:16, 200:18, 200:19, 200:22, 200:25, 218:1, 219:4,

WYLIE 582

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 316 of 356

232:14, 232:17, 233:14, 234:11
**expensive**
44:8, 44:14, 107:21
**experience**
59:6
**experienced**
259:17
**expert**
287:2
**expertise**
31:7, 123:12, 146:12, 168:4
**expiration**
265:3, 265:5
**expiring**
263:6, 265:7
**explain**
77:15
**explicit**
102:1
**explore**
66:8
**explored**
80:17
**exploring**
81:13
**express**
231:21
**extent**
40:21, 206:2, 206:12, 209:22, 210:10, 267:3, 288:15, 290:5, 291:12, 291:21
**extreme**
126:15
**eyes**
1:26

**F**

**facebook**
160:12
**fact**
34:23, 59:25, 65:1, 126:3, 127:15, 128:1, 182:12, 191:13, 191:15, 204:18
**facts**
12:11, 64:19
**fail**
164:12, 166:2
**failed**
166:6
**failing**
189:9
**fair**
291:18
**fairly**
121:10, 247:5
**false**
65:2
**familiar**
275:3
**family**
10:19, 13:11, 13:12, 255:4, 256:8, 260:22, 284:1, 285:16
**family's**
259:6
**far**
3:19, 43:19, 43:20, 50:16, 82:10, 121:19, 177:13, 262:3, 270:8, 270:15, 276:13, 290:25, 291:7
**father**
98:5, 98:15, 99:1, 99:6, 102:20, 174:7, 174:15, 239:24, 240:8, 282:6, 282:22, 283:6, 284:1, 284:18, 284:25, 285:17, 285:23, 286:21
**fe**
69:4
**february**
53:7, 65:23, 79:1, 79:2, 79:9, 79:24, 80:4, 85:9, 86:19, 104:5, 112:15, 261:19, 261:21
**federal**
10:8, 11:10, 182:8, 182:16, 203:11
**fee**
219:7, 235:7
**feel**
117:5, 181:25, 229:23, 254:5
**feeling**
59:15, 59:19
**fees**
40:20, 40:22, 41:8, 41:15, 41:23, 43:25, 48:17, 104:9, 104:19, 104:20, 104:21, 104:23, 105:2, 111:18, 217:4, 219:2, 219:5, 236:3, 236:25, 239:8, 288:4, 288:9
**felt**
39:5, 117:9, 188:24, 264:18, 264:21
**feras**
3:17
**few**
167:13, 217:22, 279:6
**fewer**
43:20
**fiduciary**
6:24, 40:17, 41:3, 41:6, 41:9, 41:15, 163:21, 163:24, 192:13, 192:15, 192:16, 192:19, 192:22, 192:25, 193:4, 193:9, 193:12, 193:16, 193:18, 193:23, 193:24, 194:4, 194:5, 194:7, 194:8, 194:11
**fight**
184:23
**figure**
42:23, 43:14, 238:2, 247:20, 249:3, 288:11
**figured**
271:2
**file**
50:12, 60:2, 180:20, 258:6, 286:10, 286:21
**filed**
40:19, 40:24, 49:8, 53:9, 71:6, 71:24, 72:1, 72:4, 83:1, 83:9, 83:14, 83:15, 158:1, 160:7, 181:8, 183:21, 186:9, 186:24, 187:4, 187:25, 188:10, 188:17, 189:25, 190:6, 190:25, 191:2, 212:10, 212:12
**filing**
46:15, 50:11, 183:5, 183:11, 183:13, 183:19, 185:22, 185:25, 186:7, 188:18, 188:25, 233:17, 289:12, 289:14, 290:17
**filings**
104:9, 104:11, 104:16, 219:3
**filled**
109:21
**final**
18:1, 18:3,

18:5
**finalized**
12:24
**finance**
84:25, 289:11
**financial**
12:9, 12:12, 26:14, 51:21, 84:18, 84:22, 84:23, 85:1, 85:6, 85:8, 85:14, 85:19, 85:22, 85:23, 85:24, 86:3, 86:11, 86:13, 87:9, 87:11, 87:23, 90:21, 91:4, 91:11, 102:9, 116:15, 117:6, 118:4, 209:11, 226:3, 226:6, 226:7, 253:8, 255:3, 255:17, 256:7, 263:13, 294:11, 295:9
**financially**
117:9, 229:21
**financing**
254:20, 279:1, 279:2, 279:6, 281:16, 281:17, 289:9
**find**
53:13, 53:22, 248:11, 250:20, 252:15, 254:8, 260:19, 290:20
**fine**
9:5
**finish**
8:20, 71:13, 71:17, 248:3
**finished**
12:23, 71:12
**fire**
48:1, 48:3
**firm**
46:12, 48:12, 48:13, 49:17, 49:18, 150:1, 169:23, 170:16, 266:9
**firms**
169:21
**first**
5:11, 10:3, 16:4, 28:4, 28:17, 28:19, 30:1, 30:5, 30:25, 31:20, 33:23, 33:24, 46:15, 47:4, 53:2, 53:5, 53:13, 53:20, 53:22, 54:1, 56:22, 79:3, 79:14, 101:22, 102:3, 104:1, 105:24, 105:25, 106:2, 106:12, 106:19, 106:24, 107:2, 107:7, 107:15, 107:17, 108:3, 108:13, 109:9, 109:10, 110:19, 111:6, 111:13, 111:14, 111:23, 113:4, 113:9, 113:12, 113:16, 113:20, 113:21, 114:6, 114:7, 114:15, 114:19, 114:22, 115:1, 115:6, 115:12, 116:1, 116:5, 116:21, 119:3, 124:8, 146:8, 157:24, 170:9, 170:14, 171:4, 171:12, 172:19, 177:12, 198:23, 199:24, 208:20, 209:9, 216:15, 219:14, 225:10, 225:12, 229:9, 230:15, 238:25, 245:9, 257:6, 261:21, 266:24, 270:12, 270:13, 282:21
**fit**
231:17
**five**
16:19, 133:3, 133:5, 133:12, 200:3, 222:21
**five-minute**
287:17
**fix**
124:12, 196:13, 261:2
**fixed**
249:12
**flexible**
256:22
**flip**
62:17, 182:7
**flow**
35:7, 289:18, 291:1
**flowed**
146:9
**focus**
71:9
**focusing**
13:1
**follow**
169:2, 289:5
**followed**
34:9, 119:6, 122:14, 196:20, 196:21
**following**
29:7, 29:11, 29:16, 58:15, 64:5, 84:14, 112:22, 210:20
**follows**
5:13
**font**
37:7, 145:6, 145:20
**food**
30:2, 30:6, 46:19, 231:16
**forced**
64:6, 188:24
**foregoing**
294:3, 294:5, 295:5
**forgetting**
71:23
**formal**
90:25, 92:20, 128:9, 152:14, 183:25
**formally**
170:16
**formation**
38:18, 49:12, 49:19, 49:24, 74:1, 80:11, 80:13, 84:14, 103:8, 130:15, 130:23, 215:4, 215:15, 279:14
**formatting**
145:19
**formed**
24:24, 29:11, 49:10, 51:10, 52:4, 52:6, 52:24, 167:13, 221:8
**forming**
53:3, 53:10, 54:15, 54:25
**forms**
77:3, 77:4, 77:5
**forth**
125:15
**forward**
26:23, 120:5, 122:17, 122:18, 124:7, 125:10, 184:7, 246:7, 246:23, 248:9, 248:12, 249:24, 254:16, 254:25, 255:1, 256:21, 256:22, 261:2,

WYLIE 584

263:11, 289:11
**forwarded**
249:25, 251:12
**forwarding**
250:8
**found**
64:7, 66:3
**foundation**
30:2, 30:7
**founder**
13:2, 24:10, 56:21, 58:3, 79:10
**founder's**
55:12
**founders**
220:20, 220:22, 224:6, 253:10
**four**
264:22
**framework**
44:21
**fraud**
6:22
**free**
79:25, 80:12, 80:17, 80:22, 89:14, 256:19
**freelance**
13:22, 31:22, 31:24
**fresh**
37:10
**friday**
278:21
**friend's**
10:17
**front**
8:3, 42:22, 43:24, 72:16, 93:16, 104:24, 105:6, 164:10, 186:25, 225:16, 288:6
**frost**
112:14, 112:22, 200:1, 245:15
**frustrated**
195:7
**frustration**
196:19
**fulfill**
164:18, 195:5
**fulfillment**
51:24, 103:22, 146:4, 149:9, 164:3, 164:19
**full**
9:14, 50:9, 107:22, 109:19, 179:22, 249:17, 249:19, 249:20, 272:16
**full-time**
32:24, 252:23
**fully**
146:17, 147:7, 294:5
**functionality**
44:22, 157:10, 159:11
**functioning**
147:7, 160:9
**functions**
230:18, 230:21
**fund**
232:10
**fundamentals**
40:2
**funding**
45:17, 50:12
**funds**
107:5, 109:16, 111:23, 111:25, 112:5, 227:22, 231:22, 232:2, 232:5, 238:24
**further**
7:9, 7:20, 209:24, 254:19, 276:21, 292:21
**furthermore**
35:5
**future**
59:18, 217:13, 259:6

**G**

**g-u-e-v-e-r-a**
13:20
**gave**
11:14, 90:9, 90:10, 103:14, 234:10, 235:18, 236:9, 239:25, 240:4
**generally**
93:17, 145:24, 260:12
**getting**
55:3, 144:14, 164:5, 166:24, 173:10, 184:15, 224:19, 248:8, 254:19, 254:20, 279:2, 280:2, 281:19, 282:10, 282:13
**give**
8:14, 8:16, 9:14, 11:13, 42:22, 81:19, 235:4, 246:14, 255:15, 272:16, 280:20, 283:14, 287:5, 287:12, 292:7
**given**
9:25, 10:5, 10:11, 45:7, 55:20, 58:14, 98:20, 155:11, 170:22, 216:25, 217:3, 217:6, 221:7, 222:13, 226:23, 271:12, 273:2, 282:22
**giving**
27:11, 56:4
**glorieni**
3:5
**go**
5:21, 5:23, 7:9, 7:20, 9:5, 13:14, 21:19, 22:5, 24:11, 40:14, 41:11, 50:11, 55:14, 58:11, 58:17, 78:22, 79:4, 84:20, 105:25, 111:13, 116:16, 134:13, 146:5, 158:20, 177:18, 179:14, 196:23, 212:25, 218:1, 219:18, 238:12, 239:4, 244:24, 246:19, 252:6, 256:19, 256:23, 272:12, 273:22, 278:23, 281:11
**goal**
257:6
**god**
287:14
**godaddy**
179:22, 179:23, 201:21
**goes**
82:10
**going**
8:15, 11:13, 14:14, 17:4, 17:11, 18:2, 18:19, 19:3, 21:19, 27:5, 40:5, 44:16, 46:6, 47:22, 55:15, 59:4, 65:13, 67:17, 71:16, 86:25, 87:19, 87:23, 109:8, 110:1, 125:17, 134:17, 144:22, 147:20, 158:6, 172:5, 177:5, 184:13, 184:14, 184:22, 184:23, 200:2, 206:1, 206:4, 206:14, 206:15, 207:23, 210:9, 210:12, 214:4, 221:9, 230:22, 234:18, 240:21,

WYLIE 585

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 319 of 356

245:15, 245:18, 250:7, 250:23, 255:11, 255:20, 260:20, 267:7, 277:24, 279:11, 282:4, 282:8, 288:14, 288:15, 288:16, 288:25, 290:4, 290:5, 291:11, 291:14, 291:20
**goldberg** 156:22, 156:24
**gone** 5:20, 287:12
**good** 5:16, 5:17, 9:25, 15:7, 18:12, 27:22, 59:3, 59:17, 59:20, 103:14
**goods** 29:17
**google** 160:12
**governance** 250:18
**graphic** 52:8, 103:12, 131:21
**great** 8:18, 8:23, 63:2, 66:8, 255:4, 256:8, 260:22
**greatly** 163:20, 165:8
**green** 216:5
**greenlee** 1:39, 295:3, 295:13
**gregory** 115:3, 264:12
**ground** 7:21, 71:13
**group** 3:6, 273:25, 274:2
**grouping** 156:13
**grow** 86:2, 230:18
**growing** 59:18
**grown** 230:22
**growth** 202:7, 254:21
**guarantee** 259:12
**guarantor** 108:2, 108:6, 108:12, 108:15, 108:22, 108:24, 108:25, 109:1, 113:25, 114:5, 116:24, 117:2, 118:7, 118:14, 118:17, 118:24, 119:16, 120:4, 120:9, 120:12, 120:18, 122:9, 172:23, 196:16, 226:6, 226:8, 246:25, 247:2, 247:3, 247:10, 247:18, 247:20, 247:23, 248:5, 248:7, 248:19, 250:14, 255:2, 255:11, 255:25, 256:13, 260:16, 261:2, 261:6, 262:3, 262:7, 262:10, 262:14, 262:22, 263:17
**guarantors** 261:16
**guess** 249:18
**guesstimate** 288:12
**guevera** 13:18, 15:14, 15:16, 15:17
**guidance** 57:17, 66:12, 66:17, 67:5, 67:19
**gunckel** 77:14
**guys** 55:25, 56:2, 219:13, 251:19

**H**

**hajjar** 46:11, 46:12, 46:14, 46:18, 47:4, 47:8, 47:12, 47:16, 48:1, 48:3, 48:5, 48:8, 48:10, 49:14, 50:7, 52:23, 53:3, 60:2, 76:19, 83:15
**half** 59:13, 64:15
**hand** 62:1, 234:18
**handed** 228:25, 245:24
**handing** 27:5, 65:12, 208:10, 215:25, 228:2, 269:5, 277:21, 283:12
**handle** 33:9, 231:6, 279:19
**handled** 57:23, 169:4, 250:18
**handles** 33:4, 33:6
**hands** 189:9, 247:10
**happen** 106:3, 117:21, 117:22, 118:23, 123:4, 154:12, 235:24, 255:16
**happened** 124:3, 161:5, 165:25
**happening** 196:9, 198:22, 270:8, 270:10, 270:15, 276:14
**happy** 9:2, 254:18
**hard** 43:2, 55:8, 259:4, 263:8
**harm** 263:5
**head** 105:17
**hear** 273:23, 286:19
**heard** 34:4, 56:18
**hearing** 11:7, 11:10, 118:21
**hearings** 11:14
**heated** 122:13, 122:18, 122:20
**held** 2:2, 25:16, 25:18, 45:17, 109:24, 186:18, 197:14, 198:8, 198:11, 198:14, 199:19, 235:17, 235:22
**hello** 270:14
**help** 16:23, 24:24, 30:15, 34:5, 47:13, 58:14, 58:21, 85:21, 86:1, 98:15, 102:8, 102:9, 103:20, 124:11, 254:21, 264:24, 271:12

**helped**
51:13, 131:13, 154:10
**helping**
86:18, 103:15
**helps**
34:23
**here**
6:10, 8:2, 19:2, 19:5, 19:10, 20:23, 21:3, 32:6, 63:22, 66:17, 67:4, 67:17, 67:23, 84:20, 173:6, 195:9, 217:13, 220:20, 221:25, 235:22, 251:16, 253:20, 256:4, 256:6, 260:10, 263:16, 270:15, 270:21, 273:8, 276:9, 282:10, 284:14, 284:15, 285:16
**hereby**
294:4, 295:3
**heroku**
74:19, 74:25, 75:1, 129:2, 146:10, 148:10, 179:24
**herself**
19:10, 68:17, 68:19, 68:22, 122:7, 173:9, 218:19
**hey**
66:1, 66:7, 66:8, 87:6, 87:8, 261:24
**hi**
278:23
**high**
107:21
**high-level**
223:25
**high-powered**
243:20
**highly**
128:5, 144:7
**hijjar**
278:16
**hire**
15:25, 46:21, 47:2, 48:18, 58:6, 76:15, 207:21, 254:21, 264:23
**hired**
16:2, 30:16, 35:11, 35:12, 35:22, 36:3, 46:22, 46:24, 84:11, 84:18, 84:21, 85:7, 85:8, 85:11, 85:13, 85:20, 85:21, 124:14, 207:17
**hiring**
15:22, 57:23, 58:5, 58:9, 58:16, 85:17
**historic**
201:16
**historical**
201:21
**hold**
24:7, 45:14, 61:24, 66:9, 113:19, 113:21, 197:14, 247:11
**holders**
23:14
**holding**
126:7, 222:22, 222:24, 237:10
**home**
252:15
**hope**
18:3, 18:5, 236:20, 254:25, 259:25
**hoped**
56:13, 205:10, 290:19
**hopefully**
257:6
**hoping**
257:3
**hostage**
45:18, 109:24, 126:7, 257:24, 258:22
**hostile**
94:1
**hour**
16:16, 133:15, 240:22, 256:20
**hourly**
16:13, 16:14, 16:15, 22:8, 22:12
**hours**
130:22, 131:7, 131:18, 131:19, 131:21, 150:5, 257:13
**how's**
116:14, 252:13
**however**
24:10, 58:24, 66:22, 70:24, 109:24, 111:17, 133:19, 144:7, 149:24, 151:2, 247:10, 255:1, 272:16, 279:11, 290:20
**huge**
229:24
**huh-huh**
8:14
**hunter**
240:3

**I**

**idea**
66:8, 66:14, 176:22
**ideal**
246:7
**ideas**
103:15
**ideation**
38:18
**identification**
27:8, 62:3, 65:14, 208:8, 215:23, 227:25, 234:16, 245:20, 266:4, 269:3, 277:19, 283:10
**identify**
35:24, 51:22, 51:23
**identifying**
51:11, 176:21
**imagery**
131:12
**immediacy**
184:2
**immediate**
267:25
**immediately**
196:22, 280:1
**impair**
9:18
**impartial**
124:10
**impasse**
124:9
**impede**
164:4
**impeded**
165:8
**implement**
151:25, 154:10
**implemented**
35:2
**implementing**
84:9
**implying**
14:22
**important**
8:19, 9:21, 250:1, 256:4
**improper**
280:19, 280:20, 280:22, 281:8
**improve**
168:4

WYLIE 587

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 321 of 356

**in-person**
109:6, 124:6
**inaccuracy**
64:23
**inception**
133:13, 134:6, 170:6, 172:13
**include**
258:5
**included**
177:14, 217:14, 238:21, 251:13
**including**
28:8, 31:15, 52:7, 60:5, 81:24, 125:10, 186:14, 209:12, 212:15, 213:3, 217:21, 253:11
**income**
216:22, 217:10, 217:22, 217:23, 219:19, 219:24
**inconvenient**
280:14
**incorporate**
50:8, 60:8, 66:12, 66:18, 66:20, 67:5, 67:20, 81:16, 257:25
**incorporated**
16:24, 22:18, 23:5, 24:15, 25:24, 32:11, 32:25, 49:25, 63:5, 63:22, 69:16, 69:18, 85:10, 116:17, 227:23, 231:3
**incorporates**
173:24
**incorporating**
55:16, 61:9, 64:2, 68:7
**incorporation**
53:9, 80:16, 80:18, 80:20, 81:7, 81:12, 81:17, 200:4
**incorrect**
64:9, 64:10, 81:9, 120:23, 126:19, 126:24, 127:3, 127:5, 127:10, 174:12, 187:20, 187:22, 190:8, 276:2
**increase**
127:17, 128:2, 279:14
**increased**
223:23
**incredibly**
195:7
**incurred**
200:25, 232:15
**indeed**
274:22
**independent**
29:9, 29:10, 288:20, 288:22
**independently**
277:16
**indicated**
223:21
**indicates**
275:20
**individual**
7:12, 7:16, 11:4, 27:24, 226:20, 285:8
**individually**
48:21, 105:3, 226:14
**individuals**
52:3, 92:2, 264:15
**industry**
31:5, 31:6, 31:8, 39:24, 85:25, 102:7, 103:20, 128:15, 168:3
**inform**
226:1
**informal**
8:3
**information**
14:4, 27:25, 32:7, 39:5, 39:21, 65:2, 75:1, 134:19, 144:15, 146:8, 163:12, 169:20, 180:17, 181:15, 182:9, 182:25, 204:24, 226:23
**informed**
123:24, 160:5, 226:13, 258:5
**informing**
79:19
**infringe**
163:3
**infringement**
6:20, 266:9
**infringing**
267:18
**initial**
27:20, 37:8, 49:6, 49:24, 51:16, 53:4, 54:23, 74:1, 98:3, 103:7, 103:23, 104:21, 104:22, 105:2, 113:18, 174:6, 185:25, 239:12
**initially**
47:12, 47:16, 50:17, 50:22, 51:4, 51:10, 51:19, 52:4, 52:6, 76:21, 98:2, 98:9, 101:24, 102:11, 103:1, 109:5, 109:23, 110:2, 112:14, 167:13, 170:22, 188:10
**initiate**
55:11, 124:4, 182:15, 186:15, 233:1
**initiated**
106:16, 181:25, 182:12, 182:18, 182:20, 187:14, 188:2, 190:10, 232:25, 233:4, 269:14
**injection**
105:9, 155:14
**injections**
104:2, 104:4
**injunction**
62:11, 160:7, 180:4, 182:20
**inner**
275:4
**inoperable**
201:17, 201:18, 201:22, 202:1, 202:12, 202:15
**input**
50:25, 56:11, 57:16, 58:14, 58:16, 59:5, 128:13, 128:14, 131:21, 209:1
**inspection**
40:8, 168:7
**install**
80:12, 144:4, 146:5
**installed**
80:22, 128:25
**installing**
146:18
**installments**
73:8
**instance**
260:7
**instant**
47:17, 49:4, 113:9, 113:12, 114:20, 114:23, 115:12, 115:22, 116:8, 182:19, 185:9, 185:23, 185:25

