1:24-CV-01512-DAE
Plaintiff
EXHIBIT
H
_____

1    CAUSE NO. D-1-GN-22-001678

2  BIG THIRST, INC.,              )  IN THE DISTRICT COURT
          Plaintiff,              )
3                                 )
   vs.                            )  TRAVIS COUNTY, TEXAS
4                                 )
   LAUREN WYLIE DONOHO,           )
5       Defendant.                )  459TH JUDICIAL DISTRICT

6

7

8    _____

9    **APPLICATION FOR TEMPORARY INJUNCTION**
     _____

10

11

12      On the 21st day of April, 2022, the following

13  proceedings came on to be held in the above-titled and

14  numbered cause before the Honorable Jan Soifer, Judge

15  Presiding, held in Austin, Travis County, Texas, via

16  videoconference.

17      Proceedings reported in computerized machine

18  shorthand by a Texas Certified Shorthand Reporter,

19  Certification Number 4471.

20

21

22

23

24

25

```
1                          APPEARANCES

2

3              ALL PARTIES APPEARED REMOTELY
                  VIA ZOOM VIDEOCONFERENCE
4

5    APPEARING FOR THE PLAINTIFF:

6        MR. DORAN D. PETERS
         SBOT NO. 24047615
7        Hajjar | Peters, LLP
         3144 Bee Cave Road
8        Austin, Texas 78746
         Telephone:  (512) 637-4956
9        E-mail:  service@legalstrategy.com

10   APPEARING FOR THE DEFENDANT:

11       MS. LEMA BARAZI
         SBOT NO. 24056016
12       MR. FERAS MOUSILLI
         SBOT NO. 24043837
13       Lloyd & Mousilli
         11807 Westheimer Road
14       Suite 550, PMB 944
         Houston, Texas 77077
15       Telephone:  (512) 609-0059
         E-mail:  lema@lloydmousilli.com
16

17

18

19

20

21

22

23

24

25
```

WYLIE 017

```
 1                          I N D E X

 2               APPLICATION FOR TEMPORARY INJUNCTION

 3                         April 21, 2022

 4                                              Page    Vol.

 5     Announcements ...........................     5     1

 6     Opening Statement by Mr. Peters .........     9     1

 7     Opening Statement by Ms. Barazi .........    12     1

 8     Closing Argument by Mr. Mousilli ........   129     1

 9     Court's Ruling ..........................   132     1

10     Adjournment .............................   135     1

11     Court Reporter's Certificate ............   136     1

12

13     PLAINTIFF'S WITNESS

14                            DIRECT    CROSS    VOL.

15     MATTHEW McGINNIS

16          By Mr. Peters ...........     18              1

17          By Ms. Barazi ...........              69     1

18          By Mr. Peters ...........    109              1

19

20     DEFENDANT'S WITNESS

21                            DIRECT    CROSS    VOL.

22     LAUREN WYLIE DONOHO

23          By Ms. Barazi ...........    110              1

24          By Mr. Peters ...........             126     1

25
```

WYLIE 018

4

I N D E X, Continued


PLAINTIFF'S EXHIBIT INDEX

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|-----|-------------|---------|----------|------|
| 1 | Cert of Incorp | 25 | 26 | 1 |
| 2 | Amendment to Cert of Incorp | 26 | 26 | 1 |
| 3 | Loan Agreement | 29 | 30 | 1 |
| 4 | Bank Account Statement | 33 | 33 | 1 |
| 5 | Panoply Order Form | 40 | 40 | 1 |
| 6 | Cumul.io Order Form | 41 | 41 | 1 |
| 7 | Rqst passwords 3/31/22 | 42 | 43 | 1 |
| 8 | Donoho Demand and Extend Time April 4-5, 2022 | 46 | 47 | 1 |
| 9 | Donoho Resigns as COO April 7, 2022 | 50 | 50 | 1 |
| 10 | Donoho Demand April 7, 2022 | 48 | 49 | 1 |
| 11 | Donoho Resigns from Board April 11, 2022 | 51 | 51 | 1 |
| 12 | Accept Resignation and Request Information April 12, 2022 | 51 | 52 | 1 |
| 13 | TRO April 12, 2022 | 53 | 53 | 1 |
| 14 | Dashboard Appearance | 57 | 57 | 1 |
| 15 | Requests for Credentials April 14, 2022 | 65 | 65 | 1 |
| 16 | Unfulfilled Orders as of April 15, 2022 | 56 | 56 | 1 |

WYLIE 019

```
 1                   I N D E X, Continued

 2

 3            PLAINTIFF'S EXHIBIT INDEX (Continued)

 4     NO.   DESCRIPTION          OFFERED   ADMITTED   VOL.

 5     25    2022.04.20 Barazi-      60        60       1
             peters email
 6
       26    McGinnis Affidavit      68        68       1
 7

 8

 9              DEFENDANT'S EXHIBIT INDEX

10     NO.   DESCRIPTION          OFFERED   ADMITTED   VOL.

11     2     2021-01-12 Big Thirst   117       117      1
             Ideation
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

WYLIE 020

```
1                         PROCEEDINGS

2                         April 21, 2022

3                            *****

4              THE COURT:  Hello, everybody.  Waiting for

5    everybody to connect to the audio.

6              All right.  Elizabeth, do you want to do

7    the preliminary stuff?

8              (Discussion off the record)

9              MR. MOUSILLI:  Your Honor, just a

10   preliminary matter.  My co-counsel, Lema Barazi, is

11   having a little bit of technical issues in connecting to

12   the Zoom link.  So -- I'm on audio with her.  So if we

13   could just give her a minute or two to see if we could

14   end up resolving this, I'd appreciate that.

15             THE COURT:  Of course.

16             (Discussion off the record)

17             THE COURT:  So let me just make a couple

18   of announcements to get that out of the way.

19             We are here on Zoom pursuant to the

20   Emergency Orders resulting from the pandemic, and this

21   hearing is being livestreamed on the Court's YouTube

22   channel pursuant to the Open Courts provision of the

23   Texas Constitution.  No one is permitted to record the

24   proceedings other than the Official Court Reporter of

25   this court, Ms. Williamson, who will be making a record
```

```
 1    for us.
 2                 I will ask that everybody be cognizant of
 3    the fact that she's trying to make a record.  And she is
 4    certified at 225 words a minute.  She clocked somebody
 5    in my hearing this morning going 490 words a minute, and
 6    that makes her sort of cranky because she's a
 7    perfectionist and she wants to make sure to get every
 8    word.  And so you may see her shaking her head from time
 9    to time.  She's doing that because she's trying to
10    signal to you you need to slow down or to not speak at
11    the same time as someone else.  So it's important that
12    we only speak one at a time because otherwise, on Zoom,
13    she can't get all of what either person says.  And she
14    has to write "unintelligible" in the transcript, and she
15    hates that.  So --
16                 All right.  So, Mr. Mousilli, is your
17    colleague going to be with us in a minute?  Still
18    working on getting in?
19                 MR. MOUSILLI:  We're still working on her
20    getting in, Your Honor.  For some reason, the pass code
21    that she's entering, which is the same one that we've
22    shared, doesn't seem to be operating on her.  So --
23                 (Ms. Barazi enters the Zoom proceedings)
24                 MR. MOUSILLI:  I see her connecting over
25    audio now through her -- through her phone.
```

```
1                    If Ms. Barazi can confirm that she's got

2       audio and video.

3                    Ms. Barazi, can you confirm that you --

4       you've got audio connection?

5                    MS. BARAZI:  I apologize, Judge.  This is

6       the first time this has ever happened to me.  I don't

7       know why -- [Zoom audio difficulty] -- via my

8       computer -- [Zoom audio difficulty] -- my phone.

9                    THE COURT:  No problem.  But I will tell

10      you that you're breaking up, so we didn't catch all of

11      your words.  It may be that you need to be a little bit

12      closer to the microphone on your phone.

13                   MS. BARAZI:  Yes, Judge.  I apologize.  If

14      I can just try again.  I've been trying multiple ways.

15      I've reset my computer.  If I can just be allowed just a

16      little bit of leeway.

17                   One second, Judge.

18                   (Discussion off the record)

19                   THE COURT:  So let me just say y'all have

20      announced for three hours.  We take that time and divide

21      it in half, and Mr. Beck will keep track of your time to

22      make sure that no one side gets more of the time than

23      the other.  And that'll put us a little past 5:00.

24                   (Discussion off the record)

25                   THE COURT:  All right.  And I will tell
```

WYLIE 023

1    you that it should shorten the hearing somewhat that I

2    have read the petition, the TRO, and the notice of

3    appearance.  So I do know something about the case.  You

4    don't have to start me back at zero.

5              So, that said, Mr. Peters.  You may

6    proceed.

7                    **OPENING STATEMENT**

8              MR. PETERS:  Thank you, Your Honor.

9              By way of a brief introduction -- and I

10   will take into account the fact that you've read

11   things -- but I would like to say that today is about

12   the survival of my client, Big Thirst, Inc.

13             Big Thirst, Inc. is a startup.  It's

14   proven itself to be a viable concern.  Big Thirst, Inc.,

15   started with an idea from Matt McGinnis as a one-stop

16   shop for distilleries to market and sell their product

17   while having data to analyze their sales and the

18   effectiveness of their advertising strategy.  He

19   approached the defendant Ms. Donoho, who had been a

20   contractor for his marketing company since 2016, about

21   doing some contract work.  She did not want to do it on

22   a contract basis.  What she wanted was an ownership

23   interest, and that's what she negotiated and that's what

24   she got.

25             She became the Chief Operating Officer;

WYLIE 024

1   she became a director of the company; and she became a

2   27 percent stakeholder in the company.  She got a

3   27 percent equity share to Mr. McGinnis' 33 percent.  So

4   together, as founders, they had 60 percent of the

5   company.  The founders' share was 45/55.  But it's

6   27 percent to Ms. Donoho; 33 percent, Mr. McGinnis; and

7   that's what was negotiated and that's what happened.

8              When it came time for Big Thirst to

9   expand, they needed an SBA loan.  They negotiated that.

10  They worked hard to get there.  They needed to hire

11  additional employees.  At the last minute, Ms. Donoho

12  raised concerns that she was a minority position and she

13  did not want to guarantee the loan in a minority

14  position.  So at the last minute, she threatened -- she

15  said she was either going to become the CEO and the

16  majority interest holder or she was going to shut down

17  the technology.  And, unfortunately, that's what she

18  did.  That's why we had to go before -- before the Court

19  to get a TRO, and a TRO with which, Your Honor, she has

20  not complied.  Despite numerous requests, she has not

21  complied with that TRO.

22             Today is important.  If plaintiff does not

23  get access to these technology tools, it will have to

24  close down.  From reading defendant's materials, she

25  seems to think that because she was in charge of the

WYLIE 025

1  company technology, that she's entitled to the company.

2  She seems to hold anyone without her technological

3  know-how in contempt.

4          But, Your Honor, the status quo -- the

5  status quo is that the business was operating and the

6  business was operating using a variety of electronic

7  tools.  That is what should continue.  The alternative

8  is the business shuts down.  That's not the status quo.

9  And there is no compelling reason why this business

10  should cease to exist.

11          Ms. Donoho has a 27 percent stake in the

12  company.  She has resigned as officer and director, but

13  she is still a shareholder.  And she can always seek

14  compensation, Your Honor, for her contributions of any

15  kind.  She can seek compensation for that.  So she does

16  have an adequate remedy at law.  The company -- the

17  company that has no profit history does not have an

18  adequate remedy at law.  So it needs to survive, and

19  today is about this company surviving.

20          I'm ready to call my first witness, or

21  opposing counsel can do their opening, whatever Your

22  Honor prefers.  Thank you.

23          THE COURT:  [Zoom audio muted.]

24          THE COURT REPORTER:  You're on mute,

25  Judge.

WYLIE 026

```
1                    THE COURT:  Would you like to make an

2    opening statement, Ms. Barazi?

3                    MS. BARAZI:  Yes, Judge, I would.

4                    THE COURT:  Did I say that correctly, your

5    name?

6                    MS. BARAZI:  Yes.  It's Barazi.  Yes,

7    that's correct.

8                    And if I may, Judge, I have just updated

9    Zoom.  If I can just have a final attempt to join.

10                   Nope.  It's not going to work.  Okay.

11   That's fine.  We did our best.

12                        OPENING STATEMENT

13                   MS. BARAZI:  May it please the Court.

14                   THE COURT:  Yes.

15                   MS. BARAZI:  Thank you, Judge.

16                   Last Tuesday, plaintiff Big Thirst

17   obtained -- emergency TRO against Lauren Donoho.

18   Plaintiff's sole cause of action --

19                   THE COURT:  So you're cutting in and out,

20   and we're missing some of your words.

21                   Let's try it now with you a little closer.

22                   MS. BARAZI:  Okay.  Would you like me to

23   join and use my audio instead of web?

24                   THE COURT:  I don't know.  If you -- right

25   now, I can hear you.  So let's --
```

```
 1                    MS. BARAZI:  Okay.

 2                    THE COURT:  -- see how a couple of

 3     sentences go.

 4                    MS. BARAZI:  Okay.

 5                    So then last Tuesday --

 6                    No?  How about now?  Is this better?

 7                    THE COURT:  Yes.

 8                    MS. BARAZI:  Okay.

 9                    THE COURT:  So far.

10                    MS. BARAZI:  Okay.

11                    Last Tuesday, plaintiff Big Thirst, Inc.,

12     obtained an emergency TRO against Lauren Donoho.

13     Plaintiff's sole cause of action against Mrs. Donoho was

14     breach of fiduciary duty.  However, Plaintiff's end goal

15     in filing the lawsuit and TRO was not to legitimately

16     pursue a claim against Ms. Donoho for breach of

17     fiduciary duty because, as the evidence today will show,

18     Ms. Donoho never breached her fiduciary duty to Big

19     Thirst, Inc., which, in fact, was her brain child and of

20     which she was the co-founder.

21                    Instead, plaintiff filed the lawsuit for

22     the sole purpose of obtaining a TRO which would force

23     Ms. Donoho to give up her intellectual property to

24     Big Thirst and Matt McGinnis without any kind of

25     compensation.  In other words, this is a sham lawsuit
```

WYLIE 028

1    filed so as to strongarm Ms. Donoho into giving up her

2    creative work which she has spent hundreds of hours in

3    creating without compensating for a penny.

4                      As the evidence today will show,

5    Ms. Donoho is a minority shareholder who has been --

6    [Zoom audio difficulty] -- repeatedly.  Not only is this

7    case --

8                      THE COURT:  Hang on.  I know the word that

9    we missed was "oppressed," but Ms. Williamson does not

10    know that.  So try that again.

11                      As the evidence will show, she is a

12    minority shareholder who has been oppressed --

13                      MS. BARAZI:  Repeatedly.  Correct, Judge.

14                      Not only is this case about minority

15    shareholder/owner oppression, but it also involves

16    intellectual property misappropriation by Big Thirst and

17    Matt McGinnis.  Those counterclaims, Judge, will be

18    filed shortly after this hearing.

19                      The evidence will show that in late 2020,

20    Mrs. Donoho came up with an eCommerce business idea for

21    selling alcohol online.  She was very excited about this

22    idea, and she shared it with Matt McGinnis who she

23    wanted to partner with.  Mrs. Donoho even built a

24    prototype for her idea and shared it with Matt McGinnis

25    in early 2021.  Matt McGinnis was very excited about

WYLIE 029

1   Ms. Donoho's idea.  Unbeknownst to Ms. Big Thirst,

2   however, in March 2021, Matt McGinnis secretly

3   incorporated the company and declared himself king.  He

4   made himself the sole owner of Big Thirst, Inc.

5               When Ms. Donoho found out, she was deeply

6   hurt, and she asked for a 50 percent stake in the

7   company.  However, Mr. McGinnis refused.  Instead, he --

8   [Zoom audio difficulty] -- her a minority -- [Zoom audio

9   difficulty] -- and to make her the Chief Operating

10  Officer.

11              THE COURT:  No.  We lost you in that

12  sentence.

13              MS. BARAZI:  Okay.

14              THE COURT:  Instead --

15              MS. BARAZI:  Instead of offering her a

16  50 percent stake in the company that she was -- that was

17  her brain child, he -- Matt McGinnis offered her a

18  minority number of shares and to make her the Chief

19  Operating Officer.

20              For over a year, Mrs. Donoho contributed

21  time and energy into running the day-to-day operations

22  of Big Thirst.  She even borrowed $50,000 from her

23  father to loan to the company.  Significantly,

24  Ms. Donoho's 50,000-dollar loan to the company was

25  90 percent of the working capital of Big Thirst.  While

WYLIE 030

1  working as the Chief Operating Officer for Big Thirst,

2  Ms. -- Mrs. Donoho also developed intellectual property

3  that was highly valuable.  Mind you, she developed this

4  intellectual property on her own time and using her own

5  tools.  Mrs. Donoho, till this day, has never been

6  compensated for her work and efforts as Chief Operating

7  Officer, nor has she been compensated for her

8  intellectual property.

9           Late last year, Mr. McGinnis and

10  Mrs. Donoho began the process of applying for SBA loans

11  from various banks.  One bank decided to extend a loan

12  to them in amount of approximately $350,000.  After

13  reading over the terms of the loan, however, Mrs. Donoho

14  realized that she was going to have to be a personal

15  guarantor for a loan that she had no input into how it

16  was spent.  Mrs. Donoho approached Mr. McGinnis with

17  questions about the loan and her concerns.  She didn't

18  think it was fair to be a personal guarantor on a loan

19  and have no say in the way the loan was spent, given

20  that she was a minority shareholder and represented only

21  one voice on the board which was comprised of

22  Mr. McGinnis, his wife, and his best friend.

23           When approached by Mrs. Donoho with her

24  concerns, Mr. McGinnis became irate.  In fact, he was

25  very angry that she had consulted with an attorney to

WYLIE 031

1    understand the loan better.  He accused Mrs. Donoho of,

2    quote, going nuclear.  When she reiterated her request

3    for a 50 percent ownership interest in the company.

4    Mrs. McGinnis -- Mr. McGinnis repeatedly tried to

5    persuade Mrs. Donoho to just sign the loan.  When that

6    didn't work, he threatened her with taking away

7    everything from her, including her intellectual

8    property.

9                  For the first time, however, Mrs. Donoho

10   stood her ground and she resigned from the company as

11   Chief Operating Officer.  Scared that Mr. McGinnis would

12   copy all of her IP and lock her out, she protected her

13   creative work.  When Mr. McGinnis realized he was having

14   difficulty accessing Ms. Donoho's IP, he initiated this

15   incident lawsuit.

16                  As I stated earlier, this entire lawsuit

17   is a sham.  In order to prevail on a temporary

18   injunction request, the movant has to establish

19   likelihood of success of their cause of action, plus

20   immediate and irreparable harm.  Big Thirst will fall

21   far short of that burden today as Mrs. Donoho has never

22   breached her fiduciary duties to the company.

23                  Thank you.

24                  THE COURT:  All right.  Mr. Peters.

25                  MR. PETERS:  Yes, thank you, Your Honor.

WYLIE 032

1    I would call Mr. Matt McGinnis.

2              THE COURT:  All right.  Mr. McGinnis,

3    would you please raise your right hand and be sworn?

4                    **MATTHEW McGINNIS,**

5    having been first duly sworn, testified as follows:

6                    **DIRECT EXAMINATION**

7    BY MR. PETERS:

8        Q.   Mr. McGinnis, what is your relationship to

9    Big Thirst, Inc.?

10       A.   I am the Chief Operating Officer and founder of

11   the company.

12       Q.   You said Chief Operating Officer.  Is that

13   right, or --

14       A.   I apologize.  I am the Chief Executive Officer

15   and founder of the company.

16       Q.   Okay.  And when you say "founder of the

17   company," what do you mean?

18       A.   So I started this company based on the work

19   that I've been doing for eight years.  I started Big

20   Thirst Marketing in 2020 -- 2014.  I had left a career

21   in technology marketing, and left as the Executive Vice

22   President and Managing Director of one of the world's

23   largest agencies to start my own agency.

24       Q.   And, Mr. McGinnis, could you -- I appreciate --

25   you are answering my question, but I need you to answer

WYLIE 033

1    it more slowly.

2        A.    Yes.

3              I left a position as the Executive Vice

4    President and Managing Director of one of the world's

5    largest marketing agencies in 2014 to start Big Thirst

6    Marketing.  And this is because I wanted to pursue a

7    passion in the beverage alcohol industry.  And working

8    for more than two decades to build credibility,

9    expertise, and relationships in beverage alcohol

10   industry, by working on weekends at a winery, by

11   becoming a certified sommelier, a certified specialist

12   of spirits, a freelance writer, and a number of other

13   things that got me deeply engrained in the industry and

14   built deep credibility, I used that credibility, those

15   relationships, and my marketing expertise to start a

16   marketing agency in 2014.

17             I then later joined forces with two

18   partners starting to plan a consulting business for

19   distilleries in late 2019 that we formed in 2020.

20   Big Thirst Consulting provides consulting services to

21   help distilleries get started or enter new markets.

22   With those two companies, it was clear that we were

23   looking at ways we could help distilleries in a broader

24   way, and we began discussions of what could we do beyond

25   the capabilities we already had.

WYLIE 034