WYLIE 588

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 322 of 356

**instead**
278:25, 281:15
**instruct**
14:15, 19:22, 47:23, 184:14, 206:14, 267:7, 288:16, 290:5, 291:12, 291:20
**instructed**
50:2, 289:4
**instructing**
14:7, 17:15, 19:20, 153:21, 214:1, 267:18, 289:2
**instruction**
206:16, 206:18, 206:25
**instructions**
207:4
**instrumental**
35:5, 56:14
**insufficient**
253:8
**insurance**
108:9, 108:10, 108:17, 109:1, 262:2, 262:6, 262:9, 262:13
**integral**
164:15
**integrate**
272:14
**integrations**
144:8
**integrity**
202:7
**intellectual**
161:24, 173:16, 267:19
**intend**
100:22, 100:25, 279:22
**intended**
186:17
**intends**
286:17
**intent**
182:3, 228:12, 230:18, 267:21
**intention**
100:24, 189:7, 189:8, 245:12, 258:5, 282:15, 282:21, 285:10, 286:3
**intentional**
224:25
**intentionally**
224:8
**interaction**
292:13
**interest**
23:14, 50:16, 61:25, 106:9, 106:10, 107:19, 107:20, 165:12, 167:21, 168:1, 170:2, 224:20, 243:5, 294:11, 295:9
**interested**
54:19, 60:4, 63:7
**interesting**
275:13
**internal**
206:24
**internet**
181:10
**interpreted**
67:25
**interrupt**
81:5
**interruptions**
150:23
**interviews**
58:10, 58:11, 58:13
**intimate**
32:9, 32:12, 39:3
**inventory**
35:7, 144:9
**investigations**
226:4
**investment**
284:2
**investor**
205:21, 205:22
**invited**
186:10, 186:12, 186:16, 197:10, 198:7, 198:25, 199:4, 199:8, 199:12, 199:17, 199:18, 199:22
**invoice**
88:21, 89:1, 89:23, 90:1
**invoiced**
88:20, 89:20, 235:23
**invoices**
148:4, 209:12, 210:15, 210:16, 210:21
**involved**
34:20, 38:17, 41:21, 41:25, 49:12, 49:19, 49:22, 50:6, 85:17, 92:1, 109:3, 109:6, 109:10, 148:15, 161:17, 169:19, 208:23, 209:1, 209:3, 209:7, 259:14, 262:10
**involvement**
148:12
**io**
74:19, 129:2, 146:19, 148:2, 148:11, 179:24, 269:9, 272:17
**ip**
273:16
**issuance**
171:24, 242:4
**issue**
68:21, 171:21, 246:25, 247:8, 251:17, 261:25
**issued**
43:10, 50:4, 153:6, 170:6, 170:11, 170:13, 170:16, 171:18, 221:12, 235:20, 242:9, 242:11, 242:21, 243:1, 243:9, 243:16, 244:2, 247:13, 279:18
**issues**
39:25, 259:21, 259:22
**it'd**
264:9
**item**
42:6, 218:9, 236:2, 238:14, 239:7, 239:19, 273:14
**items**
127:14, 177:14, 236:18, 237:10, 240:6, 240:16, 273:15
**itself**
274:6

**J**

**j-e-l-e-n-a**
85:5
**jacquelyn**
283:23, 284:11
**january**
47:5, 47:7, 53:5, 53:14, 53:23, 54:4, 54:10, 58:24, 64:8, 198:24, 198:25
**jelena**
85:3, 85:5, 85:14, 85:24, 86:15, 87:5, 87:20, 87:23, 88:4, 88:8, 89:2, 89:8, 89:20, 89:24, 90:9, 90:20,

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 323 of 356

91:1, 205:7, 205:24, 206:11
**job**
1:35, 264:22
**john**
1:27, 2:1, 4:12, 5:10, 5:19, 5:22
**join**
224:1
**joined**
30:25, 170:9, 170:14, 171:12, 199:5
**joining**
92:7, 198:3
**joint**
56:8, 258:2
**joseph**
24:18, 25:8, 25:10, 38:4, 38:5, 38:8, 38:9, 38:10, 38:13, 38:15, 38:17, 38:25, 39:3, 39:11, 39:20, 51:1, 60:5
**journalist**
13:13, 13:17, 15:1
**judge**
8:3, 203:11
**judges**
273:3
**july**
36:5, 36:13, 79:17, 99:14, 99:24, 99:25, 154:13, 161:13, 161:18, 162:21, 163:6, 167:8, 167:9, 205:5, 220:8, 220:9, 221:25, 223:18, 269:13, 271:17, 272:24, 277:2, 278:21
**june**
12:23, 35:20, 79:17, 90:17, 128:16, 162:21, 162:22, 163:6, 170:16, 220:7, 220:9, 221:25, 223:18, 268:4, 272:24
**junior**
115:10
**jury**
8:5, 77:15, 155:20

**K**

**kareem**
49:14, 53:2, 278:16, 278:23
**keep**
189:8, 217:13, 252:15, 252:16, 252:17
**keeping**
27:13
**keith**
115:8, 264:12
**kept**
151:10, 151:11
**keri**
28:10, 32:23, 32:24, 33:3, 33:6, 33:10, 33:13, 33:14, 33:16, 33:20, 33:21, 33:24, 34:3, 34:11, 34:17, 34:19, 34:21, 77:12
**key**
192:9
**kind**
16:7, 23:8, 31:12, 33:1, 37:1, 56:11, 69:5, 69:23, 70:3, 74:23, 75:21, 79:4, 80:8, 87:1, 102:2, 109:8, 125:20, 145:24, 146:12, 176:21, 235:24
**kinds**
150:22
**kirby**
3:33
**knew**
12:11, 169:3, 188:18
**know**
6:17, 7:22, 9:21, 18:18, 18:23, 20:4, 20:24, 21:18, 29:24, 33:18, 49:16, 55:22, 55:23, 59:25, 105:7, 105:17, 106:9, 113:17, 115:20, 118:21, 119:4, 119:25, 121:13, 123:12, 130:6, 145:10, 145:12, 145:13, 145:15, 149:17, 164:9, 164:21, 164:24, 165:24, 169:12, 169:13, 169:17, 171:1, 176:3, 176:6, 176:9, 179:15, 180:19, 181:19, 182:3, 183:17, 186:2, 186:6, 201:11, 202:17, 202:23, 203:4, 210:25, 211:2, 211:16, 211:25, 212:8, 212:24, 213:11, 214:6, 227:14, 230:2, 237:18, 238:22, 249:2, 252:1, 254:16, 254:23, 261:19, 261:24, 265:5, 265:12, 265:13, 269:25, 271:16, 274:19, 274:22, 274:25, 280:19, 287:14, 287:15, 288:14
**knowing**
126:7, 129:9, 129:12, 129:15, 129:18, 144:5
**knowledge**
32:9, 32:13, 35:1, 39:4, 41:14, 54:3, 157:16, 157:17, 180:7, 203:2, 206:23, 207:2, 210:10, 231:16, 258:19, 258:21, 263:5, 277:14, 294:9, 295:6
**known**
15:20, 20:6, 27:23, 28:15, 28:16, 29:23, 31:17, 31:18, 33:20, 33:21, 35:18, 38:9, 46:18, 248:21, 248:22
**kollin**
2:11, 294:3, 294:15
**kristen**
77:13
**kristin**
77:13

**L**

**label**
220:3, 227:1, 250:24, 252:25, 262:24
**labeled**
244:5, 245:18
**lane**
6:3
**langston**
77:11

WYLIE 590

**larger**
166:24, 279:5
**largest**
218:8
**last**
115:4, 115:9, 219:18, 219:19, 226:25, 263:5, 290:3, 291:4
**lataye**
77:13
**late**
15:21, 29:5, 53:7, 54:10, 56:24, 58:24, 152:24, 270:14
**lately**
107:21
**later**
13:5, 50:14, 86:19, 93:10, 148:25, 184:23, 202:21, 240:10, 258:7, 279:18
**launch**
51:17, 54:17
**launched**
76:22, 218:10
**launching**
34:4
**lauren**
1:13, 3:13, 3:34, 6:9, 6:14, 8:10, 13:2, 13:14, 14:2, 28:4, 39:9, 45:3, 48:23, 50:24, 51:3, 51:7, 52:2, 53:11, 53:16, 54:1, 54:14, 55:16, 56:7, 60:6, 60:7, 65:20, 65:25, 67:3, 67:18, 69:22, 70:4, 85:18, 87:19, 88:7, 88:18, 88:21, 88:23, 89:7, 89:11, 91:16, 91:19, 98:4, 98:11, 99:1, 99:10, 99:18, 100:6, 100:9, 100:13, 100:22, 101:4, 101:12, 101:18, 103:6, 109:5, 109:12, 109:23, 110:3, 113:24, 114:4, 116:18, 125:4, 134:22, 174:19, 197:10, 208:20, 219:12, 236:14, 237:3, 237:4, 237:9, 237:13, 237:15, 237:24, 238:3, 238:4, 238:6, 239:20, 240:4, 240:13, 241:23, 278:16, 282:9, 283:24, 284:11, 285:19, 285:23, 286:9
**lauren's**
239:24, 282:22, 286:21
**law**
3:6, 40:21, 46:12, 48:12, 48:13, 48:14, 48:15, 48:17, 48:20, 48:22, 48:24, 49:2, 49:16, 49:18, 169:21, 169:23, 170:15, 194:9, 266:9
**lawsuit**
6:13, 7:2, 7:3, 32:19, 40:24, 166:5, 180:7, 180:20, 181:9, 181:15, 182:1, 182:8, 183:5, 183:11, 183:13, 183:19, 183:20, 183:24, 184:5, 184:8, 184:16, 184:25, 186:8, 186:9, 186:24, 187:4, 187:14, 187:25, 188:2, 188:10, 188:17, 188:25, 190:1, 190:6, 190:10, 190:25, 191:2, 213:19, 233:4, 233:18, 286:21, 290:17
**lawsuits**
180:15, 180:18, 182:15
**lay**
7:21
**layout**
131:13
**lead**
102:10, 115:8, 210:1, 215:8, 289:5
**learn**
46:13
**learned**
202:21
**least**
133:14
**leave**
260:20
**leaving**
81:21, 131:16
**led**
124:5, 164:17
**ledgers**
209:16, 212:17
**left**
59:19, 76:24, 82:24, 110:5, 148:18
**legal**
11:18, 13:7, 13:8, 41:16, 104:9, 119:5, 123:8, 123:15, 180:10, 209:5, 209:6, 218:22, 219:1, 236:2, 236:25, 239:8, 242:12, 287:2, 288:4, 290:6
**legality**
123:9, 123:11
**lema**
3:16, 6:8, 20:22
**lender**
225:24, 226:1
**less**
43:19, 221:7, 257:13, 290:15
**lessie**
3:4, 18:10, 18:19, 18:21, 20:10, 21:7, 21:20, 46:6, 150:20, 251:2, 277:23, 280:11, 280:24, 281:3
**lessie@gilstrapl-awgroup**
3:11
**let's**
42:14, 55:14, 58:17, 66:9, 78:22, 79:4, 87:1, 99:16, 105:25, 109:9, 111:13, 116:16, 124:2, 143:23, 144:16, 144:19, 145:24, 158:4, 158:20, 161:4, 196:23, 212:25, 218:1, 221:24, 229:18, 238:12, 241:9, 247:20, 254:7, 259:22, 287:17
**letter**
153:10, 154:1, 154:3, 157:19,

WYLIE 591

158:2, 267:14, 267:17, 267:22, 268:5
**letter's**
267:20
**level**
146:8, 191:11, 256:15
**liabilities**
234:22, 234:23
**liability**
226:20
**liable**
194:6
**licensed**
79:1, 129:1, 146:3, 155:3, 156:6, 156:25, 273:2, 273:15, 274:8, 275:18
**licensing**
58:1, 78:1, 79:7, 79:9
**lieu**
249:6, 282:4
**life**
108:9, 108:10, 108:17, 108:25, 131:6, 262:2, 262:6, 262:9, 262:13
**likely**
27:24, 131:7, 217:18, 227:12, 233:20, 247:6
**limited**
28:9, 157:7, 160:2, 209:12, 213:3
**line**
19:13, 21:5, 42:6, 107:2, 107:13, 107:18, 108:13, 110:19, 111:5, 111:24, 112:5, 116:1, 116:4, 144:5, 177:14, 181:10, 181:21, 217:23, 218:8, 236:13, 236:17, 238:14, 239:7, 239:19, 244:11, 250:19, 262:2, 270:12, 270:13
**lines**
79:23, 106:20, 106:25, 107:4, 108:20, 244:12
**link**
74:17, 145:12
**linked**
74:9, 145:11
**linking**
74:16
**links**
144:9
**liquidity**
121:22, 172:8
**list**
179:22, 250:13, 256:22
**listed**
32:6, 50:20, 72:12, 83:16, 83:19, 243:8, 245:8, 261:16, 262:21, 262:23
**listen**
14:9
**lists**
213:4, 213:5, 261:12
**literally**
257:13, 264:23
**litigation**
10:22, 13:6, 32:7, 34:18, 34:25, 38:16, 38:20, 39:1, 47:17, 48:17, 48:23, 48:24, 48:25, 49:4, 101:3, 105:12, 111:18, 111:20, 113:8, 113:9, 113:12, 113:15, 114:2, 114:3, 114:20, 114:23, 115:12, 115:15, 115:17, 115:22, 115:25, 116:8, 182:9, 182:13, 182:19, 182:22, 185:9, 185:23, 186:1, 186:15, 214:8, 223:2, 226:1, 226:4, 226:14, 226:16, 226:22, 232:14, 232:17, 232:24, 233:1, 233:13, 233:21, 234:11, 286:7, 289:9, 289:11, 289:19
**litigation@lloyd-mousilli**
3:22
**little**
13:4, 29:2, 148:24, 195:3, 195:11, 195:12, 195:14, 236:19, 245:5, 280:10, 280:23
**live**
162:20, 163:6
**lives**
264:12
**llc**
23:2, 23:12, 23:17, 23:20, 23:24, 24:1, 24:3, 24:15, 24:18, 24:23, 25:6, 25:11, 25:15, 25:22, 26:2, 26:6, 30:24, 38:6, 46:16, 60:12
**lloyd**
3:18
**llp**
46:12, 46:14, 46:18, 47:5
**loaned**
282:7, 282:8, 282:9
**loans**
105:19, 105:21, 105:23, 106:18, 107:24, 108:21, 109:4, 112:9, 112:19, 113:5, 115:23
**locked**
164:21, 164:25, 179:22, 180:1, 191:2, 195:8, 204:2, 204:5
**locking**
164:15
**lodged**
214:10
**lodges**
213:8
**logo**
163:15
**long**
6:4, 15:20, 16:17, 28:15, 29:23, 31:17, 33:20, 34:13, 35:18, 38:9, 195:20, 200:6, 225:24, 225:25, 257:20, 281:2
**longer**
38:1, 43:9, 48:9, 148:20, 148:21, 148:22, 153:17, 157:8, 160:12, 165:3, 180:22, 242:9, 247:8, 269:21, 270:1, 272:15
**look**
27:6, 79:23, 79:24, 131:23, 214:4, 214:6, 216:10, 220:4, 221:24, 241:9,

WYLIE 592

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 326 of 356

241:12, 251:1, 251:6, 277:25
**looking**
50:11, 145:18, 241:8, 247:19, 278:4, 280:6
**looks**
65:24, 251:4, 251:18, 251:20, 280:7
**looming**
265:7
**lose**
195:1, 195:15
**losing**
194:20
**loss**
165:11, 174:22, 209:14, 212:1, 212:4, 212:16, 216:16, 216:20
**losses**
174:21
**lost**
195:2, 201:16
**lot**
51:1, 134:3, 150:7, 150:9, 150:10, 176:23, 235:6, 279:13
**lots**
261:18
**low**
112:4, 176:1
**lower**
43:19, 50:13, 247:6
**lying**
185:5

**M**

**m-e-d-i-c**
85:5
**macbook**
240:6
**machine**
156:22, 156:24
**made**
30:18, 56:10, 57:6, 58:15, 62:12, 79:23, 79:25, 86:10, 86:12, 89:5, 100:5, 100:23, 101:4, 105:9, 117:24, 120:25, 121:1, 121:4, 121:9, 126:21, 128:10, 167:21, 173:9, 181:24, 185:12, 195:23, 196:18, 208:5, 232:16, 233:7, 247:25, 248:4, 250:15, 252:14, 267:23, 268:2, 285:3, 285:5, 285:6, 291:5
**magazine**
13:23
**mail**
153:3
**main**
63:10
**maintain**
43:21, 75:5, 133:20, 154:19, 190:3, 191:11
**maintained**
149:11
**maintains**
34:21
**majority**
150:10
**make**
7:14, 7:22, 8:23, 17:9, 18:2, 40:8, 55:6, 57:4, 58:14, 61:22, 120:24, 126:16, 181:25, 222:22, 230:16, 243:21, 247:22, 250:7, 254:6, 254:8, 255:16, 267:25, 279:24
**makes**
33:11
**making**
7:18, 73:14, 150:8, 181:14, 256:20, 258:1, 263:16
**manage**
35:7, 148:23, 164:14, 191:23, 192:5, 204:14
**managed**
148:25, 151:13, 151:14, 151:17
**management**
25:2, 31:15, 33:5, 129:14, 131:15, 132:7, 132:10, 132:13, 132:17, 132:19, 132:24, 133:1, 133:5, 133:7, 133:8, 133:9, 133:12, 133:17, 133:20, 133:25, 144:9, 148:16, 148:19
**manager**
33:3, 33:14, 33:25
**manages**
34:21
**many**
46:20, 50:22, 92:11, 92:18, 132:24, 171:21, 251:16, 259:21
**mar**
189:7
**march**
1:29, 5:3, 6:1, 49:11, 52:24, 53:8, 53:9, 55:15, 58:12, 63:5, 79:2, 79:9, 79:11, 100:2, 104:5, 113:18, 113:24, 116:18, 117:25, 124:20, 172:19, 197:17, 197:18, 198:5, 198:6, 246:4, 252:23, 259:3, 263:3
**mark**
1:21, 3:14, 24:19, 25:12, 25:14, 28:9, 29:20, 29:21, 29:24, 30:6, 30:13, 30:16, 30:18, 30:25, 31:4, 39:22, 51:1, 52:15, 52:18, 60:5, 75:15, 75:16, 75:17, 77:11, 91:21, 91:24, 92:6, 92:8, 92:10, 93:4, 103:9, 103:17, 103:19, 159:25, 167:14, 183:8, 222:3, 243:25, 246:4, 248:23, 249:8, 249:10, 249:21, 250:5, 251:11, 251:13
**marked**
27:6, 27:8, 62:1, 62:3, 62:18, 62:22, 65:13, 65:14, 208:8, 208:10, 215:23, 216:1, 227:25, 228:3, 234:16, 234:19, 245:20, 245:24, 266:4, 269:3, 269:5, 277:19, 277:21, 283:10, 283:12
**market**
25:1, 51:22, 102:5, 170:25
**marketing**
15:24, 16:2,

WYLIE 593

16:11, 16:20, 17:1, 18:15, 22:2, 22:12, 22:18, 23:2, 23:3, 23:5, 23:9, 23:15, 23:17, 23:21, 23:24, 24:3, 24:4, 24:5, 24:10, 26:16, 26:19, 29:9, 29:12, 29:14, 29:18, 30:15, 30:16, 46:16, 46:25, 56:16, 63:11, 69:6, 80:13, 80:23, 83:6, 83:13, 85:12, 85:13, 86:16, 87:5, 87:8, 87:14, 88:22, 88:23, 89:1, 90:2, 90:10, 90:19, 90:20, 91:1, 91:4, 91:12, 105:12, 105:21, 108:8, 108:16, 108:24, 218:2, 218:6, 227:20, 228:8, 228:10, 228:14, 228:16, 228:20, 228:22, 229:4, 229:9, 229:10, 229:18, 229:24, 230:1, 230:18, 230:21, 231:1, 231:6, 231:10, 231:22, 232:3, 232:7, 232:13, 232:16, 233:3, 233:13, 234:10, 235:14, 236:6, 236:9, 239:15, 244:20, 244:25, 245:8, 262:21

**markup**
89:4

**marring**
189:1

**material**
131:15, 226:2

**materially**
226:6

**materials**
12:2, 12:3, 209:25

**matt**
1:20, 3:14, 5:21, 5:22, 5:24, 24:19, 27:21, 28:9, 77:12, 83:18, 83:21, 109:12, 177:2, 183:9, 215:3, 237:14, 237:21, 240:18, 249:21, 263:3, 270:14, 280:5

**matt@bigthirst**
15:18

**matter**
59:2, 288:8

**matters**
31:5, 48:6, 48:18, 48:20

**matthew**
1:27, 2:1, 4:12, 5:10, 5:19, 5:22, 5:24

**maybe**
54:5, 259:25, 279:16

**mcginnis**
1:20, 1:21, 1:27, 2:1, 3:14, 4:12, 5:10, 5:19, 5:21, 5:22, 6:8, 7:20, 12:1, 18:14, 21:25, 24:19, 27:5, 27:16, 27:21, 28:9, 28:12, 28:13, 40:20, 51:2, 52:7, 52:16, 52:18, 53:15, 60:5, 61:2, 62:7, 64:25, 65:12, 65:17, 66:5, 66:21, 67:6, 73:10, 75:21, 75:25, 77:12, 78:12, 79:13, 81:2, 83:18, 83:21, 91:21, 91:22, 92:14, 92:15, 92:21, 103:9, 103:10, 103:12, 109:12, 120:16, 122:1, 122:11, 127:25, 130:1, 131:22, 143:10, 159:4, 167:15, 169:8, 177:2, 183:9, 185:8, 197:7, 202:10, 205:1, 215:3, 215:25, 221:25, 228:2, 228:7, 241:6, 243:12, 243:16, 243:25, 250:4, 252:5, 266:1, 269:6, 273:6, 273:18, 278:2, 278:13, 281:11, 283:20, 287:4, 288:1, 292:12

**mean**
12:18, 36:8, 42:15, 50:19, 72:5, 108:19, 114:10, 117:8, 118:2, 132:17, 143:22, 149:4, 156:20, 159:17, 160:13, 176:22, 179:14, 180:8, 200:8, 204:19, 220:1, 234:24, 235:25, 242:7, 246:11, 247:16, 249:1, 249:15, 250:25, 251:25, 254:4, 256:16, 269:20, 272:4, 282:17

**meaning**
36:9, 143:23, 157:7, 283:2

**means**
114:11, 118:3, 160:14, 220:2, 242:8, 269:21, 282:18

**meant**
204:22, 236:23, 266:21

**measure**
257:24

**measures**
126:15

**mechanism**
107:4

**media**
31:25, 133:9

**mediation**
117:25, 119:6, 122:17, 124:2, 124:4, 124:5, 124:18, 125:1, 125:8, 128:20

**mediator**
124:15, 124:16, 125:15

**mediators**
124:13

**medic**
85:3, 85:5, 85:14, 85:24, 86:15, 88:4, 88:8, 89:2, 89:8, 89:20, 89:24, 90:9, 90:20, 91:1, 205:7, 205:24, 206:11