```
1                    One of the partners in Big Thirst
2      Consulting had been selling products online through
3      eCommerce platform.
4                        (Ms. Barazi no longer present in the Zoom
5                        proceedings)
6                    MR. PETERS:  And one -- his company --
7                    I'm sorry, Ms. William- --
8                    THE COURT REPORTER:  I'm sorry to
9      interrupt you, Mr. McGinnis.
10                   Did we lost Ms. Barazi?  I saw someone
11     left.  I wanted to double-check.
12                   THE COURT:  Ah.  You're right.  We did.
13                   All right.  Let's give her a minute to
14     come back.
15                   MR. PETERS:  Your Honor, I don't want to
16     be nitpicky, but I do believe we're going to be up
17     against time.  I hope that this is going against her
18     time and not mine, Your Honor.
19                   THE COURT:  Yes.
20                   MR. MOUSILLI:  We -- we can continue the
21     line of questioning while Ms. Barazi comes on.
22                   THE COURT:  All right.  Thank you, Mr. --
23     is it Mousilli?
24                   MR. MOUSILLI:  Correct.
25                   THE COURT:  All right.
```

WYLIE 035

```
 1      A.   And working with my partners in Big Thirst
 2   Consulting, we were exploring ways that we could expand
 3   our service offerings to help distilleries in multiple
 4   ways.
 5            One of the partners in Big Thirst
 6   Consulting had been using an eCommerce platform to sell
 7   one of the brands that he works with successfully and
 8   looked at the data analytics of that a partner of theirs
 9   was providing and said, We should do this.  In late
10   2019, early 2020, we started looking into how to do
11   that.  The pandemic then came about and shut down our
12   clients' -- distillery client's route to market.  And so
13   we began exploring ways that we could, one, accelerate
14   how we get into helping eCommerce market companies; and,
15   two, set up our current clients on eCommerce platforms.
16            As Mr. Peters mentioned, I had -- at the
17   time was employing Ms. Donoho as a -- [Zoom audio
18   difficulty] -- to assist with digital marketing and
19   website design.  She assisted with one of our clients in
20   on-boarding --
21            (Brief audio interruption)
22      A.   -- a client on to --
23            THE WITNESS:  I'm sorry.  Ms. Williamson?
24            THE COURT REPORTER:  I'm sorry.  I'm just
25   getting some audio interference, and it was making it
```

WYLIE 036

1    difficult for me to hear you, Mr. McGinnis.

2                    THE WITNESS:  Okay.

3        A.    In 2020, we decided as Big Thirst Consulting

4    and Big Thirst Marketing, to find ways to accelerate our

5    development for data analytics and eCommerce.  At the

6    same time, we knew we couldn't move fast enough to help

7    our clients for Big Thirst Marketing.  And so we

8    on-boarded one of our clients onto what is now a

9    competitor's eCommerce platform.  Ms. Donoho was

10   involved in the digital advertising and website design

11   for that project.  However, the concepts of doing this

12   within the Big Thirst family was well advanced before we

13   ever mentioned it to Ms. Donoho.  In fact, what was

14   presented a moment ago as her idea is not -- if she did,

15   she never mentioned it to me or to any of the other

16   members of the Big Thirst family.

17                   I incorporated Big Thirst, Incorporated,

18   in March of 2021 and -- as the sole owner, with the

19   knowledge that I would be building a team and putting

20   together an executive board for it.  I didn't do that to

21   lock anyone out.  We then later, after it was

22   incorporated, had discussions about what Ms. Donoho's

23   role would be and came to agreements that she would

24   become an officer, a director, and a shareholder.

25                   We agreed to the terms of a share

WYLIE 037

1    disbursement of which the founders would have a

2    60 percent pool divided with 55 percent for me and

3    45 percent for Ms. Donoho.  Reason being is this

4    business idea --

5                    MS. BARAZI:  Sorry.

6        A.    -- the business plan.

7                    MS. BARAZI:  I'm going to have to object,

8    Judge.  This is a narrative.

9                    THE COURT:  All right.  I'm going to ask

10   Mr. Peters that we go back to question and answer.

11                   MR. PETERS:  Sure.

12       Q.  (By Mr. Peters) Mr. McGinnis, let me ask you

13   this.  Do you dedicate -- so you are how you said CEO of

14   Big Thirst, Inc.  Do you dedicate time to your -- to

15   your role as CEO of Big Thirst, Inc.?

16                   MS. BARAZI:  Objection; leading.

17                   THE COURT:  All right.  Sustained.  Let's

18   reask the question.

19       Q.  (By Mr. Peters) Mr. McGinnis, what do you do in

20   your role as CEO of Big Thirst, Inc.?

21       A.    I spend a considerable amount of time everyday,

22   everyday, including weekends, working for this company

23   to help prospect for new clients; attract new clients;

24   do sales; do the marketing; help with all the

25   recruitment; put together the business plan completely;

1    put together the financial plan with the help of a

2    financial consultant; have been planning the growth of

3    the company; and very actively managing the corporate

4    responsibilities of the company since before Ms. Donoho

5    joined.

6        Q.    Have you been paid for your work?

7        A.    No, sir.  I have not taken a dime for my work.

8        Q.    Why not?

9        A.    Because the officers were granted share, and we

10   are working as a typical startup that we don't pay

11   ourselves until we have a decent amount of revenue

12   coming in, or -- and with the full expectation that

13   we're going to grow a corporation to a point where our

14   shares are worthy of selling and having any payment back

15   for our intense amount of work that we're both putting

16   in at a future date.

17       Q.    Okay.  Are there other officers or directors of

18   the company?

19       A.    Yes, there are two other directors.  One is

20   Mr. Mark Shilling who is an industry expert who is

21   well-known throughout the industry, not only as being a

22   past president at the American Craft Spirits

23   Association, but for spending a decade to modernize the

24   federal excise tax and get that repealed for craft

25   beverages -- or craft distilleries -- [Zoom audio

WYLIE 039

1    difficulty] -- incredibly well respected and incredibly

2    well known, which is why he was added to our board to

3    help be a -- somebody to add a lot of credibility, open

4    doors for us, and make introductions.

5                In addition, my wife is a minority

6    shareholder and a director.  Brought her on because she

7    has been the Creative Director for Big Thirst Marketing

8    for eight years and has been instrumental in helping

9    with the branding, the graphic design, and producing

10   materials for the company, and not being paid.

11       Q.   Okay.  I'm going to share my screen.

12                Mr. McGinnis, do you see what's on the

13   screen, and it's labeled at the bottom right,

14   Plaintiff's Exhibit 1?

15       A.   Yes.

16       Q.   Okay.  Is that the incorporation document you

17   mentioned earlier from March of 2019 or 2020?  March of

18   2021?

19       A.   Yes.

20                MR. PETERS:  I would offer Plaintiff's 1

21   to be admitted.

22                THE COURT:  Any objection?

23                MS. BARAZI:  Yes, Judge.  I object.  The

24   proper predicate hasn't been laid.

25                THE COURT:  Overruled.

WYLIE 040

```
1                    Plaintiff's 1 is admitted.

2        Q.   (By Mr. Peters) And, Mr. McGinnis, do you see

3    what is on your screen as Plaintiff's Exhibit 2?

4        A.   Yes.

5        Q.   Do you recognize that?

6        A.   Yes, I do.

7        Q.   What is it?

8        A.   This is the unanimous written consent to add

9    shareholders and directors that was worked on by

10   Ms. Donoho and I, with our corporate attorney, to add

11   her as a director and officer and to provide her with

12   shares in the company to amend that -- the original

13   filing.

14                  MR. PETERS:  I would offer Plaintiff's 2.

15                  MS. BARAZI:  Judge, I object.  The proper

16   predicate hasn't been laid.

17                  MR. PETERS:  Your Honor, I would just

18   point out that this is also being offered by the

19   defendant.

20                  THE COURT:  Is there a signature on the

21   end?

22                  MR. PETERS:  There is, Your Honor.

23                  THE COURT:  Plaintiff's Exhibit 2 is

24   admitted.

25       Q.   (By Mr. Peters) So, Mr. McGinnis, how did
```

1    Ms. Donoho become involved in Big Thirst, Inc.?

2        A.   She became involved when I called her to tell

3    her the work that we'd been doing, to tell her about the

4    concept for it, and to ask her if she'd like to be

5    involved as a contractor in a similar way that she had

6    been with Big Thirst Marketing.

7        Q.   And how did she respond about being a

8    contractor?

9        A.   She was excited by the opportunity, saw the

10   possibilities for it to become a big and important

11   company, and asked if she could be involved as a

12   shareholder and co-founder.

13       Q.   And is that what ultimately happened?

14       A.   It is.  As you can see by the document that you

15   just showed, we negotiated that with our corporate

16   attorney, and in compensation for her work, she was

17   receiving share.

18       Q.   What was her responsibilities as the COO or the

19   Chief Operating Officer?

20       A.   As the Chief Operating Officer, her role was to

21   help develop the data dashboard, set up the technology

22   for the company, and help onboard clients.  She became a

23   client relationship person until we could hire an

24   account manager.

25       Q.   Okay.  And as it regards to software, was she

WYLIE 042

1    responsible for licensing software?

2                    MS. BARAZI:  Objection, Judge; leading.

3                    THE COURT:  Overruled.

4        A.    Ms. Donoho was tasked with licensing software

5    as an agent of our corporation.

6        Q.  (By Mr. Peters) Do you have an employment

7    agreement with Big Thirst, Inc.?

8        A.    I do not.

9        Q.    How were the operations of Big Thirst, Inc.,

10   financed?

11       A.    We financed Big Thirst, Inc., with a loan for

12   $50,000 that was secured by Ms. Donoho from her father.

13   We had originally sought to go after equity financing;

14   however, she convinced me it would be faster and less

15   expensive to do it the way that she wanted to do it.  We

16   changed our path, let our attorney know that, let our

17   banker know that, and let our financial planner know

18   that we were going to go after a -- some additional debt

19   financing to have the required 20 percent that we needed

20   to -- to be approved for the SBA loan that we were, at

21   the time, working on with Frost Bank.

22       Q.    Okay.  And I am going to share the screen

23   again.  This document is Plaintiff's Exhibit 3.

24                    Do you recognize that?

25       A.    Yes, I do.

```
1      Q.   And what is that?
2      A.   This is the loan that Ms. Donoho secured with
3  her father in the amount of $50,000 that was to be used
4  for startup expenses for Big Thirst, Incorporated.  We,
5  in fact, put that amount and that it was a family loan
6  into our business plan that we resubmitted to the bank,
7  to our attorney, and to our financial planner.
8      Q.   Okay.  And this -- this loan agreement, you see
9  it's signed by Ms. Donoho; is that correct?
10     A.   Yes, it is.
11     Q.   Okay.
12              MR. PETERS:  I would offer Plaintiff's 3.
13              MS. BARAZI:  Object --
14              THE COURT:  Any objection.
15              MS. BARAZI:  Yes, I object, Judge.  We've
16  never seen this document, and the proper predicate
17  hasn't been laid.  And, in addition, it hasn't been
18  countersigned, so I don't know the authenticity of this
19  document.
20              THE COURT:  Well, I think you need to find
21  out from your client if she's going to contend that this
22  is not an authentic document.  I assume that's her
23  signature; but if it is not, then we need to know that.
24              MS. DONOHO:  Am I allowed to speak?
25              MS. BARAZI:  Judge, would you like me to
```

WYLIE 044

1   question my client about her signature?

2                   THE COURT:  Y'all are welcome to have a

3   side conversation.  We can move you into a breakout room

4   if you'd like.

5                   MS. BARAZI:  Yes, please.

6                   MR. PETERS:  Your Honor, I would just

7   point out that I uploaded these documents last night.

8   It's not like this is something that couldn't have been

9   handled before now.

10                  THE COURT:  I understand.

11                  Ms. Barazi and Ms. Donoho, you should get

12  an invitation to a breakout room.

13                  MS. BARAZI:  Thank you.

14                  *(Brief recess)*

15                  MS. BARAZI:  Judge, we're back.

16                  THE COURT:  All right.

17                  MS. BARAZI:  And my client has confirmed

18  that is her signature.

19                  THE COURT:  All right.  Then Plaintiff's

20  Exhibit 3 is admitted.

21                  MR. PETERS:  Thank you.

22       Q.  (By Mr. Peters) And, Mr. McGinnis, are you aware

23  how those loan proceeds were used?

24       A.   Yes.  $20,000 of that 50,000-dollar loan was

25  deposited into the Big Thirst, Incorporated, bank

account with Frost Bank.  Those were deposited in two
separate 10,000-dollar amounts as Ms. Donoho said that
it could only be done in that amount at a time.  She,
for some reason, chose not to deposit the additional
$30,000 and chose to spend that directly from her
personal account.  And she says that she spent it for
business things and produced receipts for that for
things such as the sponsorship of a conference where we
announced our company.  She also --

MS. BARAZI:  Objection, Judge.

A.    -- spent it on --

*(Simultaneous crosstalk)*

MS. BARAZI:  This is a narrative, and it's
nonresponsive to the question asked.

THE WITNESS:  He asked me -- Your Honor,
he asked me if I knew how --

MR. PETERS:  Mr. McGinnis?  Mr. McGinnis,
please allow me to speak to Her Honor.  Just wait,
please.

This was much easier back before Zoom,
right?

So, Your Honor, I would just -- I would
just say he's actually exactly answering my question,
which is how was the money used.

THE COURT:  He is answering the question.

WYLIE 046

1   But let's break it up with questions that call for

2   shorter answers so we --

3                   MR. PETERS:  Sure.

4                   THE COURT:  -- can go back to Q and A.

5       Q.  (By Mr. Peters) Mr. McGinnis, who is to repay

6   the loan?

7       A.   Big Thirst, Incorporated, was to repay

8   Ms. Donoho for the loan.

9       Q.   And I'm going to share the screen again and

10  show you what's been labeled Plaintiff's Exhibit 4.

11  It's 24 pages.

12                  Do you recognize this document?

13      A.   Yes.  This is our bank statements for Big

14  Thirst, Incorporated, bank account with Frost Bank

15  showing all transactions from August of 2021 through

16  March of 2022.

17      Q.   Okay.

18                  MR. PETERS:  I would offer Plaintiff's

19  Exhibit 4, Your Honor.

20                  MS. BARAZI:  Judge, I'm going to have to

21  object.  The proper predicate hasn't been laid.

22                  THE COURT:  Sustained.

23      Q.  (By Mr. Peters) Mr. McGinnis, how do you know

24  that these are Big Thirst, Inc., bank records?

25      A.   Because I am a signatory on the account, as was

WYLIE 047

1    Ms. Donoho, and I recognize the transactions as they

2    came and went.

3        Q.    How did you obtain these records?

4        A.    I went to the bank account and downloaded them

5    from the -- Frost Bank.

6        Q.    Did you alter them in any way?

7        A.    No, sir, I did not.

8            MR. PETERS:  Your Honor, I would reoffer

9    Plaintiff's Exhibit 4.

10            THE COURT:  Any objection?

11            MS. BARAZI:  Judge, these contain hearsay.

12            THE COURT:  Overruled.

13            Plaintiff's Exhibit 4 is admitted.

14            MR. PETERS:  Thank you.

15        Q.    (By Mr. Peters) And if we look at Page; well,

16    just the first page there of these bank accounts, there

17    is a 10,000-dollar deposit.  Is that the deposit you

18    were just referring to?

19        A.    Yes.  It's one of the two.

20        Q.    Okay.  And if we look at Page 7, there's

21    another 10,000-dollar deposit.  Is that the other one

22    you were referring to?

23        A.    Yes, that is correct.

24        Q.    Okay.  And what were the funds -- well, let me

25    ask you this.

WYLIE 048

1              From looking at this statement, can you

2    tell me some of the specifics of what the funds were

3    used for?

4        A.    Yes.  The funds were used for acquiring

5    software license agreements for the company to help

6    build our data dashboard; to help put together our

7    Shopify experience for consumers on the website -- on

8    our clients' websites.  There are also fees in there for

9    attending a conference where we announced our company,

10   and some legal fees.

11       Q.    And so I'm just looking at this page, and I'm

12   seeing there, it says "GoDaddy."  What is GoDaddy?

13       A.    GoDaddy is where we have purchased the domain

14   name for our company as well as our e-mail accounts.  So

15   it is where we have our domain and e-mail.

16       Q.    So that -- the payment for that came out of the

17   Big Thirst, Inc., bank account; is that --

18              *(Simultaneous crosstalk)*

19       A.    [Zoom audio difficulty] --

20       Q.    (By Mr. Peters) -- right?

21       A.    -- by Big Thirst, Incorporated.

22       Q.    What is Grid Software?

23       A.    That is a software program that is being used

24   as part of our overall tech stack.

25       Q.    Was that paid for by Big Thirst, Inc., from

1    its -- from its bank account?

2        A.    Yes, it was.

3        Q.    What about Panoply Technologies?

4        A.    That is a software that is used in our data

5    dashboard that helps with bringing in the data for the

6    dashboard for -- that our clients use.

7        Q.    Okay.  So this is the first mention of a

8    dashboard.  What is the dashboard?

9        A.    Our data dashboard for Big Thirst,

10   Incorporated, is a place where we aggregate information,

11   one, about eCommerce sales from Shopify and the -- the

12   amount of products that our customers have, and all

13   transactions from Shopify.  Two, it aggregates

14   information from Google Analytics, Google Ad, Facebook

15   Ad, and Mailchimp to show how effective their marketing

16   campaigns are.  The third level is -- it's supposed to

17   have customized data analytics.

18               This is what we sell to our clients on a

19   monthly subscription basis.

20       Q.    Okay.  So -- just so I understand, the

21   dashboard has something to do with what you sell your

22   clients?

23       A.    Yes.  It's one of the core things that we're

24   selling to our clients.  It's where they get information

25   about their eCommerce sales, and it's where they get

WYLIE 050

1   information about how well those sales are doing

2   compared to the marketing efforts that they -- that

3   they've undertaken.

4       Q.   What is -- the last withdrawal down here on

5   this page, Page 7 of Plaintiff's Exhibit 4, is Cumul.io.

6   I'm sure I'm saying it wrong.  What is that?

7       A.   That is a software that is integral in the

8   software stack that makes up the data dashboard.

9       Q.   Okay.

10      A.   The Big Thirst data dashboard is stitched

11  together -- as Ms. Donoho has put it, stitched together

12  various technologies.

13      Q.   Okay.  And if we looked --

14                 (Simultaneous crosstalk)

15      A.   [Zoom audio difficulty] --

16      Q.   So I don't want to take the time --

17                 THE COURT REPORTER:  I'm --

18      Q.  (By Mr. Peters) But if we looked through these

19  bank records, we would see more purchases of -- or

20  licensing of software; is that right?

21      A.   Correct.

22                 (Reporter admonition)

23                 THE WITNESS:  Yes, ma'am.

24      Q.  (By Mr. Peters) Okay.  And, Mr. McGinnis, can

25  you see what's been labeled Plaintiff's 5?

WYLIE 051