**medications**
9:17

**meet**
28:17, 30:1,

WYLIE 594

31:7, 31:20, 33:23, 122:15, 124:18, 164:12, 183:4, 183:10, 254:18
**meeting**
38:11, 53:5, 66:11, 183:7, 184:10, 186:6, 186:14, 186:16, 186:18, 187:11, 198:10, 198:13, 198:23, 199:1, 199:4, 199:8, 199:18, 199:21, 199:22, 234:14, 247:11, 289:19, 290:3
**meetings**
52:22, 102:6, 103:20, 109:6, 109:7, 116:11, 124:6, 125:15, 183:15, 184:25, 185:22, 186:10, 186:11, 186:13, 188:5, 197:11, 197:13, 197:15, 197:16, 197:25, 198:3, 198:5, 198:7, 198:9, 198:16, 198:17, 198:19, 198:20, 198:21, 199:13, 199:14, 199:17, 214:25
**member**
187:8, 187:15, 199:19, 223:2, 279:20, 279:25
**members**
24:1, 24:2, 24:16, 58:16, 183:8, 184:21, 221:22, 221:23, 222:21, 223:7, 223:25, 243:22, 243:23, 243:24, 279:12, 279:18, 279:22, 289:25
**membership**
25:16, 161:3
**memory**
9:18
**mention**
56:7
**mentioned**
59:7, 72:13, 244:15
**mentions**
264:1
**mentors**
128:14
**merge**
231:15
**message**
153:13, 153:16, 251:12, 256:18, 257:1, 270:3, 270:4
**met**
11:18, 11:21, 15:21, 16:4, 28:18, 28:20, 30:2, 30:5, 31:21, 31:25, 33:24, 35:20, 35:21, 38:10, 53:2, 125:13, 183:15, 183:19, 186:3, 250:14, 257:21, 257:25, 258:10, 292:14
**mid-may**
157:11, 201:7
**middle**
225:22, 283:25
**might**
9:4, 9:17, 32:7, 41:17, 237:17, 250:9, 292:16
**million**
144:2, 170:13, 170:19, 171:5, 171:12, 173:22, 205:12, 220:18, 220:25, 223:15, 223:22, 223:24, 241:21, 279:15
**millions**
144:12
**mind**
38:22, 62:20, 118:21, 122:10, 263:17
**mine**
224:16
**minimum**
253:14, 253:23
**minute**
263:5
**minutes**
185:13, 185:15, 214:25, 234:14, 245:4
**missed**
106:22
**misspoke**
143:17
**misstated**
64:18, 223:11
**misstatement**
203:16, 203:20
**mistaken**
271:8
**misunderstand**
229:20
**misunderstanding**
240:11
**mode**
280:1
**model**
231:18
**moderating**
253:20
**modify**
82:6, 82:9, 82:13
**moment**
122:14, 208:12, 216:10, 246:14
**momentarily**
203:2
**monetary**
101:19, 102:12, 128:11, 173:7, 174:3, 174:6, 189:11
**money**
54:21, 121:23, 122:6, 172:9, 172:12, 217:25, 218:18, 233:6, 233:21, 235:17, 238:23, 240:16, 245:14, 248:9, 258:21, 278:25, 279:13, 281:15, 282:4
**monies**
111:15
**month**
163:1, 176:13, 177:8, 177:12, 177:13, 220:11, 247:7
**monthly**
43:25, 44:11, 106:9, 290:25
**months**
104:9, 118:10, 169:18, 200:3, 264:9, 279:6
**more**
9:2, 43:20, 43:25, 44:8, 44:13, 44:14, 54:20, 59:11, 64:5, 66:11, 100:9, 102:1, 102:20, 102:22, 102:24, 111:21, 122:16, 144:2, 146:6, 148:24, 149:25, 168:14, 176:24, 200:3, 211:3, 211:5, 220:2, 221:7, 221:20, 224:15, 224:20, 243:22, 243:23, 248:7,

WYLIE 595

248:12, 248:14, 248:18, 251:5, 252:8, 253:12, 254:10, 262:3, 273:14
**moreover**
210:2
**morning**
5:16, 5:17
**mortgaging**
259:6
**most**
16:15, 250:20
**mostly**
24:10, 112:4
**mouth**
194:21
**move**
120:5, 164:20, 184:7, 186:4, 229:21, 229:22, 248:9, 254:16, 255:1, 256:22, 261:2, 262:18, 280:1
**moved**
29:8, 51:12
**moving**
26:23, 43:20, 263:11
**much**
68:24, 88:18, 89:1, 98:20, 104:22, 105:13, 106:5, 107:6, 107:11, 108:10, 111:19, 129:4, 129:7, 129:10, 129:13, 129:16, 129:19, 130:12, 130:20, 131:3, 131:17, 132:6, 133:11, 133:17, 133:25, 134:7, 149:13, 149:18, 149:25, 150:2, 151:21, 151:22, 179:25, 189:22, 218:12, 218:20, 236:16, 236:21, 237:1, 238:6, 239:10, 263:12, 264:24, 288:4, 288:25, 290:25
**multiple**
243:20
**multiples**
205:10
**must**
40:7
**myself**
24:9, 202:6, 252:19, 262:3, 277:24

**N**

**nailed**
66:13
**name**
5:18, 5:19, 5:20, 5:23, 6:8, 13:18, 22:21, 27:23, 46:15, 71:6, 77:10, 83:3, 83:5, 84:23, 115:4, 115:9, 256:25, 285:8
**named**
115:8
**national**
15:10
**nature**
54:16, 218:25
**navigation**
131:14, 163:13
**near**
266:16, 279:8
**necessarily**
250:1
**necessary**
33:11, 40:2, 113:17, 279:25
**need**
9:20, 18:21, 19:6, 19:7, 19:15, 19:18, 19:22, 20:15, 20:16, 20:19, 27:9, 65:6, 87:6, 87:9, 87:11, 158:10, 158:16, 162:25, 184:2, 238:11, 247:14, 248:8, 248:25, 249:3, 249:11, 264:2, 279:5, 279:6, 279:16, 293:2, 293:3, 293:4
**needed**
7:5, 34:5, 34:10, 44:13, 44:14, 186:3, 195:4, 224:10, 231:18, 235:7, 242:13, 243:21, 245:10, 248:9, 250:14, 250:17, 264:18, 264:21, 264:23, 264:24
**needs**
210:3, 230:16
**negative**
194:21, 219:21, 219:24
**negotiate**
125:18, 257:7
**negotiated**
290:16
**negotiating**
109:3, 109:11
**negotiations**
243:19
**neighborhood**
33:19, 68:25
**neither**
69:21, 209:25, 294:10, 295:7
**net**
219:19, 219:23
**never**
35:21, 46:3, 65:2, 101:5, 126:25, 129:6, 149:16, 150:25, 172:12, 196:20, 242:15, 242:17, 242:20, 242:25, 261:22, 277:12
**new**
10:2, 10:3, 16:24, 33:10, 34:5, 35:2, 35:25, 37:10, 43:7, 43:14, 43:18, 44:19, 44:21, 53:18, 57:9, 60:13, 105:11, 131:12, 149:6, 149:11, 154:13, 161:10, 161:14, 161:17, 162:20, 163:2, 163:5, 189:12, 204:23, 223:6, 229:18, 229:25, 243:18, 247:6, 247:14, 248:11, 248:25, 249:3, 249:4, 249:5, 261:17
**news**
20:9
**next**
104:8, 105:9, 160:6, 187:23, 187:24, 187:25, 217:22, 218:15, 220:3, 225:4, 236:2, 238:1, 239:7, 241:12, 254:20, 259:1
**nobody**
20:3, 242:22
**noncompete**
72:23, 83:22, 84:1, 84:4, 84:10, 93:20, 97:22
**none**
250:22, 286:2

WYLIE 596

**nonetheless**
240:13
**nonmonetary**
194:16
**nonresponsive**
44:17, 67:15, 70:1, 70:14, 78:10, 80:25, 89:17, 110:2, 120:14, 126:9, 133:22, 155:24, 169:6, 173:12, 202:8, 211:8, 228:17, 255:20, 273:4, 274:9
**nonspirits**
231:17
**nonverbal**
9:24, 68:9, 285:12
**noresponsive**
101:9
**normal**
293:8
**north**
288:7
**notary**
2:12, 294:1, 294:15
**nothing**
5:12, 64:19, 123:5, 126:16, 253:9, 274:24, 280:22
**notice**
197:22, 266:9
**notices**
226:1
**november**
37:13, 37:22, 54:5, 112:25
**number**
27:24, 30:14, 33:18, 42:4, 42:8, 42:10, 43:13, 55:23, 59:4, 62:21, 104:24, 120:4, 176:1, 176:3, 176:7, 221:11, 221:14, 225:16, 227:2, 244:2, 247:12, 253:15, 253:23, 254:8, 279:14, 288:6
**numbers**
42:21, 42:23, 42:24, 43:4, 43:6, 43:24, 59:24, 237:5, 237:19, 238:8
**numeral**
273:14
**numerous**
26:2, 29:1, 29:7, 52:21, 102:6, 122:15, 122:18, 131:21, 164:17, 183:15, 273:14

**O**

**o'brien**
77:13
**oath**
7:22, 19:25, 61:3, 134:21, 197:8, 241:6, 266:2, 288:2
**object**
9:5, 41:19, 44:16, 45:15, 45:22, 46:1, 46:8, 67:14, 110:1, 120:14, 184:13, 206:1, 210:9, 211:7, 255:20, 273:12
**objection**
10:23, 17:2, 17:5, 17:11, 17:13, 17:22, 18:2, 18:16, 18:20, 19:19, 22:3, 22:7, 22:16, 22:23, 23:1, 23:11, 23:16, 23:22, 24:8, 24:22, 26:5, 26:12, 26:18, 38:21, 39:2, 39:14, 39:19, 41:10, 42:9, 43:5, 44:10, 45:5, 45:15, 45:25, 47:22, 48:2, 54:8, 57:2, 64:21, 65:4, 65:9, 68:2, 68:11, 70:1, 70:5, 70:11, 70:14, 70:18, 71:4, 73:13, 73:19, 77:24, 78:6, 78:10, 80:21, 80:25, 81:8, 81:22, 82:8, 82:19, 84:7, 87:25, 88:9, 88:14, 89:10, 89:16, 89:25, 91:6, 91:13, 92:3, 98:13, 99:4, 101:9, 101:14, 102:18, 102:23, 104:3, 117:3, 119:11, 119:18, 120:2, 120:4, 120:10, 120:20, 121:2, 121:8, 121:21, 122:5, 122:12, 122:23, 123:3, 123:10, 123:17, 123:20, 126:9, 126:18, 127:19, 129:21, 131:5, 132:9, 132:15, 132:21, 133:22, 134:2, 143:12, 152:8, 153:1, 153:15, 153:23, 154:17, 155:24, 156:4, 156:11, 159:19, 161:25, 162:5, 163:4, 163:10, 163:23, 164:8, 165:1, 165:7, 165:23, 166:10, 166:18, 168:2, 169:6, 170:4, 170:24, 171:6, 171:13, 172:1, 172:7, 172:16, 172:17, 172:24, 173:12, 173:17, 174:8, 174:17, 175:6, 175:12, 175:13, 175:14, 175:19, 175:24, 176:5, 176:11, 176:17, 176:19, 179:8, 179:13, 180:9, 181:16, 182:2, 182:14, 185:11, 187:9, 187:16, 187:19, 189:3, 189:17, 191:6, 191:9, 191:22, 192:2, 192:7, 192:18, 192:24, 193:19, 193:25, 194:12, 194:18, 196:1, 196:7, 196:17, 199:6, 201:19, 202:3, 202:8, 202:13, 202:19, 202:25, 203:8, 203:13, 203:17, 203:21, 204:7, 204:12, 204:21, 213:14, 213:20, 214:23, 221:10, 222:9, 222:15, 223:5, 224:4, 224:14, 225:1, 226:21, 228:17, 229:7, 230:7, 231:11, 231:24,

WYLIE 597

232:20, 233:5, 233:15, 233:19, 234:12, 240:2, 247:18, 248:11, 249:16, 250:6, 252:10, 255:13, 256:2, 256:14, 257:5, 257:11, 258:3, 258:13, 260:5, 261:11, 263:19, 263:22, 264:20, 266:19, 266:25, 268:7, 268:25, 269:15, 269:24, 270:22, 271:10, 271:20, 272:2, 272:9, 272:25, 273:4, 273:12, 273:22, 274:5, 274:9, 274:13, 274:16, 274:21, 275:2, 275:9, 275:16, 276:1, 276:17, 277:4, 277:8, 277:13, 280:13, 280:15, 280:17, 280:19, 282:25, 285:1, 286:14, 286:23, 287:1, 287:7, 287:13, 290:18, 291:11, 292:18

**objections**
17:5, 19:8, 208:19, 213:9, 214:10, 215:18, 281:8

**objects**
9:6, 209:21, 209:24, 210:2, 214:15

**obligation**
115:22

**obligations**
57:11, 57:19, 57:20, 289:19

**obtain**
112:10, 116:22, 165:21, 224:21

**obtained**
105:19, 105:22, 113:2, 113:6, 225:12, 225:13

**obtaining**
114:7, 116:23

**obviously**
107:20, 249:21

**occur**
58:22, 166:9

**occurred**
186:6

**october**
12:24, 51:17, 76:22, 112:25, 113:1, 170:17, 200:11, 241:17

**off-the-shelf**
74:16, 74:17, 143:11, 143:18, 143:21

**offended**
258:17, 258:24, 258:25

**offer**
117:23, 117:24, 119:6, 120:3, 262:13, 291:2, 291:4, 291:7

**offered**
117:11, 117:13, 118:15, 118:18, 119:10, 120:11, 122:17, 124:13, 125:11, 290:21, 291:3

**offering**
125:10

**offerings**
118:19

**offers**
208:5

**office**
153:8

**officer**
29:22, 30:19, 45:7, 45:8, 51:5, 52:1, 57:14, 57:21, 78:8, 186:13, 186:22, 192:14, 192:15, 192:20, 199:9, 199:12, 253:15, 253:24, 254:3, 294:3

**officers**
72:7, 163:25, 214:14, 214:16, 214:21, 264:16

**offices**
2:2, 157:20

**official**
214:24

**officially**
24:14, 26:4, 26:7

**often**
9:23, 29:13, 235:24

**oh**
181:8, 228:5, 287:14

**ohio**
264:12

**old**
161:15

**onboard**
34:23, 268:17

**onboarding**
33:4

**onboards**
33:10

**once**
50:14, 55:2, 66:13, 68:18, 69:16, 101:3, 168:14, 279:25

**one**
15:5, 21:1, 21:4, 21:8, 29:17, 36:22, 37:10, 38:14, 42:3, 43:19, 43:23, 44:1, 44:2, 44:5, 44:8, 59:15, 60:12, 64:4, 76:2, 107:7, 120:4, 123:8, 123:15, 124:13, 144:3, 148:19, 155:1, 161:15, 206:10, 208:12, 209:8, 211:5, 218:8, 218:15, 220:10, 228:4, 237:15, 238:22, 238:23, 244:12, 249:25, 250:8, 250:15, 251:3, 256:21, 259:12, 259:13, 259:21, 261:13, 264:13, 267:1, 273:14, 280:10, 286:8, 290:20

**ones**
260:25

**ongoing**
33:12, 34:11

**online**
36:25, 37:1, 37:3, 37:4, 37:15, 37:19, 103:14, 144:2

**only**
1:26, 14:4, 17:5, 17:13, 21:1, 21:4, 21:8, 36:20, 69:8, 75:23, 76:2, 76:5, 82:16, 82:22, 89:7, 91:20, 115:17, 143:11, 143:17, 145:10, 164:6, 192:6, 192:8, 194:6, 198:8, 229:8, 232:4, 247:20, 248:10, 261:3, 261:7

**open**
222:22, 222:25

WYLIE 598

**operate**
76:3, 154:18, 165:17, 180:1, 180:5, 180:22, 190:3, 254:22
**operated**
7:5
**operating**
29:21, 30:18, 32:14, 32:15, 45:7, 51:5, 52:1, 57:14, 57:21, 184:3, 200:7, 200:8, 219:19
**operation**
25:21, 25:23, 26:17, 26:20, 57:12
**operational**
103:13
**operations**
7:6, 57:19, 57:21, 111:17, 112:3, 112:4, 112:8, 148:25, 149:3, 149:5, 149:22, 150:3, 151:6, 166:20, 168:4, 180:2, 188:11, 200:10, 254:24
**opinion**
20:18, 192:1, 192:4
**opinions**
20:15
**opportunities**
118:22, 119:12
**opportunity**
59:15
**opposed**
32:21, 154:7
**opposing**
158:18
**opt**
255:4, 256:8, 260:22
**optimistic**
59:19
**order**
145:9, 145:22, 183:11, 188:12, 240:5, 286:18
**orders**
35:6, 51:12, 74:7, 146:4, 164:16, 164:17, 188:12, 195:5, 293:1
**oregon**
6:7
**organization**
30:8, 49:6, 50:15, 50:25
**organizing**
50:25
**original**
34:20, 52:11, 62:10, 62:18, 62:23, 228:12, 239:18
**originally**
221:12
**other**
5:20, 5:23, 8:19, 16:21, 22:11, 24:7, 37:7, 41:5, 43:1, 48:18, 50:10, 51:7, 52:3, 55:4, 60:4, 63:8, 66:24, 66:25, 68:13, 71:2, 74:11, 74:13, 75:16, 84:12, 86:1, 90:15, 91:2, 91:20, 93:1, 93:8, 105:19, 105:21, 106:18, 107:24, 112:19, 113:5, 115:9, 117:24, 122:6, 127:22, 145:10, 152:16, 167:25, 190:18, 190:19, 195:15, 195:17, 196:22, 198:5, 198:6, 198:17, 205:10, 205:19, 205:23, 206:9, 240:16, 247:21, 247:22, 250:17, 259:22, 260:25, 261:14, 261:16, 270:16, 287:4, 287:11, 290:7, 292:16
**otherwise**
20:3, 294:12, 295:9
**ourselves**
69:17
**out**
19:13, 21:5, 34:8, 50:9, 50:14, 55:24, 57:10, 109:21, 120:3, 128:13, 134:14, 134:23, 164:16, 164:19, 164:22, 164:25, 179:22, 180:1, 180:23, 191:3, 197:22, 204:2, 204:5, 221:9, 234:10, 247:10, 247:20, 249:3, 255:4, 256:8, 256:24, 260:3, 260:10, 260:22, 261:1, 263:8, 271:2, 286:13, 291:7
**outcome**
294:12, 295:9
**outings**
31:25
**outlined**
163:25, 254:17, 279:23
**outlines**
279:21
**outside**
49:18, 147:9, 147:10
**outstanding**
107:25, 239:18
**outstrip**
48:17, 146:24
**outstripped**
146:14, 146:16, 147:6, 147:14
**over**
7:3, 8:19, 29:1, 46:7, 59:4, 64:15, 79:1, 86:2, 104:8, 125:18, 148:17, 148:19, 181:10, 190:17, 190:19, 232:8, 249:6, 251:6, 261:18, 280:16, 287:12
**overall**
153:13, 153:16
**overly**
209:21, 209:24, 215:7
**oversaw**
149:3, 149:5
**owe**
193:12, 193:17, 193:24, 194:11
**owed**
164:7, 192:12, 232:6
**owes**
100:9, 286:9
**own**
13:3, 23:20, 73:9, 104:12, 104:15, 116:17, 120:1, 165:12, 165:18, 165:19, 166:12, 229:22, 231:14, 260:16, 277:16
**owned**
23:18, 72:8,

WYLIE 599

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 333 of 356

77:19, 119:15, 224:20
**owner**
50:20, 83:16, 83:19, 103:13, 105:8, 121:16, 144:4, 247:9, 247:23, 248:1, 248:5, 248:6, 248:13, 248:15, 248:19, 255:5, 255:12, 255:18, 255:25, 256:9, 256:13, 258:6, 260:23
**owners**
113:18, 224:6, 243:20
**ownership**
7:4, 50:9, 117:11, 117:13, 118:5, 121:24, 128:12, 155:4, 172:3, 221:16, 221:19, 223:4, 224:2, 224:9, 224:12, 224:24, 247:11, 249:3, 255:3, 256:7, 259:20

**P**

**page**
4:2, 27:23, 40:5, 62:20, 62:22, 216:15, 225:4, 225:21, 225:23, 226:25, 227:5, 227:6, 229:17, 234:19, 241:11, 252:25, 259:1
**pages**
1:37, 62:23, 211:3, 251:16, 281:2, 283:16
**paid**
44:25, 45:2, 68:17, 88:15, 88:18, 88:19, 89:7, 89:19, 90:16, 90:20, 104:9, 104:11, 104:20, 105:3, 111:21, 122:6, 148:4, 161:21, 172:13, 173:10, 174:18, 200:16, 200:19, 200:25, 217:19, 218:19, 232:13, 235:7, 235:16, 239:2, 252:22, 282:18, 283:2, 283:6, 283:7
**pain**
265:1
**painful**
264:25
**panoply**
58:2, 74:19, 74:20, 74:21, 129:2, 146:9, 148:10, 155:11, 156:25, 179:25, 269:9, 269:21, 270:7, 270:14, 271:4, 271:5, 271:9, 271:13, 271:18, 272:17, 274:6, 274:11, 274:19, 274:25, 275:4, 275:21, 275:23, 276:5, 276:6, 276:7, 276:22, 277:1, 277:7
**paper**
242:16
**papers**
53:9, 196:16, 255:11, 255:25
**paperwork**
116:13, 247:4
**paragraph**
63:3, 63:4, 253:19, 256:6
**paramount**
224:17
**pardon**
45:18, 278:19
**parenthetical**
253:17
**park**
235:7, 238:24
**parking**
235:6
**part**
40:22, 57:18, 57:24, 58:4, 60:12, 74:2, 101:11, 133:16, 133:24, 155:4, 155:6, 155:12, 160:17, 164:15, 236:11, 240:12, 252:2, 252:9, 271:25, 272:6, 278:10
**part-time**
15:23
**partial**
278:6
**particular**
164:15
**particularly**
74:24, 235:25, 263:12
**parties**
45:23, 46:9, 60:5, 158:15, 207:15, 208:5, 237:16, 258:14, 281:6, 281:9, 294:11, 295:8
**partner**
25:7, 25:11, 25:15, 30:23, 38:5, 56:19, 56:25, 70:9, 70:16, 126:23, 127:2
**partners**
25:18, 29:17, 51:23, 56:2, 66:25, 68:13, 70:19
**partnership**
24:18, 29:12, 29:13, 55:1
**parts**
43:20, 44:13, 79:1, 79:7
**party**
40:7, 123:8, 123:15, 124:10, 180:13, 184:22, 207:22
**pass**
292:9, 292:19
**pass-through**
217:24
**passwords**
165:3, 179:21
**past**
29:1
**path**
59:20, 246:6, 246:23, 247:13, 247:21, 248:25, 254:25
**path-forward**
249:11
**paths**
125:10
**pay**
16:12, 68:19, 79:13, 88:23, 99:14, 105:12, 111:18, 174:23, 230:1, 232:5, 232:17, 233:6, 233:21, 282:21
**paycheck**
68:21, 172:19
**paying**
86:20, 100:22, 101:1, 282:20
**payment**
86:10, 99:14, 100:10, 100:13, 144:8, 188:13,