```
 1        A.    Yes.

 2        Q.    What is that?

 3        A.    This is the contract to start our license

 4   agreement with Panoply.

 5        Q.    Okay.  And who entered into that license

 6   agreement?

 7        A.    Wylie Donoho.

 8        Q.    Okay.  Did she do it for herself?

 9        A.    No.  She did it --

10              (Simultaneous crosstalk)

11              MS. BARAZI:  Objection --

12        A.    -- as her role --

13              MS. BARAZI:  Objection --

14        A.    -- as a founder --

15              MS. BARAZI:  I'm sorry.  I'm objecting.

16   So once I object --

17              Judge, I object.  This is leading.

18              THE COURT:  Sorry.  It takes me a minute

19   to find the mute button.

20              Yes.  The objection is sustained.  You can

21   reask the question.

22              MR. PETERS:  Sure.

23        Q.  (By Mr. Peters) Mr. McGinnis, who -- who

24   purchased this license for Panoply Technologies, Inc.?

25        A.    Ms. Donoho purchased this license as an agent
```

1  of Big Thirst, Incorporated.

2      Q.   Why do you think it was as an agent of

3  Big Thirst, Incorporated?

4      A.   She signed her name -- or her title as founder.

5  She's only the founder of one company, and that's Big

6  Thirst, Incorporated.

7      Q.   Okay.  Thank you.

8           MR. PETERS:  I would move that Plaintiff's

9  5 be admitted.

10          MS. BARAZI:  Objection, Judge; the proper

11  predicate hasn't been laid.

12          THE COURT:  So we have a three-hour

13  hearing here, and there are all these objections to

14  foundation.  And I'm inclined to let these documents in,

15  but I think you do need to lay the background that this

16  is a true and correct copy and all of those kinds of

17  issues that you normally have to do to admit an exhibit,

18  Mr. Peters.

19          MR. PETERS:  Thank you, Your Honor.  I'm

20  simply trying to save time, and it's been my --

21          THE COURT:  I know you are.

22          MR. PETERS:  -- experience that, you know,

23  most attorneys will see this and see their attorney --

24  their client's signature on it and not -- not try and

25  waste the Court's time.  But I'll be happy to do that.

1              MS. BARAZI:  I'm sorry.  Judge, I'm going

2     to have to object to that mischaracterization of me

3     wasting the Court's time.  I am an advocate for my

4     client, and I'm making proper objections.

5              So I'd like to ask opposing counsel not to

6     engage in these sidebars attacking me.

7              THE COURT:  All right.  Well, let's stop

8     the sidebars on both sides.

9              Mr. Peters, let's go back and lay the

10    foundation on this.

11             MR. PETERS:  Thank you.

12    Q.  (By Mr. Peters) Mr. McGinnis, is this -- where

13    did you get this document?

14    A.   This document was e-mailed to me this weekend.

15    Q.   Okay.  Why was it e-mailed to you this weekend?

16    A.   I believe that Ms. Donoho was trying to e-mail

17    it to herself and inadvertently sent it to me.

18    Q.   Okay.  What do you -- you've already testified

19    that you recognize this document to be your licensing

20    agreement between Big Thirst, Inc., and Panoply,

21    correct?

22    A.   Correct.

23    Q.   Okay.  Is this a true and correct copy of that

24    document?

25    A.   Yes, it is.

1        Q.    Have you modified this document in any way
2    other than obviously I have put "Plaintiff's Exhibit 5,
3    Page 1" down at the bottom?
4        A.    I have not.
5                MR. PETERS:   Move that Plaintiff's 5 be
6    admitted.
7                MS. BARAZI:   No objection, Judge.
8                THE COURT:   P-5 is admitted.
9                MR. PETERS:   Thank you.
10       Q.    (By Mr. Peters) And, Mr. McGinnis, I'm hoping
11   I'm showing you what's been labeled Plaintiff's
12   Exhibit 6.  Can you see that?
13       A.    Yes, I can.
14       Q.    Okay.  Do you recognize this document?
15       A.    Yes, I do.
16       Q.    What is it?
17       A.    This is an order form for another technology
18   that is used in the Big Thirst, Incorporated, dashboard
19   for Cumul.io.
20       Q.    Okay.  And who -- who ordered this?
21       A.    This was ordered by Ms. Donoho.
22       Q.    Okay.  In what capacity was this ordered by
23   Ms. Donoho?
24       A.    She was ordering this as an agent of
25   Big Thirst, Incorporated.

```
 1        Q.   And how do you know that?

 2        A.   Because she signed it as founder and used a Big

 3   Thirst e-mail.

 4        Q.   And have you modified this document in any way?

 5        A.   I have not modified this document in any way.

 6        Q.   Is this a true and correct copy of the license

 7   agreement between Big Thirst, Inc., and Cumul.io?

 8        A.   It is true and accurate.

 9             MR. PETERS:  Move that Plaintiff's 6 be

10   admitted.

11             MS. BARAZI:  No objection, Judge.

12             THE COURT:  6 is admitted.

13        Q.   (By Mr. Peters) Mr. McGinnis, Plaintiff's

14   Exhibit 7, can you see that on your screen?

15        A.   Yes.

16        Q.   What is that?

17        A.   This is a letter that I sent to Ms. Donoho on

18   the evening of March 31st following a mediation session

19   that we attended.  It was apparent that she was going

20   to -- well, I can't say what was happening in the

21   mediation session, I understand.  But I felt the need to

22   request that she provide access to the software owned by

23   the company.

24        Q.   And is this a true and correct copy of that

25   document that you sent to her?
```

1       A.   Yes, it is.

2                    MR. PETERS:  Move that Plaintiff's 7 be

3       admitted.

4                    MS. BARAZI:  Objection, Judge; this is

5       hearsay.

6                    THE COURT:  The purpose of --

7                    MR. PETERS:  Your Honor, the purpose of

8       this is to show that there was a dispute between the

9       parties and that my client asked for information.  It's

10      not being offered for the truth of anything.  It's not

11      asserting the truth of anything.

12                   THE COURT:  All right.

13                   Yes, Ms. Barazi?

14                   MS. BARAZI:  What is it asserting then,

15      Judge?  It's asserting the truth of the matter stated.

16      And I think this also goes into settlement negotiations,

17      which are forbidden from --

18                       (Simultaneous crosstalk)

19                   MR. PETERS:  -- settlement negotiations

20      are not forbidden.  They're forbidden for establishing

21      liability.  And that's an awfully misuse -- that's an

22      awfully misused objection.  This is not being offered

23      for the truth of the matter asserted because there isn't

24      one.  This is being offered for showing what my client

25      communicated to the defendant, which is completely

1   appropriate.

2            MS. BARAZI:  And, Judge --

3            THE COURT:  All --

4            MS. BARAZI:  -- I think --

5            *(Simultaneous crosstalk)*

6            THE COURT:  -- right.

7            MS. BARAZI:  -- backdoor settlement

8   negotiations, and --

9            THE COURT:  I'll admit P-7 for the limited

10  purposes of showing that he asked Ms. Donoho for certain

11  documents.

12           MR. PETERS:  Thank you, Your Honor.

13      Q.  (By Mr. Peters) Okay.  When did the problems

14  arise between the company and Ms. Donoho?

15      A.   The first real issue came on March 15th, two

16  days before we were to close on our SBA loan.  We were

17  scheduled to close on that loan on March 17th.

18  Ms. Donoho sent me an e-mail with a list of demands

19  saying that she needed those to be met for her to sign

20  the loan.

21      Q.   Okay.

22           MR. PETERS:  Your Honor, with your

23  permission, I'm going to share screen.  I know that

24  that's discouraged, but it's just taking me too long to

25  stop sharing and then going back to sharing.  I'm about

1  to go through a lot of documents.  So, with your

2  permission, I'd like to just remain on stop [sic] share.

3            THE COURT:  No problem.  I'll just tell

4  you that Ms. Williamson kind of needs to see your lips

5  when you're speaking.  It helps her transcribe the

6  questions and answers.  So I'll just ask that you be

7  especially mindful of the fact that she's trying to make

8  a transcript.

9            MR. PETERS:  Absolutely, Your Honor.

10  Thank you.

11     Q.   (By Mr. Peters) Mr. McGinnis, do you see what's

12  on your screen as Plaintiff's Exhibit 8?

13     A.   Yes, I do.

14     Q.   Okay.  And if we look at Page 3 -- well, it

15  starts at the bottom of Page 2, and then it moves on to

16  Page 3.  Do you recognize that?

17     A.   Yes, I do.

18     Q.   What is that?

19     A.   This is a e-mail from Ms. Donoho to

20  Mr. Shilling and to me saying this she did not want to

21  provide additional information and did not believe the

22  mediation went well.  So she had offered two options.

23  The first was for us to immediately pay her almost

24  $37,000 and she would transfer some of the technology to

25  us; and then an additional 17,467, and then she would

1   transfer the website.  She would not transfer any of the

2   documentation or the actual data dashboard to us no

3   matter what under Option 1; that she would terminate her

4   employment immediately with immediate payment or she

5   would close down the software.

6           The second option was to make her CEO.

7   Q.   Okay.  And did you respond to that?

8   A.   Yes.  I responded that the requests --

9           MS. BARAZI:  Objection; hearsay.

10           MR. PETERS:  Your Honor --

11           THE COURT:  Go ahead, Mr. Peters.

12           MR. PETERS:  He has a lot to testify as to

13   what he said to somebody.  That is not hearsay.

14           MS. BARAZI:  That's an out-of-court

15   statement offered for the truth of the matter asserted.

16   That's exactly what hearsay is.

17           THE COURT:  It is; and I'll sustain the

18   objection.

19           MR. PETERS:  Okay.

20   Q.   (By Mr. Peters) Mr. McGinnis, did you respond by

21   e-mail?

22   A.   Yes, I did.

23   Q.   And is that your e-mail there at the top of

24   Plaintiff's Exhibit 2 -- 8, Page 2?

25   A.   Yes, it is.

WYLIE 060

1    Q.   Is that a true and correct copy of that?

2    A.   Yes, it is.

3    Q.   And is it a true and correct copy of

4  Ms. Donoho's e-mail down at the bottom of Page 2 and all

5  of Page 3?

6    A.   Yes, it is.

7         MR. PETERS:  Okay.  I would move that

8  Plaintiff's 8 be admitted.

9         MS. BARAZI:  Judge, I object; this is all

10 hearsay.  It also -- proper predicate hasn't been laid.

11 Again, I just see a lot of hearsay in it, and I object

12 on that ground.

13        MR. PETERS:  Your Honor --

14        THE COURT:  So the state- --

15        (Simultaneous crosstalk)

16        MR. PETERS:  -- [Zoom audio difficulty] --

17 are not hearsay.

18        THE COURT:  So the statements by

19 Ms. Donoho -- is it Donoho or Donoho, ma'am?

20        MS. DONOHO:  Sorry.  I was muted.

21        It's Donoho.

22        THE COURT:  Thank you.

23        The statements by Ms. Donoho are not

24 hearsay because they fall under the exception of

25 statements by a party opponent.  The statements by

WYLIE 061

1    Mr. McGinnis, unless there's a hearsay exception, would

2    appear to be hearsay.

3                    So is there an exception, Mr. Peters?

4                    MR. PETERS:  Not off the top of my head,

5    Your Honor.  I just never had anyone object to e-mail

6    communications between parties before.  And I've been

7    practicing for 20 years and tried many cases, and this

8    is the first time it's come up.

9                    MS. BARAZI:  Judge, this is classic

10   hearsay.

11                   THE COURT:  So I will -- unless there's an

12   exception for Mr. McGinnis' statements, I will admit the

13   statements of Ms. Donoho and disregard the statements of

14   Mr. McGinnis.

15                   So the statements of Ms. Donoho in

16   Plaintiff's 8 are admitted.

17       Q.  (By Mr. Peters) Okay.  Mr. McGinnis, do you

18   recognize the e-mail that's on Page 1 of Plaintiff's 8?

19       A.   Yes, I do.

20       Q.   Okay.  And on Page 1, is that an e-mail from

21   Ms. Donoho?

22       A.   Yes, it is.

23       Q.   And what is she telling you?

24       A.   She's granting a little bit of time for us to

25   hold an emergency board meeting to consider the two

WYLIE 062

1   options that she put forth.

2        Q.   Okay.  What was the SBA loan going to be used

3   for?

4        A.   It would've been used for hiring immediately

5   four new employees; for paying a salary to Ms. Donoho

6   and to me; and to purchase equipment and further

7   software; and to pay some additional legal fees.  You

8   can say that is working capital.

9        Q.   And I'm showing you what's been labeled

10  Plaintiff's 10.  Do you recognize this document?

11       A.   Yes, I do.

12       Q.   What is it?

13       A.   This is a further reiteration of her two

14  positions.  However, in this point on -- two days after

15  she granted us time to pull together a board meeting to

16  come up with a way to figure out governance and a way to

17  potentially figure out the money she was asking for,

18  which was substantial, she chose then to say, no, I

19  don't -- I don't want to give you time.  So you either

20  pay me now, or I close it down, or you make me CEO now.

21       Q.   Okay.

22            MR. PETERS:  Move that Plaintiff's 10 be

23  admitted.

24            MS. BARAZI:  Objection, Judge; this is

25  hearsay.

```
1                    MR. PETERS:  This is Ms. Donoho's

2    statement.

3                    MS. BARAZI:  I believe it also includes

4    Mr. McGinnis' statements.

5                    THE COURT:  All right.  At this point, I

6    will admit those portions of Plaintiff's 10 that are

7    Ms. Donoho's statements.

8                    MR. PETERS:  Right.  Which is all of it.

9    There are no other statements.

10                   THE COURT:  All right.

11                   MR. PETERS:  Thank you.

12       Q.  (By Mr. Peters) Okay.  And that was April 7th

13   that we just saw?

14       A.   Correct.

15       Q.   On that -- do you recognize the document that's

16   here on Plaintiff's Exhibit 9?

17       A.   Yes.

18       Q.   What is it?

19       A.   This is her resignation as an officer of the

20   company.

21       Q.   And is that a true and correct copy of that

22   resignation?

23       A.   Yes, it is.

24       Q.   How did you receive that?

25       A.   In e-mail.
```

```
1        Q.   From?

2        A.   From Ms. Donoho.

3             MR. PETERS:  Move that Plaintiff's 11

4   [sic] be admitted.

5             MS. BARAZI:  No objection, Judge.

6             THE COURT REPORTER:  Is this --

7             THE COURT:  I'm sorry.

8             THE COURT REPORTER:  -- Plaintiff's 11 or

9   Plaintiff's 9?

10            MR. PETERS:  Apologize.

11            Plaintiff's 9 be admitted, Your Honor.

12            THE COURT:  Plaintiff's 9 is admitted.

13       Q.   (By Mr. Peters) Okay.  So she is now, as of

14  April 7th, resigned as Chief Operating Officer.  Is she

15  still a director?

16       A.   Yes.

17       Q.   Okay.  Does she eventually resign as a

18  director?