WYLIE 600

213:4, 219:6
**payments** 99:22, 100:5, 148:8, 164:20
**paypal** 81:25, 82:5, 164:19, 179:23
**pending** 9:22, 158:10, 264:22
**penny** 45:11, 121:18, 122:2
**people** 31:7, 46:20, 50:22, 50:25, 52:5, 91:20, 102:6, 128:14, 144:13, 167:13
**people's** 168:1
**percent** 25:19, 55:10, 55:12, 220:15, 220:21, 220:22, 220:23, 221:4, 221:6, 224:11, 224:20, 244:24, 248:2, 248:7, 248:13, 248:15, 248:19, 249:6, 250:16
**percentage** 52:12, 171:15, 221:3, 221:5
**percentages** 259:22, 259:25
**perfectly** 123:7, 123:15
**performed** 205:6, 205:19, 205:24, 206:9
**period** 73:24, 76:9, 91:18, 101:21, 130:14, 253:18
**permanent** 62:10
**permitted** 40:21
**perpetually** 195:22
**person** 32:6, 82:16, 82:22, 83:14, 130:1, 151:21, 151:22, 217:15, 227:9, 254:18, 260:13
**person's** 167:21
**personal** 108:12, 108:22, 200:23, 201:2, 240:7, 253:13, 253:22, 262:3
**personally** 6:21, 259:12
**perspective** 55:12
**peters** 46:11, 46:12, 46:14, 46:18, 47:4, 47:8, 47:12, 47:16, 48:1, 48:3, 48:5, 48:8, 48:10, 49:14, 50:7, 52:23, 60:2, 76:19, 83:15
**petition** 62:18, 62:23
**phantom** 118:1, 119:7, 125:10, 247:22, 255:15
**phase** 254:21
**phone** 2:8, 15:12, 59:14, 109:6, 124:6
**phrase** 214:16
**physical** 242:10
**piece** 192:9, 263:11, 280:10
**pieces** 242:16
**pitching** 150:11
**place** 15:8, 40:2, 76:20, 76:21, 77:2, 122:21, 254:9, 259:19, 259:23, 280:1, 280:3
**placed** 165:12
**placeholder** 37:9
**placement** 145:7
**plaintiff** 1:8, 3:3, 11:1, 214:14, 214:17, 215:4, 292:10
**plaintiff's** 209:11, 213:2
**plakas** 28:10, 31:9, 31:10, 31:14, 31:18, 31:22, 32:1, 32:3, 32:9, 32:14, 32:20, 34:19, 43:2, 77:12
**plan** 51:20, 51:21, 85:22, 85:23, 86:1, 87:9, 87:11, 88:3, 102:8, 102:9, 287:5, 287:12
**planet** 3:33
**planned** 186:5
**planning** 54:17, 249:11
**plano** 264:13
**plans** 86:3
**platform** 35:2, 54:18, 81:24, 144:1, 219:6, 230:24
**platforms** 32:15, 188:15
**played** 255:22
**pleadings** 13:16
**please** 5:18, 8:19, 8:25, 9:21, 11:21, 17:14, 18:7, 21:20, 22:5, 66:6, 67:12, 71:9, 71:12, 81:5, 85:4, 91:8, 115:4, 132:10, 134:23, 152:4, 190:20, 193:6, 254:16, 255:21, 279:10, 279:23, 280:24, 281:3, 281:7, 287:18, 293:12
**plenty** 103:15
**pllc** 3:18
**pocket** 45:11, 121:18, 122:2
**point** 61:21, 121:6, 160:16, 238:22, 250:2, 280:2, 289:10, 289:20, 289:22
**point-of-view** 125:12
**policies** 103:21
**policy** 108:9, 108:10,

WYLIE 601

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 335 of 356

109:1
**pool**
220:20, 220:22
**populate**
144:4
**populated**
74:10, 146:9, 149:8
**portion**
111:17, 155:1, 232:6
**portions**
1:26, 230:2
**portland**
6:7
**position**
30:21, 32:22, 34:6, 34:7, 34:10, 249:3, 259:10
**positive**
209:1
**possibility**
196:19, 289:13, 289:16, 289:17
**possible**
54:10, 58:24, 60:17, 161:15, 271:2, 290:16, 290:22
**possibly**
279:16
**potential**
51:22, 223:1
**potentially**
55:3
**pow-wow**
261:25
**powerhouse**
229:24
**pre-suit**
266:9
**preceded**
80:11
**precipitated**
188:3
**preclude**
173:9, 180:2
**precluded**
43:10
**precluding**
164:4
**predicated**
61:23, 254:22
**preferred**
84:25, 85:1, 85:6, 85:8, 85:13, 85:19, 91:4, 91:11
**preliminary**
58:10
**premoney**
205:9
**prepare**
11:16, 85:21, 150:21
**prepared**
9:10, 42:2, 42:5, 85:25, 125:9, 255:1, 279:20, 295:4
**preparing**
39:7
**prepay**
235:11
**present**
3:32, 181:5, 181:6, 183:7, 245:10
**presented**
76:21, 76:24
**presently**
6:2
**preservation**
224:16
**president**
24:6, 24:11, 30:8, 38:13
**pressure**
118:13
**pretty**
45:20, 81:2, 113:1, 179:25, 243:20, 259:4
**previous**
32:21, 35:4, 35:8, 43:19, 43:23, 44:2, 61:24, 203:23, 292:8
**previously**
11:6, 22:1, 37:5, 40:19, 58:23, 63:20, 64:1, 68:6, 84:21, 84:22, 86:24, 204:4, 250:15, 283:19
**price**
86:22
**primarily**
13:22, 23:4, 57:22, 111:16, 112:3, 112:8, 115:3, 146:8, 230:23
**primary**
26:2, 50:24, 57:15, 57:20, 149:25, 151:24, 161:19, 188:11, 248:10
**printed**
242:8, 242:11
**prior**
6:6, 11:14, 28:24, 30:9, 30:10, 30:21, 35:21, 43:11, 53:10, 53:17, 54:25, 55:15, 55:16, 61:7, 61:9, 76:19, 80:13, 80:16, 80:20, 81:11, 81:20, 82:1, 82:5, 84:13, 112:11, 131:16, 149:24, 154:15, 183:13, 185:22, 200:19, 203:25, 215:4, 215:14, 249:10, 290:17, 291:3
**privilege**
47:24, 134:12, 184:15, 206:5
**privileged**
267:8
**pro**
240:7
**probably**
112:25, 281:2
**problem**
271:3, 271:5
**procedures**
169:3
**proceed**
288:25
**proceeding**
295:5
**proceedings**
5:2, 226:5, 293:15, 294:4, 294:5, 294:6, 294:8, 295:6
**proceeds**
240:8, 240:16, 245:13, 256:24, 288:8
**process**
26:11, 35:6, 39:7, 53:3, 74:7, 76:17, 188:12, 261:15
**processed**
164:16, 195:6
**processing**
32:16, 51:12, 219:6
**produce**
150:14
**produced**
40:19, 40:22, 42:25, 86:6, 86:8, 205:16, 210:19, 210:21, 210:23, 210:25, 211:2, 211:12, 211:14, 211:21, 211:23, 212:4, 212:7, 212:20,

WYLIE 602

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 336 of 356

212:22, 215:13, 215:17
**product** 29:17, 103:14
**production** 208:21, 209:9, 213:1, 214:2, 214:5, 214:7, 214:12, 215:2, 215:20
**productive** 257:19
**products** 37:3, 144:5, 149:7
**professional** 218:23, 219:1
**profit** 175:7, 175:10, 175:15, 175:20, 209:13, 212:1, 212:4, 212:15, 216:16, 216:20
**profits** 175:3, 175:9, 175:11, 175:17
**program** 155:10
**project** 36:15, 36:20, 36:22, 36:24, 37:12, 37:14, 56:8, 133:1, 133:7, 146:17, 235:10, 238:25, 258:2
**projection** 87:24, 88:3
**projections** 85:25, 90:21
**projects** 29:7
**promise** 59:18
**promised** 43:8, 157:7, 160:11, 160:13, 174:16, 195:19
**promises** 55:6, 213:4
**promptly** 226:1
**proof** 132:1, 285:15
**proper** 8:13, 17:17, 45:24, 94:2, 254:5
**properly** 146:9
**property** 161:24, 173:16, 240:7, 267:19
**proportional** 210:3
**proposal** 117:25
**proprietor** 258:7
**proprietorship** 23:18, 23:24, 50:8, 50:13, 50:18, 50:19, 60:2, 119:9, 196:15
**prospecting** 150:10, 150:11
**protect** 202:6
**protected** 262:1
**prototype** 79:3, 79:5, 79:11, 79:15, 79:16, 79:19, 80:3, 80:5, 80:6, 80:10
**provide** 14:3, 14:4, 16:23, 39:21, 43:8, 43:9, 47:10, 86:21, 87:23, 88:7, 89:13, 103:11, 103:18, 103:23, 185:15, 231:1, 279:11
**provided** 24:24, 25:24, 29:9, 29:18, 31:4, 31:6, 47:12, 52:7, 58:14, 77:2, 78:9, 89:12, 101:25, 103:12, 103:19, 104:4, 127:22, 131:20, 168:25, 205:13, 213:11, 213:15, 217:4, 227:13, 253:13, 253:20, 253:21
**provides** 31:14
**providing** 23:3, 23:5, 26:20, 56:16, 63:7, 69:6, 86:17, 112:18, 169:22, 202:5, 267:4
**provisions** 254:17
**public** 2:12, 13:15, 133:8, 180:15, 180:16, 180:18, 181:9, 181:15, 182:8, 182:25, 188:18, 188:20, 294:1, 294:15
**publication** 13:21
**publications** 31:24
**pulls** 74:21
**punish** 173:2
**punished** 172:23
**purchase** 37:3, 174:23, 208:6, 279:7
**purchased** 43:3, 228:8, 228:20
**purchases** 32:16, 217:5
**purpose** 24:20, 73:23, 74:3, 222:24, 270:3, 275:24, 276:5
**purposely** 126:25
**purposes** 205:21, 205:23
**pursuant** 2:11
**pursue** 110:6, 224:11
**put** 18:19, 79:25, 108:11, 113:19, 113:21, 232:21, 235:22, 262:6, 262:9
**putting** 262:2

**Q**

**qualified** 245:12, 294:7
**qualify** 245:10, 245:14
**quantified** 149:16
**quarter** 177:13
**quarterly** 198:19
**question** 7:8, 8:16, 8:20, 8:25, 9:5, 9:6, 9:8, 9:22, 14:15, 14:19, 14:20, 15:2, 15:4, 17:8, 17:16, 20:12, 22:6, 38:23, 47:23, 64:25,

WYLIE 603

66:6, 67:10, 67:12, 67:17, 71:10, 71:12, 71:13, 71:17, 79:14, 81:2, 84:21, 87:4, 91:8, 120:13, 123:14, 125:24, 127:4, 127:25, 130:3, 133:2, 144:25, 147:3, 147:17, 150:16, 150:24, 152:3, 155:23, 158:10, 163:1, 164:24, 166:4, 171:3, 173:11, 179:10, 182:4, 183:2, 187:13, 193:6, 193:15, 193:20, 193:22, 206:21, 207:24, 208:2, 211:4, 211:6, 211:7, 233:9, 234:8, 242:23, 248:4, 255:20, 255:21, 255:22, 265:10, 265:11, 289:3, 289:5, 290:10, 291:24, 292:2

**questioning**
7:15, 181:2, 181:4, 181:11, 181:22

**questionnaires**
58:13

**questions**
8:24, 9:10, 9:14, 21:2, 21:6, 21:9, 21:10, 21:11, 130:18, 150:18, 177:19, 279:13, 292:22

**quick**
113:1

**quickbooks**
236:18, 237:11

**quickly**
122:14, 183:16, 186:4

**quintero**
284:14

**quit**
58:7, 58:8, 195:3

**quitting**
32:22, 35:4

**quote**
143:11, 182:7

**R**

**rainbow**
195:2, 195:9

**raise**
279:5

**raising**
278:25, 281:15

**rarely**
235:25

**rate**
16:14, 16:15, 106:9, 106:10

**rate's**
107:19

**rates**
107:20

**rather**
59:8, 86:20, 284:2

**rationale**
245:7

**reach**
25:1, 34:8, 291:7

**reached**
52:20, 52:21

**read**
5:6, 40:14, 63:2, 63:20, 65:24, 66:1, 128:14, 209:17, 210:5, 213:6, 213:7, 214:9, 237:5, 246:12, 246:19, 249:13, 255:6, 255:21, 259:8, 259:15, 259:16, 260:1, 260:2, 260:11, 263:14, 263:15, 265:24, 278:22, 284:4

**reading**
62:9, 66:6, 164:10, 231:13, 269:22

**ready**
58:11, 146:5, 246:17, 259:19

**realistic**
291:9, 291:10

**really**
20:13, 123:12, 188:14, 248:9, 252:5, 274:19

**reason**
9:13, 11:12, 60:1, 113:3, 117:4, 242:12, 245:7

**reasonably**
209:25, 215:8

**reasons**
26:2

**reassess**
279:5

**rebuild**
174:24

**rebuilding**
43:14

**recall**
15:10, 72:15, 73:14, 79:17, 79:18, 79:21, 79:22, 79:24, 114:17, 115:9, 115:19, 153:12, 168:6, 168:11, 168:13, 168:22, 168:23, 175:25, 196:2, 196:14, 266:12, 266:14

**receipt**
232:5, 244:10

**receipts**
42:3, 42:6, 42:11, 42:25, 253:13, 253:22

**receive**
33:15, 45:16, 52:14, 52:15, 52:16, 69:19, 69:23, 70:4, 100:13, 112:20, 121:23, 128:18, 128:19, 152:25, 161:3, 168:10, 173:3

**received**
14:1, 69:21, 69:24, 70:12, 88:5, 98:5, 98:18, 104:2, 105:11, 109:16, 109:19, 121:18, 122:2, 123:1, 153:2, 153:20, 154:1, 154:3, 157:19, 158:2, 162:9, 171:4, 172:18, 173:7, 173:18, 173:21, 220:2, 227:16, 242:15, 242:17, 242:20, 242:25, 243:4

**receiving**
168:6, 266:12, 266:14, 267:22

**recent**
16:15

**recess**
21:22, 60:22, 158:24, 197:2, 240:25, 265:19, 287:21

**recognize**
42:21, 62:5, 62:7, 65:16, 208:11

**recollection**
54:9, 186:3

WYLIE 604

**recommendation** 50:12, 291:15, 291:24
**recommendations** 103:13, 103:15, 279:24
**recommended** 124:10, 282:4
**recommending** 55:12, 56:21
**reconcile** 63:19
**reconciled** 228:11
**reconfiguring** 35:6
**reconnected** 270:4, 277:16
**record** 5:5, 5:18, 14:4, 20:24, 21:20, 60:20, 60:24, 61:2, 123:8, 123:16, 127:11, 150:12, 151:5, 157:21, 158:17, 158:18, 158:20, 158:21, 158:22, 159:1, 159:2, 183:12, 196:25, 197:5, 241:3, 242:13, 265:17, 265:22, 287:19, 287:23, 292:23, 293:1, 293:14, 294:9, 295:6
**recorded** 8:15, 119:4, 123:23, 123:25, 125:21, 126:4, 126:8, 126:11, 294:6
**recording** 5:5, 125:25, 294:8, 295:4
**records** 12:4, 12:9, 12:13, 12:16, 12:18, 116:15, 151:9, 168:7, 168:20, 168:25, 169:1, 169:10, 169:15, 169:16, 170:3, 208:15, 213:4
**recover** 40:20
**recruit** 171:19, 223:6
**recruited** 30:7, 34:2
**redacted** 1:24
**reduce** 195:18, 224:8, 247:12
**reduced** 163:20, 172:2, 195:20, 294:6
**refer** 125:21, 125:24, 183:12
**reference** 217:2
**referenced** 198:1
**referred** 24:9, 44:5, 46:20, 67:22, 113:4, 125:22, 128:21
**referring** 26:24, 35:16, 37:15, 44:3, 44:6, 67:24, 104:16, 159:14, 161:1, 243:25, 250:5, 250:12
**refers** 67:7
**reflected** 56:13, 170:2, 185:13, 234:13, 245:14
**reflecting** 209:11, 213:2, 214:13, 214:16, 214:21
**reflective** 274:7
**reflects** 218:21
**refrain** 166:2, 166:6, 267:18
**refuse** 125:18
**refused** 113:25, 114:4, 117:1
**regain** 188:11
**regard** 63:21
**regarding** 32:7, 49:22, 55:7, 55:19, 57:7, 99:20, 184:25, 185:9, 214:2, 251:13, 253:10
**regardless** 259:24
**regards** 243:12, 280:5, 291:18
**regions** 112:22, 113:4
**registered** 26:7, 53:7, 104:18
**reimbursements** 99:22
**reissued** 114:12
**rejected** 112:17
**rejection** 112:22
**related** 10:8, 34:24, 110:11, 110:14, 110:17, 132:19, 148:4, 152:14, 181:15, 182:9, 209:10, 213:1, 214:8, 214:13, 294:10, 295:7
**relating** 133:20, 214:21, 214:25, 290:13
**relations** 133:9, 149:14, 151:13, 151:15, 151:18
**relationship** 16:25, 17:1, 18:15, 22:1, 22:11, 58:17, 59:3, 213:2
**relationships** 33:4, 102:8, 127:21, 150:7, 150:9
**relevant** 39:5, 39:21, 209:25, 210:7, 213:19, 214:7, 215:10
**relies** 210:10, 291:21
**rely** 147:10, 169:2, 213:21, 291:13, 291:14, 292:2, 292:5, 292:7, 292:8
**relying** 288:15, 291:23
**remains** 170:12, 225:25
**remedy** 180:12
**remember** 11:7, 11:10, 59:14, 71:13, 180:24, 181:1, 181:3, 181:4, 181:7, 181:10, 181:12, 181:13, 181:18, 181:21, 182:1, 182:6

WYLIE 605

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 339 of 356

**remove** 166:11
**removing** 160:3
**rendered** 201:17, 201:18, 201:22, 202:1, 202:12, 202:15
**repaid** 100:13, 174:3, 284:21, 284:25, 286:22
**repay** 174:16, 286:1
**repaying** 286:4
**repayment** 101:6, 105:16
**repayments** 106:8
**repeat** 91:7, 106:22
**rephrase** 9:1
**replace** 145:13, 161:6
**replaced** 44:9, 163:8
**replacement** 161:4, 217:5
**replacing** 117:25
**replied** 34:10, 122:16
**reply** 230:11, 230:13
**report** 210:2
**reporter** 5:7, 8:8, 8:15, 190:19, 292:25, 293:5, 293:7, 293:9, 293:13, 294:1
**reports** 157:10, 209:13, 211:18, 211:20
**represent** 6:9, 43:4, 43:6, 47:19, 48:5, 60:7, 208:18
**representations** 56:10, 57:6, 160:21, 258:1
**representatives** 28:8
**represented** 47:16, 160:19, 223:17
**representing** 48:21, 48:22, 48:25, 49:3, 169:21, 215:19, 220:25
**represents** 220:18
**reputation** 127:21, 189:1, 189:8, 194:20
**request** 13:13, 13:14, 62:10, 62:12, 73:4, 73:6, 73:10, 73:15, 162:8, 168:18, 185:18, 208:14, 208:21, 209:9, 209:21, 209:23, 209:24, 210:3, 210:7, 211:5, 212:14, 212:25, 213:18, 214:6, 214:7, 214:12, 214:15, 215:2
**requested** 12:4, 12:5, 62:13, 124:6, 125:12, 162:1, 162:6, 168:24, 169:9, 169:14, 169:20, 185:17, 210:24, 213:16, 242:1, 255:22, 268:16
**requests** 122:14, 168:19, 214:2, 214:5, 215:20
**require** 247:11
**required** 43:7, 146:11, 245:9, 245:16, 255:5, 256:9, 260:23
**requires** 14:6, 17:13, 206:13
**research** 39:4, 102:6
**reside** 6:2, 6:6
**resided** 6:4
**resides** 274:12
**resign** 155:17, 179:5, 186:20
**resigned** 109:25, 154:23, 155:9, 155:19, 156:1, 156:10, 156:18, 157:5, 157:11, 157:14, 160:1, 160:18, 167:10, 167:18, 167:20, 179:7, 179:12, 186:17, 186:20, 186:22, 187:5, 187:10, 188:1, 189:13, 190:23, 191:8, 191:13, 191:15, 191:21, 192:17, 192:23, 193:1, 193:4, 193:9, 193:13, 195:24, 196:12, 199:16, 199:19, 201:4, 204:11, 242:4, 273:8, 273:10, 275:7, 275:14
**resolution** 125:17, 183:23, 183:25, 184:5
**resolutions** 184:12, 185:2, 185:9, 196:22, 290:12, 290:14
**resolve** 101:3, 124:11, 186:17, 250:9, 250:11
**respect** 57:12
**respond** 168:17, 168:21, 276:21
**responded** 13:13, 13:15, 15:13, 15:19, 250:19, 253:21
**responding** 66:2, 67:2, 124:9
**response** 8:16, 9:24, 28:4, 28:7, 40:12, 40:13, 40:15, 62:6, 66:19, 68:9, 94:2, 114:23, 117:10, 117:12, 117:18, 180:3, 190:25, 191:2, 196:11, 209:20, 214:14, 215:7, 249:7, 249:22, 251:12, 251:15, 253:5, 253:20, 260:10, 260:12, 260:15, 260:21, 266:17, 266:23, 267:13, 268:5, 270:6, 270:14, 275:13, 276:13, 285:12
**responses** 208:19, 208:20, 208:24, 208:25, 209:4, 209:7, 209:15

WYLIE 606

**responsibilities** 51:7, 51:16, 57:12, 60:4
**responsibility** 75:3, 75:6, 75:8, 75:11, 148:17, 151:20
**responsible** 51:6, 58:5, 58:9, 75:10, 82:23, 110:8, 110:20, 111:7
**responsive** 209:23
**rest** 249:17, 289:9, 289:11
**restate** 84:21, 152:4, 166:4, 179:9
**restating** 38:22
**restrict** 17:5
**restricted** 17:11
**restructure** 109:25, 118:25, 119:2, 120:11
**restructured** 114:11
**resubmit** 247:3
**result** 128:20, 128:22, 202:14, 205:8
**resulted** 7:4
**results** 156:24, 157:2
**retail** 31:6, 51:23, 103:22, 164:18
**retailer** 217:24
**retailers** 40:1, 150:8, 164:20, 217:19, 280:2, 280:3
**retain** 252:14
**retained** 84:20
**retainer** 233:7
**retribution** 166:24
**return** 7:6
**returns** 209:14, 212:9, 212:10, 212:16
**reveal** 14:7
**revenue** 86:1, 112:18, 113:3, 176:1, 176:9, 176:12, 176:22, 177:3, 177:4, 177:6, 177:7, 177:15, 200:12, 217:11, 229:20, 245:11
**revenues** 175:22, 176:4, 176:15, 176:21, 177:9, 177:12, 200:14
**review** 11:25, 12:10, 42:17, 64:6, 110:25, 111:9, 208:12, 279:23
**reviewed** 11:18, 12:2, 12:8, 208:25, 215:20, 215:21
**revise** 247:11, 258:7
**revised** 131:10
**revision** 132:4
**revisited** 64:22
**revolver** 279:3, 281:21
**reward** 255:17
**rewritten** 163:20
**rewrote** 114:8, 114:9
**rice** 77:13
**rich** 28:10, 31:9, 31:10, 31:14, 31:18, 31:22, 32:1, 32:3, 32:9, 32:14, 32:20, 34:19, 43:2, 77:12
**richly** 45:9
**right** 7:15, 19:17, 19:19, 55:17, 65:8, 67:2, 83:1, 91:19, 125:21, 158:12, 181:5, 183:2, 216:24, 218:14, 218:22, 219:8, 229:23, 239:3, 249:24, 252:6, 258:10, 264:4, 264:24, 270:19, 276:11, 278:7, 278:11, 284:18, 291:4, 292:12
**rights** 75:14, 75:16, 273:2
**risk** 255:3, 256:7, 260:21, 263:13
**risks** 255:3, 256:7
**role** 10:22, 11:1, 31:1, 31:2, 38:7, 38:8, 51:3, 51:18, 51:20, 56:15, 56:16, 173:22, 173:24, 247:14, 248:25
**roles** 252:24
**rolling** 66:16
**room** 94:1, 125:13, 177:17
**rooms** 125:14
**rough** 293:5
**roughly** 219:23
**round** 279:1, 281:16
**route** 164:18
**routes** 51:22, 146:4
**routing** 164:17
**row** 241:15
**royal** 66:24
**rube** 156:22, 156:24
**rule** 40:8
**rules** 7:21, 18:8, 18:10, 71:14, 158:7, 281:5
**ruling** 273:1
**run** 35:3, 103:16
**running** 50:25, 182:21, 186:5, 279:4
**rush** 264:2, 264:18, 293:2, 293:4, 293:5