19       A.   Yes, she did.

20       Q.   Okay.  And I'm going to show you

21  Plaintiff's 11.  What is that document?

22       A.   This is her resignation as a director.

23       Q.   And you -- how did you receive this document?

24       A.   I received this in e-mail from Ms. Donoho.

25       Q.   Is that a true and correct copy of the
```

WYLIE 065

1    document?

2        A.   Yes, it is.

3              MR. PETERS:  Move that Plaintiff's 11 be

4    admitted.

5              MS. BARAZI:  No objection, Judge.

6              THE COURT:  Plaintiff's 11 is admitted.

7        Q.   (By Mr. Peters) Okay.  Did the company accept

8    that resignation?

9        A.   Yes, we did.

10       Q.   And I'm going to ask that you look at

11   Plaintiff's 12.  What is that document?

12       A.   This is a letter of acceptance of her

13   resignation both as a officer and a director, and also

14   terminating her contract with Big Thirst Marketing.

15       Q.   Okay.  And is that a true and correct copy of

16   that document?

17       A.   Yes, it is.

18             MR. PETERS:  Move that Plaintiff's 12 be

19   admitted.

20             MS. BARAZI:  I'm sorry, Judge.  I'm -- I'm

21   going to have to object to the basis of hearsay.

22             THE COURT:  Is there a hearsay exception?

23             MR. PETERS:  I don't know how to say --

24   this is not being offered for the truth -- this is being

25   offered for -- well, it's being offered for two things:

WYLIE 066

1    One, to show that the company accepted her resignation;

2    and, two, to show that the company is asking her for

3    certain materials that it believes to belong to it.

4              So I'm not saying that this is -- he is

5    saying we own this and it's being offered for the proof

6    that they own it; it's being offered to show that

7    they're asking for it.

8              MS. BARAZI:  Judge, this is, again,

9    classic hearsay.

10             THE COURT:  I'm going to overrule the

11   objection.  Plaintiff's 12 is admitted.

12       Q.  (By Mr. Peters) Now, Mr. McGinnis, on that date,

13   you went to a hearing, correct, for a temporary

14   restraining order?

15             MS. BARAZI:  Objection; leading.

16       A.   We had a hearing for a temporary --

17             MS. BARAZI:  I'm sorry.  Mr. McGinnis,

18   you're going to have to wait for the judge to rule.

19             MR. PETERS:  Your Honor, if you could ask

20   opposing counsel not to speak directly to my client.

21             THE COURT:  So the objection is overruled.

22             MR. PETERS:  Thank you.

23       Q.  (By Mr. Peters) Mr. McGinnis, Plaintiff's

24   Exhibit 13, do you see that?

25       A.   Yes, I do.

1    Q.   Okay.  Do you recognize that as a copy of the

2    temporary restraining order issued in this case?

3    A.   Yes, I do.

4    Q.   Okay.  And that's a true and correct copy of

5    the temporary restraining order issued in this case?

6    A.   Yes, it is.

7              MR. PETERS:  Move that Plaintiff's 13 be

8    admitted, Your Honor.

9              MS. BARAZI:  No objection, Judge.

10              THE COURT:  13 is admitted.

11    Q.   (By Mr. Peters) Okay.  So, Mr. McGinnis,

12    Number 1 on Page 1 orders that Ms. Donoho "Restore Big

13    Thirst, Inc.'s data dashboard to fully functioning

14    status as it was on April 1, 2022."

15              Has that happened to date?

16    A.   No, it has not.

17    Q.   How has it not happened?

18    A.   Its functionality has been removed in a few

19    ways.  Number one, the data that we sell to our clients

20    in the second and third tier with Google Analytics,

21    Google Ad, Facebook Ad, and Mailchimp, have all been

22    removed.  They're no longer accessible to our clients.

23    In another -- [Zoom audio difficulty] -- our clients

24    have complained that they can no longer see the

25    inventory.  In another complaint from a client, they're

WYLIE 068

1    telling me that they no longer have the correct order

2    status.  And it is apparent to our clients that the

3    dashboard has been changed.

4             MS. BARAZI:  Objection; speculation as to

5    what the clients believe, Judge.

6             THE COURT:  Overruled.

7        Q.  (By Mr. Peters) And Number 2, it orders that

8    Ms. Donoho forward all e-mails that defendant rerouted

9    from Big Thirst, Inc. e-mail to a personal e-mail

10   account to help.  Do you know whether or not that has

11   happened?

12       A.   I do not know if she's sending all e-mails to

13   me.  I started receiving e-mails from her on Friday --

14   Good Friday of last week.  And I received a password for

15   the help@bigthirst.com yesterday.  However, I did not

16   receive the log-in information for GoDaddy where the

17   e-mail is hosted.  So I don't know whether I'm receiving

18   everything because I can't get in to actually forward

19   them to myself.

20       Q.   And is GoDaddy -- is that intellectual property

21   that's licensed or owned by Big Thirst, Inc.?

22       A.   Yes, it is a -- it is licensed to Big Thirst,

23   Inc., as it is shown in the bank statement that you

24   displayed earlier.

25       Q.   And so did you just testify that she has not

WYLIE 069

1   given you the administrative log-in credentials for

2   GoDaddy?

3        A.   That is correct.

4        Q.   And so Number 3, has she complied with that

5   order?

6        A.   No, she has not.

7        Q.   Are there other instances that you know of that

8   she has not provided you with log-in credentials for

9   software owned by Big Thirst and intellectual property

10  labeled as belonging to Big Thirst?

11       A.   Yes, she has.  She has not given log-in

12  credentials to one particular software that we use that

13  has caused a lot of problems, and that's called

14  ShipStation.  As of this week, on Tuesday, I was able to

15  get in finally, but not because she allowed it after

16  repeated requests, but finally was able to get myself

17  into it to -- but in the interim, it caused backlog of a

18  lot of unfill- -- over 100 unfulfilled orders, which

19  caused a lot of problems for consumers and our clients

20  that resulted in refunds having to be issued and very

21  angry clients.

22       Q.   Okay.  Do you recognize Plaintiff's 16?

23       A.   Yes, I do.

24       Q.   What is it?

25       A.   This is a screenshot from Shopify showing

1   unfulfilled orders that I could not access because she

2   would not provide log-in credentials to ShipStation.

3       Q.   Okay.  And what was the date that you

4   created -- did you create this document?

5       A.   .Yes.  This is a screenshot.  And I believe

6   this was done on April 15th.

7       Q.   And is this a true and correct copy of that

8   screenshot, or has it been changed in any way?

9       A.   It is a true and correct copy.

10      Q.   Okay.  And is that from the records of

11  Big Thirst, Inc.?

12      A.   Yes.  This is from a software program that

13  we -- that is licensed to us.

14      Q.   And you're the CEO of Big Thirst, Inc., right?

15      A.   That is correct.

16           MR. PETERS:  Move that Plaintiff's 16 be

17  admitted.

18           MS. BARAZI:  No objections, Judge.

19           THE COURT:  P-16 is admitted.

20      Q.  (By Mr. Peters) Mr. McGinnis, since April 15,

21  have there been any additional unfulfilled orders?

22      A.   Yes, there have.  Since gaining access to

23  ShipStation, I've been able to move many of them along.

24  But there have been unfulfilled orders that have come up

25  since then.

WYLIE 071

1    Q.   Okay.  And how does that affect the business if

2   there are unfulfilled orders?

3    A.   It erodes the confidence that our clients have

4   in us to provide the services that they contracted us to

5   provide, and it angers the consumers that they didn't

6   get their products shipped to them in a timely way.

7    Q.   And, Mr. McGinnis, I'm going to show you

8   Plaintiff's 14.  What is that?

9    A.   That is a screenshot of the Big Thirst,

10  Incorporated, data dashboard from one of our clients.

11   Q.   Okay.  And is that a true and correct copy --

12  is that a true and correct representation of what the

13  data dashboard looks like?

14   A.   Yes, it is.

15   Q.   Okay.

16         MR. PETERS:  Move that Plaintiff's 14 be

17  admitted.

18         MS. BARAZI:  No objection, Judge.

19         THE COURT:  P-14 is admitted.

20   Q.  (By Mr. Peters) And, Mr. McGinnis, is that how

21  the dashboard appeared prior to April 1, 2022?

22   A.   Well, this aspect of the view, yes.

23   Q.   Now, you mentioned data analytics.  Where are

24  they?

25   A.   They are not on this screen.

1      Q.   That's a different screen.

2      A.   It is; yes.

3      Q.   Okay.

4           MR. MOUSILLI:  Your Honor, if I might,

5  just a point of order.  I just want to understand our

6  timeline here.  I had understood that we had only

7  90 minutes allocated.  So I just want to be able to

8  structure the rest of my afternoon here.

9           THE COURT:  It's a three-hour hearing, so

10  an hour and a half for each side.

11          MR. MOUSILLI:  Okay.  Thank you, Your

12  Honor.

13          THE COURT:  But the court reporter is

14  asking for a break since we have been at it for an hour

15  and 15 -- 18 minutes.  So we will go ahead and take a

16  break until 3:30.

17          *(Recess taken)*

18          THE COURT:  All right.  Mr. Peters, you

19  may continue.

20          MR. PETERS:  Thank you, Your Honor.

21      Q.   (By Mr. Peters) So, Mr. McGinnis, we've

22  talked about a lot of -- well, let's do this.  I'm

23  going to show you -- do you see what's been labeled

24  Plaintiff's 25?

25      A.   Yes, I do.

1     Q.   Okay.  What is that?

2     A.   These are log-in credentials to our website,

3   our e-mail, and to PayPal and Stripe that were given

4   yesterday.

5     Q.   Okay.  And, Mr. --

6            MR. MOUSILLI:  Mr. Peters, just a point of

7   order.  This is being live broadcast, and you have

8   credentials -- admin credentials that you're showing to

9   the public for the Big Thirst proprietary software.  I

10   don't think that's appropriate.

11            MR. PETERS:  Is there an objection?

12            MR. MOUSILLI:  Yes.  I'm objecting to the

13   confidentiality of this information that you're sharing

14   and broadcasting in public.  That should be disclosed

15   per a --

16            MR. PETERS:  Is there a motion on file to

17   keep this --

18            MS. BARAZI:  There doesn't need to be a

19   motion on file.  We're objecting now regarding the

20   confidentiality of this matter.

21            THE COURT:  All right.  So if this

22   information is, in fact, confidential, and it does

23   appear to be, then I would recommend that you not post

24   it where --

25            MR. PETERS:  Okay.

WYLIE 074

1          THE COURT:  -- the public can see it on

2   YouTube.  We can all take a look in the documents that

3   are in Box if that's where it's posted.

4          MR. PETERS:  Yes, it is there.  It's

5   Plaintiff's 25.  But I can do it this way.

6      Q.  (By Mr. Peters) The credentials that are in

7   Plaintiff's Exhibit 25, Mr. McGinnis, you received those

8   for the first time on the 20th; is that correct?

9      A.   That is correct.

10     Q.   Okay.  And did that provide you with the

11  information you needed?

12     A.   No, it does not.

13         MR. PETERS:  And by the way, Your Honor, I

14  would move that Plaintiff's 25 be admitted.

15         MS. BARAZI:  No objection, Judge.

16         THE COURT:  All right.  P-25 is admitted.

17  But I will recommend that it be redacted before it

18  become a record.

19         MR. PETERS:  Thank you.

20         MR. MOUSILLI:  Your Honor, one last point

21  of order.  We -- we can see the files in Box, but

22  apparently we don't have access to those files that have

23  uploaded.  So I'm not sure if there's some other

24  permission that needs to be granted.

25         And this goes back to what Mr. Peters had

1    raised earlier that we'd had an opportunity to see

2    these.  We can see what -- the files, but we can't

3    actually access or download --

4              THE COURT:  Somebody was sent credentials.

5    It probably wasn't both of you.

6              Let's go off the record.

7              *(Discussion off the record)*

8              THE COURT:  All right.  So is there an

9    objection to P-25?  No, we already admitted it.

10             Okay.  Let's move on.

11             MR. PETERS:  Thank you.

12        Q.  (By Mr. Peters) Why -- you just testified that

13   that did not give you what you needed, Mr. McGinnis.

14   Why not?

15        A.   That's correct.  It does not give me the access

16   to GoDaddy that we had requested and was covered in the

17   TRO, because giving me a password without access to

18   GoDaddy doesn't let me get in to see that or reroute it.

19   Also, the same is true for the following credentials

20   because it says access help, but I can't get to it that

21   way.  Furthermore, it didn't provide the ShipStation or

22   the log-in for the database.  None of those things that

23   were requested in the TRO came through.  It's just a few

24   things that were essentially making it look like they

25   were complying with the TRO.

WYLIE 076

```
 1        Q.   Did -- okay.  So I'm just going to go through
 2   some of the technology that I believe we've discussed.
 3             GoDaddy, do you have the -- do you have
 4   the credentials for that?
 5        A.   I do not.
 6        Q.   Have you requested it after the TRO?
 7        A.   Yes; numerous times.
 8        Q.   ShipStation, do you have the credentials for
 9   that?
10        A.   I was able to gain access but not because
11   Ms. Donoho.  I got it separately from her.
12        Q.   Did you request it from Ms. Donoho?
13        A.   Numerous times.
14        Q.   How about QuickBooks?
15        A.   I have access; yes.
16        Q.   Okay.  Stripe?
17        A.   Yes, I have Stripe.
18        Q.   PayPal?
19        A.   No, I don't.
20        Q.   Shopify?
21        A.   Yes, I do.
22        Q.   Panoply?
23        A.   No, I don't.
24        Q.   Auth0.com?
25        A.   No.
```

WYLIE 077

1     Q.   Gobigthirst.herokuapp.com?

2     A.   That is the data dashboard.  I can view it, but

3  I can't use it.

4     Q.   Cumul.io?

5     A.   No, I don't.

6     Q.   Bigthirst.com?

7     A.   I do not have the credentials to get into it.

8     Q.   WIP for Bigthirst.com?

9     A.   No.

10     Q.   Klaviyo?

11     A.   No.

12     Q.   Okay.  Now, in order for Big Thirst, Inc., to

13  operate as it was operating before April 1, would you

14  need those credentials?

15     A.   Many of them; yes.

16     Q.   Okay.  What about Google Analytics; do you have

17  that?

18     A.   I do not.

19     Q.   Google Ad analytics, do you have that?

20     A.   I do not.

21     Q.   Facebook Ad analytics, do you have that?

22     A.   I do not.

23     Q.   What about the e-mail marketing?

24     A.   Nope.

25     Q.   Okay.  Is this all stuff that is Big Thirst,

WYLIE 078

1    Inc., property?

2         A.   Yes, it is.

3         Q.   Okay.  And, as of today, you do not have it.

4              I'm going to show you what's been labeled

5    as Plaintiff's Exhibit 15, Page 2.  It's a picture

6    that -- appears to be a picture.  Do you recognize that

7    picture?

8         A.   Yes, I do.

9         Q.   What is it?

10        A.   This is a screenshot of the main data

11   dashboard.  And I drew a red box on this screenshot to

12   show where the other aspects of the things that you just

13   mentioned should be showing up.  The data analytics for

14   our clients in our Tier 2 and Tier 3 should be able to

15   access information for Google Analytics, Google Ad,

16   Facebook Ad, and Mailchimp.  And none of those were

17   there at the time I took that screenshot, and they have

18   not been added back.

19        Q.   Okay.  Were they there prior to April 1?

20        A.   Yes.

21             MR. PETERS:  Your Honor, I would move that

22   Plaintiff's 15, Page 2, just the picture, be admitted.

23             MS. BARAZI:  And I apologize, Judge, but I

24   didn't hear the date when this picture was taken.

25             THE COURT:  All right.  Do you have the

1   date, Mr. Peters?

2                   MR. PETERS:  I could ask.

3       Q.  (By Mr. Peters) Mr. McGinnis, when did you take

4   this picture?

5       A.   To be completely sure, I would need to see the

6   e-mail where I sent that to you.  But I believe that

7   would have been on either Thursday, the 14th, or Friday,

8   the 15th.

9       Q.   Well, we know it has to be before Friday the

10  15th, because I sent it to Mr. O'Toole, defendant's

11  prior counsel, on April the 14th.  Do you see that?

12      A.   Thursday the 14th is when I sent it to you.

13      Q.   Thank you.

14                  MR. PETERS:  Move that that picture be

15  admitted.

16                  MS. BARAZI:  No objection, Judge.

17                  THE COURT:  You'll need to upload a

18  redacted version of P-15 that just has the picture.  And

19  that is admitted.

20      Q.  (By Mr. Peters) And, Mr. McGinnis, do you know

21  who Brian O'Toole is?

22      A.   Yes.  He was an attorney representing

23  Ms. Donoho.

24      Q.   Was he at that TRO hearing?

25      A.   Yes, he was.

1    Q.   And since that TRO hearing, have you asked --
2    in writing, have you asked for Shopify --
3              MS. BARAZI:  Objection; leading.
4    A.   Mr. Peters, I have asked --
5              MS. BARAZI:  I'm sorry.
6              *(Simultaneous crosstalk)*
7    A.   -- for --
8              MS. BARAZI:  I'm sorry.
9              THE COURT:  Hang on.  Hang on.
10             I will sustain the objection.  You need to
11   reword the question.
12   Q.  (By Mr. Peters) Since -- Mr. McGinnis, since the
13   TRO hearing, have you asked specifically for
14   credentials?
15             MS. BARAZI:  Objection; leading.
16             MR. PETERS:  Okay.  Your Honor, I'll try
17   again.
18   Q.  (By Mr. Peters) Mr. McGinnis, since the TRO
19   hearing, have you asked anything of defendant?
20   A.   Yes, Mr. Peters.  I've requested numerous times
21   that the defendant abide by the TRO.
22   Q.   Okay.  And in what way did you ask her to abide
23   by the TRO?
24   A.   I sent her direct e-mails requesting very
25   specific items that not only are harming the business

1    but are harming our clients.

2         Q.    How are we harming the business?

3         A.    By restricting access to technologies, I'm not

4    able to provide our clients with the functionality that

5    they're paying for.

6         Q.    What prompted you to make those requests?

7         A.    I made requests before the TRO.  I made

8    requests after the TRO.  And I made requests

9    specifically because clients had raised concerns and

10   complaints not only to Big Thirst, Inc., but also to

11   Big Thirst Marketing, which is not covered by the TRO.

12   And Ms. Donoho is still withholding important client

13   information for that company, as well, for absolutely no

14   reason.

15        Q.    So you bring up client complaints.  In what

16   form did those complaints come?  Did they come by phone

17   or e-mail or text?  How did they come to you?

18        A.    I received both phone complaints and text

19   complaints.

20        Q.    Did you receive any by e-mail?

21        A.    And, yes, I'm sorry, e-mail complaints, which I

22   also forwarded to you and to Ms. Donoho and her former

23   attorney.

24        Q.    Do you know whether or not Ms. Donoho is still

25   accessing Big Thirst, Inc., technology?

```
1                MS. BARAZI:  Objection; leading.  And

2    objection; speculation.