S

**s** 29:5

WYLIE 607

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 341 of 356

**s-a-i-l-o-r**
13:20
**said**
14:1, 14:3, 20:3, 37:25, 46:2, 46:3, 54:19, 54:20, 59:8, 79:5, 86:25, 87:5, 87:8, 87:14, 89:12, 90:8, 111:24, 113:20, 143:15, 153:24, 158:10, 167:12, 173:21, 182:6, 185:21, 206:8, 228:23, 240:13, 247:21, 248:24, 256:19, 274:2, 292:2, 294:7, 294:8, 295:5
**sailor**
13:18, 15:14, 15:16
**salaried**
33:16
**salaries**
69:21
**salary**
33:15, 33:17, 69:20, 252:22, 252:23
**sales**
25:1, 38:14, 63:11, 74:24, 157:10, 164:4, 280:1
**same**
8:5, 8:21, 15:19, 86:22, 106:19, 106:24, 107:17, 112:21, 113:3, 116:3, 118:4, 170:17, 221:11, 221:14, 245:16, 252:22, 253:1, 255:16, 255:17
**sanctions**
286:8, 286:18
**santa**
69:4
**saturday**
15:9
**saw**
8:9, 8:13, 79:15, 79:16
**say**
8:9, 11:20, 14:2, 15:1, 17:13, 17:22, 18:2, 18:4, 18:6, 18:20, 18:22, 19:19, 26:23, 35:15, 36:7, 37:14, 37:17, 42:14, 44:2, 44:19, 52:17, 56:4, 56:18, 59:22, 66:20, 66:25, 67:13, 67:19, 78:18, 90:18, 93:18, 108:18, 114:9, 114:18, 124:23, 143:21, 144:11, 147:20, 149:5, 153:11, 159:13, 160:13, 177:3, 200:2, 230:17, 243:24, 247:19, 248:14, 248:17, 248:20, 250:11, 256:6, 261:3, 261:24, 270:10, 273:23, 274:2, 275:11, 278:19, 280:15, 281:25, 285:5, 285:16, 286:19
**saying**
13:15, 44:7, 63:22, 76:23, 79:22, 134:18, 147:13, 170:18, 185:4, 199:7, 230:14, 230:15, 231:18, 238:1, 250:21, 252:17, 254:4, 254:6, 256:12, 274:24
**says**
27:23, 40:6, 56:23, 66:1, 66:3, 66:6, 66:17, 67:4, 67:6, 67:21, 216:22, 216:24, 218:2, 218:15, 218:22, 219:19, 220:12, 225:5, 225:23, 229:17, 234:23, 236:13, 237:15, 238:14, 239:19, 239:22, 241:14, 241:15, 241:21, 241:23, 241:25, 243:8, 244:6, 246:6, 246:22, 253:3, 253:7, 254:15, 263:3, 276:9, 276:20, 281:13, 281:17, 281:19, 281:23, 282:10, 284:1
**sba**
58:12, 105:23, 106:20, 106:25, 112:21, 224:11, 224:21, 225:10, 245:9, 251:13, 252:5, 254:17, 255:2, 259:3, 259:18, 262:10, 263:6, 264:2, 264:17, 279:3, 281:20, 282:14, 282:16, 282:19, 282:20, 283:2, 283:5, 284:3
**schedule**
99:14, 105:17
**scheduled**
198:19
**scoped**
79:8
**seat**
222:5, 222:7, 222:13
**seats**
222:21, 222:25, 250:17
**second**
28:7, 107:13, 111:5, 112:5, 114:15, 116:4, 219:16, 219:18, 225:21, 229:17, 230:17, 241:14
**secretary**
104:18
**secrets**
134:18
**section**
40:9, 218:1, 241:25
**secured**
53:8
**security**
117:5
**see**
27:22, 28:1, 28:2, 40:6, 40:9, 40:11, 40:13, 62:18, 62:25, 145:18, 190:13, 190:15, 209:17, 209:19, 215:5, 215:6, 215:11, 215:12, 216:17, 217:12, 218:2, 225:17, 229:23, 230:4, 230:5, 234:20, 237:23, 241:14, 241:17, 243:9, 249:25, 256:21, 259:23, 270:8, 270:15, 276:13, 278:10
**seed**
279:1, 281:16,

WYLIE 608

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 342 of 356

282:4
**seek**
40:20, 98:14, 166:24
**seeking**
180:12, 188:9, 189:11, 189:22
**seeks**
40:16, 209:22, 209:25
**seem**
125:20
**seemed**
124:8, 181:13
**seems**
123:12, 253:11
**seen**
27:16, 180:18, 208:16, 216:13, 275:17, 278:2, 283:19
**segment**
197:4, 241:2, 265:21
**select**
124:13
**selected**
131:12
**selections**
58:15
**self-dealing**
166:3, 166:6, 166:9, 166:14
**send**
88:21, 197:22
**sending**
79:18
**senior**
115:8
**sense**
17:9, 230:16
**sent**
13:14, 15:13, 55:10, 56:20, 65:25, 89:23, 89:24, 90:1, 191:14, 250:13, 266:9
**sentence**
230:15, 230:17
**separate**
125:14, 231:14, 232:9, 232:11, 232:12
**separately**
117:20, 124:22, 124:25, 228:14, 231:7
**september**
36:16, 154:14
**served**
30:7
**service**
86:18, 86:21, 279:21
**services**
16:23, 23:3, 23:6, 24:24, 25:23, 26:20, 29:14, 29:18, 47:2, 47:7, 47:10, 47:12, 63:8, 69:3, 69:5, 69:6, 86:12, 86:14, 86:25, 87:17, 87:22, 88:8, 89:13, 90:4, 90:6, 101:25, 127:22, 128:4, 128:5, 128:8, 148:4, 148:13, 164:5, 218:23, 219:1, 228:9, 228:20, 231:1, 231:2, 231:6
**set**
45:16, 47:13, 47:14, 57:21, 71:14, 113:23, 146:5, 148:7, 148:9, 149:7, 149:11, 150:8
**sets**
33:10
**setting**
8:3
**settlement**
286:8, 290:20, 291:18
**setup**
32:4, 32:17, 148:15, 219:3
**seven**
157:9, 195:17
**several**
22:21, 31:24, 115:9, 132:3, 132:16, 169:18, 186:3, 212:14, 215:16, 252:14
**several-month**
169:13
**shake**
128:13
**shape**
102:8, 102:9, 103:15, 103:20
**share**
13:16, 25:18, 59:17, 60:3, 117:11, 128:13, 134:20, 166:24, 220:7, 230:1, 259:20, 259:22
**shared**
261:20
**shareholder**
50:21, 197:11, 198:4, 198:6, 198:8, 198:10, 198:13, 198:16, 199:12, 199:14, 250:16
**shareholders**
12:19, 23:23, 70:20, 197:14
**shares**
7:4, 12:15, 13:1, 13:2, 23:21, 45:9, 50:3, 50:4, 52:7, 52:14, 52:15, 52:16, 54:22, 55:3, 55:7, 55:8, 55:20, 55:22, 55:23, 57:9, 59:9, 59:18, 59:21, 59:24, 61:18, 69:25, 70:13, 72:7, 92:10, 92:11, 92:17, 92:18, 117:13, 117:25, 118:1, 121:17, 121:23, 125:10, 127:8, 127:17, 128:2, 128:6, 128:18, 128:19, 170:5, 170:10, 170:11, 170:12, 170:13, 170:19, 170:22, 171:5, 171:8, 171:12, 171:18, 171:19, 171:21, 171:23, 171:25, 172:3, 172:9, 173:18, 173:22, 220:13, 220:16, 220:25, 221:12, 221:14, 221:20, 221:22, 222:1, 222:4, 222:14, 222:17, 222:23, 223:10, 223:14, 223:20, 223:23, 224:16, 242:1, 242:8, 243:17, 243:22, 243:23, 244:3, 247:12, 247:22, 249:6, 260:16, 279:12, 279:15
**sharing**
144:14
**sheet**
216:5, 216:16, 216:20, 234:7, 234:14
**sheets**
209:16, 212:17
**shell**
257:12

WYLIE 609

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 343 of 356

**shilling**
1:21, 3:14, 24:19, 25:12, 28:9, 29:20, 29:21, 29:24, 30:16, 30:18, 30:25, 31:4, 39:22, 51:1, 52:15, 52:18, 60:6, 75:15, 75:16, 75:17, 75:20, 75:21, 77:11, 91:21, 91:24, 92:6, 92:8, 92:10, 93:4, 103:9, 103:17, 103:19, 159:25, 167:14, 183:8, 222:3, 243:25, 246:4, 249:8, 251:11
**shilling's**
25:14, 249:10, 250:5
**shipping**
149:9, 217:4, 217:10, 217:12, 217:20, 217:22
**shipstation**
81:25, 82:5, 128:25, 145:11, 146:3, 148:10, 152:13, 164:16, 179:24, 195:6
**shocked**
257:12
**shopify**
66:3, 73:5, 73:7, 73:8, 73:11, 73:18, 73:21, 74:4, 74:5, 74:12, 74:24, 79:25, 80:9, 80:12, 80:18, 80:23, 81:13, 81:24, 82:4, 128:25, 143:23, 144:1, 144:12, 144:24, 145:4, 145:9, 145:16, 145:22, 146:3, 146:8, 148:10, 152:13, 164:16, 269:17, 269:22, 270:5, 271:4, 271:24, 276:10, 277:16
**shopping**
74:6
**short**
196:24, 241:5, 266:2, 288:1
**shorthand**
250:15
**shortly**
199:19
**should**
72:7, 172:8, 185:2, 247:5, 259:18
**shoulder**
251:7
**shoulders**
262:4
**shouldn't**
100:13, 292:4
**show**
132:3, 132:4
**showed**
12:14
**showing**
198:3
**shut**
125:19, 159:5, 159:10, 159:18, 159:23, 164:14, 166:19, 172:19, 203:23, 203:25
**shutting**
165:18, 180:23
**sic**
158:8
**sidebar**
19:6, 19:15, 41:19, 46:1
**sign**
70:25, 72:14, 76:17, 77:21, 78:1, 118:24, 119:15, 120:9, 120:18, 122:9, 196:16, 255:11, 259:18, 265:24, 285:9
**signature-5tmlq**
295:11
**signature-b7fzp**
294:13
**signed**
36:5, 36:7, 36:9, 58:1, 71:5, 71:24, 77:5, 77:7, 79:10, 92:25, 97:22, 97:24, 160:25, 227:5, 227:6, 227:8, 227:9, 227:10, 227:14, 228:12, 228:14, 229:9
**significant**
32:18, 34:17, 38:15, 38:19, 38:25, 111:17, 200:18
**significantly**
127:16
**signing**
58:2, 58:12, 110:20, 111:7, 118:16
**signs**
230:24, 230:25, 255:25
**similar**
37:4, 56:15, 86:22, 226:5, 263:7
**similarly**
112:7
**simple**
247:23
**simply**
72:12, 146:4, 245:13
**simultaneous**
233:11
**since**
34:15, 41:22, 64:18, 111:20, 131:11, 199:5, 254:19, 260:9, 292:14
**sincerely**
290:19
**single**
45:11, 199:4, 199:8
**sit**
173:6
**site**
73:5, 73:7, 73:11, 73:17, 73:21, 73:23, 74:3, 74:11
**sites**
73:8, 74:7
**situation**
101:7, 124:13, 183:16, 186:17, 249:12, 250:4, 263:4
**six**
33:21
**six-month**
168:23, 169:9
**size**
145:6, 145:20
**skills**
294:9, 295:7
**skip**
218:14
**slate**
58:11
**slightly**
157:1, 278:24, 281:12
**slimy**
123:12, 125:22, 126:1
**small**
144:4, 244:6
**snippet**
280:23

WYLIE 610

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 344 of 356

**social**
133:9
**software**
7:5, 42:12, 43:2, 58:1, 74:16, 74:17, 79:10, 129:17, 134:7, 134:10, 134:11, 143:18, 144:12, 144:18, 144:23, 146:3, 149:9, 154:9, 155:3, 156:6, 157:1, 165:17, 166:12, 174:23, 180:5, 209:13, 211:17, 211:20, 212:15, 273:2, 273:15, 274:8, 275:18, 277:17
**sold**
63:13, 103:14, 160:14
**sole**
23:18, 23:24, 50:8, 50:13, 50:17, 50:19, 50:20, 60:2, 75:11, 119:9, 196:15, 247:17, 258:6, 260:25
**solidified**
12:19
**solutions**
84:25, 85:1, 85:6, 85:8, 85:14, 85:19, 91:5, 91:11
**solve**
264:25
**some**
7:21, 16:11, 66:12, 66:17, 67:4, 67:19, 112:3, 146:14, 169:3, 236:20, 240:15, 247:22, 249:11
**somebody**
59:16
**somehow**
181:14, 181:24
**someone**
123:24, 134:20, 150:25
**something**
59:19, 79:22, 100:14, 144:3, 154:20, 249:23, 258:21, 261:17, 263:7, 290:21, 291:8
**sometime**
79:11
**somewhere**
224:19
**soon**
34:10, 63:5
**sorry**
17:4, 37:17, 66:5, 66:23, 67:8, 75:21, 87:4, 90:10, 105:19, 106:22, 113:20, 114:14, 116:17, 124:23, 125:24, 143:16, 151:14, 151:16, 157:17, 158:5, 158:16, 162:25, 183:2, 200:24, 223:12, 234:8, 234:23, 235:9, 237:6, 238:10, 248:3, 262:9, 270:14, 280:24, 283:14, 284:23, 287:8, 287:15
**sotto**
158:3, 177:20, 216:3, 234:15, 245:17, 251:9, 252:3, 265:14, 266:5, 277:18, 278:5, 283:17, 287:16
**sought**
112:14, 180:4, 258:16, 258:18, 258:20, 258:23
**sounded**
131:23, 254:6, 254:12
**source**
66:9, 129:20, 129:22, 130:7, 130:8, 143:11, 271:18, 274:11, 277:6, 277:10, 277:12, 277:15
**sources**
74:22, 146:7, 177:4
**speak**
151:23
**speaker**
60:17
**speaking**
19:7, 73:25, 76:9, 280:19, 281:8
**specific**
15:25, 42:21, 176:23
**specifically**
9:7, 73:6, 160:8
**specifics**
59:14, 144:22
**speculate**
39:15, 57:3, 68:3, 181:20, 275:10
**spell**
13:19, 85:4, 115:4
**spend**
129:4, 129:10, 129:13, 129:16, 129:19, 130:12, 130:20, 131:17, 132:6, 133:14, 133:17, 133:25, 134:3, 134:9, 240:5
**spent**
42:12, 98:6, 129:8, 131:3, 131:7, 133:11, 134:7, 149:14, 150:13, 151:6, 220:2, 235:19, 240:15
**spirit**
230:24, 230:25
**spirits**
23:6, 69:4, 218:10, 219:15, 219:17, 231:4
**spite**
166:20, 166:22, 166:23
**split**
52:12, 55:12, 56:21
**spoke**
246:24
**spoken**
13:7
**sponsorship**
218:9
**spreadsheet**
42:2, 42:5, 42:16
**spring**
79:12, 102:5
**st**
3:7
**stack**
44:4, 44:24, 45:3, 51:6, 78:5, 78:8, 78:13, 78:17, 78:25, 80:16, 80:19, 81:3, 81:4, 81:20, 82:7, 82:10, 82:17, 146:1, 152:17, 152:21, 153:22, 153:24, 153:25, 154:4, 154:6, 154:8,

WYLIE 611

155:5, 155:6, 155:21, 156:2, 156:13, 189:12, 189:15, 271:25, 272:4, 272:14, 272:18, 272:20, 272:23, 273:7, 273:9, 273:14, 273:16, 273:20, 273:23, 274:3
**stacked** 273:15
**stacks** 61:12, 157:25, 268:6
**staff** 43:22
**staffing** 35:11, 36:10, 45:1, 150:1
**stand** 214:11, 215:17, 215:21
**standalone** 60:13, 74:12, 277:17
**standard** 5:5
**staples** 27:12
**start** 54:21, 66:6, 66:15, 84:9, 100:25, 151:16, 162:23, 184:15, 198:21
**started** 24:25, 29:8, 29:16, 37:8, 37:12, 51:11, 81:3, 111:20, 112:15, 149:23, 163:2, 188:4, 200:1, 265:23
**starting** 7:11, 37:11, 53:18, 59:20, 252:23, 253:19, 261:14
**startup** 89:15, 90:6, 98:15, 112:18, 278:24, 281:12
**state** 2:12, 5:18, 10:8, 11:7, 12:20, 12:24, 26:7, 49:9, 71:6, 71:25, 72:1, 72:5, 104:18, 118:21, 170:16, 182:22, 219:3, 242:14, 264:13, 264:14, 294:16
**stated** 58:23, 117:4, 134:20, 149:24, 186:2, 261:14, 273:21
**statement** 120:23, 120:25, 121:1, 121:4, 121:9, 187:22, 189:6, 190:12, 214:9, 214:18, 253:19
**statements** 195:24, 209:12, 209:13, 209:14, 209:15, 211:10, 211:11, 212:2, 212:5, 212:15, 212:16, 217:13
**states** 1:1, 259:4, 270:14
**stating** 71:23, 72:6
**status** 117:6, 209:11
**stay** 228:15
**step** 134:23
**steps** 64:11, 64:13, 285:25, 289:21
**stick** 264:22
**still** 25:20, 26:16, 26:20, 36:17, 47:19, 48:5, 61:3, 74:2, 121:16, 152:17, 158:17, 170:18, 187:7, 187:14, 190:1, 191:4, 192:20, 193:12, 197:8, 236:10, 241:6, 242:11, 242:13, 266:2, 268:23, 272:23, 276:4, 279:11, 286:10, 288:2
**stipulation** 5:6
**stitched** 44:4, 44:12, 129:1
**stock** 69:25, 70:13, 119:7, 121:17, 128:6, 241:15, 241:17, 242:20, 242:25, 243:1, 243:5, 243:17, 255:16, 279:7, 279:18, 279:23
**stocks** 242:17
**stop** 19:18, 19:19, 20:19, 21:15, 151:1, 152:20, 153:21, 157:25, 162:3, 162:8, 162:15, 162:16, 162:18, 165:5, 190:17, 217:21, 257:14, 268:6, 268:11, 273:19, 274:3, 280:25, 281:3, 281:7
**stopped** 124:8, 155:20, 269:17, 273:7, 276:10
**store** 36:25, 37:1, 37:2, 37:5, 37:9, 37:15, 37:19, 73:9, 74:5, 74:12, 80:7, 80:8, 80:9, 81:15, 149:7
**stores** 144:2
**straight** 155:16, 237:17
**straightforward** 145:19, 247:5
**strategies** 31:14
**strategy** 51:21, 102:7
**stream** 249:18, 278:10
**street** 3:7
**strike** 105:19, 262:18
**stripe** 179:24, 219:5, 219:6
**strong-arm** 257:9
**structure** 49:6, 49:23, 50:9, 50:10, 50:14, 51:24, 53:6, 118:4, 120:1, 126:6, 247:12, 249:4
**structured** 50:16
**stuck** 164:17, 195:6
**subject** 55:9
**submit** 12:3

WYLIE 612

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 346 of 356

**submitted**
12:2, 12:20, 43:1, 129:6, 208:21, 227:8
**subordinated**
279:3, 281:20, 282:14, 282:16, 283:2
**subscriptions**
148:7, 148:9, 160:15
**substance**
54:13, 184:11, 184:16, 184:24
**substantial**
121:24
**successful**
116:23
**sued**
11:3
**suffer**
174:21
**suffered**
194:16, 194:19
**sufficient**
127:17, 128:2, 289:18
**suggested**
54:22
**suggestion**
117:19
**suite**
2:6, 3:8
**summer**
79:3, 79:12, 171:19, 171:22, 220:11
**support**
29:9, 31:16, 56:17, 146:25, 147:9, 147:11, 147:12, 147:14, 147:22, 147:25
**supposed**
167:2, 239:4, 281:25
**sure**
7:15, 7:18, 7:22, 8:23, 38:25, 126:16, 126:21, 132:17, 143:25, 150:8, 179:20, 193:8, 208:13, 222:22, 240:23, 245:6, 246:12, 246:15, 267:8
**surprise**
261:22
**surrounding**
126:13
**suzanne**
1:20, 3:14, 28:9, 28:12, 28:13, 51:2, 52:7, 52:16, 52:18, 60:5, 75:14, 75:25, 77:12, 91:21, 91:22, 92:14, 92:15, 92:21, 103:9, 103:10, 103:12, 131:22, 167:14, 183:9, 221:25, 243:12, 243:25
**swath**
272:16
**sweat**
59:17, 59:22, 102:2, 103:2, 103:7, 103:10, 103:17
**sworn**
5:6, 5:11, 7:24, 10:5, 10:11, 63:16, 294:5
**system**
129:14, 131:15, 132:7, 132:11, 132:13, 132:19, 133:7, 133:8, 133:9, 144:9
**systems**
132:24, 133:1, 133:6, 133:10, 133:12, 133:17, 133:20, 133:25, 134:10, 134:11, 148:16, 180:23

**T**

**t-a-b-r-o-n**
115:5
**table**
223:21
**tabron**
115:3
**tag**
18:24, 19:1
**take**
6:11, 9:20, 9:22, 9:23, 15:8, 27:6, 46:7, 60:18, 64:11, 120:7, 120:16, 121:4, 122:10, 150:22, 158:4, 158:6, 158:11, 188:12, 196:24, 208:4, 214:4, 216:10, 240:22, 246:13, 247:7, 257:24, 258:6, 263:8, 263:12, 265:15, 287:17, 290:9, 292:25
**takedown**
7:4, 43:10, 272:17
**taken**
21:22, 60:22, 64:13, 123:2, 123:5, 158:24, 180:12, 197:2, 201:20, 229:25, 231:9, 240:25, 265:19, 285:25, 286:13, 287:21, 289:21, 294:4
**takes**
146:3
**taking**
8:8, 9:17, 17:19, 20:21, 20:25, 229:10, 258:21, 290:6
**talk**
8:19, 11:21, 19:16, 21:16, 61:19, 61:21, 99:16, 109:9, 124:2, 145:24, 150:24, 158:11, 161:4, 196:4, 196:5, 206:7, 231:18, 259:21, 259:22
**talked**
13:5, 40:3, 61:11, 63:23, 64:1, 67:3, 68:6, 175:1, 236:8
**talking**
19:2, 20:19, 21:13, 21:14, 55:15, 61:7, 93:25, 104:7, 113:21, 176:21, 181:2, 190:17, 190:19, 272:22, 273:24, 290:6
**tax**
209:14, 212:9, 212:10, 212:16
**team**
11:18, 13:7, 13:8, 18:24, 19:1, 171:20, 209:5, 209:6, 254:21
**tech**
44:4, 44:24, 45:3, 51:6, 61:12, 78:5, 78:7, 78:13, 78:17, 78:25, 80:15, 80:19, 81:3, 81:4,