3                THE COURT:  Overruled.

4        A.   Yes, she is.  I have seen her logging in to

5    Big Thirst Shopify as recently as this week.

6        Q.  (By Mr. Peters) And, Mr. McGinnis, I'm going to

7    show you what's been labeled Plaintiff's Exhibit 26.  Do

8    you recognize that?

9        A.   It is not showing up on my screen yet.

10       Q.   I'm sorry.  That is user error.

11               Plaintiff's Exhibit 26, do you recognize

12   that?

13       A.   Yes, I do.

14       Q.   What is it?

15       A.   This is the affidavit I submitted for our TRO

16   hearing.

17       Q.   Is that a true and correct copy of that

18   affidavit?

19       A.   Yes, it is.

20               MR. PETERS:  I would move that Plaintiff's

21   26 be admitted.

22               MS. BARAZI:  Judge, I object because it

23   contains hearsay.

24               THE COURT:  Overruled.

25               P-26 is admitted.
```

WYLIE 083

```
 1              MR. PETERS:  I will pass the witness, Your

 2    Honor.

 3              MS. BARAZI:  Mr. Peters, if you can stop

 4    sharing your screen, please.

 5              Thank you.

 6                      CROSS-EXAMINATION

 7    BY MS. BARAZI:

 8    Q.   Mr. McGinnis, how many jobs do you have?

 9    A.   I am the CEO of Big Thirst, Incorporated; I am

10    the president of Big Thirst Marketing; and I am a

11    partner in Big Thirst Consulting.

12    Q.   And approximately how many hours do you work

13    for Big Thirst Marketing per week?

14    A.   Per week, I probably spend about 10 to -- to 14

15    hours per week.

16    Q.   And how many hours do you spend working on

17    Big Thirst Consulting?

18    A.   Per week, maybe an hour.

19    Q.   An hour per week?

20              And how many hours per week do you work on

21    Big Thirst, Inc.?

22    A.   Probably 50 to 60.

23    Q.   And are you being compensated for those other

24    jobs as -- in Big Thirst Marketing and Big Thirst

25    Consulting?
```

WYLIE 084

1      A.   For Big Thirst Marketing, yes.

2      Q.   And how much are you being compensated?

3           MR. PETERS:   Objection, Your Honor;

4    relevance.

5           MS. BARAZI:   Judge, this was a

6    foundational question.

7           MR. PETERS:   Judge, Marketing is not a

8    party to this lawsuit.  What he's being paid for -- for

9    working for a company that is not part of this lawsuit

10   has no relevance to this dispute at all.

11          THE COURT:   What is the relevance,

12   Ms. Barazi?

13          MS. BARAZI:   Judge, it goes to show that

14   Mr. McGinnis is being compensated for his time and has

15   other sources of revenue as compared to Mrs. Donoho who

16   doesn't.

17          MR. PETERS:   Your Honor, that's not

18   relevant.

19          THE COURT:   I'll -- I'll sustain the

20   objection.

21     Q.   (By Ms. Barazi) Mr. McGinnis, did you review

22   Big Thirst's original petition and application for a

23   temporary restraining order that your attorney, Doran

24   Peters, drafted and filed with the Court?

25     A.   Could you restate that question, please?

1    Q.    Did you review Big Thirst's original petition

2    and application for a temporary restraining order that

3    your attorney drafted and filed with the Court?

4    A.    Yes, I did.

5    Q.    Okay.  Do you stand by all the statements made

6    in Big Thirst's application --

7    A.    Yes, I do.

8    Q.    -- for a tempo- -- I'm sorry.  Let me finish my

9    question before you answer.

10              Do you stand by all the statements made in

11   Big Thirst's original petition and application for a

12   temporary restraining order?

13   A.    Yes, I do.

14   Q.    And have you read the temporary restraining

15   order the Court issued on April 12th, 2022?

16   A.    Yes, I have.

17   Q.    Do you fully understand the temporary

18   restraining order?

19   A.    I -- sometimes legalese is not my strong-suit,

20   but I believe I understand it.

21   Q.    Have you personally been in compliance with the

22   temporary restraining order?

23   A.    Yes, I have.

24   Q.    And has Big Thirst been fully compliant with

25   the temporary restraining order?

1      A.    To my knowledge, yes.

2      Q.    Why did you, as CEO of Big Thirst, apply for a

3  temporary restraining order against Lauren Donoho?

4      A.    Because she threatened to shut down the

5  software that -- that is used for our -- our company to

6  process orders and to operate our business.

7      Q.    And let's -- let's talk a little bit about the

8  Big Thirst data dashboard.

9            What is the Big Thirst data dashboard?

10     A.    It is a repository for information of both

11  eCommerce sales and marketing information that we sell

12  to our clients as a way to know how they're doing in

13  their business, both with eCommerce and in the return on

14  investment on eMarketing.

15     Q.    What functions does the data dashboard serve?

16     A.    It's an information repository and

17  visualization so that clients can understand what's

18  going on with their business.

19     Q.    Okay.  Is the data dashboard used to place

20  customer orders?

21     A.    No.  Customer orders show up in it, and the

22  inventory is reflected there, as well.

23     Q.    Okay.

24            MS. BARAZI:  Judge, I object to everything

25  after "no" as being nonresponsive.

WYLIE 087

1          MR. PETERS:  Your Honor, he's just

2     answering the question as fully as he can.

3          THE COURT:  All right.  So I'm going to

4     sustain the objection and just instruct Mr. McGinnis to

5     answer the question and stop.  If you have additional

6     explanation you want to give, Mr. Peters will have an

7     opportunity to ask you about that.

8          MS. BARAZI:  Thank you, Judge.

9     Q.    (By Ms. Barazi) Is the data dashboard used to

10    fulfill customer orders?

11    A.    No.

12    Q.    Explain to the Court how the data dashboard is

13    necessary to run Big Thirst.

14    A.    It is exactly what we're selling to our clients

15    as a way to see how their orders are being -- that

16    they're -- they're being made.  They get customer

17    information, such as e-mail.  They get to see where

18    those orders are placed.  And they also get to see

19    what -- how much inventory they have.  Furthermore, it

20    provides them with analytics on marketing aspects to

21    help them improve their sales.

22    Q.    Okay.  In your sworn affidavit dated

23    April 11th, 2022, that you filed with the Court, you

24    claim Big Thirst needed all e-mails generated from or

25    through the data dashboard that were rerouted to

WYLIE 088

1  Donoho's business address, correct?

2      A.   Correct.

3      Q.   But that wasn't true, was it?

4      A.   I believe it to be true.

5      Q.   Does the data dashboard generate e-mails?

6      A.   It --

7      Q.   It doesn't, does it?

8                  *(Simultaneous crosstalk)*

9      A.   -- of itself does not generate e-mails.

10 E-mails can be sent to people on the back end of it,

11 though.

12     Q.   (By Ms. Barazi) Okay.  The data dashboard

13 doesn't generate e-mails, does it?

14     A.   It, in and of itself, does not generate

15 e-mails.  People generate e-mails.

16     Q.   Okay.  And so my question is, does the dat- --

17 the dash -- data dashboard doesn't generate e-mails,

18 does it?

19                  MR. PETERS:  Objection, Your Honor; asked

20 and answered.

21                  MS. BARAZI:  Judge, he's not answering my

22 question.

23                  THE COURT:  All right.  I'll overrule the

24 objection.  But I do think we have an answer.

25     Q.   (By Ms. Barazi) Mr. McGinnis, the data

1    dashboard doesn't generate e-mails, does it?

2        A.    No.

3        Q.    Thank you.

4                    Mr. McGinnis, by claiming that the data

5    dashboard does generate e-mails in your affidavit, it

6    appears that you're not very familiar with the data

7    dashboard.

8                    You're not very familiar with it, are you?

9        A.    Are you asking me a question?

10       Q.    I am.  I'm asking you, are -- I'm asking you,

11   you're not very familiar with it, are you?

12       A.    Ms. Barazi, my role has not been to --

13                   MS. BARAZI:  Objection, Judge;

14   nonresponsive.

15                   THE COURT:  Sustained.

16                   MR. PETERS:  Your Honor, I'll object to

17   the question.  It's asking for a degree that is not

18   defined in any way.  The word "familiar" is not

19   something that I think -- I think it's a very subjective

20   term.

21                   THE COURT:  Overruled.

22                   You may answer the question, Mr. McGinnis.

23       A.    I have never been provided access to be able to

24   work with the dashboard.  I've only been able to view it

25   on a shared screen from Ms. Donoho.  So my level of

WYLIE 090

```
1    understanding of how it's used is nowhere near as -- as

2    great as hers.

3         Q.   (By Ms. Barazi) Then, Mr. McGinnis, you're not

4    very familiar with the data dashboard, are you?

5                   MR. PETERS:  Objection --

6         A.   I am --

7                   (Simultaneous crosstalk)

8                   MR. PETERS:  -- asked and --

9         A.   -- familiar with it --

10                  MR. PETERS:  -- answered.

11                  THE COURT:  All right.  So just listen to

12   the question and answer it, and you'll have an

13   opportunity to explain your answer.

14        Q.  (By Ms. Barazi) Mr. McGinnis, you're not very

15   familiar with the data dashboard.

16        A.   I am familiar with it.

17        Q.   Yet you think it generates e-mails, correct?

18        A.   I have already stated that I know it does not.

19        Q.   However, in your affidavit, you stated it did,

20   correct?

21        A.   I would need to see that.

22        Q.   You need to see your own affidavit that you

23   earlier stated -- where you earlier stated that you did

24   make that statement?

25                  MR. PETERS:  Objection, Your Honor.  She's
```

1   badgering the witness.  And it is appropriate, if she's

2   going to ask the witness about a document, that the

3   witness be allowed to view the document that she -- he's

4   being asked about.

5           MS. BARAZI:  Judge, I earlier asked --

6   asked Mr. McGinnis about the statement, and he

7   acknowledged making the statement in his affidavit.

8           THE COURT:  So I think we're getting a

9   little far afield here.  But will you read him the

10  statement from his affidavit?  And then ask him the

11  question, please.  Or show it to him.

12          MS. BARAZI:  Judge, in -- in --

13      Q.   (By Ms. Barazi) Mr. McGinnis, in your

14  affidavit, you stated you -- you claim Big Thirst

15  needed -- needed, quote, all e-mails generated from or

16  through the data dashboard that were rerouted to

17  Donoho's business address.  Isn't that correct?

18      A.   That is correct.

19      Q.   Okay.  Is it your contention that Mrs. Donoho

20  shut down the Big Thirst data dashboard prior to your

21  request for a TRO?

22      A.   It is my contention that she restricted the

23  functionality of it and that she precluded me from

24  gaining access to it.

25          MS. BARAZI:  Objection, Judge;

WYLIE 092

1    nonresponsive.

2                    THE COURT:  I overrule the objection.

3        Q.  (By Ms. Barazi) Mr. -- Mr. McGinnis, is it your

4    contention that Big Thirst -- that the Big Thirst data

5    dashboard was not fully functioning prior to your

6    request for a TRO?

7        A.  Yes.

8        Q.  The Big Thirst data dashboard was fully

9    functioning prior to your request for a TRO, wasn't it?

10       A.  I don't have full answer to that.  However, I

11   can tell you that I showed a screenshot of it not being

12   fully functional since then.  What -- our response was

13   into her threat that she was going to close it down that

14   she provided in a written statement, which is why we

15   issued the TRO.

16       Q.  Help us understand better.  Are you contending

17   that the data dashboard was not functioning, or are you

18   contending that you didn't have access to the data

19   dashboard, Mr. McGinnis?

20       A.  The password that I had previously used to

21   access the data dashboard no longer worked before the

22   TRO was issued.  She removed my password.

23       Q.  Okay.  So the -- the data dashboard was

24   working; however, you didn't have access to it, correct?

25                    MR. PETERS:  Objection, Your Honor.  This

WYLIE 093

1    misstates the testimony.

2                    MS. BARAZI:  Judge, I'm just restating

3    what he -- what Mr. McGinnis just said.

4                    MR. PETERS:  No, you're not.  That's the

5    objection.  You're misstating what he just said.

6                    THE COURT:  All right.  He can answer the

7    question; and if -- if there's a falsity in it, he

8    can ex- -- he can tell her there is.

9        Q.  (By Ms. Barazi) Mr. McGinnis, go ahead and

10   answer my question, please.

11       A.    Please restate your question.

12       Q.    Is it your contention that the data dashboard

13   wasn't fully functioning, or is it your contention that

14   you didn't have access to the data dashboard?

15       A.    When she issued the threat of shutting it down,

16   I went to access it and was not able to access it.  I

17   quickly asked a client to check it out, and the client

18   responded that it looked like the functionality had

19   changed and less information was there.

20       Q.    So this was information based on your client's

21   access to their data dashboard.

22       A.    Correct.

23       Q.    Okay.  So it's speculation, at best, correct?

24       A.    I trust my clients.

25       Q.    In fact, Lauren -- Ms. -- Mrs. Donoho never

1    shut down the Big Thirst data dashboard since it was

2    implemented; isn't that correct?

3        A.    She has not shut it down.  She has reduced its

4    functionality.

5              MS. BARAZI:  Objection to everything after

6    "She has not shut it down," Judge, as being

7    nonresponsive.

8              THE COURT:  Sustained.

9              MR. PETERS:  I think it's a complete

10   response.

11       Q.  (By Ms. Barazi) In fact, the Big Thirst data

12   dashboard has remained functioning both before your

13   request for a TRO and afterwards through today, correct?

14       A.    It is functioning.

15       Q.    In the TRO, you requested for the Court to

16   force Mrs. Donoho to restore Big Thirst data dashboard

17   to fully functioning status as it was on April 1st,

18   2022; is that correct?

19       A.    That is correct.

20       Q.    Okay.  Did you ask the Court to order the data

21   dashboard to be restored to fully functioning status so

22   as to make it seem like there was an emergency?

23       A.    Having reduced functionality means that our

24   clients aren't getting what we promised.  I would like

25   it -- to be able to fulfill the promises we made to our

WYLIE 095

1  clients.

2              MS. BARAZI:  Objection; nonresponsive.

3              THE COURT:  Overruled.

4      Q.  (By Ms. Barazi) Mr. McGinnis, did you ask the

5  Court to order the data dashboard to be restored to

6  fully functioning status so as to make it seem that

7  Mrs. Donoho was harming the company?

8              MR. PETERS:  Objection, Your Honor; just

9  asked and answered.

10             MS. BARAZI:  Completely different question

11 if opposing counsel would listen more carefully.

12             THE COURT:  I'm going to overrule that

13 ob- -- objection and let Mr. McGinnis answer it.

14     A.  Could you restate your question, please?

15     Q.  (By Ms. Barazi) Did you ask the Court to order

16 the data dashboard to be restored to fully functioning

17 status so as to make sure -- make it seem like

18 Mrs. Donoho was harming the company?

19     A.  By not having full functionality, it is harming

20 the company.

21     Q.  Mr. McGinnis, isn't it true that Big Thirst is

22 able to operate without the data dashboard?

23     A.  We sell our services as -- the core of -- the

24 data dashboard is at the core of it.

25             MS. BARAZI:  Objection; nonresponsive.

WYLIE 096

```
 1        A.    May I answer it in a different way, then?
 2                  MS. BARAZI:  We're going to have to wait
 3    for the Judge to rule.
 4                  THE COURT:  So I'll -- I'll sustain that
 5    objection.
 6                  MS. BARAZI:  Thank you.
 7        Q.   (By Ms. Barazi) Mr. McGinnis, isn't it true that
 8    Big Thirst is able to operate without the data
 9    dashboard?
10        A.    Our ability to operate is reduced without the
11    data dashboard.
12                  MS. BARAZI:  Objection; nonresponsive.
13        Q.   (By Ms. Barazi) Mr. McGinnis --
14                  THE COURT:  Overruled.
15                  MS. BARAZI:  Okay.
16        Q.   (By Ms. Barazi) Isn't it true that Mrs. Donoho
17    never used the data dashboard to fulfill customer
18    orders?
19        A.    That is true.
20        Q.    Okay.  So, in fact, the data dashboard is not
21    needed to operate Big Thirst; isn't that correct?
22        A.    That is not correct.
23        Q.    How do you reconcile the fact that Mrs. Donoho
24    never used the data dashboard to fulfill customer orders
25    with your statement that it's -- that a data dashboard
```

1    is necessary to operate Big Thirst?

2        A.    They are separate things.

3        Q.    Yet Ms. Donoho was able to operate and fulfill

4    customer orders without it, correct?

5        A.    Those are --

6               MR. PETERS:  Your Honor, I'm going to

7    object.  He's answered many times that you can fulfill

8    orders without the dash -- or with the dashboard, but

9    that the dashboard is an essential part of the company

10   and it's what is sold to the clients.

11              So I understand --

12              (Simultaneous crosstalk)

13              MS. BARAZI:  Objection --

14              MR. PETERS:  -- what opposing counsel's --

15              MS. BARAZI:  Judge --

16              MR. PETERS:  -- trying to do, but there

17   are multi- --

18              (Simultaneous crosstalk)

19              MS. BARAZI:  Opposing counsel's testifying

20   here.  Opposing --

21              THE COURT:  So --

22              MS. BARAZI:  -- counsel --

23              THE COURT:  All right.  Let's keep the

24   objections to one word unless I --

25              (Simultaneous crosstalk)

WYLIE 098

```
 1                    MR. PETERS:  Asked and --

 2                    THE COURT:  -- ask --

 3                    MR. PETERS:  -- answered, Your Honor.

 4                    THE COURT:  That's overruled.

 5                    You may ask the question again.

 6                    MS. BARAZI:  Can the court reporter --

 7                    THE COURT:  I'll read it back.

 8                    Ms. -- Ms. Donoho was able to operate and

 9     fulfill customer orders without it, correct?

10        A.   Orders are processed separately from the

11     dashboard.  The dashboard is the information that we

12     give to our clients about how the orders are -- are

13     fulfilled.  I'm sorry that you don't understand the

14     technology.

15        Q.   (By Ms. Barazi) No, sir.  It's not that I don't

16     understand the technology.  It's that you're not

17     answering the question.

18                    MS. BARAZI:  Judge, I object as

19     nonresponsive.

20                    THE COURT:  Sustained.

21                    MS. BARAZI:  Thank you.

22                    Judge, can you please instruct

23     Mr. McGinnis to answer my question?

24                    THE COURT:  I believe you got the answer,

25     ma'am.  You may ask your next question.
```

WYLIE 099

```
1              MS. BARAZI:  Thank you, Judge.

2         Q.   (By Ms. Barazi) Mr. McGinnis, you claimed

3    earlier that you and Big Thirst have been fully

4    compliant with the Court's temporary restraining order,

5    correct?