WYLIE 613

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 347 of 356

81:20, 82:6, 82:9, 82:17, 146:1, 146:25, 147:12, 152:17, 152:21, 153:22, 153:24, 153:25, 154:4, 154:6, 154:8, 155:5, 155:6, 155:20, 156:2, 156:13, 157:25, 189:12, 189:15, 268:6, 271:25, 272:4, 272:14, 272:18, 272:20, 272:22, 273:7, 273:9

**technical**
40:3, 56:17, 57:22, 63:8, 129:5, 129:8, 129:25, 130:13, 146:12, 148:5, 272:6, 273:20, 274:3, 274:4, 275:7, 275:14, 275:24

**technically**
85:12

**technologies**
32:10, 35:25, 51:11, 56:15, 74:9, 155:2, 156:14, 188:12, 191:3

**technology**
16:23, 61:12, 161:11, 173:24, 192:9

**telephone**
27:24, 115:16

**tell**
7:24, 9:1, 17:21, 17:24, 29:2, 32:12, 59:11, 63:6, 76:12, 78:4, 78:13, 78:15, 86:14, 90:15, 107:2, 118:23, 133:5, 151:1, 206:8, 214:5, 228:7, 228:19, 245:25, 253:6

**telling**
43:14, 62:20, 150:23, 155:16, 155:20, 181:7, 196:14, 255:10

**tells**
9:7

**temp**
15:22

**template**
37:6

**temporarily**
155:10, 235:17

**temporary**
62:10, 155:14, 160:7, 180:4, 182:20

**term**
18:24, 101:5, 176:22, 180:8, 180:10, 279:8

**terms**
91:4, 91:11, 92:6, 92:13, 93:14, 99:12, 99:13, 100:16, 100:18, 101:2, 105:15, 105:16, 106:7, 106:8, 107:17, 145:25

**testified**
5:13, 143:10, 146:14, 273:6, 292:12

**testify**
5:11, 39:13, 39:16, 39:18, 184:24, 290:7, 292:17

**testimony**
10:5, 10:11, 11:13, 11:14, 82:16, 98:12, 105:5, 115:11, 130:10, 199:3, 268:14, 287:5, 287:11

**texas**
1:2, 1:28, 2:7, 2:12, 3:9, 3:20, 6:3, 26:8, 29:8, 30:3, 123:7, 123:15, 264:8, 264:17, 264:19, 294:16

**text**
256:18, 257:1, 257:2, 257:4

**th**
5:4, 53:14, 58:12, 113:24, 117:25, 124:20, 158:2, 180:25, 186:6, 186:23, 187:6, 192:20, 193:1, 193:7, 193:9, 193:13, 194:10, 201:8, 201:10, 242:9, 246:4, 252:23, 256:20, 263:3, 266:11, 269:13, 271:17, 272:24, 277:2, 283:21, 284:8

**thank**
5:8, 8:18, 21:25, 65:12, 81:19, 151:3, 216:2, 216:8, 245:22, 280:4, 280:18, 293:13

**thematic**
131:21

**theme**
37:6, 163:12

**thereafter**
294:6

**therefore**
201:17, 204:17

**thing**
104:10, 145:10, 196:18, 235:24, 270:16

**things**
12:4, 12:5, 58:2, 66:10, 66:15, 86:1, 122:16, 144:10, 153:18, 169:4, 169:5, 176:23, 179:25, 195:7, 196:9, 196:13, 212:14, 219:4, 236:20, 255:16, 260:3, 260:10, 292:16

**think**
17:10, 19:9, 39:12, 54:20, 68:1, 79:9, 88:19, 105:7, 145:25, 146:2, 146:11, 149:13, 186:7, 231:12, 240:11, 250:1, 252:18, 291:8

**thinking**
73:9, 181:19

**third**
124:10, 195:10, 207:15, 207:21, 208:5

**third-party**
84:15, 207:3, 207:8

**thirst's**
133:12, 145:5, 145:22, 157:13, 157:17, 175:3, 175:9, 175:11, 175:17, 175:22, 197:11, 198:17, 200:4, 208:22, 229:25, 240:5, 267:23

**thoroughly**
64:6

**thought**
39:7, 59:16,

WYLIE 614

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 348 of 356

144:17, 204:4, 225:14, 229:18, 248:10, 271:3
**thousand**
239:13
**thread**
249:20
**threat**
118:20, 119:24, 120:24, 122:11
**threaten**
118:16
**threatened**
119:8, 119:14, 120:7, 120:16, 226:3
**three**
25:18, 86:2, 105:23, 108:17, 108:18, 108:21, 183:8, 195:14, 250:16, 256:21, 256:24
**three-year**
85:22, 85:23, 86:3, 87:23, 88:3
**through**
7:10, 12:21, 15:22, 28:18, 30:2, 31:25, 35:11, 42:7, 46:15, 62:13, 62:17, 83:15, 102:19, 105:24, 105:25, 106:19, 106:24, 107:15, 110:19, 112:14, 112:22, 116:5, 116:12, 146:9, 154:10, 167:9, 188:25, 192:20, 194:22, 195:6, 196:21, 216:10, 229:19, 231:19, 234:25, 242:1, 252:6, 256:23, 264:13, 264:14, 288:25
**throughout**
261:15
**thursday**
1:29
**ti**
155:12, 155:15
**tier**
157:7, 157:8, 159:12, 160:14, 160:15, 195:18, 195:20, 195:21
**time**
5:4, 5:5, 9:4, 10:3, 16:21, 17:20, 18:1, 18:4, 18:6, 31:22, 34:5, 42:11, 42:15, 48:12, 48:19, 50:3, 50:5, 50:17, 52:7, 52:9, 52:10, 53:2, 56:22, 59:23, 60:3, 60:10, 69:8, 73:9, 73:24, 75:8, 75:17, 76:1, 76:9, 79:1, 79:14, 91:18, 93:2, 93:9, 101:21, 104:1, 114:3, 114:19, 116:3, 121:13, 125:12, 125:16, 126:21, 129:4, 129:7, 129:10, 129:13, 129:16, 129:19, 130:12, 130:14, 130:16, 130:20, 130:25, 131:3, 131:17, 132:6, 133:11, 133:17, 133:25, 134:3, 134:7, 134:9, 149:13, 149:18, 149:23, 150:2, 150:12, 151:6, 151:22, 151:23, 151:24, 154:3, 157:11, 157:24, 159:4, 169:9, 169:14, 169:15, 174:23, 186:4, 187:7, 194:7, 204:11, 217:15, 242:11, 242:12, 247:17, 248:11, 257:20, 262:22
**timeframe**
51:9
**timeline**
66:13, 67:5, 67:20, 155:15, 169:4, 169:12, 264:22
**times**
29:1, 102:17, 122:15, 127:16, 128:1, 183:15, 186:3, 232:4
**timesheet**
129:6, 149:17
**timesheets**
43:1
**timing**
39:6, 66:15
**title**
24:4, 24:5, 25:4, 25:6, 25:8, 25:10, 25:13, 25:14, 33:13, 45:7, 51:25, 71:23, 223:11
**titled**
259:2
**titles**
24:7
**toad**
195:3, 195:11, 195:13, 195:14
**today**
9:11, 9:15, 11:13, 35:3, 115:11, 130:10, 130:15, 130:24, 131:3, 132:8, 133:13, 134:6, 170:7, 170:12, 170:18, 170:23, 171:5, 172:14, 173:6, 175:18, 189:10, 199:3, 199:5, 208:16, 244:17, 249:11, 268:14, 287:6, 287:12, 292:13
**today's**
5:3, 11:17
**together**
29:6, 44:5, 44:13, 60:9, 60:15, 61:20, 61:22, 67:4, 68:7, 74:16, 74:18, 116:18, 125:13, 129:1, 156:23, 158:17
**told**
7:9, 14:5, 14:12, 14:18, 14:25, 19:24, 54:18, 63:20, 64:1, 78:16, 118:25, 152:20, 157:9, 157:25, 162:3, 203:11, 225:14, 238:9, 255:15, 255:24, 259:17, 260:15, 271:5, 273:3
**tomlinson**
283:23, 284:11
**tons**
19:16
**took**
122:21, 126:15, 148:17, 148:19, 158:19, 202:1, 202:6, 234:10, 288:1
**tools**
132:17

WYLIE 615

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 349 of 356

**top**
65:24, 66:1, 105:17, 216:22, 220:12, 225:5, 244:6, 246:6, 246:22, 253:3, 266:10, 281:13
**top-notch**
171:20
**topic**
55:5
**topics**
11:19
**toptal**
42:25, 45:1
**total**
111:20, 172:2, 176:1, 177:4, 177:7, 177:9, 217:8, 218:4, 220:12, 220:15, 223:10, 223:13, 223:20
**totality**
164:9, 173:23
**tow**
195:12
**toward**
89:15, 98:6
**towards**
225:22, 254:14, 283:25, 289:21
**track**
35:6, 184:3, 217:18
**trade**
86:12, 86:13, 86:14, 86:20, 134:18
**trademark**
46:15, 46:17, 83:7, 83:9, 83:12, 83:20
**traffic**
10:15
**transcribed**
1:39
**transcriber**
295:1
**transcript**
293:1, 295:4, 295:5
**transcriptionist**
294:7
**transcripts**
293:10
**transfer**
232:7, 232:10, 238:23
**transferred**
201:3, 201:24, 202:10
**transferring**
201:11, 203:4
**travel**
219:8, 219:13
**traveling**
264:8, 264:11, 264:13, 264:17, 264:19
**trial**
287:5, 287:12, 288:8, 288:25, 292:17
**tried**
116:22, 181:25
**trip**
68:7
**triple**
229:13, 229:14, 229:15
**tro**
273:1
**trucks**
231:17
**true**
64:20, 191:21, 225:18, 252:11, 252:13, 260:24, 261:9, 273:11, 273:13, 294:8, 295:5
**truly**
247:20
**trusted**
59:16
**truth**
5:12, 7:25
**try**
8:21, 9:22, 124:11, 256:22
**trying**
124:12, 157:2, 196:12, 250:20, 251:15, 254:9, 257:9, 271:23, 272:23
**tuesday**
66:12
**turmoil**
194:22
**turn**
119:8, 119:14, 225:21, 226:25, 252:25, 262:24
**twice**
131:10
**twin**
195:2, 195:9
**two**
15:9, 18:23, 19:4, 26:3, 45:17, 45:18, 59:13, 59:17, 64:15, 64:17, 64:18, 65:1, 92:2, 106:20, 106:25, 127:13, 167:24, 197:14, 197:25, 198:4, 224:6, 243:18, 244:12, 244:23, 250:16, 251:5, 255:16, 256:23, 259:13, 261:12, 264:15, 269:17, 270:23, 276:10, 279:13, 279:20, 283:15, 283:16, 286:9
**type**
57:25, 104:9, 112:21
**types**
219:3
**typewriting**
294:7
**typo**
281:23

**U**

**ubiquitous**
144:3
**uh-huh**
8:14, 28:3, 102:13, 117:15, 216:12, 219:10, 236:4, 238:13, 241:10, 241:19, 241:22, 243:13, 253:2, 254:2, 269:10
**unable**
190:9, 190:13
**unallocated**
222:6, 222:17
**unaware**
64:23, 65:5, 129:22
**uncomfortable**
177:16
**unconscionable**
256:21, 259:7
**under**
7:22, 19:25, 31:23, 40:8, 61:3, 107:17, 134:21, 197:8, 219:8, 222:13, 234:22, 236:13, 241:6, 266:2, 273:1, 288:2
**underlying**
161:11
**underneath**
40:11
**understand**
6:10, 6:12, 6:15, 6:23, 7:1, 8:24, 9:1, 11:3, 22:20, 37:25, 40:24, 41:8, 49:2, 61:5, 115:11, 115:21, 117:8, 134:15,

WYLIE 616

144:11, 152:3, 156:12, 177:2, 185:21, 189:10, 197:8, 230:8, 230:13, 233:9, 266:21, 267:16, 267:17, 276:4, 286:17, 286:20, 286:25, 287:9, 292:4, 292:6
**understandably** 118:12
**understanding** 10:21, 10:25, 39:24, 39:25, 40:1, 77:16, 77:17, 115:14, 145:23, 157:12, 180:11, 194:9, 272:13, 273:24, 274:15, 274:17
**understands** 19:21, 32:20
**understood** 22:20, 82:15, 114:25, 143:17, 267:20
**underwritten** 247:5
**unexpected** 269:18, 276:11
**unicorn** 195:2
**unidentified** 60:17
**unified** 156:13, 156:19, 156:20, 272:18, 272:19, 273:24, 274:2
**unilaterally** 153:17, 158:8, 158:19
**united** 1:1
**units** 25:16
**unless** 9:7
**unnecessarily** 21:15
**unnecessary** 263:9, 263:10
**until** 51:17, 55:9, 58:6, 79:16, 100:13, 120:8, 120:17, 121:6, 121:14, 130:15, 130:23, 131:3, 132:7, 133:13, 134:6, 134:18, 154:10, 157:11, 170:18, 170:23, 171:5, 172:13, 199:5, 200:11, 235:7, 261:22
**update** 154:19, 204:14, 204:18
**updates** 16:9
**updating** 204:23
**uphold** 164:3
**upset** 118:6, 118:8, 118:11, 118:12, 125:20, 126:3, 126:11, 126:13, 127:12, 257:16
**usable** 43:21
**usage** 219:7
**use** 32:10, 37:6, 43:11, 51:12, 63:11, 63:12, 77:22, 78:5, 78:13, 80:17, 81:13, 82:4, 89:14, 98:5, 124:14, 126:6, 143:23, 144:7, 144:13, 144:23, 145:5, 145:22, 152:5, 152:12, 152:15, 153:18, 154:22, 154:25, 155:6, 156:2, 156:16, 156:24, 161:15, 163:2, 165:18, 166:12, 174:22, 180:5, 204:22, 230:2, 235:8, 245:12, 272:18, 273:2, 273:9, 276:7, 277:1, 277:6, 277:9
**useful** 204:17
**user** 82:5
**uses** 132:13, 132:16, 143:11, 143:18, 152:13
**using** 42:24, 43:19, 44:13, 152:17, 152:20, 153:21, 153:25, 154:4, 154:5, 154:7, 154:11, 154:16, 155:20, 157:25, 161:23, 162:3, 162:8, 162:15, 162:16, 162:18, 162:23, 220:6, 268:6, 268:8, 268:11, 268:23, 273:7, 273:15, 273:16, 273:19, 274:4, 279:5

V

**vague** 55:21, 214:17
**valid** 112:18
**valley** 195:2, 195:9
**valuable** 59:19
**valuation** 128:7, 205:6, 205:8, 205:9, 205:24
**valuations** 205:2, 205:13, 205:16, 205:19, 205:21, 205:23, 206:9, 206:24, 207:3, 207:8, 207:11, 207:14
**value** 170:21, 170:25, 171:1, 171:3, 171:10, 171:11, 171:24, 172:2, 189:15, 205:12, 208:1, 254:23
**valued** 59:5, 59:6, 128:4, 128:5, 128:11, 252:8
**valueless** 192:5
**variable** 106:10, 107:19
**variety** 154:9
**various** 16:10, 31:7, 31:25, 32:4, 74:16, 74:21, 132:5, 146:7, 150:9, 188:15, 272:14, 273:9
**vendor** 57:25, 213:5
**vendors** 57:23, 84:15
**venture** 63:6
**verbal** 8:16, 99:3, 99:9, 99:16, 99:17, 100:11, 100:20, 126:23

WYLIE 617

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 351 of 356

**verbally**
78:4, 78:12, 115:18, 127:9
**verbatim**
153:12
**versa**
30:15, 232:7
**version**
79:25, 80:18, 80:23
**via**
153:3, 268:20
**viable**
26:16, 26:20
**vice**
30:15, 38:13, 232:7
**video**
144:20
**videographer**
3:33, 5:3, 21:21, 60:20, 60:24, 158:22, 159:1, 196:25, 197:4, 240:24, 241:2, 265:17, 265:21, 287:19, 287:23, 292:23
**videotaped**
1:27, 2:1
**view**
75:23, 75:25, 76:5, 159:18, 159:22, 159:25, 190:5, 190:9, 190:22
**viewer**
81:25
**viewing**
75:14, 159:14, 160:4, 160:10, 204:5
**virtually**
253:9
**visibility**
157:22
**voce**
158:3, 177:20, 216:3, 234:15, 245:17, 251:9, 252:3, 265:14, 266:5, 277:18, 278:5, 283:17, 287:16
**vodka**
195:2
**voice**
124:10
**vote**
118:4, 255:17
**votes**
184:7
**vulnerable**
117:9

**W**

**wait**
8:20, 11:20, 14:14, 27:3, 27:9, 71:13, 71:16, 81:5, 119:18, 162:25, 172:16, 184:13, 200:6, 267:3, 278:4
**waiting**
100:10
**walk**
42:7, 256:24, 259:21
**wanda**
1:39, 295:3, 295:13
**want**
7:21, 7:22, 8:23, 19:17, 39:18, 41:17, 59:8, 66:10, 116:23, 118:6, 134:14, 134:20, 150:21, 150:22, 150:24, 155:15, 158:20, 177:19, 187:11, 220:4, 222:22, 243:21, 246:13, 249:2, 259:21, 263:9, 265:24, 270:16, 276:15, 280:2, 289:1, 293:9
**wanted**
7:14, 79:8, 88:8, 124:14, 154:11, 166:23, 188:14, 231:15, 235:11, 238:24, 252:1, 252:5, 254:6, 254:10, 260:3, 260:9, 264:25
**wanting**
55:10
**wants**
151:2, 231:1, 231:5
**way**
35:3, 74:5, 122:17, 126:7, 129:9, 129:12, 129:15, 129:18, 144:7, 155:2, 156:21, 156:23, 156:25, 157:2, 169:4, 204:13, 210:20, 217:16, 228:11, 232:10, 235:20, 247:19, 247:22, 248:12, 249:4, 251:20, 252:24, 254:8, 257:18, 257:19, 258:25, 276:8, 289:10
**ways**
122:18, 124:7, 247:21, 250:9, 252:15, 255:15, 256:21, 260:19
**we'll**
9:22, 13:4, 66:12, 66:14, 66:17, 67:4, 67:19, 87:16, 122:10, 134:13, 148:24, 208:4, 280:2
**we're**
5:5, 8:2, 18:25, 19:2, 19:5, 21:19, 21:20, 55:14, 60:20, 60:24, 61:2, 100:2, 101:7, 158:6, 158:17, 158:22, 177:13, 196:25, 197:5, 197:7, 210:20, 222:22, 224:19, 229:9, 237:10, 240:24, 241:3, 241:5, 262:1, 265:17, 265:21, 266:1, 282:10, 284:2, 287:19, 292:23, 293:13
**we've**
20:6, 41:22, 42:2, 214:2, 240:21, 275:17, 280:16
**web**
63:8
**website**
16:1, 16:9, 31:15, 32:3, 32:14, 37:4, 51:14, 54:19, 55:4, 56:14, 58:21, 59:6, 80:1, 80:13, 80:23, 86:17, 86:21, 87:6, 87:20, 88:7, 88:13, 89:2, 89:8, 89:20, 89:21, 129:3, 129:11, 130:21, 131:4, 131:7, 131:9, 131:10, 131:11, 131:17, 131:24, 149:8,

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 352 of 356

162:9, 162:16, 162:19, 162:20, 163:2, 163:5, 163:8, 163:9, 202:23, 203:1, 267:24, 268:1, 268:3
**wednesday** 246:24, 259:3
**week** 150:5, 247:1
**weekly** 34:12
**weeks** 15:9, 269:18, 276:10
**weight** 262:4
**went** 39:4, 40:2, 45:11, 111:18, 113:1, 114:18, 116:11, 125:15, 128:7
**weren't** 181:9, 196:9, 200:8, 224:21, 267:2, 272:24
**western** 1:2, 17:13
**whatever** 252:1
**whereby** 107:5
**whereupon** 5:9
**whether** 60:11, 115:19, 183:20
**whiskey** 13:23
**whole** 5:12, 245:7, 247:22
**wholly** 119:15
**wife** 28:14
**willing** 58:21, 124:8, 125:19, 254:16
**wind** 26:4
**winding** 26:10
**wine** 30:2, 30:6, 33:25
**winery** 34:1
**withdraws** 247:2
**within** 49:16, 157:2, 173:23, 195:4, 231:2
**without** 112:18, 118:4, 119:4, 123:24, 144:5, 147:8, 164:10, 173:5, 188:6, 191:23, 192:4, 249:19, 255:2, 255:18, 257:21, 258:1, 258:11, 258:20, 259:11, 259:18, 260:20, 290:8
**witness(es** 294:4
**witnesses** 4:10
**women's** 15:10
**word** 194:21
**wording** 37:7, 180:11
**words** 46:4, 246:9, 254:1, 284:6
**work** 15:24, 15:25, 16:7, 16:12, 16:17, 16:20, 16:21, 28:18, 28:23, 29:11, 29:13, 31:12, 35:12, 36:11, 36:14, 37:21, 37:23, 39:23, 46:17, 46:19, 48:15, 51:1, 54:22, 55:3, 55:23, 57:15, 59:5, 59:8, 59:17, 61:15, 61:23, 68:22, 77:19, 80:19, 81:3, 84:16, 85:2, 88:12, 115:1, 115:6, 121:19, 122:3, 127:21, 133:19, 145:16, 146:6, 146:11, 147:15, 149:25, 150:10, 152:5, 172:6, 173:8, 235:22, 259:20, 260:3, 260:10, 261:1, 264:24, 272:6, 274:4, 274:7, 275:7, 275:14, 279:7
**work-for-hire** 73:1, 76:8, 76:12, 76:14, 76:16, 76:23, 77:8, 77:16, 86:20, 93:20, 97:25
**worked** 28:24, 29:3, 29:6, 29:10, 30:9, 34:13, 34:15, 49:17, 50:9, 50:14, 50:22, 52:3, 52:5, 52:6, 57:10, 60:3, 76:2, 115:10, 116:18, 118:9, 122:3, 124:14, 146:22, 149:19, 149:21, 153:18, 157:8, 275:25
**working** 28:24, 30:9, 30:10, 34:12, 36:1, 39:22, 46:14, 48:11, 48:13, 51:13, 59:3, 59:16, 69:16, 78:23, 79:3, 80:15, 81:6, 81:11, 91:20, 102:4, 120:8, 120:17, 121:5, 123:2, 146:19, 148:2, 149:21, 150:8, 190:2, 190:4, 191:4, 191:11, 191:20, 192:8, 254:19, 257:20, 269:17, 270:1, 270:24, 276:10
**workings** 275:4
**works** 77:22, 156:23, 250:22, 273:18, 274:19, 274:25, 275:1
**worksheet** 112:2, 112:7, 220:6
**world** 144:3
**worth** 68:24, 171:8, 172:9, 243:21
**worthless** 191:24, 192:10
**wouldn't** 9:13, 120:12, 196:16, 256:16, 261:24, 264:8
**wound** 26:7
**wrapped** 26:13