6         A.   To my knowledge, yes.

7         Q.   Can you read for me Paragraph 4 of the

8    temporary restraining order?  And I'll -- I'll have my

9    paralegal pull that up.

10             MR. PETERS:  Objection, Your Honor.  The

11   document speaks for itself.

12             MS. BARAZI:  Marlene, if you don't mind

13   pulling up the temporary restraining order.

14             Marlene, if you don't mind making it

15   bigger so that Mr. Donoho [sic] can read for us from the

16   document.

17             Thank you.

18        Q.   (By Ms. Barazi) Mr. Donoho [sic], can you read

19   from Paragraph 4 of the TRO?

20             I'm sorry.  Mr. McGinnis, can you read for

21   me Paragraph 4 of the TRO?

22        A.   Yes.  [As read] All parties are prohibited from

23   copying, changing, modifying, selling, or providing

24   access to third parties to any intellectual property

25   owned or allegedly owned by the company.  This
```

1    prohibition does not include [sic] use by customers used

2    prior to April 1st.

3        Q.    Okay.  Did you contact GoDaddy.com recently and

4    provide them with Lauren Donoho's personal identifying

5    information so as to transfer the account to you?

6        A.    Yes.  However, that is not intellectual

7    property.  That is soft- -- it is an e-mail service that

8    was included in -- it's not intellectual property.  It

9    is an e-mail service.

10       Q.    It's the domain and the e-mail for the company,

11   correct?

12       A.    Yes.  I want access to the e-mail.

13       Q.    So you've, in fact, violated Paragraph 4 of the

14   TRO by changing --

15       A.    -- has access to it --

16                      (Simultaneous crosstalk)

17       Q.    -- modifying --

18       A.    -- [Zoom audio difficulty] requested access --

19       Q.    I'm sorry.  Don't talk over me.

20             No, sir.  Do not talk over me.

21             Mr. McGinnis, you have, in fact, violated

22   Paragraph 4 of the temporary restraining order by

23   modifying the GoDaddy account; isn't that true?

24       A.    No, it is not.  The account has not been --

25             MS. BARAZI:  I'm sorry.

WYLIE 101

1      A.   -- modified.

2            MS. BARAZI:   Objection, Judge, every -- to

3  everything after "no."

4            THE COURT:   Sustained.

5      Q.   (By Ms. Barazi) What personal identifying

6  information did you provide to GoDaddy -- what personal

7  identifying information belonging to Mrs. Donoho did you

8  provide to GoDaddy?

9      A.   Her e-mail address.

10     Q.   What else?

11     A.   I don't have any rec- -- recollection of giving

12  them anything else.

13     Q.   Did you tell them that you had Ms. Donoho's

14  permission?

15     A.   I did not.

16     Q.   Who is Richard Plakas?

17     A.   Richard Plakas is an employee of Big Thirst,

18  Inc., and Big Thirst Marketing.

19     Q.   Did you give Richard Plakas access to Big

20  Thirst's Shopify account?

21     A.   Yes, I did.

22     Q.   How did you gain access to ShipStation?

23     A.   By contacting their customer service over and

24  over.

25     Q.   Okay.  And isn't that another violation of the

WYLIE 102

1    TRO, specifically Paragraph 4?

2        A.    To gain access to a software that is owned by

3    my company is -- no.  No, it's not.

4        Q.    You changed the credentials to ShipStation,

5    didn't you, Mr. McGinnis?

6        A.    Yes, I did.

7        Q.    And that is a violation of a TRO, correct?

8              MR. PETERS:  Objection; asked and

9    answered.

10             THE COURT:  Overruled.

11       Q.    (By Ms. Barazi) You can go ahead and answer the

12   question.  Mr. McGinnis?

13       A.    Changing credentials to a software owned by our

14   company and used by our company, to not let somebody

15   who's no longer employed by our company, is not in

16   violation; no.

17       Q.    The temporary restraining order specifically

18   prohibits all parties from copying, changing, modifying,

19   selling, or providing access to third parties.  Isn't

20   that correct, Mr. McGinnis?

21             MR. PETERS:  Objection, Your Honor.  The

22   document speaks for itself.

23             THE COURT:  Sustained.

24       Q.    (By Ms. Barazi) Mr. McGinnis, by modifying

25   credentials, you have violated Paragraph 4 of the

WYLIE 103

1    temporary restraining order; isn't that correct?

2                    MR. PETERS:  Objection, Your Honor; asked

3    and answered.

4                    THE COURT:  Overruled.

5        Q.   (By Ms. Barazi) Please answer, Mr. McGinnis.

6        A.   I believe protecting the integrity of my

7    company is important.

8                    MS. BARAZI:  Objection; nonresponsive,

9    Judge.

10                   THE COURT:  Sustained.

11                   MS. BARAZI:  Judge, if you can please

12   instruct the witness to answer the question.

13                   THE COURT:  So you need to just answer the

14   question and stop.  And then Mr. Peters will be able to

15   allow you to explain it.

16       A.   Please restate your question.

17       Q.   (By Ms. Barazi) Mr. McGinnis, by modifying,

18   changing, et cetera, credentials to these various

19   accounts, you have violated the temporary restraining

20   order; isn't that correct?

21       A.   I do not believe so.

22       Q.   Have you hired any -- [Zoom audio difficulty]

23   -- to develop or replicate Mrs. Donoho's creative work?

24       A.   I have not.

25       Q.   What is Toptal?

WYLIE 104

```
1       A.    That is a recruiting company.

2       Q.    Have you recently hired any contractors from

3   Toptal?

4       A.    I have not.

5       Q.    Have you spoken to any contractors for Toptal?

6       A.    I have not.

7       Q.    Has anyone from your company?

8       A.    Let me -- reask that last question.

9       Q.    Have you recently communicated with any

10  contractors from Toptal?

11      A.    No contractors, no.

12      Q.    Have you recently communicated with anyone from

13  Toptal?

14      A.    Yes, I have.

15      Q.    Who are those people?

16      A.    I spoke with their customer service

17  representatives and recruiters.

18      Q.    For what purpose?

19      A.    To hire somebody in the future for software

20  development.

21      Q.    You wanted to hire someone to do Mrs. Donoho's

22  work?

23      A.    No.  I'd like to replace the current work

24  with -- with new technology.

25      Q.    Where is Big Thirst's primary office?
```

```
 1        A.    We are headquartered at my home office at 2101

 2   Elton Lane, Austin, Texas.

 3        Q.    And how many physical offices does Big Thirst

 4   have?

 5        A.    We are a remote company.  We don't have any

 6   physical offices.

 7        Q.    How many employees does Big Thirst have?

 8        A.    Big Thirst, Incorporated, currently has two.

 9        Q.    Okay.  And let me -- let me clarify.  Any time

10   I refer to "Big Thirst," I'm, in fact, referring to Big

11   Thirst, Inc.  Can we agree on that?

12        A.    Yes, we can.

13        Q.    Okay.  So you said Big Thirst has two

14   employees?

15        A.    Correct.

16        Q.    Who are those two employees?

17        A.    Myself and Richard Plakas.

18        Q.    How many independent contractors does Big

19   Thirst have?

20        A.    Actually, I -- let me rephrase the last one.

21              Richard Plakas is an independent

22   contractor.  So we have one independent contractor, one

23   employee.

24        Q.    Okay.  So -- so who are your independent

25   contractors?
```

WYLIE 106

1          A.    Richard Plakas.

2          Q.    Okay.  At any point in time, has Mrs. Donoho

3    ever been an employee for Big Thirst, Inc.?

4          A.    Yes, she was.

5          Q.    When was she an employee for Big Thirst, Inc.?

6          A.    She was an employee for Big Thirst, Inc.,

7    beginning in March -- approximately March of 2021 until

8    April 7th of 2022.

9          Q.    Has Ms. Donoho ever signed an employment

10   agreement?

11         A.    Ms. Donoho was covered by our incorporation

12   document that we amended in -- over the summer and filed

13   in October.

14                MS. BARAZI:  Objection; nonresponsive.

15   That wasn't my question.

16         Q.    (By Ms. Barazi) Has Ms. Donoho ever signed an

17   employment agreement with Big Thirst?

18         A.    No.

19         Q.    How was Ms. Donoho compensated as an employee?

20         A.    She was given 2,700,000 shares in the company.

21         Q.    At any point in time, has Ms. Donoho ever

22   served as an independent contractor for Big Thirst?

23         A.    Not -- no.

24         Q.    Okay.

25         A.    As an owner -- there's no reason to be an

1    independent contractor when you're an officer or

2    director and an owner.

3        Q.   Okay.  So you're saying by giving Ms. Donoho

4    2700 -- 27,000 shares, she has become an employee of the

5    company?

6        A.   The same way I am; yes.

7        Q.   Okay.  Doesn't that make her -- doesn't that

8    make her a founder -- I mean, a shareholder --

9        A.   Yes.

10       Q.   -- not an employee?

11       A.   As being granted a title of officer and being

12   compensated with stock, that makes her an employee.

13       Q.   Okay.  You believe that makes her an employee.

14   Okay.

15       A.   Correct.  In the same way that it made me an

16   employee.

17       Q.   Did you ever set Mrs. Donoho's hours of work?

18       A.   No.

19       Q.   Did you ever oversee Ms. Donoho's work?

20       A.   Oversee?  We had regular meetings to discuss

21   our progress.

22       Q.   Okay.  But you never oversaw her work?

23            MR. PETERS:  Objection; asked and

24   answered.

25            THE COURT:  Overruled.

1              MS. BARAZI:  Judge, Mr. McGinnis did not,
2    in fact, answer my question.
3              THE COURT:  I overruled the objection.
4              MR. PETERS:  I will also object on -- I
5    would like her to describe what she means by "oversee,"
6    because, otherwise, the question is -- is not clear.
7              THE COURT:  That's not a proper objection.
8              MS. BARAZI:  May I continue, Judge?
9              THE COURT:  Yes.
10             Do you need to have this document up
11    still, or can we pull it --
12             MS. BARAZI:  No.  I apologize.  We can put
13    that down.
14             THE COURT:  No problem.  I just can see
15    everybody better that way.
16             MS. BARAZI:  I apologize, Judge.
17             Marlene, can you take that down, please?
18       Q.   (By Ms. Barazi) Okay.  And while that's
19    happening, Mr. McGinnis, did you ever oversee
20    Mrs. Donoho's work?
21       A.   We met regularly.  So, yes, I looked at and
22    helped and collaborated on many, many, many aspects of
23    Ms. Donoho's work on a very much ongoing basis.  We talk
24    daily.
25       Q.   What work specifically?

 1      A.   Do you want me to list everything for the past

 2  year?

 3      Q.   Yes.  Sure.

 4      A.   It's impossible.  The number of things that

 5  we've done as a company is extensive, and this line of

 6  questioning is irrelevant to me.

 7              What did I oversee?  What did we

 8  collaborate on?  What did we do together as co-founders?

 9  The way you're asking the question sounds like I was a

10  direct supervisor of an entry-level employee, and that's

11  not how the relationship was.

12      Q.   So tell us, how was the relationship?

13      A.   We were co-collaborators, as co-founders, with

14  specific roles that we both provided.  We worked

15  together very much hand in hand on some things, and I

16  trusted her to do work on other areas that she was

17  assigned to do.

18      Q.   Did you ever oversee Ms. Donoho's technical

19  work?

20      A.   She showed me her progress on a regular basis;

21  yes.

22      Q.   Did you ever provide any kind of input?

23      A.   Yes, I did.

24      Q.   What kind of input did you provide?

25      A.   On -- on technical -- so -- yeah.  Website, for

WYLIE 110

1    example, if you want to call it a website technical

2    work.  I wrote the copy.  I gave a lot of input to the

3    design and layout and worked collaboratively to -- to

4    get that launched.

5        Q.   Did you offer any kind of technical expertise

6    regarding the data dashboard or Shopify or ShipStation?

7        A.   I'm not a technologist, which is why we hired

8    Ms. Donoho.

9            MS. BARAZI:  Objection; nonresponsive.

10           THE COURT:  Sustained.

11       A.   No, I did not direct her technical work.

12       Q.   (By Ms. Barazi) Thank you, Mr. McGinnis.

13           Now, let's talk about the Big Thirst data

14   dashboard.  Who was responsible for developing the

15   source code for the data dashboard?

16       A.   Wylie put that together, the way she said,

17   stitching together off-the-shelf software.

18       Q.   Okay.  I'm not familiar --

19           (Simultaneous crosstalk)

20       A.   [Zoom audio difficulty] -- company.

21       Q.   (By Ms. Barazi) And I don't believe the Court's

22   familiar with who Wylie is.

23           So, again --

24           (Simultaneous crosstalk)

25       A.   Ms. Donoho.

```
1        Q.  (By Ms. Barazi) -- who is -- who is
2   responsible --
3              (Reporter admonition)
4              MS. BARAZI:  Certainly.  I apologize about
5   that.
6        Q.  (By Ms. Barazi) Who was responsible for
7   developing the source code for the data dashboard?
8        A.  Ms. Donoho, in her words, stitched together
9   software that was purchased for the company.
10             MS. BARAZI:  Judge, objection to
11  everything after "Ms. Donoho."
12             THE COURT:  Overruled.
13       Q.  (By Ms. Barazi) Did anyone else contribute to
14  the development of the source code for the data
15  dashboard?
16       A.  She did work with a developer; yes.
17       Q.  When you -- when you say "she," who are you
18  referring to?
19       A.  Ms. Donoho.
20       Q.  And who is that developer that you're referring
21  to?
22       A.  I believe his name was Todd.
23       Q.  Can you tell us who Todd is?
24       A.  No.
25       Q.  You can't tell us who Todd is?
```

1      A.   No, I cannot.

2      Q.   Where did Mrs. Donoho do her work when

3   developing the source code for the data dashboard?

4      A.   From her home office.

5      Q.   Who was responsible for designing Big Thirst's

6   website?

7      A.   It was a collaborative project with Ms. Donoho

8   leading.

9      Q.   Who created the source code for the Big Thirst

10  website?

11     A.   There is no source code.  It is a -- it's a

12  WordPress theme that she helped design with graphic

13  design input from Susan McGinnis and written content

14  from me.

15     Q.   Okay.  So who actually created it?

16     A.   Ms. Donoho.

17     Q.   Thank you.

18               And who was -- who was -- strike that.

19               Where did Mrs. Donoho do her work when

20  designing the Big Thirst website?

21     A.   From her home office.

22     Q.   Have you ever leased part of Ms. Donoho's home

23  from her?

24     A.   No, I have not.

25     Q.   Has Big Thirst ever leased part of

1    Mrs. Donoho's home from her?

2        A.    No.

3        Q.    Have you ever paid rent to Ms. Donoho for the

4    use of her home to perform programming or design work?

5        A.    No.

6        Q.    Has Big Thirst ever paid rent to Mrs. Donoho

7    for the use of her home to perform programming or design

8    work?

9        A.    No.

10       Q.    How much money has Ms. Donoho -- Mrs. Donoho

11   loaned to Big Thirst?

12       A.    Zero.

13       Q.    Mr. McGinnis, earlier you stated that

14   Mrs. Donoho loaned Big Thirst $50,000; isn't that

15   correct?

16       A.    Ms. Donoho secured a loan from her father to

17   the company.

18       Q.    Right.  So how much money has Mrs. Donoho

19   loaned to Big Thirst?

20       A.    She puts that number at about $47,000.

21       Q.    And how has the money Mrs. Donoho loaned to

22   Big Thirst been used?

23                   MR. PETERS:  Objection, Your Honor; it's

24   misstating the testimony.

25                   THE COURT:  Overruled.

WYLIE 114

1          MR. PETERS:  The testimony has been --

2          THE COURT:  Overruled.  Overruled.

3     A.    The debt financing that Ms. Donoho secured for

4   Big Thirst, Incorporated, was used to pay for legal

5   fees, to pay for sponsorship at an event, to pay for

6   software licensing for the company as an agent of the

7   company.

8     Q.    (By Ms. Barazi) So the money that Mrs. Donoho

9   has loaned to Big Thirst is, in fact, funding this

10  litigation against her?

11         MR. PETERS:  Your Honor, I would just ask

12  for a running objection to the misstatement of

13  Ms. Donoho loaning money to the company.

14         THE COURT:  So Mr. McGinnis can speak for

15  himself.  And if the question includes anything

16  inaccurate, then he needs to deny the question.  But I'm

17  going to overrule the objection.

18         You may ask it again, Ms. Barazi.

19         MR. PETERS:  Judge, just so I don't keep

20  interrupting, may I have a running objection?

21         THE COURT:  You may.

22         MR. PETERS:  Thank you.

23         MS. BARAZI:  Thank you, Judge.

24    Q.    (By Ms. Barazi) Mr. McGinnis, so if I

25  understand it correctly, the $50,000 that Mrs. Donoho

```
1   has secured for Big Thirst is being used to fund this

2   litigation against her, correct?

3        A.   No, that is incorrect.

4        Q.   How is it incorrect?

5        A.   The funding -- the debt financing that

6   Ms. Donoho secured on behalf of Big Thirst,

7   Incorporated, was used for prior legal fees.

8        Q.   And who is paying the legal fees now?

9             MR. PETERS:  Objection, Your Honor.

10  That's getting into attorney-client information.

11            MS. BARAZI:  I'm sorry, Judge, but that's

12  not attorney-client privileged information.  Who's

13  paying for the bills is certainly not attorney-client

14  privileged information.

15            THE COURT:  Overruled.

16       A.   The funds for these legal proceedings are not

17  being paid for by Big Thirst, Incorporated.  And they

18  are not being paid for with any of the funds that were

19  from the debt financing we received.

20       Q.   (By Ms. Barazi) How are they being paid?

21       A.   They are being paid for by Big Thirst

22  Marketing.

23       Q.   How much of the loan -- the 50,000-dollar loan

24  to Big Thirst has been repaid?