WYLIE 619

**write**
256:18, 257:1, 257:2
**writer**
13:22, 31:24, 269:18, 276:11
**writers**
31:23
**writing**
13:23, 67:18, 115:15, 126:17, 160:21, 226:2, 249:8, 253:9
**written**
53:14, 70:22, 71:2, 71:5, 71:10, 71:18, 71:21, 71:22, 71:24, 72:1, 72:4, 72:10, 72:13, 72:20, 76:18, 90:25, 91:3, 91:10, 92:24, 93:3, 93:19, 98:18, 98:25, 100:18, 109:13, 127:7, 151:5, 210:20, 222:20, 234:5, 234:9, 249:7, 262:15, 262:17, 285:7, 285:9
**wrong**
65:2, 235:21, 237:5, 254:13, 270:21
**wrote**
126:25, 131:12, 132:4, 214:19, 235:21, 249:11, 255:8
**wylie**
1:13, 3:13, 3:34, 6:9, 13:2, 13:14, 14:2, 28:5, 39:9, 48:23, 50:24, 60:6, 65:21, 66:1, 66:7, 66:8, 67:1, 76:19, 85:18, 86:17, 89:12, 98:4, 99:10, 109:5, 109:12, 109:23, 113:25, 114:4, 131:22, 174:19, 208:20, 219:12, 240:3, 241:23, 246:25, 249:12, 250:4, 251:13, 278:17, 282:3, 282:9, 283:24, 285:19, 286:9
**wylie's**
253:19, 284:1, 285:2, 285:17, 285:22

**Y**

**yeah**
10:4, 19:12, 20:5, 87:3, 212:18, 220:10, 230:5, 232:22, 237:20, 238:25, 244:16, 246:22, 248:3, 249:25, 251:6, 253:17, 260:12, 267:6, 290:4
**year**
162:22, 163:1, 163:2, 168:15, 170:17, 201:9, 216:21
**years**
6:5, 16:19, 28:16, 29:1, 29:25, 30:14, 31:19, 33:22, 59:4, 59:13, 64:15, 64:17, 64:18, 65:1, 86:2, 212:10, 212:12, 217:22
**yep**
11:23, 229:15, 238:25, 239:6
**yes-or-no**
8:14, 144:25, 193:22
**yesterday**
7:9, 8:9, 8:11, 8:13, 17:12, 46:2, 146:14, 181:1
**yourself**
49:19, 101:25, 102:12, 119:15, 167:14, 209:3

**Z**

**zero**
227:21, 237:6, 238:20, 244:25
**zoom**
198:3

**$**

**$1,800**
88:19, 89:19
**$10,287**
218:4
**$100,000**
105:14, 105:20, 279:4
**$150,000**
222:1, 222:3
**$1500**
69:1, 105:7
**$2,000**
219:11
**$2,500**
86:23, 89:20, 90:10, 90:23
**$20,000**
176:13
**$250,000**
107:7
**$257,000**
227:16
**$300,000**
111:21, 288:7
**$350,000**
106:6, 106:14, 108:11
**$38,707**
236:17
**$4**
205:12
**$400,000**
107:14, 112:6, 244:17
**$41,593**
43:13
**$41,593.39**
40:16
**$42,000**
161:21, 175:1
**$43,000**
98:6, 98:24
**$46,000**
177:12
**$5,100**
98:4, 98:8, 104:7
**$50**
281:23
**$50,000**
98:19, 98:20, 279:2
**$55,000**
33:19
**$58**
217:8
**$7,500**
218:13
**$79,491.14**
236:22
**$80,000**
100:10
**$85**
16:15

**.**

**.2100**
2:8

**0**

**0001**
216:16

WYLIE 620

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 354 of 356

**0004**
220:3, 223:17
**0005**
225:4
**000567**
254:15
**000568**
259:2
**000574**
262:25
**0006**
225:22
**0010**
227:1, 227:3
**0029**
234:20
**0035**
241:12
**0039**
244:6
**00467**
1:10
**0059**
3:21
**06**
1:30, 5:2, 5:4
**08**
158:23, 158:24
**09**
265:18, 265:19

**1**

**1**
158:23, 158:24, 158:25, 159:2, 197:1, 197:2
**1,000**
50:4, 52:15, 52:16, 92:12, 92:19
**1,800**
88:24
**1,825**
88:20
**10**
4:27, 4:29, 60:21, 60:22, 60:23, 60:25, 102:17, 118:9, 127:16, 128:1, 201:8, 223:15, 223:23, 269:3, 269:6, 275:20, 279:15, 295:14
**100**
105:18, 220:15, 236:8, 239:13, 244:24, 281:20
**11**
4:14, 4:28, 62:22, 186:23, 192:20, 193:1, 193:7, 193:9, 193:13, 194:10, 256:20, 266:11, 277:19, 277:22
**1100**
69:1
**111**
2:5
**12**
4:29, 29:25, 31:18, 53:14, 158:25, 159:2, 180:25, 186:6, 187:6, 215:2, 215:5, 283:10, 283:13
**134**
4:5
**14**
4:20, 220:18, 223:22, 223:24
**143**
4:6
**15**
4:13, 60:21, 60:22
**150,000**
222:1, 222:5, 222:8, 222:13
**16**
4:24, 240:24, 240:25, 242:1, 259:3, 265:20, 265:22
**17**
58:12, 113:24, 172:19, 252:23
**1700**
218:21
**177**
4:7
**179**
4:8
**18**
246:4, 263:3
**1800**
89:8
**1801**
3:7
**19**
4:4, 4:28, 197:3, 197:5, 201:10, 242:9, 243:9
**19.29**
221:6
**1969**
6:1
**1998**
28:18
**1:-cv--rp**
1:10
**1st**
36:6, 161:13, 161:18

**2**

**2**
197:3, 197:5, 213:1
**2,500**
89:3
**2,700,000**
45:9, 52:15, 69:25, 70:12, 121:16, 128:6, 128:19, 170:12, 173:18
**2.7**
170:13, 170:19, 171:4, 171:11, 173:21, 241:21
**20**
4:25, 224:10, 224:20, 248:2, 248:6, 248:13, 248:15, 248:19, 249:6, 271:17, 272:24, 281:2
**20,000**
177:8, 177:13, 240:15
**2010**
30:3
**2011**
239:16
**2012**
31:22
**2015**
38:10
**2016**
15:21, 15:23, 16:4, 59:5, 292:14
**2020**
24:15, 46:23, 54:4, 54:5, 54:6, 54:11, 56:24, 58:25, 86:16, 102:5, 272:24
**2021**
12:24, 12:25, 16:22, 34:4, 47:6, 47:7, 49:11, 51:17, 52:24, 53:8, 53:14, 53:23, 54:4, 54:10, 55:9, 56:20, 58:24, 63:5, 65:23, 79:12, 79:17, 80:4, 85:9, 88:6, 90:16, 90:17, 90:21, 104:5, 112:16, 112:17, 113:1, 116:18, 128:16, 175:4, 175:23, 175:25,

WYLIE 621

176:4, 176:7, 198:14, 200:2, 200:11, 205:5, 212:13, 216:21, 217:8, 217:14, 218:18, 241:18, 242:2, 245:15, 254:20, 284:9

**2022**
34:16, 35:21, 36:6, 36:16, 37:13, 37:22, 37:24, 58:13, 84:12, 88:20, 106:4, 106:16, 108:4, 113:14, 113:18, 113:24, 114:14, 115:13, 124:20, 152:24, 154:14, 154:15, 155:18, 161:13, 161:18, 162:24, 163:6, 167:8, 170:16, 171:19, 171:22, 172:19, 175:9, 176:10, 176:13, 179:6, 192:17, 192:23, 193:5, 193:10, 193:13, 194:10, 198:11, 198:24, 198:25, 201:10, 204:3, 212:13, 220:8, 220:9, 220:11, 222:1, 223:18, 225:13, 232:22, 242:9, 243:9, 246:5, 252:23, 259:3, 266:11, 268:4, 269:13, 271:17, 277:2

**2023**
25:23, 29:8, 30:20, 34:16, 99:15, 99:25, 167:9, 168:16, 175:11, 176:16, 177:7, 177:11, 197:17, 198:5

**2024**
1:29, 5:4, 100:2, 168:16, 175:17, 177:10, 177:12, 197:18, 198:6, 263:3, 295:14

**2062**
3:10

**208**
4:21

**21**
4:7, 6:5, 78:21

**2101**
6:3

**215**
4:22

**22**
1:10, 36:13, 109:14, 109:17, 110:6, 111:14, 271:17

**227**
4:23

**23**
4:22

**23.57**
221:4

**234**
4:24

**24**
4:5, 283:21, 284:8

**245**
4:25

**25**
4:23, 21:21, 21:22, 90:9, 269:13

**250**
111:24, 279:3, 281:20, 282:14, 282:17, 283:5

**250,000**
107:11, 225:15, 284:3

**2500**
89:8

**257,800**
225:17, 225:19

**26**
21:23, 28:16, 29:1, 60:23, 60:25, 65:23, 158:2

**266**
4:26

**269**
4:27

**27**
4:18

**277**
4:28

**28**
1:29, 5:4, 277:2

**283**
4:29

**29**
117:25, 124:20

**292**
4:14

**295**
1:37, 3:8

**2nd**
6:1, 53:8, 159:9

**3**

**3**
4:8, 4:19, 4:27, 240:24, 240:25, 241:1, 241:3

**3,000**
211:3

**3,300,000**
52:14, 128:18

**30**
130:22, 131:18, 131:19, 284:2

**32**
241:1, 241:3

**33**
25:19

**33,000**
219:21, 219:24

**34**
40:8

**350**
109:10

**3500**
105:1

**365**
3:8

**38,000**
238:5

**38,707.89**
237:2, 238:7, 239:23

**4**

**4**
4:3, 4:26, 63:4, 265:18, 265:19, 265:20, 265:22, 287:20, 287:21, 287:22, 287:24, 292:24, 293:15

**4,000**
171:18, 171:23

**4.1**
144:2

**40**
174:25, 287:20, 287:21

**400**
107:22, 116:5

**42**
220:22

**42,000**
189:16, 189:20

**42.86**
220:23

**43**
98:11

**43,000**
240:14

**4400**
3:19

**45**
150:5, 287:22,

WYLIE 622

Case 1:24-cv-01512-DAE Document 42-15 Filed 11/26/25 Page 356 of 356

287:24
**48**
257:13
**4th**
261:21

5

**5**
4:13, 214:12
**5,100**
101:17
**5,150**
237:13, 237:21, 240:19
**50**
55:10, 55:12, 56:21, 101:18, 150:5, 239:25, 240:14, 250:16, 281:19, 282:1, 282:2, 282:5, 282:13, 282:22, 283:6, 284:24, 285:22, 292:24
**50,000**
240:4, 243:9, 243:17, 243:23, 284:1, 285:16
**500**
2:6
**51**
3:7, 293:15
**512**
3:10, 3:21
**512.855**
2:8
**526597**
1:35
**53**
197:1, 197:2
**561**
250:24
**567**
252:25
**571**
251:19, 251:24
**572**
251:23
**574**
262:24
**585**
250:24

6

**60**
131:7
**609**
3:21
**62**
4:19
**65**
4:20
**6th**
200:11

7

**76**
236:24
**76,000**
236:23, 237:9
**76,491**
235:3
**76,491.14**
239:11
**78701**
2:7
**78723**
3:9
**78731**
3:20
**7th**
155:18, 179:6, 186:22, 188:4, 204:3, 268:13

8

**8**
4:6, 4:18, 4:21
**813**
3:10
**8th**
49:11, 52:24, 53:9, 55:15, 112:16, 268:16

9

**9**
1:30, 5:2, 5:4, 21:21, 21:22, 21:23
**90**
29:5
**94**
4:3
**97**
4:4
**9th**
278:21

WYLIE 623

The settlement agreement between Donoho, Big Thirst, and McGinnis from the prior litigation is irrelevant.

Plaintiff cites this exhibit as part of a "haystack" of documents but identifies no language within it containing any promise to Plaintiff.

1:24-CV-01512-DAE
Plaintiff
EXHIBIT
M

**CONFIDENTIAL SETTLEMENT AGREEMENT**

This Settlement Agreement and Mutual Release (the "Agreement") is entered into and between Big Thirst, Inc. ("Big Thirst"), Lauren Wylie Donoho ("Donoho") and Matthew McGinnis ("McGinnis"; Big Thirst, Donoho and McGinnis are referred to collectively herein as the "Parties"). This Agreement takes effect on the last date on which a Party affixes their signature hereto (the "Effective Date").

**RECITALS**

WHEREAS Big Thirst offers e-commerce services to customers in the spirits industry;

WHEREAS McGinnis is the CEO and the majority shareholder of Big Thirst;

WHEREAS Donoho is currently a shareholder of Big Thirst and was formerly an officer and director of Big Thirst;

WHEREAS Donoho developed certain intellectual property used by Big Thirst in connection with its e-commerce services including but not limited to an e-commerce platform, website, and data dashboard;

WHEREAS disputes arose regarding the operation Big Thirst and the ownership and control of its shares and assets;

WHEREAS Big Thirst filed a lawsuit related to those disputes styled *Big Thirst, Inc. v. Donoho et al.*, which is currently pending as Case No. 1:22-CV-00467-RP in the United States District Court for the Western District of Texas, Austin Division (the "Lawsuit");

WHEREAS Donoho asserted counterclaims against Big Thirst as well as third-party claims against McGinnis and the other directors of Big Thirst in the Lawsuit;

WHEREAS all of the parties in the Lawsuit deny the allegations against them;

WHEREAS the Parties wish to resolve the Lawsuit through this Settlement Agreement without the uncertainty and expense of further litigation;

WHEREAS the Parties mutually agree that, pursuant to the terms and conditions set forth in this Agreement, it is in their collective best interest for the Parties to settle their disputes and disagreements and for Big Thirst to redeem the shares owned by Donoho;

WHEREAS it is the intention of the Parties to fully, finally, absolutely, and forever resolve any and all claims and disputes between and among them, save and except those specifically reserved by the terms of this Agreement;

THEREFORE, in consideration of the foregoing, the mutual agreements herein, and other good and valuable consideration, the Parties make the following Settlement

D000007

Agreement.

**AGREEMENT**

1. **Dismissal of Suit and Waiver of Sanctions**. The Parties shall, within two (2) business days after the Effective Date, file a Joint, Stipulated Motion to Dismiss the Lawsuit with Prejudice of all claims and causes of action that were or could have been asserted in the Lawsuit, along with a proposed order, in the forms attached hereto as **Exhibit A**. Additionally, Big Thirst and McGinnis hereby forever waive, forfeit, and abandon any and all rights to receive the sanctions imposed by the court against Donoho in the Lawsuit in the amount of $80,137.50, as well as any other fees, penalties, interest, or other related compensation. Donoho also hereby forever waives, forfeits, and abandons any and all rights to receive payment on any loans she claims to have made to Big Thirst, as well as any other fees, penalties, interest, or other related compensation. To avoid doubt, the Parties acknowledge that Hunter Wylie, Donoho's father, is not a party to this Agreement and he is not hereby waiving or releasing claims he may have, if any.

2. **Sale of Donoho's Shares**. Subject to the terms of this Agreement and the Stock Repurchase Agreement attached hereto as **Exhibit B** (together with the Stock Assignment attached thereto, the "Transfer Documents"), Donoho agrees to sell and convey to Big Thirst, and Big Thirst agrees to purchase from Donoho, free and clear of any encumbrances, all of Donoho's shares and interests in Big Thirst, Inc. specifically 2,700,000 shares of common stock, but excluding the amounts owing to Donoho under this Agreement and the Transfer Documents to avoid doubt (the "Repurchased Shares"). The purchase price for the Repurchased Shares is $370,000.00 (the "Purchase Price"), which shall be paid as further provided in and according to the terms of the Transfer Documents. In the event Big Thirst fails to pay the full Purchase Price when due under the Transfer Documents, and to cure same within the applicable notice and cure period, if any, as her sole and exclusive remedy, Donoho shall be entitled to retain all installments of the Purchase Price paid by Big Thirst and not proceed with the release of the Stock Assignment to Big Thirst as contemplated under the Transfer Documents and revoke the License as provided in Section 3 below. However, and to avoid doubt, upon payment of the Purchase Price in full, Donoho shall cause the executed Stock Assignment to be delivered to Big Thirst as provided in the Transfer Documents and the License shall automatically become irrevocable as provided in Section 3 below.

3. **License.** To the extent not owned by Big Thirst, Donoho hereby grants to Big Thirst a non-exclusive, fully assignable and sublicensable, worldwide, royalty free license (the "License") to use any and all intellectual property of any kind, including, without limitation, any inventions, developments, designs, concepts, names, marks, software, technology, and any other patentable, copyrightable, or proprietary works and items,

which were created by Donoho in connection with any of Donoho's work relating to Big Thirst and/or its affiliates, including but not limited to all aspects of the website, e-commerce platform, and data dashboard at issue in the Lawsuit. In the event Big Thirst fails to pay the full Purchase Price according to the terms of the Transfer Documents, and to cure same within the applicable notice and cure period, if any, Donoho may revoke the License on written notice to Big Thirst. However, and to avoid doubt, upon payment of the Purchase Price in full, the License shall automatically become irrevocable.

**4. Mutual General Releases**

4.1. Subject to and except as provided in Section 4.3 below, McGinnis and Big Thirst, as well as their respective directors, officers, employees, shareholders, successors, predecessors, affiliates, agents, representatives and assigns, and other persons acting by, through, or on account of them, hereby generally and completely release Donoho, as well as her agents, representatives and assigns, and other persons acting by, through, or on account of her, from any and all claims, causes of action, liabilities, expenses, costs, attorneys' fees and obligations, of any kind, whether arising from statute, common law, case law, or otherwise, known or unknown, accrued or unaccrued, whether contractual or tortious or otherwise, whether arising in law or in equity, from the beginning of time through the Effective Date of this Agreement.

4.2. Subject to and as except as provided in Section 4.3 below, Donoho as well as her successors, predecessors, agents, representatives and assigns, and other persons acting by, through, or on account of her, hereby generally and completely release McGinnis and Big Thirst, as well as their respective directors, officers, employees, shareholders, successors, predecessors, affiliates, agents, representatives and assigns, and other persons acting by, through, or on account of them, including but not limited to Big Thirst Marketing LLC, Mark Shilling, and Suzanne McGinnis, from any and all claims, causes of action, liabilities, expenses, costs, attorneys' fees and obligations, of any kind, whether arising from statute, common law, case law, or otherwise, known or unknown, accrued or unaccrued, whether contractual or tortious or otherwise, whether arising in law or in equity, from the beginning of time through the Effective Date of this Agreement).

4.3. To avoid doubt and notwithstanding the foregoing or anything to the contrary herein, nothing herein shall be construed as a release or waiver of the obligations of the Parties under this Agreement and the Transfer Documents, including, without limitation, the obligation of Big Thirst to pay the Purchase Price, and the obligation of Donoho to cause the Stock Assignment to be delivered upon payment of the Purchase Price in full, according to the terms of the Transfer Documents, according. Additionally, the Parties acknowledge that Hunter Wylie, Donoho's father, is not a party to this Agreement and he is not hereby waiving or releasing claims he may have, if any.

5. **Confidentiality**

5.1. The Parties agree that the terms of this Agreement shall remain confidential. The Parties may disclose to others that the Claims between them have been resolved to the satisfaction of all Parties. The Parties agree that notwithstanding the foregoing, any Party may disclose the terms of this Agreement to a third-party in the following circumstances:

5.1.1. Insofar as disclosures are reasonably necessary to carry out and effectuate the Party's regular business operations, including making necessary disclosures to a Party's officers, directors, partners, lenders, insurers, or regulators;

5.1.2. Insofar as disclosures are necessary to carry out, enforce and effectuate the terms of this Agreement;

5.1.3. Insofar as disclosure is necessary to a Party's tax, financial, and legal advisors, or government regulators, or their insurers; and

5.1.4. Insofar as disclosure is required by court order, subpoena or other compulsory or legal process.

6. **Additional Settlement Terms**.

6.1. **Acknowledgment; No Admission**. The Parties agree and acknowledge that they are entering into this Agreement for the purpose of resolving Claims and disputes, and avoiding the substantial costs, expenses and uncertainties associated with such disputes. It is expressly agreed and acknowledged that neither the execution nor performance of any of the terms of this Agreement, or the settlement of the Lawsuit, shall be deemed to constitute and admission of liability or indication by any Party that any of the claims or potential claims have any merit.

6.2. **Notices**. In the event either party fails to pay or perform any obligation when due hereunder, the non-defaulting party shall first give the defaulting party written notice thereof and the opportunity to cure such default within 15 days after receipt of such notice prior to exercising any rights and remedies; provided, however, with respect to any failure to make any payment when due, the defaulting party shall only be entitled to one opportunity to cure such payment default per calendar year. Any notices given in connection with this Agreement must be in writing and delivered personally, by United States mail (with tracking or return receipt requested), by a nationally recognized courier service (such as FedEx or UPS), or by email (if the recipient has provided an email address). Notice that is personally delivered will be deemed received when personally delivered. Notice sent by United States mail or courier service will be deemed received when tracking information confirms its delivery. Notice transmitted by email will be deemed received if successfully transmitted without an error

message. A party may change its contact information for notices from time to time by giving written notice to the other party in accordance with this provision.

If to Big Thirst: Attn: Matthew McGinnis, CEO
Email (to both): matt@bigthirst.com and matt@bigthirstmarketing.com

If to Donoho: Attn: Lauren Wylie Donoho
401 N. Howard Street
Newberg, Oregon 97132
Email: laurenlmw@gmail.com

With a copy to: Lloyd & Mousilli, PLLC
Email: notices@lloydmousilli.com

7. **Representations and Warranties.** By their signatures below, each Party represents, warrants, and affirms to the other Party as follows:

7.1. Such Party has full right, power, legal capacity, and authority to enter into and perform this Agreement and the Transfer Documents, and to consummate the releases and transactions contemplated hereby and thereby, and has obtained all necessary consents and approvals therefor, is voluntarily entering into this Agreement and the Transfer Documents without duress, and this Agreement and the Transfer Documents constitute a valid and binding agreement enforceable against such Party in accordance with their terms;

7.2. Such Party's entry into and performance of this Agreement and the Transfer Documents will not violate any laws applicable to, or agreements binding on, such Party;

7.3. Such Party has made any investigation into this Agreement and the Transfer Documents, and all related facts, as such Party deems necessary or desirable, and such Party has had the opportunity to consult with and receive advice from such Party's own independent legal and tax advisors about this Agreement and the Transfer Documents and the releases and transactions contemplated hereby and thereby, and such Party is not relying on any representations, warranties, agreements, or understandings, which are not expressly set forth in writing in this Agreement or the Transfer Documents;

7.4. Except for the Lawsuit, such Party has not filed any claim, complaint, or report against a releasee under this Agreement with any court, arbitrator, or governmental agency;

7.5. With respect to all claims released by such Party under this Agreement, such Party has not made any prior pledge, assignment, or conveyance of the such

released claims, in whole or part; and

7.6. With respect to the Repurchased Shares, Donoho represents, warrants, and affirms that to the best of her knowledge, she has valid title to the Repurchased Shares free and clear of any liens, encumbrances, and adverse claims, she has not made any pledge, assignment, or conveyance of the Repurchased Shares, in whole or part (except for the conveyance to Big Thirst provided for in the Transfer Documents).