25       A.   The agreement for the loan states that
```

1    repayment begins on August 1st, 2023.  At this time, it

2    is not yet that date, so zero has been paid.

3        Q.    What are the plans for repaying the loan?

4        A.    There's a monthly payment that has a term of

5    seven years.

6        Q.    To date, approximately how many hours of work

7    would you estimate Mrs. Donoho has dedicated to

8    Big Thirst in her capacity as Chief Operating Officer?

9        A.    She could answer that for you.

10       Q.    And I'm asking you.

11       A.    I don't have a correct or accurate accounting

12   of the number of hours she has spent.  She does not keep

13   a time sheet.

14       Q.    And how many hours would you estimate it to be?

15            MR. PETERS:  Objection, Your Honor; calls

16   for speculation.

17            THE COURT:  If he can estimate it, he may

18   do so.

19       A.    I have no way of knowing.

20       Q.    (By Ms. Barazi) Has Ms. Donoho ever been

21   compensated for any of her work for Big Thirst as Chief

22   Operating Officer?

23       A.    Yes; she paid herself.

24       Q.    How did she pay herself?

25       A.    She used an electronic debit to pay herself on

1    December 2nd, 2021.

2        Q.    How much did she pay herself?

3        A.    $1,700.

4        Q.    Is that the only compensation you contend that

5    Mrs. Donoho received for her work as COO of Big Thirst?

6        A.    No.  She was also granted 2,700,000 shares in

7    the company.

8        Q.    Have you ever paid Mrs. Donoho for the use of

9    her intellectual property?

10       A.    Yes.  She --

11            MR. PETERS:  Objection --

12       A.    -- was granted 2,700,000 shares in the company.

13       Q.    (By Ms. Barazi) Has Big Thirst ever paid

14    Mrs. Donoho for the use of her intellectual property?

15       A.    Yes --

16            MR. PETERS:  Objection --

17            (Simultaneous crosstalk)

18       A.    -- she granted 2,700,000 shares in the company.

19            MS. BARAZI:  At this time, Judge, I'd like

20    to show Plaintiff's Exhibit Number 2, if we can display

21    that, Marlene.

22            No.  That's defendant's exhibit.  Marlene,

23    we're asking for Plaintiff's Exhibit Number 2, which has

24    already been admitted.

25            MR. MOUSILLI:  Point of order for Marlene,

1    I'm not sure if she's going to be able to share that if

2    it's in the Box account from plaintiffs since we don't

3    have display capabilities for that.

4                    THE COURT REPORTER:  You should be able

5    to.  The only thing you cannot do is download.

6                    MS. BARAZI:  Then, Mr. Peters, can you

7    please display for us Plaintiff's Exhibit Number 2?

8                    MR. PETERS:  Sure.  I'll need control of

9    the screen.

10                   What would you like again?

11                   MS. BARAZI:  Plaintiff's Exhibit Number 2.

12                   Thank you.

13   Q.    (By Ms. Barazi) And, Mr. McGinnis, this -- this

14   exhibit has already been admitted.  It's the -- can you

15   identify what it is?

16   A.    It's the Unanimous Written Consent of the Sole

17   Director and Sole Shareholder [sic] of Big Thirst,

18   Incorporated.

19   Q.    And what was the purpose of this document?

20   A.    This document was to amend the original filing

21   to add directors and to grant stock.

22                   MS. BARAZI:  Let's go to Page 4, if you

23   don't mind.

24                   Thank you, Mr. Peters.

25   Q.    (By Ms. Barazi) And what was the compensation

1    offered to Mrs. Donoho?

2         A.    2,700,000 shares of stock.

3         Q.    For -- for what exactly?

4         A.    For her work as the Chief Operating Officer.

5         Q.    Okay.

6         A.    So -- and if you'll read right there -- if you

7    want me to continue answering -- "in exchange for

8    consideration in the form of property, cash, and

9    services set forth."

10        Q.    In her capacity as Chief Op- -- Operating

11   Officer, however, I believe "Consideration" is blank.

12   The line for "Consideration" is blank, isn't it?

13        A.    It is.

14        Q.    Okay.  So what was the consideration offered to

15   Mrs. Donoho?

16        A.    I -- I apologize.  I don't understand that --

17   the question.

18        Q.    In the table on -- on Page 4 under the column

19   where it says "Consideration," all of those blanks --

20   all of those boxes are blank, correct?

21        A.    Correct.  So if -- you're asking for the value

22   of the share?

23        Q.    No, I'm not.

24              So, in essence, her consideration is just

25   her being a foun- -- co-founder, correct?

WYLIE 120

```
1        A.    Correct, as the C- -- as the COO.

2        Q.    Okay.  Thank you.

3              And, to be clear, this document doesn't

4    talk -- doesn't have anything to do with any

5    intellectual property assignments, correct?

6        A.    There is no specific discussion of roles of any

7    person in here.

8        Q.    That wasn't my question.

9              There were no assignments of intellectual

10   property in this document, correct?

11       A.    There's no assignment of intellectual property

12   in this contract.

13       Q.    Have you ever entered into an agreement with

14   Mrs. Donoho for the use of her intellectual property?

15       A.    I have not.  I --

16       Q.    Has --

17              (Simultaneous crosstalk)

18       A.    -- understood this intellectual property to be

19   owned by the company as it was being developed as an

20   agent to the company.  As the --

21              MS. BARAZI:  Objection --

22       A.    -- Chief Operating Officer --

23              (Simultaneous crosstalk)

24              MS. BARAZI:  Objection to everything after

25   "no," Judge.
```

```
1                    THE COURT:  All right.  Sustained.  I
2    don't actually see that he said no, but he said, "I have
3    not."  And so I take the objection to be everything
4    after "I have not."
5                    MS. BARAZI:  Thank you, Judge.
6                    And, Mr. Peters, if we can stop sharing, I
7    think we're done with this document.  Thank you for
8    sharing.
9        Q.   (By Ms. Barazi) Mr. McGinnis, has Big Thirst
10   ever entered into an agreement with Mrs. Donoho for the
11   use of her intellectual property?
12       A.   No.
13       Q.   Is there anything in writing that indicates
14   Mrs. Donoho agreed to transfer her ownership of her IP
15   to you or Big Thirst?
16       A.   No.
17       Q.   Did you ever have a Work Made for Hire
18   Agreement with Mrs. Donoho?
19       A.   No.
20       Q.   Did Big Thirst ever have a Work Made for Hire
21   Agreement with Mrs. Donoho?
22       A.   No.
23                    MS. BARAZI:  And, again, Mr. --
24   Mr. Peters, if you could so kindly assist us with
25   Plaintiff's Exhibit 25.
```

```
1              Actually, before -- before we get into
2    that --
3         Q.  (By Ms. Barazi) Mr. McGinnis, you testified
4    earlier that you didn't have access to PayPal despite
5    the fact that I e-mailed your opposing counsel -- your
6    counsel the credentials to PayPal, correct?
7         A.  You -- yes.  You provided it yesterday.
8         Q.  Okay.  And you testified earlier today that you
9    still don't have access to PayPal?
10        A.  I did not until yesterday.
11        Q.  Okay.  So am I correct to understand that you
12   do have access to PayPal?
13        A.  As of yesterday, I do.
14        Q.  Okay.
15        A.  However, let me --
16        Q.  No.  I don't need anything --
17        A.  No, I don't.  Let me restate that then.  No, I
18   don't.
19              MS. BARAZI:  Judge, I don't want to
20   display Plaintiff's Exhibit 25 because it contains
21   confidential information that I don't want to be
22   livestreamed to the public.  However --
23        A.  -- [Zoom audio difficulty] --
24              (Simultaneous crosstalk)
25              MS. BARAZI:  However, we are all aware of
```

WYLIE 123

1    what's in that document.  And I'd like to refer the

2    Court to that document wherein I provide credentials to

3    PayPal -- to Big Thirst's PayPal account.  I'd like the

4    Court to take judicial notice of that.

5                THE COURT:  Well, I've already admitted

6    the exhibit.  So if you want to bring that up in your

7    closing argument, if you save time for a closing

8    argument, you may do so.

9                MS. BARAZI:  Thank you, Judge.

10       Q.   (By Ms. Barazi) And, Mr. McGinnis, have -- has

11   Mrs. Donoho ever signed a non-compete agreement with Big

12   Thirst, Inc.?

13       A.   She has not.

14       Q.   Thank you.

15               MS. BARAZI:  I pass the witness.

16               MR. PETERS:  Thank you.

17                   **REDIRECT EXAMINATION**

18   BY MR. PETERS:

19       Q.   Mr. McGinnis, what happens if the TR- -- if the

20   temporary injunction is not granted today?

21       A.   She did not provide access to --

22       Q.   Mr. McGinnis, let me restate the question.

23               Today, if the Court does not give you the

24   relief you are asking for today, what happens?

25       A.   Big Thirst will need to close for business.

1      Q.    Thank you.

2                  MR. PETERS:  Pass the witness.

3                  MS. BARAZI:  Judge, I have no further

4      questions for this witness.

5                  THE COURT:  All right.

6                  Mr. Peters, you may call your next

7      witness.

8                  MR. PETERS:  I do not have another

9      witness, Your Honor.

10                 THE COURT:  All right.  So you rest?

11                 MR. PETERS:  I do.

12                 THE COURT:  All right.

13                 Ms. Barazi?

14                 MS. BARAZI:  Thank you, Judge.

15                 At this time, I'd like to call

16     Mrs. Donoho.

17                 THE COURT:  All right.  Ms. Donoho, would

18     you raise your right hand?

19                     **LAUREN WYLIE DONOHO,**

20     having been first duly sworn, testified as follows:

21                     **DIRECT EXAMINATION**

22     BY MS. BARAZI:

23     Q.    Please state your full name for the record.

24     A.    Lauren Wylie Donoho.

25     Q.    And where do you reside?

1      A.    Dripping Springs, Texas.

2      Q.    Mrs. Donoho, what's your profession?

3      A.    I am a co-founder of Big Thirst and an

4  independent contractor for data solutions and marketing

5  exclusions.

6      Q.    And can you describe for us your recent work

7  experience?

8              MR. PETERS:  Objection; calls for a

9  narrative.

10             THE COURT:  I'll allow it.

11     A.    Since 2010, I have been working in the

12  marketing and data solutions realm.  I have developed

13  over 50 websites for a variety of different industries

14  and client sizes, the largest being a website that I

15  worked on and led a team of internal and external teams

16  with a public company that val- -- is valued over

17  $1.5 billion.

18             Because of that work -- along with other

19  work that I do in the data industry and marketing

20  industry, I have also worked for their trial company for

21  three years that is a data and analytics company that

22  does data modeling for the healthcare industry and was

23  one of the leading efforts -- or leading companies in

24  that field.  During that time, I was their main

25  contractor for all marketing efforts and helped develop

1    application development and implemented a lot of

2    different solutions for them to sell specifically their

3    data and analytics tech stack.

4              I also have experience in sales and

5    hospitality from my work in the Oregon Wine Country.  So

6    my experience covers a lot of different industries and a

7    lot of different solutions over a vast amount of time.

8        Q.  (By Ms. Barazi) Thank you.

9              MS. BARAZI:  Judge, if I can just get a

10   check on my time.  How much time do I have?

11             THE COURT:  Mr. Beck?

12             STAFF ATTORNEY:  You've got about

13   18 minutes left.

14             MS. BARAZI:  Eighteen minutes for my

15   direct of my witness?

16             STAFF ATTORNEY:  That's correct.

17             THE COURT:  You each had an hour and a

18   half to start with.  It's 4:35.  So we've been here for

19   two and a half hours.  So all of your questioning of the

20   other witnesses went against your time -- or the other

21   witness, as well as your opening.

22       Q.  (By Ms. Barazi) Mrs. --

23             MS. BARAZI:  Thank you, Judge.

24       Q.  (By Ms. Barazi) Mrs. Donoho, what businesses do

25   you own?

1          A.    Lianas Creative Company.

2          Q.    Okay.  And what kind of business is that?

3          A.    It is a creative company that offers marketing

4   and technical solutions for a variety of industries.

5          Q.    Who serves as the custodian of records for that

6   company?

7          A.    I am.

8          Q.    What is your relationship to Big Thirst, Inc.?

9          A.    I am the co-founder of Big Thirst, Inc., and

10  I -- that's -- that's my current relationship today.

11         Q.    And for purposes of my direct, when I refer to

12  "Big Thirst," I'm referring to Big Thirst, Inc.  Can we

13  agree on that?

14         A.    Correct.

15         Q.    Okay.  How did you come to know Mr. McGinnis?

16         A.    In late 2016, I was sourced from a hiring

17  company for marketing needs that he had for a variety of

18  his clients.  I served as an independent contractor for

19  him for six years for Big Thirst Marketing, LLC.

20         Q.    What experience does Mr. McGinnis have in

21  technology with --

22              MR. PETERS:  Objection, Your Honor; did --

23  she's asking for speculation.

24              THE COURT:  She may answer it --

25              MR. PETERS:  [Zoom audio difficulty] --

WYLIE 128

```
 1              THE COURT:  -- if she knows.

 2              (Simultaneous crosstalk)

 3              MR. PETERS:  -- that her client knows my

 4    client's background.

 5              THE COURT:  If -- she may answer it if she

 6    knows.

 7         A.   With the exception of the Microsoft Office

 8    Suite, Mr. McGinnis is not technically a bit -- able to

 9    do pretty much anything at all.  He's very technically

10    inept.

11         Q.   (By Ms. Barazi) What projects did you and

12    Mr. McGinnis collaborate on in 2020, if any?

13         A.   In late 2020, one of his marketing clients

14    needed an eCommerce platform to be installed on their

15    website.  So there was a solution presented that I

16    installed onto the client's website, and I also

17    onboarded them through most of the process and

18    understood the inner workings of how that company built

19    that technology.

20         Q.   And based on your experience with that project,

21    what did you do?

22         A.   After seeing how it was made and the poor

23    representation of how it was applied, I saw a lot of

24    areas of opportunity for what I could do on that

25    platform, which was Shopify.  I have built about 12
```

1    other different Shopify instances and am very familiar

2    with the entire structure of Shopify.  And so I was able

3    to present Ms. -- Matt McGinnis with a working prototype

4    of what the technology could do around January of 2020.

5                    And I was able to also say that because of

6    all of this, I could also provide these additional

7    solutions, which were not limited to the data and

8    analytics that I have had experience with in how to

9    data-model those things along with an entire dashboard

10   experience that was far greater than any of the

11   competitors out in the current landscape.  And I also

12   was able to say that we could bootstrap the marketing

13   solutions that I provide for Big Thirst Marketing on top

14   of Big Thirst, Inc., to provide a full eCommerce and

15   marketing solution for the distillery and alcohol

16   industry that they have never seen before.

17      Q.   Okay.  So when exactly did you -- did you

18   develop this prototype?

19      A.   I believe it was in late January or early

20   February of 2021.

21      Q.   And that was before Big Thirst, Inc., was

22   incorporated, correct?

23      A.   Yes, that is correct.

24      Q.   After you shared this prototype with

25   Mr. McGinnis, what did he do?

WYLIE 130

```
 1      A.    He was able to go and -- well, we -- we started

 2    working on different business options within the

 3    company.  We reached out to a financial planner who then

 4    helped us model a three-year projection for the business

 5    to show its viability and so that we could essentially

 6    begin to develop a business plan.  In order to do that

 7    project, I actually traded my work for her services in

 8    terms of building out a logo and a website.

 9      Q.    Okay.  And what -- what did Mr. McGinnis do

10    next?

11      A.    He then formed the company without my knowledge

12    and -- to the state of Delaware.

13      Q.    Okay.  And how did you feel about that?

14      A.    Shocked that that was done without my

15    knowledge.  And because it was done without my

16    knowledge, he was able to essentially wield power over

17    the entire company without any kind of say or oversight

18    on my part.  It was a stab in the back, which I am

19    definitely feeling today and have been feeling for

20    months.

21      Q.    Okay.

22            MS. BARAZI:  Judge, I apologize.  We don't

23    have a lot of time, but there's a few exhibits that I'd

24    like to share.