**8. Terms and Conditions**

8.1. **Choice of Law and Venue.** This Agreement is made according to, is governed by, and will be construed and enforced in accordance with, the law of the State of Texas (without regard to conflicts of laws rules). Exclusive venue for any claims arising from or relating to this Agreement shall be in a court of proper jurisdiction in the State of Texas.

8.2. **Recovery of Attorney Fees.** In the event of any legal proceeding to enforce or interpret this Agreement, the prevailing Party shall be entitled to recover from the other Party their reasonable and necessary attorney fees and expenses incurred in connection therewith.

8.3. **Entire Agreement; Disclaimer of Reliance.** This Agreement and the Transfer Documents contains the entire agreement between the Parties with respect to the subject matter hereof, and supersedes any and all other and prior agreements, arrangements, or understandings between the Parties with respect to such subject matter, whether oral or written. Except for the express representations, warranties, and agreements made in this Agreement and the Transfer Documents, the Parties are not relying on any representations, warranties, agreements, statements, or understandings of any kind, oral or written, in entering into and performing this Agreement and the Transfer Documents.

8.4. **Severability; Interpretation.** If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it shall be formed to be valid and enforceable while still reflecting the original intent of this Agreement to the greatest extent possible, and to the extent such reformation is not possible, the remainder of the Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. The parties have been advised by independent counsel of their choice and participated jointly in the negotiation and drafting this Agreement and the Transfer Documents, which shall not be construed against any party as the drafting party. As used herein, "claims" means any and all causes of action, claims, suits, damages, judgments, liens, liabilities, obligations, and demands

whatsoever, whether at law or in equity, contract or tort. Use of any form of the word "including" shall be construed to be without limitation to the listed items.

8.5. **Amendments and Waivers in Writing.** No amendment, modification, or waiver of any provision of this Agreement or the Transfer Documents will be enforceable against a Party unless it is made in a writing signed by the Party against whom it is to be enforced.

8.6. **Execution in Counterparts.** This Agreement may be executed electronically (e.g. by DocuSign) and in one or more counterparts with the same effect as if the Parties had signed the same document. All counterparts so executed and delivered will be an original that is to be construed together and shall constitute one and the same Agreement.

**Big Thirst, Inc.**

By: DocuSigned by: Matt McGinnis
Matthew McGinnis, CEO

Date: 10/9/2024

DocuSigned by: Matt McGinnis
Matthew McGinnis, individually

Date: 10/9/2024

Signed by: Lauren Wylie Donoho
Lauren Wylie Donoho

Date: 10/2/2024

D000013

**STOCK REPURCHASE AGREEMENT**

THIS STOCK REPURCHASE AGREEMENT (the "***Agreement***") is made effective as of the date signed by both parties as indicated on the signature page below (the "***Effective Date***") by and between BIG THIRST, INC., a Delaware corporation (the "***Company***"), and LAUREN WYLIE DONOHO (the "***Stockholder***").

The Stockholder and the Company have entered into that certain Confidential Settlement Agreement dated the same as this Agreement (the "***Settlement Agreement***");

As contemplated by the Settlement Agreement, Stockholder and the Company are entering into this Agreement, pursuant to which Stockholder is selling and conveying to the Company, and the Company is repurchasing, all of the Stockholder's equity and ownership interests in the Company (the "***Repurchased Shares***"), which includes 2,700,000 shares of the Company's common stock;

THEREFORE, in consideration of the foregoing, the mutual agreements herein, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. Repurchase.

1.1 Repurchase and Sale of Repurchased Shares. Subject to the terms and conditions of this Agreement, the Stockholder agrees to sell, assign and transfer to the Company, and the Company agrees to repurchase from the Stockholder, the Repurchased Shares and all of the Stockholder's right, title and interest therein.

1.2 Purchase Price. The purchase price for the Repurchased Shares is $370,000.00 (the "***Purchase Price***"). Within three (3) business days after the Effective Date, the Company shall make an initial down payment of the Purchase Price in the amount of $37,000 (10% of the Purchase Price). The remaining unpaid balance of the Purchase Price ($333,000) shall accrue interest at a fixed rate equal to 7.5% per annum and the remaining principal and interest will be due and payable in equal monthly installments of $ $6,672.64 (payments will be due on the same day of the month as the Effective Date (or next business day if not on a business day)), and any and all remaining principal and interest shall be due and payable no later than then fifth anniversary of the Effective Date. However, the Company may prepay the outstanding balance, in whole or part, without penalty or premium at any time. Any prepayments will be applied first to interest and then to principal and the amount of the monthly installments due and payable will be calculated accordingly based on the five year term provided above. All payments will be electronically deposited into the following IOLTA account of Stockholder's legal counsel:

| | |
|---|---|
| Account: | Lloyd & Mousilli, PLLC IOLTA |
| Address: | 11807 Westheimer Rd., STE 550 PMB 944<br>Houston, TX 77077 |
| Bank: | Chase Bank |
| Routing Number: | 111000614 |
| Account Number: | 610962729 |

1.3 Closing. The closing of the transaction contemplated hereby (the "***Closing***") is taking place on the Effective Date of this Agreement. At the Closing, the Stockholder shall execute the Stock

Assignment in the form attached hereto as **Exhibit A** (the "***Stock Assignment***") and deliver the same and any stock certificates representing the Repurchased Shares to Stockholder's legal counsel, who shall hold the same in escrow as security for the payment of the Purchase Price. Upon payment in full of the Purchase Price, the executed Stock Assignment and all stock certificates representing the Repurchased Shares shall be released from escrow and delivered to the Company. All terms of this Agreement survive the Closing.

1.4 Termination of Rights as the Stockholder. Upon payment in full of the Purchase Price, the Repurchased Shares shall cease to be outstanding for any and all purposes, and the Stockholder shall no longer have any rights as a holder of the Repurchased Shares, including any rights that the Stockholder may have had under the Company's governing documents or otherwise. Additionally, until payment of the Purchase Price in full and provided the Company is not in default of payment of the Purchase Price beyond the applicable notice and cure period, the Repurchased Shares shall be treated as if already cancelled and the holder thereof shall not have the right to receive any dividends or other consideration (other than the Purchase Price as provided herein) or to vote or consent on any matter relating to the Company.

1.5 No Withholding. Stockholder acknowledges and agrees that Company shall not deduct or withhold any amounts for tax obligations from Company's payments to Stockholder under this Agreement and Stockholder shall be solely responsible for payment of any taxes owed on amounts paid under this Agreement.

2. Mutual General Release.

2.1 Release by Stockholder. Subject to and except as provided in Section 2.3 below, effective upon payment in full of the Purchase Price, Stockholder hereby generally releases, acquits, and forever discharges the Company and its affiliates, and their respective directors, officers, governing persons, shareholders, employees, agents, representatives, and insurers, from any and all causes of action, claims, suits, damages, judgments, liens, liabilities, obligations, and demands whatsoever, whether at law or in equity, contract or tort, known or unknown, asserted or unasserted, now accrued or that may accrue hereafter, or that arise out of or relate to facts or transactions that existed, occurred, happened, arose, or transpired at any time on or before the date upon which the Purchase Price is paid in full.

2.2 Release by Company. Subject to and except as provided in Section 2.3 below, the Company hereby generally releases, acquits, and forever discharges the Stockholder and their agents and representatives from any and all causes of action, claims, suits, damages, judgments, liens, liabilities, obligations, and demands whatsoever, whether at law or in equity, contract or tort, known or unknown, asserted or unasserted, now accrued or that may accrue hereafter, or that arise out of or relate to facts or transactions that existed, occurred, happened, arose, or transpired at any time on or before the date upon which the Purchase Price is paid in full..

2.3 Exclusions from Release. To avoid doubt and notwithstanding the foregoing or anything to the contrary herein, nothing herein shall be construed as a release or waiver of the obligations of the Parties under this Agreement or the Settlement Agreement, including, without limitation, the obligation of Big Thirst to pay the Purchase Price according to the terms hereof and the obligation of Stockholder to cause the Stock Assignment to be delivered to Big Thirst upon payment of the Purchase Price in full as provided herein. Additionally, the Parties acknowledge that Hunter

Wylie, Donoho's father, is not a party to this Agreement or the Settlement Agreement and he is not hereby or thereby waiving or releasing claims he may have, if any.

3. Representations and Warranties. The Stockholder represents and warrants as follows as of the date of this Agreement and through the date upon which the Purchase Price is paid in full and the Stockholder's executed Stock Assignment is delivered to Big Thirst as provided in Section 1.3 above:

3.1 Ownership of Shares. The Stockholder, to their knowledge, has good and marketable right, title and interest (legal and beneficial) in and to all of the Repurchased Shares, free and clear of all liens, pledges, security interests, charges, claims, equity or encumbrances of any kind.

3.2 Authorization. The Stockholder has all necessary capacity, power, and authority to execute, deliver and perform the Stockholder's obligations under this Agreement and all agreements, instruments and documents contemplated hereby and to sell and deliver the Repurchased Shares being sold hereunder, and this Agreement constitutes a valid and binding obligation of the Stockholder.

3.3 No Conflict. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby will not result in a breach by the Stockholder of, or constitute a default by the Stockholder under, any agreement, instrument, decree, judgment, order, or law, to which the Stockholder is a party or by which the Stockholder may be bound.

3.4 No Future Participation. The Stockholder acknowledges that the Stockholder will have no future participation in any Company gains, losses, profits or distributions. If the Repurchased Shares increase in value by any means, or if the Company's equity becomes freely tradable and increases in value, the Stockholder acknowledges that the Stockholder is voluntarily forfeiting any opportunity to share in any resulting increase in value from the Repurchased Shares.

3.5 Purchase Price. The Stockholder understands that there is no public market for the Repurchased Shares and agrees the Purchase Price has been arbitrarily determined and negotiated by the Stockholder and is not based on any particular financial statements, projections, or other valuation metrics or criteria.

3.6 Tax Matters. The Stockholder has had an opportunity to obtain advice concerning the tax consequences of this Agreement and the transaction contemplated hereby from the Stockholder's own independent tax advisers, and the Stockholder is not relying on any advice from the Company or its representatives in entering into and performing this Agreement. The Stockholder understands that the Stockholder (and not the Company) shall be responsible for determining and timely paying and reporting the Stockholder's tax liability relating to this Agreement, the transaction contemplated hereby, and the Stockholder's ownership of the Repurchased Shares until the Stock Assignment and stock certificates for the Repurchased Shares are delivered to the Company as provided above.

3.7 No Assignments. The Stockholder has not assigned, pledged, or otherwise transferred, in whole or in part, any interest in the Repurchased Shares or claims released hereunder.

4. Indemnification for Misrepresentations. The Stockholder shall indemnify, defend, and hold harmless the Company and its affiliates, and their respective directors, officers, governing persons, shareholders, employees, agents, representatives, and insurers, from and against any and all claims and liabilities arising from or relating to the breach or inaccuracy in any material respect of the Stockholder's express representations and warranties herein.

5. Miscellaneous.

5.1 Binding Effect; Assignment. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of, and be binding upon, the respective successors and permitted assigns of the parties. The releases in this Agreement shall also inure to the benefit of the releasees thereunder; otherwise, there are no third party beneficiaries with standing to this Agreement (including by way of subrogation). This Agreement is made in connection with the Settlement Agreement, which is intended to resolve all disputes between the parties and with the expectation that the Company will be dealing with the Stockholder to resolve any disputes that may arise under or relate to this Agreement and the Settlement Agreement. Accordingly, except for transfers to the Stockholder's heirs (including a trust for the benefit of the Stockholder's heirs) or legal representative occurring upon the death or legal incapacity of the Stockholder, the Stockholder may not transfer or assign any of her rights under this Agreement unless the Company in its discretion joins in such assignment as a party. To avoid doubt, this provision shall not be deemed to limit the Stockholder from making, without the Company's consent or joinder, any assignment of payments she receives hereunder whereby the Stockholder retains exclusive standing to enforce this Agreement against the Company and the assignee's recourse is limited to enforcing such assignment against Stockholder. No assignment of this Agreement will release the assignor of its obligations hereunder (and the assignor and assignee shall be jointly and severally responsible for the obligations of the assignor).

5.2 Governing Law; Venue; Attorneys' Fees. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas (without regard to choice of laws rules). The exclusive forum and venue for any disputes arising under or relating to this Agreement shall be a court of appropriate jurisdiction in the State of Texas. The prevailing party in any action to enforce or interpret this Agreement shall be entitled to recover its reasonable attorneys' fees and expenses from the nonprevailing party.

5.3 Notices. In the event of any breach of this Agreement, the non-defaulting party shall give the defaulting party written notice thereof and 15 days after the defaulting party's receipt of such notice to cure such breach before the non-defaulting party may exercise any rights or remedies with respect to such breach; provided, however, with respect to any failure to make any payment when due, the defaulting party shall only be entitled to one opportunity to cure such payment default per calendar year. All notices under or relating to this Agreement shall be given in accordance with the Settlement Agreement, and, to avoid doubt, a party may change its contact information for notices as provided in the Settlement Agreement.

5.4 Entire Agreement; Disclaimer of Reliance. This Agreement and the Settlement Agreement contains the entire agreement and understanding of the parties, and supersedes all other agreements or understandings, written or oral, with respect to the subject matter hereof. Except for the express representations, warranties, and terms of this Agreement and the Settlement Agreement, the parties disclaim reliance on any representations, warranties, projections, statements, agreements, or understandings.

5.5 Amendments and Waivers. No amendment, modification, or waiver of any provision of this Agreement will be effective unless it is made in writing and signed by the party against whom it is to be enforced.

5.6 Further Assurances. Each party hereto agrees to execute any additional documents and take any additional actions as may be necessary or reasonably requested by the other party in order to give effect to the intent of this Agreement and the transactions contemplated hereby.

5.7 Spouses Bound. In the event Stockholder is or becomes married prior to the Company paying the Purchase Price in full and Stockholder delivering the Stock Assignment to the Company as provided herein, the Stockholder's spouse shall be bound by all terms of this Agreement to the extent the spouse has any rights or interests relating to the Repurchased Shares, and the Stockholder shall cause the Stockholder's spouse to execute and deliver the Stock Assignment and any other documents that may be necessary or reasonably requested by the Company in order to give effect to the intent of this Agreement and the transactions contemplated hereby.

5.8 Interpretation; Severability. The parties have participated jointly in the negotiation and preparation of this Agreement and this Agreement shall not be construed against any party as the drafting party. Whenever possible, each provision of this Agreement shall be interpreted and, if necessary reformed by the court, in such manner as to be effective and valid under applicable law while still giving effect to the original intent of this Agreement to the greatest extent possible. Any provision of this Agreement that court, after giving effect to the prior sentence, holds is still prohibited by or invalid under applicable law shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. As used herein, "***claims***" means any and all causes of action, claims, suits, damages, judgments, liens, liabilities, obligations, and demands whatsoever, whether at law or in equity, contract or tort. Use of any form of the word "***including***" shall be construed to be without limitation to the listed items.

5.9 Electronic Execution and Delivery; Counterparts. This Agreement may be executed and delivered in counterparts and/or electronically (e.g. by DocuSign), and copies of such signatures shall be deemed originals for all purposes.

IN WITNESS WHEREOF, each of the parties have executed this Stock Repurchase Agreement as of the Effective Date set forth above.

**COMPANY**:

BIG THIRST, INC.

DocuSigned by:

By Matt McGinnis 10/9/2024

Name: Matt McGinnis

Title: CEO, Big Thirst

**STOCKHOLDER**:

Signed by:

Lauren Wylie Donoho 10/2/2024

Lauren Wylie Donoho

D000019

**STOCK ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned does hereby sells, assigns and transfers to BIG THIRST, INC., a Delaware corporation (the "***Company***") all of the undersigned's equity and ownership interests in the Company, including 2,700,000 shares of the Company's common stock, which are in the Stockholder's name on the books of the Company, and does hereby irrevocably constitute and irrevocably appoint the Company's secretary as the undersigned's lawful attorney-in-fact, with full power of substitution, to transfer such stock on the books and in the records of the Company. Such power of attorney is coupled with an interest and shall survive the death, disability, bankruptcy, or incapacity of the undersigned.

Dated: 10/2/2024

**STOCKHOLDER**

Signed by:

Lauren Wylie Dohono

**SPOUSE**

DocuSigned by:

Jason Donoho

This Stock Assignment was executed pursuant to the terms of that certain Stock Repurchase Agreement by and between the Company and the Stockholder dated the same as this Stock Assignment. By signing above, the Stockholder and her Spouse acknowledge and agree to all terms of such Stock Repurchase Agreement.

This is another exhibit Plaintiff includes as part of the "haystack" of documents, but Plaintiff fails to explain why it is included. I could not find any reference to this exhibit except in the affidavits. But the affidavits merely authenticate the email and fail to explain why it is relevant to defeat Defendants' motion for summary judgment.

Again, the strategy here appears to be, let's attach a haystack and hope the Court does not want to take the time to review it but instead decides "there has to be a fact issue in all these pages somewhere." The Court should not fall for this ruse.

1:24-CV-01512-DAE
Plaintiff
EXHIBIT
N

**From:** Matt McGinnis matt@bigthirst.com
**Subject:** RE: Merging my clients
**Date:** November 6, 2021 at 12:31 PM
**To:** Wylie Donoho wylie@bigthirst.com

For clarification – my last line of let's do what you outlined below, I mean setting a road map for growth of Inc. for the next 1, 3, and 5 years.

**Matt McGinnis**
Founder & CEO
Big Thirst Inc.

512-809-8712
matt@bigthirst.com
bigthirst.com
Get Your Bottles Moving

**From:** Matt McGinnis
**Sent:** Saturday, November 6, 2021 10:02 AM
**To:** Wylie Donoho <wylie@bigthirst.com>
**Subject:** RE: Merging my clients

Yes, let's discuss. It needs to make sense all the way around.

Yes, the intent is to grow the marketing functions of Big Thirst, Inc. However I see that growth as mainly in the disciplines that drive online sales directly – email marketing and digital ads. Once we have the ability to hire marketing team members fully funded by Inc., we can grow that portion of the biz.

Right now Big Thirst Inc. is not set up to have:

1. Social media tools like SproutSocial
2. PR tools like Cision
3. Marketing Employees. I see our hiring priorities as sales and customer service.

All of our marketing team members are contractors to Big Thirst Marketing currently. All of our marketing tools are paid for by Big Thirst Marketing currently. Near term, I don't see us having the financial ability to change that.

For the near term, I think it makes sense to recognize any new marketing business from a completely new Inc. client – like Vantgaurd – in Inc. with a team member having a 1099 with both Marketing and Inc.

Let's do exactly what you outline below!

EXHIBIT 3/28
McGinnis 06
Planet Depos, LLC

WYLIE 260



Matt McGinnis
Founder & CEO
Big Thirst Inc.
512-809-8712
matt@bigthirst.com
bigthirst.com
Get Your Bottles Moving

**From:** Wylie Donoho <wylie@bigthirst.com>
**Sent:** Saturday, November 6, 2021 9:48 AM
**To:** Matt McGinnis <matt@bigthirst.com>
**Subject:** RE: Merging my clients

Let's discuss. I thought we agreed that any new marketing clients that come through Big Thirst Inc. would be baked into the Big Thirst Inc. revenue. Did I misunderstand? Though it would be financially beneficial to move my clients to BTM, I can't move my clients into a company I don't own. That doesn't feel right to me. I see Big Thirst Inc becoming a huge marketing powerhouse driven by both of us where all of these costs would be taken on by Big Thirsts new clients and Big Thirst Marketing would pay their share for any portions they use.

Let me know when you'd like to discuss this. Not a huge priority, but the sooner we have our road map in place for how we actually want to grow Inc. I think a lot of these answers will come forward easily. How about before we meet we draw up a 1, 3, and 5 year growth goal (or capital goal) for what we can do with money we bring in. We have to do this anyway for our investor deck. Let's see what ideas we come up with and how we can unify our goals.

Have a great weekend and safe travels.

**Schedule a Meeting**

Wylie Donoho
Founder & COO
Big Thirst Inc.
503-989-7589
wylie@bigthirst.com
bigthirst.com
Get Your Bottles Moving

WYLIE 261



On Fri, Nov 5th, 2021 at 3:37 PM, Matt McGinnis <matt@bigthirst.com> wrote:

Hi Wylie,

I think it makes sense to merge these to take advantage of efficiencies. I agree that January makes sense to start new w9 / 1099 docs.

As an executive of Big Thirst, Inc., I can understand why it would make sense for you to want to roll your clients under this umbrella. However, the synergies actually exist with Big Thirst Marketing – tools and personnel.

As I said, I would be happy to have these as a pass-through without me cutting into your margin (this assumes that I have no responsibility for client work or personnel management). The exceptions would be for:
- A share of any software cost for SproutSocial, Asana, Cision, etc. that are used by people working on these accounts
- A portion of the cost for bookkeeping – invoicing, payroll, taxes, etc.

We can discuss this further to make sure it all makes sense for you.

As we discussed recently, I don't think it makes sense to merge the Big Thirst companies at this time as each of the 3 has a different financial set-up, governance, legal entities, etc.

Cheers, Matt



**Matt McGinnis**
Founder & CEO
Big Thirst Inc.

512-809-8712
matt@bigthirst.com
bigthirst.com

Get Your Bottles Moving

**From:** Wylie Donoho <wylie@bigthirst.com>
**Sent:** Friday, November 5, 2021 10:41 AM
**To:** Matt McGinnis <matt@bigthirst.com>
**Subject:** Merging my clients

Hi Matt,
I think merging my clients in 2022 is the best way forward. I don't want them to worry

WYLIE 262

about 1099s now at the end of the year. I think this will help streamline costs. This is merging with Inc. you good with that?

My clients are:
Crow Engineering & Miloptic varies based on projects  (my brothers companies)
AerMist - $8-1k Jelena's husband Kristin does the social
Garbos - $3k Kristin does social, Jennifer helped with one event
Liaison (they need help managing allscripts website) not sure what this monthly retainer would be. It's not a lot of work.

Let me know what you think. Is it worth it to combine BTM too for the SBA stuff?

**Schedule a Meeting**



**Wylie Donoho**
Founder & COO
Big Thirst Inc.

503-989-7589
wylie@bigthirst.com
bigthirst.com

Get Your Bottles Moving

WYLIE 263