25            Exhibit D-2, Marlene, if you don't mind.
```

1     Q.   (By Ms. Barazi) What is this, Mrs. Donoho?

2     A.   That was an e-mail that I sent to Mark

3  Shilling, Joseph Castillo, and two others that are not

4  listed here that I'm not sure, sent on January 21st

5  [sic], 2021, from my Big Thirst Marketing e-mail

6  account.  Or, no, that was actually sent from Matt

7  McGinnis' Big Thirst Marketing e-mail account.

8     Q.   And what is the purpose of this e-mail?

9     A.   It was to disclose some of the other entities

10  or the Big Thirst family, is what Matt says, that we

11  have spoken and that I am able to provide solutions that

12  compete with the current landscape of what's currently

13  available, and that there is a huge market for eCommerce

14  providers for DTC shipping.

15          She knows the current companies are

16  backlogged -- I'm sorry.  That was Emily Pennington.

17  I'm sorry.  At the top it says, I had a conversation

18  with Wylie, who is included -- included in this message,

19  about the desire to develop DTC eCommerce --

20     Q.   Thank you, Mrs. Donoho.

21          MS. BARAZI:  Judge, at this time, I'd like

22  to move for Exhibit D-2 to be admitted into evidence.

23          MR. PETERS:  No objection, Your Honor.

24          THE COURT:  D-2 is admitted.

25          MS. BARAZI:  Marlene, if you can display

1    D-3, please.

2        Q.    (By Ms. Barazi) Mrs. Donoho, what is -- what is

3    this exhibit?

4        A.    This is an e-mail that I sent to Matt McGinnis

5    on February 3rd, 2021, that outlines the details of the

6    prototype that I built out for him to view.

7        Q.    And what does this establish?

8        A.    This establishes that there is a working

9    prototype, and it was actually that -- this is the same

10   Shopify instance that's being currently used today, was

11   building out products prior to the corporation being

12   formed.

13       Q.    Were any corporate documents created indicating

14   your were the Chief Operating Officer of Big Thirst?

15       A.    No.

16       Q.    Were there any corporate documents authorizing

17   the issuance of the 27,000 [sic] shares to you?

18       A.    There's one document that you -- that was

19   showed earlier.

20       Q.    Have you ever -- were you ever issued stock

21   certificates indicating the amount you were owed?

22       A.    No.

23       Q.    Who are the people who make up Big Thirst's

24   Board of Directors?

25       A.    Myself, Matt McGinnis, Suzanne McGinnis -- that

1    is Matt's wife -- and Mark Shilling.  And that is Matt

2    McGinnis' best friend.

3        Q.   Okay.  Describe for us the work you did for

4    Big Thirst.

5        A.   Starting in -- as early as February 3rd of

6    2021, I built the entire tech stack and the solutions

7    that run our entire company today.  Every bit of this

8    technology was hand-built by me and only me and

9    hand-selected after at least a very conservative 1700

10   hours' worth of work.

11             Apart from all of the data and solutions

12   that I have provided and built, I was also the

13   day-to-day operation of the company.  I handled all of

14   the clients' issues.  I was the core part of the sales.

15   I met with all of our clients on multiple times to

16   ensure their safety in our company and that their

17   products would be safe and -- and -- with us.  I handled

18   all of every day-to-day -- every day-to-day part of this

19   company, including customer service issues, client

20   issues, fulfillment, logistics, retailer partnerships.

21   Pretty much everything that has to do with this company,

22   I was a key and integral part of it.

23       Q.   Okay.  And approximately how many hours of work

24   have you invested in Big Thirst thus far?

25       A.   Conservatively, 1700 hours.

1    Q.    And have you ever been compensated for your

2    work on behalf of the company?

3    A.    No.

4    Q.    Have you ever received any employee benefits

5    from the company?

6    A.    No.  Never.

7    Q.    Okay.  What loans, if any, did you make to

8    Big Thirst?

9    A.    I provided a 50,000-dollar loan to Big Thirst,

10   give or take -- it was about $47,500 to Big Thirst.

11   Q.    How did you obtain this money?

12   A.    On my wedding day, it was -- my father was in a

13   very bad accident and he was compensated for it, and

14   this was part of the compensation.

15             MS. BARAZI:  I'm sorry to hear that,

16   Mrs. Donoho.  Do you need time?

17             THE WITNESS:  No.  I'm okay.  We don't

18   have time.

19   Q.    (By Ms. Barazi) To date, have you been repaid

20   for this loan?

21   A.    No.

22   Q.    Nothing at all?

23   A.    No.  Never.

24   Q.    Let's jump to the SBA loan.

25             What kind of loans did Big Thirst apply

1    for?

2        A.    We applied for a number of SBA loans from a

3    variety of different banks starting as early as March of

4    2021.

5        Q.    Okay.  And can you tell us a little bit about

6    the details of the SBA loan that you were able to not

7    secure, ultimately, but that you-all were working on?

8        A.    In November of 2021, two bankers came down from

9    Commonwealth Bank to meet with Matt and myself

10    specifically to meet the co-founders and the people

11    behind this company in which they were looking to secure

12    up to $350,000 worth of SBA loan to us.

13              During that time, they were able to see

14    that we actually had a working and tangible product that

15    was built by me and that they -- that we -- that I am --

16    what I built was a differentiator in the marketplace and

17    was --

18              Okay.

19        Q.    Okay.  Were you asked to be a personal

20    guarantor on this loan?

21        A.    Yes.

22        Q.    And why didn't you feel comfortable doing that?

23        A.    When I received the loan documents in its

24    entirety, I saw that Big Thirst Marketing was also a

25    co-borrower.  And Big Thirst Marketing is an LLC that I

1    am not a part of.  I am only an independent contractor

2    for that company.

3        Q.   What kind of threats did Mr. McGinnis make to

4    you if you didn't sign the loan?

5        A.   He said that if I didn't sign the loan, that he

6    would turn this company into a sole proprietorship, and

7    he would take away all of my IP and he would figure out

8    a way to compensate me fairly.

9        Q.   How much do you believe the IP you developed is

10   worth?

11       A.   $4 million based of our company's pro forma for

12   the -- we had a -- somebody actually built this out for

13   us, $4 million.

14           STAFF ATTORNEY:  Ms. Barazi, I just want

15   to let you know you've got about five minutes left.

16           MS. BARAZI:  Thank you.

17           MR. MOUSILLI:  Mr. Elliott, can we get an

18   accounting on the time real quick, if we could just

19   pause?  Because it -- my -- my calculations are not

20   adding up for -- for -- for the time.

21           STAFF ATTORNEY:  I'm not really sure what

22   you want me to say.

23           MR. MOUSILLI:  Okay.  Was the late start

24   attributed to the Zoom issues allocated to the defendant

25   only?

```
1                    STAFF ATTORNEY:  No.

2                    MR. MOUSILLI:  Okay.  Thank you.

3                    I'll let you guys continue.

4         Q.   (By Ms. Barazi) Mrs. Donoho, when did you begin

5    work on what we are currently referring to as the

6    Big Thirst data dashboard?

7         A.   January 2021.

8         Q.   That was before Big Thirst was incorporated?

9         A.   Oh, sorry.  The data dashboard?  That was

10   around April 2021.

11        Q.   Okay.  When did you begin work on the Shopify

12   technical stack?

13        A.   January 2021.

14        Q.   Before Big Thirst was incorporated, correct?

15        A.   Yes.

16        Q.   Okay.  I'm just trying to jump through stuff.

17                    Mrs. Donoho, did you use your own tools

18   when --

19        A.   Yes.

20        Q.   -- you developed --

21                    MR. PETERS:  Objection, Your Honor;

22   leading.

23                    THE COURT:  All right.  Sustained.

24        Q.   (By Ms. Barazi) Mrs. Donoho, what tools did you

25   use to create your intellectual property?
```

```
1              MR. PETERS:  Objection, Your Honor;
2    leading.
3              MS. BARAZI:  I'm asking --
4              THE COURT:  Overruled.
5       Q.   (By Ms. Barazi) Go ahead, Mrs. Donoho.
6       A.   My own.
7       Q.   Mrs. Donoho, what harm will you suffer if this
8    Court allows Big Thirst to use your intellectual
9    property?
10      A.   All of my work is gone and taken by the
11   company, and I have no say over what happens to it.
12   This is something that I could take elsewhere and use.
13   And if it's taken away from me, then all of the work
14   that I have done to date would be gone.  They also have
15   no idea how to use what I've done.  So it not only --
16              Yeah.
17      Q.   Mrs. Donoho, have you ever granted a license to
18   Big Thirst to use your intellectual property?
19      A.   No.
20      Q.   And to what extent have you complied with the
21   Court's TRO?
22      A.   To the fullest extent.  And I've gone above and
23   beyond to provide additional information to -- to
24   protect our clients.
25      Q.   Mrs. Donoho, what are you asking of this Court?
```

```
1        A.    I am asking them to stop stealing my IP and all

2   of the work that I've developed and essentially stop

3   Matt from continuing to issue and fulfill his threat

4   that he made me on March 16th.  I have done, above and

5   beyond, everything I can do for this company and the

6   clients that we serve.  I adore the people that we work

7   with, and I have had the greatest privilege of actually

8   building this company from scratch myself.

9             And to sit here today because I wasn't

10  able to have any kind of equality in this company is

11  completely betrayed.  Everything I've done to date was

12  only for this company.  And beyond the TRO, I continued

13  to serve this company and the people that we promised to

14  serve.  I ask that the Court stop stealing my IP and my

15  work product.

16       Q.    And, Mrs. Donoho, to be clear, have you ever

17  been compensated for your intellectual property by

18  Mr. McGinnis or Big Thirst?

19       A.    No.

20       Q.    Have you ever been compensated by Mr. McGinnis

21  or Big Thirst for your role as Chief Operating Officer

22  of Big Thirst?

23       A.    No.

24       Q.    Thank you, Ms. -- Ms. Donoho.

25             MS. BARAZI:  I pass the witness.
```

1          MR. PETERS:  I'm just going to touch on a

2    couple of things very briefly, Your Honor.

3                    **CROSS-EXAMINATION**

4    BY MR. PETERS:

5        Q.   Ms. Donoho, if it was your work that you

6    thought you were owning, why did you license it in the

7    name of Big Thirst?

8        A.   It wasn't licensed in the name of Big Thirst.

9        Q.   Okay.  Well, we saw contracts earlier that it

10   was.

11       A.   No.  It didn't say Big Thirst.

12       Q.   And you are not a -- you don't have any

13   training in valuation of companies, do you?

14       A.   No.  That's why we hired --

15       Q.   Okay.

16       A.   -- a consultant --

17       Q.   Thank you.

18       A.   -- to do that valuation.

19           MR. PETERS:  Objection, Your Honor;

20   hearsay.

21           MS. BARAZI:  Object -- I'm sorry, Judge.

22           How was that hearsay?

23           MR. PETERS:  She just said what she --

24   what somebody else -- or she was trying to say what

25   somebody else had said.

1          MS. BARAZI:  What somebody else has --

2     that they have hired someone else.  She didn't say what

3     they said.

4          THE COURT:  All right.  I overrule the

5     objection.

6          MR. PETERS:  Okay.

7     Q.  (By Mr. Peters) I'm going to ask it again; and

8     it's a yes-or-no question.

9          Ms. Donoho, are you trained at appraising

10    valuation of companies?

11    A.  No.

12    Q.  Was Matt McGinnis' life insurance going to be

13    part of the guarantee for the SBA loan?

14    A.  Yes.

15    Q.  How about yours?

16    A.  No.

17    Q.  Was Matt McGinnis' other company, the Marketing

18    company, going to be on the hook for the SBA loan?

19    A.  What do you refer to as a "hook"?

20    Q.  Was it going to be a guarantor of the SBA loan?

21    A.  Yes.

22    Q.  Okay.  And you said that you were bootstrapping

23    marketing technology to the Big Thirst -- to the

24    technology you were developing for Big Thirst, Inc.,

25    right?  You used that term "bootstrap" marketing

1  technology for Big Thirst, Inc.

2      A.   Can you clarify your question?

3      Q.   You're using -- you used marketing technology

4  in Big Thirst, Inc., work, correct?

5      A.   I honestly don't understand your question.

6      Q.   You said it, Ms. Donoho.  You said --

7      A.   Okay.

8      Q.   -- you bootstrapped marketing technology to

9  Big Thirst, Inc., work.

10     A.   No.  I said that we could bootstrap marketing

11 technology -- marketing efforts with the Big Thirst

12 technology when we were developing the -- planning the

13 business in January of 2021 before the corporation was

14 formed.

15     Q.   Did you give the credentials for GoDaddy to my

16 client?

17     A.   No.

18     Q.   Did you give the credentials for ShipStation to

19 my client?

20     A.   No.

21             MS. BARAZI:  Objection, Judge.  There's no

22 reference to time, so -- and it's an ambiguous question.

23             THE COURT:  All right.  Well --

24     Q.   (By Mr. Peters) Ms. Donoho, have you ever given

25 the credentials for ShipStation to my client?

```
1        A.    No.

2                    MR. PETERS:  Pass the witness, Your Honor.

3                    MS. BARAZI:  Judge, I'll save the

4     remaining of my time for closing.

5                    THE COURT:  All right.  So you rest?

6                    MS. BARAZI:  Yes, Judge, I rest.  Thank

7     you.

8                    THE COURT:  Mr. Beck, how much time do

9     each of them have left?

10                    STAFF ATTORNEY:  Plaintiff's got about

11    nine minutes left, and defendant's got about one.

12                    THE COURT:  Honestly, I don't feel like I

13    really need closing argument.

14                    MR. MOUSILLI:  Your Honor, we'd like to

15    reserve ours if at all possible.

16                    THE COURT:  I'm sorry.  You want to use

17    your one minute?

18                    MR. MOUSILLI:  Yes, Your Honor.

19                    THE COURT:  Go ahead.

20                         CLOSING ARGUMENT

21                    MR. MOUSILLI:  All right.  Your Honor,

22    you'll see throughout the course of the testimony in

23    this hearing --

24                    MR. PETERS:  Your Honor, if I may, as a

25    point of order, I believe that your court rules require
```

```
 1   appropriate dress, at least that's what I read and what
 2   was sent to me.  I do not believe the counsel is
 3   speaking now is dressed in appropriate attire.  So I
 4   think it would be more appropriate if the counsel that
 5   is did the closing.
 6               THE COURT:  So I -- there are judges in
 7   our courthouse that make a big issue out of that.  I'm
 8   really not one of them.  So let's -- let's hear
 9   Mr. Mousilli out.
10               MR. MOUSILLI:  Thank you, Your Honor.
11               I just want to note that other than
12   Mr. McGinnis' self-serving testimony, we have no
13   evidence whatsoever that's been proffered that there's
14   any irreparable harm that Big Thirst is sustaining.
15               You've heard from Mr. McGinnis himself
16   that the business can continue and orders can be
17   fulfilled for clients without use of Ms. Donoho's IP.
18   Throughout the entire course of this hearing, no mention
19   of breach of fiduciary duty was ever mentioned.  That's
20   the essentially thrust of this case.  And as my
21   co-counsel had pointed out, we believe that this entire
22   suit is a sham lawsuit.  There is no evidence or basis
23   for Ms. Donoho breaching her fiduciary duty whatsoever
24   to Big Thirst, given the fact that she is simply a
25   shareholder now.
```

```
1                Your Honor, the irreparable harm that will
2      happen if the Court was to force Ms. Donoho to have her
3      intellectual property -- that's never been assigned,
4      never been purchased, never been paid for, or otherwise
5      bargained for -- to be forced into a license with
6      Big Thirst would be a travesty of justice.  We've
7      established that there is no copyright assignment, no
8      work for hire.  Ms. Donoho was never an employee of
9      Big Thirst.  There is an absolute right under U.S.
10     federal copyright law that all of the creations, the
11     code, the designs that Ms. Donoho has made are retained
12     by her individually absent an explicit agreement and
13     assignment.  We ask that this Court deny this injunction
14     and restore Ms. Donoho's complete rights over her
15     intellectual property and the code that she's developed
16     and all of the software that she has written and she has
17     amended and customized.
18               Your Honor, in closing, Big Thirst has
19     failed to carry its substantial burden for this
20     temporary injunction hearing.  They have the ability to
21     seek out licenses to all of the other software that
22     Ms. Donoho had built herself and stitched together
23     herself.  You didn't hear once, Your Honor, that they
24     couldn't end up obtaining their own Shopify account;
25     that they couldn't obtain their own ShipStation account;
```

WYLIE 146

1    et cetera.  All they are trying to do is misappropriate

2    and frankly pirate the intellectual property that

3    Ms. Donoho has spent hundreds and hundreds of hours

4    developing.

5              Your Honor, we ask that you deny this

6    temporary injunction and restore all of the rights that

7    Ms. Donoho had prior to that temporary injunction

8    hearing.

9              Thank you.

10             THE COURT:  All right.  I -- I am granting

11   the temporary injunction.  I believe the plaintiff has

12   met their burden of proof.  I believe that there is

13   sufficient evidence of each of the elements required for

14   a temporary injunction.  I will point out under Rule 692

15   of this Texas Rules of Civil Procedure that disobedience

16   of an injunction may be punished by contempt of court --

17   as contempt of court.

18             Mr. Peters, what -- what amount of bond

19   are you proposing?

20             MR. PETERS:  Your Honor, we've already put

21   up a 1,000-dollar bond, and I would argue that that

22   would be appropriate to carry through.  Ms. Donoho is

23   still a 27 percent shareholder.  She is protected.

24   She -- as they said, they're going to bring claims for

25   her ownership interest, to the extent she has it, for

1  her compensation, to the extent she's entitled to it.

2  So they're going to have their claims.  So I would argue

3  that the 1,000-dollar bond that is on file with the

4  Court already serve for the bond as the temporary

5  injunction.

6           MS. BARAZI:  Judge, if I may, Mrs. Donoho

7  has already testified that her IP is estimated at

8  $4 million.  So I'd like to ask for a bond to be

9  commensurate with the value of her IP.

10          THE COURT:  So the company, if the -- when

11  the temporary injunction is in place, will be an ongoing

12  concern.  The ownership of the company will be at issue,

13  but the CEO will continue to be the CEO of the company.

14          Ms. Donoho has resigned as COO and has

15  resigned as a director, but she still has a 27 percent

16  ownership of the shares.  So I don't find that there's

17  substantial danger as long as the company continues to

18  be an on- -- ongoing concern.

19          So I will --

20          MS. BARAZI:  If I --

21          THE COURT:  -- approve --

22          MS. BARAZI:  -- may, Judge?

23          If I may -- I don't mean to interrupt you.

24          THE COURT:  You may.

25          MS. BARAZI:  Thank you.

WYLIE 148

```
1                At any moment, Mr. McGinnis can dilute
2      Mrs. Donoho's shares so they're worth less than a
3      dollar.
4                THE COURT:  And if he does that, then I'm
5      certain there will be a counterclaim for having done so.
6      But, at this point, I think a thousand-dollar bond is
7      sufficient.  And I want to --
8                Do -- have you provided a proposed order,
9      Mr. Peters?
10               MR. PETERS:  I uploaded it into the other
11     documents, the plaintiff's other documents in the -- in
12     the Box application.
13               THE COURT:  All right.  Have you taken a
14     look at it, Ms. Barazi or Mr. Mousilli?
15               MS. BARAZI:  No, Judge, I haven't.
16               THE COURT:  All right.  Well, I'm going to
17     ask you to let me know if you have any trouble with the
18     form of the order.
19               When does the TRO expire?
20               MS. BARAZI:  On the 26th, Judge.
21               MR. PETERS:  I believe it expires today.
22     I believe it expires at the hearing of the temporary
23     injunction.  So TROs last for 14 days or until the
24     temporary injunction hearing.  So it's -- it expires
25     today.
```

1            THE COURT:  All right.  Let me take a

2    quick look at that.

3            So it says that it's a 14-day order, which

4    is typical.  It does not suggest that it expires at the

5    time of this hearing.  Obviously, it will be supplanted

6    by a -- by a temporary injunction.

7            So my -- my reason for asking that is that

8    you're still under the requirements of the temporary

9    restraining order until the Court signs a temporary

10   injunction.

11           I will give Ms. Barazi and Mr. Mousilli

12   time to review the proposed temporary injunction and to

13   let me know by 9:00 o'clock tomorrow morning if you have

14   any objection to the form of it.  But I will sign a

15   temporary injunction tomorrow.  And it will become

16   effective immediately because the bond, I take it, has

17   already been paid?

18           MR. PETERS:  Yes, Your Honor.

19           THE COURT:  All right.

20           All right.  Well, that concludes our

21   hearing.  And y'all are excused.

22           *(Hearing concluded)*

23

24

25

1  STATE OF TEXAS        )

2  COUNTY OF TRAVIS      )

3      I, Michelle Williamson, Official Court Reporter in

4  and for the 345th District Court of Travis, State of

5  Texas, do hereby certify that the above and foregoing

6  contains a true and correct transcription of all

7  portions of evidence and other proceedings requested in

8  writing by counsel for the parties to be included in

9  this volume of the Reporter's Record in the above-styled

10 and numbered cause, all of which occurred remotely via

11 videoconference in open court or in chambers and were

12 reported by me.

13     I further certify that this Reporter's Record of the

14 proceedings truly and correctly reflects the exhibits,

15 if any, offered by the respective parties.

16     WITNESS MY OFFICIAL HAND this 25th day of April,

17 2022.

18

19

20                        */s/ Michelle Williamson*_____

                          Michelle Williamson, CSR
21                        Texas CSR #4471
                          Expires:  01/31/2024
22                        Official Court Reporter
                          345th District Court
23                        Travis County, Texas
                          P.O. Box 1748
24                        Austin, Texas 78767
                          Telephone:  (512) 854-9373

25

WYLIE 151