



# Transcript of Matthew John McGinnis

**Date:** March 28, 2024
**Case:** Big Thirst, Inc. -v- Donoho, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

1:24-CV-01512-DAE
Plaintiff
EXHIBIT
___L___

```
1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
2                          AUSTIN DIVISION

3    -----------------------------------x
                                        )
4    BIG THIRST, INC.,                  )
                                        )
5         Plaintiff, Counter-Defendant, )
                                        )  CIVIL ACTION NO.
6         v.                            )  1:22-cv-00467-RP
                                        )
7    LAUREN WYLIE DONOHO,               )
                                        )
8         Defendant, Counter-Plaintiff,)
9         Cross-Plaintiff,              )
                                        )
10        v.                            )
                                        )
11   MATT MCGINNIS, SUZANNE             )
     MCGINNIS, AND MARK SHILLING,       )
12                                      )
          Cross-Defendants.            )
13   -----------------------------------x Redacted

14

15    CONTAINS CONFIDENTIAL PORTIONS - ATTORNEYS' EYES ONLY

16       VIDEOTAPED DEPOSITION OF MATTHEW JOHN MCGINNIS

17                        AUSTIN, TEXAS
                     THURSDAY, MARCH 28, 2024
18                        9:06 A.M. CST

19

20

21

22
     Job No.:  526597
23
     Pages:  1 - 295
24
     Transcribed by:  Wanda Greenlee
25
```

WYLIE 269

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    2

1        Videotaped Deposition of Matthew John McGinnis,

2    held at the offices of:

3

4

5            111 Congress Avenue

6            Suite 500

7            Austin, Texas 78701

8            Phone: 512.855.2100

9

10

11       Pursuant to agreement, before Kollin Casarez,

12    Notary Public in and for the State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25

WYLIE 270

```
1              A P P E A R A N C E S

2

3   ON BEHALF OF THE PLAINTIFF, BIG THIRST, INC.:

4       Lessie C. Gilstrap, Esquire
        Glorieni Azeredo, Esquire
5       GILSTRAP LAW GROUP
        1801 E 51st Street
6       Suite 365-295
        Austin, Texas 78723
7       (512) 813-2062
        lessie@gilstraplawgroup.com
8

9   ON BEHALF OF THE DEFENDANTS, LAUREN WYLIE DONOHO,
    MATT MCGINNIS, SUZANNE MCGINNIS, AND MARK SHILLING:
10
        Lema Mousilli, Esquire
11      Feras Mousilli, Esquire
        LLOYD & MOUSILLI, PLLC
12      4400 Far W Blvd.
        Austin, Texas 78731
13      (512) 609-0059
        litigation@lloydmousilli.com
14

15

16

17

18

19

20

21

22

23  Also present:

24  Brent Kirby, Planet Depos Videographer

25  Lauren Wylie Donoho, Defendant
```

WYLIE 271

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          4

```
1                    C O N T E N T S

2                                              PAGE

3    AEO DESIGNATION BEGINS                    94:4
     AEO DESIGNATION CONCLUDES                 97:19
4    AEO DESIGNATION BEGINS                    134:24
     AEO DESIGNATION CONCLUDES                 143:8
5    AEO DESIGNATION BEGINS                    177:21
     AEO DESIGNATION CONCLUDES                 179:3
6
                        WITNESSES
7
       MATTHEW JOHN MCGINNIS
8        Examination by MS. MOUSILLI           5:15
         Examination by MS. GILSTRAP           292:11
9
                        EXHIBITS
10
11     1                                       27:8

12     2                                       62:3

13     3                                       65:14

14     4                                       208:8

15     5                                       215:23

16     6                                       227:25

17     7                                       234:16

18     8                                       245:20

19     9                                       266:4

20     10                                      269:3

21     11                                      277:19

22     12                                      283:10

23

24

25
```

WYLIE 272

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    5

```
1                    P R O C E E D I N G S
2                (Proceedings began at 9:06 a.m.)
3                    THE VIDEOGRAPHER:  Today's date is March
4    28th, 2024.  The approximate time, 9:06 a.m. Central
5    Standard Time.  We're recording and we're on record.
6                    (Stipulation read and witness sworn by the
7    court reporter.)
8                    MS. MOUSILLI:  Thank you.
9    Whereupon,
10                   MATTHEW JOHN MCGINNIS,
11   being first duly sworn or affirmed to testify to the
12   truth, the whole truth, and nothing but the truth, was
13   examined and testified as follows:
14               EXAMINATION BY COUNSEL FOR THE DEFENDANT
15   BY MS. MOUSILLI:
16        Q.    Good morning.
17        A.    Good morning.
18        Q.    Please state your name for the record.
19        A.    My name is Matthew John McGinnis.
20        Q.    Have you ever gone by any other name?
21        A.    I go by Matt McGinnis.
22        Q.    Besides Matt, Matthew John McGinnis, do you
23   go by any other name?
24        A.    No, Matt or Matthew.
25        Q.    Okay.  And what is your date of birth?
```

WYLIE 273

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    6

```
1              A.      March 2nd, 1969.

2              Q.      And where do you presently reside?

3              A.      2101 Elton Lane, Austin Texas.

4              Q.      And how long have you resided there?

5              A.      21 years.

6              Q.      Where did you reside prior to that address?

7              A.      Portland, Oregon.

8              Q.      Okay.  Mr. McGinnis, my name is Lema

9    Mousilli, and I represent Ms. Lauren Wylie Donoho, the

10   defendant in this case.  You understand that you're here

11   to take your deposition?

12             A.      Yes, I understand.

13             Q.      And it's in connection with this lawsuit

14   that you've brought against Ms. Lauren Donoho?

15             A.      I understand.

16             Q.      Okay.  She also has claims against you.  Do

17   you know what those claims are?

18             A.      Yes, I do.

19             Q.      What are those claims?

20             A.      Those claims are copyright infringement for

21   -- against the company and the -- and me personally and

22   fraud against me.

23             Q.      Do you understand that there's also a

24   breach of fiduciary duty claim?

25             A.      Correct, yes.
```

WYLIE 274

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    7

```
1          Q.     Okay.  So what do you understand this
2     lawsuit to be about?
3          A.     This lawsuit is about a disagreement over
4     ownership shares that resulted in the takedown of the
5     software that operated Big Thirst.  And we needed to
6     compel the defendant to return operations of those.  She
7     then countersued.
8                 MS. GILSTRAP:  I have a question for you
9     before we go any further.  I -- I was told yesterday by --
10    through -- through your assistant -- or through your
11    associate to my colleague, that you were starting this as
12    in his individual capacity?
13                MS. MOUSILLI:  Correct.
14                MS. GILSTRAP:  Okay.  I just wanted to make
15    sure.  So this deposition right now -- the questioning is
16    in his individual capacity?
17                MS. MOUSILLI:  Correct.
18                MS. GILSTRAP:  Okay.  Just making sure.
19    BY MS. MOUSILLI:
20         Q.     So, Mr. McGinnis, before I go any further,
21    there's some ground rules that I want to lay.  And I just
22    want to make sure you know that you're under oath?
23         A.     Correct.
24         Q.     Okay.  And that you're sworn to tell the
25    truth?
```

WYLIE 275

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                  8

1          A.     Yes.

2          Q.     And even though we're here in a very

3    informal setting, it's as if you're in front of a judge --

4          A.     Yes.

5          Q.     -- or a jury and it has the same effect.

6    Okay?

7          A.     Yes.

8          Q.     The court reporter is taking down

9    everything you say.  So as you saw yesterday -- because

10   you were attending Ms. Lauren Donoho's deposition

11   yesterday, correct?

12         A.     Yes.

13         Q.     Okay.  So as you saw yesterday, it's proper

14   to give a yes-or-no answer.  Uh-huh or huh-huh is not

15   going to be able to be recorded by the court reporter, so

16   I ask you to give a verbal response to each question.

17         A.     I will.

18         Q.     Okay.  Great.  Thank you.  And it's very

19   important for us not to talk over each other, so please

20   wait for me to finish my entire question before you

21   answer.  And I'll try to do the same.  Okay?

22         A.     Yes.

23         Q.     Okay.  Great.  I also want to make sure you

24   understand my questions.  So if you don't understand a

25   question that I've asked, please don't answer it.  Ask me

WYLIE 276

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              9

1    to rephrase or tell me that you don't understand, and I'm

2    more than happy to do that.  Okay?

3          A.     Yes.

4          Q.     And from time to time your attorney might

5    object to a question, and that's fine.  But you go ahead

6    and answer my question, after your attorney objects,

7    unless she specifically tells you, Don't answer that

8    question.  Okay?

9          A.     Okay.

10         Q.     Are you prepared to answer my questions

11   today?

12         A.     I am.

13         Q.     Is there any reason that you wouldn't be

14   able to give me full and accurate answers to my questions

15   today?

16         A.     No.

17         Q.     Are you taking any medications that might

18   impair your memory?

19         A.     No.

20         Q.     Okay.  And if we need to take any breaks,

21   please let me know.  It's just important that you don't

22   take a break during a pending question.  And we'll try to

23   take a break every so often.  Okay?

24         A.     (Nonverbal response.)

25         Q.     Okay.  Good.  So have you given your

WYLIE 277

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    10

```
 1   deposition before?
 2           A.      No.  This is new.
 3           Q.      This is new.  This is your first time?
 4           A.      Yeah.
 5           Q.      Have you ever given any sworn testimony?
 6           A.      Yes.
 7           Q.      When was that?
 8           A.      In state court and federal court related to
 9   this case.
10           Q.      Okay.  Besides this case, have you ever
11   given any sworn testimony?
12           A.      No.
13           Q.      Okay.  Have you ever been in -- in court
14   before, besides for this case?
15           A.      For a traffic citation.
16           Q.      Okay.  Have you ever been in court for any
17   -- a friend's case?
18           A.      No.
19           Q.      Family case?
20           A.      No.
21           Q.      Okay.  What is your understanding of your
22   role in this litigation?
23                   MS. GILSTRAP:  Objection, form.  But you
24   can answer, if you can.
25                   THE WITNESS:  My understanding of this --
```

WYLIE 278

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    11

1   of my role is, as a plaintiff, and as a cross-defendant.

2   BY MS. MOUSILLI:

3        Q.    You understand that you have been sued in

4   your individual capacity, correct?

5        A.    Correct.

6        Q.    Okay.  Previously I cross-examined you at a

7   hearing in state court.  Do you remember that?

8        A.    Yes.

9        Q.    Okay.  And I also cross-examined you at a

10  hearing in federal court.  Do you remember that?

11       A.    Yes.

12       Q.    Okay.  Is there any reason that any

13  testimony you give today is going to be different than the

14  testimony you gave in those prior hearings?

15       A.    No.

16       Q.    Okay.  What did you do to prepare for

17  today's deposition?

18       A.    I met with my legal team and we reviewed

19  topics.

20            MS. GILSTRAP:  Wait.  You can say that you

21  met with us, but please don't talk about anything that we

22  discussed.  Okay?

23            THE WITNESS:  Yep.

24  BY MS. MOUSILLI:

25       Q.    What documents did you review,

WYLIE 279

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    12

1    Mr. McGinnis?

2         A.    Reviewed the materials we submitted.

3         Q.    What materials did you submit?

4         A.    Things requested for books and records.

5         Q.    Things requested by who?

6         A.    By you and Ms. Donoho.

7         Q.    Okay.  And what were those documents that

8    you reviewed?

9         A.    Financial records and corporate documents.

10        Q.    And why did you review those documents?

11        A.    To ensure that I knew the facts.

12        Q.    Okay.  Anything besides those financial

13   records?

14        A.    We had documents that showed the different

15   discussions and -- and the shares that were authorized,

16   and when we agreed on those for corporate records.

17        Q.    When you agreed on those for corporate

18   records.  Can you clarify what you mean by that?

19        A.    When we solidified our shareholders'

20   agreement and submitted it to the State of Delaware

21   through our attorney.

22        Q.    Okay.  And when was that?

23        A.    The agreements were finished in June of

24   2021, and it was finalized with the state in October of

25   2021.

WYLIE 280

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    13

1          Q.    Okay.  Whose shares were you focusing on?

2          A.    The founder shares of Lauren Wylie Donoho

3     and my own.

4          Q.    Okay.  And we'll get to that a little bit

5     later on.  Have you ever talked to anybody about this

6     litigation?

7          A.    I have spoken with my legal team.

8          Q.    Who else besides your legal team?

9          A.    The board of directors in my company.

10         Q.    And who else besides them?

11         A.    And my family.

12         Q.    Your family.  Who else?

13         A.    I have responded to a journalist request

14     that -- when Lauren Wylie Donoho sent a request to go

15     public with this court case, I responded by saying:  I

16     have no comment, but can you share the court pleadings?

17         Q.    Who is that journalist?

18         A.    Her name is Sailor -- Sailor Guevera.

19         Q.    Can you spell that?

20         A.    S-A-I-L-O-R, G-U-E-V-E-R-A.

21         Q.    What publication was she with?

22         A.    She is a freelance writer, primarily

23     writing for American Whiskey Magazine and Artisan

24     Distiller.

25         Q.    And what did she ask you?

WYLIE 281

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    14

```
1           A.     She said, I received concerning allegations
2   from Lauren Wylie Donoho.  What do you have to say?  And I
3   said, I cannot comment on this.  I cannot provide you
4   information.  I can only provide a court record.
5           Q.     Who told you not to comment?
6                  MS. GILSTRAP:  If your answer requires you
7   to reveal attorney-client communications, I'm instructing
8   you not to answer.
9                  THE WITNESS:  I choose to listen to my
10  counsel.
11  BY MS. MOUSILLI:
12          Q.     Okay.  Who told you not to answer?
13          A.     That's a --
14                 MS. GILSTRAP:  Wait -- wait.  I'm going to
15  instruct you not to answer that question.
16  BY MS. MOUSILLI:
17          Q.     Is it anybody besides your attorney that
18  told you not to answer?
19          A.     I'm not answering that question.
20          Q.     No.  You can answer that question.
21                 MS. GILSTRAP:  No, because you're -- it's
22  implying what I had -- conversations I had.  If you answer
23  -- ask it --
24                 MS. MOUSILLI:  No.  I'm asking if anybody
25  else besides your attorney told you not to answer -- told
```

WYLIE 282

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                  15

```
1    you to say -- not to comment anything to the journalist?

2    That's my question.

3                    MS. GILSTRAP:  You can answer that

4    question.

5                    THE WITNESS:  No one else has.

6    BY MS. MOUSILLI:

7         Q.    Okay.  Very good.  And when did that call

8    take place?

9         A.    Approximately two weeks ago on a Saturday

10   afternoon, National Women's Day.  I don't recall the exact

11   date.

12        Q.    Did she call your cell phone?

13        A.    She sent me an email and I responded to it.

14        Q.    To what email address did Sailor Guevera

15   email you?

16        A.    Sailor Guevera --

17        Q.    Guevera.

18        A.    -- emailed me at matt@bigthirst.com, and I

19   responded with the same email address.

20        Q.    Okay.  How long have you known Ms. Donoho?

21        A.    I met Ms. Donoho in late 2016.  She was a

22   contractor through a temp hiring agency, and I employed

23   her as a part-time contractor beginning in December 2016

24   for work for Big Thirst Marketing.

25        Q.    What specific work did you hire her for?
```

WYLIE 283

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                        16

```
1          A.      For digital advertising and website design.

2          Q.      You hired her for Big Thirst Marketing?

3          A.      Correct.

4          Q.      Okay.  And so you first met in 2016,

5   correct?

6          A.      Correct.

7          Q.      What kind of work did you ask for her to

8   do?

9          A.      She did website design, website updates,

10  and digital advertising for various clients, as well as

11  some email marketing.

12         Q.      Did you pay Ms. Donoho for that work?

13         A.      Yes.  She billed hourly.

14         Q.      And what was her hourly rate?

15         A.      Her most recent hourly rate was $85 an

16  hour.

17         Q.      How long did she work for you as a

18  contractor?

19         A.      For approximately five years.

20         Q.      Besides work for Big Thirst Marketing, did

21  -- did Ms. Donoho do any other work for you at that time?

22         A.      In 2021, we began discussions for her to

23  provide services to help build the technology for Big

24  Thirst, Incorporated, a new e-commerce company.

25         Q.      What is her relationship to -- what is
```

WYLIE 284

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    17

1    Ms. Donoho's relationship to Big Thirst Marketing?

2                    MS. GILSTRAP:  Objection, form.  Answer if

3    you can.

4                    Ms. MOUSILLI:  I'm sorry.  I'm going to ask

5    you to only restrict your objections to, Objection form

6    and not to continue with, Answer if you can.  That's

7    not --

8                    MS. GILSTRAP:  Well, your question doesn't

9    make any sense.

10                   MS. MOUSILLI:  I don't care what you think.

11   You are restricted to, Objection form, and I'm going to

12   ask you to abide by that.  As we discussed yesterday, the

13   Western District requires you to only say, Objection form,

14   and so please abide by that.  Okay.

15                   MS. GILSTRAP:  I'm instructing him to

16   answer the question.

17                   MS. MOUSILLI:  No.  It's not proper --

18                   MS. GILSTRAP:  I can --

19                   MS. MOUSILLI:  -- and you're taking up

20   time.

21                   MS. GILSTRAP:  I can tell my client --

22                   MS. MOUSILLI:  You can say, Objection form

23   and that's all.  Okay.

24                   MS. GILSTRAP:  I can tell my client to

25   answer.

WYLIE 285

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    18

1              MS. MOUSILLI:  That's the final time I'm

2     going to -- say make that objection clear.  Okay?

3              MS. GILSTRAP:  I hope that is the final

4     time you say it.

5              MS. MOUSILLI:  And I hope that's the final

6     time you say it as well.

7              MS. GILSTRAP:  I will do as I please.

8              MS. MOUSILLI:  Abide by the rules.

9              MS. GILSTRAP:  I will.  I will.

10             MS. MOUSILLI:  Lessie, abide by the rules.

11             MS. GILSTRAP:  I will.  I am.

12             MS. MOUSILLI:  Very good.

13    BY MS. MOUSILLI:

14        Q.    Mr. -- Mr. McGinnis, what was Ms. Donoho's

15    relationship to Big Thirst Marketing?

16             MS. GILSTRAP:  Objection, form.  Answer if

17    you can.

18             MS. MOUSILLI:  Okay.  You know what, I'm

19    not going to -- I'm not going to put up with this, Lessie.

20    You say, Objection form and that's it.

21             MR. MOUSILLI:  Lessie, you don't need to

22    say to say, Answer if you can.

23             MS. GILSTRAP:  You know, I'm not having two

24    attorney's tag term -- team.

25             MS. MOUSILLI:  We're not --

WYLIE 286

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    19

1          MR. MOUSILLI:  There's no tag team, but
2    we're talking about decorum here.
3          MS. GILSTRAP:  You are not going to have
4    two attorneys --
5          MR. MOUSILLI:  We're having decorum here.
6    We don't need this sidebar.
7          MS. MOUSILLI:  I don't need the speaking
8    objections from you.  Okay.
9          MS. GILSTRAP:  Okay.  I think Ms. Mousilli
10   can defend herself here.
11         MR. MOUSILLI:  She can.
12         MS. GILSTRAP:  Yeah.
13         MR. MOUSILLI:  But you're just out of line.
14         MS. GILSTRAP:  Okay.
15         MR. MOUSILLI:  We don't need the sidebar.
16         MS. GILSTRAP:  We can have tons of talk
17   about this right now if you want to.
18         MS. MOUSILLI:  I need you to stop.  I need
19   you to say, Objection form and stop right there.
20         MS. GILSTRAP:  I will -- I'm instructing
21   him to answer so that he understands.
22         MR. MOUSILLI:  You don't need to instruct
23   him to answer.
24         MS. MOUSILLI:  I already told him.
25         MR. MOUSILLI:  He's under oath to answer.

WYLIE 287

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    20

```
1                    MS. GILSTRAP:  I am his attorney and I'm --
2                    MR. MOUSILLI:  Correct.
3                    MS. MOUSILLI:  Nobody said otherwise.  We
4    know you're his attorney.
5                    MS. GILSTRAP:  Yeah.
6                    MS. MOUSILLI:  We've known that for a
7    while.
8                    MS. GILSTRAP:  Okay.
9                    MS. MOUSILLI:  It's not news to anybody,
10   Lessie.
11                   MS. GILSTRAP:  Well, if you ask a better
12   question, I won't have to --
13                   Ms. MOUSILLI:  I'm not -- I don't really
14   care --
15                   MR. MOUSILLI:  We don't need your opinions.
16                   MS. GILSTRAP:  Well, I don't need both of
17   you --
18                   MR. MOUSILLI:  This is your opinion.  You
19   don't need anything.  You need to stop talking and let the
20   deposition continue.
21                   MS. GILSTRAP:  Are you taking the
22   deposition or is Lema?
23                   MR. MOUSILLI:  I'm here as attorney of
24   record.  You know that.
25                   MS. GILSTRAP:  Are you taking the
```

WYLIE 288

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    21

1   deposition?  Because only one --

2                   MR. MOUSILLI:  You're not asking questions

3   here.

4                   MS. GILSTRAP:  There is only one --

5                   MS. MOUSILLI:  You're out of line.

6                   MR. MOUSILLI:  You're not asking questions,

7   Lessie.

8                   MS. GILSTRAP:  There is only one attorney

9   who can ask questions.

10                  MR. MOUSILLI:  You're not asking questions,

11  correct.  She's asking the questions.

12                  MS. GILSTRAP:  Okay.  Well, why are you

13  talking?

14                  MR. MOUSILLI:  Because you're talking

15  unnecessarily.  Stop it.  Just stop it.

16                  MS. GILSTRAP:  I can talk in the

17  deposition.

18                  MS. MOUSILLI:  Okay. You know what, I'm

19  going to -- we're going to -- we're going to go off the

20  record, please.  Lessie, we're not doing this.

21                  THE VIDEOGRAPHER:  It's 9:25 a.m.

22                  (A recess was taken at 9:25 a.m. to

23  9:26 a.m.)

24  BY MS. MOUSILLI:

25          Q.    Okay.  Thank you.  Mr. McGinnis, I had

WYLIE 289

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    22

1    previously asked you what Ms. Donoho's relationship was to

2    Big Thirst Marketing?

3                    MS. GILSTRAP:  Objection, form.

4    BY MS. MOUSILLI:

5        Q.    Can you please go ahead and answer that

6    question?

7                    MS. GILSTRAP:  Objection, form.

8                    THE WITNESS:  Ms. Donoho was an hourly

9    contractor.

10   BY MS. MOUSILLI:

11       Q.    Did she have any other relationship to Big

12   Thirst Marketing besides being an hourly contract --

13   contractor?

14       A.    No.

15       Q.    Okay.  What is Big Thirst?

16                   MS. GILSTRAP:  Objection, form.

17                   THE WITNESS:  Are you asking me what is Big

18   Thirst, Incorporated; Big Thirst Marketing?

19   BY MS. MOUSILLI:

20       Q.    I understood -- I understand that there are

21   several entities with the name Big Thirst, correct?

22       A.    Correct.

23                   MS. GILSTRAP:  Objection, form.

24   BY MS. MOUSILLI:

25       Q.    So what are those entities?

WYLIE 290

1            MS. GILSTRAP:  Objection, form.

2            THE WITNESS:  Big Thirst Marketing, LLC, is

3    a marketing agency providing marketing services for

4    primarily beverage and alcohol companies.  Big Thirst,

5    Incorporated is a company providing e-commerce marketing

6    and consulting services to spirits brands.

7    BY MS. MOUSILLI:

8        Q.     Okay.  What kind of entity is Big Thirst

9    Marketing?

10       A.     It is an --

11           MS. GILSTRAP:  Objection, form.

12           THE WITNESS:  It is an LLC.

13   BY MS. MOUSILLI:

14       Q.     Who are the interest holders of Big Thirst

15   Marketing?

16           MS. GILSTRAP:  Objection, form.

17           THE WITNESS:  Big Thirst Marketing, LLC is

18   a sole proprietorship owned by me.

19   BY MS. MOUSILLI:

20       Q.     So it's an LLC.  Does anybody own any

21   shares in Big Thirst Marketing?

22           MS. GILSTRAP:  Objection, form.

23           THE WITNESS:  There are no shareholders at

24   Big Thirst Marketing, LLC.  It's a sole proprietorship.

25   BY MS. MOUSILLI:

WYLIE 291

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          24

1        Q.      Any members of the LLC besides you?
2        A.      There are no members of Big Thirst
3    Marketing, LLC.
4        Q.      What is your title at Big Thirst Marketing?
5        A.      My title at Big Thirst Marketing is
6    president.
7        Q.      Do you hold any other titles?
8                MS. GILSTRAP:  Objection, form.
9                THE WITNESS:  I have referred to myself as
10   founder of Big Thirst Marketing.  However, I mostly just
11   go by president.
12   BY MS. MOUSILLI:
13       Q.      When was Big Thirst Consulting created?
14       A.      Big Thirst Consulting was officially
15   incorporated as an LLC in 2020.
16       Q.      Who were the members of Big Thirst
17   Consulting?
18       A.      It is a partnership LLC with Joseph
19   Castillo, Mark Shilling, and me, Matt McGinnis.
20       Q.      And what is the purpose of Big Thirst
21   Consulting?
22               MS. GILSTRAP:  Objection, form.
23               THE WITNESS:  Big Thirst Consulting, LLC,
24   was formed and provided consulting services to help
25   distilleries get started, be in compliance, and expand

WYLIE 292

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          25

1    their market reach with sales enablement and distribution

2    management.

3    BY MS. MOUSILLI:

4         Q.     What is your title at Big Thirst

5    Consulting?

6         A.     My title at Big Thirst Consulting, LLC, was

7    partner.

8         Q.     What is Joseph Castillo's title at Big

9    Thirst Consulting?

10        A.     Joseph Castillo's title at Big Thirst

11   Consulting, LLC, was partner.

12        Q.     What about Mark Shilling, what -- what was

13   his title at Big Thirst Consulting?

14        A.     Mark Shilling's title at Big Thirst

15   Consulting, LLC, was partner.

16        Q.     Who, if anyone, held any membership units

17   at Big Thirst Consulting?

18        A.     The three partners each held an equal share

19   of 33 percent.

20        Q.     Okay.  Is Big Thirst Consulting still in

21   operation?

22        A.     Big Thirst Consulting, LLC, has ceased as

23   an operation and closed in December of 2023, with services

24   now being provided by Big Thirst, Incorporated.

25        Q.     Why did Big Thirst Consulting close?

WYLIE 293

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    26

1          A.      We chose to close Big Thirst Consulting,

2    LLC, for numerous reasons.  But the primary was

3    duplication of efforts between two companies.

4          Q.      Did the company officially wind down?

5                  MS. GILSTRAP:  Objection, form.

6                  THE WITNESS:  Big Thirst Consulting, LLC,

7    officially wound down and is not registered with the State

8    of Texas.

9    BY MS. MOUSILLI:

10         Q.      Did you do the winding -- winding up or did

11   your -- did you have attorneys do that process for you?

12                 MS. GILSTRAP:  Objection, form.

13                 THE WITNESS:  The company was wrapped up by

14   a -- a financial consultant.

15   BY MS. MOUSILLI:

16         Q.      Is Big Thirst Marketing still a viable

17   operation?

18                 MS. GILSTRAP:  Objection, form.

19                 THE WITNESS:  Yes.  Big Thirst Marketing is

20   still a viable operation, an operation providing services

21   to clients.

22   BY MS. MOUSILLI:

23         Q.      Okay.  Moving forward, when I say Big

24   Thirst in this deposition, can we agree that I'm referring

25   to Big Thirst, Inc.?

WYLIE 294

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    27

```
1          A.    Yes.

2          Q.    Okay.

3                MS. MOUSILLI:  Wait.  Can I get --

4    BY MS. MOUSILLI:

5          Q.    Mr. McGinnis, I'm going to be handing you

6    what's been marked as Exhibit No. 1.  You can take a look

7    at that.

8                (Exhibit 1 marked for identification.)

9                MS. GILSTRAP:  Wait.  I need a copy

10   before --

11               MS. MOUSILLI:  I'm giving you a copy.

12               MS. GILSTRAP:  Do you have staples or

13   anything keeping this --

14               MS. MOUSILLI:  No, I don't.

15   BY MS. MOUSILLI:

16         Q.    Mr. McGinnis, have you seen this document

17   before?

18         A.    Yes, I have.

19         Q.    Okay.  What is it?

20         A.    This is an amended initial disclosure of

21   Big Thirst, Inc. and Matt McGinnis.

22         Q.    Okay.  Very good.  So do you see (A) on

23   page 1, where it says:  The name, and if known, the

24   address and telephone number of each individual likely to

25   have discoverable information?
```

WYLIE 295

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          28

```
 1           A.      Yes, I do see that.
 2           Q.      You see that?
 3           A.      Uh-huh.
 4           Q.      Okay.  And your first response was Lauren
 5   Wylie Donoho, correct?
 6           A.      Correct.
 7           Q.      And your second response was
 8   representatives of Big Thirst, Inc., including but not
 9   limited to Matt McGinnis, Suzanne McGinnis, Mark Shilling,
10   Rich -- Rich Plakas and Keri Emerson, correct?
11           A.      Correct.
12           Q.      Okay.  Who is Suzanne McGinnis?
13           A.      Suzanne McGinnis is a director with Big
14   Thirst, Inc., and she's also my wife.
15           Q.      How long have you known her?
16           A.      I've known her for 26 years.
17           Q.      When did you first meet?
18           A.      We met in 1998 through work.
19           Q.      What were the circumstances when you first
20   met?
21           A.      She was an art director at an ad agency
22   assigned to my client -- or to me as my -- as a client.
23   She did the work for my account.
24           Q.      Have you worked with her prior to working
25   with her at Big Thirst?
```

WYLIE 296

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              29

```
1              A.     Yes, numerous times over the past 26 years.
2              Q.     Okay.  Can you tell me a little bit about
3       how -- those different companies that you worked with her
4       at?
5              A.     Yes.  Beginning in the late '90s, I was her
6       client.  She was at an ad agency and we worked together
7       closely on numerous ad campaigns and projects.  Following
8       that, when we moved to Texas in 2023, she started an
9       independent marketing agency and provided support for the
10      agency I worked for as an independent contractor to do
11      work for our clients.  Following that, she formed another
12      marketing company as a partnership.  And with that
13      partnership, they often called on me to work as a
14      consultant for marketing services.
15             Q.     Okay.
16             A.     Following that, she started a consumer
17      product goods company with one of the partners from the
18      marketing agency, and I've provided marketing services to
19      that.
20             Q.     Okay.  Who is Mark Shilling?
21             A.     Mark Shilling is the chief operating
22      officer of Big Thirst.
23             Q.     How long have you known him?
24             A.     I have know Mark Shilling for approximately
25      12 years.
```

WYLIE 297

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              30

```
1          Q.      When did you first meet?
2          A.      We met through the Wine & Food Foundation
3    of Texas in about 2010.
4          Q.      And what were the circumstances of when you
5    first met?
6          A.      Mark was on the board of the Wine & Food
7    Foundation and recruited me to the board, and he served as
8    president of that organization.
9          Q.      Have you worked with him prior to working
10   -- prior to him working at Big Thirst?
11         A.      Yes.
12         Q.      In what capacity?
13         A.      Mark has been a distillery consultant for a
14   number of years.  And in that capacity, he brought Big
15   Thirst Marketing in to help his clients; and vice versa,
16   Big Thirst Marketing hired Mark Shilling as a distillery
17   consultant for our clients.
18         Q.      When was Mark Shilling made chief operating
19   officer?
20         A.      In April of 2023.
21         Q.      What was his position prior to that?
22         A.      He was a director to -- for Big Thirst,
23   Inc., and he was also a partner in Big Thirst Consulting,
24   LLC.
25         Q.      When Mark Shilling first joined Big Thirst,
```

WYLIE 298

1    what was his role?

2            A.     His role was director.

3            Q.     And what did he do as a director?

4            A.     He provided -- Mark Shilling provided

5    counsel on industry matters, such as compliance,

6    distribution, retail.  He also provided his industry

7    expertise for connections to meet with various people in

8    the industry.

9            Q.     Who is Rich Plakas?

10           A.     Rich Plakas is a contractor for Big Thirst,

11   Inc.

12           Q.     What kind of contract work does he do for

13   Big Thirst, Inc.?

14           A.     Rich Plakas provides digital strategies,

15   including ad campaigns, website management, website

16   design, and e-commerce support.

17           Q.     How long have you known him?

18           A.     I've known Rich Plakas for approximately 12

19   years.

20           Q.     When did you first meet?

21           A.     Let me amend that answer.  I believe I met

22   Rich Plakas in 2012.  At the time, we were both freelance

23   writers.  He was a blogger under a blog, and I was a

24   blogger and freelance writer for several publications.  We

25   met through various media events and outings.

WYLIE 299

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    32

```
1           Q.     Okay.  What has Rich Plakas been contracted
2     to do for Big Thirst, Inc.?
3           A.     Rich Plakas is active in website design,
4     digital advertising, and e-commerce setup for various
5     clients.
6           Q.     Why was he listed here as a person that
7     might have information regarding this litigation in
8     Exhibit 1?
9           A.     Rich Plakas has intimate knowledge of the
10    technologies that we currently use with Big Thirst, Inc.
11    -- Incorporated.
12          Q.     Okay.  Tell me about that intimate
13    knowledge that he has.
14          A.     Rich Plakas is operating our website.  He's
15    operating e-commerce platforms for our clients, and he's
16    assisting with the processing of e-commerce purchases or
17    the setup of them.
18          Q.     Okay.  So how is he significant to this
19    lawsuit?
20          A.     Rich Plakas understands exactly what we do
21    now as opposed to what was done previous to Ms. Donoho
22    quitting her position.
23          Q.     And who is Keri Emerson?
24          A.     Keri Emerson is a full-time employee of Big
25    Thirst, Incorporated.
```

WYLIE 300

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    33

1          Q.      What kind of employee is she?  What does
2     she do?
3          A.      Keri Emerson is an account manager who
4     handles client relationships, onboarding of clients, as
5     well as the management of our data dashboard.
6          Q.      So Keri Emerson handles the data dashboard
7     for Big Thirst?
8          A.      Correct.
9          Q.      And how does she handle the data dashboard?
10         A.      Keri Emerson onboards new clients, sets
11    them up on the dashboard and makes necessary adjustments
12    to it ongoing on a day-to-day basis.
13         Q.      What is Keri Emerson's title?
14         A.      Keri Emerson is an account manager.
15         Q.      Does she receive a salary?
16         A.      Keri Emerson is a salaried employee.
17         Q.      What is her salary?
18         A.      I don't know the exact number, but I
19    believe it is in the neighborhood of $55,000 annually.
20         Q.      How long have you known Keri Emerson?
21         A.      I've known Keri for approximately six
22    years.
23         Q.      When did you first meet her?
24         A.      I first met Keri while she was the
25    direct-to-consumer manager and wine club manager at a

WYLIE 301

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    34

1    winery.

2          Q.    How was she recruited?

3          A.    Keri Emerson approached me in --

4    approximately in 2021 when she heard we were launching a

5    new company and asked if we needed help.  At the time, I

6    did not have a position available for her.

7          Q.    So when you had a position available, did

8    you reach out to her or did she reach out to you?

9          A.    I believe she had followed up with me very

10   soon before I needed a position, and then I replied to

11   her.  Keri Emerson and I had an ongoing dialogue on a

12   weekly basis because she was working at our client.

13         Q.    Okay.  So how long has she worked at Big

14   Thirst?

15         A.    She's worked at Big Thirst since May of

16   2023 -- excuse me, let me amend that -- May of 2022.

17         Q.    And how is Keri Emerson significant to this

18   litigation?

19         A.    Keri Emerson, as Rich Plakas, were both

20   involved in the original creation of our current data

21   dashboard, and Keri manages and maintains that data

22   dashboard on a daily basis.

23         Q.    So the fact that she now helps onboard

24   clients to the data dashboard, how is that related to this

25   litigation?

WYLIE 302

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    35

1          A.     She has direct knowledge of the changes

2     that we implemented with a completely new platform and how

3     we run that today in an absolutely different way than we

4     did previous to Ms. Donoho quitting.

5                 She, furthermore, was instrumental in

6     reconfiguring how we process orders and how we track

7     inventory and how we manage inventory flow, which was a

8     complete change from what was done previous.

9          Q.     Who is Edson Espindola?

10         A.     Edson Espindola is a contractor that we

11    hired through a staffing agency.

12         Q.     He was hired to work as a contractor for

13    Big Thirst, Inc.?

14         A.     Correct.

15         Q.     And again, when I say Big Thirst, I'm

16    referring to Big Thirst, Inc.  And so are you, correct?

17         A.     Yes.

18         Q.     Okay.  How long have you known Edson

19    Espindola?

20         A.     I met Edson Espindola, like, in June of

21    2022 and had never met him prior.

22         Q.     And what was he hired to do as a contractor

23    for Big Thirst?

24         A.     We contracted Edson Espindola to identify

25    technologies, to create a new data dashboard, to build

WYLIE 303

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              36

1    that data dashboard and to deliver a working dashboard for
2    us to build upon.
3         Q.    Okay.  When was he hired as a contractor to
4    build a data dashboard for Big Thirst, Inc.?
5         A.    I believe the account was signed on July
6    1st, 2022.
7         Q.    When you say the account was signed, what
8    does that mean?
9         A.    Meaning we signed a contract with the
10   staffing agency.
11        Q.    Okay.  So when did he begin work to build a
12   data dashboard for Big Thirst?
13        A.    In July '22.
14        Q.    When did his work end?
15        A.    For that project, it ended in the end of
16   September 2022.
17        Q.    Is he still a contractor for Big Thirst?
18        A.    He is not currently engaged with Big
19   Thirst.
20        Q.    Was that his only project, to build a data
21   dashboard for Big Thirst?
22        A.    He completed one additional project after
23   that.
24        Q.    And what was that project?
25        A.    He built an online store for Big Thirst.

WYLIE 304

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    37

1        Q.     What kind of online store did he build?

2        A.     It is a store where all of our clients'

3   products are available for purchase online.

4        Q.     Was it similar to the website and online

5   store that Ms. Donoho had previously built for Big Thirst?

6        A.     We did not use the template, the theme, the

7   direction, the colors, the font, the wording, or any other

8   aspects of what Ms. Donoho had started as an initial

9   placeholder for a store.  It was completely disregarded

10  and built a fresh new one.

11       Q.     Starting on what date?

12       A.     I believe we started that project in

13  November 2022 and completed it in December 2022.

14       Q.     When you say that project, are you

15  referring to the online store that --

16       A.     His contract --

17       Q.     I'm sorry.  Okay.  When you say -- okay.

18  So Edson Espindola was contracted by Big Thirst, Inc. to

19  build an online store for Big Thirst, correct?

20       A.     Correct.

21       Q.     And when did that work begin?

22       A.     I believe that was November of 2022.

23       Q.     And when did that work end?

24       A.     In December of 2022.

25       Q.     So as I understand what you said, is that

WYLIE 305

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    38

1  Edson Espindola no longer is a contractor for Big Thirst,

2  Inc., correct?

3          A.      We do not have a contractor currently.

4          Q.      Who is Joseph Castillo?

5          A.      Joseph Castillo was a partner in Big Thirst

6  Consulting, LLC.

7          Q.      What was his role at Big Thirst?

8          A.      Joseph Castillo has no role at Big Thirst.

9          Q.      How long have you known Joseph Castillo?

10         A.      I met Joseph Castillo in 2015.

11         Q.      What were the circumstances of meeting him

12  then?

13         A.      Joseph Castillo was the vice president of

14  sales at one of our distillery clients.

15         Q.      How is Joseph Castillo significant to this

16  litigation?

17         A.      Joseph Castillo was involved in the early

18  ideation for the formation of Big Thirst.

19         Q.      And why is he significant to this

20  litigation?

21                 MS. GILSTRAP:  Objection, form.

22                 THE WITNESS:  Would you mind restating your

23  question?

24  BY MS. MOUSILLI:

25         Q.      Sure.  Why is Joseph Castillo significant

WYLIE 306

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          39

1    to this litigation?

2                MS. GILSTRAP:  Objection, form.

3                THE WITNESS:  Joseph Castillo has intimate

4    knowledge of how we went about doing our research, the

5    information that we felt was relevant, the competitive

6    analysis that we conducted, and the timing of when we

7    began preparing our thought process for how we would build

8    this company well in advance of ever discussing it with

9    Lauren Wylie Donoho.

10   BY MS. MOUSILLI:

11        Q.    So if Joseph Castillo was called as a

12   witness in this case what, what do you think he will

13   testify to?

14                MS. GILSTRAP:  Objection, form.

15                THE WITNESS:  I cannot speculate on what he

16   would testify to.

17   BY MS. MOUSILLI:

18        Q.    What would you want him to testify to?

19                MS. GILSTRAP:  Objection, form.

20                THE WITNESS:  I would expect that Joseph

21   Castillo would provide relevant information based on his

22   working with me and with Mark Shilling on crafting the

23   concept for Big Thirst, Inc., and the work that we did for

24   competitive analysis, understanding the industry,

25   understanding the compliance issues, understanding

WYLIE 307

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    40

1    distribution channels, understanding retailers, all of the

2    necessary fundamentals that went into place well before we

3    talked about the technical aspects of it.

4    BY MS. MOUSILLI:

5          Q.    Going back to Exhibit 1 on page 3, do you

6    see where it says (C):  A computation of each category of

7    damages claimed by the disclosing party, who must also

8    make available for inspection and copying as under Rule 34

9    the documents -- do you see what -- Section C?

10         A.    I do.

11         Q.    Okay.  Do you see underneath it, there's a

12   response?

13         A.    I see the response.

14         Q.    Okay.  Can you go ahead and read that

15   response for me?

16         A.    Big Thirst seeks damages of $41,593.39

17   arising from Donoho's breach of her fiduciary duties to

18   Big Thirst.  Documentation of these damages has been

19   previously produced as a filed exhibit.  Big Thirst and

20   McGinnis also seek to recover their attorneys' fees and

21   costs to the extent permitted by law.  Documentation of

22   attorneys' fees has been produced as part of the discovery

23   in this case.

24         Q.    So you understand that you filed a lawsuit

25   against Ms. Donoho?

WYLIE 308

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    41

```
1              A.    Correct.
2              Q.    And your claim against Ms. Donoho is for
3    breach of fiduciary duty, correct?
4              A.    Correct.
5              Q.    Okay.  And you have no other claim besides
6    breach of fiduciary duty, correct?
7              A.    Correct.
8              Q.    And do you understand that attorney fees
9    aren't allowed as damages for breach of fiduciary duty?
10             MS. GILSTRAP:  Objection, form.
11             THE WITNESS:  I go by the advice of my
12   counsel.
13   BY MS. MOUSILLI:
14             Q.    Okay.  But to your knowledge, are
15   attorney's fees allowed for a breach of fiduciary claim?
16             A.    I'm not aware of the legal aspects of that.
17             Q.    You might want to discuss that with your
18   attorney.
19             MS. GILSTRAP:  I object to the sidebar.
20   BY MS. MOUSILLI:
21             Q.    So were you involved in counseling --
22             MS. GILSTRAP:  Since we've already brought
23   in attorney's fees for this case.
24   BY MS. MOUSILLI:
25             Q.    Were you involved in calculating damages
```

WYLIE 309

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    42

```
1    for this --
2           A.     Correct, yes.  We've prepared a spreadsheet
3    and attached receipts to each one.
4           Q.     How did you arrive to this number?
5           A.     We prepared a spreadsheet and attached
6    receipts to each line item.
7           Q.     Well, walk me through how you arrived to
8    that number, based on -- based on that.
9                  MS. GILSTRAP:  Objection, form.
10                 THE WITNESS:  We arrived at that number
11   based on adding up all receipts for engineering time, time
12   that contractors spent on it, and software costs.
13   BY MS. MOUSILLI:
14          Q.     Okay.  Let's break it down.  When you say
15   engineering time, what do you mean by engineering time?
16          A.     Do you have the spreadsheet available for
17   me to review?
18          Q.     I don't.
19          A.     Okay.
20          Q.     But if you can just -- and I'm not asking
21   for specific numbers.  I recognize you don't have the
22   document in front of you, but if you can just give me like
23   a ballpark figure how you arrived at these numbers.
24          A.     We arrived at those numbers using the
25   receipts produced by the contractor's agency, TopTal, as
```

WYLIE 310

1    well as the timesheets submitted by the other contractor,

2    Rich Plakas, as well as the hard costs of software

3    purchased.

4            Q.    What did those numbers represent?

5                  MS. GILSTRAP:  Objection, form.

6                  THE WITNESS:  The numbers represent the

7    cost of building a new data dashboard that was required to

8    continue to provide the data analytics promised to our

9    clients that I could no longer provide because there was a

10   DMCA takedown issued by Ms. Donoho, which precluded the

11   use of our prior dashboard.

12   BY MS. MOUSILLI:

13           Q.    Okay.  So this number, $41,593, you're

14   telling me this is the figure for rebuilding a new data

15   dashboard?

16           A.    Correct.

17           Q.    Okay.

18           A.    We were able to build a new data dashboard

19   at a lower cost than the previous one with using far less

20   complexity and far -- fewer moving parts so it is more

21   usable for our clients and easier to maintain by our

22   staff.

23           Q.    What is the cost of the previous one?

24           A.    The -- I do not have those numbers in front

25   of me, but the monthly fees added up to considerably more

WYLIE 311

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    44

1    than the cost of this one.

2          Q.    Okay.  When you say the previous one, are

3    you referring to the data dashboard that Ms. Donoho built?

4          A.    The tech stack that Ms. Donoho stitched

5    together, is how she referred to it, is the one I'm

6    referring to.

7          Q.    Okay.  So you're saying the data dashboard

8    that Ms. Donoho built was more expensive than the one that

9    you had it replaced by, correct?

10               MS. GILSTRAP:  Objection, form.

11               THE WITNESS:  That is correct.  The monthly

12   cost of that data dashboard that Ms. Donoho stitched

13   together, using more parts than needed and more complexity

14   than needed, was more expensive than what we currently

15   have.

16               MS. MOUSILLI:  And I'm going to object as

17   nonresponsive to everything after, That is correct.

18   BY MS. MOUSILLI:

19         Q.    Who is it, did you say, that built this new

20   data dashboard?

21         A.    The new data dashboard, the framework and

22   core functionality was built by Edson Espindola.

23         Q.    Was Edson Espindola compensated for this

24   tech stack that he built?

25         A.    Correct.  Edson Espindola was paid for by a

WYLIE 312

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          45

1    staffing agency called TopTal.

2            Q.    Okay.  So Edson Espindola was paid for the

3    tech stack that he built, yet Ms. Lauren Donoho wasn't,

4    correct?

5                    MS. GILSTRAP:  Objection, form.

6                    THE WITNESS:  Ms. Donoho was compensated by

7    given the title of cofounder, chief operating officer, an

8    officer of a company, director in the company, and she was

9    compensated richly with 2,700,000 shares in the company.

10   BY MS. MOUSILLI:

11           Q.    But not a single penny went to her pocket,

12   did it?

13           A.    Ms. Donoho --

14                   MS. GILSTRAP:  Just hold on.  Let me

15   object.  Objection, form.

16                   THE WITNESS:  Ms. Donoho was set to receive

17   cash compensation two days before she held our funding

18   hostage -- two days after, pardon me.

19   BY MS. MOUSILLI:

20           Q.    That's pretty convenient.  Okay.  Who

21   was --

22                   MS. GILSTRAP:  Object to the --

23                   (Crosstalk between parties.)

24                   MS. MOUSILLI:  That's not a proper

25   objection.

WYLIE 313

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    46

```
 1                    MS. GILSTRAP:  Object to the sidebar.  You
 2    said it all day yesterday.
 3                    MS. MOUSILLI:  No, I never said those
 4    words.
 5                    MS. GILSTRAP:  Yes, you did.
 6                    MS. MOUSILLI:  Lessie, I'm not going to let
 7    you take over my deposition.
 8                    MS. GILSTRAP:  I object -- I can --
 9                    (Crosstalk between parties.)
10    BY MS. MOUSILLI:
11          Q.    What is -- what is Hajjar Peters?
12          A.    Hajjar Peters, LLP, is a law firm.
13          Q.    And how did you learn about them?
14          A.    I began working with Hajjar Peters, LLP,
15    first through filing a trademark when I changed the name
16    of my marketing agency to Big Thirst Marketing, LLC.
17          Q.    Okay.  They did trademark work for you?
18          A.    They did.  Hajjar Peters, LLP is known for
19    its work in corporate counsel for food and beverage
20    companies.  I was referred to them by many people.
21          Q.    When did you decide to hire them?
22          A.    I believe that I hired them in -- at the
23    beginning of 2020.
24          Q.    And you hired them for Big Thirst
25    Marketing, correct?
```

WYLIE 314

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    47

1        A.      Correct.
2        Q.      When did you hire them to do any services
3   for Big Thirst, Inc.?
4        A.      My first conversations with Hajjar Peters,
5   LLP for Big Thirst, Inc., I believe were in January of
6   2021.
7        Q.      In January 2021 you engaged the services of
8   Hajjar Peters for Big Thirst, Inc.?
9        A.      Correct.
10       Q.      What services did they provide for Big
11  Thirst, Inc.?
12       A.      Initially, Hajjar Peters provided services
13  to help set up -- set up the corporation and then to set
14  up the bylaws, to set up the -- all corporate documents
15  for the company.
16       Q.      Hajjar Peters initially represented Big
17  Thirst in the instant litigation, correct?
18       A.      Correct.
19       Q.      Do they still represent Big Thirst?
20       A.      They do not.
21       Q.      Why not?
22              MS. GILSTRAP:  Objection, form.  I'm going
23  to instruct you not to answer the question on the basis of
24  attorney-client privilege.
25  BY MS. MOUSILLI:

WYLIE 315

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              48

1          Q.     Did you fire Hajjar Peters?

2                 MS. GILSTRAP:  Objection, form.

3                 THE WITNESS:  I did not fire Hajjar Peters.

4     BY MS. MOUSILLI:

5          Q.     Does Hajjar Peters still represent Big

6     Thirst in corporate matters?

7          A.     We do not have -- currently have any

8     business with Hajjar Peters.

9          Q.     Why do you no longer have business with

10    Hajjar Peters?

11         A.     We are actively working with a different

12    law firm at this time.

13         Q.     What law firm are you working with now?

14         A.     With Gilstrap Law.

15         Q.     Is Gilstrap Law doing your corporate work?

16         A.     No.  We are not currently doing any

17    corporate law.  Our litigation fees outstrip the ability

18    to hire any other attorneys for any other matters at this

19    time.

20         Q.     So on what matters is Gilstrap Law

21    representing you individually?

22         A.     Gilstrap Law is representing me in

23    litigation with Ms. Lauren Wylie Donoho.

24         Q.     What litigation is Gilstrap Law

25    representing Big Thirst in besides this litigation?

WYLIE 316

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              49

```
1              A.      That's all.
2              Q.      So if I understand correctly, Gilstrap Law
3     is not representing you or Big Thirst in any capacity
4     besides this instant litigation, correct?
5              A.      That is correct.
6              Q.      What was the initial organization structure
7     of Big Thirst?
8              A.      Big Thirst is a C-corporation filed in the
9     State of Delaware.
10             Q.      When was it formed?
11             A.      March 8th, 2021.
12             Q.      Who was involved in the formation of Big
13    Thirst?
14             A.      Kareem Hajjar from Hajjar Peters and me.
15             Q.      Was there anyone else?
16             A.      I do not know if anyone else within the law
17    firm worked on it.
18             Q.      No, but outside of the law firm and besides
19    yourself, was anyone else involved in the formation of Big
20    Thirst?
21             A.      No.
22             Q.      Who was involved in the decisions regarding
23    coordination and structure of Big Thirst?
24             A.      The initial formation was done by me.
25             Q.      Why was Big Thirst incorporated in
```

WYLIE 317

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    50

1    Delaware?

2          A.      I was instructed by counsel to do that.

3          Q.      Were any shares created at that time?

4          A.      Yes.  There were 1,000 shares issued at

5    that time.

6          Q.      Who was involved in that determination?

7          A.      That was the advice of Hajjar Peters to

8    incorporate it as a sole proprietorship for -- because we

9    had not yet worked out a full ownership structure,

10   corporate structure, or any other aspects.  And for

11   expediency of filing, for expediency of looking to go get

12   funding, it was their recommendation that we file as a

13   sole proprietorship for a lower cost and amend it at a

14   later date once we worked out the structure, which we did.

15         Q.      How was the organization -- organization

16   structured as far as the division of interest?

17         A.      At that time, initially, it was a sole

18   proprietorship.

19         Q.      What do you mean by a sole proprietorship?

20         A.      I was listed as the sole owner and

21   shareholder.

22         Q.      How many people initially worked for Big

23   Thirst?

24         A.      Lauren Wylie Donoho and I were the primary

25   people organizing and running the organization with input

WYLIE 318

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    51

1    from Mark Shilling and Joseph Castillo, and a lot of work

2    from Suzanne McGinnis.

3           Q.     So what was Lauren Donoho's role at Big

4    Thirst initially?

5           A.     She was the chief operating officer and was

6    responsible for developing the tech stack.

7           Q.     What other responsibilities did Lauren

8    Donoho have?

9           A.     In what timeframe?

10          Q.     Initially when Big Thirst was formed.

11          A.     She started by identifying technologies to

12   use for processing e-commerce orders.  She then moved on

13   to working on developing a data dashboard and then helped

14   with the creation of the website.

15          Q.     Anything else?

16          A.     Those were her initial responsibilities

17   until the launch of the company in October of 2021.

18          Q.     What was your role at Big Thirst when it

19   was initially created?

20          A.     My role was to develop the business plan,

21   the strategy of a financial plan, the direction for the

22   company, identify routes to market, identify potential

23   clients, identify partners for distribution, retail

24   fulfillment, and to determine the corporate structure.

25          Q.     What was your title?

WYLIE 319

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    52

1          A.     Chief operating officer.

2          Q.     Besides you and Lauren, were there any

3    other individuals who worked for Big Thirst when it was

4    initially formed?

5          A.     All people who worked for Big Thirst, when

6    it was initially formed, worked for compensation of

7    shares, including Suzanne McGinnis who provided time for

8    graphic design and creative direction.

9          Q.     Were there any employees at that time?

10         A.     There were no employees at that time.

11         Q.     What was the original agreement for

12   percentage split in Big Thirst?

13         A.     The agreement that we arrived at was for me

14   to receive 3,300,000 shares, Ms. Donoho to receive

15   2,700,000 shares, Mark Shilling to receive 1,000 shares

16   and Suzanne McGinnis to receive 1,000 shares.

17         Q.     When you say we agreed to this, who is we?

18         A.     Ms. Donoho, Mark Shilling, Suzanne McGinnis

19   and me.

20         Q.     And how was that agreement reached?

21         A.     The agreement was reached in numerous

22   conversations, as well as meetings with our corporate

23   attorney, Hajjar Peters.

24         Q.     The business was formed on March 8th, 2021,

25   correct?

WYLIE 320

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                53

1        A.     Correct.

2        Q.     When was the first time you met with Kareem

3   Hajjar to begin that process of forming Big Thirst, Inc.?

4        A.     I believe we had an initial call in

5   January, and then we had our first meeting to discuss

6   corporate structure and how to form it and how to get a

7   registered agent in late February.  The registered agent

8   was secured on March 2nd, 2021.  From there, the corporate

9   papers were filed and the incorporation was on March 8th.

10       Q.     Okay.  Prior to forming Big Thirst, Inc.,

11   did you have discussions with Lauren Donoho about the

12   creation of the entity?

13       A.     The first documentation I could find with

14   anything written was on January 12th, 2021.

15       Q.     That's not what I asked you, Mr. McGinnis.

16   I asked you:  Did you have discussions with Lauren Donoho

17   prior to creation -- creating Big Thirst, Inc.?

18       A.     Yes.  I had discussed starting a new

19   company.

20       Q.     When was the first date of those

21   discussions?

22       A.     The first evidence I can find of any

23   discussion was in January 2021.

24       Q.     Again, that's not what I asked you.  I'm

25   not asking you about evidence of discussions.  When did

WYLIE 321

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                54

```
1    you first discuss with Ms. Lauren Donoho about creating an

2    entity called Big Thirst, Inc.?

3           A.    To my knowledge, it was at the very end of

4    December 2020 or the beginning of January 2021.

5           Q.    So maybe November of 2020 or December of

6    2020?

7           A.    It's --

8                 MS. GILSTRAP:  Objection, form.

9                 THE WITNESS:  My recollection was that it

10   was January 2021, but it's possible it was late December

11   2020.

12   BY MS. MOUSILLI:

13          Q.    And what was the substance of those

14   conversations between you and Ms. Lauren Donoho about

15   forming the company?

16          A.    That the -- the nature of the discussion

17   was that we had been planning to launch an e-commerce

18   platform.  When I told her of it, I asked if she would be

19   interested in creating a website for it.  And she said, I

20   think I could do more than just that.  And I said, I don't

21   have money to start this company or bootstrapping.  And

22   she suggested that she could work for shares.  That was

23   the initial conversation.

24          Q.    What conversations were had between you and

25   Ms. Donoho prior to you forming the company about
```

WYLIE 322

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                55

1    partnership and the entity?

2          A.    Once we had conversations about her

3    potentially getting shares in exchange for work to develop

4    the website and any other aspects, then we broached the

5    topic of her being called a cofounder.

6          Q.    What promises did you make to Ms. Donoho

7    regarding shares in the company?

8          A.    There were no hard discussions of shares

9    until May of 2021, when she broached the subject of

10   wanting 50 percent.  And she sent me an article to

11   initiate that conversation.  In that article was a

12   founder's perspective of recommending a 50-percent split

13   between cofounders.

14         Q.    Okay.  Let's go back -- we're -- so we're

15   talking -- I'm going to ask you about prior to March 8th,

16   prior to incorporating Big Thirst.  You and Lauren Donoho

17   had conversations about creating a company, right?

18         A.    Correct.

19         Q.    What conversations were had regarding

20   shares that Ms. Donoho would be given of the entity?

21         A.    They were very vague conversations that she

22   would be compensated with shares.  We did not know the

23   number of shares.  We did not know how that would work

24   out.

25         Q.    Did you guys discuss being cofounders?

WYLIE 323

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          56

1          A.     We discussed being cofounders.

2          Q.     Did you guys discuss being partners?

3          A.     No.

4          Q.     Did you discuss giving her an equal say

5     into the company?

6          A.     No.

7          Q.     Did you ever mention to Lauren Donoho that

8     this was a joint project between you and her?

9          A.     No.

10         Q.     What representations were made by you about

11    the kind of input that Ms. Donoho would have in this

12    entity?

13         A.     Our discussions reflected that I hoped that

14    she would be instrumental in creating the website and

15    associated technologies.  And her role would be similar to

16    her role at Big Thirst Marketing where she was providing

17    technical support.

18         Q.     Have you heard Ms. Donoho say that she was

19    expecting to be an equal partner with you?

20         A.     In May of 2021, she sent me an article

21    about a founder recommending the 50/50 split.  That's the

22    first time that had been broached.

23         Q.     So if Ms. Donoho says that she had

24    conversations with you as early as late 2020 about being

25    an equal partner with you in Big Thirst, what is she

WYLIE 324

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              57

1    attributing that to?

2                    MS. GILSTRAP:  Objection, form.

3                    THE WITNESS:  I cannot speculate on how she

4    would make that decision.

5    BY MS. MOUSILLI:

6         Q.    What representations were made to

7    Ms. Donoho regarding compensation?

8         A.    We discussed that she would be compensated

9    with shares in this new company, the details of which were

10   not worked out.

11        Q.    What are your obligations and

12   responsibilities with respect to the operation of Big

13   Thirst?

14        A.    As the chief operating officer for Big

15   Thirst, I am the primary decision-maker and I work with a

16   board of directors and an advisory board for input and

17   guidance and assistance in decision-making.

18        Q.    When Ms. Donoho was a part of Big Thirst,

19   what were her obligations to the operations of Big Thirst?

20        A.    Her primary obligations were -- as the

21   chief operating officer, were to set up the operations and

22   primarily the technical -- technical aspects.

23        Q.    Who handled hiring vendors at Big Thirst

24   when Ms. Donoho was a part of Big Thirst?

25        A.    It depended on the type of vendor.

WYLIE 325

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          58

1   Ms. Donoho signed the licensing agreements for software on

2   behalf of Big Thirst for things like Panoply, signing them

3   as a founder of Big Thirst.

4          Q.     Okay.  When Ms. Donoho was a part of Big

5   Thirst, who was responsible for hiring employees?

6          A.     We did not hire any employees until

7   Ms. Donoho quit.

8          Q.     And after Ms. Donoho quit, who was

9   responsible for hiring employees at Big Thirst?

10         A.     I conducted all interviews, preliminary

11  interviews, and we had a slate of candidates ready to go

12  upon signing and closing on our SBA loan on March 17th,

13  2022.  I had conducted all interviews, with questionnaires

14  provided to Ms. Donoho, who was given input to help make

15  those selections.  Following her departure, I made all

16  decisions for hiring with input from my board members.

17         Q.     Let's go back to the relationship with you

18  and Ms. Donoho.  Who approached who about this concept

19  about Big Thirst?

20         A.     I approached Ms. Donoho and asked if she

21  would be willing to help us build a website for it.

22         Q.     When did this occur?

23         A.     As stated previously, I believe it was in

24  January 2021.  However, it's possible it was in late

25  December 2020.

WYLIE 326

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          59

1          Q.     Why did you approach Ms. Donoho about this

2    matter?

3          A.     I had a good working relationship with

4    Ms. Donoho over a number of years, going back to December

5    of 2016.  I valued her work.  I valued her input, and I

6    valued her experience in the aspects of website design.

7          Q.     So earlier you mentioned that Ms. Donoho

8    said, No, I don't want to work as a contractor; I'd rather

9    get shares in this company.  Correct?

10         A.     Correct.

11         Q.     Okay.  Tell me more about that

12   conversation.

13         A.     As this was two and a half years ago, I

14   don't remember the specifics of a phone call.  I remember

15   feeling excited by the opportunity that, one, I would

16   continue working with somebody I trusted and thought did

17   good work; two, that we could share in the sweat equity

18   for shares and the promise of the future of growing

19   something valuable, and left with that feeling optimistic

20   that we could be starting on a good path.

21         Q.     So when Ms. Donoho asked for shares in

22   exchange for sweat equity, what did you say?

23         A.     I believe I agreed to it.  But at the time,

24   there was no discussion of numbers of shares.  And in

25   fact, I know that that was not discussed because that is

WYLIE 327

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                          60

1    the entire reason why I was counseled by my attorney,

2    Hajjar Peters, to file as a sole proprietorship because at

3    the time we had not worked on any share or equity

4    corporate responsibilities between other interested

5    parties, including Suzanne McGinnis, Joseph Castillo, Mark

6    Shilling and Lauren Wylie Donoho.

7          Q.    Did you ever represent to Lauren Donoho

8    that you would -- you and her would incorporate the entity

9    together?

10         A.    I do not believe so.  At the time, there

11   was also considerable discussion of whether it would be an

12   LLC, a part of one of the existing Big Thirst entities or

13   a new standalone company.

14         Q.    Did you ever discuss with Ms. Donoho about

15   creating the entity together?

16         A.    I did not.

17               UNIDENTIFIED SPEAKER:  Would it be possible

18   to take a break?

19               MS. MOUSILLI:  Certainly.

20               THE VIDEOGRAPHER:  We're off the record at

21   10:15 a.m.

22               (A recess was taken at 10:15 a.m. to

23   10:26 a.m.)

24               THE VIDEOGRAPHER:  We're back on the record

25   at 10:26 a.m.)

WYLIE 328

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          61

1    BY MS. MOUSILLI:

2         Q.    Mr. McGinnis, we're back on the record, but

3    you're still under oath.

4         A.    Correct.

5         Q.    Do you understand that?

6         A.    Yes.

7         Q.    Okay.  Prior to the break, we were talking

8    about the conversations you were having with Ms. Donoho

9    prior to incorporating Big Thirst?

10        A.    Correct.

11        Q.    And you and her talked about her building

12   tech stacks and technology for the company, correct?

13        A.    Correct.

14        Q.    And in exchange, you would compensate her

15   for her work?

16        A.    Correct.

17        Q.    And how would you compensate her?

18        A.    With shares in the company.

19        Q.    Did you ever talk to Ms. Donoho about

20   creating the entity together?

21        A.    We did not, at that point, talk about

22   creating the entity together.  I did make it clear that I

23   -- it would be built -- predicated on all of the work done

24   in my previous companies, and then I would hold the

25   control and interest in the company.

WYLIE 329

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    62

```
 1            Q.     Let me hand you what's been marked as
 2      Exhibit 2.
 3                   (Exhibit 2 marked for identification.)
 4      BY MS. MOUSILLI:
 5            Q.     Do you recognize Exhibit 2?
 6            A.     (No response.)
 7            Q.     Mr. McGinnis, I asked if you recognize
 8      Exhibit 2?
 9            A.     I'm reading this document.  I believe this
10      is the original request for a temporary and permanent
11      injunction.
12            Q.     And who made this request?
13            A.     This was requested through my attorney by
14      me.
15            Q.     On behalf of Big Thirst?
16            A.     On behalf of Big Thirst.
17            Q.     If you flip through to your affidavit, it's
18      marked as Exhibit A to the original petition.  Do you see
19      that?
20            A.     And would you mind telling me which page
21      number?
22            Q.     It's marked as Page No. 4.  It's after 11
23      pages of your original petition.
24            A.     Okay.
25            Q.     Do you see it?
```

WYLIE 330

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          63

1          A.     Yes.

2          Q.     Okay.  Great.  Can you read for me

3   paragraph 4?

4          A.     Yes.  Paragraph -- paragraph 4:  I

5   incorporated Big Thirst, Inc. in March 2021.  Soon after

6   this, I called Donoho to tell her about the venture, and

7   asked if she would be interested in providing contractor

8   services for web design and other technical aspects,

9   especially developing a data dashboard that would be the

10  main component of Big Thirst, Inc.  The customers would

11  use this dashboard for their marketing, for their sales,

12  and for their analysis.  Essentially, use of the data

13  dashboard is what would be sold to customers and what

14  differentiates Big Thirst, Inc. for its -- from its

15  competitors.

16         Q.     Okay.  And this affidavit was your sworn

17  affidavit, correct?

18         A.     Correct.

19         Q.     Okay.  So how do you reconcile what you

20  just read with what you told me previously?

21         A.     In what regard?

22         Q.     Here you're saying you incorporated Big

23  Thirst, and then afterwards you talked to Ms. Donoho,

24  correct, in this affidavit?

25         A.     Correct.

WYLIE 331

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    64

1          Q.     And previously you told me you talked to

2    Ms. Donoho before incorporating Big Thirst, correct?

3          A.     Correct.

4          Q.     Which one is correct?

5          A.     Following the affidavit, I was able to more

6    thoroughly review -- forced into it actually by the

7    cross-examination -- and found evidence that there was

8    discussion in January.

9          Q.     So your affidavit was incorrect?

10         A.     I believe the date in this is incorrect.

11         Q.     Did you ever take steps to correct your

12   affidavit?

13         A.     I have not taken steps to correct this

14   affidavit.

15         Q.     Well, it's been over two and a half years,

16   correct?

17         A.     It has been two years.

18         Q.     So it's been two years since you misstated

19   facts in your affidavit and you did nothing to correct it;

20   is that true?

21               MS. GILSTRAP:  Objection, form.

22               THE WITNESS:  I have not revisited this

23   document and was unaware of that inaccuracy.

24   BY MS. MOUSILLI:

25         Q.     That wasn't my question, Mr. McGinnis.

WYLIE 332

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                         65

```
 1   Despite the fact that it's been two years and you have a
 2   wrong affidavit with false information, and you never
 3   corrected it, did you?
 4                   MS. GILSTRAP:  Objection, form.
 5                   THE WITNESS:  I was unaware there was a
 6   need to correct anything.
 7   BY MS. MOUSILLI:
 8        Q.    And you didn't correct it; is that right?
 9                   MS. GILSTRAP:  Objection, form.
10                   THE WITNESS:  I have not corrected this.
11   BY MS. MOUSILLI:
12        Q.    Thank you.  Mr. McGinnis, I'm now handing
13   you what's going to be marked as Exhibit 3.
14                   (Exhibit 3 marked for identification.)
15   BY MS. MOUSILLI:
16        Q.    Do you recognize this document,
17   Mr. McGinnis?
18        A.    This is an email exchange.
19        Q.    Between who?
20        A.    This is an email exchange between Lauren
21   Wylie and me.
22        Q.    What is the date of this email exchange?
23        A.    February 26, 2021.
24        Q.    Can you read from the top -- it looks like
25   it's an email that you sent to Lauren Donoho.  Can you
```

WYLIE 333

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    66

1   read from the top where it says, Hey, Wylie?

2          A.     I am responding to the email below, in --

3   in which she says she found a Shopify app-building

4   agency --

5          Q.     I'm sorry.  Mr. McGinnis, that wasn't my

6   question.  Can you please start reading where it says,

7   Hey, Wylie, on Exhibit 3?

8          A.     Hey, Wylie, that's a great idea to explore

9   with another source.  Let's hold off just a bit before we

10  engage them.  I want to get things buttoned down a bit

11  more.  I have another meeting with the attorney on

12  Tuesday, and we'll get some guidance on how we incorporate

13  and a timeline for that.  Once I have that nailed down, I

14  can apply for the loan.  Then we'll have a better idea of

15  timing and when we can actually start to get things

16  rolling.

17         Q.     So it says here, We'll get some guidance on

18  how we incorporate, correct?

19         A.     (No response.)

20         Q.     Does it say on how we incorporate,

21  Mr. McGinnis?

22         A.     It does.  However, we does not define --

23         Q.     I'm sorry.  That wasn't --

24         A.     -- anybody other -- we could be a royal we,

25  we could be my other partners.  It does not say with you,

WYLIE 334

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    67

1    Wylie Donoho.

2           Q.     All right.  But you're responding to

3    Ms. Lauren Donoho and you've talked about creating an

4    entity together.  And here it says, We'll get some

5    guidance on how we incorporate and a timeline for that.

6    It says that, correct, Mr. McGinnis?

7           A.     I believe that we refers to --

8           Q.     I'm sorry.

9           A.     -- determining and to --

10          MS. GILSTRAP:  Just answer her question.

11   BY MS. MOUSILLI:

12          Q.     Please answer my question.

13          A.     It does say we.

14          MS. MOUSILLI:  Okay.  If I can object as

15   nonresponsive.

16   BY MS. MOUSILLI:

17          Q.     I'm going to ask the question again.  Here

18   in this email, where you're writing back to Ms. Lauren

19   Donoho, you say:  And we'll get some guidance on how we

20   incorporate it and a timeline for that, correct?

21          A.     That is what it says.

22          Q.     Okay.  And who was the we that you referred

23   to here?

24          A.     I believe I was referring to the attorney.

25          Q.     Is that how Ms. Donoho interpreted it, do

WYLIE 335

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    68

1    you think?

2                  MS. GILSTRAP:  Objection, form.

3                  THE WITNESS:  I can't speculate on what she

4    believes.

5    BY MS. MOUSILLI:

6         Q.    Okay.  But you previously talked about

7    incorporating -- creating a business trip together,

8    correct?

9         A.    (Nonverbal response.)

10        Q.    Is that a yes?

11                 MS. GILSTRAP:  Objection, form.

12                 THE WITNESS:  I do believe we discussed it,

13   as I had with my other partners.

14   BY MS. MOUSILLI:

15        Q.    Was Ms. Donoho ever a contractor for Big

16   Thirst, Inc.?

17        A.    Ms. Donoho paid herself as a contractor

18   once.

19        Q.    How did Ms. Donoho pay for her -- herself

20   as a contractor for the Big Thirst, Inc.?

21        A.    Ms. Donoho chose to issue a paycheck to

22   herself for contract work, although that's not the

23   agreement we had.

24        Q.    How much was that check worth?

25        A.    I believe it was in the neighborhood of

WYLIE 336

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    69

1  1100 to $1500.

2          Q.      And what was that check for?

3          A.      For client services for a client called

4  Santa Fe Spirits.

5          Q.      What kind of client services?

6          A.      We were providing marketing services for

7  that client, as well as e-commerce.

8          Q.      And was that the only time Ms. Donoho was

9  compensated as a contractor by Big Thirst, Inc.?

10         A.      Yes.

11         Q.      Was Ms. Donoho ever considered an employee

12 for Big Thirst?

13         A.      Yes.

14         Q.      When was Ms. Donoho considered an employee

15 for Big Thirst?

16         A.      Once we had incorporated and began working

17 in earnest, we both considered ourselves employees of Big

18 Thirst, Incorporated.

19         Q.      Did Ms. Donoho, as an employee, receive a

20 salary?

21         A.      Neither of us received salaries.

22         Q.      Did Ms. Lauren Donoho, as an employee,

23 receive any kind of benefits as an employee?

24         A.      Ms. Donoho received compensation in the

25 form of 2,700,000 shares of stock in the company.

WYLIE 337

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    70

1              MS. MOUSILLI:  Objection, nonresponsive.
2   BY MS. MOUSILLI:
3         Q.    I asked for benefits.  What kind of
4   benefits did Ms. Lauren Donoho receive as an employee?
5              MS. GILSTRAP:  Objection, form.
6              THE WITNESS:  There were no benefits
7   allotted to any employee.
8   BY MS. MOUSILLI:
9         Q.    Was Ms. Donoho considered an equity partner
10  in Big Thirst?
11             MS. GILSTRAP:  Objection, form.
12             THE WITNESS:  Ms. Donoho received 2,700,000
13  shares of stock.
14             MS. MOUSILLI:  Objection, nonresponsive.
15  BY MS. MOUSILLI:
16        Q.    Was Ms. Donoho considered an equity partner
17  in Big Thirst?
18             MS. GILSTRAP:  Objection, form.
19             THE WITNESS:  There are no equity partners
20  in Big Thirst beyond shareholders.
21  BY MS. MOUSILLI:
22        Q.    Were there any written agreements between
23  Big Thirst and Ms. Donoho?
24        A.    We had director agreements.  However,
25  Ms. Donoho did not sign it.

WYLIE 338

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          71

```
 1          Q.     Besides director agreements, were there any
 2    other written agreements between Big Thirst and
 3    Ms. Donoho?
 4                  MS. GILSTRAP:  Objection, form.
 5                  THE WITNESS:  We had the signed written
 6    consent filed with the State of Delaware with her name on
 7    it.
 8    BY MS. MOUSILLI:
 9          Q.     Okay.  Again, if you can just please focus
10    on this question.  Were there any written agreements --
11          A.     Yes.
12          Q.     I wasn't finished with my question.  Please
13    wait for me to finish my question.  Do remember the ground
14    rules we set up at the very beginning?
15          A.     Correct.
16          Q.     Okay.  I'm going to ask you to wait for me
17    to finish my question and then answer.  Okay.  So are
18    there any written agreements between Big Thirst, Inc. and
19    Ms. Donoho?
20          A.     Yes.
21          Q.     Okay.  What are those written agreements?
22          A.     The written agreement is what I was just
23    stating, the -- I'm forgetting the exact title, but the
24    written consent of the corporation signed with -- filed
25    with the State of Delaware.
```

WYLIE 339

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    72

1          Q.     A written consent filed with the State of
2     Delaware?
3          A.     Yes.
4          Q.     What does a written consent filed with the
5     State of Delaware mean?
6          A.     It is our corporate document stating who
7     were the officers and what should -- and what shares they
8     owned.
9          Q.     Besides that document, were there any
10    written agreements between Ms. Donoho and Big Thirst?
11         A.     No.
12         Q.     When -- was Ms. Donoho simply listed on the
13    written consent document that you just mentioned or did
14    she sign?
15         A.     I don't recall it, and I do not have the
16    document in front of me.
17         Q.     Okay.  Were there any employment agreements
18    between Big Thirst and Ms. Donoho?
19         A.     No.
20         Q.     Were there any written employment
21    agreements between Big Thirst and Ms. Donoho?
22         A.     No.
23         Q.     Were there any noncompete agreements
24    between Big Thirst and Ms. Donoho?
25         A.     No.

WYLIE 340

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    73

```
1            Q.     Were there any work-for-hire agreements
2      between Big Thirst and Ms. Donoho?
3            A.     No.
4            Q.     Did you ever request for Ms. Donoho to
5      create an e-commerce site on Shopify for Big Thirst?
6            A.     Did I specifically request that she create
7      an e-commerce site on Shopify?  We -- it was our business
8      to create Shopify installments on client sites.  We also,
9      at the time, were thinking of creating our own store.
10           Q.     Mr. McGinnis, did you ever request for
11     Ms. Donoho to create an e-commerce site on Shopify for Big
12     Thirst?
13                  MS. GILSTRAP:  Objection, form.
14                  THE WITNESS:  I do not recall making that
15     request.
16     BY MS. MOUSILLI:
17           Q.     Does Big Thirst have an e-commerce site on
18     Shopify?
19                  MS. GILSTRAP:  Objection, form.
20                  THE WITNESS:  Big Thirst has an e-commerce
21     site on Shopify.
22     BY MS. MOUSILLI:
23           Q.     What was the purpose of this site?
24           A.     Would you clarify the period of time when
25     you're speaking?
```

WYLIE 341

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    74

1           Q.      Certainly.  At the initial formation of Big

2     Thirst, when Ms. Donoho was still a part of Big Thirst,

3     Inc., what was the purpose of the e-commerce site on

4     Shopify that Big Thirst had?

5           A.      The Shopify store acted as the way of

6     creating buy buttons and shopping carts to add to client

7     sites to process orders.

8           Q.      Was there a data dashboard aspect?

9           A.      It was linked to technologies that

10    populated the data dashboard.

11          Q.      What other aspects were on the site?

12          A.      Shopify is a standalone e-commerce store.

13          Q.      What other aspects were on the data

14    dashboard?

15          A.      Ms. Donoho created a data dashboard by

16    linking together various off-the-shelf software.

17          Q.      What off-the-shelf software did she link

18    together on that dashboard?

19          A.      Auth0, Panoply, Cumul.io, and Heroku.

20          Q.      What does Panoply do?

21          A.      Panoply, it pulls data from various

22    sources.

23          Q.      What kind of data?

24          A.      Particularly, sales data from Shopify.

25          Q.      What does Heroku do?

WYLIE 342

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                         75

1          A.      Heroku displays information in dashboard
2     form.
3          Q.      What was Ms. Donoho's responsibility for
4     the data dashboard?
5          A.      To create and maintain it.
6          Q.      What was your responsibility for the data
7     dashboard?
8          A.      I had no responsibility at the time.
9          Q.      Who else at Big Thirst, while Ms. Donoho
10    was there, was responsible for the data dashboard?
11         A.      It was her sole responsibility.
12         Q.      Who else had access to the data dashboard
13    when Ms. Donoho was at Big Thirst?
14         A.      I had viewing rights, as did Suzanne and
15    Mark Shilling.
16         Q.      What other rights did Mark Shilling have?
17         A.      Mark Shilling was also, at the time, the
18    acting CEO of a client.  And in that capacity, he had
19    client aspect -- access to the dashboard.
20         Q.      And what about Ms. Shilling --
21    Mrs. Shilling -- I'm sorry, Mrs. McGinnis.  What kind of
22    access --
23         A.      She only could view it.
24         Q.      -- did she have to the data dashboard?
25         A.      Suzanne McGinnis could view the dashboard.

WYLIE 343

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    76

```
1          Q.      Okay.  So at the time that Ms. Donoho
2    worked at Big Thirst, she was the only one who could
3    operate the data dashboard?
4          A.      Correct.
5          Q.      Everybody else could only view it, correct?
6          A.      Correct.
7          Q.      Did Big Thirst ever enter into any
8    work-for-hire agreements with anyone?
9          A.      In what time period are you speaking?
10         Q.      Ever.
11         A.      Yes.
12         Q.      Okay.  Tell me about those work-for-hire
13   agreements.
14         A.      We have work-for-hire agreements with any
15   contractor that we hire -- and employees, excuse me.
16         Q.      When did this work-for-hire agreements
17   process for having contractors and employees sign begin?
18         A.      We had written employment agreements
19   created by Hajjar Peters prior to Ms. Wylie Donoho
20   departing the company.  It was in place -- they were in
21   place and presented to her initially before the company
22   launched in October.
23         Q.      You're saying there were work-for-hire
24   agreements presented to Ms. Donoho before she left the
25   company?
```

WYLIE 344

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              77

```
1            A.      We had employment and director agreements
2      in place provided by our attorneys.
3            Q.      You had forms?
4            A.      We had forms, yes.
5            Q.      Were these forms ever signed by Ms. Donoho?
6            A.      They were not.
7            Q.      Okay.  Who at Big Thirst has signed a
8      work-for-hire agreement?
9            A.      All of the employees.
10           Q.      Can you name these employees?
11           A.      Asher -- Asher Langston, Mark Shilling,
12     Suzanne McGinnis, Matt McGinnis, Rich Plakas, Keri
13     Emerson, Lataye Carr, Kristin Rice, Kristen O'Brien and
14     Ashley Gunckel.
15           Q.      Okay.  Can you explain to the jury what
16     your understanding is of a work-for-hire agreement?
17           A.      My understanding is that an employee or
18     contractor agrees that when they are employed by or
19     contracting for the corporation that their work is owned
20     by the corporation.
21           Q.      Did Ms. Donoho ever sign an agreement with
22     Big Thirst allowing for the use of her creative works?
23           A.      No.
24                   MS. GILSTRAP:  Objection, form.
25     BY MS. MOUSILLI:
```

WYLIE 345

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                           78

1          Q.    Did Ms. Donoho ever sign a licensing

2    agreement with Big Thirst?

3          A.    No.

4          Q.    Did Ms. Donoho ever verbally tell you that

5    you could use her tech stack?

6                MS. GILSTRAP:  Objection, form.

7                THE WITNESS:  Ms. Donoho developed the tech

8    stack as an officer and director of the company and with

9    compensation provided.

10               MS. MOUSILLI:  Objection, nonresponsive.

11   BY MS. MOUSILLI:

12         Q.    Mr. McGinnis, did Ms. Donoho ever verbally

13   tell you that you could use her tech stack?

14         A.    Yes.

15         Q.    When did she tell you that?

16         A.    Ms. Donoho told me that from the beginning,

17   that the tech stack would be used for Big Thirst.

18         Q.    When you say from the beginning, when is

19   that?

20         A.    From when she began developing the data

21   dashboard in, I believe, May of '21.

22         Q.    Okay.  Let's go back to the development of

23   a data dashboard.  When did she begin working on the data

24   dashboard?

25         A.    She began concepting this tech stack in

WYLIE 346

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              79

1   February.  She licensed parts of it over time, I believe,

2   beginning in February, March and into May.  And I believe

3   the first working prototype of anything was about summer.

4          Q.     Let's go back and kind of digest what you

5   said.  So Ms. Donoho created a prototype for this data

6   dashboard when?

7          A.     I believe she began licensing parts of it

8   that -- she scoped what she wanted to do, and I believe

9   February or March I begin -- I think she began licensing

10  the software, signed as a founder of Big Thirst, I believe

11  in March.  And I believe she had a prototype sometime in

12  the spring/summer of 2021.

13         Q.     Okay.  Mr. McGinnis, if you can just pay

14  attention to my question.  So when was the first time you

15  saw a prototype by Ms. Donoho for the data dashboard?

16         A.     I don't believe I saw a prototype until

17  June or July of 2021.  I don't recall the exact date.

18         Q.     Do you recall Ms. Donoho ever sending you

19  an email informing you that she had developed a prototype

20  for the data dashboard?

21         A.     I do not recall the date.

22         Q.     But do you recall an email saying something

23  along the lines of, Look what I made?

24         A.     I recall an email in February, Look what I

25  made, when she put a free version of Shopify on the

WYLIE 347

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                         80

1    bigthirstmarketing.com website.  That was not a data

2    dashboard.

3            Q.     So is that a prototype that Ms. Donoho

4    created in February 2021?

5            A.     It was not a prototype of a dashboard.

6            Q.     What was it a prototype of?

7            A.     A store.

8            Q.     A store.  What kind of store?

9            A.     The Shopify store.

10           Q.     And that prototype that Ms. Donoho created

11   preceded the formation of Big Thirst, correct?

12           A.     She added a free install of Shopify to the

13   Big Thirst Marketing website prior to the formation of Big

14   Thirst, Inc.

15           Q.     So Ms. Donoho was working on this tech

16   stack prior to the incorporation of Big Thirst, correct?

17           A.     Ms. Donoho explored how to use a free

18   version of Shopify before the incorporation of Big Thirst.

19           Q.     Ms. Donoho began work on this tech stack

20   prior to the incorporation of Big Thirst, correct?

21                  MS. GILSTRAP:  Objection, form.

22                  THE WITNESS:  Ms. Donoho installed a free

23   version of Shopify on the Big Thirst Marketing website

24   before --

25                  MS. MOUSILLI:  Objection, nonresponsive.

WYLIE 348

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                          81

```
1    BY MS. MOUSILLI:
2         Q.     Mr. McGinnis, my question is pretty clear.
3    Ms. Donoho started to work on this tech stack, but --
4         A.     Will you define tech stack?
5         Q.     Okay.  Wait.  Please don't interrupt me.
6    Okay.  So Ms. Donoho began working on a data dashboard
7    before the incorporation of Big Thirst, correct?
8                MS. GILSTRAP:  Objection, form.
9                THE WITNESS:  Incorrect.
10   BY MS. MOUSILLI:
11        Q.     What was Ms. Donoho working on prior to the
12   incorporation of Big Thirst?
13        A.     She was exploring the use of Shopify.
14        Q.     And what was she building?
15        A.     An e-commerce store.
16        Q.     And that was before the incorporate --
17   incorporation of Big Thirst, correct?
18        A.     Correct.
19        Q.     Thank you.  Did Ms. Donoho ever give
20   control of the tech stack she created to Big Thirst prior
21   to leaving?
22                MS. GILSTRAP:  Objection, form.
23                THE WITNESS:  The -- I had access to
24   aspects of the e-commerce platform, including Shopify,
25   ShipStation, PayPal, and the data dashboard as a viewer
```

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    82

1    prior to her departure.

2    BY MS. MOUSILLI:

3            Q.    Okay.  So --

4            A.    I had aspects -- or I could use Shopify,

5    ShipStation, and PayPal as a user prior to her departure.

6            Q.    Okay.  Were you able to modify the tech

7    stack while Ms. Donoho was at Big Thirst?

8                  MS. GILSTRAP:  Objection, form.

9                  THE WITNESS:  I did not modify the tech

10   stack as far as the dashboard goes.

11   BY MS. MOUSILLI:

12           Q.    Did you have the ability to do so?

13           A.    I did not have the ability to modify the

14   dashboard before she departed or after she departed.

15           Q.    Okay.  Because as I understood your

16   testimony before, Ms. Donoho was the only person who was

17   in control of the tech stack while she was at Big Thirst,

18   correct?

19                 MS. GILSTRAP:  Objection, form.

20                 THE WITNESS:  Of the dashboard.

21   BY MS. MOUSILLI:

22           Q.    So Ms. Donoho was the only person who was

23   responsible and had control of the dashboard at Big Thirst

24   before she left, correct?

25           A.    Correct.

WYLIE 350

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    83

```
1           Q.      All right.  Has Big Thirst ever filed for
2     any copyright applications?
3           A.      We have a copyright in our name.
4           Q.      What is that copyright for?
5           A.      The copyright is for the name Big Thirst
6     Marketing.
7           Q.      Is that a trademark?
8           A.      It is the copyright.
9           Q.      Has Big Thirst ever filed a trademark
10    application?
11          A.      Yes.
12          Q.      What is that trademark for?
13          A.      Big Thirst Marketing.
14          Q.      Who was the person who filed these?
15          A.      It was filed through Hajjar Peters.
16          Q.      And who was listed as the owner for the
17    copyright?
18          A.      Matt McGinnis.
19          Q.      And who was listed as the owner for the
20    trademark?
21          A.      Matt McGinnis.
22          Q.      Does Big Thirst have any noncompete
23    agreements with any of its employees?
24          A.      Yes.
25          Q.      Who?
```

WYLIE 351

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    84

1          A.      There is a noncompete clause in employment
2     agreements for each employee.
3          Q.      Okay.  But, again, Ms. -- there's no
4     noncompete agreement between Big Thirst and Ms. Donoho,
5     correct?
6          A.      Correct.
7                  MS. GILSTRAP:  Objection, form.
8     BY MS. MOUSILLI:
9          Q.      When did Big Thirst start implementing
10    noncompete agreements?
11         A.      We began with all employees hired after
12    April 2022.  We did not have employees other than
13    Ms. Donoho and me prior.
14         Q.      Following the formation of Big Thirst, were
15    any third-party vendors or contractors commissioned for
16    work?
17         A.      No.
18         Q.      Were any financial advisors hired by Big
19    Thirst?
20         A.      Here we go.  Yes.  We retained -- so let me
21    restate -- answer the question previously.  Yes.  We hired
22    a financial consultant previously.
23         Q.      What was the name of the financial
24    consultant?
25         A.      Preferred Finance Solutions.

WYLIE 352

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    85

1          Q.     Who at Preferred Financial Solutions did
2    you work with?
3          A.     Jelena Medic.
4          Q.     Can you spell that for us, please.
5          A.     Jelena, J-E-L-E-N-A, Medic, M-E-D-I-C.
6          Q.     When was Preferred Financial Solutions
7    hired?
8          A.     Preferred Financial Solutions was hired in
9    February 2021.
10         Q.     So that's before Big Thirst, Incorporated?
11         A.     Correct.  She was hired by Big Thirst
12   Marketing, technically.
13         Q.     So Big Thirst Marketing hired Preferred
14   Financial Solutions and Jelena Medic, not Big Thirst,
15   correct?
16         A.     Correct.
17         Q.     Who was involved in the hiring?
18         A.     I was, as well, as Lauren Wylie Donoho.
19         Q.     What was Preferred Financial Solutions
20   hired for?
21         A.     They were hired to help us prepare a
22   three-year financial plan.
23         Q.     What was a three-year financial plan?
24         A.     Jelena Medic is a financial analyst in the
25   alcohol industry, and she prepared projections for

WYLIE 353

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              86

```
 1    revenue, expenses, and other things that help us plan for
 2    how we would grow over three years.
 3            Q.    Were these three-year financial plans
 4    documented?
 5            A.    Yes.
 6            Q.    Were they produced?
 7            A.    Yes.
 8            Q.    Were they produced in discovery?
 9            A.    I believe so, yes.
10            Q.    What payment arrangements were made with
11    this financial advisor?
12            A.    We made a services trade which was backed
13    by a financial trade.
14            Q.    Tell me about this services trade.
15            A.    Jelena Medic had approached Big Thirst
16    Marketing in December of 2020 and asked if we would design
17    a website for her with Wylie Donoho providing that
18    service, with me helping with the concept and copywriting.
19                 We later agreed, in February, that that
20    would be a work-for-hire trade.  Rather than she paying us
21    for a website design, she would provide us this service
22    for the similar price -- same price, and we exchanged
23    checks for $2,500 each.
24            Q.    Okay.  I'm confused now because previously
25    you said that you're going to exchange services and now
```

WYLIE 354

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    87

1    you've exchanged checks.  So let's kind of break this

2    down.

3              A.    Yeah.  So for --

4              Q.    I'm sorry.  There's not a question just

5    yet.  So Jelena came to Big Thirst Marketing and said,

6    Hey, I need a website, correct?

7              A.    Yes.

8              Q.    Okay.  And Big Thirst Marketing said, Hey,

9    we need a financial plan, correct?

10             A.    Yes.

11             Q.    We need a financial plan for Big Thirst,

12   Inc., correct?

13             A.    Correct.

14             Q.    Is what Big Thirst Marketing said?

15             A.    Correct.

16             Q.    And so you all decided, Okay.  We'll

17   exchange services?

18             A.    Correct.

19             Q.    Okay.  And Lauren Donoho was going to build

20   that website for Jelena, correct?

21             A.    Correct.

22             Q.    And in exchange for Ms. Donoho's services,

23   Jelena was going to provide a three-year financial

24   projection for Big Thirst, Inc., correct?

25                   MS. GILSTRAP:  Objection, form.

WYLIE 355

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    88

```
1                    THE WITNESS:  Correct.
2    BY MS. MOUSILLI:
3           Q.    Was the three-year projection plan
4    delivered by Jelena Medic?
5           A.    Yes.  I believe we received that in May of
6    2021.
7           Q.    Did Lauren Donoho provide the website that
8    Jelena Medic wanted in exchange for her services?
9                  MS. GILSTRAP:  Objection, form.
10                 THE WITNESS:  Yes.
11   BY MS. MOUSILLI:
12          Q.    How was Ms. Donoho compensated for her work
13   on the website?
14                 MS. GILSTRAP:  Objection, form.
15                 THE WITNESS:  Ms. Donoho was paid in cash
16   for that.
17   BY MS. MOUSILLI:
18          Q.    How much was Lauren Donoho paid?
19          A.    She was paid $1,800 and I think -- I
20   believe it was 1,825 that she invoiced in May of 2022.
21          Q.    Where did Lauren Donoho send that invoice?
22          A.    To Big Thirst Marketing.
23          Q.    Did Big Thirst Marketing pay Lauren Donoho
24   1,800 and change?
25          A.    Correct.
```

WYLIE 356

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              89

1          Q.     How much did Big Thirst Marketing invoice

2    to Jelena Medic for that website?

3          A.     2,500.

4          Q.     What accounted for that markup?

5          A.     We made an estimate, she made an estimate,

6    we agreed to an estimate and that was it.

7          Q.     So while Lauren Donoho was only paid about

8    1800 for the website, you billed Jelena Medic 2500,

9    correct?

10              MS. GILSTRAP:  Objection, form.

11              THE WITNESS:  The estimate that Lauren

12   Wylie provided was that amount.  She had said she would

13   provide her services -- and this is in discovery -- for

14   free and would not bill for it and would use that as a

15   contribution toward the startup of the company.

16              MS. MOUSILLI:  Okay.  Objection,

17   nonresponsive.

18   BY MS. MOUSILLI:

19         Q.     While Ms. Donoho was paid about $1,800 for

20   the website, Ms. Jelena Medic was invoiced about $2,500

21   for that website, correct?

22         A.     Correct.

23         Q.     Who sent -- on whose behalf was the invoice

24   sent to Jelena Medic?

25              MS. GILSTRAP:  Objection, form.

WYLIE 357

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    90

1              THE WITNESS:  The invoice was sent from Big

2    Thirst Marketing.

3    BY MS. MOUSILLI:

4         Q.    But the services were for Big Thirst, Inc.,

5    correct?

6         A.    The services were for a startup.  It was

7    not yet built.

8         Q.    Now, you said earlier that there was an

9    exchange of checks.  Jelena Medic gave you 25 -- I'm

10   sorry, gave Big Thirst Marketing a $2,500 Check?

11        A.    Yes.

12        Q.    And then there was another check exchanged

13   to her?

14        A.    Correct.

15        Q.    Tell me about that other check.

16        A.    She paid us in May of 2021.  We paid her in

17   June of 2021.

18        Q.    When you say we, who's we?

19        A.    Big Thirst Marketing.

20        Q.    Big Thirst Marketing paid Jelena Medic a

21   check in 2021 for her financial projections?

22        A.    Yes.

23        Q.    In the amount of $2,500?

24        A.    Correct.

25        Q.    Were there any formal or written agreements

WYLIE 358

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                        91

1    between Big Thirst Marketing and Jelena Medic?

2           A.     Other than email, no.

3           Q.     Were there any written documentation of any

4    terms between Big Thirst Marketing and Preferred Financial

5    Solutions?

6                  MS. GILSTRAP:  Objection, form.

7                  THE WITNESS:  Could you repeat the

8    question, please?

9    BY MS. MOUSILLI:

10          Q.     Were there any written documentations of

11   any terms between Preferred Financial Solutions and Big

12   Thirst Marketing?

13                 MS. GILSTRAP:  Objection, form.

14                 THE WITNESS:  No.

15   BY MS. MOUSILLI:

16          Q.     Okay.  After you brought on Lauren Donoho

17   to Big Thirst, Inc., who else was brought in?

18          A.     In what time period?

19          Q.     Right after you brought on Lauren Donoho.

20          A.     The only other people working on the

21   business were Suzanne McGinnis and Mark Shilling.

22          Q.     Who decided to bring on Suzanne McGinnis?

23          A.     I did.

24          Q.     And who decided to bring on Mark Shilling?

25          A.     I did.

WYLIE 359

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    92

1          Q.      Was anyone else involved in bringing these

2     two individuals on to Big Thirst?

3                  MS. GILSTRAP:  Objection, form.

4                  THE WITNESS:  I do not believe so.

5     BY MS. MOUSILLI:

6          Q.      What were the terms of Mark Shilling

7     joining Big Thirst?

8          A.      Mark Shilling was a director.

9          Q.      And how was he to be compensated?

10         A.      Mark Shilling was compensated in shares.

11         Q.      How many shares?

12         A.      1,000.

13         Q.      And what were the terms for bringing on

14    Suzanne McGinnis?

15         A.      Suzanne McGinnis is the director.

16         Q.      And how was she compensated?

17         A.      With shares.

18         Q.      How many shares?

19         A.      1,000.

20         Q.      Were there any formal agreements between

21    Big Thirst and Suzanne McGinnis?

22         A.      Yes.

23         Q.      What are those?

24         A.      The director's agreement written and

25    signed.

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    93

```
 1            Q.     Any other agreements?
 2            A.     Not at that time, no.
 3            Q.     Any written agreements between Big Thirst
 4    and Mark Shilling?
 5            A.     Yes.
 6            Q.     What are those agreements?
 7            A.     The director's agreement.
 8            Q.     Any other agreement?
 9            A.     Not at that time.
10            Q.     Any agreements later on?
11            A.     Yes.
12            Q.     What are those agreements?
13            A.     Employment agreement.
14            Q.     What are the terms of that employment
15    agreement?
16            A.     I don't have that in front of me.
17            Q.     Okay.  Generally, what does that employment
18    agreement say?
19            A.     It's an employment agreement written by our
20    attorney that covers noncompete and work-for-hire.
21            Q.     Does it discuss compensation?
22            A.     Yes.
23            Q.     Okay.  And what is the compensation
24    discussed in that document?
25            A.     I'm not comfortable talking about current
```

WYLIE 361

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    94

```
1    employment when there is a hostile competitor in the room.
2           Q.     Okay.  That's not a proper response.
3           A.     Can I --
4                       AEO DESIGNATION BEGINS
5    <-- CONFIDENTIAL
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

WYLIE 362

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    95

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WYLIE 363

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    96

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WYLIE 364

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    97

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    -->

19                    AEO DESIGNATION CONCLUDES

20    BY MS. MOUSILLI:

21            Q.    So again, your -- the employees at Big

22    Thirst have all signed a noncompete agreement?

23            A.    Correct.

24            Q.    And all employees at Big Thirst have signed

25    work-for-hire agreements?

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    98

1          A.     Correct.

2          Q.     How was Big Thirst initially capitalized?

3          A.     The initial capitalization was with a

4    contribution from me for $5,100.  And Lauren Wylie Donoho

5    received a loan from her father for use for Big Thirst,

6    and she deposited -- or spent about $43,000 of that toward

7    company expenditures.

8          Q.     So you contributed $5,100 to Big Thirst

9    initially, correct?

10         A.     Correct.

11         Q.     And Lauren Donoho contributed 43k, is your

12   testimony?

13             MS. GILSTRAP:  Objection, form.

14             THE WITNESS:  She chose to seek a loan from

15   her father to help with startup costs, correct.

16   BY MS. MOUSILLI:

17         Q.     And what was the amount of that loan?

18         A.     She received a loan written to her for

19   $50,000.

20         Q.     How much of that $50,000 was given to Big

21   Thirst, Inc.?

22         A.     Either in expenditures directly for the

23   company or deposited into the bank account of

24   approximately $43,000.

25         Q.     Is there a written agreement between Big

WYLIE 366

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    99

```
 1   Thirst and Lauren Donoho's father for this loan?
 2           A.      There is not.
 3           Q.      Okay.  Is there a verbal agreement?
 4                   MS. GILSTRAP:  Objection, form.
 5                   THE WITNESS:  There is no agreement with
 6   her father.
 7   BY MS. MOUSILLI:
 8           Q.      Okay.  Who is the agreement between?
 9           A.      There was a verbal agreement with Big
10   Thirst and Lauren Wylie Donoho.
11           Q.      What is the -- what was that -- what were
12   the terms of that agreement?
13           A.      The terms of the agreement is that we would
14   pay back based on a payment schedule beginning in July
15   2023.
16           Q.      Okay.  So let's talk about this verbal
17   agreement.  There's -- so there's a verbal agreement
18   between Big Thirst and Lauren Donoho, correct?
19           A.      Yes.
20           Q.      Regarding this loan, correct?
21           A.      Yes.
22           Q.      And the payments -- the reimbursements
23   would begin in May of --
24           A.      July.
25           Q.      July of 2023?
```

WYLIE 367

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                        100

```
1          A.    Correct.
2          Q.    Okay.  So we're now in March of 2024,
3    correct?
4          A.    Correct.
5          Q.    Have any payments been made by Big Thirst
6    to Lauren Donoho for this agreement?
7          A.    No.
8          Q.    Why not?
9          A.    Lauren Donoho owes Big Thirst more than
10   $80,000, and we are waiting on the payment for that.
11         Q.    Okay.  So you believe that this verbal
12   agreement that you entered into on behalf of Big Thirst
13   and Lauren shouldn't be repaid until you receive payment
14   for something else?
15         A.    Correct.
16         Q.    Is that what the terms of the agreement
17   were?
18         A.    There were no written terms in the
19   agreement.
20         Q.    But there's a verbal agreement, correct?
21         A.    Correct.
22         Q.    Do you intend on ever paying back Lauren
23   for this loan that she made to Big Thirst?
24         A.    That is our intention.
25         Q.    Okay.  And when do you intend to start
```

WYLIE 368

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    101

1    paying Ms. Donoho back?

2           A.    We would like to come to terms with that

3    once we can resolve this litigation.

4           Q.    But back when Ms. Lauren Donoho made this

5    loan to Big Thirst, that was never a term or a condition

6    for repayment to her, correct?

7           A.    We did not anticipate the situation we're

8    currently in.

9                 MS. MOUSILLI:  Objection, noresponsive.

10   BY MS. MOUSILLI:

11          Q.    That wasn't part of the agreement between

12   Lauren and Big Thirst, correct?

13          A.    That was not --

14                MS. GILSTRAP:  Objection, form.

15                THE WITNESS:  That was not the agreement.

16   BY MS. MOUSILLI:

17          Q.    Okay.  So you contributed 5,100 to Big

18   Thirst, and Lauren Donoho contributed a 50k loan.  Did

19   anybody else contribute any monetary amounts to Big

20   Thirst?

21          A.    In what time period?

22          Q.    When it was first created.

23          A.    No.

24          Q.    When Big Thirst was initially created, what

25   services were provided by yourself?

WYLIE 369

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              102

1          A.      Could you be more explicit.

2          Q.      What kind of sweat equity was -- or did you

3    contribute to Big Thirst when it was first created?

4          A.      I began working in earnest on developing

5    the concept for Big Thirst in spring of 2020, doing market

6    research, doing numerous meetings with people in the

7    industry, developing the strategy, developing the

8    relationships, develop the business plan, help shape the

9    financial plan, help shape the entire direction for the

10   company, and then was the lead on client acquisition.

11         Q.      So when Big Thirst was initially created,

12   there were monetary contributions by yourself --

13         A.      Uh-huh.

14         Q.      -- and by Ms. Donoho, correct?

15         A.      Correct.

16         Q.      Okay.  Ms. Donoho contributed approximately

17   10 times what you did, correct?

18                 MS. GILSTRAP:  Objection, form.

19                 THE WITNESS:  Ms. Donoho, through a loan

20   from her father, contributed more.

21   BY MS. MOUSILLI:

22         Q.      Okay.  Considerably more, correct?

23                 MS. GILSTRAP:  Objection, form.

24                 THE WITNESS:  Ms. Donoho contributed more.

25   BY MS. MOUSILLI:

WYLIE 370

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    103

1          Q.     Okay.  And when Big Thirst was initially

2     created, was any sweat equity contributed?

3          A.     Yes, considerable.

4          Q.     By who?

5          A.     By both of us.

6          Q.     Was there anyone besides you and Lauren

7     Donoho that contributed any sweat equity at the initial

8     formation of Big Thirst?

9          A.     Yes, Mark Shilling and Suzanne McGinnis.

10         Q.     What sweat equity did Suzanne McGinnis

11    provide?

12         A.     Suzanne McGinnis provided graphic design as

13    well as operational recommendations as a owner of a

14    consumer product good company that sold online.  She gave

15    plenty of recommendations for helping me shape ideas of

16    how to run the company.

17         Q.     What sweat equity did Mark Shilling

18    provide?

19         A.     Mark Shilling provided connections in the

20    industry for meetings and conversations to help shape our

21    compliance policies, as well as direction for distribution

22    and retail fulfillment.

23         Q.     Did anyone else provide any initial capital

24    to Big Thirst?

25         A.     No.

WYLIE 371

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    104

```
 1          Q.     When was the first time that Big Thirst
 2   received capital injections?
 3                 MS. GILSTRAP:  Objection, form.
 4                 THE WITNESS:  I provided capital injections
 5   beginning in either February or March of 2021, and --
 6   BY MS. MOUSILLI:
 7          Q.     Is that the $5,100 you were talking about?
 8          A.     Over -- over the course of the next couple
 9   months, I paid for filings and legal fees, that type of
10   thing.
11          Q.     Okay.  But you paid for those filings from
12   your own account or --
13          A.     Yes.
14          Q.     -- Big Thirst accounts?
15          A.     From my own accounts.
16          Q.     Okay.  So what filings were you referring
17   to?
18          A.     Secretary of state registered agent, the
19   EIN, and attorney fees.
20          Q.     Who paid for any attorney fees?
21          A.     The initial attorney fees, I did.
22          Q.     And how much were those initial attorney
23   fees?
24          A.     I don't have that number in front of me.
25          Q.     Approximately?
```

WYLIE 372

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          105

1          A.      Approximately 3500.

2          Q.      So the initial attorney fees by Big Thirst

3    were paid by you individually?

4          A.      Correct.

5          Q.      That's your testimony?

6          A.      I don't have my bank account in front of

7    me, but I know that -- I think we carry on our books $1500

8    owner contribution from me.

9          Q.      What was the next capital injection made

10   into Big Thirst?

11         A.      We received a new loan from Big Thirst

12   Marketing to pay for litigation expenses.

13         Q.      And how much was that loan for?

14         A.      $100,000.

15         Q.      What were the terms of that loan?

16         A.      The terms of that loan are a repayment

17   schedule, and I don't know that off the top of my head.

18         Q.      Besides a 100k loan from Big Thirst, what

19   other loans were obtained by -- I'm sorry, strike that.

20                 Besides the $100,000 loan from Big Thirst

21   Marketing to Big Thirst, Inc., what other loans were

22   obtained by Big Thirst?

23         A.      We also have three loans from the SBA

24   through First Commonwealth Bank.

25         Q.      Okay.  Let's go through these.  First

WYLIE 373

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    106

1  Common --

2          A.      First Commonwealth Bank.

3          Q.      When did this loan happen?

4          A.      August of 2022.

5          Q.      And how much was this loan for?

6          A.      $350,000.

7          Q.      What were the terms of this loan?

8          A.      The terms of the loan are repayments

9  monthly, and I don't know the current interest rate --

10  variable interest rate.

11          Q.      So this is a loan between Big Thirst, Inc.

12  and First Commonwealth Bank, correct?

13          A.      Correct.

14          Q.      For $350,000?

15          A.      Correct.

16          Q.      And it was initiated August 2022, correct?

17          A.      Correct.

18          Q.      Okay.  What other loans are there?

19          A.      Through the same entity, through First

20  Commonwealth Bank and the SBA, we have two lines of

21  credit.

22          Q.      I'm sorry.  I missed that.  Can you repeat

23  that?

24          A.      Through the same agreement with First

25  Commonwealth Bank and the SBA, we have two lines of

WYLIE 374

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    107

```
1    credit.
2            Q.    Okay.  Tell me about that first line of
3    credit.
4            A.    The lines of credit were a mechanism
5    whereby we could access additional funds.
6            Q.    How much additional?
7            A.    I believe the first one was for $250,000.
8            Q.    So this is a loan that you could access.
9    Have you accessed it?
10           A.    Yes.
11           Q.    How much of the 250,000 have you accessed?
12           A.    All of it.
13           Q.    What about the second line of credit?
14           A.    It was for $400,000.
15           Q.    Through First Commonwealth Bank?
16           A.    Correct.
17           Q.    And is it under the same terms as the first
18   line of credit?
19           A.    The interest rate's variable, so it would
20   be different.  And obviously, the interest rates have been
21   very high lately, so it's expensive.
22           Q.    Have you accessed the full 400k?
23           A.    Yes.
24           Q.    Are there any other loans that Big Thirst
25   has outstanding?
```

WYLIE 375

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    108

```
1              A.      No.
2              Q.      Are you a guarantor for the loan that is
3       between Big Thirst, Inc. and First Commonwealth Bank, the
4       August 2022 --
5              A.      Yes.
6              Q.      -- loan?  Who else is a guarantor on that
7       loan?
8              A.      Big Marketing and Big Thirst Consulting, as
9       well as my life insurance policy.
10             Q.      How much is your life insurance policy for?
11             A.      We put up $350,000 for that.
12             Q.      Is there -- are you a personal guarantor
13      for the first line of credit from First Commonwealth Bank?
14             A.      Yes.
15             Q.      Who else is a guarantor?
16             A.      Big Thirst Marketing, Big Thirst Consulting
17      and my life insurance, on all three.
18             Q.      When you say on all three, what does that
19      mean?
20             A.      On both lines of credit and the loan.
21             Q.      And so for all three loans, you are a
22      personal guarantor?
23             A.      Correct.
24             Q.      Big Thirst Marketing is a guarantor, and
25      Big Thirst Consulting is a guarantor, and your life
```

WYLIE 376

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    109

1    insurance policy is a guarantor, correct?

2           A.    Correct.

3           Q.    Okay.  Who was involved in negotiating

4    these loans?

5           A.    Initially, Lauren Wylie Donoho and I were

6    both involved, both in in-person meetings, in phone

7    meetings and in an email.

8           Q.    Okay.  I'm going to kind of break this

9    down.  So let's -- let's talk about the first loan, the

10   350k with First Commonwealth Bank.  Who was involved in

11   negotiating that loan?

12          A.    Lauren Wylie Donoho and Matt McGinnis.

13          Q.    And there's a written agreement for that

14   August 22 loan, correct?

15          A.    Correct.

16          Q.    When were the funds received for that

17   August 22 loan?

18          A.    In August.

19          Q.    The full amount was received?

20          A.    For the loan, yes.

21          Q.    Who filled out any loan documents for that

22   loan?

23          A.    Initially, both Lauren Wylie Donoho and I

24   did.  However, this is the loan that she held hostage and

25   we had to restructure after she resigned.

WYLIE 377

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              110

```
 1                  MS. MOUSILLI:  Okay.  I'm going to object
 2      as nonresponsive to everything after, Initially, both
 3      Lauren and I.
 4      BY MS. MOUSILLI:
 5              Q.      After Ms. Donoho left Big Thirst, Inc., did
 6      you continue to pursue that August 22 loan?
 7              A.      Correct.
 8              Q.      Okay.  And were you responsible for the
 9      documents --
10              A.      Yes.
11              Q.      -- related to that loan?
12              A.      Yes.
13              Q.      Yes.  Did you approve all the documents
14      related to that loan?
15              A.      Yes.
16              Q.      Did anybody else approve those documents
17      related to that loan?
18              A.      No.
19              Q.      For the first line of credit through First
20      Commonwealth Bank, who was responsible for signing any of
21      the agreements on behalf of Big Thirst?
22              A.      I was.
23              Q.      Was anybody else?
24              A.      No.
25              Q.      Did anybody else from Big Thirst review
```

WYLIE 378

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                               111

1    those documents?

2            A.      Yes.

3            Q.      Who?

4            A.      The board of directors.

5            Q.      And for the second line of credit between

6    Big Thirst, Inc. and First Commonwealth Bank, who was

7    responsible for signing the agreements there?

8            A.      I was.

9            Q.      Did you review the documents?

10           A.      Yes.

11           Q.      Did you approve the documents?

12           A.      Yes.

13           Q.      Let's go back to the first loan, the August

14   22 loan from First Commonwealth Bank.  How were those

15   monies allocated?

16           A.      They were allocated primarily for business

17   operations.  However, there was a significant portion that

18   went to pay litigation fees.

19           Q.      How much?

20           A.      In total and since litigation has started,

21   we have paid more than $300,000, which has been crippling

22   for the company.

23           Q.      Okay.  How were the funds for the first

24   line of credit, the 250k that you said that you used all

25   up, how were those funds allocated?

WYLIE 379

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    112

1          A.      They were allocated -- we allocate -- we

2     have an allocation worksheet that allocates.  It was

3     primarily to operations, some to equipment.  Our equipment

4     costs are very low, so it's mostly for operations.

5          Q.      And how were the funds for the second line

6     of credit, the $400,000, allocated?

7          A.      Similarly.  The allocation worksheet is

8     primarily for operations.

9          Q.      Were there any loans that Big Thirst

10    applied for but didn't obtain?

11         A.      Prior to this loan, yes.

12         Q.      Okay.  Which entities did Big Thirst apply

13    for a loan with?

14         A.      We initially sought a loan through Frost

15    Bank, and the conversation started for that on February

16    8th of 2021, and in earnest with applications in May of

17    2021.  The loan was rejected, as they did not believe a

18    startup without revenue was valid for providing a loan.

19         Q.      What other loans did Big Thirst apply for

20    but did not receive?

21         A.      We applied for the same type of SBA loan

22    through Regions Bank, following the rejection from Frost

23    Bank.

24         Q.      When was that?

25         A.      In October, November -- excuse me, probably

WYLIE 380

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    113

1    just October -- it went pretty quick -- of 2021.

2             Q.      And why was the loan not obtained?

3             A.      Same reason, no assets and no revenue.

4    Regions Bank referred us to First Commonwealth Bank.

5             Q.      Okay.  What other loans were applied for by

6    Big Thirst but not obtained?

7             A.      That's all.

8             Q.      Did you disclose the litigation -- the

9    instant litigation to First Commonwealth Bank?

10            A.      Yes.

11            Q.      When did you disclose that ability -- when

12   did you first disclose the instant litigation to First

13   Commonwealth Bank?

14            A.      In April of 2022.

15            Q.      How did you disclose the litigation to

16   First Commonwealth Bank?

17            A.      It was necessary to let them know we had an

18   owners' dispute in March of 2022, as the initial loan had

19   to be put on hold and then cancelled.

20            Q.      Okay.  I'm sorry.  You said the first loan

21   had to be put on hold.  Which first loan are we talking

22   about?

23            A.      We had a loan that we were set to close on

24   on March 17th, 2022, and this is the loan that Lauren

25   Wylie Donoho refused to be a guarantor for.

WYLIE 381

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    114

1          Q.     So the loan was cancelled because you

2     didn't disclose the litigation?

3          A.     We were not in litigation at that time.  It

4     was cancelled because Lauren Wylie Donoho refused to be a

5     guarantor.

6          Q.     Okay.  So that was the first attempt at

7     obtaining a loan from First Commonwealth Bank, correct?

8          A.     Yes.  We rewrote it.

9          Q.     Okay.  And when you say you rewrote it,

10    what does that mean?

11         A.     It means the loan had to be restructured

12    and reissued.

13         Q.     Okay.  And when you applied in -- I'm

14    sorry, this is when you applied in April of 2022, for that

15    -- that second attempt at First Commonwealth Bank,

16    correct?

17         A.     I don't recall the exact date of when the

18    loan application went in, but I would say it was April.

19         Q.     And at that time, you disclosed to First

20    Commonwealth Bank the instant litigation?

21         A.     Correct.

22         Q.     And what was First Commonwealth Bank's

23    response to your disclosure of the instant litigation?

24         A.     There was clear concern, but they

25    understood the circumstances.

WYLIE 382

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    115

1          Q.      Who at First Commonwealth Bank did you work
2    with?
3          A.      Primarily, Gregory Tabron.
4          Q.      Can you please spell his last name?
5          A.      T-A-B-R-O-N.
6          Q.      Did you work with anybody else at First
7    Commonwealth Bank?
8          A.      Yes.  His senior lead is named Keith, and I
9    don't recall his last name.  And there were several other
10   junior employees that worked on the account.
11         Q.      So I understand your testimony today is
12   that you disclosed the instant litigation to First
13   Commonwealth Bank in April 2022, correct?
14         A.      That's my understanding.
15         Q.      Did you disclose the litigation in writing?
16         A.      I believe on the telephone.
17         Q.      Okay.  So you only disclosed the litigation
18   verbally, correct?
19         A.      I don't recall whether there was any email
20   communication, but I know they were well aware.
21         Q.      Okay.  And you understand you have an
22   obligation to disclose the instant litigation when
23   applying for these loans, correct?
24         A.      Correct.
25         Q.      Did you disclose the litigation when you

WYLIE 383

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    116

1    applied for the first line of credit with First

2    Commonwealth Bank?

3            A.      They were done at the same time, yes.

4            Q.      And when you applied for the second line of

5    credit, the 400k through First Commonwealth Bank, did you

6    disclose the --

7            A.      Yes.

8            Q.      -- instant litigation?

9            A.      Yes.

10           Q.      And how did you disclose it?

11           A.      In meetings.  And I'm -- when we went

12   through everything with all the documentation, all the

13   paperwork, it's clear it's in there.

14           Q.      How's it clear?

15           A.      It's in all of our financial records.

16           Q.      Okay.  Let's go back to after you

17   incorporated Big Thirst on your own in April -- I'm sorry,

18   March 2021, you and Lauren Donoho worked together at Big

19   Thirst, Inc., correct?

20           A.      Correct.

21           Q.      Then you alluded to a loan at First

22   Commonwealth Bank that you tried to obtain, that you were

23   not successful in obtaining because Ms. Donoho didn't want

24   to be a guarantor on that loan, correct?

25           A.      Correct.

WYLIE 384

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                         117

1          Q.      Why is it that Ms. Donoho refused to be a
2    guarantor on that loan?
3                  MS. GILSTRAP:  Objection, form.
4                  THE WITNESS:  Her stated reason was that
5    she did not feel comfortable with the security of her
6    financial status.
7    BY MS. MOUSILLI:
8          Q.      What did you understand that to mean?
9          A.      That she felt vulnerable financially.
10         Q.      And what did you do in response?
11         A.      I offered to adjust the ownership share and
12   -- in response.
13         Q.      You offered to adjust the ownership shares
14   in Big Thirst --
15         A.      Uh-huh.
16         Q.      -- for Ms. Donoho --
17         A.      Yes.
18         Q.      -- in your response?  Okay.  And what was
19   your suggestion?
20         A.      Compensate her separately.
21         Q.      And how was that compensation to happen?
22         A.      It didn't happen because she chose not to.
23         Q.      Okay.  So what exactly was your offer?
24         A.      There wasn't an offer made other than a
25   proposal in mediation on March 29th of replacing shares

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    118

1    with phantom shares.

2            Q.    Okay.  And what does that mean?

3            A.    It means that she could be compensated with

4    the same vote, same financial structure, but without the

5    ownership.

6            Q.    Were you upset that Ms. Donoho didn't want

7    to be a guarantor on this loan?

8            A.    I was upset that she chose to broach it on

9    the eve of closing on a loan that we'd worked on for 10

10   months.

11           Q.    So you were upset?

12           A.    I was understandably upset, yes.

13           Q.    Did you pressure Ms. Donoho to become a

14   guarantor on this loan?

15           A.    I offered her alternatives.

16           Q.    Did you threaten Ms. Donoho into signing as

17   a guarantor for this loan?

18           A.    I offered her alternatives.

19           Q.    Could those alternative offerings be

20   construed as a threat?

21           A.    I don't know her state of mind in hearing

22   what those opportunities were.

23           Q.    What did you tell Ms. Donoho would happen

24   if she didn't sign as a guarantor?

25           A.    I told her we could restructure the

WYLIE 386

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          119

1    company.

2          Q.    How could you restructure the company?

3          A.    I had -- the first conversation that she

4    recorded without my consent, I did not know how I would do

5    that because I didn't have legal advice on doing that.

6    When I followed up with her, it was in mediation to offer

7    phantom stock.

8          Q.    Okay.  So you threatened Ms. Donoho to turn

9    Big Thirst into a sole proprietorship, correct?

10         A.    I offered --

11               MS. GILSTRAP:  Objection, form.

12               THE WITNESS:  -- opportunities.

13   BY MS. MOUSILLI:

14         Q.    You threatened to turn Big Thirst into an

15   entity owned wholly by yourself if Ms. Donoho did not sign

16   as a guarantor?

17         A.    I disagree.

18               MS. GILSTRAP:  Wait.  Objection, form.  You

19   can answer.

20               THE WITNESS:  I disagree with your

21   characterization.

22   BY MS. MOUSILLI:

23         Q.    What do you disagree?

24         A.    I do not characterize it as a threat.

25         Q.    You let Ms. Donoho know that you would

WYLIE 387

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              120

1   change the structure at Big Thirst on your own, correct?

2                MS. GILSTRAP:  Objection, form.

3                THE WITNESS:  My offer was to let her out

4   of her number one objection of being a guarantor on the

5   loan to be able to move forward.

6   BY MS. MOUSILLI:

7        Q.    You threatened to take away everything that

8   Ms. Donoho had been working on up until then if she didn't

9   sign as a guarantor, correct?

10               MS. GILSTRAP:  Objection, form.

11               THE WITNESS:  I offered to restructure the

12  loan so she wouldn't have to be a guarantor.

13               MS. MOUSILLI:  That wasn't my question.  I

14  object as nonresponsive.

15  BY MS. MOUSILLI:

16       Q.    Mr. McGinnis, you threatened to take away

17  everything that Ms. Donoho had been working on up until

18  then if she didn't sign as a guarantor; isn't that

19  correct?

20               MS. GILSTRAP:  Objection, form.

21               THE WITNESS:  That is not correct.

22  BY MS. MOUSILLI:

23       Q.    What is incorrect about that statement?

24       A.    I did not make a threat.

25       Q.    You made a statement, didn't you?

WYLIE 388

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    121

```
1              A.     I made a statement --
2                     MS. GILSTRAP:  Objection, form.
3    BY MS. MOUSILLI:
4         Q.     You made a statement that you would take
5    away everything that Ms. Donoho had been working up -- on
6    up until that point, correct?
7              A.     I --
8                     MS. GILSTRAP:  Objection, form.
9                     THE WITNESS:  I made a statement that I
10   would compensate her fairly.
11   BY MS. MOUSILLI:
12            Q.     How would you compensate her?
13            A.     At the time, I did not know.
14            Q.     Okay.  And have you compensated her until
15   this date?
16            A.     Yes.  She still is an owner of 2,700,000
17   shares of stock in Big Thirst.
18            Q.     Has she received a penny in her pocket for
19   any of the work that she's done thus far for Big Thirst,
20   Inc.?
21                    MS. GILSTRAP:  Objection, form.
22                    THE WITNESS:  There has been a liquidity
23   event for her to receive money for the shares in the
24   ownership she has in the company, which is substantial.
25   BY MS. MOUSILLI:
```

WYLIE 389

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    122

```
 1          Q.     The answer is no, isn't it, Mr. McGinnis?
 2    Ms. Donoho has not received a penny to her pocket for any
 3    of the work that she's worked on for Big Thirst, Inc.;
 4    isn't that correct?
 5                   MS. GILSTRAP:  Objection, form.
 6                   THE WITNESS:  Other than money she paid
 7    herself, no.
 8    BY MS. MOUSILLI:
 9          Q.     So sign a guarantor -- sign as a guarantor
10    or else we'll take away everything, is not, in your mind,
11    a threat, Mr. McGinnis?
12                   MS. GILSTRAP:  Objection, form.
13                   THE WITNESS:  There was a heated discussion
14    in the moment.  I quickly followed up with requests to
15    meet for a coolheaded conversation numerous times.  I also
16    replied coolheaded with more concrete things that we could
17    do, and I offered mediation as a way forward.  I offered
18    numerous ways forward after a heated conversation.
19    BY MS. MOUSILLI:
20          Q.     You acknowledge that heated conversation
21    took place, don't you?
22          A.     Yes.
23                   MS. GILSTRAP:  Objection, form.
24    BY MS. MOUSILLI:
25          Q.     And you acknowledge that Ms. Donoho
```

WYLIE 390

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    123

1    received a communication from you that everything that she

2    had been working on could be taken away from her, correct?

3                   MS. GILSTRAP:  Objection, form.

4                   THE WITNESS:  That did not happen.  There

5    was nothing taken away from her.

6    BY MS. MOUSILLI:

7         Q.    Are you aware that in Texas it's perfectly

8    legal for one party to record a conversation?

9         A.    Legality --

10                  MS. GILSTRAP:  Objection, form.

11                  THE WITNESS:  Legality is not my -- my

12   expertise.  I do know that it seems really slimy.

13   BY MS. MOUSILLI:

14        Q.    Okay.  That wasn't my question.  Okay.  Are

15   you aware that in Texas it's perfectly legal for one party

16   to record a conversation?

17                  MS. GILSTRAP:  Objection, form.

18   BY MS. MOUSILLI:

19        Q.    Yes or no?

20                  MS. GILSTRAP:  Objection, form.

21                  THE WITNESS:  I am aware now.

22   BY MS. MOUSILLI:

23        Q.    Have you ever recorded a conversation

24   between you and someone else without them being informed

25   that the conversation was being recorded?

WYLIE 391

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    124

```
1              A.      No.

2              Q.      Let's talk about that mediation that

3      happened that you alluded to earlier.  What happened to

4      initiate that mediation?

5              A.      What led to the mediation is I had

6      requested in-person meetings by phone, calling her and

7      asking for it or in an email asking for ways forward.  She

8      seemed willing to discuss at first, but then stopped

9      responding.  It was clear that we were at an impasse, and

10     I recommended we get a third party -- an impartial voice

11     to help us try and resolve this.

12                     I was committed to trying to fix the

13     situation.  I offered mediators and let her select one

14     that she wanted to use.  We hired and worked with a

15     mediator of her choice.

16             Q.      Okay.  Who was that mediator?

17             A.      Claude Ducloux -- Ducloux.

18             Q.      And when did you meet for mediation with

19     Ms. Donoho?

20             A.      On March 29th of 2022.

21             Q.      Did you come alone?

22             A.      We drove separately, yes.

23             Q.      I'm sorry.  When you say we drove, who's

24     we?

25             A.      Ms. Donoho and I arrived separately.
```

WYLIE 392

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                           125

| | |
|---|---|
| 1 | Q. Okay. Who appeared for the mediation on |
| 2 | your behalf? |
| 3 | A. Just me. |
| 4 | Q. Just you. And who appeared on Ms. Lauren |
| 5 | Donoho's behalf? |
| 6 | A. Just her. |
| 7 | Q. And what were the discussions at the |
| 8 | mediation? |
| 9 | A. I had prepared a document in advance |
| 10 | offering paths forward, including phantom shares. I |
| 11 | believe she offered her -- her document, as well. |
| 12 | Point-of-view documents were both requested ahead of time. |
| 13 | We then met very briefly together in a conference room and |
| 14 | then had separate discussions in separate rooms. And the |
| 15 | mediator went back and forth between the meetings. |
| 16 | It was disclosed at that time that there |
| 17 | was not going to be any resolution and that Ms. Donoho had |
| 18 | me over a barrel and would refuse to negotiate at all and |
| 19 | was willing to shut down the company. |
| 20 | Q. So you seem kind of upset that Ms. Donoho |
| 21 | recorded your conversation, right? You refer to it as |
| 22 | being slimy; is that correct? You referred to her -- |
| 23 | A. I -- |
| 24 | Q. I'm sorry. My question is: Did you refer |
| 25 | to her recording of a conversation between you and her as |

WYLIE 393

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          126

1    slimy?

2         A.    I just did, yes.

3         Q.    Okay.  You were upset at the fact that she

4    had recorded a conversation, correct?

5         A.    She had coerced an attempt -- as a change

6    in the corporate structure, attempted to use coercion in

7    holding a loan hostage to get her way.  And then knowing I

8    was angry, called and recorded.

9              MS. MOUSILLI:  Objection, nonresponsive.

10   BY MS. MOUSILLI:

11        Q.    You were upset that Ms. Donoho recorded the

12   conversation between you and her, correct?

13        A.    I'm upset by the circumstances surrounding

14   it.

15        Q.    Okay.  Because you took extreme measures to

16   make sure nothing that you and her agreed on was in

17   writing, correct?

18              MS. GILSTRAP:  Objection, form.

19              THE WITNESS:  Incorrect.

20   BY MS. MOUSILLI:

21        Q.    Okay.  And you made sure that every time

22   you and her had discussions about her being an equal

23   partner, it was all verbal, correct?

24        A.    Incorrect.

25        Q.    And you purposely never wrote down any of

WYLIE 394

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    127

```
 1    the agreements that you had with Ms. Donoho about being an
 2    equal partner, correct?
 3            A.      Incorrect.  All of this is documented.
 4                    MS. GILSTRAP:  Just answer the question.
 5                    THE WITNESS:  Incorrect.
 6    BY MS. MOUSILLI:
 7            Q.      Okay.  So again, there are no written
 8    communications about her equal shares in the company
 9    because you did that all verbally, correct?
10            A.      Incorrect.
11            Q.      Yet, when she chose to record a
12    conversation, you become upset, correct?
13            A.      There's no causation between those two
14    items.
15            Q.      The fact that Ms. Donoho contributed, as a
16    capital contribution significantly -- 10 times what you
17    contributed -- was not sufficient to increase her shares,
18    was it?
19                    MS. GILSTRAP:  Objection, form.
20                    THE WITNESS:  The company was built on my
21    work, my relationships, my reputation, the reputation of
22    the brands and the services provided by the other Big
23    Thirst companies.
24    BY MS. MOUSILLI:
25            Q.      That wasn't my question, Mr. McGinnis.  The
```

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                           128

1    fact that Ms. Donoho contributed 10 times the capital that
2    you did wasn't sufficient to increase her shares, was it?
3            A.      No.
4            Q.      How were Ms. Donoho's services valued?
5            A.      Ms. Donoho's services were valued highly,
6    and she was compensated with 2,700,000 shares of stock.
7            Q.      What went into the valuation of her
8    services?
9            A.      There was no formal evaluation of the
10   contributions made by either of us.
11           Q.      How was her monetary contribution valued?
12           A.      We had discussions about how ownership
13   share would shake out based on input from articles we
14   read, input from mentors, input from people in the
15   industry, and we came to agreement on it between May and
16   June of 2021.
17           Q.      And what was that agreement?
18           A.      That I would receive 3,300,000 shares and
19   she would receive 2,700,000 shares.
20           Q.      What was the result of that mediation that
21   you referred to earlier?
22           A.      The result was that there was no agreement.
23           Q.      What all did Ms. Donoho create while she
24   was with Big Thirst?
25           A.      She installed Shopify and ShipStation.  She

WYLIE 396

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    129

1   licensed and stitched together a dashboard consisting of

2   Auth0, Panoply, Cumul.io, and Heroku, and she assisted

3   with the development of the website.

4           Q.      How much time did Ms. Donoho spend on the

5   technical aspects?

6           A.      Ms. Donoho never submitted a timesheet.

7           Q.      How much time do you estimate that

8   Ms. Donoho spent on the technical aspects?

9           A.      I have no way of knowing.

10          Q.      How much time did Ms. Donoho spend on

11  developing the website for Big Thirst?

12          A.      I have no way of knowing.

13          Q.      How much time did Ms. Donoho spend on the

14  management system?

15          A.      I have no way of knowing.

16          Q.      How much time did Ms. Donoho spend on

17  developing the software applications?

18          A.      I have no way of knowing.

19          Q.      How much time did Ms. Donoho spend on

20  creating the source code for Big Thirst?

21                  MS. GILSTRAP:  Objection, form.

22                  THE WITNESS:  I am unaware of any source

23  code created.

24  BY MS. MOUSILLI:

25          Q.      Is that because you're not a technical

WYLIE 397

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    130

```
1    person, Mr. McGinnis?
2            A.      That is because in all applications --
3                    MS. GILSTRAP:  Answer the question.
4                    THE WITNESS:  No, it is not correct.
5    BY MS. MOUSILLI:
6            Q.      Okay.  How is it that you don't know that
7    there was source code created for Big Thirst, Inc.?
8            A.      I do not believe there's any source code
9    created for Big Thirst, Inc.
10           Q.      Okay.  And that's your testimony today?
11           A.      Yes.
12           Q.      How much time did you spend on the
13   technical aspects for Big Thirst, Inc.?
14           A.      In what time period?
15           Q.      From its formation until today.
16           A.      A considerable amount of time.  It's a
17   daily aspect.
18                   MS. GILSTRAP:  Answer the questions.
19   BY MS. MOUSILLI:
20           Q.      How much time did you spend on developing
21   the website for Big Thirst, Inc.?
22           A.      I would estimate about 30 hours.
23           Q.      From the formation of Big Thirst until
24   today?
25           A.      No, during the time when Ms. Donoho was
```

WYLIE 398

1    employed.

2             Q.     Okay.  So from the creation of Big Thirst,

3    Inc. until today, how much time have you spent on

4    developing the website?

5             MS. GILSTRAP:  Objection, form.

6             THE WITNESS:  In the entire life of the

7    company, I've likely spent 60 hours on that website.

8    BY MS. MOUSILLI:

9             Q.     Doing what on the website?

10            A.     On -- the website has been revised twice

11   since her departure.  The current website is completely

12   new.  I selected all imagery for it.  I wrote all the

13   content.  I helped do the layout, the concepts, the

14   navigation, everything except for the actual adding the

15   material to the content management system.

16            Q.     Prior to Ms. Donoho leaving Big Thirst, how

17   much time did you spend on the website?

18            A.     I would estimate about 30 hours.

19            Q.     And what did you do in those 30 hours?

20            A.     I authored the content.  I provided the

21   graphic design and thematic input and had numerous hours

22   with Suzanne McGinnis and Wylie Donoho to come up with

23   what it would look like and what it sounded like.

24            Q.     You authored the content for the website?

25            A.     That's correct.

WYLIE 399

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    132

1        Q.     Okay.  What proof do you have that you
2   authored the content?
3        A.     I have several documents that show that I
4   am the author, and revision control show what I wrote both
5   in -- in various documents.
6        Q.     How much time did you spend on the
7   management system for Big Thirst from creation until
8   today?
9                MS. GILSTRAP:  Objection, form.
10               THE WITNESS:  Please define the management
11  system.
12  BY MS. MOUSILLI:
13       Q.     Big Thirst, Inc. uses a management system,
14  correct?
15               MS. GILSTRAP:  Objection, form.
16               THE WITNESS:  Big Thirst, Inc. uses several
17  management tools.  I'm not sure what you mean.
18  BY MS. MOUSILLI:
19       Q.     Okay.  The management system related to the
20  data dashboard.
21               MS. GILSTRAP:  Objection, form.
22               THE WITNESS:  Are you --
23  BY MS. MOUSILLI:
24       Q.     Okay.  How many management systems does Big
25  Thirst, Inc. have?

WYLIE 400

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          133

```
 1          A.      We have project management systems.
 2                  MS. GILSTRAP:  Answer her question.
 3                  THE WITNESS:  We have five.
 4   BY MS. MOUSILLI:
 5          Q.      And tell me about those five management
 6   systems.
 7          A.      We have a project management system.  We
 8   have a communication management system.  We have a public
 9   relations management system and social media management
10   systems.
11          Q.      How much time have you spent on the -- on
12   any of those five management systems from Big Thirst's
13   inception until today?
14          A.      I would estimate that I spend at least an
15   hour a day on all of those.
16          Q.      When Ms. Donoho was a part of Big Thirst,
17   how much time did you spend on the management systems
18   belonging to Big Thirst, Inc.?
19          A.      I did not work on the dashboard.  However,
20   I did maintain management systems relating to our
21   communications.
22                  MS. MOUSILLI:  Objection, nonresponsive.
23   BY MS. MOUSILLI:
24          Q.      When Ms. Donoho was part of Big Thirst, how
25   much time did you spend on the management systems
```

WYLIE 401

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          134

1    belonging to Big Thirst?

2                MS. GILSTRAP:  Objection, form.

3                THE WITNESS:  I did not spend a lot of time

4    on those.

5    BY MS. MOUSILLI:

6        Q.    Okay.  From its inception until today, how

7    much time have you spent on software applications

8    belonging to Big Thirst, Inc.?

9        A.    I spend considerable time daily on our

10   software systems.

11       Q.    What do you do to the software systems?

12       A.    I would consider this attorney privilege.

13               MS. GILSTRAP:  Okay.  We'll go AEO, if you

14   want to ask your clients out.

15               MS. MOUSILLI:  I don't understand how this

16   is AEO.

17               MS. GILSTRAP:  Well, I'm not going to have

18   him answer it until -- he's saying these are trade secrets

19   or confidential information about his business that he

20   doesn't want to share with someone who's already stated

21   under oath that she can just --

22               MS. MOUSILLI:  Lauren, if you could just

23   step out, please.

24                   AEO DESIGNATION BEGINS

25   <-- CONFIDENTIAL

WYLIE 402

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          135

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WYLIE 403

Transcript of Matthew John McGinnis
Conducted on March 28, 2024    136

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WYLIE 404

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

137

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

138

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WYLIE 406

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WYLIE 407

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

140

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

WYLIE 408

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

141

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

WYLIE 409

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    142

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WYLIE 410

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    143

```
1

2

3

4

5

6

7      -->

8                    AEO DESIGNATION CONCLUDES

9   BY MS. MOUSILLI:

10         Q.    Okay.  Mr. McGinnis, you testified that Big

11  Thirst only uses, quote, off-the-shelf source code --

12              MS. GILSTRAP:  Objection, form.

13  BY MS. MOUSILLI:

14         Q.    -- correct?

15         A.    That's not what I said.

16         Q.    What is it that you -- I'm sorry.  I

17  misspoke.  I had understood from you that Big Thirst only

18  uses off-the-shelf software, correct?

19         A.    Correct.  And that there is customization

20  to that.

21         Q.    And when you say off-the-shelf, what do you

22  mean by that?

23         A.    Meaning -- let's use Shopify as an example,

24  if that's okay.

25         Q.    Sure.
```

WYLIE 411

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                            144

1          A.     Okay.  Shopify is an e-commerce platform

2     used by more than 4.1 million online stores around the

3     world.  It's ubiquitous.  It's something that any one

4     small business owner can download, install, and populate

5     with products without ever knowing how to do a line of

6     code.

7                 However, the way we use it is highly

8     customized beyond that.  So the integrations, the payment

9     system it links to, the inventory management, all those

10    things are different.

11         Q.     Okay.  So what I understand you to say is

12    Shopify, for example, is a software that millions of

13    people use and that Big Thirst has customized, correct?

14         A.     We have -- are we getting into sharing

15    information that --

16                MS. GILSTRAP:  Let's do this --

17                THE WITNESS:  I thought we were done with

18    software.

19                MS. GILSTRAP:  Let's just do this on the

20    video and --

21    BY MS. MOUSILLI:

22         Q.     I'm not going to get into the specifics of

23    how you use the software, but I'm asking you:  Have you

24    customized Shopify for Big Thirst?

25                MS. GILSTRAP:  It's a yes-or-no question.

WYLIE 412

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          145

1          THE WITNESS:  Yes.

2    BY MS. MOUSILLI:

3          Q.    Okay.  When Ms. Donoho was COO -- COO and

4    director at Big Thirst, did she customize Shopify for Big

5    Thirst's use?

6          A.    In the aspects of choosing font size and

7    placement of buttons, yes.

8          Q.    Do you believe she did anything else to

9    Shopify in order to customize it for Big Thirst?

10         A.    The only other thing I know of is how it

11   linked up to ShipStation.

12         Q.    And what do you know about that link?

13         A.    I know that we had to replace it.  It

14   wasn't connected correctly.

15         Q.    Okay.  So what do you know about

16   Ms. Donoho's work in customizing Shopify for Big Thirst,

17   Inc.?

18         A.    In looking at the code, all I can see is

19   that she did this straightforward formatting of changing

20   font -- font size and colors.

21         Q.    And is that all you believe that Ms. Donoho

22   did in order to customize Shopify for Big Thirst's use?

23         A.    That's my understanding.

24         Q.    Let's kind of talk generally.  What do you

25   think it is that Ms. Donoho did in terms of creating a

WYLIE 413

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          146

1    tech stack for Big Thirst, Inc.?

2            A.    What I think she did and what she did, she

3    licensed software for Shopify and ShipStation, which takes

4    orders and routes them for fulfillment.  It is simply

5    install them, connect them, set them up, ready to go.

6                    For the dashboard, it was more work than

7    that to ensure that the data from various sources,

8    primarily Shopify for the first level of information,

9    flowed in properly into Panoply, populated through Cumul

10   and Heroku.

11           Q.    Do you think Ms. Donoho's work required any

12   kind of technical expertise?

13           A.    In -- for that application, yes.  And as

14   she testified yesterday, some of that outstripped her

15   ability.

16           Q.    What outstripped her ability?

17           A.    The ability to fully complete the project

18   with installing Cumul.

19           Q.    Was Cumul.io working when Ms. Donoho was a

20   COO and director at Big Thirst?

21           A.    Yes.

22           Q.    And who worked on it besides Ms. Donoho?

23           A.    Just Ms. Donoho.

24           Q.    So did it outstrip her abilities?

25           A.    She used tech support --

WYLIE 414

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              147

```
 1                    MS. GILSTRAP:  So answer --
 2                    THE WITNESS:  Yes.
 3                    MS. GILSTRAP:  -- the question.
 4                    THE WITNESS:  Yes.
 5    BY MS. MOUSILLI:
 6         Q.    How is it that it outstripped her abilities
 7    if it was fully functioning?
 8         A.    She was not able to complete it without
 9    outside support.
10         Q.    And who did she rely on for outside
11    support?
12         A.    Cumul tech support.
13         Q.    So you're saying because she contacted
14    customer support for an application, that outstripped her
15    ability to work on the application?
16         A.    She conveyed --
17                    MS. GILSTRAP:  Answer the question.
18                    THE WITNESS:  Yes.
19    BY MS. MOUSILLI:
20         Q.    What were you going to say?  She conveyed
21    what?
22         A.    She conveyed to me additional support.
23         Q.    To who?
24         A.    To me.
25         Q.    And did she get that support?
```

WYLIE 415

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                           148

1          A.      She did.

2          Q.      And was Cumul.io working?

3          A.      After that, yes.

4          Q.      Who paid invoices for services related to

5    the technical aspects for Big Thirst when Ms. Donoho was

6    COO and director?

7          A.      Ms. Donoho set up the subscriptions and

8    there were automated payments after that.

9          Q.      What subscriptions did Ms. Donoho set up?

10         A.      Shopify, ShipStation, Panoply, Heroku,

11   Cumul.io.

12         Q.      What was your involvement with these

13   services while Ms. Donoho was COO and director at Big

14   Thirst?

15         A.      I was not directly involved in the setup or

16   management of the systems.

17         Q.      Who took over this responsibility after

18   Ms. Donoho left Big Thirst?

19         A.      No one took over the management of that

20   data dashboard, as it was no longer available.

21         Q.      What was no longer available?

22         A.      That data dashboard was no longer available

23   for us to manage.

24         Q.      We'll get into that a little bit more

25   later.  Who managed the day-to-day business operations for

WYLIE 416

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    149

1    Big Thirst when Ms. Donoho was a COO and director at Big

2    Thirst?

3            A.    Ms. Donoho oversaw the operations.

4            Q.    Can you elaborate on what you mean when you

5    say she oversaw the operations?

6            A.    Yes, for example, if -- when we got a new

7    client, she set up their products in the store, got their

8    website populated with the buy buttons, and connected to

9    the shipping fulfillment software.

10           Q.    What else did she do?

11           A.    She maintained the dashboard and set up new

12   clients on it.

13           Q.    Okay.  How much time each day do you think

14   Ms. Donoho spent on the day-to-day business relations for

15   Big Thirst?

16           A.    She has never quantified that in a

17   timesheet, so I don't know.

18           Q.    How much time do you approximate?

19           A.    I assume she worked eight-hour days.

20           Q.    Okay.  So these eight-hour days that

21   Ms. Donoho worked, she was working on day-to-day business

22   operations for Big Thirst?

23           A.    From the time the company started.

24   However, she has stated that Big Thirst, prior, was not

25   her primary client and she had much more work with a

WYLIE 417

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          150

1   different staffing firm.

2          Q.     How much time did you dedicate to the

3   day-to-day operations for Big Thirst when Ms. Donoho was

4   COO and director?

5          A.     Approximately 45 to 50 hours a week.

6          Q.     And what did you do in that capacity?

7          A.     A lot of it was the relationships with the

8   -- making sure we had set up with the retailers, working

9   on relationships with various distributors, and a lot of

10  customer prospecting, a lot of -- the majority of my work

11  was on prospecting and pitching.

12         Q.     Is there any record of the time that you

13  spent?

14         A.     I can produce all of my calendars and all

15  of my communications.

16                MS. GILSTRAP:  Answer the question.

17                THE WITNESS:  Yes.

18                MS. GILSTRAP:  Just answer the questions.

19                THE WITNESS:  Yes.

20                MS. MOUSILLI:  Okay.  Lessie, if we can --

21  do you want to prepare your client better?  Do you want to

22  take a break?  Because I don't want these kinds of

23  interruptions when you're telling him to answer the

24  question.  Do you want to talk to him?

25                MS. GILSTRAP:  I've never had someone to

WYLIE 418

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          151

1   tell me not to tell my client to -- but I'll stop and he

2   can answer however he wants.

3                   MS. MOUSILLI:  Okay.  Thank you.

4   BY MS. MOUSILLI:

5           Q.      So again, is there any written record of

6   the time you spent in day-to-day operations for Big

7   Thirst?

8           A.      Yes.

9           Q.      Okay.  And what are those records?

10          A.      I have kept all of my email documentation.

11  I have kept CRM documentation.  I've kept calendar

12  documentation.

13          Q.      Who managed the day-to-day client relations

14  when -- I'm sorry.  Well, let me -- well, who managed the

15  day-to-day client relations for Big Thirst when Ms. --

16  okay.  Let me start again.  Sorry.  I just -- I apologize.

17                  Okay.  Who managed the day-to-day client

18  relations when Ms. Donoho was a COO and director at Big

19  Thirst?

20          A.      We both had direct responsibility.

21          Q.      Okay.  How much did each person contribute?

22  How much time did each person contribute?

23          A.      I can't speak to her time.  That was a

24  primary aspect of my time.

25          Q.      Did Big Thirst implement anything that

WYLIE 419

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          152

1   Ms. Donoho created while she was the COO and director at

2   Big Thirst?

3        A.    I don't understand your question.  Could

4   you restate, please?

5        Q.    Did Big Thirst use any work that Ms. Donoho

6   created when she was COO and director at Big Thirst?

7        A.    Yes.

8              MS. GILSTRAP:  Objection, form.

9              THE WITNESS:  Yes, we used the data

10  dashboard.

11  BY MS. MOUSILLI:

12       Q.    What else did you use?

13       A.    We uses the ShipStation and Shopify.

14       Q.    Were there any formal agreements related to

15  this use?

16       A.    Other than the corporate documents, no.

17       Q.    Is Big Thirst still using the tech stack

18  that Ms. Donoho created?

19       A.    No.

20       Q.    Was Big Thirst ever told to stop using the

21  tech stack that Ms. Donoho created?

22       A.    Yes.

23       Q.    When?

24       A.    In late April of 2022.

25       Q.    How did you receive that communication?

WYLIE 420

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    153

```
1                    MS. GILSTRAP:  Objection, form.
2                    THE WITNESS:  We received that
3    communication via certified mail.
4    BY MS. MOUSILLI:
5           Q.    What was that communication?
6           A.    That Ms. Donoho issued a cease and desist.
7           Q.    Okay.  Did that communication come from my
8    office?
9           A.    I believe so.
10          Q.    And what did that cease and desist letter
11   say?
12          A.    I don't recall it verbatim.
13          Q.    What was the overall message about cease
14   and desist?
15                   MS. GILSTRAP:  Objection, form.
16                   THE WITNESS:  The overall message was that
17   you were unilaterally declaring that we were no longer
18   allowed to use things that she had worked on.
19   BY MS. MOUSILLI:
20          Q.    So you received a communication on behalf
21   of Ms. Donoho instructing you and Big Thirst to stop using
22   the tech stack that Ms. Donoho created, correct?
23                   MS. GILSTRAP:  Objection, form.
24                   THE WITNESS:  You said the tech stack that
25   she created.  We were not using a tech stack that she
```

WYLIE 421

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                           154

1    created after we received that letter.

2    BY MS. MOUSILLI:

3         Q.    At the time that you received the letter,

4    was Big Thirst using Ms. Donoho's tech stack?

5         A.    We were not using what you're calling a

6    tech stack, no.

7         Q.    What was Big Thirst using as opposed to

8    that tech stack?

9         A.    We used a variety of software applications

10   that helped us get through until we could implement what

11   we wanted to be using.

12        Q.    Okay.  And when did that happen?

13        A.    We built a new data dashboard between July

14   2022 and September 2022.

15        Q.    But in April 2022 -- prior to April 2022,

16   what were you using?

17              MS. GILSTRAP:  Objection, form.

18              THE WITNESS:  We were not able to operate,

19   update, maintain, or do anything to the data dashboard.

20   So it was not something we used.

21   BY MS. MOUSILLI:

22        Q.    You didn't use the data dashboard after

23   Ms. Donoho resigned?

24        A.    That's correct.

25        Q.    You didn't use it in any capacity?

WYLIE 422

```
1          A.    We used a portion -- one of the
2    technologies in a way that was not the way it was used in
3    the dashboard, but that software was licensed to Big
4    Thirst and the ownership of Big Thirst and not as a part
5    of a combined tech stack authored by Ms. Donoho.
6          Q.    Did you use any part of the tech stack that
7    Ms. Donoho created --
8          A.    We --
9          Q.    -- after she resigned?
10         A.    -- temporarily used a program called
11   Panoply and -- because we were given access to that by
12   Ms. Donoho as part of the TI.
13         Q.    What is DI?
14         A.    The temporary injection.
15         Q.    TI.  So I just want to get the timeline
16   that you're telling me straight.  When did Ms. Donoho
17   resign?
18         A.    On April 7th, 2022.
19         Q.    Okay.  And after Ms. Donoho resigned,
20   you're telling the jury that you stopped using her tech
21   stack?
22         A.    I had no access to that dashboard.
23         Q.    That wasn't my question.
24               MS. MOUSILLI:  Objection, nonresponsive.
25   BY MS. MOUSILLI:
```

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    156

1           Q.      After Ms. Donoho resigned, did Big Thirst

2    continue to use any aspect of the tech stack that

3    Ms. Donoho created?

4                   MS. GILSTRAP:  Objection, form.

5                   THE WITNESS:  Are you asking if we used any

6    software licensed to Big Thirst?

7    BY MS. MOUSILLI:

8           Q.      I'm asking you if you used any aspect of

9    the data dashboard that Ms. Donoho created after she

10   resigned?

11                  MS. GILSTRAP:  Objection, form.

12                  THE WITNESS:  As I understand how you

13   define tech stack -- it's a unified grouping of

14   technologies.  In that case, no.

15   BY MS. MOUSILLI:

16          Q.      Did anyone at Big Thirst use any aspect of

17   the data dashboard that Ms. Donoho created after she

18   resigned?

19          A.      As a unified dashboard, no.

20          Q.      What do you mean by unified dashboard?

21          A.      The way Ms. Donoho describes her dashboard

22   is, it is a complex Rube Goldberg machine, I believe she

23   called it, that works together in a very complex way to

24   get results.  We did not use that Rube Goldberg machine

25   the way she built it.  We used Panoply as a licensed

WYLIE 424

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          157

1    software to Big Thirst for a slightly -- well, for a

2    different way within trying to do data results for our

3    clients.

4            Q.    Did any of your clients have access to the

5    data dashboard that Ms. Donoho created after she resigned?

6            A.    They had access to the data dashboard in a

7    limited capacity.  Meaning, that what was promised in Tier

8    2 and Tier 3 clients no longer worked as attributed -- as

9    would be told to me by seven clients.  And -- but there

10   was the basic functionality of sales reports in those

11   dashboards from the time she resigned until mid-May.

12           Q.    To your understanding, did any of your

13   client -- did any of Big Thirst's clients access the data

14   dashboard that Ms. Donoho created after she resigned?

15           A.    Yes.

16           Q.    To your knowledge, did any of your clients

17   -- I'm sorry.  To your knowledge, did any of Big Thirst's

18   clients access the data dashboard that Ms. Donoho created

19   after you received the cease and desist letter from our

20   offices?

21           A.    I have no record of what those accesses

22   were because I did not have visibility to the dashboard.

23   My answer would be no.

24           Q.    When was the first time that Ms. Donoho

25   told you to stop using her tech stacks?

WYLIE 425

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    158

1          A.     I believe that the copyright was filed on

2     April 26th, and we received the letter after that.

3                    (Sotto voce discussion.)

4                    MS. GILSTRAP:  Counsel, let's take a break.

5                    MS. MOUSILLI:  I'm sorry?

6                    MS. GILSTRAP:  We're going to take a break.

7                    MS. MOUSILLI:  Okay.  So the rules are that

8     we have to unilaterally [sic] agree to a break.

9                    MS. GILSTRAP:  We don't have to -- we --

10    there's no question pending.  And you said, Do you need to

11    take a break to talk to your client?

12                   MS. MOUSILLI:  Right.

13                   MS. GILSTRAP:  And I do.

14                   MS. MOUSILLI:  Okay.  So --

15                   (Crosstalk between parties.)

16                   MS. MOUSILLI:  I'm sorry.  We need to agree

17    to this together.  We're still on the record.  We're still

18    on the record.  Okay.  So opposing counsel did not ask me

19    for a break.  She just unilaterally took the break.  I

20    want that to be clear on the record.  Let's go off the

21    record.

22                   THE VIDEOGRAPHER:  We're off the record at

23    1:08 p.m.

24                   (A recess was taken at 1:08 p.m. to

25    1:12 p.m.)

WYLIE 426

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                159

1              THE VIDEOGRAPHER:  Record No. 4, back on

2    the record at 1:12 p.m.)

3    BY MS. MOUSILLI:

4         Q.     Mr. McGinnis, was there ever a time that

5    Ms. Donoho shut down the data dashboard that she had

6    created for Big Thirst?

7         A.     Yes.

8         Q.     When was that?

9         A.     April 2nd.

10        Q.     And what was shut down?

11        A.     My access to it, as well as functionality

12   for Tier 2 and Tier 3 clients.

13        Q.     Okay.  When you say your access to it, are

14   you referring to your viewing access of the data

15   dashboard?

16        A.     Yes.

17        Q.     And does that mean the data dashboard was

18   shut down just because you couldn't view it?

19             MS. GILSTRAP:  Objection, form.

20             THE WITNESS:  Yes.

21   BY MS. MOUSILLI:

22        Q.     So just because you couldn't view it, you

23   believe the data dashboard was shut down, correct?

24        A.     Yes.

25        Q.     Was Mark Shilling able to view the data

WYLIE 427

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          160

1    dashboard when Ms. Donoho resigned?

2          A.      In a limited capacity.

3          Q.      What did you do about Ms. Donoho removing

4    your viewing access to the data dashboard?

5          A.      I informed my attorney.

6          Q.      And what did you do next?

7          A.      We filed a temporary injunction.

8          Q.      What specifically about the data dashboard

9    was not functioning, according to you, besides your

10   viewing access?

11         A.      The promised aspects of having data

12   analytics for Facebook and Google were no longer there.

13         Q.      When you say promised, what does that mean?

14         A.      It means that that's how we sold Tier 2 and

15   Tier 3 subscriptions, and it was not in the data

16   dashboards for clients after that point.

17         Q.      Do you believe it was part of the data

18   dashboard before Ms. Donoho resigned?

19         A.      That is how she represented it to clients

20   and to me, yes.

21         Q.      Were those representations in writing

22   anywhere?

23         A.      Yes.

24         Q.      Where?

25         A.      In all agreements signed with clients.

WYLIE 428

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                            161

1          Q.      What agreements are you referring to?

2          A.      The annual agreements of contract of what

3    they receive for them in membership dues.

4          Q.      Let's talk about the replacement of the

5    data dashboard that you allege happened.  Did you ever

6    replace the data dashboard that Ms. Donoho created for Big

7    Thirst?

8          A.      Yes.

9          Q.      How?

10         A.      We built a completely new dashboard with

11   completely different underlying technology.

12         Q.      When?

13         A.      Beginning July 1st, 2022.

14         Q.      And why was a new data dashboard created?

15         A.      Because the old one was not possible to use

16   at all.

17         Q.      Who was involved in creating the new data

18   dashboard for Big Thirst on July 1st, 2022?

19         A.      The primary architect was Edson Espindola.

20         Q.      And is this the data dashboard that you

21   claim you paid about $42,000 for?

22         A.      Correct.

23         Q.      Was Big Thirst ever asked to cease using

24   any intellectual property by anyone?

25                 MS. GILSTRAP:  Objection, form.

WYLIE 429

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              162

```
 1                    THE WITNESS:  Ms. Donoho requested that.
 2    BY MS. MOUSILLI:
 3           Q.     Was Big Thirst ever told to stop using a
 4    copyright by anyone?
 5                    MS. GILSTRAP:  Objection, form.
 6                    THE WITNESS:  Ms. Donoho requested that.
 7    BY MS. MOUSILLI:
 8           Q.     When was the request to stop using
 9    Ms. Donoho's copyright to the website received by Big
10    Thirst?
11           A.     I don't have the date.
12           Q.     Approximately?
13           A.     Approximately, end of April, beginning of
14    May.
15           Q.     Did Big Thirst stop using the copyrighted
16    website that Ms. Donoho asked for it to stop using?
17           A.     Yes.
18           Q.     When did Big Thirst stop using the
19    copyrighted website that Ms. Donoho created?
20           A.     We built a new website.  It was live in
21    June or the beginning of July.
22           Q.     So the beginning of June of what year did
23    you start using --
24           A.     2022.
25           Q.     Okay.  I'm sorry.  You need to wait for my
```

WYLIE 430

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    163

1    question.  Beginning of what year -- what is the month and

2    the year that Big Thirst started to use a new website that

3    didn't infringe on Ms. Donoho's copyright?

4                    MS. GILSTRAP:  Objection, form.

5                    THE WITNESS:  We built a new website and it

6    was live in June or July of 2022.

7    BY MS. MOUSILLI:

8          Q.    How did the website that you claim replaced

9    the website that Ms. Donoho copyrighted differ from hers?

10                    MS. GILSTRAP:  Objection, form.

11                    THE WITNESS:  It was built with a different

12   theme.  It was built with different information and had a

13   different navigation.

14   BY MS. MOUSILLI:

15         Q.    Did it have a different logo?

16         A.    No, it did not.

17         Q.    Was the content different?

18         A.    Yes.

19         Q.    How was it different?

20         A.    It was greatly reduced and rewritten.

21         Q.    What fiduciary duties did Ms. Donoho have

22   to Big Thirst when she was a -- the COO and director?

23                    MS. GILSTRAP:  Objection, form.

24                    THE WITNESS:  The fiduciary duties of

25   officers are outlined in our bylaws.

WYLIE 431

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    164

```
 1   BY MS. MOUSILLI:
 2         Q.     And what are those?
 3         A.     To uphold the fulfillment of their duties
 4   of not precluding any commerce, any sales, or to impede
 5   any customer getting their services.
 6         Q.     Are those the only duties that Ms. Donoho
 7   owed to Big Thirst, Inc.?
 8              MS. GILSTRAP:  Objection, form.
 9              THE WITNESS:  I don't know the totality
10   without reading it in front of me.
11   BY MS. MOUSILLI:
12         Q.     How did Ms. Donoho fail to meet these
13   duties?
14         A.     Ms. Donoho shut down my ability to manage
15   an integral part of the business:  In particular, locking
16   me out of Shopify, which processed orders; ShipStation,
17   routing orders, which led to numerous orders being stuck
18   and not being able to route to retail fulfill --
19   fulfillment; and out of PayPal, which didn't allow me to
20   move payments to retailers.
21         Q.     How do you know that Ms. Donoho locked you
22   out of these applications?
23         A.     It's well documented in court.
24         Q.     That wasn't my question.  How do you know
25   that Ms. Donoho locked you out of these applications?
```

WYLIE 432

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                         165

```
1                    MS. GILSTRAP:  Objection, form.
2                    THE WITNESS:  Ms. Donoho changed the
3      passwords and I no longer had access.
4      BY MS. MOUSILLI:
5           Q.    Did that stop Big Thirst from being able to
6      do any business?
7                    MS. GILSTRAP:  Objection, form.
8                    THE WITNESS:  It greatly impeded our
9      business.
10     BY MS. MOUSILLI:
11          Q.    In your claim -- in your loss, you claim
12     Ms. Donoho placed her own interest above Big Thirst; isn't
13     that correct?
14          A.    Correct.
15          Q.    Okay.  And how did she do that?
16          A.    By claiming that the Big Thirst dashboard
17     and the software we used to operate e-commerce were her
18     own and shutting them off for the company to use.
19          Q.    Were they her own?
20          A.    No, they were not.
21          Q.    But she was able to obtain a copyright,
22     correct?
23                   MS. GILSTRAP:  Objection, form.
24                   THE WITNESS:  I do not know how that
25     happened.
```

WYLIE 433

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                               166

```
1    BY MS. MOUSILLI:
2          Q.    How did Ms. Donoho fail to refrain from
3    self-dealing with Big Thirst?
4          A.    Could you restate that question?
5          Q.    In your lawsuit you claim that Ms. Donoho
6    failed to refrain from self-dealing with Big Thirst,
7    correct?
8          A.    Correct.
9          Q.    And how -- how did that self-dealing occur?
10         MS. GILSTRAP:  Objection, form.
11         THE WITNESS:  Ms. Donoho chose to remove
12   access to critical software for her own use.
13   BY MS. MOUSILLI:
14         Q.    And is that what you believe self-dealing
15   is?
16         A.    Yes.
17         Q.    How was Ms. Donoho disloyal to Big Thirst?
18         MS. GILSTRAP:  Objection, form.
19         THE WITNESS:  Ms. Donoho chose to shut down
20   the operations in spite.
21   BY MS. MOUSILLI:
22         Q.    In spite of what?
23         A.    In spite of the company.  She wanted to
24   seek retribution for not getting a larger share in the
25   company.
```

WYLIE 434

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    167

```
 1          Q.      Okay.  Do you believe that Ms. Donoho
 2    wasn't supposed to compete with Big Thirst?
 3          A.      We did not ask her not to compete.
 4          Q.      Do you believe Ms. Donoho competed with Big
 5    Thirst?
 6          A.      Yes.
 7          Q.      When?
 8          A.      Beginning in July 2022, and commencing
 9    through July 2023.
10          Q.      Is that after she resigned from Big Thirst?
11          A.      Yes.
12          Q.      So earlier you said that when Big Thirst
13    was initially formed, there were a few people on the
14    board:  Yourself, Ms. Donoho, Mark Shilling, and Suzanne
15    McGinnis, correct?
16          A.      Correct.
17          Q.      Okay.  Was anybody added to the board after
18    Ms. Donoho resigned?
19          A.      We did not add to the board of directors.
20          Q.      After Ms. Donoho resigned, were any changes
21    made to any person's interest in Big Thirst?
22          A.      Yes.
23          Q.      Who?
24          A.      We added two advisors.
25          Q.      Okay.  And how did that affect other
```

WYLIE 435

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                168

1    people's interest in Big Thirst?

2              MS. GILSTRAP:  Objection, form.

3              THE WITNESS:  It allowed us to get industry

4    expertise to improve our operations.

5    BY MS. MOUSILLI:

6         Q.    Okay.  Did you -- do you recall receiving a

7    demand for inspection of Big Thirst records from

8    Ms. Donoho?

9         A.    Yes.

10        Q.    Okay.  When did you receive it?

11        A.    I don't recall any dates.

12        Q.    Approximately?

13        A.    I don't recall any dates, and I believe it

14   was more than once.

15        Q.    Was it this year?

16        A.    I believe; also, in 2023 and 2024.

17        Q.    Okay.  Did Big Thirst ever respond to

18   Ms. Donoho's request?

19        A.    We complied with all requests for books and

20   records.

21        Q.    And when did Big Thirst respond?

22        A.    I don't recall the dates.

23        Q.    Do you recall that there was a six-month

24   delay between when Ms. Donoho requested the books and

25   records and when Big Thirst provided those books and

WYLIE 436

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    169

1    records?

2           A.    I rely on my attorneys to follow the

3    procedures, and I knew that there were some discrepancies

4    in the way things were handled and when -- the timeline

5    for when things were done.

6                 MS. MOUSILLI:  Objection, nonresponsive.

7    BY MS. MOUSILLI:

8           Q.    Mr. McGinnis, are you aware that there was

9    a six-month delay between the time Ms. Donoho requested

10   the books and records of Big Thirst and when they were

11   delivered to her?

12          A.    I don't know the timeline.

13          Q.    Do you know that there was a several-month

14   delay between the time Ms. Donoho requested the books and

15   records of Big Thirst, Inc. and the time that Big Thirst,

16   Inc. delivered those books and records?

17          A.    I don't know what the delay is and what you

18   consider several months.

19          Q.    Who was involved in the collection of

20   information that Ms. Donoho requested?

21          A.    The law firms representing Big Thirst.

22          Q.    And who from Big Thirst was providing those

23   documents to the law firm?

24          A.    I was.

25          Q.    Okay.  Anybody else?

WYLIE 437

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    170

1          A.      No.
2          Q.      What was Ms. Donoho's interest reflected in
3    those books and records?
4                  MS. GILSTRAP:  Objection, form.
5                  THE WITNESS:  Ms. Donoho's shares have not
6    changed from the inception and when they were issued to
7    today.
8    BY MS. MOUSILLI:
9          Q.      When Ms. Donoho first joined Big Thirst,
10   what were her shares?
11         A.      When the shares were issued to her, the
12   allocation was 2,700,000 shares that remains today.
13         Q.      2.7 million shares were issued to
14   Ms. Donoho when she first joined Big Thirst, correct?
15         A.      They were codified, in agreement with a law
16   firm, in June of 2022 and formally issued by the state in
17   October of the same year.
18         Q.      And you're saying until today, she still
19   has 2.7 million shares in Big Thirst, Inc., correct?
20         A.      That's correct.
21         Q.      Okay.  How has the value of Ms. Donoho's
22   shares changed from when they were initially given to her
23   until today?
24                 MS. GILSTRAP:  Objection, form.
25                 THE WITNESS:  The value is based on market

WYLIE 438

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                               171

1    value, which we don't know.

2    BY MS. MOUSILLI:

3        Q.    That wasn't my question.  How has the value

4    changed from when Ms. Donoho first received her 2.7

5    million shares until today?

6                MS. GILSTRAP:  Objection, form.

7                THE WITNESS:  Are you asking for what these

8    shares are worth?

9    BY MS. MOUSILLI:

10       Q.    I'm asking what the value -- or the value

11   -- what was -- what was the value of Ms. Donoho's 2.7

12   million shares when she first joined Big Thirst?

13               MS. GILSTRAP:  Objection, form.

14               THE WITNESS:  Are you asking if that is for

15   percentage of the company?

16   BY MS. MOUSILLI:

17       Q.    Correct.

18       A.    Okay.  We issued an additional 4,000 shares

19   in the summer of 2022 to be able to have shares to recruit

20   top-notch advisors to our team.

21       Q.    How many additional shares did you issue in

22   the summer of 2022?

23       A.    4,000 shares.

24       Q.    And what did that issuance do to the value

25   of Ms. Donoho's shares?

WYLIE 439

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                         172

```
1                    MS. GILSTRAP:  Objection, form.
2                    THE WITNESS:  It reduced the value of total
3     ownership of my shares and her shares.
4     BY MS. MOUSILLI:
5          Q.    How is Big Thirst going to compensate
6     Ms. Donoho for her work as COO?
7                    MS. GILSTRAP:  Objection, form.
8                    THE WITNESS:  Should there be a liquidity
9     event, the shares will be worth money and then she can
10    collect on that.
11    BY MS. MOUSILLI:
12         Q.    Okay.  So there was never any actual money
13    paid to Ms. Donoho from the inception of Big Thirst until
14    today, correct?
15         A.    She was --
16                   MS. GILSTRAP:  Objection -- wait.
17    Objection, form.
18                   THE WITNESS:  She would have received her
19    first paycheck on March 17, 2022, had she not shut down
20    the loan.
21    BY MS. MOUSILLI:
22         Q.    So because she didn't agree to be a
23    guarantor on this loan, you punished her?
24                   MS. GILSTRAP:  Objection, form.
25    BY MS. MOUSILLI:
```

WYLIE 440

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                        173

1          Q.     Correct?

2          A.     I did not punish Ms. Donoho, no.

3          Q.     Then why didn't she receive compensation?

4          A.     Because we could not apply for the loan

5     without her.

6          Q.     So again, as we sit here today, Ms. Donoho

7     has not received any actual monetary compensation for her

8     work as COO and director for Big Thirst, correct?

9          A.     She made a choice to preclude herself from

10    getting paid.

11         Q.     That wasn't my question.

12                MS. MOUSILLI:  Objection, nonresponsive.

13                THE WITNESS:  No.

14    BY MS. MOUSILLI:

15         Q.     Was Ms. Donoho ever compensated for her

16    intellectual property by Big Thirst, Inc.?

17                MS. GILSTRAP:  Objection, form.

18                THE WITNESS:  She received 2,700,000 shares

19    for compensation.

20    BY MS. MOUSILLI:

21         Q.     Okay.  Earlier you said she received 2.7

22    million shares for her role as COO and director, correct?

23         A.     Yes.  And that is in totality within that

24    role, incorporates creating the technology for the

25    company.  That was the agreement.

WYLIE 441

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                        174

```
 1            Q.    Is that your belief?

 2            A.    Yes.

 3            Q.    Was Ms. Donoho ever repaid for her monetary

 4    capital contributions?

 5            A.    No.

 6            Q.    And that initial monetary contribution was

 7    a loan from her father to Big Thirst, correct?

 8                  MS. GILSTRAP:  Objection --

 9                  THE WITNESS:  No.

10                  MS. GILSTRAP:  -- form.

11    BY MS. MOUSILLI:

12            Q.    How is that incorrect?

13            A.    That was a loan to her.

14            Q.    From?

15            A.    From her father.

16            Q.    Which Big Thirst promised to repay to her?

17                  MS. GILSTRAP:  Objection, form.

18                  THE WITNESS:  We would have paid it back to

19    Lauren Wylie.

20    BY MS. MOUSILLI:

21            Q.    What losses did Big Thirst allegedly suffer

22    from the alleged loss of use of the data dashboard?

23            A.    We had to purchase software and pay time to

24    contractors and employees to rebuild it.

25            Q.    Okay.  And is that the 40 -- approximately
```

WYLIE 442

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    175

```
1    $42,000 in damages that we talked about earlier?

2            A.      Correct.

3            Q.      Okay.  What are Big Thirst's profits for

4    2021?

5            A.      We have --

6                    MS. GILSTRAP:  Objection, form.

7                    THE WITNESS:  We have no profit.

8    BY MS. MOUSILLI:

9            Q.      What were Big Thirst's profits for 2022?

10           A.      We had no profit.

11           Q.      What were Big Thirst's profits for 2023?

12                   MS. GILSTRAP:  Objection, form.

13                   MS. MOUSILLI:  What was your objection?

14                   MS. GILSTRAP:  Objection, form.

15                   THE WITNESS:  We have no profit.

16   BY MS. MOUSILLI:

17           Q.      What were Big Thirst's profits for 2024, as

18   of today?

19                   MS. GILSTRAP:  Objection, form.

20                   THE WITNESS:  We have no profit.

21   BY MS. MOUSILLI:

22           Q.      What were -- what are Big Thirst's revenues

23   for 2021?

24                   MS. GILSTRAP:  Objection, form.

25                   THE WITNESS:  For 2021, I don't recall the
```

WYLIE 443

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          176

1    total revenue number.  It was very low.

2    BY MS. MOUSILLI:

3           Q.     Okay.  Do you know an approximate number

4    for the revenues in 2021 for Big Thirst?

5                  MS. GILSTRAP:  Objection, form.

6                  THE WITNESS:  I don't know an approximate

7    number for 2021.

8    BY MS. MOUSILLI:

9           Q.     Do you know the approximate revenue for Big

10   Thirst in 2022?

11                 MS. GILSTRAP:  Objection, form.

12                 THE WITNESS:  The approximate revenue for

13   2022 is about $20,000 per month.

14   BY MS. MOUSILLI:

15          Q.     Okay.  What were the approximate revenues

16   for Big Thirst for 2023?

17                 MS. GILSTRAP:  Objection, form.

18                 MS. MOUSILLI:  What was the basis for your

19   objection?

20                 MS. GILSTRAP:  Because you're not

21   identifying what kind of revenues you're talking about.  I

22   have no idea.  Revenue is a very broad term that can mean

23   a lot of different things, and you're not being specific.

24                 MS. MOUSILLI:  Okay.  You can just be more

25   concise with your answer.  That's -- okay.

WYLIE 444

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    177

1    BY MS. MOUSILLI:

2          Q.    Matt McGinnis, what do you understand me to

3    say when I say revenue for Big Thirst?

4          A.    Total revenue from all sources.

5          Q.    Okay.  So I'm going to ask you again:  What

6    is the Big -- what is the amount of revenue for Big

7    Thirst, Inc., total revenue for 2023?

8          A.    Approximately 20,000 per month.

9          Q.    What are the total revenues for Big Thirst,

10   Inc. for 2024?

11         A.    Well, excuse me, for 2023, the approximate

12   revenues are $46,000 per month.  And for 2024, for first

13   quarter, so far we're averaging about 20,000 per month.

14         Q.    What are the line items included for

15   revenue?

16         A.    Again, I am uncomfortable answering with a

17   competitor in the room.

18              MS. GILSTRAP:  Counsel, so we can go AEO if

19   you want him to answer these questions.

20              (Sotto voce discussion.)

21              AEO DESIGNATION BEGINS

22   <-- CONFIDENTIAL

23

24

25

WYLIE 445

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

WYLIE 446

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    179

```
 1
 2     -->
 3                     AEO DESIGNATION CONCLUDES
 4     BY MS. MOUSILLI:
 5             Q.    When did Ms. Donoho resign from Big Thirst?
 6             A.    April 7th, 2022.
 7             Q.    And what did she do when she resigned?
 8                   MS. GILSTRAP:  Objection, form.
 9                   THE WITNESS:  Could you restate the
10     question?
11     BY MS. MOUSILLI:
12             Q.    What did Ms. Donoho do when she resigned?
13                   MS. GILSTRAP:  Objection, form.
14                   THE WITNESS:  Do you mean did she go care
15     for her child?  I don't know any --
16     BY MS. MOUSILLI:
17             Q.    Okay.  Anything and everything that
18     Ms. Donoho did, that you're aware of, what did she do --
19             A.    To Big Thirst?
20             Q.    To Big Thirst.  Sure.
21             A.    Okay.  So she changed the passwords and
22     locked us out of GoDaddy -- the full list is already
23     documented in court, but to GoDaddy, to PayPal, to
24     ShipStation, to Stripe, to Heroku, to Cumul.io, to
25     Panoply, to Auth0 -- to pretty much all things that we
```

WYLIE 447

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          180

```
1    used to operate the business, she locked me out of them to
2    preclude me from continuing business operations.
3          Q.     And what did you do in response?
4          A.     We sought a temporary injunction to get
5    access back to the software that we use to operate Big
6    Thirst.
7          Q.     What is a lawsuit, to your knowledge?  What
8    does that term mean?
9                 MS. GILSTRAP:  Objection, form.
10                THE WITNESS:  It's a legal term that I
11   don't have the exact wording for.  In my understanding, it
12   is seeking remedy in court for an action taken by another
13   party.
14   BY MS. MOUSILLI:
15         Q.     Okay.  Do you believe lawsuits are public?
16         A.     They are public.
17         Q.     Do you believe information contained in
18   lawsuits can be seen by the public?
19         A.     Yes, I know they can.
20         Q.     When did you decide to file a lawsuit
21   against Ms. Donoho?
22         A.     When we were no longer able to operate the
23   business based on her shutting me out of all systems.
24         Q.     Do you remember a date?
25         A.     I believe it was April 12th.
```

WYLIE 448

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          181

1          Q.     Do you remember yesterday when your
2    attorney was talking to Ms. Donoho and was questioning her
3    at her deposition?  Do you remember that?
4          A.     Yes, I remember her questioning --
5          Q.     You were present, right?
6          A.     Yes, I was present.
7          Q.     And do you remember your attorney telling
8    Ms. Donoho, Oh, well, what did you expect when you filed a
9    lawsuit for this; weren't you expecting it to be public
10   and all over the Internet?  Do you remember that line of
11   questioning?
12         A.     I remember that, yes.
13         Q.     Do you remember how it seemed like your
14   attorney was somehow blaming Ms. Donoho for making this
15   information related to this lawsuit public?
16                MS. GILSTRAP:  Objection, form.
17   BY MS. MOUSILLI:
18         Q.     Do you remember that?
19         A.     I don't know what she was thinking, no.  I
20   can't speculate.
21         Q.     Okay.  But do you remember that line of
22   questioning?
23         A.     I do.
24         Q.     Okay.  And how she somehow made Ms. Donoho
25   -- or she tried to make Ms. Donoho feel like she initiated

WYLIE 449

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    182

1    this lawsuit.  Do you remember that?
2                  MS. GILSTRAP:  Objection, form.
3                  THE WITNESS:  I don't know the intent of
4    her question.
5    BY MS. MOUSILLI:
6          Q.    Okay.  Do you remember how she said, Well,
7    what do you expect when you flip this -- quote, flip this
8    lawsuit into federal court, that this -- that the public
9    would have information related to this litigation,
10   correct?
11         A.    That is correct.
12         Q.    But it is, in fact, you that initiated
13   litigation, correct?
14                 MS. GILSTRAP:  Objection, form.
15                 THE WITNESS:  I did not initiate lawsuits
16   in federal court.
17   BY MS. MOUSILLI:
18         Q.    Who is it that initiated this -- the
19   instant litigation?
20         A.    I initiated the temporary injunction to get
21   our company up and running again.
22         Q.    Okay.  That's litigation in state court,
23   correct?
24         A.    Correct.
25         Q.    And that's public information, correct?

WYLIE 450

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    183

```
 1          A.     Correct.  It was our --
 2          Q.     I'm sorry.  There's no question right
 3   there.
 4                 Was -- did the Big Thirst board meet to
 5   discuss filing a lawsuit against Ms. Donoho?
 6          A.     Yes.
 7          Q.     And who was present at that meeting?
 8          A.     All three board members; Mark Shilling,
 9   Suzanne McGinnis, Matt McGinnis.
10          Q.     And when did the board of directors meet in
11   order to discuss filing a lawsuit against Ms. Donoho?
12          A.     I would have to refer to my record.
13          Q.     Well, prior to the filing of the lawsuit or
14   after?
15          A.     We met numerous times in emergency meetings
16   because the situation was evolving very quickly.  I don't
17   know the exact dates.
18          Q.     I'm not asking you for exact dates.  I'm
19   asking you when the board met to discuss filing a lawsuit
20   against Ms. Donoho, whether it was before the lawsuit was
21   filed or after?
22          A.     I believe it was before.
23          Q.     Okay.  Was there a corporate resolution
24   authorizing the lawsuit by Big Thirst against Ms. Donoho?
25          A.     There was no formal corporate resolution.
```

WYLIE 451

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                         184

1          Q.     And why not?

2          A.     It was a need of immediacy to get the

3    company back on -- on track and operating again.

4          Q.     To date, has there ever been a corporate

5    resolution authorizing the lawsuit by Big Thirst against

6    Ms. Donoho?

7          A.     There have been board votes to move forward

8    with the lawsuit, yes.

9          Q.     And when was that created?

10         A.     Each board meeting.

11         Q.     And what was the substance of those

12   corporate resolutions?

13               MS. GILSTRAP:  Wait.  I'm going to object

14   and instruct you not to answer because this is going to

15   start getting into privilege when you're asking about the

16   substance of conversations about the lawsuit and the

17   board.

18   BY MS. MOUSILLI:

19         Q.     Okay.  I'm not asking you about any

20   conversations you had with your attorneys.

21               MS. GILSTRAP:  Nor with the board members.

22   It's party communications.  It's going to be covered --

23   and we can fight about that later, but I'm not going to

24   have him testify about the substance of communications

25   during board meetings regarding the lawsuit.

WYLIE 452

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    185

1              MR. MOUSILLI:  They're not communications.

2     They're resolutions that we should have already had.

3              MS. GILSTRAP:  If they exist.

4              MS. MOUSILLI:  Well, your client is saying

5     they exist.  So either he's lying or you are.

6              MS. GILSTRAP:  Ask him.

7     BY MS. MOUSILLI:

8         Q.    Okay.  Mr. McGinnis, do corporate

9     resolutions exist regarding the instant litigation against

10    Ms. Donoho?

11             MS. GILSTRAP:  Objection, form.

12             THE WITNESS:  Decisions were made and

13    reflected in our minutes.

14    BY MS. MOUSILLI:

15        Q.    Okay.  Did you provide those minutes to

16    your attorney?

17        A.    They have not been requested.

18        Q.    Your attorney did not request these

19    documents from you?

20        A.    No.

21        Q.    Okay.  So as I understand you, you said

22    that there were board meetings prior to the filing of the

23    instant litigation, correct?

24        A.    Correct.

25        Q.    The initial filing of the instant

WYLIE 453

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    186

1    litigation, correct?

2          A.    I stated that I don't know the exact date.

3    My recollection is we met several times and we needed to

4    move quickly because it was time -- it was of the essence

5    to get the company up and running again.  We had a planned

6    meeting for April 12th.  I don't know if that occurred

7    before or after.  I think it was concurrent with filing

8    the lawsuit.

9          Q.    Before you filed the lawsuit and you had

10   these board meetings, was Ms. Donoho invited to these

11   board meetings?

12         A.    Ms. Donoho was invited to all board

13   meetings while she was an officer.

14         Q.    Including the -- the board meeting to

15   initiate a litigation against her?

16         A.    She was invited to a board meeting that was

17   intended to resolve the situation.  She resigned before

18   that board meeting was held.

19         Q.    Okay.  So again, what was the date that she

20   resigned?  What date did Ms. Donoho resign from Big

21   Thirst, Inc.?

22         A.    She resigned as an officer on April 7th and

23   as an -- excuse me, as a director on April 11th.

24         Q.    And what date was the lawsuit filed?

25         A.    I don't have that in front of me.

WYLIE 454

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    187

```
 1                    MS. GILSTRAP:  You do.
 2                    THE WITNESS:  I do.  Okay.
 3    BY MS. MOUSILLI:
 4         Q.    Was the lawsuit filed before or after
 5    Ms. Donoho resigned as COO of Big Thirst, Inc.?
 6         A.    This is on April 12th, so it was after.
 7         Q.    Yet at that time, Ms. Donoho was still a
 8    board member, correct?
 9                    MS. GILSTRAP:  Objection, form.
10                    THE WITNESS:  She resigned because she did
11    not want to attend the board meeting.
12    BY MS. MOUSILLI:
13         Q.    Okay.  That wasn't my question.  When the
14    lawsuit was initiated against Ms. Donoho, she was still a
15    board member --
16                    MS. GILSTRAP:  Objection --
17    BY MS. MOUSILLI:
18         Q.    -- correct?
19                    MS. GILSTRAP:  Objection, form.
20                    THE WITNESS:  Incorrect, no.
21    BY MS. MOUSILLI:
22         Q.    What's incorrect about that statement?
23         A.    It was the next day.
24         Q.    What was the next day?
25         A.    The lawsuit was filed the next day.
```

WYLIE 455

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              188

```
1          Q.      The day after Ms. Donoho resigned as a
2    director, the lawsuit was initiated?
3          A.      Yes, but the actions that precipitated it
4    started on April 7th.
5          Q.      Did you ever have any board meetings
6    without Ms. Donoho when Ms. Donoho was COO and director at
7    Big Thirst, Inc.?
8          A.      No.
9          Q.      What were you seeking to achieve from your
10   lawsuit when you filed it initially?
11         A.      To regain the operations of the primary
12   technologies, to take order -- process orders and collect
13   payment.
14         Q.      Okay.  So you really wanted the credentials
15   to the various platforms, correct?
16         A.      Correct.
17         Q.      Okay.  So when you filed the lawsuit, you
18   knew the filing would be public to everyone, correct?
19         A.      Correct.
20         Q.      And you didn't care that it would be public
21   to everyone, correct?
22         A.      That's not accurate.
23         Q.      What's not accurate?
24         A.      I did care, but we felt forced into it.
25         Q.      And through the filing of that lawsuit, you
```

WYLIE 456

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    189

1    didn't care that you would be marring the reputation of

2    Ms. Donoho, correct?

3                    MS. GILSTRAP:  Objection, form.

4                    THE WITNESS:  That is not correct.

5    BY MS. MOUSILLI:

6         Q.     What's not correct about that statement?

7         A.     It was not my intention to mar the

8    reputation of anybody.  It was my intention to keep our

9    company from failing at her hands.

10        Q.     Okay.  So as I understand you today, the

11   monetary damages that you're seeking from Ms. Donoho is

12   the new tech stack that was created by Big Thirst,

13   Inc. after Ms. Donoho resigned, correct?

14        A.     Correct.

15        Q.     And the value of that tech stack, you

16   believe, is about 42,000, correct?

17                    MS. GILSTRAP:  Objection, form.

18                    THE WITNESS:  The cost to create that.

19   BY MS. MOUSILLI:

20        Q.     Is 42,000?

21        A.     Correct.

22        Q.     And that's how much you're seeking from

23   Ms. Donoho?

24        A.     Correct.

25        Q.     Okay.  But when Big Thirst, Inc. filed a

WYLIE 457

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                         190

1    lawsuit against Ms. Donoho, the data dashboard was still

2    working, correct?

3            A.    If I'm not able to operate it and maintain

4    it, it is not working.

5            Q.    Okay.  You're -- you were able to view the

6    data dashboard when you filed the lawsuit against

7    Ms. Donoho, correct?

8            A.    Incorrect.

9            Q.    Okay.  You were unable to view the data

10   dashboard when you initiated a lawsuit against Ms. Donoho?

11           A.    No.  It was --

12           Q.    Which statement is correct?  You were

13   unable or were you able to see --

14           A.    I was not able to.

15           Q.    You were not able to see the data --

16           A.    I was not able to --

17                 MS. GILSTRAP:  Stop.  You're talking over

18   each other.

19                 THE REPORTER:  No talking over each other,

20   please.

21   BY MS. MOUSILLI:

22           Q.    Were you able to view the data dashboard

23   when Ms. Donoho resigned?

24           A.    No.

25           Q.    So in response, you filed a lawsuit,

WYLIE 458

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                        191

1    correct?

2            A.    Filed a lawsuit in response to being locked

3    out of all technologies.

4            Q.    Yet the data dashboard were still working,

5    correct?

6                  MS. GILSTRAP:  Objection, form.

7    BY MS. MOUSILLI:

8            Q.    When Ms. Donoho resigned?

9                  MS. GILSTRAP:  Objection, form.

10                 THE WITNESS:  The data dashboard was not

11   working at the level that I could maintain it.

12   BY MS. MOUSILLI:

13           Q.    In fact, after Ms. Donoho resigned, you

14   sent her an email asking her to add another client,

15   despite the fact that she had resigned, correct?

16           A.    Correct.

17           Q.    And you asked her to add that client to the

18   data dashboard, correct?

19           A.    Correct.

20           Q.    So the data dashboard was working after

21   Ms. Donoho resigned; isn't that true?

22                 MS. GILSTRAP:  Objection, form.

23                 THE WITNESS:  Without my ability to manage

24   it, it was worthless.

25   BY MS. MOUSILLI:

WYLIE 459

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    192

```
 1            Q.      In your opinion, correct?
 2                    MS. GILSTRAP:  Objection, form.
 3    BY MS. MOUSILLI:
 4            Q.      In your opinion, without your ability to
 5    manage the data dashboard, it was valueless?
 6            A.      As the only --
 7                    MS. GILSTRAP:  Objection, form.
 8                    THE WITNESS:  If the only employee working
 9    for the company can't access the key piece of technology,
10    it's worthless.
11    BY MS. MOUSILLI:
12            Q.      Do you believe Ms. Donoho owed Big Thirst a
13    fiduciary duty?
14            A.      As an officer and a director, anybody who's
15    an officer and a director has a fiduciary duty.
16            Q.      Okay.  So was Ms. Donoho a fiduciary to Big
17    Thirst after she resigned in April 2022?
18                    MS. GILSTRAP:  Objection, form.
19                    THE WITNESS:  Ms. Donoho had a fiduciary
20    duty while still an officer through April 11th.
21    BY MS. MOUSILLI:
22            Q.      So again, was Ms. Donoho a fiduciary to Big
23    Thirst after she resigned in April 2022?
24                    MS. GILSTRAP:  Objection, form.
25                    THE WITNESS:  She did not have a fiduciary
```

WYLIE 460

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          193

1    duty after she resigned on April 11th.

2    BY MS. MOUSILLI:

3          Q.    So the answer is yes or no.  Was Ms. Donoho

4    a fiduciary to Big Thirst after she resigned in April of

5    2022?

6          A.    Would you please arrange your question with

7    the exact date of April 11th?

8          Q.    Sure.  Was Ms. Donoho -- was Ms. Donoho a

9    fiduciary to Big Thirst after she resigned on April 11th,

10   2022?

11         A.    No.

12         Q.    Did Ms. Donoho still owe a fiduciary duty

13   to Big Thirst after she resigned on April 11th, 2022?

14         A.    I answered no.

15         Q.    That was a different question.  Did you --

16   do you agree that Ms. Donoho can't breach her fiduciary

17   duty to Big Thirst if she didn't owe Big Thirst a

18   fiduciary duty?

19              MS. GILSTRAP:  Objection, form.

20              THE WITNESS:  It's a circular question.

21   BY MS. MOUSILLI:

22         Q.    It's a yes-or-no question.  Do you agree

23   that Ms. Donoho can't breach her fiduciary duty to Big

24   Thirst if she didn't owe Big Thirst a fiduciary duty?

25              MS. GILSTRAP:  Objection, form.

WYLIE 461

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          194

```
 1                    THE WITNESS:  No.
 2    BY MS. MOUSILLI:
 3          Q.     You don't agree?
 4          A.     She doesn't have fiduciary duty, if she
 5    doesn't have fiduciary duty.
 6          Q.     Ms. Donoho is only liable to Big Thirst for
 7    breaching a fiduciary duty during the time she has a
 8    fiduciary duty, correct?
 9          A.     That is my understanding of the law.
10          Q.     So after April 11th, 2022, Ms. Donoho did
11    not owe Big Thirst a fiduciary duty, correct?
12                    MS. GILSTRAP:  Objection, form.
13                    THE WITNESS:  That's correct.
14    BY MS. MOUSILLI:
15          Q.     Do you allege that there are any
16    nonmonetary damages that Big Thirst allegedly suffered due
17    to Ms. Donoho's conduct?
18                    MS. GILSTRAP:  Objection, form.
19                    THE WITNESS:  There were -- we suffered
20    reputation damage, considerably.  We ended up losing
21    clients because of it and word of mouth was negative
22    because of the turmoil it created with -- through her
23    actions.
24    BY MS. MOUSILLI:
25          Q.     What clients do you -- did you allege --
```

WYLIE 462

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                        195

1    did Big Thirst allegedly lose?

2           A.    We lost Rainbow Unicorn Vodka, Twin Valley,

3    and Little Toad Creek.  They all -- all quit because they

4    didn't have access to what they needed within the

5    dashboard, and they couldn't fulfill the orders that were

6    processed through ShipStation because they were stuck.

7    And they were incredibly frustrated because those things

8    were locked down.

9           Q.    Okay.  I have here Rainbow, Twin Valley --

10   and what's the third?

11          A.    Little Toad Creek.

12          Q.    Little Tow Creek?

13          A.    Toad.

14          Q.    Little Toad Creek.  Besides those three

15   clients, did Big Thirst lose any other clients, allegedly,

16   due to Ms. Donoho's conduct?

17          A.    We had seven other clients that we had to

18   reduce from Tier 3 or Tier 2 clients because they didn't

19   have access to the dashboard as they were promised.

20          Q.    And how long were they reduced from Tier 2

21   to Tier 3?

22          A.    Perpetually.

23          Q.    Have you ever made any disparaging comments

24   or statements about Ms. Donoho after she resigned to

25   anyone?

WYLIE 463

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                        196

```
1                    MS. GILSTRAP:  Objection, form.
2                    THE WITNESS:  I don't recall any.
3    BY MS. MOUSILLI:
4         Q.     Did you ever talk to any customers -- did
5    you ever talk to any Big Thirst customers about Ms.
6    Donoho?
7                    MS. GILSTRAP:  Objection, form.
8                    THE WITNESS:  Clients asked about why
9    things weren't happening and where she was.
10   BY MS. MOUSILLI:
11        Q.     And what was your response?
12        A.     That she had resigned and we were trying to
13   fix things as we could.
14        Q.     Do you ever recall telling Ms. Donoho you
15   would convert Big Thirst into a sole proprietorship if she
16   wouldn't sign the guarantor papers?
17                   MS. GILSTRAP:  Objection, form.
18                   THE WITNESS:  That was a thing made in
19   frustration.  It was absolutely not a possibility.  I
20   didn't have the authority to do so, and never followed
21   through with anything like that.  I followed up
22   immediately with other resolutions.
23                   MS. MOUSILLI:  Okay.  Let's go ahead and
24   take a short break.
25                   THE VIDEOGRAPHER:  We're off the record at
```

WYLIE 464

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    197

```
1    1:53 p.m.
2                    (A recess was taken at 1:53 p.m. to
3    2:19 p.m.)
4                    THE VIDEOGRAPHER:  This is Segment No. 5.
5    We're back on the record at 2:19 p.m.
6    BY MS. MOUSILLI:
7         Q.    Mr. McGinnis, we're back after a break, but
8    you're still under oath.  Do you understand that?
9         A.    Yes.
10        Q.    Was Ms. Lauren Donoho ever invited to any
11   of Big Thirst's shareholder meetings?
12        A.    Yes.
13        Q.    Which meetings?
14        A.    We had hold -- held two shareholders'
15   meetings and she has attended both.
16        Q.    What were the dates of those meetings?
17        A.    The end of March of 2023 and the end of
18   March 2024.
19        Q.    Is there any documentation to that effect?
20        A.    Yes.
21        Q.    What documentation?
22        A.    That we send out notice or that she
23   attended?
24        Q.    Is there -- what documentation exists that
25   Ms. Donoho attended these two meetings that you just
```

WYLIE 465

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              198

1    referenced?

2          A.      There's documentation in the form of her

3    joining the Zoom meetings, showing that she has attended.

4          Q.      Okay.  Besides those two shareholder

5    meetings, when -- at the end of March 2023 and the other

6    at the end of March 2024, were there any other shareholder

7    meetings that Ms. Donoho was invited to?

8          A.      No.  We have only held annual shareholder

9    meetings.

10         Q.      Was there an annual shareholder meeting

11   held in 2022?

12         A.      There was not.

13         Q.      Was there an annual shareholder meeting

14   held in 2021?

15         A.      There was not.

16         Q.      Besides annual shareholder meetings, what

17   other meetings does Big Thirst's board -- Big Thirst's

18   board have?

19         A.      We have quarterly scheduled board meetings

20   and we have biannual advisory board meetings.

21         Q.      And when did those meetings start

22   happening?

23         A.      The first Big Thirst board meeting was in

24   January 2022.

25         Q.      Was Ms. Donoho invited to the January 2022

WYLIE 466

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          199

1    board meeting?

2          A.    Yes, and she was in attendance.

3          Q.    So is it your testimony today that

4    Ms. Donoho has been invited to every single board meeting

5    for Big Thirst since she joined until today?

6                MS. GILSTRAP:  Objection, form.

7                THE WITNESS:  No, I'm not saying that.

8    She's been invited to every single board meeting while she

9    was an officer.

10   BY MS. MOUSILLI:

11         Q.    And after Ms. Donoho ceased being an

12   officer, was Ms. Donoho invited to any shareholder

13   meetings?

14         A.    Shareholder -- all shareholder meetings,

15   yes.

16         Q.    Okay.  After Ms. Donoho resigned, was she

17   invited to any board meetings at Big Thirst?

18         A.    She was invited to a board meeting that was

19   held shortly after she resigned as a board member, but did

20   not attend.

21         Q.    After that board meeting, was she ever

22   invited as a -- to a board meeting --

23         A.    No.

24         Q.    -- of Big Thirst?  When did you first

25   create a bank account for Big Thirst?

WYLIE 467

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    200

1          A.     The bank account at Frost Bank was started
2    -- I'm going to say August of 2021.
3          Q.     That was more than five months after Big
4    Thirst's incorporation, correct?
5          A.     Yes.
6          Q.     Why did you wait so long?
7          A.     We were not operating as a company.
8          Q.     What do you mean you weren't operating as a
9    company?
10         A.     We didn't begin operations of the business
11   until October 6th, 2021.  We didn't have clients.  We
12   didn't have revenue.
13         Q.     You didn't have clients and you didn't have
14   revenues, but did you have expenses?
15         A.     Yes.
16         Q.     And how were those expenses paid if there
17   was no Big Thirst bank account?
18         A.     We didn't have significant expenses for the
19   company prior to that, and the expenses were paid by
20   either Ms. Donoho or by me.
21         Q.     From which bank account were those
22   expenses --
23         A.     From our personal --
24         Q.     I'm sorry.  From which bank accounts were
25   those expenses that Big Thirst incurred paid by -- paid

WYLIE 468

```
1    from?
2         A.    I believe by our personal accounts.
3         Q.    Who transferred the domain, bigthirst.com
4    from Ms. Donoho's account after she resigned?
5         A.    I did.
6         Q.    On what date did you do that?
7         A.    It was in mid-May.  I believe it was May
8    10th.
9         Q.    Of what year?
10        A.    2022.  On the 19th.
11        Q.    Do you know what effect transferring the
12   domain from Ms. Donoho's account to yours had on the data
13   dashboard?
14        A.    Yes.
15        Q.    What was that effect?
16        A.    It lost all historic connections; and
17   therefore, the data dashboard was rendered inoperable.
18        Q.    And who rendered it inoperable?
19             MS. GILSTRAP:  Objection, form.
20             THE WITNESS:  The action was taken by
21   GoDaddy, they did not back up historical data, and that --
22   it rendered it inoperable.
23   BY MS. MOUSILLI:
24        Q.    So isn't it because you transferred the
25   domain from Ms. Donoho's account, the action that you
```

WYLIE 469

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                202

1    took, that rendered the data dashboard inoperable?

2            A.      Ms. Donoho --

3                    MS. GILSTRAP:  Objection, form.

4                    THE WITNESS:  Ms. Donoho was in contempt of

5    court by not providing that access.  That access had to be

6    done.  I took it upon myself to do that to protect the

7    integrity and growth of the company.

8                    MS. MOUSILLI:  Objection, nonresponsive.

9    BY MS. MOUSILLI:

10           Q.      Mr. McGinnis, you transferred the

11   bigthirst.com domain from Ms. Donoho's account to yours,

12   and that rendered the data dashboard inoperable, correct?

13                   MS. GILSTRAP:  Objection, form.

14                   THE WITNESS:  A result of that was that it

15   was rendered inoperable.

16   BY MS. MOUSILLI:

17           Q.      Did you know that that caused the data

18   dashboard to break?

19                   MS. GILSTRAP:  Objection, form.

20                   THE WITNESS:  I did not anticipate that.  I

21   learned that later.

22   BY MS. MOUSILLI:

23           Q.      Did you know that also caused the website

24   to break?

25                   MS. GILSTRAP:  Objection, form.

WYLIE 470

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    203

```
1                    THE WITNESS:  The -- the website, to my
2      knowledge, was -- if down, was momentarily.
3      BY MS. MOUSILLI:
4           Q.    Did you know that transferring the
5      bigthirst.com domain from Ms. Donoho's account to yours
6      also caused the corporate emails to break?
7           A.    That was --
8                    MS. GILSTRAP:  Objection, form.
9                    THE WITNESS:  Yes.
10     BY MS. MOUSILLI:
11          Q.    Yet you told a federal judge that Ms.
12     Donoho broke the data dashboard, didn't you?
13                   MS. GILSTRAP:  Objection, form.
14                   THE WITNESS:  That is accurate.
15     BY MS. MOUSILLI:
16          Q.    Was that a misstatement?
17                   MS. GILSTRAP:  Objection, form.
18                   THE WITNESS:  No, it was not.
19     BY MS. MOUSILLI:
20          Q.    How was that not a misstatement?
21                   MS. GILSTRAP:  Objection, form.
22                   THE WITNESS:  The data dashboard had been
23     shut down previous to that.
24     BY MS. MOUSILLI:
25          Q.    When was the data dashboard shut down prior
```

WYLIE 471

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    204

```
1    to that?
2            A.      I was locked out of it beginning on April
3    7th, 2022.
4            Q.      Okay.  I thought we previously established
5    that you were locked out of viewing the data dashboard,
6    correct?
7                    MS. GILSTRAP:  Objection, form.
8                    THE WITNESS:  Correct.
9    BY MS. MOUSILLI:
10           Q.      So the data dashboard wasn't down at the
11   time that Ms. Donoho resigned, correct?
12                   MS. GILSTRAP:  Objection, form.
13                   THE WITNESS:  There was no way for me to
14   manage or update for clients.
15   BY MS. MOUSILLI:
16           Q.      Would that have been --
17           A.      Therefore, it was not useful.
18           Q.      Okay.  The fact that you couldn't update
19   the data dashboard, doesn't mean that it was broken,
20   correct?
21                   MS. GILSTRAP:  Objection, form.
22                   THE WITNESS:  It meant that I could not use
23   it for updating clients, adding new clients, or adding
24   information.
25   BY MS. MOUSILLI:
```

WYLIE 472

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          205

1           Q.      Mr. McGinnis, were there any company

2     valuations done for Big Thirst ever?

3           A.      Yes.

4           Q.      When?

5           A.      In July of 2021.

6           Q.      Who performed that valuation?

7           A.      Jelena Medic.

8           Q.      What was the result of that valuation?

9           A.      Our premoney valuation was estimated based

10    on EBITDA that we hoped to achieve and multiples of other

11    e-commerce companies.  And she estimated it to be

12    approximately $4 million in value.

13          Q.      Were those valuations ever provided to your

14    attorney?

15          A.      Yes.

16          Q.      Were those valuations ever produced in

17    discovery?

18          A.      Yes.

19          Q.      Were there any other valuations performed

20    for the company?

21          A.      No valuations for investor purposes.

22          Q.      Okay.  I didn't ask just for investor

23    purposes.  Were there any other valuations besides this

24    valuation conducted by Jelena Medic performed for Big

25    Thirst, Inc.?

WYLIE 473

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    206

```
 1                    MS. GILSTRAP:  I'm going to object to the
 2    extent that your answer conveys any communications or --
 3    with your attorneys.
 4                    THE WITNESS:  I am not going to answer
 5    because there's attorney-client privilege.
 6    BY MS. MOUSILLI:
 7        Q.    Okay.  I'm not asking you to talk to me or
 8    tell me what you said to your attorney.  But I'm asking
 9    you:  Were there any other company valuations performed
10    for Big Thirst besides the one you just disclosed by
11    Jelena Medic?
12                    MS. GILSTRAP:  To the extent that your
13    answer requires any actions on behalf of your attorneys,
14    I'm going to instruct you not to answer.
15                    THE WITNESS:  I'm not going to answer on
16    the instruction of my counsel.
17    BY MS. MOUSILLI:
18        Q.    Okay.  That wasn't an instruction of your
19    counsel.
20                    MS. GILSTRAP:  It is.  He can't answer the
21    question.
22    BY MS. MOUSILLI:
23        Q.    Okay.  To your knowledge, were there any
24    internal valuations conducted by Big Thirst?
25        A.    I'm not answering that on the instruction
```

WYLIE 474

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          207

```
1    of my counsel.
2           Q.    To your knowledge, were there any
3    third-party valuations conducted for Big Thirst?
4           A.    I'm not answering that on the instructions
5    from my counsel.
6           Q.    Okay.  So again, I'm not asking you about
7    your communications with your attorney, but any
8    third-party valuations.  Were any third-party valuations
9    conducted by Big Thirst?
10              MS. GILSTRAP:  You can -- you can ask him
11   about any valuations that were not conducted by his
12   counsel.
13   BY MS. MOUSILLI:
14          Q.    Were there any valuations conducted by Big
15   Thirst -- by any third parties that were not your
16   attorneys?
17              MS. GILSTRAP:  And they're not hired by
18   your attorneys.
19                 THE WITNESS:  No.
20   BY MS. MOUSILLI:
21          Q.    Okay.  So did your attorneys hire a third
22   party --
23              MS. GILSTRAP:  I'm not going to let him
24   answer that question.
25   BY MS. MOUSILLI:
```

WYLIE 475

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    208

```
 1            Q.     -- to value Big Thirst, Inc.?
 2            A.     I'm not answering that question on advice
 3      from my counsel.
 4            Q.     Okay.  We'll take that up in court.
 5                   Have any third parties made any offers to
 6      purchase Big Thirst, Inc.?
 7            A.     No.
 8                   (Exhibit 4 marked for identification.)
 9      BY MS. MOUSILLI:
10            Q.     I'm handing you what's been marked as
11      Exhibit 4.  Do you recognize this document?
12            A.     One moment to review.
13            Q.     Sure.
14            A.     This appears to be a request for books and
15      records.
16            Q.     Have you seen Exhibit 4 before today?
17            A.     Yes.
18            Q.     So I'll represent to you that Exhibit 4 is
19      your amended responses and it was -- amended objections
20      and responses to Defendant Lauren Wylie Donoho's first
21      request for production that your attorney submitted on Big
22      Thirst's behalf.
23                   Were you involved in drafting these
24      responses?
25            A.     I believe I've reviewed these responses.
```

WYLIE 476

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                     209

1    My input, I'm positive, was - was involved, but I'm not

2    the author.

3            Q.    Who besides yourself was involved in

4    drafting these responses?

5            A.    My legal team.

6            Q.    Besides you and your legal team, who else

7    was involved in drafting these responses?

8            A.    No one.

9            Q.    Okay.  The first request for production

10   asks:  Any document or communication related to, derived

11   from, or reflecting Plaintiff's financial status

12   including, but not limited to, invoices, bank statements,

13   reports or statements from accounting software, profit and

14   loss statements, tax returns, credit agreements and

15   responses -- or credit agreements and statements, balance

16   sheets, and account ledgers.

17               Do you see that?  Did I read that

18   correctly?

19           A.    I do see that.

20           Q.    Okay.  And the response on behalf of Big

21   Thirst is:  Big Thirst objects to this request as overly

22   burdensome to the extent is seeks any document or

23   communication responsive to this request.  Big Thirst

24   further objects that this request is overly broad and

25   seeks materials that are neither relevant nor reasonably

WYLIE 477

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    210

```
1    calculated to lead to the discovery of admissible

2    evidence.  Moreover, Big Thirst objects that this report

3    -- this request is not proportional to the needs of this

4    case.

5                  Did I read that correctly?

6         A.       It appears so, yes.

7         Q.       Why is this document request not relevant

8    to this case?

9                  MS. GILSTRAP:  I'm going to object to the

10   extent that you -- that your knowledge relies on any

11   attorney-client communications.

12                 THE WITNESS:  I am not going to answer on

13   the advice of my counsel.

14   BY MS. MOUSILLI:

15        Q.       Does Big Thirst have invoices?

16        A.       Does Big Thirst have invoices?

17        Q.       Correct.

18        A.       Yes.

19        Q.       Have they been produced?

20        A.       We're following the way this was written.

21        Q.       Okay.  Have you produced invoices to your

22   counsel?

23        A.       I have produced anything my counsel has

24   requested.

25        Q.       Do you know if your counsel's produced
```

WYLIE 478

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              211

```
 1    these documents to us?
 2            A.      I do not know.  I know we have produced
 3    more than 3,000 pages of documents --
 4            Q.      That wasn't my question.
 5            A.      -- in more than one request.
 6            Q.      That wasn't my question.
 7                    MS. MOUSILLI:  Object to that question as
 8    -- that answer as nonresponsive.
 9    BY MS. MOUSILLI:
10            Q.      Does Big Thirst have bank statements?
11            A.      Big Thirst has bank statements.
12            Q.      Have they been produced to your attorney?
13            A.      Yes.
14            Q.      And has your attorney produced those
15    documents to us?
16            A.      I don't know that answer.
17            Q.      Does Big Thirst have accounting software
18    reports?
19            A.      Yes.
20            Q.      And have those accounting software reports
21    been produced to your attorney?
22            A.      Yes.
23            Q.      And has your attorney produced those
24    documents to us?
25            A.      I don't know the answer.
```

WYLIE 479

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    212

```
1           Q.     Does Big Thirst have profit and loss
2    statements?
3           A.     Yes.
4           Q.     And have you produced those profit and loss
5    statements to your attorney?
6           A.     Yes.
7           Q.     And have they produced those to us?
8           A.     I don't know the answer.
9           Q.     Does Big Thirst have tax returns?
10          A.     We have tax returns for the years filed,
11   yes.
12          Q.     What years were filed?
13          A.     2022 and 2021.
14          Q.     So this request asks for several things,
15   including bank statements, accounting software, profit and
16   loss statements, tax returns, credit agreements, balance
17   sheets, and account ledgers, correct?
18          A.     Yeah.
19          Q.     Okay.  And have all those documents been
20   produced to your attorneys?
21          A.     Correct.
22          Q.     And have your attorneys produced those
23   documents to us?
24          A.     I don't know.
25          Q.     Okay.  So let's go to Request for
```

WYLIE 480

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          213

1    Production No. 2:  Any document or communication related

2    to, derived from, or reflecting Plaintiff's relationship

3    with Ms. Donoho including, but not limited to, agreements,

4    records of payment or promises of payment, customer lists,

5    vendor lists, and business contacts.

6                    Did I read that correctly?

7          A.     You read that correctly.

8          Q.     Okay.  And then Big Thirst lodges a bunch

9    of objections, correct?

10         A.     Correct.

11         Q.     Okay.  Do you know if you provided these

12   documents to your attorney?

13         A.     I --

14                MS. GILSTRAP:  Objection, form.

15                THE WITNESS:  I provided any documents my

16   attorney has requested.

17   BY MS. MOUSILLI:

18         Q.     Okay.  Do you believe this -- this request

19   is relevant to this lawsuit?

20                MS. GILSTRAP:  Objection, form.

21                THE WITNESS:  I rely on the counsel of my

22   attorneys.

23   BY MS. MOUSILLI:

24         Q.     What is that counsel?

25                MS. GILSTRAP:  No.  You're not -- I'm

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              214

1    instructing you not to answer as to any communications

2    we've had regarding these requests for production.

3    BY MS. MOUSILLI:

4         Q.    I'm going to ask you to take a look at all

5    of these requests for production, and tell me -- if you

6    can look at them, and let me know which request for

7    production you don't believe is a request for relevant

8    documents related to this litigation.

9         A.    As a blanket statement, I would read each

10   of these.  And the objections lodged by my attorneys, I

11   stand by.

12        Q.    Okay.  Request for Production No. 5:  Any

13   document or communication related to or reflecting the

14   officers and/or executives of Plaintiff.  And the response

15   is:  Big Thirst objects that this request is ambiguous

16   because the phrase reflecting the officers and/or

17   executives and Plaintiff is vague and ambiguous.

18             Do you agree with that statement?

19        A.    Yes.  I believe what our attorneys wrote.

20        Q.    Do you have documents or communications

21   relating to or reflecting the officers and/or executives

22   of Big Thirst?

23             MS. GILSTRAP:  Objection, form.

24             THE WITNESS:  We have official documents

25   relating to our board meetings and minutes for those.

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              215

```
1    BY MS. MOUSILLI:
2          Q.     Request for Production No. 12:  Any
3    document and correspondence by and between Matt McGinnis
4    and Ms. Donoho prior to formation of Plaintiff.
5                 Do you see that, No. 12?
6          A.     I do see that.
7          Q.     And the response is that it's overly
8    burdensome and not reasonably calculated to lead to
9    discovery of admissible evidence and that it's basically
10   not relevant.
11                Do you see that?
12         A.     I do see that.
13         Q.     Okay.  But have you produced documents and
14   correspondence between you and Ms. Donoho prior to
15   formation of Big Thirst to your attorneys?
16         A.     There have been several documents that have
17   been produced to my attorneys, and I stand by their
18   objections.
19         Q.     Okay.  So are you representing to the Court
20   that you've reviewed these requests for production?
21         A.     I have reviewed these and I stand by the
22   advice of my counsel.
23                (Exhibit 5 marked for identification.)
24   BY MS. MOUSILLI:
25         Q.     Mr. McGinnis, I'm handing you what's been
```

WYLIE 483

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    216

```
1    marked as Exhibit 5.
2          A.     Thank you.
3                 (Sotto voce discussion.).
4    BY MS. MOUSILLI:
5          Q.     After the green sheet is a copy for your
6    attorney.
7          A.     Okay.
8                 MS. GILSTRAP:  Thank you.
9    BY MS. MOUSILLI:
10         Q.     Can you take a moment to look through those
11   documents?
12         A.     Uh-huh.
13         Q.     Have you seen these documents before?
14         A.     Yes, I have.
15         Q.     Okay.  The first page, which is
16   Bates-labeled 0001, is a profit and loss sheet.  Do you
17   see that?
18         A.     Yes.
19         Q.     What is this document?
20         A.     This is our profit and loss sheet for the
21   year 2021.
22         Q.     Okay.  At the top it says income --
23         A.     Correct.
24         Q.     -- right?  And then it says discounts
25   given, correct?
```

WYLIE 484

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          217

```
1            A.    Yes.

2            Q.    What are -- what is that in reference to?

3            A.    I believe discounts given would be to

4    anything that we provided as a discount, for shipping fees

5    or anything like that, broken or replacement purchases.

6            Q.    So is this discounts given to clients?

7            A.    Yes.

8            Q.    And that's a total $58 for 2021?

9            A.    Correct.

10           Q.    Okay.  What is shipping income?

11           A.    That would be revenue that was brought in

12   for the cost of shipping to a customer.  You'll see in

13   future statements, we don't keep that in here.

14           Q.    And why was it included in 2021?

15           A.    The person doing the books at that time

16   accounted for it that way.

17           Q.    Why is that?

18           A.    Likely, to just track what the costs were

19   that were being paid directly to the retailers for

20   shipping costs.

21           Q.    Okay.  And so why did you stop including

22   shipping income in your -- in the next few years?

23           A.    It's not an income line for us.  It's a

24   direct pass-through from a consumer to a retailer.  It is

25   not our money to count.
```

WYLIE 485

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          218

```
1          Q.      Okay.  Let's go to the expenses section.
2    Do you see where it says advertising and marketing?
3          A.      Yes.
4          Q.      And then the total was $10,287?
5          A.      Correct.
6          Q.      What advertising and marketing was done by
7    Big Thirst?
8          A.      The largest expenditure in that one line
9    item is -- would be a sponsorship for the Distilled
10   Spirits Council annual convention where we launched our
11   company.
12         Q.      And how much was that?
13         A.      $7,500.
14         Q.      All right.  And then if you skip -- not the
15   next one, but the one after it says contractors?
16         A.      Correct.
17         Q.      Who were those contractors?
18         A.      In 2021, I believe that's the money that
19   Donoho paid herself.
20         Q.      And how much was that?
21         A.      It reflects 1700.
22         Q.      And right after it, it says legal and
23   professional services, correct?
24         A.      Correct.
25         Q.      And what were -- what was the nature of
```

WYLIE 486

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    219

1    those legal and professional services?

2         A.    That would account for fees for the

3    corporate setup, filings with the state, all those types

4    of things, corporate expenses.

5         Q.    What are Stripe fees?

6         A.    Stripe is a payment processing platform and

7    it charges a fee for its usage.

8         Q.    All right.  Under travel -- was it

9    accommodation --

10        A.    Uh-huh.

11        Q.    -- of $2,000, who is that for?

12        A.    Lauren Wylie Donoho and me.

13        Q.    Where did you guys travel?

14        A.    The first was just to downtown Austin for

15   attendance to the Distilled Spirits Council conference,

16   and the second was for me to attend the American Craft

17   Spirits Association convention.

18        Q.    Okay.  And if you go to the last -- second

19   to last, it says net operating income, correct?

20        A.    Correct.

21        Q.    And it's a negative 33,000 --

22        A.    Correct.

23        Q.    -- roughly?  And then below that is net

24   income.  It's a negative 33,000 again?

25        A.    Correct.

WYLIE 487

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    220

```
1            Q.     What does that mean?

2            A.     That means we spent more than we received.

3            Q.     Okay.  Bates label 0004 is the next

4    document that I want you to look at.  What is this

5    document?

6            A.     This is the worksheet we were using to

7    determine share allocation -- I believe it was June or

8    July of 2022.

9            Q.     This was for June or July of 2022?

10           A.     Yeah, I believe.  Yeah, one of those -- a

11   summer month in 2022.

12           Q.     Okay.  And at the top, it says total

13   authorized shares?

14           A.     Correct.

15           Q.     So the 100 percent of the total authorized

16   shares for Big Thirst, Inc.  Is that what --

17           A.     Yes.

18           Q.     -- that represents?  And it's 14 million?

19           A.     Yes.

20           Q.     And here, the founders pool is what

21   percent?

22           A.     The founders pool is 42 percent.

23           Q.     Not 42.86 percent?

24           A.     Correct.

25           Q.     Representing 6 million shares?
```

WYLIE 488

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    221

```
 1              A.      Yes.

 2              Q.      And what were your -- what was your

 3    percentage?

 4              A.      It is 23.57 percent.

 5              Q.      And Ms. Donoho's percentage?

 6              A.      19.29 percent.

 7              Q.      Was that more or less than what was given

 8    to Ms. Donoho when she formed the company -- when she was

 9    going to be cut out of the company?

10                      MS. GILSTRAP:  Objection, form.

11                      THE WITNESS:  That's the same number of

12    shares that she was issued originally.

13    BY MS. MOUSILLI:

14              Q.      It's the same number of shares, correct?

15              A.      Correct.

16              Q.      But her ownership was diminished?

17              A.      Correct.

18              Q.      Okay.  And what -- what do you attribute

19    the diminishment of ownership to?

20              A.      We allocated more shares.

21              Q.      To who?

22              A.      We added shares to board members and to

23    advisory board members.

24              Q.      Okay.  So let's look at the board of

25    directors.  Suzanne McGinnis, she -- here, June or July of
```

WYLIE 489

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    222

```
1    2022, she had $150,000 -- 150,000 shares, correct?
2           A.     Correct.
3           Q.     And Mark Shilling had $150,000?
4           A.     Correct.  Shares.
5           Q.     Okay.  And Seat 4 had 150,000?
6           A.     They were unallocated.
7           Q.     That's not what I asked.  Seat 4 had
8    150,000?
9                  MS. GILSTRAP:  Objection, form.
10   BY MS. MOUSILLI:
11          Q.     Correct?
12          A.     Correct.
13          Q.     And then Seat 5 was given under 150,000
14   shares?
15                 MS. GILSTRAP:  Objection, form.  You can
16   answer.
17                 THE WITNESS:  They were unallocated shares.
18   BY MS. MOUSILLI:
19          Q.     Okay.  And why was that done?
20          A.     We anticipate, and it's been written in our
21   bylaws, that we would have five seats for board members,
22   and we're holding those open and want to make sure that we
23   have shares available for them.
24          Q.     For what purpose are you holding these
25   seats open?
```

WYLIE 490

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          223

1          A.     It is not appealing to a potential board

2    member to enter a company that's in litigation.

3          Q.     This wasn't done just to dilute

4    Ms. Donoho's ownership of Big Thirst, correct?

5               MS. GILSTRAP:  Objection, form.

6               THE WITNESS:  This was done to recruit new

7    advisory board members.

8    BY MS. MOUSILLI:

9          Q.     When Ms. Donoho was a director and COO of

10   Big Thirst, what were the total authorized shares?

11         A.     I believe you misstated her title.

12         Q.     I'm sorry.  When Ms. Donoho was COO and

13   director of Big Thirst, Inc., what were the total

14   authorized shares for Big Thirst, Inc.?

15         A.     10 million.

16         Q.     Okay.  And -- and on this document that's

17   Bates-labeled Big Thirst 0004 -- and you've represented

18   that this is for June or July of 2022, correct?

19         A.     Correct.

20         Q.     What are the total authorized shares

21   indicated in this table?

22         A.     14 million.

23         Q.     Why were the shares increased from 10

24   million to 14 million?

25         A.     To entice high-level advisory board members

WYLIE 491

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    224

1   to join.

2          Q.     Not to dilute Ms. Donoho's ownership in Big

3   Thirst, correct?

4                 MS. GILSTRAP:  Objection, form.

5                 THE WITNESS:  There was a dilution of the

6   two owners -- or two founders.

7   BY MS. MOUSILLI:

8          Q.     Okay.  Was it intentionally done to reduce

9   Ms. Donoho's ownership in Big Thirst?

10         A.     We needed to have Ms. Donoho below 20

11  percent so we could pursue an SBA loan.

12         Q.     Okay.  So that's why Ms. Donoho's ownership

13  in Big Thirst was diluted, correct?

14                MS. GILSTRAP:  Objection, form.

15                THE WITNESS:  It is why we authorized more

16  shares, and mine were diluted, as well.  The preservation

17  of our company was paramount.

18  BY MS. MOUSILLI:

19         Q.     And now we're getting somewhere.  So when

20  Ms. Donoho owned more than 20 percent interest in Big

21  Thirst, you weren't able to obtain an SBA loan for Big

22  Thirst, Inc., correct?

23         A.     That's correct.

24         Q.     So the dilution of Ms. Donoho's ownership

25  in Big Thirst was intentional, correct?

WYLIE 492

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    225

```
1                    MS. GILSTRAP:  Objection, form.
2                    THE WITNESS:  That is correct.
3    BY MS. MOUSILLI:
4         Q.    On the next page, Big Thirst 0005, at the
5    top of this document, it says business loan agreement,
6    correct?
7         A.    It does.
8         Q.    Okay.  What is this document?
9         A.    This is a business loan agreement for the
10   SBA loan with the First Commonwealth Bank.
11        Q.    Which loan is this?
12        A.    This is the loan obtained -- the first loan
13   obtained in August of 2022.
14        Q.    Okay.  I thought you had told me that that
15   loan was for 250,000?
16        A.    I didn't have a number in front of me and
17   now I see that it is 257,800.
18        Q.    Okay.  So the -- the true amount is
19   257,800, correct?
20        A.    Correct.
21        Q.    If you turn to the second page of that loan
22   agreement, Big Thirst 0006, down towards the middle of the
23   page, it says affirmative covenants.  It says:  Borrower
24   covenants and agrees with Lender that as long as -- so
25   long as this agreement remains in effect, Borrower will:
```

WYLIE 493

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    226

```
1    Notices of Claims and Litigation.  Promptly inform Lender

2    in writing of all material adverse changes in Borrower's

3    financial condition, and all existing and all threatened

4    litigation, claims, investigations, administrative

5    proceedings or similar actions affecting Borrower or any

6    Guarantor which could materially affect the financial

7    condition of Borrower or the financial condition of any

8    Guarantor.  Correct?

9            A.      Correct.

10           Q.      Have you abided by that affirmative

11   covenant?

12           A.      Yes.

13           Q.      Have you informed -- have you informed this

14   bank that there is litigation against you individually?

15           A.      Yes.

16           Q.      They're aware that there's litigation

17   against Big Thirst, correct?

18           A.      Yes.

19           Q.      And now they're aware that there's

20   individual liability on your behalf, correct?

21               MS. GILSTRAP:  Objection, form.

22               THE WITNESS:  They're aware of litigation,

23   yes.  I've given them all of the information.

24   BY MS. MOUSILLI:

25           Q.      If you turn to the last page of the
```

WYLIE 494

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              227

1   agreement, Big Thirst 0010 is the Bates label.

2                   MS. GILSTRAP:   What number?

3                   MS. MOUSILLI:   0010.

4   BY MS. MOUSILLI:

5           Q.      This page isn't signed, is that?

6           A.      This page is not signed, correct.

7           Q.      But the document -- the agreement that you

8   submitted to the bank, I assume, was signed?

9           A.      I'm assuming it was signed in person.

10          Q.      Okay.  Do you have a copy of that signed

11  agreement?

12          A.      I likely do, yes.

13          Q.      Was that provided to your attorney?

14          A.      I don't know if they have the signed

15  agreement.

16          Q.      So you received about $257,000 from the

17  bank for this loan, correct?

18          A.      Correct.

19          Q.      Okay.  Was any of that loan used by Big

20  Thirst Marketing?

21          A.      No, zero.

22          Q.      All the funds were used by who?

23          A.      Big Thirst, Incorporated.

24          Q.      Okay.

25                  (Exhibit 6 marked for identification.)

WYLIE 495

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                           228

```
1    BY MS. MOUSILLI:
2         Q.    Okay.  Mr. McGinnis, I'm handing you what's
3    been marked as Exhibit 6.
4               MS. GILSTRAP:  Do you have one for me?
5               MS. MOUSILLI:  Oh, yes.
6    BY MS. MOUSILLI:
7         Q.    Mr. McGinnis, did you ever tell Ms. Donoho
8    that all Big Thirst, Inc. clients that purchased marketing
9    services would be for Big Thirst, Inc., and not for Big
10   Thirst Marketing?
11        A.    That we reconciled the way we do that --
12   that was -- the original intent was if it's signed up by
13   Big Thirst, Inc., it's with Big Thirst, Inc.  If it's
14   signed up separately, if it was a Big Thirst Marketing
15   client and they do not do e-commerce, they stay with Big
16   Thirst Marketing.
17              MS. MOUSILLI:  Objection, nonresponsive.
18   BY MS. MOUSILLI:
19        Q.    Did you ever tell Ms. Donoho that all Big
20   Thirst, Inc. clients that purchased marketing services
21   would be for Big Thirst, Inc., and not for Big Thirst
22   Marketing?
23        A.    Yes, and that's what I just said.
24        Q.    Well, what is this document that I just
25   handed to you as Exhibit 6?
```

WYLIE 496

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    229

1          A.      This is an email exchange.

2          Q.      What is Exhibit 6?

3          A.      This is an email exchange.

4          Q.      Okay.  Are there any Big Thirst Marketing

5   clients that are also Big Thirst, Inc. clients?

6          A.      The --

7                  MS. GILSTRAP:  Objection, form.

8                  THE WITNESS:  The only client we have that

9   is with both, signed up for marketing first.  And we're

10  taking them into Big Thirst Marketing.

11  BY MS. MOUSILLI:

12         Q.      What client is that?

13         A.      Triple Dog.

14         Q.      Triple Dog?

15         A.      Yep, Triple Dog.

16         Q.      Okay.  In this email, in Exhibit 6, on the

17  second page, there's an email from Ms. Donoho.  It says:

18  Let's discuss.  I thought we agreed that any new marketing

19  clients that come through Big Thirst would be baked into

20  Big Thirst, Inc. revenue.  Did I misunderstand?  Though it

21  would be financially beneficial to move my clients to BTM,

22  I can't move my clients into a company I don't own.  That

23  doesn't feel right to me.  I see Big Thirst, Inc. becoming

24  a huge marketing powerhouse driven by both of us where all

25  these costs would be taken on by Big Thirst's new clients

WYLIE 497

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    230

```
 1    and Big Thirst Marketing would pay their share for any

 2    portions they use.  Let me know when you'd like to

 3    discuss.

 4                     Do you see that?

 5         A.     I do see that, yeah.

 6         Q.     Okay.  What was Ms. Donoho's concerns?

 7                MS. GILSTRAP:  Objection, form.

 8                THE WITNESS:  I don't understand her

 9    concern.

10    BY MS. MOUSILLI:

11         Q.     Yet you reply to her email, correct?

12         A.     I did.

13         Q.     Did you reply, I don't understand what

14    you're saying?

15         A.     I'm saying in the first sentence I'd like

16    to discuss it because it needs to make sense.

17         Q.     Okay.  And the second sentence you say:

18    Yes, the intent is to grow the marketing functions of Big

19    Thirst, Inc.?

20         A.     Correct.

21         Q.     And how were the marketing functions of Big

22    Thirst, Inc. going to be grown?

23         A.     Big Thirst, Inc. is primarily an e-commerce

24    platform.  If a client signs up for -- is a spirit brand

25    -- it has to be a spirit brand.  If it signs up for
```

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                231

```
1   e-commerce services and then wants us to provide marketing

2   or consulting services, those services are within that

3   client in Big Thirst, Incorporated.

4              If a company that is not a spirits brand,

5   who's not doing e-commerce on Big Thirst, Inc., wants

6   marketing or consulting services from us, we handle it

7   separately.

8        Q.    Okay.  So Ms. Donoho was concerned that

9   clients belonging to Big Thirst would be taken by Big

10  Thirst Marketing, correct?

11             MS. GILSTRAP:  Objection, form.

12             THE WITNESS:  I think what her -- what she

13  was asking -- if I'm reading this correctly, what she's

14  asking is she had separate clients of her own that she

15  wanted to merge into Big Thirst, Inc.

16             But to my knowledge, they were, like, food

17  trucks or nonspirits brands, so it didn't fit the business

18  model.  And that's what I was saying we needed to talk

19  through.

20  BY MS. MOUSILLI:

21       Q.    Did Ms. Donoho ever express any concern to

22  you of commingling funds between Big Thirst Marketing and

23  Big Thirst, Inc.?

24             MS. GILSTRAP:  Objection, form.

25             THE WITNESS:  She may have.
```

WYLIE 499

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    232

```
1    BY MS. MOUSILLI:
2         Q.    Were there any actual commingling of funds
3    between Big Thirst Marketing and Big Thirst, Inc.?
4         A.    The only times when there's a commingling
5    of funds is when a client would pay a receipt to Big
6    Thirst, Inc., and a portion of that is owed to Big Thirst
7    Marketing or vice versa, and there's a direct transfer
8    over.
9               They're separate bank accounts, separate
10   banks.  There was no way just to do a fund transfer.  The
11   accounting is separate.  The bookkeeping is separate.  So
12   no, there is no commingling.  They're separate.
13        Q.    Has Big Thirst Marketing paid for any of
14   the litigation expenses that Big Thirst, Inc. has
15   incurred?
16        A.    Big Thirst Marketing made a loan to Big
17   Thirst, Inc. to pay for litigation expenses.
18        Q.    And when was that loan documented?
19        A.    That loan was documented in --
20              MS. GILSTRAP:  Objection, form.
21              THE WITNESS:  We put that in our books, I
22   believe, in -- yeah, in April of 2022.
23   BY MS. MOUSILLI:
24        Q.    Was that before or after the litigation was
25   initiated?
```

WYLIE 500

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    233

```
 1              A.      It was to initiate the litigation.
 2              Q.      So was the loan documents from Big Thirst
 3      Marketing to Big Thirst, Inc., were they created before or
 4      after the lawsuit was initiated?
 5                   MS. GILSTRAP:  Objection, form.
 6                   THE WITNESS:  We had to have money to pay a
 7      retainer and we made the loan.
 8      BY MS. MOUSILLI:
 9              Q.      That wasn't my question.  I understand the
10      loan was --
11              A.      It was simultaneous.
12              Q.      Okay.  When was the loan agreement from Big
13      Thirst Marketing to Big Thirst, Inc. for the litigation
14      expenses created --
15                   MS. GILSTRAP:  Objection, form.
16      BY MS. MOUSILLI:
17              Q.      -- before or after the filing of the
18      lawsuit?
19                   MS. GILSTRAP:  Objection, form.
20                   THE WITNESS:  Likely, the day before so we
21      had money to pay for the litigation.
22      BY MS. MOUSILLI:
23              Q.      Is there documentation of this loan
24      agreement?
25              A.      It's in my books.
```

WYLIE 501

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    234

1          Q.      It's what?

2          A.      It's carried in our books.

3          Q.      It's carried in your books?

4          A.      Yes.

5          Q.      So there's written documentation of when

6    the loan agreement between --

7          A.      It's in the balance sheet.

8          Q.      I'm sorry.  I'm asking a question.  So

9    there is written documentation of when Big Thirst

10   Marketing took out a loan -- it gave a loan to Big Thirst,

11   Inc. for litigation expenses, correct?

12              MS. GILSTRAP:  Objection, form.

13              THE WITNESS:  It is reflected in our

14   balance sheet and our board meeting minutes.

15              (Sotto voce discussion.)

16              (Exhibit 7 marked for identification.)

17   BY MS. MOUSILLI:

18         Q.      Okay.  I'm going to hand you what's been

19   marked as Exhibit 7.  On page 1 of Exhibit 7, Big Thirst

20   0029, do you see that?

21         A.      Yes.

22         Q.      Okay.  Under Liabilities and Equities --

23   I'm sorry, Liabilities and Equity, it says:  Loan from

24   BTC.  What does that mean?

25         A.      That would be through Big Thirst

WYLIE 502

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                235

1    Consulting.

2            Q.      And what is the amount?

3            A.      76,491.

4            Q.      Why did Big Thirst Consulting give a loan

5    in this amount to Big Thirst, Inc.?

6            A.      Essentially, that was a parking lot for a

7    fee paid by a client that needed to park it until they

8    could use it.

9            Q.      I'm sorry.  What?

10           A.      They had a project coming up and they

11   wanted to prepay it.

12           Q.      A client for which entity?

13           A.      It was a dual client between Big Thirst

14   Marketing -- or excuse me, Big Thirst, Inc. and Big Thirst

15   Consulting.  And we booked it in Big Thirst, Inc., and

16   then paid it back.

17           Q.      So you held money for a client temporarily,

18   and then gave it back to the client?

19           A.      No, no, no.  We -- we spent it on behalf of

20   the client, but the way they issued the check was to the

21   wrong entity.  They wrote it to Big Thirst, Inc., so we

22   put it here, held it.  And then when we did the work,

23   invoiced it to Big Thirst Consulting.

24           Q.      How often does this kind of thing happen?

25           A.      Rarely.  Particularly, rarely.  I mean,

WYLIE 503

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    236

```
1    there's this...
2           Q.     The next item is a loan from BTM for legal
3    fees?
4           A.     Uh-huh.
5           Q.     What is BTM?
6           A.     Big Thirst Marketing.
7           Q.     Is this an additional loan, aside from the
8    100k you had talked about earlier that Big Thirst
9    Marketing gave to Big Thirst, Inc.?
10          A.     I believe this is still that loan.
11          Q.     That's a part of that loan?
12          A.     I believe that is.
13          Q.     And under that line, it says:  Loan from
14   Lauren?
15          A.     That's correct.
16          Q.     And how much is that?
17          A.     That is $38,707.  And those are the line
18   items that she deleted from our QuickBooks.
19          Q.     Okay.  Because I am a little confused, and
20   I hope we can clarify some things.  Okay.  So the loan
21   from BTC is for how much?
22          A.     That is $79,491.14.
23          Q.     You meant 76,000?
24          A.     76.
25          Q.     Okay.  A loan from BTM for legal fees is
```

WYLIE 504

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    237

1    how much?

2           A.     38,707.89.

3           Q.     And then there was a loan from Lauren.  I'm

4    assuming Lauren Donoho?

5           A.     I just read you the wrong numbers.  The

6    loan from BTC is -- there's a zero.  Sorry.  I'm not doing

7    this correctly.  There is no loan from BTC.

8           Q.     Okay.

9           A.     The BTM is 76,000.  The loan from Lauren is

10   what we're holding on the books and the items she deleted

11   from the QuickBooks.

12          Q.     Okay.  Clarify for me how there's a loan

13   from Lauren for 5,150.

14          A.     No, that's from Matt.

15          Q.     It says one from Lauren.

16                 (Crosstalk between parties.)

17                 MS. GILSTRAP:  It might not be straight.

18                 MS. MOUSILLI:  I know.  That's why I'm

19   asking him for the numbers.

20                 THE WITNESS:  Yeah.  So you confused me

21   earlier, but the loan from Matt is 5,150.

22   BY MS. MOUSILLI:

23          Q.     I don't -- okay.  I -- I don't -- I see a

24   loan from Lauren?

25          A.     Yes.

WYLIE 505

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    238

```
 1          Q.      And then next to that, you're saying is
 2   what figure?
 3          A.      The loan from Lauren --
 4          Q.      The loan from Lauren --
 5          A.      38,000.
 6          Q.      How much is the loan from Lauren?
 7          A.      38,707.89.
 8          Q.      Okay.  So all the numbers were off that you
 9   just told me?
10          A.      I'm sorry.
11          Q.      No, no, no.  No need to apologize.  So
12   let's just go back.
13          A.      Uh-huh.
14          Q.      Okay.  So there's a line item that says
15   loan from BTC?
16          A.      Yes.
17          Q.      Big Thirst Consulting?
18          A.      Yes.
19          Q.      And that amount is?
20          A.      Zero.
21          Q.      So why was that loan amount included?
22          A.      I know that at one point there was a
23   transfer of money between accounts for one client.
24          Q.      That wanted to park their funds with --
25          A.      Yeah, for the first project coming up, yep.
```

WYLIE 506

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    239

```
1            Q.      Okay.  And that actually -- accidentally
2      paid Big Thirst, Inc.?
3            A.      Right.
4            Q.      And it was supposed to go to Big Thirst
5      Consulting?
6            A.      Yep, correct.
7            Q.      Okay.  And then the next line item is a
8      loan from BTM for legal fees, correct?
9            A.      Correct.
10           Q.      And how much is that amount?
11           A.      That's 7 -- 76,491.14.
12           Q.      And was this in addition to the initial
13     100k thousand from --
14           A.      That's the amount --
15           Q.      -- Big Thirst Marketing to Big Thirst, Inc.
16     in April of 2011?
17           A.      I believe that is the -- what is
18     outstanding from that original loan.
19           Q.      And then there's a line item that says loan
20     from Lauren, correct?
21           A.      Correct.
22           Q.      And it says -- what is that amount?
23           A.      38,707.89.
24           Q.      Okay.  So the loan that Lauren's father
25     gave to Big Thirst, Inc. was about 50k, correct?
```

WYLIE 507

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    240

1          A.     The loan --

2                 MS. GILSTRAP:  Objection, form.

3                 THE WITNESS:  The loan that Hunter Wylie

4    gave to Lauren was 50,000.  She did not deposit all of

5    that into Big Thirst's bank account in order to spend it

6    on Big Thirst items.  For example, she bought a MacBook

7    Pro that she claimed was her personal property with loan

8    proceeds from her father.

9    BY MS. MOUSILLI:

10          Q.     We can get into that later, who the loan

11   was between, because I think there's a misunderstanding on

12   your part of who that loan is between, and we can clarify

13   that.  But nonetheless, you said that Lauren had deposited

14   43,000 of that 50k, correct, earlier?

15          A.     No.  She deposited 20,000 and spent some of

16   that money from the loan proceeds on other items for Big

17   Thirst.

18          Q.     Okay.  And there's a loan from Matt for

19   5,150?

20          A.     Correct.

21                 MS. GILSTRAP:  We've been going about an

22   hour.  Can we take a break?

23                 MS. MOUSILLI:  Sure.

24                 THE VIDEOGRAPHER:  We're off at 3:16.

25                 (A recess was taken at 3:16 p.m. to

WYLIE 508

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    241

1    3:32 p.m.)

2              THE VIDEOGRAPHER:  This is Segment No. 6.

3    We're back on the record at 3:32 p.m.

4    BY MS. MOUSILLI:

5         Q.    Okay.  We're back after a short break,

6    Mr. McGinnis, but you're still under oath, correct?

7         A.    Correct.

8         Q.    Okay.  We were looking at Exhibit 7 before

9    the break, and let's look at that again.

10        A.    Uh-huh.

11        Q.    Page -- the page that's Bates-labeled Big

12   Thirst 0035 is what I'd like to look at next.

13        A.    Okay.

14        Q.    Do you see where it says -- in the second

15   row, where it says common stock?

16        A.    Yes.

17        Q.    Do you see CS-2 common stock, October 6,

18   2021?

19        A.    Uh-huh.

20        Q.    Date of certificate not applicable.  And

21   then it says 2.7 million?

22        A.    Uh-huh.

23        Q.    And then it says Lauren Wylie Donoho?

24        A.    Correct.

25        Q.    And then it says in the comments section:

WYLIE 509

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              242

1    Shares requested through corporate attorney on August 16,

2    2021.  Correct?

3            A.     Yes.

4            Q.     Employee resigned before issuance of

5    certificates.  Correct?

6            A.     Correct.

7            Q.     What does that mean?

8            A.     It means the shares were actually printed

9    and issued in May 19th of 2022.  Because she was no longer

10   an employee, we didn't get physical certificates at that

11   time.  They still can be issued and printed as

12   certificates at any time, but there was no legal reason

13   that they needed to be.  They're still on record with the

14   state.

15           Q.     Okay.  So Ms. Donoho has never received --

16           A.     Pieces of paper.

17           Q.     Ms. Donoho has never received stocks or

18   certificates from Big Thirst, Inc., correct?

19           A.     That is correct.

20           Q.     She never received those stock certificates

21   when they were issued by Big Thirst, Inc., correct?

22           A.     Nobody did.

23           Q.     That wasn't my question.

24           A.     She did not.

25           Q.     Ms. Donoho never received stock

WYLIE 510

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                            243

1    certificates when she was issued stock at Big Thirst,

2    Inc., correct?

3           A.    Correct.

4           Q.    To this date, Ms. Donoho has not received

5    stock certificates for her interest in Big Thirst, Inc.,

6    correct?

7           A.    Correct.

8           Q.    Okay.  Listed below that comment, it says:

9    Additional 50,000 issued on May 19, 2022.  Do you see

10   that?

11          A.    Correct.

12          Q.    And that's in regards to Suzanne McGinnis?

13          A.    Uh-huh.

14          Q.    Yes?

15          A.    Correct.

16          Q.    Okay.  And why was Ms. McGinnis issued an

17   additional 50,000 shares of stock?

18          A.    When we brought on two new advisors, we --

19   the negotiations to get them on board, because they're

20   pretty high-powered owners of multiple companies, we

21   needed to make it worth their while.  And we didn't want

22   advisors to have more shares than board members.  So we

23   allocated 50,000 more shares to both board members.

24          Q.    When you say both board members, you're

25   referring to Suzanne McGinnis and Mark Shilling, correct?

WYLIE 511

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          244

```
1              A.      Correct.
2              Q.      Were you issued an additional number of
3      shares?
4              A.      I was not.
5              Q.      Okay.  On the document labeled Big Thirst
6      0039, at the top it says U.S. Small Business
7      Administration, correct?
8              A.      Correct.
9              Q.      And what is this document?
10             A.      This is a receipt of the business loan
11     application.  I believe this is a line of credit.
12             Q.      Okay.  This is one of the two lines that
13     you --
14             A.      Yes.
15             Q.      -- mentioned earlier --
16             A.      Yeah.
17             Q.      -- today?  And it's for $400,000, correct?
18             A.      Correct.
19             Q.      It's for Big Thirst, Inc. and Big Thirst
20     Marketing, correct?
21             A.      Yes.
22             Q.      How were the amounts to be divvied up
23     between the two borrowers?
24             A.      100 percent will go to Big Thirst, Inc. and
25     zero to Big Thirst Marketing.
```

WYLIE 512

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                         245

1        Q.    Was that documented anywhere?

2        A.    Yes.

3        Q.    Where?

4        A.    It is in our board minutes.  May I add to

5   that a little bit?

6        Q.    Sure.

7        A.    The rationale -- the whole reason for Big

8   Thirst Marketing being listed as a coborrower is because

9   it was required by the SBA, by First Commonwealth Bank,

10  for us to qualify for the loan.  We needed to present a

11  company that had revenue and assets in the amount that

12  qualified for it, but there was no intention to use the

13  loan proceeds for that company.  It was simply to have

14  enough money to qualify, and that was reflected in all

15  documents going back to May of 2021 with Frost Bank.  They

16  required the same.

17             (Sotto voce discussion.)

18             MS. MOUSILLI:  This is going to labeled

19  Bates -- Exhibit No. 8.

20             (Exhibit 8 marked for identification.)

21             MS. MOUSILLI:  And this is for you.

22             MS. GILSTRAP:  Thank you.

23  BY MS. MOUSILLI:

24       Q.    I handed you what's been marked as Exhibit

25  8.  Can you tell me what that is -- can you tell me what

WYLIE 513

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          246

```
1    this is?
2            A.      This is an email.
3            Q.      Okay.  Between who and who?
4            A.      From me to Mark Shilling on March 18th,
5    2022.
6            Q.      At the top, it says:  Yes, we have a path
7    forward, but it is not ideal.  Correct?
8            A.      Correct.
9            Q.      Who is -- who is the author of those words?
10           A.      That was me.
11           Q.      And what does that mean?
12           A.      I have not read this, so I'm not sure.
13           Q.      Okay.  Do you want to take --
14           A.      Give me a moment.
15           Q.      Sure.
16           A.      Okay.
17           Q.      Are you ready?
18           A.      Yes.
19           Q.      Okay.  Can you go ahead and read this
20    email?
21           A.      In this --
22           Q.      Yeah, from the top, from where it says:
23    Yes, we have a path forward.
24           A.      I spoke with our banker on Wednesday and
25    alerted him that Wylie had an issue with being a guarantor
```

WYLIE 514

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          247

1    and that we had to delay the closing by a week.  If she

2    would -- if she withdraws from being a guarantor, I can

3    resubmit the loan application with just me as a guarantor.

4    Because the paperwork is already done, the loan is already

5    underwritten, it should be fairly straightforward to get a

6    new deal.  It would likely be a lower dollar amount and

7    may take up to a month to complete.

8              The big issue is that she can no longer be

9    an owner of the company if she chooses not to be a

10   guarantor.  That is out of my hands.  However, it will

11   require us to hold a board meeting and revise ownership

12   structure of the company and reduce the number of shares

13   that she has been issued.  If she chooses that path, we

14   then need to determine what her new role will be with the

15   company.

16             Q.    Okay.  What does that mean?

17             A.    At the time, I believed that her sole

18   objection was to be the guarantor on the loan.  And I was

19   looking for a way to say, Okay, you don't have to be a

20   guarantor.  If that's truly only it, let's figure out a

21   path to -- as I said in other ways, compensate you with

22   phantom shares or some other way to make you whole, but

23   you can't be an owner and not be a guarantor.  Simple as

24   that.

25             Q.    Who made the determination that she can't

WYLIE 515

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    248

1    be an owner --

2              A.      At 20 percent --

3              Q.      Yeah, I'm sorry.  Let me just finish my

4    question, if you will.  Who made the determination that

5    she can't be an owner and not a guarantor?

6              A.      To be -- anybody who is an owner of 20

7    percent more -- or more has to be a guarantor on the loan.

8    And we were in very big need of getting that loan.  We

9    really desperately needed the money.  To move forward, if

10   she -- if that was her primary and only -- which I thought

11   it was at the time -- objection, then we can find a new

12   way forward with different compensation, but not as more

13   than 20 percent owner.

14             Q.      Where does it say that she can't be more

15   than 20 percent owner?

16             A.      It's in the loan documents.

17             Q.      In this email does it say she can't be any

18   more than a -- she can't -- she has -- if she is more than

19   a 20 percent owner, she has to be a guarantor?

20             A.      It doesn't say that in this email, but it

21   was known.

22             Q.      Known to who?

23             A.      To both Mark and to me and to Ms. Donoho.

24             Q.      And when you said:  If she chooses that

25   path, we will then need to determine what her new role

WYLIE 516

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    249

1    will be with the company.  What did you mean by that?

2            A.    If she did not want to be the -- you know,

3    in an ownership position, we'd need to figure out a new

4    compensation, a new way to structure it.

5            Q.    A new compensation for what?

6            A.    In lieu of shares over 20 percent.

7            Q.    Okay.  This email was written in response

8    to Mark Shilling writing an email, correct?

9            A.    Yes.

10           Q.    In Mark Shilling's prior email to you, he

11   wrote:  Do we need to do some path-forward planning today

12   in the event the Wylie situation cannot be fixed?

13           Did I read that correctly?

14           A.    That is correct, yes.

15           Q.    What does he mean there?

16           MS. GILSTRAP:  Objection.  Do you have the

17   rest of this document because it's -- it's not the full

18   email stream.  I guess I'm concerned about him answering

19   it without the full.

20           MS. MOUSILLI:  That's the full thread that

21   I have between Matt and Mark.  It's obviously like a --

22           MR. MOUSILLI:  It's in response to

23   something --

24           MS. MOUSILLI:  -- a forward, right?  And we

25   can't see the one below that had been forwarded.  Yeah, I

WYLIE 517

1    -- I don't think that's necessarily important at this

2    point.

3    BY MS. MOUSILLI:

4          Q.    Mr. McGinnis, what is the Wylie situation

5    that Mark Shilling's referring to?

6                MS. GILSTRAP:  Objection, form.

7                THE WITNESS:  I'm going to make an

8    assumption that the email that he's forwarding was one

9    from me asking for ways that we might resolve this.

10   BY MS. MOUSILLI:

11         Q.    And when you say resolve this, what are you

12   referring to?

13         A.    Ms. Donoho had sent a list of demands which

14   she needed to be met to become a guarantor, and they were

15   enumerated previously.  But shorthand, one was being made

16   a 50 percent shareholder.  Two was being awarded three

17   board seats.  And there were other demands that needed to

18   be handled in governance documents.

19                And I responded to that in line;

20   essentially, trying to find agreements -- or most of them.

21   So I assume -- assume that he is saying, What if that --

22   none of that works.

23         Q.    Okay.  I'm going to add to Exhibit 3 a

24   Bates label 561 to 585.

25                MS. GILSTRAP:  Do you mean Exhibit 8?

WYLIE 518

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              251

```
 1                    MS. MOUSILLI:  Exhibit 8.  You can look at
 2   them, Lessie, and --
 3                    MS. GILSTRAP:  You just have one copy?
 4                    MS. MOUSILLI:  It looks like we don't have
 5   any more than two copies.
 6                    MS. GILSTRAP:  Yeah.  I can look over his
 7   shoulder.
 8                    MS. MOUSILLI:  Okay.
 9                    (Sotto voce discussion.)
10   BY MS. MOUSILLI:
11        Q.    Okay.  So this email from Mark Shilling was
12   in response to a message that you forwarded to him that
13   included you and Wylie and Mark regarding the SBA loan,
14   correct?
15        A.    It's in response to -- yes.  I'm trying to
16   address -- there's many pages here -- address the concerns
17   that were at issue.
18                    MS. GILSTRAP:  Okay.  It looks like the
19   email ends at 571 -- BTI 571.  Is that what you guys --
20   the way -- it looks like that --
21                    MR. MOUSILLI:  No.
22                    MS. GILSTRAP:  -- there's a break and then
23   572 is a different --
24                    MS. MOUSILLI:  571 --
25                    MS. GILSTRAP:  I mean, you can ask him
```

WYLIE 519

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                     252

1    about whatever.  I just didn't know if you wanted it all

2    to be part of the exhibit.

3                    (Sotto voce discussion.)

4    BY MS. MOUSILLI:

5          Q.    Mr. McGinnis, you really wanted this SBA

6    loan to go through, right?

7          A.    I did.

8          Q.    And you valued it more than you valued

9    having Ms. Donoho as a part of Big Thirst, correct?

10                MS. GILSTRAP:  Objection, form.

11                THE WITNESS:  That's not true.

12   BY MS. MOUSILLI:

13         Q.    How's it not true?

14         A.    I made several attempts to retain her and

15   find ways that could keep her home and keep -- we could

16   keep her as an employee.

17         Q.    You keep saying that she's an employee.

18   Why do you think that she was an employee?

19         A.    I considered myself and Ms. Donoho

20   employees.

21         Q.    Okay.  What's your definition of employee?

22         A.    We would have been paid a salary, the same

23   exact salary, starting on March 17th, 2022, as full-time

24   employees.  And that's the way we have defined our roles.

25         Q.    If you can turn to page Bates label 567 in

WYLIE 520

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    253

1    that same exhibit.

2          A.      Uh-huh.

3          Q.      It says at the top this is an email from

4    you to whom?

5          A.      This is Ms. Donoho's email response, and

6    below it, you can't tell due to the different colors.

7          Q.      So when it -- when it says:  There is

8    insufficient documentation of my financial contributions

9    to the company, and there's virtually nothing in writing

10   regarding any agreement between us as the founders of the

11   company.  I'm not including the bylaws because that seems

12   to be more a boilerplate form than an actual agreement.

13   We have both provided receipts for personal contributions

14   to the company.  If you'd like to establish a minimum

15   buy-in number to be an officer of the company, we can

16   discuss that?

17         A.      Yeah.  So the end of the parenthetical

18   from:  Than an actual agreement, period.  That's the end

19   of Wylie's statement.  In the paragraph starting, We have

20   both provided, that's my moderating.  No response here.

21         Q.      So you responded:  We have both provided

22   receipts for personal contributions to the company.  If

23   you'd like to establish a minimum buy-in number to be an

24   officer of the company, we can discuss that.  Correct?

25         A.      Correct.

WYLIE 521

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    254

1          Q.     Those are your words?

2          A.     Uh-huh.

3          Q.     Was she not an officer of the company?

4          A.     No.  I mean, she's saying that she didn't

5    feel like there was proper documentation.  And I was

6    saying, Okay, well, it sounded like she wanted me to make

7    a bigger contribution.  And if that was the case, let's

8    establish that number and I'll find a way to make that --

9    that was my -- I was trying to get to an amicable place.

10         Q.     Okay.  So she wanted you to contribute more

11   to Big Thirst, Inc.?

12         A.     That's what it sounded like, and I could be

13   wrong.

14         Q.     Then towards the bottom of that

15   Bates-labeled document, Bates-labeled BTI 000567, it says:

16   Please let me know if you're willing to move forward with

17   the SBA loan with the provisions outlined above.  If so,

18   I'm happy to meet with you in person to discuss it

19   further.  We have been working on getting a loan since May

20   2021.  Getting this financing is critical to the next

21   phase of our growth and our ability to hire a team to help

22   us operate and is predicated on closing this loan.  I

23   value your contributions to this company and know that you

24   are an asset to our -- to our operations.  I certainly

25   hope that we can agree to a path forward.

WYLIE 522

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          255

1              However, I am prepared to move forward

2    without you as a guarantor to this SBA loan.  Yes,

3    ownership comes with financial risks.  If that risk is too

4    great for you and your family, you can opt out.  You're

5    not required to be an owner of Big Thirst, Inc.

6              Did I read that correctly?

7         A.    Yes.

8         Q.    And you wrote that to Ms. Donoho, correct?

9         A.    Correct.

10        Q.    Okay.  So you're basically telling her,

11   Either sign the guarantor papers or you're not going to be

12   an owner in Big Thirst, correct?

13             MS. GILSTRAP:  Objection, form.

14             THE WITNESS:  I believed there were -- and

15   my attorney told me there were ways to give her phantom

16   stock that would make two things happen; the same amount

17   of vote and the same amount of financial reward at the end

18   without being an owner.

19             MS. MOUSILLI:  Okay.  So that wasn't my

20   question.  So I'm going to object to nonresponsive.  Can

21   you please read back my question.

22             (Question played back as requested.)

23   BY MS. MOUSILLI:

24        Q.    So you basically told Ms. Donoho that she

25   either signs the guarantor papers or she won't be an owner

WYLIE 523

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          256

```
1    in Big Thirst, correct?
2                 MS. GILSTRAP:  Objection, form.
3                 THE WITNESS:  I believe the context is
4    important here.
5    BY MS. MOUSILLI:
6         Q.     Okay.  But in this paragraph here, you say:
7    Yes, ownership comes with financial risks.  If that risk
8    is too great for you and your family, you can opt out.
9    You are not required to be an owner of Big Thirst, Inc.
10   Correct?
11        A.     That's correct.
12        Q.     So it's basically saying you either be a
13   guarantor or you're not an owner in Big Thirst, correct?
14                MS. GILSTRAP:  Objection, form.
15                THE WITNESS:  At the base level, yes, but
16   it does not mean that she wouldn't be compensated.
17   BY MS. MOUSILLI:
18        Q.     Did you ever write a text message to
19   Ms. Donoho that said:  You're free to go to an attorney
20   now.  And making demands at the 11th hour is
21   unconscionable.  I see three ways forward:  One, be
22   flexible with your list of demands and try to move forward
23   with closing this loan; two, go through with the loan as
24   is, let me buy you out with the proceeds; or three, walk
25   away completely.  Everything is in my name.
```

WYLIE 524

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    257

```
 1                    Did you ever write that text message?
 2         A.     I did write that text.
 3         Q.     And what were you hoping to accomplish with
 4    this text?
 5                    MS. GILSTRAP:  Objection, form.
 6                    THE WITNESS:  My first goal was, hopefully,
 7    that she would negotiate with me.
 8    BY MS. MOUSILLI:
 9         Q.     So you were trying to strong-arm
10    Ms. Donoho?
11                    MS. GILSTRAP:  Objection, form.
12                    THE WITNESS:  I was shell shocked that
13    literally in less than 48 hours before closing she would
14    contact an attorney and stop a loan.
15    BY MS. MOUSILLI:
16         Q.     Why were you upset that she had contacted
17    an attorney?
18         A.     Because it's not an amicable way or a
19    productive way to do business with a -- a business
20    executive you've been working with for a long time.
21         Q.     You met with an attorney without her,
22    didn't you?
23         A.     But for the betterment of the company, not
24    as a course of measure to take hostage of a loan.
25         Q.     You met with an attorney to incorporate the
```

WYLIE 525

1    company without her, despite making representations that

2    it was a joint project between you and her, correct?

3              MS. GILSTRAP:  Objection, form.

4              THE WITNESS:  I chose to -- the attorney

5    was informed -- my intention was to include her as an

6    owner.  I chose to take his advice to file it as a sole

7    proprietor for expediency and revise it later, which we

8    did.

9    BY MS. MOUSILLI:

10        Q.    All right.  So you met with an attorney

11   without Ms. Donoho when you created Big Thirst, Inc.,

12   correct?

13             MS. GILSTRAP:  Objection --

14             (Crosstalk between parties.)

15   BY MS. MOUSILLI:

16        Q.    But when she sought the counsel of an

17   attorney, you were offended, correct?

18        A.    When I sought the counsel of an attorney,

19   it was with her knowledge and for the betterment of the

20   company.  When she sought counsel, it was without my

21   knowledge to coerce me into something by taking the money

22   hostage.

23        Q.    When Ms. Donoho sought counsel, you were

24   offended; isn't that correct?

25        A.    In the way she did it, I was offended.

WYLIE 526

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    259

1          Q.      The next page, which is Bates-labeled BTI
2    000568, is an email from Ms. Donoho to you titled:
3    Re: SBA loan.  That's dated Wednesday, March 16, 2022.
4    And in this email, Ms. Donoho states:  It's pretty hard to
5    believe that you would characterize my checking with an
6    attorney before mortgaging my family's future as
7    unconscionable.
8                    Did I read that correctly?
9          A.      That is correct.
10         Q.      I appreciate your position, but this
11   company would not exist without my contributions.  As
12   well, I'm the one being asked to personally guarantee a
13   loan to two borrowers that I don't control, one of which
14   I'm not involved with at all.
15                  Did I read that correctly?
16         A.      You read that correctly.
17         Q.      I've been told by an experienced attorney
18   that I should not sign these SBA documents without
19   additional agreements in place.  I'm ready when you are to
20   work on these additional agreements.  Share ownership is
21   one of many issues.  If you don't walk -- want to talk
22   about share percentages, let's talk about the other issues
23   and see what we can accomplish.  If we can get to a place
24   where I have a degree of control, regardless of
25   percentages, maybe we can get there.  I hope we can.

WYLIE 527

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                        260

```
1                    Did I read that correctly?
2          A.      You read that correctly.
3          Q.      Ms. Donoho wanted to work things out,
4    didn't she?
5                  MS. GILSTRAP:  Objection, form.
6                  THE WITNESS:  It appears that she did in
7    this instance.
8    BY MS. MOUSILLI:
9          Q.      Since it appears that Ms. Donoho wanted to
10   work things out here, what was your response?
11         A.      We just read it.
12         Q.      Yeah.  What was your response, generally?
13         A.      That I would like to do it in person and
14   discuss it.
15         Q.      And despite this response, you told her
16   either you're a guarantor or you don't own any shares in
17   Big Thirst, correct?
18         A.      We'd also had the discussion that we would
19   find ways to compensate her.  So it wasn't like we were
20   going to leave her without any compensation.
21         Q.      But your response was:  If the risk is too
22   great for you and your family, you can opt out.  You are
23   not required to be an owner of a Big Thirst, Inc.?
24         A.      That's true.  I believe -- and it is true
25   that if that is her sole concern, beyond the other ones
```

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    261

1    that we can work out, if it's just that -- if it was just

2    being a guarantor, we can fix that.  We can move forward.

3           Q.     But did Ms. Donoho say that was her only

4    concern that she was concerned --

5           A.     It was --

6           Q.     -- that her concern was being a guarantor?

7    Was that the only concern that Ms. Donoho had?

8           A.     No.

9           Q.     Okay.  What were -- what was her true

10   concern?

11          MS. GILSTRAP:  Objection, form.

12          THE WITNESS:  She also lists that two

13   borrowers that she doesn't control -- and one of which she

14   did, and the other which was stated starting back in May

15   is documented throughout the loan process that we had to

16   have other guarantors in Big Thirst listed as a borrower.

17   It was not new.  This was something that had been brought

18   up over and over again on lots of documents.

19          And, you know, in February, the loan

20   agreement document that was shared with both of us from

21   First Commonwealth Bank, February 4th, I believe -- It's

22   No. 2.  It was not a surprise and it never came up until

23   -- before.

24          And I don't know why you wouldn't say, Hey,

25   this is an issue.  I'd like to pow-wow with an attorney so

WYLIE 529

1    that we're all protected.  Because clearly, with me

2    putting my life insurance, my companies on the line, and

3    myself as a personal guarantor, that is far, far more

4    weight on my shoulders.

5    BY MS. MOUSILLI:

6         Q.    So did you put your life insurance as a

7    guarantor when --

8         A.    I did.

9         Q.    I'm sorry.  Did you put your life insurance

10   as a guarantor when Ms. Donoho was involved in this SBA

11   loan?

12        A.    I did.

13        Q.    Didn't she also offer up her life insurance

14   as a guarantor too?

15        A.    After it was already written and done.

16        Q.    So that's a yes?

17        A.    Yes, but after it was written and done.

18             MS. MOUSILLI:  I move to strike everything

19   after, Yes.

20   BY MS. MOUSILLI:

21        Q.    Was Big Thirst Marketing listed as a

22   guarantor and not as a borrower at that time?

23        A.    It was listed as both.

24        Q.    If you can turn to Bates label 574, BTI

25   000574.  Are you there?

WYLIE 530

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          263

```
1              A.     I am.
2              Q.     Okay.  This is an email from Ms. Donoho to
3     you, dated March 18th, 2024, where she says:  Matt, this
4     situation is being characterized as me dropping a bomb at
5     the last minute.  But to my knowledge, there is no harm in
6     delaying the SBA closing.  Absent an expiring loan
7     commitment or something similar, which I'm not aware of,
8     there's no hard deadline to take out the loan.
9                     Of course, we all want to avoid unnecessary
10    delays, but this is not an unnecessary delay.  It is
11    critical -- it is a critical piece for me moving forward;
12    particularly, when I'm being asked to take on so much
13    financial risk.
14                    Did I read that correctly?
15             A.     Yes, you read that correctly.
16             Q.     Okay.  So Ms. Donoho was making clear here
17    that she doesn't mind being a guarantor, but she does have
18    concerns --
19                    MS. GILSTRAP:  Objection --
20    BY MS. MOUSILLI:
21             Q.     -- correct?
22                    MS. GILSTRAP:  Objection, form.
23    BY MS. MOUSILLI:
24             Q.     Is that correct?
25             A.     That's correct.
```

WYLIE 531

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    264

```
 1            Q.      Okay.  And then she also mentions:  There's
 2    no need for such a rush in the SBA closing.  Correct?
 3            A.      That is correct.
 4            Q.      Okay.  And was that right?
 5            A.      I disagree with that.
 6            Q.      Why would you disagree?
 7            A.      I disagree with that because they were
 8    traveling to Texas to do it and wouldn't be able to -- if
 9    we changed it, it'd be months again before we would do it
10    again.
11            Q.      Who's -- they were traveling, who's they?
12            A.      Keith, who lives in Ohio; and Gregory, who
13    is in Plano.  So one traveling through one state and one
14    through his state.
15            Q.      Who are these two individuals?
16            A.      They're loan officers.
17            Q.      So they're traveling to Texas for this SBA
18    loan, and so you felt you needed to rush it because they
19    were traveling to Texas?
20                    MS. GILSTRAP:  Objection, form.
21                    THE WITNESS:  I felt that we needed to
22    stick to our timeline because we also had pending four job
23    applicants that we needed to hire.  We were literally
24    drowning in too much work and we needed help right away.
25    And it was -- it was painful, and I wanted to solve that
```

WYLIE 532

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    265

1    pain.

2    BY MS. MOUSILLI:

3         Q.    Was there an expiration date for the loan

4    commitment?

5         A.    I don't know of an expiration date.

6         Q.    So was Ms. Donoho correct that there wasn't

7    an expiring loan commitment that was looming?

8         A.    Do you have documentation that there was

9    no --

10        Q.    That wasn't my question.  That wasn't my

11   question.

12        A.    I don't have that -- I don't know.

13        Q.    You don't know.

14             (Sotto voce discussion.).

15             THE WITNESS:  Can we take a break?

16             MS. MOUSILLI:  Yes.

17             THE VIDEOGRAPHER:  We're off the record at

18   4:09 p.m.

19             (A recess was taken at 4:09 p.m. to

20   4:16 p.m.)

21             THE VIDEOGRAPHER:  Segment No. 7.  We're

22   back on the record at 4:16 p.m.

23             MS. GILSTRAP:  Before we get started, we

24   want to read and sign.

25   BY MS. MOUSILLI:

WYLIE 533

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    266

```
1              Q.      Okay.  Mr. McGinnis, we're back from our
2      short break, but you're still under oath, correct?
3              A.      Yes, correct.
4                      (Exhibit 9 marked for identification.)
5                      (Sotto voce discussion.)
6      BY MS. MOUSILLI:
7              Q.      What is Exhibit 9?
8              A.      This is a cease and desist copyright
9      infringement pre-suit notice sent from your law firm.
10             Q.      Okay.  And what is the date at the top?
11             A.      May 11th, 2022.
12             Q.      Do you recall receiving this document?
13             A.      I do.
14             Q.      Do you recall receiving it on a certain
15     date?
16             A.      I assume it was near that date.
17             Q.      Okay.  What was your response to this cease
18     and desist?
19                     MS. GILSTRAP:  Objection, form.
20                     THE WITNESS:  I believe I called my
21     attorney to understand what it meant.
22     BY MS. MOUSILLI:
23             Q.      Okay.  And in response to this cease and
24     desist, what did they first do?
25                     MS. GILSTRAP:  Objection, form.
```

WYLIE 534

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    267

1              THE WITNESS:  We evaluated that, one, we

2    weren't --

3              MS. GILSTRAP:  Wait, wait.  To the extent

4    that you are providing -- you are describing a

5    conversation you've had with your attorney --

6              THE WITNESS:  Yeah.

7              MS. GILSTRAP:  -- I'm going to instruct you

8    not to answer.  It's privileged.  I'm not sure that's what

9    she's asking, but --

10             THE WITNESS:  Okay.

11             MS. GILSTRAP:  -- just --

12   BY MS. MOUSILLI:

13       Q.    In response to this cease and desist

14   letter, what did Big Thirst do?

15       A.    We abided by the advice of our attorney.

16       Q.    Okay.  Did Big Thirst understand that --

17   did you understand that this cease and desist letter was

18   instructing you and Big Thirst to refrain from infringing

19   on Ms. Donoho's intellectual property?

20       A.    I understood that that was the letter's

21   intent, yes.

22       Q.    Okay.  After receiving this letter, the

23   cease and desist, were any changes made to Big Thirst's

24   website?

25       A.    We did not make immediate changes to the

WYLIE 535

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          268

1    website.

2            Q.    When -- when were changes made to the

3    website?

4            A.    Beginning in June 2022.

5            Q.    In response to this letter, did Big Thirst

6    stop using the tech stacks that Ms. Donoho had created?

7                  MS. GILSTRAP:  Objection, form.

8                  THE WITNESS:  We were not using the data

9    dashboard at all.

10   BY MS. MOUSILLI:

11           Q.    So when did Big Thirst stop using

12   Ms. Donoho's data dashboard?

13           A.    April 7th.

14           Q.    That's your testimony today?

15           A.    Yes.

16           Q.    On April 8th, you had actually requested

17   for Ms. Donoho to onboard another client to Big Thirst,

18   Inc., correct?

19           A.    I did.

20           Q.    Okay.  And that was via the data dashboard,

21   correct?

22           A.    Correct.

23           Q.    So Big Thirst was still using the data

24   dashboard that Ms. Donoho had created, correct?

25                 MS. GILSTRAP:  Objection, form.

WYLIE 536

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    269

```
1                    THE WITNESS:  Big Thirst was not, a client
2      was.
3                    (Exhibit 10 marked for identification.)
4      BY MS. MOUSILLI:
5           Q.    Okay.  I'm handing you what's been marked
6      as Exhibit No. 10.  What is this document, Mr. McGinnis?
7           A.    This is an email.
8           Q.    Who is it an email between?
9           A.    Amit from Panoply.io --
10          Q.    Uh-huh.
11          A.    -- to Big Thirst.
12          Q.    On what date?
13          A.    July 25th, 2022.
14          Q.    And who initiated this email?
15                   MS. GILSTRAP:  Objection, form.
16                   THE WITNESS:  It came from me on behalf of
17     Big Thirst.  The Shopify connection stopped working two
18     weeks ago, unexpected writer error.
19     BY MS. MOUSILLI:
20          Q.    What does that mean?
21          A.    That means that the Panoply was no longer
22     reading from Shopify.
23          Q.    And why is that?
24                   MS. GILSTRAP:  Objection, form.
25                   THE WITNESS:  I don't know why it was no
```

WYLIE 537

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    270

1    longer working.

2    BY MS. MOUSILLI:

3         Q.    What was the purpose of this message?

4         A.    The message was to get it reconnected to

5    Shopify.

6         Q.    What was the response from Amit from

7    Panoply?

8         A.    As far as I can see, this is not happening

9    anymore.

10        Q.    Where does it say:  It's not happening

11   anymore?

12        A.    In the first line.

13        Q.    In the first line.  Okay.  So Amit from

14   Panoply states:  Hello, Matt.  Sorry for the late response

15   here.  As far as I can see, this is not happening anymore.

16   Am I correct?  Is there any other thing you want me to

17   assist you with?

18        A.    Yes.

19        Q.    Right?

20        A.    Correct.

21        Q.    So your concern was wrong here?

22              MS. GILSTRAP:  Objection, form.

23              THE WITNESS:  I believe in the two days it

24   may have begun working again.

25   BY MS. MOUSILLI:

WYLIE 538

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                           271

1          Q.     Okay.

2          A.     But it is possible that we figured it out.

3          Q.     Okay.  So you thought there was a problem

4    with Shopify.  You connected Panoply -- you contacted

5    Panoply, and Panoply told you, No, there's no problem,

6    correct?

7          A.     Correct.

8          Q.     Okay.  So you were mistaken in your belief

9    that Panoply had been disabled, correct?

10               MS. GILSTRAP:  Objection, form.

11               THE WITNESS:  This was after we were -- had

12   been given the help at -- Big Thirst had been given access

13   again to Panoply.

14   BY MS. MOUSILLI:

15         Q.     Okay.

16         A.     And I don't know the date, but you may.

17         Q.     Okay.  So on July 20th, 2022, you're

18   contacting Panoply because you couldn't access the source

19   code for the data dashboard, correct?

20               MS. GILSTRAP:  Objection, form.

21               THE WITNESS:  That's not correct.

22   BY MS. MOUSILLI:

23         Q.     Okay.  What were you trying to access?

24         A.     The data from Shopify.

25         Q.     Okay.  And that was part of the tech stack

WYLIE 539

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    272

1    that Ms. Donoho had created, correct?

2                    MS. GILSTRAP:  Objection, form.

3                    THE WITNESS:  Would you clarify what you

4    mean by tech stack?

5    BY MS. MOUSILLI:

6         Q.    That was part of the technical work that

7    Ms. Donoho had created while she was at Big Thirst,

8    correct?

9                    MS. GILSTRAP:  Objection, form.

10                    THE WITNESS:  May I clarify?

11    BY MS. MOUSILLI:

12         Q.    Go ahead.

13         A.    My understanding of what is described as

14    the tech stack is what she did to integrate various

15    disparate components.  We no longer had access to that

16    full swath of components.  However, Ms. Donoho did give

17    access to Panoply to do the DMCA takedown of Cumul.io.  So

18    we could not use a unified tech stack at all.

19         Q.    Okay.  I'm not asking about the unified

20    tech stack.

21         A.    Okay.

22         Q.    I'm talking about any aspect of the tech

23    stack that Ms. Donoho created.  You're still trying to

24    access it as of June -- July 20th, 2020, weren't you?

25                    MS. GILSTRAP:  Objection, form.

WYLIE 540

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          273

1              THE WITNESS:  Under the ruling of the TRO,

2      we were given rights to continue to use software licensed

3      to Big Thirst.  I abided by what the judges told me.

4              MS. MOUSILLI:  Objection, nonresponsive.

5      BY MS. MOUSILLI:

6          Q.    Mr. McGinnis, you earlier testified that

7      you stopped using the tech stack that Ms. Donoho created

8      on the date that she resigned.  Here we have evidence that

9      you continued to use various aspects of the tech stack

10     well beyond the date that Ms. Donoho resigned; isn't that

11     true?

12             MS. GILSTRAP:  Object -- objection, form.

13             THE WITNESS:  That is not true.  I define

14     stack as more than one item.  Stack is numeral -- numerous

15     items stacked.  Using a software licensed to Big Thirst is

16     not using a stack of any build with any IP in it.

17     BY MS. MOUSILLI:

18         Q.    That's not how it works, Mr. McGinnis.  I

19     asked you when did Big Thirst, Inc. stop using any aspect

20     of the technical stack that Ms. Donoho had created.  And

21     you stated what?

22             MS. GILSTRAP:  Objection, form.  Go ahead.

23             THE WITNESS:  When I hear you say stack, my

24     understanding is that you're talking about a unified

25     group.

WYLIE 541

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    274

```
1   BY MS. MOUSILLI:
2        Q.    I didn't say a unified group.  I said any
3   aspect of the technical stack.  When did Big Thirst stop
4   using any of Ms. Donoho's technical work?
5              MS. GILSTRAP:  Objection, form.
6              THE WITNESS:  Panoply, in and of itself, is
7   not at all reflective of Ms. Donoho's work.  It is a
8   software licensed to the company.
9              MS. MOUSILLI:  Objection, nonresponsive.
10  BY MS. MOUSILLI:
11       Q.    Panoply is where all of Ms. Donoho's source
12  code resides?
13             MS. GILSTRAP:  Objection, form.
14  BY MS. MOUSILLI:
15       Q.    Is that to your understanding?
16             MS. GILSTRAP:  Objection, form.
17             THE WITNESS:  That is not my understanding.
18  BY MS. MOUSILLI:
19       Q.    So you don't really know how Panoply works,
20  do you?
21             MS. GILSTRAP:  Objection, form.
22             THE WITNESS:  I know what it does, indeed.
23  BY MS. MOUSILLI:
24       Q.    There's nothing embarrassing about saying,
25  I don't know how Panoply works.  Do you know how Panoply
```

WYLIE 542

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              275

1    works?

2                    MS. GILSTRAP:  Objection, form.

3                    THE WITNESS:  I am not deeply familiar with

4    the inner workings of Panoply.

5    BY MS. MOUSILLI:

6          Q.    Okay.  So you may have used aspects of

7    Ms. Donoho's technical work after she had resigned; isn't

8    that correct?

9                    MS. GILSTRAP:  Objection, form.

10                   THE WITNESS:  I cannot speculate when you

11   say may have.

12   BY MS. MOUSILLI:

13         Q.    That's an interesting response.  So you may

14   have used her technical work after the day she resigned

15   and you may not have, correct?

16                   MS. GILSTRAP:  Objection, form.

17                   THE WITNESS:  What I've seen is we've used

18   software licensed to Big Thirst.

19   BY MS. MOUSILLI:

20         Q.    So Exhibit 10 indicates that you are

21   contacting Panoply, correct?

22         A.    Correct.

23         Q.    And you were contacting Panoply for the

24   purpose of accessing a technical aspect that Ms. Donoho

25   had created while she worked at Big Thirst, Inc., correct?

WYLIE 543

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                        276

```
 1                    MS. GILSTRAP:  Objection, form.
 2                    THE WITNESS:  Incorrect.
 3  BY MS. MOUSILLI:
 4        Q.    Okay.  I still don't understand why you
 5  were contacting Panoply then.  For what purpose where you
 6  contacting Panoply?
 7        A.    I was contacting Panoply to use it in a
 8  different way than Ms. Donoho had built it.
 9        Q.    That's not what it says here.  It says:
10  Shopify connection stopped working two weeks ago,
11  unexpected writer error.  Right?
12        A.    Correct.
13        Q.    And the response is:  As far as I can see,
14  this is not happening anymore.  Am I correct?  Is there
15  anything else you want to -- me to assist you with?
16  Correct?
17                    MS. GILSTRAP:  Objection to form.
18  BY MS. MOUSILLI:
19        Q.    Is that correct?
20        A.    That's what the email says.
21        Q.    Did you respond further to Amit from
22  Panoply?
23        A.    I don't believe I did.
24        Q.    So your concerns were addressed, correct?
25        A.    My concern was addressed.
```

WYLIE 544

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    277

1          Q.     Okay.  And you continued to use Panoply

2    after July 28th, 2022, correct?

3          A.     Correct.

4                 MS. GILSTRAP:  Objection, form.

5    BY MS. MOUSILLI:

6          Q.     And you continued to use the source code

7    that Ms. Donoho had created for Panoply, correct?

8                 MS. GILSTRAP:  Objection, form.

9                 THE WITNESS:  We did not use Ms. Donoho's

10   source code.

11   BY MS. MOUSILLI:

12         Q.     You never used Ms. Donoho's source code?

13                MS. GILSTRAP:  Objection, form.

14                THE WITNESS:  To my knowledge, there was no

15   source code.  After the dashboard was completely broken,

16   we reconnected Shopify on our own independently, as

17   standalone software.

18                (Sotto voce discussion.)

19                (Exhibit 11 marked for identification.)

20   BY MS. MOUSILLI:

21         Q.     I'm handing you what has been marked as

22   Exhibit 11.

23                MS. MOUSILLI:  And Lessie, I don't have a

24   copy of it for myself.  So I'm going to ask you all to

25   look at that document.

WYLIE 545

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    278

```
 1   BY MS. MOUSILLI:
 2        Q.    Mr. McGinnis, have you ever seen that
 3   document?
 4              MS. GILSTRAP:  Wait.  I'm looking at it.
 5              (Sotto voce discussion.)
 6              MS. GILSTRAP:  Okay.  This is a partial,
 7   right?
 8              MS. MOUSILLI:  That's an email.
 9              MS. GILSTRAP:  Well, but it's -- it's a --
10   I can see that it's part of a stream that's been created,
11   right?
12   BY MS. MOUSILLI:
13        Q.    Mr. McGinnis, what is this document?
14        A.    This is an email.
15        Q.    From who to who?
16        A.    From me to Kareem Hijjar, copying Lauren
17   Wylie.
18        Q.    Okay.  And what is the date of that email?
19        A.    Pardon me?  Say it again.
20        Q.    What is the date of that email?
21        A.    Friday, July 9th.
22        Q.    Can you read that email?
23        A.    Hi, Kareem.  We have decided to go in a
24   slightly different direction for the startup of Big
25   Thirst, Inc.  Instead of raising money with equity
```

WYLIE 546

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    279

```
1   financing in a seed round now, we are doing it with all
2   debt financing.  We are getting a loan for $50,000 that
3   will be subordinated to a SBA loan 250 and a revolver of
4   $100,000.  That will be enough to get up and running.  We
5   will reassess the need for a larger raise using equity
6   financing in a few months.  This decision delays the need
7   for us to have you work on stock purchase agreements in
8   the near term.
9              Would you like me to continue?
10        Q.     Yes, please.
11        A.     However, we are still going to provide
12   equity shares to board members as compensation.  That
13   brings up two questions:  Does it cost a lot of money to
14   amend a Certificate of Formation to increase the number of
15   authorized shares from 1 million to 10 million?  If not,
16   maybe we need to do that now.  Because possibly, we may
17   choose not to do it now and delay it.  If we choose to do
18   it later, but have already issued stock to board members,
19   how do we handle it?
20             Two, we have prepared a draft board member
21   service agreement, attached, that outlines duties and
22   compensation.  We intend to compensate board members with
23   stock as outlined in this document.  Please review this
24   document and make recommendations for any changes
25   necessary.  Once we have the board member agreement in
```

WYLIE 547

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    280

1    place, we will immediately move into sales mode with

2    retailers.  At that point, we'll want to discuss getting

3    agreements in place with retailers.

4                    Thank you for your continued assistance.

5    Regards, Matt.

6                    MS. GILSTRAP:  So I'm looking at this, and

7    it looks like there's emails before and after.

8                    MS. MOUSILLI:  Okay.

9                    MS. GILSTRAP:  But this is all just like

10   one little piece.

11                   MS. MOUSILLI:  Okay.  Lessie, that's not an

12   appropriate --

13                   MS. GILSTRAP:  Well, that's an objection

14   that this is inconvenient --

15                   MS. MOUSILLI:  You can say, Objection,

16   form.  We've been over this.

17                   MS. GILSTRAP:  Objection, form.

18                   MS. MOUSILLI:  Thank you.  Again, that's a

19   speaking objection.  It's improper and you know that.

20                   MS. GILSTRAP:  It's improper to give a

21   witness just a --

22                   MS. MOUSILLI:  No.  Nothing is improper --

23                   MS. GILSTRAP:  -- little snippet --

24                   MS. MOUSILLI:  I'm sorry.  Lessie, please

25   stop.

WYLIE 548

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    281

```
 1              MS. GILSTRAP:  -- of an email that's
 2  probably 20 pages long.
 3              MS. MOUSILLI:  Lessie, please stop.  Your
 4  behavior is not appropriate and not enforcing of the
 5  rules.
 6              (Crosstalk between parties.)
 7              MS. MOUSILLI:  So please stop.  Your
 8  speaking objections are improper.
 9              (Crosstalk between parties.)
10  BY MS. MOUSILLI:
11       Q.    Mr. McGinnis, we have decided to go in a
12  slightly different direction for the startup of Big
13  Thirst, Inc., correct?  That's what it says at the top?
14       A.    Correct.
15       Q.    Okay.  Instead of raising money with equity
16  financing in a seed round now, we are doing it all with
17  debt financing.  Correct?  That's what it says?
18       A.    Correct.
19       Q.    It says:  We are getting a loan for 50 that
20  will be subordinated to a SBA loan of 250k and 100k
21  revolver.  Correct?
22       A.    Correct.
23       Q.    Was that a typo there where it says $50?
24       A.    Yes.
25       Q.    What was it supposed to say?
```

WYLIE 549

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    282

```
 1              A.      50k.
 2              Q.      Okay.  And where did that 50k come from?
 3              A.      That was the loan that Ms. Wylie Donoho had
 4    recommended that we do in lieu of going for seed money.
 5              Q.      And where was that 50k coming from?
 6              A.      From her father.
 7              Q.      Okay.  To -- and who was it loaned to?
 8              A.      It was going to be loaned to Big Thirst but
 9    it got loaned to Lauren Wylie.
10              Q.      Okay.  But here it says:  We're getting a
11    loan.  Who is we?
12              A.      Big Thirst.
13              Q.      So Big Thirst is getting a loan for 50k
14    that will be subordinated to an SBA loan of 250k, correct?
15              A.      That was the intention, yes.
16              Q.      What does subordinated to an SBA loan of
17    250k mean?
18              A.      It means that the loan would have been paid
19    off after the SBA loan.
20              Q.      Okay.  So after paying off the SBA loan,
21    your intention -- first your -- the intention was to pay
22    off the 50k loan that Lauren's father had given to Big
23    Thirst, correct?
24              A.      In the case --
25                      MS. GILSTRAP:  Objection, form.
```

WYLIE 550

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    283

```
1                    THE WITNESS:  In the case of this
2     subordinated to the SBA loan, meaning it will be paid
3     after.
4     BY MS. MOUSILLI:
5          Q.     Okay.  So after the SBA loan of 250k was
6     paid off, the 50k loan from Ms. Donoho's father would be
7     paid off by Big Thirst, correct?
8          A.     That's correct.
9          Q.     Okay.
10                (Exhibit 12 marked for identification.)
11    BY MS. MOUSILLI:
12         Q.     I'm handing you what's been marked as
13    Exhibit 12.
14                MS. MOUSILLI:  I'm sorry.  Did I give you
15    two copies?
16                MS. GILSTRAP:  No.  It was two pages.
17                (Sotto voce discussion.)
18    BY MS. MOUSILLI:
19         Q.     Have you previously seen this document,
20    Mr. McGinnis?
21         A.     This is an email from August 24th.
22         Q.     Okay.  Who is it from?
23         A.     This is from me to Jacquelyn Tomlinson and
24    Wylie -- Lauren Wylie.
25         Q.     Okay.  And down towards the middle, it
```

WYLIE 551

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                              284

```
1    says:  We have a 50,000 family loan from Wylie's father,

2    rather than a 30k equity investment.  We're applying for a

3    250,000 SBA loan.

4              Did I read that correctly?

5         A.    You did.

6         Q.    And that's your words, correct?

7         A.    Yes.

8         Q.    And that's in an email dated August 24th,

9    2021, correct?

10        A.    Yes.

11        Q.    To Jacquelyn Tomlinson and Lauren Donoho,

12   correct?

13        A.    Correct.

14        Q.    And Danielle Quintero is CC'd here.  So

15   here you're acknowledging that there is a loan to Big

16   Thirst --

17        A.    Correct.

18        Q.    -- right?  From Ms. Donoho's father,

19   correct?

20        A.    Yes.

21        Q.    Okay.  So this loan hasn't been repaid, has

22   it?

23        A.    I'm sorry?

24        Q.    This loan, the 50k loan from Ms. Donoho's

25   father to Big Thirst has not been repaid, has it?
```

WYLIE 552

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          285

```
1              MS. GILSTRAP:  Objection, form.
2              THE WITNESS:  There is no loan from Wylie's
3   dad to Big Thirst.  It was made to her.
4   BY MS. MOUSILLI:
5        Q.    When you say it was made to her, why do you
6   believe it was made to her?
7        A.    Because it was written to her as an
8   individual with no name of Big Thirst on it.  She doesn't
9   sign it as Big Thirst.  It's not written to Big Thirst.
10       Q.    It was the intention of everyone that it
11  was to Big Thirst, Inc., wasn't it?
12       A.    (Nonverbal response.)
13       Q.    Yes?
14       A.    Correct.
15       Q.    Okay. And that -- and we have proof of that
16  here where you say:  We have a 50,000 family loan from
17  Wylie's father, correct?
18       A.    Correct.
19       Q.    And Wylie is Lauren Donoho, correct?
20       A.    Yes.
21       Q.    Okay.  So we have an acknowledgement that
22  this 50k loan was to Big Thirst, Inc. from Wylie's -- or
23  Lauren Donoho's father correct?
24       A.    Correct.
25       Q.    And you haven't taken any taken any steps
```

WYLIE 553

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                          286

1    to repay that loan, correct?

2         A.    None.

3         Q.    Okay.  And do you have any intention of

4    repaying that loan?

5         A.    Yes.

6         Q.    When?

7         A.    At the conclusion of litigation when we

8    determine, one, the settlement for the sanctions that

9    Lauren Wylie Donoho owes the company and, two, determine

10   if we are still -- if we have to file for bankruptcy or

11   not.

12        Q.    Okay.  Was that ever a condition of the

13   loan when it was taken out?

14             MS. GILSTRAP:  Objection, form.

15             THE WITNESS:  It was not.

16   BY MS. MOUSILLI:

17        Q.    Do you understand that Ms. Donoho intends

18   to appeal that sanctions order?

19        A.    I did hear you say that, but no.

20        Q.    Okay.  Do you understand that Mr. Donoho --

21   Lauren's father could file a lawsuit against Big Thirst

22   for the loan that has not been repaid?

23             MS. GILSTRAP:  Objection, form.

24   BY MS. MOUSILLI:

25        Q.    Do you understand that?

WYLIE 554

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    287

```
1              MS. GILSTRAP:  Objection, form.
2              THE WITNESS:  I'm not a legal expert.
3    BY MS. MOUSILLI:
4         Q.    Okay.  Mr. McGinnis, is there any other
5    testimony that you plan to give at trial that I haven't
6    covered today?
7              MS. GILSTRAP:  Objection, form.
8              THE WITNESS:  I'm sorry.  I didn't
9    understand that.
10   BY MS. MOUSILLI:
11        Q.    Is there any other testimony that we
12   haven't gone over today that you plan to give at trial?
13             MS. GILSTRAP:  Objection, form.
14             THE WITNESS:  Oh, God.  I don't know.  I
15   don't know.  I'm sorry.
16             (Sotto voce discussion.)
17             MS. MOUSILLI:  Let's take a five-minute
18   break, please.
19             THE VIDEOGRAPHER:  We're off the record at
20   4:40.
21             (A recess was taken at 4:40 p.m. to
22   4:45 p.m.)
23             THE VIDEOGRAPHER:  Back on the record at
24   4:45 p.m.
25   BY MS. MOUSILLI:
```

WYLIE 555

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    288

1          Q.     Okay.  Mr. McGinnis, we took a short break
2     and you're still under oath, correct?
3          A.     Correct.
4          Q.     Okay.  To date, how much in legal fees has
5     Big Thirst expended?
6          A.     I do not have the exact number in front of
7     me, but it is north of $300,000.
8          Q.     And when this matter proceeds to trial, do
9     you have any estimation of what the attorney fees will be?
10         A.     I do not.
11         Q.     Do you have a ballpark figure?
12         A.     I have a guesstimate of approximately
13    another --
14                MS. GILSTRAP:  You know what, I'm going to
15    -- I'm going to -- to the extent you're relying on any
16    communications with your attorneys, I'm going to instruct
17    you not to answer that.
18                THE WITNESS:  I choose not to answer that.
19                MS. GILSTRAP:  Do you have an
20    independent --
21                THE WITNESS:  I do not have an
22    independent --
23    BY MS. MOUSILLI:
24         Q.     So you were advised by your attorneys how
25    much it's going to cost to proceed through trial, but you

WYLIE 556

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    289

1    don't want to disclose that amount, correct?

2              MS. GILSTRAP:  Well, I'm instructing him

3    not to answer that question.

4              THE WITNESS:  I've been instructed not to

5    answer that question.  I choose to follow the lead of my

6    counsel.

7    BY MS. MOUSILLI:

8         Q.    Okay.  So how do you anticipate Big Thirst

9    financing the rest of the litigation?

10        A.    At this point, we do not have a clear way

11   forward to finance the rest of the litigation.

12        Q.    Earlier you alluded to filing bankruptcy?

13        A.    That is a possibility.

14        Q.    Okay.  You alluded to Big Thirst filing

15   bankruptcy, correct?

16        A.    That is a possibility.

17        Q.    Okay.  Why is that a possibility?

18        A.    We do not have a sufficient cash flow to

19   continue meeting the obligations of litigation at this

20   point.

21        Q.    Have any steps been taken by anyone towards

22   bankruptcy at this point?

23        A.    We have not.

24        Q.    Has bankruptcy been discussed between any

25   of the board members?

WYLIE 557

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    290

1          A.     Yes, it has been.

2          Q.     Who has discussed bankruptcy?

3          A.     In our last board meeting, in our --

4                 MS. GILSTRAP:  Yeah.  I'm going to -- I'm

5     going to instruct you not to answer to the extent you're

6     talking about legal -- taking about legal advice or

7     anything like that, but if other -- if you can testify

8     without it --

9                 THE WITNESS:  I choose to take the advice

10    of my counsel and not answer that question.

11    BY MS. MOUSILLI:

12         Q.     Okay.  Were any board resolutions drawn

13    relating to bankruptcy?

14         A.     There have been no board resolutions drawn.

15         Q.     Do you believe a less costly alternative

16    would have been possible had you negotiated with

17    Ms. Donoho prior to filing a lawsuit?

18                MS. GILSTRAP:  Objection, form.

19                THE WITNESS:  We sincerely had hoped to

20    find a cost-effective settlement.  However, the one

21    offered was not something we could do.  It was not

22    possible for us to afford that.

23    BY MS. MOUSILLI:

24         Q.     Why is that?

25         A.     It was far too much for our monthly cash

WYLIE 558

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    291

```
1    flow.
2             Q.      Did you offer a counteroffer?
3             A.      We had offered counteroffers prior to that.
4             Q.      All right.  But after the last offer that
5    Ms. Donoho made, was there a counteroffer made by Big
6    Thirst?
7             A.      The offer was so far out of our reach, we
8    did not think that Ms. Donoho would accept something that
9    was realistic to us.
10            Q.      Okay.  And what is realistic to you?
11                    MS. GILSTRAP:  Objection, form.  I'm going
12   to instruct you not to answer to the extent you're having
13   to rely on any communications with counsel.
14                    THE WITNESS:  I'm going to rely on my
15   counsel's recommendation and not answer.
16   BY MS. MOUSILLI:
17            Q.      Okay.  In your estimation, what would a
18   fair settlement be to Ms. Donoho with regards to her
19   claims against you and Big Thirst?
20                    MS. GILSTRAP:  I'm going to instruct you
21   not to answer, to the extent your answer relies on counsel
22   -- between you and your attorneys.
23                    THE WITNESS:  I'm relying on my counsel's
24   recommendation and not answering the question.
25   BY MS. MOUSILLI:
```

WYLIE 559

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    292

1          Q.      Okay.  Your counsel didn't ask you not to

2    answer the question.  She said if your answer would rely

3    on attorney-client communications, then you don't -- you

4    shouldn't answer.  Do you understand the distinction?

5          A.      That does rely on that.

6          Q.      Do you understand the distinction?

7          A.      I do and the answer I would give would rely

8    on -- rely on previous conversations.

9                  MS. MOUSILLI:  I pass the witness.

10              EXAMINATION BY COUNSEL FOR THE PLAINTIFF

11   BY MS. GILSTRAP:

12         Q.      All right. Mr. McGinnis, have you testified

13   today about every interaction or communication you've ever

14   had with Ms. Donoho from -- since you met her in 2016?

15         A.      No, not at all.

16         Q.      So there might be other things that you

17   testify about at trial, correct?

18                 MS. MOUSILLI:  Objection, form.

19                 MS. GILSTRAP:  Okay.  I'll pass the

20   witness.

21                 MS. MOUSILLI:  We don't have any further

22   questions.

23                 THE VIDEOGRAPHER:  We're off the record at

24   4:50.

25                 THE REPORTER:  Before I take us off of this

WYLIE 560

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    293

1    record, can I get the orders for the transcript.  Would

2    you like a copy?  Do each of you need a rush?

3              MS. MOUSILLI:  We do need a copy.  We don't

4    need a rush.  We don't need anything expedited.

5              THE REPORTER:  No rush and no rough.

6              MS. MOUSILLI:  No.

7              THE REPORTER:  Okay.

8              MS. GILSTRAP:  Just a condensed and normal.

9              THE REPORTER:  And do you want the exhibits

10   attached to the transcripts?

11             MS. GILSTRAP:  Yes.

12             MS. MOUSILLI:  Yes, please.

13             THE REPORTER:  Okay.  Thank you.  We're off

14   the record.

15             (Proceedings concluded at 4:51 p.m.)

16

17

18

19

20

21

22

23

24

25

WYLIE 561

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                    294

```
 1              CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

 2

 3        I, Kollin Casarez, the officer before whom the foregoing

 4    proceedings were taken, do hereby certify that any witness(es)

 5    in the foregoing proceedings were fully sworn; that the

 6    proceedings were recorded by me and thereafter reduced to

 7    typewriting by a qualified transcriptionist; that said digital

 8    audio recording of said proceedings are a true and accurate

 9    record to the best of my knowledge, skills, and ability; and

10    that I am neither counsel for, related to, nor employed by any

11    of the parties to this case and have no interest, financial or

12    otherwise, in its outcome.

13                        Kollin Casarez

14    _____

15    KOLLIN CASAREZ, NOTARY PUBLIC

16    FOR THE STATE OF TEXAS

17

18

19

20

21

22

23

24

25
```

WYLIE 562

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                            295

```
 1                  CERTIFICATE OF TRANSCRIBER

 2

 3            I, Wanda Greenlee, do hereby certify that this

 4    transcript was prepared from the digital audio recording of the

 5    foregoing proceeding; that said transcript is a true and

 6    accurate record of the proceedings to the best of my knowledge,

 7    skills, and ability; and that I am neither counsel for, related

 8    to, nor employed by any of the parties to the case and have no

 9    interest, financial or otherwise, in its outcome.

10

11         Wanda Greenlee

12    _____

13    Wanda Greenlee, CCR

14    April 10, 2024

15

16

17

18

19

20

21

22

23

24

25
```

WYLIE 563

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

296

| A | | | |
|---|---|---|---|
| **abide**<br>17:12, 17:14,<br>18:8, 18:10<br>**abided**<br>226:10, 267:15,<br>273:3<br>**abilities**<br>146:24, 147:6<br>**ability**<br>48:17, 82:12,<br>82:13, 113:11,<br>146:15, 146:16,<br>146:17, 147:15,<br>164:14, 191:23,<br>192:4, 254:21,<br>294:9, 295:7<br>**able**<br>8:15, 9:14,<br>43:18, 64:5,<br>82:6, 120:5,<br>147:8, 154:18,<br>159:25, 164:18,<br>165:5, 165:21,<br>171:19, 180:22,<br>190:3, 190:5,<br>190:13, 190:14,<br>190:15, 190:16,<br>190:22, 224:21,<br>264:8<br>**about**<br>7:2, 7:3,<br>11:21, 13:5,<br>19:2, 19:17,<br>25:12, 29:2,<br>30:3, 32:12,<br>39:4, 40:3,<br>46:13, 53:11,<br>53:25, 54:1,<br>54:14, 54:25,<br>55:2, 55:15,<br>55:17, 56:10,<br>56:21, 56:24,<br>58:18, 58:19,<br>59:1, 59:11,<br>60:14, 61:8,<br>61:11, 61:19, | 61:21, 63:6,<br>67:3, 68:6,<br>75:20, 76:12,<br>79:3, 86:14,<br>89:7, 89:19,<br>89:20, 90:15,<br>93:25, 98:6,<br>99:16, 104:7,<br>107:2, 107:13,<br>109:9, 113:22,<br>120:23, 124:2,<br>126:22, 127:1,<br>127:8, 128:12,<br>130:22, 131:18,<br>133:5, 134:19,<br>145:12, 145:15,<br>153:13, 160:3,<br>160:8, 161:4,<br>161:21, 175:1,<br>176:13, 176:21,<br>177:13, 184:15,<br>184:16, 184:19,<br>184:23, 184:24,<br>187:22, 189:6,<br>189:16, 195:24,<br>196:5, 196:8,<br>207:6, 207:11,<br>227:16, 236:8,<br>239:25, 240:21,<br>249:18, 252:1,<br>259:22, 272:19,<br>272:22, 273:24,<br>274:24, 290:6,<br>292:13, 292:17<br>**above**<br>165:12, 254:17<br>**absent**<br>263:6<br>**absolutely**<br>35:3, 196:19<br>**accept**<br>291:8<br>**access**<br>75:12, 75:19,<br>75:22, 81:23,<br>107:5, 107:8,<br>155:11, 155:22,<br>157:4, 157:6, | 157:13, 157:18,<br>159:11, 159:13,<br>159:14, 160:4,<br>160:10, 165:3,<br>166:12, 180:5,<br>192:9, 195:4,<br>195:19, 202:5,<br>271:12, 271:18,<br>271:23, 272:15,<br>272:17, 272:24<br>**accessed**<br>107:9, 107:11,<br>107:22<br>**accesses**<br>157:21<br>**accessing**<br>275:24<br>**accidentally**<br>239:1<br>**accommodation**<br>219:9<br>**accomplish**<br>257:3, 259:23<br>**according**<br>160:9<br>**account**<br>28:23, 33:3,<br>33:14, 36:5,<br>36:7, 98:23,<br>104:12, 105:6,<br>115:10, 199:25,<br>200:1, 200:17,<br>200:21, 201:4,<br>201:12, 201:25,<br>202:11, 203:5,<br>209:16, 212:17,<br>219:2, 240:5<br>**accounted**<br>89:4, 217:16<br>**accounting**<br>209:13, 211:17,<br>211:20, 212:15,<br>232:11<br>**accounts**<br>104:14, 104:15,<br>200:24, 201:2,<br>232:9, 238:23<br>**accurate**<br>9:14, 188:22, | 188:23, 203:14,<br>294:8, 295:6<br>**achieve**<br>188:9, 205:10<br>**acknowledge**<br>122:20, 122:25<br>**acknowledgement**<br>285:21<br>**acknowledging**<br>284:15<br>**acquisition**<br>102:10<br>**acted**<br>74:5<br>**acting**<br>75:18<br>**action**<br>1:9, 180:12,<br>201:20, 201:25<br>**actions**<br>188:3, 194:23,<br>206:13, 226:5<br>**active**<br>32:3<br>**actively**<br>48:11<br>**actual**<br>131:14, 172:12,<br>173:7, 232:2,<br>253:12, 253:18<br>**actually**<br>64:6, 66:15,<br>239:1, 242:8,<br>268:16<br>**ad**<br>28:21, 29:6,<br>29:7, 31:15<br>**add**<br>74:6, 167:19,<br>191:14, 191:17,<br>245:4, 250:23<br>**added**<br>43:25, 80:12,<br>167:17, 167:24,<br>221:22<br>**adding**<br>42:11, 131:14,<br>204:23 |

WYLIE 564

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

297

addition
239:12
additional
36:22, 107:5,
107:6, 147:22,
171:18, 171:21,
236:7, 243:9,
243:17, 244:2,
259:19, 259:20
address
6:6, 15:14,
15:19, 27:24,
251:16
addressed
276:24, 276:25
adjust
117:11, 117:13
adjustments
33:11
administration
244:7
administrative
226:4
admissible
210:1, 215:9
advance
39:8, 125:9
adverse
226:2
advertising
16:1, 16:10,
32:4, 218:2,
218:6
advice
41:11, 50:7,
119:5, 208:2,
210:13, 215:22,
258:6, 267:15,
290:6, 290:9
advised
288:24
advisor
86:11
advisors
84:18, 167:24,
171:20, 243:18,
243:22
advisory
57:16, 198:20,

221:23, 223:7,
223:25
aeo
4:3, 4:4, 4:5,
4:6, 4:7, 4:8,
94:4, 97:19,
134:13, 134:16,
134:24, 143:8,
177:18, 177:21,
179:3
affect
167:25, 226:6
affecting
226:5
affidavit
62:17, 63:16,
63:17, 63:24,
64:5, 64:9,
64:12, 64:14,
64:19, 65:2
affirmative
225:23, 226:10
affirmed
5:11
afford
290:22
after
9:6, 36:22,
44:17, 45:18,
58:8, 62:22,
63:5, 82:14,
84:11, 91:16,
91:19, 109:25,
110:2, 110:5,
116:16, 122:18,
148:3, 148:8,
148:17, 154:1,
154:22, 155:9,
155:19, 156:1,
156:9, 156:17,
157:5, 157:14,
157:19, 158:2,
160:16, 167:10,
167:17, 167:20,
183:14, 183:21,
186:7, 187:4,
187:6, 188:1,
189:13, 191:13,

191:20, 192:17,
192:23, 193:1,
193:4, 193:9,
193:13, 194:10,
195:24, 197:7,
199:11, 199:16,
199:19, 199:21,
200:3, 201:4,
216:5, 218:15,
218:22, 232:24,
233:4, 233:17,
241:5, 262:15,
262:17, 262:19,
267:22, 271:11,
275:7, 275:14,
277:2, 277:15,
280:7, 282:19,
282:20, 283:3,
283:5, 291:4
afternoon
15:10
afterwards
63:23
again
35:15, 53:24,
67:17, 71:9,
84:3, 97:21,
127:7, 151:5,
151:16, 173:6,
177:5, 177:16,
182:21, 184:3,
186:5, 186:19,
192:22, 207:6,
219:24, 241:9,
261:18, 264:9,
264:10, 270:24,
271:13, 278:19,
280:18
against
6:14, 6:16,
6:21, 6:22,
40:25, 41:2,
180:21, 183:5,
183:11, 183:20,
183:24, 184:5,
185:9, 186:5,
187:14, 190:1,
190:6, 190:10,

226:14, 226:17,
286:21, 291:19
agency
15:22, 23:3,
28:21, 29:6,
29:9, 29:10,
29:18, 35:11,
36:10, 42:25,
45:1, 46:16,
66:4
agent
53:7, 104:18
ago
15:9, 59:13,
269:18, 276:10
agree
26:24, 158:8,
158:16, 172:22,
193:16, 193:22,
194:3, 214:18,
254:25
agreed
12:16, 12:17,
52:17, 59:23,
86:19, 89:6,
126:16, 229:18
agreement
2:11, 12:20,
52:11, 52:13,
52:20, 52:21,
68:23, 71:22,
77:8, 77:16,
77:21, 78:2,
84:4, 92:24,
93:7, 93:8,
93:13, 93:15,
93:18, 93:19,
97:22, 98:25,
99:3, 99:5,
99:8, 99:9,
99:12, 99:13,
99:17, 100:6,
100:12, 100:16,
100:19, 100:20,
101:11, 101:15,
106:24, 109:13,
128:15, 128:17,
128:22, 170:15,

173:25, 225:5,
225:9, 225:22,
225:25, 227:1,
227:7, 227:11,
227:15, 233:12,
233:24, 234:6,
253:10, 253:12,
253:18, 261:20,
279:21, 279:25
**agreements**
12:23, 58:1,
70:22, 70:24,
71:1, 71:2,
71:10, 71:18,
71:21, 72:10,
72:17, 72:21,
72:23, 73:1,
76:8, 76:13,
76:14, 76:16,
76:18, 76:24,
77:1, 83:23,
84:2, 84:10,
90:25, 92:20,
93:1, 93:3,
93:6, 93:10,
93:12, 97:25,
110:21, 111:7,
127:1, 152:14,
160:25, 161:1,
161:2, 209:14,
209:15, 212:16,
213:3, 250:20,
259:19, 259:20,
279:7, 280:3
**agrees**
77:18, 225:24
**ahead**
9:5, 22:5,
40:14, 125:12,
196:23, 246:19,
272:12, 273:22
**alcohol**
23:4, 85:25
**alerted**
246:25
**all**
17:23, 37:2,
40:1, 42:11,

46:2, 47:14,
49:1, 52:5,
58:10, 58:13,
58:15, 61:23,
67:2, 77:9,
83:1, 84:11,
87:16, 97:22,
97:24, 107:12,
108:17, 108:18,
108:21, 110:13,
111:24, 113:7,
116:12, 116:15,
125:18, 126:23,
127:3, 127:9,
128:23, 130:2,
131:12, 133:15,
144:9, 145:18,
145:21, 150:14,
151:10, 160:25,
161:16, 168:19,
177:4, 179:25,
180:23, 181:10,
183:8, 186:12,
191:3, 195:3,
199:14, 201:16,
212:19, 214:4,
218:14, 219:3,
219:8, 226:2,
226:3, 226:23,
227:22, 228:8,
228:19, 229:24,
238:8, 240:4,
245:14, 252:1,
258:10, 259:14,
262:1, 263:9,
268:9, 272:18,
274:7, 274:11,
277:24, 279:1,
280:9, 281:16,
291:4, 292:12,
292:15
**allegations**
14:1
**allege**
161:5, 194:15,
194:25
**alleged**
174:22

**allegedly**
174:21, 194:16,
195:1, 195:15
**allocate**
112:1
**allocated**
111:15, 111:16,
111:25, 112:1,
112:6, 221:20,
243:23
**allocates**
112:2
**allocation**
112:2, 112:7,
170:12, 220:7
**allotted**
70:7
**allow**
164:19
**allowed**
41:9, 41:15,
153:18, 168:3
**allowing**
77:22
**alluded**
116:21, 124:3,
289:12, 289:14
**alone**
124:21
**along**
79:23
**already**
19:24, 41:22,
134:20, 179:22,
185:2, 247:4,
262:15, 279:18
**also**
3:32, 6:16,
6:23, 8:23,
11:9, 28:14,
30:23, 31:6,
40:7, 40:20,
60:11, 73:8,
75:17, 105:23,
122:15, 168:16,
202:23, 203:6,
229:5, 260:18,
261:12, 262:13,

264:1, 264:22
**alternative**
118:19, 290:15
**alternatives**
118:15, 118:18
**although**
68:22
**ambiguous**
214:15, 214:17
**amend**
31:21, 34:16,
50:13, 279:14
**amended**
27:20, 208:19
**american**
13:23, 219:16
**amicable**
254:9, 257:18
**amit**
269:9, 270:6,
270:13, 276:21
**amount**
89:12, 90:23,
98:17, 109:19,
130:16, 177:6,
225:18, 235:2,
235:5, 238:19,
238:21, 239:10,
239:14, 239:22,
245:11, 247:6,
255:16, 255:17,
289:1
**amounts**
101:19, 244:22
**analysis**
39:6, 39:24,
63:12
**analyst**
85:24
**analytics**
43:8, 160:12
**angry**
126:8
**annual**
161:2, 198:8,
198:10, 198:13,
198:16, 218:10
**annually**
33:19

WYLIE 566

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

299

| | | | |
|---|---|---|---|
| **another** | 206:25, 207:4, | **appeared** | 29:24, 31:18, |
| 29:11, 66:9, | 208:2, 249:18, | 125:1, 125:4 | 33:21, 34:4, |
| 66:11, 90:12, | 291:24 | **appears** | 98:24, 102:16, |
| 180:12, 191:14, | **answers** | 208:14, 210:6, | 104:25, 105:1, |
| 268:17, 288:13 | 9:14 | 260:6, 260:9 | 150:5, 162:12, |
| **answer** | **anticipate** | **applicable** | 162:13, 168:12, |
| 8:14, 8:21, | 101:7, 202:20, | 241:20 | 174:25, 177:8, |
| 8:25, 9:6, 9:7, | 222:20, 289:8 | **applicants** | 205:12, 288:12 |
| 9:10, 10:24, | **anybody** | 264:23 | **april** |
| 14:6, 14:8, | 13:5, 14:17, | **application** | 30:20, 84:12, |
| 14:12, 14:15, | 14:24, 20:9, | 83:10, 114:18, | 113:14, 114:14, |
| 14:18, 14:20, | 23:20, 66:24, | 146:13, 147:14, | 114:18, 115:13, |
| 14:22, 14:25, | 101:19, 110:16, | 147:15, 244:11, | 116:17, 152:24, |
| 15:3, 17:2, | 110:23, 110:25, | 247:3 | 154:15, 155:18, |
| 17:6, 17:16, | 115:6, 167:17, | **applications** | 158:2, 159:9, |
| 17:25, 18:16, | 169:25, 189:8, | 83:2, 112:16, | 162:13, 179:6, |
| 18:22, 19:21, | 192:14, 248:6 | 129:17, 130:2, | 180:25, 186:6, |
| 19:23, 19:25, | **anymore** | 134:7, 154:9, | 186:22, 186:23, |
| 22:5, 31:21, | 270:9, 270:11, | 164:22, 164:25 | 187:6, 188:4, |
| 47:23, 67:10, | 270:15, 276:14 | **applied** | 192:17, 192:20, |
| 67:12, 71:17, | **anyone** | 112:10, 112:21, | 192:23, 193:1, |
| 84:21, 119:19, | 25:16, 49:15, | 113:5, 114:13, | 193:4, 193:7, |
| 122:1, 127:4, | 49:16, 49:19, | 114:14, 116:1, | 193:9, 193:13, |
| 130:3, 130:18, | 76:8, 92:1, | 116:4 | 194:10, 204:2, |
| 133:2, 134:18, | 103:6, 103:23, | **apply** | 232:22, 239:16, |
| 147:1, 147:17, | 156:16, 161:24, | 66:14, 112:12, | 268:13, 268:16, |
| 150:16, 150:18, | 162:4, 195:25, | 112:19, 173:4 | 295:14 |
| 150:23, 151:2, | 289:21 | **applying** | **architect** |
| 157:23, 176:25, | **anything** | 115:23, 284:2 | 161:19 |
| 177:19, 184:14, | 11:21, 12:12, | **appreciate** | **aren't** |
| 193:3, 206:2, | 15:1, 20:19, | 259:10 | 41:9 |
| 206:4, 206:13, | 27:13, 51:15, | **approach** | **arising** |
| 206:14, 206:15, | 53:14, 65:6, | 59:1 | 40:17 |
| 206:20, 207:24, | 79:3, 145:8, | **approached** | **around** |
| 210:12, 211:8, | 151:25, 154:19, | 34:3, 58:18, | 144:2 |
| 211:16, 211:25, | 179:17, 196:21, | 58:20, 86:15 | **arrange** |
| 212:8, 214:1, | 210:23, 217:4, | **appropriate** | 193:6 |
| 222:16, 267:8, | 217:5, 276:15, | 280:12, 281:4 | **arrangements** |
| 288:17, 288:18, | 290:7, 293:4 | **approve** | 86:10 |
| 289:3, 289:5, | **anywhere** | 110:13, 110:16, | **arrive** |
| 290:5, 290:10, | 160:22, 245:1 | 111:11 | 42:4 |
| 291:12, 291:15, | **apologize** | **approximate** | **arrived** |
| 291:21, 292:2, | 151:16, 238:11 | 5:4, 149:18, | 42:7, 42:10, |
| 292:4, 292:7 | **app-building** | 176:3, 176:6, | 42:23, 42:24, |
| **answered** | 66:3 | 176:9, 176:12, | 52:13, 124:25 |
| 193:14 | **appeal** | 176:15, 177:11 | **art** |
| **answering** | 286:18 | **approximately** | 28:21 |
| 14:19, 177:16, | **appealing** | 15:9, 16:19, | **article** |
| | 223:1 | | 55:10, 55:11, |

WYLIE 567

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

300

| | | | |
|---|---|---|---|
| 56:20<br>**articles**<br>128:13<br>**artisan**<br>13:23<br>**asher**<br>77:11<br>**ashley**<br>77:14<br>**aside**<br>236:7<br>**asked**<br>8:25, 22:1,<br>34:5, 53:15,<br>53:16, 53:24,<br>54:18, 58:20,<br>59:21, 62:7,<br>63:7, 70:3,<br>86:16, 161:23,<br>162:16, 191:17,<br>196:8, 222:7,<br>259:12, 263:12,<br>273:19<br>**asking**<br>14:24, 21:2,<br>21:6, 21:10,<br>21:11, 22:17,<br>42:20, 53:25,<br>124:7, 144:23,<br>156:5, 156:8,<br>171:7, 171:10,<br>171:14, 183:18,<br>183:19, 184:15,<br>184:19, 191:14,<br>206:7, 206:8,<br>207:6, 231:13,<br>231:14, 234:8,<br>237:19, 250:9,<br>267:9, 272:19<br>**asks**<br>209:10, 212:14<br>**aspect**<br>74:8, 75:19,<br>130:17, 151:24,<br>156:2, 156:8,<br>156:16, 272:22,<br>273:19, 274:3,<br>275:24 | **aspects**<br>37:8, 40:3,<br>41:16, 50:10,<br>55:4, 57:22,<br>59:6, 63:8,<br>74:11, 74:13,<br>81:24, 82:4,<br>129:5, 129:8,<br>130:13, 145:6,<br>148:5, 160:11,<br>273:9, 275:6<br>**asset**<br>254:24<br>**assets**<br>113:3, 245:11<br>**assigned**<br>28:22<br>**assist**<br>270:17, 276:15<br>**assistance**<br>57:17, 280:4<br>**assistant**<br>7:10<br>**assisted**<br>129:2<br>**assisting**<br>32:16<br>**associate**<br>7:11<br>**associated**<br>56:15<br>**association**<br>219:17<br>**assume**<br>149:19, 227:8,<br>250:21, 266:16<br>**assuming**<br>227:9, 237:4<br>**assumption**<br>250:8<br>**attached**<br>42:3, 42:5,<br>279:21, 293:10<br>**attempt**<br>114:6, 114:15,<br>126:5<br>**attempted**<br>126:6 | **attempts**<br>252:14<br>**attend**<br>187:11, 199:20,<br>219:16<br>**attendance**<br>199:2, 219:15<br>**attended**<br>197:15, 197:23,<br>197:25, 198:3<br>**attending**<br>8:10<br>**attention**<br>79:14<br>**attorney**<br>9:4, 9:6,<br>12:21, 14:17,<br>14:25, 20:1,<br>20:4, 20:23,<br>21:8, 41:8,<br>41:18, 52:23,<br>60:1, 62:13,<br>66:11, 67:24,<br>93:20, 104:19,<br>104:20, 104:21,<br>104:22, 105:2,<br>134:12, 160:5,<br>181:2, 181:7,<br>181:14, 185:16,<br>185:18, 205:14,<br>206:8, 207:7,<br>208:21, 211:12,<br>211:14, 211:21,<br>211:23, 212:5,<br>213:12, 213:16,<br>216:6, 227:13,<br>242:1, 255:15,<br>256:19, 257:14,<br>257:17, 257:21,<br>257:25, 258:4,<br>258:10, 258:17,<br>258:18, 259:6,<br>259:17, 261:25,<br>266:21, 267:5,<br>267:15, 288:9<br>**attorney's**<br>18:24, 41:15,<br>41:23 | **attorney-client**<br>14:7, 47:24,<br>206:5, 210:11,<br>292:3<br>**attorneys**<br>1:26, 19:4,<br>26:11, 40:20,<br>40:22, 48:18,<br>77:2, 169:2,<br>184:20, 206:3,<br>206:13, 207:16,<br>207:18, 207:21,<br>212:20, 212:22,<br>213:22, 214:10,<br>214:19, 215:15,<br>215:17, 288:16,<br>288:24, 291:22<br>**attribute**<br>221:18<br>**attributed**<br>157:8<br>**attributing**<br>57:1<br>**audio**<br>294:8, 295:4<br>**august**<br>106:4, 106:16,<br>108:4, 109:14,<br>109:17, 109:18,<br>110:6, 111:13,<br>200:2, 225:13,<br>242:1, 283:21,<br>284:8<br>**austin**<br>1:3, 1:28, 2:7,<br>3:9, 3:20, 6:3,<br>219:14<br>**auth0**<br>74:19, 129:2,<br>179:25<br>**author**<br>132:4, 209:2,<br>246:9<br>**authored**<br>131:20, 131:24,<br>132:2, 155:5<br>**authority**<br>196:20 |

WYLIE 568

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

301

**authorized**
12:15, 220:13,
220:15, 223:10,
223:14, 223:20,
224:15, 279:15
**authorizing**
183:24, 184:5
**automated**
148:8
**available**
34:6, 34:7,
37:3, 40:8,
42:16, 148:20,
148:21, 148:22,
222:23
**avenue**
2:5
**averaging**
177:13
**avoid**
263:9
**awarded**
250:16
**aware**
41:16, 115:20,
123:7, 123:15,
123:21, 169:8,
179:18, 226:16,
226:19, 226:22,
263:7
**away**
120:7, 120:16,
121:5, 122:10,
123:2, 123:5,
256:25, 264:24
**azeredo**
3:5

**B**

**back**
40:5, 55:14,
58:17, 59:4,
60:24, 61:2,
67:18, 78:22,
79:4, 99:14,
100:22, 101:1,
101:4, 111:13,
116:16, 125:15,

159:1, 174:18,
180:5, 184:3,
197:5, 197:7,
201:21, 235:16,
235:18, 238:12,
241:3, 241:5,
245:15, 255:21,
255:22, 261:14,
265:22, 266:1,
287:23
**backed**
86:12
**baked**
229:19
**balance**
209:15, 212:16,
234:7, 234:14
**ballpark**
42:23, 288:11
**bank**
98:23, 105:6,
105:24, 106:2,
106:12, 106:20,
106:25, 107:15,
108:3, 108:13,
109:10, 110:20,
111:6, 111:14,
112:15, 112:22,
112:23, 113:4,
113:9, 113:13,
113:16, 114:7,
114:15, 114:20,
115:1, 115:7,
115:13, 116:2,
116:5, 116:22,
199:25, 200:1,
200:17, 200:21,
200:24, 209:12,
211:10, 211:11,
212:15, 225:10,
226:14, 227:8,
227:17, 232:9,
240:5, 245:9,
245:15, 261:21
**bank's**
114:22
**banker**
246:24

**bankruptcy**
286:10, 289:12,
289:15, 289:22,
289:24, 290:2,
290:13
**banks**
232:10
**barrel**
125:18
**base**
256:15
**based**
39:21, 42:8,
42:11, 99:14,
128:13, 170:25,
180:23, 205:9
**basic**
157:10
**basically**
215:9, 255:10,
255:24, 256:12
**basis**
33:12, 34:12,
34:22, 47:23,
176:18
**bates**
220:3, 227:1,
245:19, 250:24,
252:25, 262:24
**bates-labeled**
216:16, 223:17,
241:11, 254:15,
259:1
**because**
8:9, 14:21,
21:1, 21:14,
34:12, 43:9,
50:8, 59:25,
60:2, 82:15,
86:24, 114:1,
114:4, 116:23,
117:22, 119:5,
126:15, 127:9,
129:25, 130:2,
147:13, 150:22,
155:11, 157:22,
159:18, 159:22,
161:15, 172:22,

173:4, 176:20,
183:16, 184:14,
186:4, 187:10,
194:21, 194:22,
195:3, 195:6,
195:7, 195:18,
201:24, 206:5,
214:16, 230:16,
236:19, 240:11,
242:9, 243:19,
245:8, 247:4,
249:17, 253:11,
257:18, 262:1,
264:7, 264:18,
264:22, 271:18,
279:16, 285:7
**become**
118:13, 127:12,
250:14
**becoming**
229:23
**been**
10:13, 10:16,
11:3, 27:6,
30:13, 32:1,
40:18, 40:22,
54:17, 56:22,
62:1, 64:15,
64:17, 64:18,
65:1, 100:5,
107:20, 111:21,
120:8, 120:17,
121:5, 121:22,
123:2, 131:10,
184:4, 184:7,
185:17, 199:4,
199:8, 203:22,
204:16, 208:10,
210:19, 211:12,
211:21, 212:19,
215:16, 215:17,
215:25, 222:20,
228:3, 234:18,
240:21, 245:24,
247:13, 249:25,
252:22, 254:19,
257:20, 259:17,
261:17, 269:5,

WYLIE 569

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

271:9, 271:12,
277:21, 278:10,
280:16, 282:18,
283:12, 284:21,
284:25, 286:22,
289:4, 289:21,
289:24, 290:1,
290:14, 290:16
**before**
2:11, 7:9,
7:20, 8:20,
10:1, 10:14,
27:10, 27:17,
34:10, 40:2,
45:17, 64:2,
66:9, 76:21,
76:24, 80:18,
80:24, 81:7,
81:16, 82:14,
82:16, 82:24,
85:10, 160:18,
183:20, 183:22,
186:7, 186:9,
186:17, 187:4,
208:16, 216:13,
232:24, 233:3,
233:17, 233:20,
241:8, 242:4,
257:13, 259:6,
261:23, 264:9,
265:23, 280:7,
292:25, 294:3
**began**
5:2, 16:22,
39:7, 46:14,
69:16, 78:20,
78:25, 79:7,
79:9, 80:19,
81:6, 84:11,
102:4
**begin**
36:11, 37:21,
53:3, 76:17,
78:23, 79:9,
99:23, 200:10
**beginning**
15:23, 29:5,
46:23, 54:4,

71:14, 78:16,
78:18, 79:2,
99:14, 104:5,
161:13, 162:13,
162:21, 162:22,
163:1, 167:8,
204:2, 268:4
**begins**
4:3, 4:5, 4:7,
94:4, 134:24,
177:21
**begun**
270:24
**behalf**
3:3, 3:13,
58:2, 62:15,
62:16, 89:23,
100:12, 110:21,
125:2, 125:5,
153:20, 206:13,
208:22, 209:20,
226:20, 235:19,
269:16
**behavior**
281:4
**being**
5:11, 22:12,
25:24, 55:5,
55:25, 56:1,
56:2, 56:24,
120:4, 123:24,
123:25, 125:22,
126:22, 127:1,
164:17, 164:18,
165:5, 176:23,
191:2, 199:11,
217:19, 245:8,
246:25, 247:2,
250:15, 250:16,
255:18, 259:12,
261:2, 261:6,
263:4, 263:12,
263:17
**belief**
174:1, 271:8
**believe**
31:21, 33:19,
34:9, 36:5,

37:12, 37:22,
46:22, 47:5,
53:4, 58:23,
59:23, 60:10,
62:9, 64:10,
67:7, 67:24,
68:12, 68:25,
78:21, 79:1,
79:2, 79:7,
79:8, 79:10,
79:11, 79:16,
86:9, 88:5,
88:20, 92:4,
100:11, 107:7,
112:17, 115:16,
125:11, 130:8,
145:8, 145:21,
153:9, 156:22,
158:1, 159:23,
160:17, 166:14,
167:1, 167:4,
168:13, 168:16,
180:15, 180:17,
180:25, 183:22,
189:16, 192:12,
201:2, 201:7,
208:25, 213:18,
214:7, 214:19,
217:3, 218:18,
220:7, 220:10,
223:11, 232:22,
236:10, 236:12,
239:17, 244:11,
256:3, 259:5,
260:24, 261:21,
266:20, 270:23,
276:23, 285:6,
290:15
**believed**
247:17, 255:14
**believes**
68:4
**belonging**
133:18, 134:1,
134:8, 231:9
**below**
66:2, 219:23,
224:10, 243:8,

249:25, 253:6
**beneficial**
229:21
**benefits**
69:23, 70:3,
70:4, 70:6
**besides**
5:22, 10:10,
10:14, 12:12,
13:8, 13:10,
14:17, 14:25,
16:20, 22:12,
24:1, 41:5,
48:25, 49:4,
49:18, 52:2,
71:1, 72:9,
103:6, 105:18,
105:20, 146:22,
160:9, 195:14,
198:4, 198:16,
205:23, 206:10,
209:3, 209:6
**best**
294:9, 295:6
**better**
20:11, 66:14,
150:21
**betterment**
257:23, 258:19
**between**
26:3, 45:23,
46:9, 54:14,
54:24, 55:13,
56:8, 60:4,
65:19, 65:20,
70:22, 71:2,
71:18, 72:10,
72:18, 72:21,
72:24, 73:2,
84:4, 91:1,
91:4, 91:11,
92:20, 93:3,
98:25, 99:8,
99:18, 101:11,
106:11, 108:3,
111:5, 123:24,
125:15, 125:25,
126:12, 127:13,

WYLIE 570

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                303

128:15, 154:13,
158:15, 168:24,
169:9, 169:14,
215:3, 215:14,
231:22, 232:3,
234:6, 235:13,
237:16, 238:23,
240:11, 240:12,
244:23, 246:3,
249:21, 253:10,
258:2, 258:14,
269:8, 281:6,
281:9, 289:24,
291:22
**beverage**
23:4, 46:19
**beyond**
70:20, 144:8,
260:25, 273:10
**biannual**
198:20
**bigger**
254:7
**bigthirst**
201:3, 202:11,
203:5
**bigthirstmarketi-
ng**
80:1
**bill**
89:14
**billed**
16:13, 89:8
**birth**
5:25
**bit**
13:4, 29:2,
66:9, 66:10,
148:24, 245:5
**blaming**
181:14
**blanket**
214:9
**blog**
31:23
**blogger**
31:23, 31:24
**blvd**
3:19

**board**
13:9, 30:6,
30:7, 57:16,
58:16, 111:4,
167:14, 167:17,
167:19, 183:4,
183:8, 183:10,
183:19, 184:7,
184:10, 184:17,
184:21, 184:25,
185:22, 186:10,
186:11, 186:12,
186:14, 186:16,
186:18, 187:8,
187:11, 187:15,
188:5, 198:17,
198:18, 198:19,
198:20, 198:23,
199:1, 199:4,
199:8, 199:17,
199:18, 199:19,
199:21, 199:22,
214:25, 221:22,
221:23, 221:24,
222:21, 223:1,
223:7, 223:25,
234:14, 243:19,
243:22, 243:23,
243:24, 245:4,
247:11, 250:17,
279:12, 279:18,
279:20, 279:22,
279:25, 289:25,
290:3, 290:12,
290:14
**boilerplate**
253:12
**bomb**
263:4
**booked**
235:15
**bookkeeping**
232:11
**books**
12:4, 105:7,
168:19, 168:24,
168:25, 169:10,
169:14, 169:16,

170:3, 208:14,
217:15, 232:21,
233:25, 234:2,
234:3, 237:10
**bootstrapping**
54:21
**borrower**
225:23, 225:25,
226:5, 226:7,
261:16, 262:22
**borrower's**
226:2
**borrowers**
244:23, 259:13,
261:13
**both**
20:16, 31:22,
34:19, 69:17,
103:5, 108:20,
109:6, 109:23,
110:2, 125:12,
132:4, 151:20,
197:15, 229:9,
229:24, 243:23,
243:24, 248:23,
253:13, 253:20,
253:21, 261:20,
262:23
**bottom**
254:14
**bought**
240:6
**brand**
230:24, 230:25,
231:4
**brands**
23:6, 127:22,
231:17
**breach**
6:24, 40:17,
41:3, 41:6,
41:9, 41:15,
193:16, 193:23
**breaching**
194:7
**break**
9:22, 9:23,
42:14, 60:18,

61:7, 87:1,
109:8, 150:22,
158:4, 158:6,
158:8, 158:11,
158:19, 196:24,
197:7, 202:18,
202:24, 203:6,
240:22, 241:5,
241:9, 251:22,
265:15, 266:2,
287:18, 288:1
**breaks**
9:20
**brent**
3:33
**briefly**
125:13
**bring**
91:22, 91:24
**bringing**
92:1, 92:13
**brings**
279:13
**broach**
118:8
**broached**
55:4, 55:9,
56:22
**broad**
176:12, 209:24
**broke**
203:12
**broken**
204:19, 217:5,
277:15
**brought**
6:14, 30:14,
41:22, 91:16,
91:17, 91:19,
217:11, 243:18,
261:17
**btc**
234:24, 236:21,
237:6, 237:7,
238:15
**bti**
251:19, 254:15,
259:1, 262:24

WYLIE 571

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

304

**btm**
229:21, 236:2,
236:5, 236:25,
237:9, 239:8
**build**
16:23, 35:25,
36:2, 36:4,
36:11, 36:20,
37:1, 37:19,
39:7, 43:18,
58:21, 87:19,
273:16
**building**
43:7, 61:11,
81:14
**built**
36:25, 37:5,
37:10, 44:3,
44:8, 44:19,
44:22, 44:24,
45:3, 61:23,
90:7, 127:20,
154:13, 156:25,
161:10, 162:20,
163:5, 163:11,
163:12, 276:8
**bunch**
213:8
**burdensome**
209:22, 215:8
**business**
48:8, 48:9,
51:20, 52:24,
68:7, 73:7,
91:21, 102:8,
111:16, 134:19,
144:4, 148:25,
149:14, 149:21,
164:15, 165:6,
165:9, 180:1,
180:2, 180:23,
200:10, 213:5,
225:5, 225:9,
231:17, 244:6,
244:10, 257:19
**buttoned**
66:10
**buttons**
74:6, 145:7,

149:8
**buy**
74:6, 149:8,
256:24
**buy-in**
253:15, 253:23
**bylaws**
47:14, 163:25,
222:21, 253:11

**C**

**c**
40:6
**c-corporation**
49:8
**calculated**
210:1, 215:8
**calculating**
41:25
**calendar**
151:11
**calendars**
150:14
**call**
15:7, 15:12,
53:4, 59:14
**called**
29:13, 39:11,
45:1, 54:2,
55:5, 63:6,
69:3, 126:8,
155:10, 156:23,
266:20
**calling**
124:6, 154:5
**came**
87:5, 128:15,
261:22, 269:16
**campaigns**
29:7, 31:15
**can't**
68:3, 151:23,
181:20, 192:9,
193:16, 193:23,
206:20, 229:22,
247:23, 247:25,
248:5, 248:14,
248:17, 248:18,

249:25, 253:6
**cancelled**
113:19, 114:1,
114:4
**candidates**
58:11
**cannot**
14:3, 39:15,
57:3, 249:12,
275:10
**capacity**
7:12, 7:16,
11:4, 30:12,
30:14, 49:3,
75:18, 150:6,
154:25, 157:7,
160:2
**capital**
103:23, 104:2,
104:4, 105:9,
127:16, 128:1,
174:4
**capitalization**
98:3
**capitalized**
98:2
**care**
17:10, 20:14,
179:14, 188:20,
188:24, 189:1
**carr**
77:13
**carried**
234:2, 234:3
**carry**
105:7
**carts**
74:6
**casarez**
2:11, 294:3,
294:15
**case**
6:10, 10:9,
10:10, 10:14,
10:17, 10:19,
13:15, 39:12,
40:23, 41:23,
156:14, 210:4,

210:8, 254:7,
282:24, 283:1,
294:11, 295:8
**cash**
45:17, 88:15,
289:18, 290:25
**castillo**
24:19, 38:4,
38:5, 38:8,
38:9, 38:10,
38:13, 38:15,
38:17, 38:25,
39:3, 39:11,
39:21, 51:1,
60:5
**castillo's**
25:8, 25:10
**category**
40:6
**causation**
127:13
**caused**
202:17, 202:23,
203:6
**cc'd**
284:14
**ccr**
295:13
**cease**
153:6, 153:10,
153:13, 157:19,
161:23, 266:8,
266:17, 266:23,
267:13, 267:17,
267:23
**ceased**
25:22, 199:11
**cell**
15:12
**central**
5:4
**ceo**
75:18
**certain**
266:14
**certainly**
60:19, 74:1,
254:24

WYLIE 572

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

305

| | | | |
|---|---|---|---|
| **certificate**<br>241:20, 279:14,<br>294:1, 295:1<br>**certificates**<br>242:5, 242:10,<br>242:12, 242:18,<br>242:20, 243:1,<br>243:5<br>**certified**<br>153:3<br>**certify**<br>294:4, 295:3<br>**change**<br>35:8, 88:24,<br>120:1, 126:5<br>**changed**<br>46:15, 165:2,<br>170:6, 170:22,<br>171:4, 179:21,<br>264:9<br>**changes**<br>35:1, 167:20,<br>226:2, 267:23,<br>267:25, 268:2,<br>279:24<br>**changing**<br>145:19<br>**channels**<br>40:1<br>**characterization**<br>119:21<br>**characterize**<br>119:24, 259:5<br>**characterized**<br>263:4<br>**charges**<br>219:7<br>**check**<br>68:24, 69:2,<br>90:10, 90:12,<br>90:15, 90:21,<br>235:20<br>**checking**<br>259:5<br>**checks**<br>86:23, 87:1,<br>90:9<br>**chief**<br>29:21, 30:18, | 45:7, 51:5,<br>52:1, 57:14,<br>57:21<br>**child**<br>179:15<br>**choice**<br>124:15, 173:9<br>**choose**<br>14:9, 279:17,<br>288:18, 289:5,<br>290:9<br>**chooses**<br>247:9, 247:13,<br>248:24<br>**choosing**<br>145:6<br>**chose**<br>26:1, 68:21,<br>98:14, 117:22,<br>118:8, 127:11,<br>166:11, 166:19,<br>258:4, 258:6<br>**circular**<br>193:20<br>**circumstances**<br>28:19, 30:4,<br>38:11, 114:25,<br>126:13<br>**citation**<br>10:15<br>**civil**<br>1:9<br>**claim**<br>6:24, 41:2,<br>41:5, 41:15,<br>161:21, 163:8,<br>165:11, 166:5<br>**claimed**<br>40:7, 240:7<br>**claiming**<br>165:16<br>**claims**<br>6:16, 6:17,<br>6:19, 6:20,<br>226:1, 226:4,<br>291:19<br>**clarify**<br>12:18, 73:24, | 236:20, 237:12,<br>240:12, 272:3,<br>272:10<br>**claude**<br>124:17<br>**clause**<br>84:1<br>**clear**<br>18:2, 61:22,<br>81:2, 114:24,<br>116:13, 116:14,<br>124:9, 158:20,<br>263:16, 289:10<br>**clearly**<br>262:1<br>**client**<br>17:21, 17:24,<br>28:22, 29:6,<br>33:4, 34:12,<br>69:3, 69:5,<br>69:7, 73:8,<br>74:6, 75:18,<br>75:19, 102:10,<br>149:7, 149:25,<br>150:21, 151:1,<br>151:13, 151:15,<br>151:17, 157:13,<br>158:11, 185:4,<br>191:14, 191:17,<br>228:15, 229:8,<br>229:12, 230:24,<br>231:3, 232:5,<br>235:7, 235:12,<br>235:13, 235:17,<br>235:18, 235:20,<br>238:23, 268:17,<br>269:1<br>**clients**<br>16:10, 26:21,<br>29:11, 30:15,<br>30:17, 32:5,<br>32:15, 33:4,<br>33:10, 34:24,<br>37:2, 38:14,<br>43:9, 43:21,<br>51:23, 134:14,<br>149:12, 157:3,<br>157:4, 157:8, | 157:9, 157:13,<br>157:16, 157:18,<br>159:12, 160:16,<br>160:19, 160:25,<br>194:21, 194:25,<br>195:15, 195:17,<br>195:18, 196:8,<br>200:11, 200:13,<br>204:14, 204:23,<br>217:6, 228:8,<br>228:20, 229:5,<br>229:19, 229:21,<br>229:22, 229:25,<br>231:9, 231:14<br>**close**<br>25:25, 26:1,<br>113:23<br>**closed**<br>25:23<br>**closely**<br>29:7<br>**closing**<br>58:12, 118:9,<br>247:1, 254:22,<br>256:23, 257:13,<br>263:6, 264:2<br>**club**<br>33:25<br>**coborrower**<br>245:8<br>**code**<br>129:20, 129:23,<br>130:7, 130:8,<br>143:11, 144:6,<br>145:18, 271:19,<br>274:12, 277:6,<br>277:10, 277:12,<br>277:15<br>**codified**<br>170:15<br>**coerce**<br>258:21<br>**coerced**<br>126:5<br>**coercion**<br>126:6<br>**cofounder**<br>45:7, 55:5 |

WYLIE 573

cofounders
55:13, 55:25,
56:1
colleague
7:11
collect
172:10, 188:12
collection
169:19
colors
37:7, 145:20,
253:6
com
3:11, 3:22,
15:18, 80:1,
201:3, 202:11,
203:5
combined
155:5
come
101:2, 124:21,
131:22, 153:7,
229:19, 282:2
comes
255:3, 256:7
comfortable
93:25, 117:5
coming
235:10, 238:25,
282:5
commencing
167:8
comment
13:16, 14:3,
14:5, 15:1,
243:8
comments
195:23, 241:25
commerce
164:4
commingling
231:22, 232:2,
232:4, 232:12
commissioned
84:15
commitment
263:7, 265:4,
265:7

committed
124:12
common
106:1, 241:15,
241:17
commonwealth
105:24, 106:2,
106:12, 106:20,
106:25, 107:15,
108:3, 108:13,
109:10, 110:20,
111:6, 111:14,
113:4, 113:9,
113:13, 113:16,
114:7, 114:15,
114:20, 114:22,
115:1, 115:7,
115:13, 116:2,
116:5, 116:22,
225:10, 245:9,
261:21
communication
115:20, 123:1,
133:8, 152:25,
153:3, 153:5,
153:7, 153:20,
209:10, 209:23,
213:1, 214:13,
292:13
communications
14:7, 127:8,
133:21, 150:15,
184:22, 184:24,
185:1, 206:2,
207:7, 210:11,
214:1, 214:20,
288:16, 291:13,
292:3
companies
23:4, 26:3,
29:3, 46:20,
61:24, 127:23,
205:11, 243:20,
262:2
company
6:21, 13:9,
16:24, 23:5,
26:4, 26:13,

29:12, 29:17,
34:5, 39:8,
45:8, 45:9,
47:15, 51:17,
51:22, 53:19,
54:15, 54:21,
54:25, 55:7,
55:17, 56:5,
57:9, 59:9,
60:13, 61:12,
61:18, 61:25,
69:25, 76:20,
76:21, 76:25,
78:8, 89:15,
98:7, 98:23,
102:10, 103:14,
103:16, 111:22,
119:1, 119:2,
121:24, 125:19,
127:8, 127:20,
131:7, 149:23,
165:18, 166:23,
166:25, 171:15,
173:25, 182:21,
184:3, 186:5,
189:9, 192:9,
200:7, 200:9,
200:19, 202:7,
205:1, 205:20,
206:9, 218:11,
221:8, 221:9,
223:2, 224:17,
229:22, 231:4,
245:11, 245:13,
247:9, 247:12,
247:15, 249:1,
253:9, 253:11,
253:14, 253:15,
253:22, 253:24,
254:3, 254:23,
257:23, 258:1,
258:20, 259:11,
274:8, 286:9
compel
7:6
compensate
61:14, 61:17,
117:20, 121:10,

121:12, 172:5,
247:21, 260:19,
279:22
compensated
44:23, 45:6,
45:9, 55:22,
57:8, 69:9,
88:12, 92:9,
92:10, 92:16,
118:3, 121:14,
128:6, 173:15,
256:16
compensation
45:17, 52:6,
57:7, 69:24,
78:9, 93:21,
93:23, 117:21,
173:3, 173:7,
173:19, 248:12,
249:4, 249:5,
260:20, 279:12,
279:22
compete
167:2, 167:3
competed
167:4
competitive
39:5, 39:24
competitor
94:1, 177:17
competitors
63:15
complete
35:8, 146:17,
147:8, 247:7
completed
36:22, 37:13
completely
35:2, 37:9,
131:11, 161:10,
161:11, 256:25,
277:15
complex
156:22, 156:23
complexity
43:20, 44:13
compliance
24:25, 31:5,

WYLIE 574

39:25, 103:21
**complied**
168:19
**component**
63:10
**components**
272:15, 272:16
**computation**
40:6
**concept**
39:23, 58:18,
86:18, 102:5
**concepting**
78:25
**concepts**
131:13
**concern**
114:24, 230:9,
231:21, 260:25,
261:4, 261:6,
261:7, 261:10,
270:21, 276:25
**concerned**
231:8, 249:18,
261:4
**concerning**
14:1
**concerns**
230:6, 251:16,
263:18, 276:24
**concise**
176:25
**concluded**
293:15
**concludes**
4:4, 4:6, 4:8,
97:19, 143:8,
179:3
**conclusion**
286:7
**concrete**
122:16
**concurrent**
186:7
**condensed**
293:8
**condition**
101:5, 226:3,

226:7, 286:12
**conduct**
194:17, 195:16
**conducted**
39:6, 58:10,
58:13, 205:24,
206:24, 207:3,
207:9, 207:11,
207:14
**conference**
125:13, 219:15
**confidential**
1:26, 94:5,
134:19, 134:25,
177:22
**confused**
86:24, 236:19,
237:20
**congress**
2:5
**connect**
146:5
**connected**
145:14, 149:8,
271:4
**connection**
6:13, 269:17,
276:10
**connections**
31:7, 103:19,
201:16
**consent**
71:6, 71:24,
72:1, 72:4,
72:13, 119:4
**consider**
134:12, 169:18
**considerable**
60:11, 103:3,
130:16, 134:9
**considerably**
43:25, 102:22,
194:20
**considered**
69:11, 69:14,
69:17, 70:9,
70:16, 252:19
**consisting**
129:1

**construed**
118:20
**consultant**
26:14, 29:14,
30:13, 30:17,
84:22, 84:24
**consulting**
23:6, 24:13,
24:14, 24:17,
24:21, 24:23,
24:24, 25:5,
25:6, 25:9,
25:11, 25:13,
25:15, 25:17,
25:20, 25:22,
25:25, 26:1,
26:6, 30:23,
38:6, 108:8,
108:16, 108:25,
231:2, 231:6,
235:1, 235:4,
235:15, 235:23,
238:17, 239:5
**consumer**
29:16, 103:14,
217:24
**contact**
257:14
**contacted**
147:13, 257:16,
271:4
**contacting**
271:18, 275:21,
275:23, 276:5,
276:6, 276:7
**contacts**
213:5
**contained**
180:17
**contains**
1:26
**contempt**
202:4
**content**
131:13, 131:15,
131:20, 131:24,
132:2, 163:17
**context**
256:3

**continue**
17:6, 20:20,
43:8, 59:16,
110:6, 156:2,
273:2, 279:9,
289:19
**continued**
273:9, 277:1,
277:6, 280:4
**continuing**
180:2
**contract**
22:12, 31:12,
36:9, 37:16,
68:22, 161:2
**contracted**
32:1, 35:24,
37:18
**contracting**
77:19
**contractor**
15:22, 15:23,
16:18, 22:9,
22:13, 29:10,
31:10, 35:10,
35:12, 35:22,
36:3, 36:17,
38:1, 38:3,
43:1, 59:8,
63:7, 68:15,
68:17, 68:20,
69:9, 76:15,
77:18
**contractor's**
42:25
**contractors**
42:12, 76:17,
84:15, 174:24,
218:15, 218:17
**contribute**
101:19, 102:3,
151:21, 151:22,
254:10
**contributed**
98:8, 98:11,
101:17, 101:18,
102:16, 102:20,
102:24, 103:2,

WYLIE 575

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

308

103:7, 127:15,
127:17, 128:1
**contribution**
89:15, 98:4,
105:8, 127:16,
128:11, 174:6,
254:7
**contributions**
102:12, 128:10,
174:4, 253:8,
253:13, 253:22,
254:23, 259:11
**control**
61:25, 81:20,
82:17, 82:23,
132:4, 259:13,
259:24, 261:13
**convenient**
45:20
**convention**
218:10, 219:17
**conversation**
54:23, 55:11,
59:12, 112:15,
119:3, 122:15,
122:18, 122:20,
123:8, 123:16,
123:23, 123:25,
125:21, 125:25,
126:4, 126:12,
127:12, 267:5
**conversations**
14:22, 47:4,
52:22, 54:14,
54:24, 55:2,
55:17, 55:19,
55:21, 56:24,
61:8, 103:20,
184:16, 184:20,
292:8
**convert**
196:15
**conveyed**
147:16, 147:20,
147:22
**conveys**
206:2
**coo**
145:3, 146:20,

148:3, 148:13,
149:1, 150:4,
151:18, 152:1,
152:6, 163:22,
172:6, 173:8,
173:22, 187:5,
188:6, 223:9,
223:12
**coolheaded**
122:15, 122:16
**coordination**
49:23
**copies**
251:5, 283:15
**copy**
27:9, 27:11,
216:5, 227:10,
251:3, 277:24,
293:2, 293:3
**copying**
40:8, 278:16
**copyright**
6:20, 83:2,
83:3, 83:4,
83:5, 83:8,
83:17, 158:1,
162:4, 162:9,
163:3, 165:21,
266:8
**copyrighted**
162:15, 162:19,
163:9
**copywriting**
86:18
**core**
44:22
**corporate**
12:9, 12:16,
12:17, 46:19,
47:14, 48:6,
48:15, 48:17,
50:10, 51:24,
52:22, 53:6,
53:8, 60:4,
72:6, 126:6,
152:16, 183:23,
183:25, 184:4,
184:12, 185:8,

203:6, 219:3,
219:4, 242:1
**corporation**
47:13, 71:24,
77:19, 77:20
**corrected**
65:3, 65:10
**correctly**
49:2, 145:14,
209:18, 210:5,
213:6, 213:7,
231:13, 237:7,
249:13, 255:6,
259:8, 259:15,
259:16, 260:1,
260:2, 263:14,
263:15, 284:4
**correspondence**
215:3, 215:14
**cost**
43:7, 43:19,
43:23, 44:1,
44:12, 50:13,
189:18, 217:12,
279:13, 288:25
**cost-effective**
290:20
**costly**
290:15
**costs**
40:21, 42:12,
43:2, 98:15,
112:4, 217:18,
217:20, 229:25
**could**
43:9, 53:13,
54:20, 54:22,
59:17, 59:20,
66:24, 66:25,
75:23, 75:25,
76:2, 76:5,
78:5, 78:13,
82:4, 91:7,
102:1, 107:5,
107:8, 118:3,
118:19, 118:25,
119:2, 122:16,
123:2, 134:22,

152:3, 154:10,
166:4, 173:4,
179:9, 191:11,
196:13, 204:22,
224:11, 226:6,
235:8, 252:15,
254:12, 272:18,
286:21, 290:21
**couldn't**
159:18, 159:22,
195:5, 204:18,
271:18
**council**
218:10, 219:15
**counsel**
5:14, 14:10,
31:5, 41:12,
46:19, 50:2,
158:4, 158:18,
177:18, 206:16,
206:19, 207:1,
207:5, 207:12,
208:3, 210:13,
210:22, 210:23,
213:21, 213:24,
215:22, 258:16,
258:18, 258:20,
258:23, 289:6,
290:10, 291:13,
291:21, 292:1,
292:10, 294:10,
295:7
**counsel's**
210:25, 291:15,
291:23
**counseled**
60:1
**counseling**
41:21
**count**
217:25
**counter-defendant**
1:8
**counter-plaintiff**
1:15
**counteroffer**
291:2, 291:5
**counteroffers**
291:3

WYLIE 576

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                    309

**countersued**
7:7
**couple**
104:8
**course**
104:8, 257:24,
263:9
**court**
1:1, 5:7, 8:8,
8:15, 10:8,
10:13, 10:16,
11:7, 11:10,
13:15, 13:16,
14:4, 164:23,
179:23, 180:12,
182:8, 182:16,
182:22, 202:5,
208:4, 215:19,
294:1
**covenant**
226:11
**covenants**
225:23, 225:24
**covered**
184:22, 287:6
**covers**
93:20
**craft**
219:16
**crafting**
39:22
**create**
35:25, 73:5,
73:6, 73:8,
73:11, 75:5,
128:23, 189:18,
199:25
**created**
24:13, 50:3,
51:19, 74:15,
76:19, 79:5,
80:4, 80:10,
81:20, 101:22,
101:24, 102:3,
102:11, 103:2,
129:23, 130:7,
130:9, 152:1,
152:6, 152:18,

152:21, 153:22,
153:25, 154:1,
155:7, 156:3,
156:9, 156:17,
157:5, 157:14,
157:18, 159:6,
161:6, 161:14,
162:19, 184:9,
189:12, 194:22,
233:3, 233:14,
258:11, 268:6,
268:24, 272:1,
272:7, 272:23,
273:7, 273:20,
275:25, 277:7,
278:10
**creating**
53:17, 54:1,
54:19, 55:17,
56:14, 60:15,
61:20, 61:22,
67:3, 68:7,
73:9, 74:6,
129:20, 145:25,
161:17, 173:24
**creation**
34:20, 51:14,
53:12, 53:17,
131:2, 132:7
**creative**
52:8, 77:22
**credentials**
188:14
**credit**
106:21, 107:1,
107:3, 107:4,
107:13, 107:18,
108:13, 108:20,
110:19, 111:5,
111:24, 112:6,
116:1, 116:5,
209:14, 209:15,
212:16, 244:11
**creek**
195:3, 195:11,
195:12, 195:14
**crippling**
111:21

**critical**
166:12, 254:20,
263:11
**crm**
151:11
**cross-defendant**
11:1
**cross-defendants**
1:23
**cross-examination**
64:7
**cross-examined**
11:6, 11:9
**cross-plaintiff**
1:16
**crosstalk**
45:23, 46:9,
158:15, 237:16,
258:14, 281:6,
281:9
**cs-2**
241:17
**cst**
1:30
**cumul**
74:19, 129:2,
146:9, 146:18,
146:19, 147:12,
148:2, 148:11,
179:24, 272:17
**current**
34:20, 93:25,
106:9, 131:11
**currently**
32:10, 36:18,
38:3, 44:14,
48:7, 48:16,
101:8
**customer**
147:14, 150:10,
164:5, 213:4,
217:12
**customers**
63:10, 63:13,
196:4, 196:5
**customization**
143:19
**customize**
145:4, 145:9,

145:22
**customized**
144:8, 144:13,
144:24
**customizing**
145:16
**cut**
221:9

---
**D**
---

**dad**
285:3
**daily**
34:22, 130:17,
134:9
**damage**
194:20
**damages**
40:7, 40:16,
40:18, 41:9,
41:25, 175:1,
189:11, 194:16
**danielle**
284:14
**dashboards**
157:11, 160:16
**date**
5:3, 5:25,
15:11, 37:11,
50:14, 53:20,
64:10, 65:22,
79:17, 79:21,
114:17, 121:15,
162:11, 180:24,
184:4, 186:2,
186:19, 186:20,
186:24, 193:7,
201:6, 241:20,
243:4, 265:3,
265:5, 266:10,
266:15, 266:16,
269:12, 271:16,
273:8, 273:10,
278:18, 278:20,
288:4
**dated**
259:3, 263:3,
284:8

WYLIE 577

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

310

dates
168:11, 168:13,
168:22, 183:17,
183:18, 197:16
day
15:10, 46:2,
133:15, 149:13,
187:23, 187:24,
187:25, 188:1,
233:20, 275:14
day-to-day
33:12, 148:25,
149:14, 149:21,
150:3, 151:6,
151:13, 151:15,
151:17
days
45:17, 45:18,
149:19, 149:20,
270:23
deadline
263:8
deal
247:6
debt
279:2, 281:17
december
15:23, 25:23,
37:13, 37:24,
54:4, 54:5,
54:10, 58:25,
59:4, 86:16
decide
46:21, 180:20
decided
87:16, 91:22,
91:24, 278:23,
281:11
decision
57:4, 279:6
decision-maker
57:15
decision-making
57:17
decisions
49:22, 58:16,
185:12
declaring
153:17

decorum
19:2, 19:5
dedicate
150:2
deeply
275:3
defend
19:10
defendant
1:15, 3:34,
5:14, 6:10, 7:6,
208:20
defendants
3:13
define
66:22, 81:4,
132:10, 156:13,
273:13
defined
252:24
definition
252:21
degree
259:24
delaware
12:20, 49:9,
50:1, 71:6,
71:25, 72:2,
72:5
delay
168:24, 169:9,
169:14, 169:17,
247:1, 263:10,
279:17
delaying
263:6
delays
263:10, 279:6
deleted
236:18, 237:10
deliver
36:1
delivered
88:4, 169:11,
169:16
demand
168:7
demands
250:13, 250:17,

256:20, 256:22
departed
82:14
departing
76:20
departure
58:15, 82:1,
82:5, 131:11
depended
57:25
depos
3:33
deposit
240:4
deposited
98:6, 98:23,
240:13, 240:15
deposition
1:27, 2:1,
6:11, 7:15,
8:10, 10:1,
11:17, 20:20,
20:22, 21:1,
21:17, 26:24,
46:7, 181:3
derived
209:10, 213:2
described
272:13
describes
156:21
describing
267:4
design
16:1, 16:9,
31:16, 32:3,
52:8, 59:6,
63:8, 86:16,
86:21, 103:12,
131:21
designation
4:3, 4:4, 4:5,
4:6, 4:7, 4:8,
94:4, 97:19,
134:24, 143:8,
177:21, 179:3
desist
153:6, 153:10,

153:14, 157:19,
266:8, 266:18,
266:24, 267:13,
267:17, 267:23
desperately
248:9
despite
65:1, 191:15,
258:1, 260:15
details
57:9
determination
50:6, 247:25,
248:4
determine
51:24, 220:7,
247:14, 248:25,
286:8, 286:9
determining
67:9
develop
51:20, 55:3,
102:8
developed
78:7, 79:19
developing
51:6, 51:13,
63:9, 78:20,
102:4, 102:7,
129:11, 129:17,
130:20, 131:4
development
78:22, 129:3
di
155:13
dialogue
34:11
differ
163:9
different
11:13, 12:14,
29:3, 35:3,
48:11, 107:20,
144:10, 150:1,
157:2, 161:11,
163:11, 163:12,
163:13, 163:15,
163:17, 163:19,

WYLIE 578

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

311

176:23, 193:15,
248:12, 251:23,
253:6, 276:8,
278:24, 281:12
**differentiates**
63:14
**digest**
79:4
**digital**
16:1, 16:10,
31:14, 32:4,
294:7, 295:4
**dilute**
223:3, 224:2
**diluted**
224:13, 224:16
**dilution**
224:5, 224:24
**diminished**
221:16
**diminishment**
221:19
**direct**
35:1, 151:20,
217:24, 232:7
**direct-to-consum-
er**
33:25
**direction**
37:7, 51:21,
52:8, 102:9,
103:21, 278:24,
281:12
**directly**
98:22, 148:15,
217:19
**director**
28:13, 28:21,
30:22, 31:2,
31:3, 45:8,
70:24, 71:1,
77:1, 78:8,
92:8, 92:15,
145:4, 146:20,
148:6, 148:13,
149:1, 150:4,
151:18, 152:1,
152:6, 163:22,

173:8, 173:22,
186:23, 188:2,
188:6, 192:14,
192:15, 223:9,
223:13
**director's**
92:24, 93:7
**directors**
13:9, 57:16,
111:4, 167:19,
183:10, 221:25
**disabled**
271:9
**disagree**
119:17, 119:20,
119:23, 264:5,
264:6, 264:7
**disagreement**
7:3
**disclose**
113:8, 113:11,
113:12, 113:15,
114:2, 115:15,
115:22, 115:25,
116:6, 116:10,
289:1
**disclosed**
114:19, 115:12,
115:17, 125:16,
206:10
**disclosing**
40:7
**disclosure**
27:20, 114:23
**discount**
217:4
**discounts**
216:24, 217:3,
217:6
**discoverable**
27:25
**discovery**
40:22, 86:8,
89:13, 205:17,
210:1, 215:9
**discrepancies**
169:3
**discuss**
41:17, 53:5,

54:1, 55:25,
56:2, 56:4,
60:14, 93:21,
124:8, 183:5,
183:11, 183:19,
229:18, 230:3,
230:16, 253:16,
253:24, 254:18,
260:14, 280:2
**discussed**
11:22, 17:12,
53:18, 56:1,
57:8, 59:25,
68:12, 93:24,
289:24, 290:2
**discussing**
39:8
**discussion**
53:23, 54:16,
59:24, 60:11,
64:8, 122:13,
158:3, 177:20,
216:3, 234:15,
245:17, 251:9,
252:3, 260:18,
265:14, 266:5,
277:18, 278:5,
283:17, 287:16
**discussions**
12:15, 16:22,
53:11, 53:16,
53:21, 53:25,
55:8, 56:13,
125:7, 125:14,
126:22, 128:12
**disloyal**
166:17
**disparaging**
195:23
**disparate**
272:15
**displays**
75:1
**dispute**
113:18
**disregarded**
37:9
**distilled**
218:9, 219:15

**distiller**
13:24
**distilleries**
24:25
**distillery**
30:13, 30:16,
38:14
**distinction**
292:4, 292:6
**distribution**
25:1, 31:6,
40:1, 51:23,
103:21
**distributors**
150:9
**district**
1:1, 1:2, 17:13
**division**
1:3, 50:16
**divvied**
244:22
**dmca**
43:10, 272:17
**document**
27:16, 42:22,
62:9, 64:23,
65:16, 72:6,
72:9, 72:13,
72:16, 93:24,
125:9, 125:11,
208:11, 209:10,
209:22, 210:7,
213:1, 214:13,
215:3, 216:19,
220:4, 220:5,
223:16, 225:5,
225:8, 227:7,
228:24, 244:5,
244:9, 249:17,
254:15, 261:20,
266:12, 269:6,
277:25, 278:3,
278:13, 279:23,
279:24, 283:19
**documentation**
40:18, 40:21,
53:13, 91:3,
116:12, 151:10,

WYLIE 579

151:11, 151:12,
197:19, 197:21,
197:24, 198:2,
233:23, 234:5,
234:9, 253:8,
254:5, 265:8
**documentations**
91:10
**documented**
86:4, 127:3,
164:23, 179:23,
232:18, 232:19,
245:1, 261:15
**documents**
11:25, 12:7,
12:9, 12:10,
12:14, 40:9,
47:14, 109:21,
110:9, 110:13,
110:16, 111:1,
111:9, 111:11,
125:12, 132:3,
132:5, 152:16,
169:23, 185:19,
211:1, 211:3,
211:15, 211:24,
212:19, 212:23,
213:12, 213:15,
214:8, 214:20,
214:24, 215:13,
215:16, 216:11,
216:13, 233:2,
245:15, 248:16,
250:18, 259:18,
261:18
**dog**
229:13, 229:14,
229:15
**doing**
21:20, 39:4,
48:15, 48:16,
102:5, 102:6,
119:5, 131:9,
217:15, 231:5,
237:6, 279:1,
281:16
**dollar**
247:6

**domain**
201:3, 201:12,
201:25, 202:11,
203:5
**done**
32:21, 35:8,
49:24, 61:23,
116:3, 121:19,
144:17, 169:5,
202:6, 205:2,
218:6, 222:19,
223:3, 223:6,
224:8, 247:4,
262:15, 262:17
**donoho's**
8:10, 17:1,
18:14, 22:1,
40:17, 51:3,
75:3, 87:22,
99:1, 125:5,
128:4, 128:5,
145:16, 146:11,
154:4, 162:9,
163:3, 168:18,
170:2, 170:5,
170:21, 171:11,
171:25, 194:17,
195:16, 201:4,
201:12, 201:25,
202:11, 203:5,
208:20, 221:5,
223:4, 224:2,
224:9, 224:12,
224:24, 230:6,
253:5, 267:19,
268:12, 274:4,
274:7, 274:11,
275:7, 277:9,
277:12, 283:6,
284:18, 284:24,
285:23
**down**
8:8, 26:4,
26:7, 42:14,
66:10, 66:13,
87:2, 109:9,
125:19, 126:25,
159:5, 159:10,

159:18, 159:23,
164:14, 166:19,
172:19, 195:8,
203:2, 203:23,
203:25, 204:10,
225:22, 283:25
**download**
144:4
**downtown**
219:14
**draft**
279:20
**drafting**
208:23, 209:4,
209:7
**drawn**
290:12, 290:14
**driven**
229:24
**dropping**
263:4
**drove**
124:22, 124:23
**drowning**
264:24
**dual**
235:13
**ducloux**
124:17
**due**
194:16, 195:16,
253:6
**dues**
161:3
**duly**
5:11
**duplication**
26:3
**during**
9:22, 130:25,
184:25, 194:7
**duties**
40:17, 163:21,
163:24, 164:3,
164:6, 164:13,
279:21
**duty**
6:24, 41:3,

41:6, 41:9,
192:13, 192:15,
192:20, 193:1,
193:12, 193:17,
193:18, 193:23,
193:24, 194:4,
194:5, 194:7,
194:8, 194:11

## E

**e-commerce**
16:24, 23:5,
31:16, 32:4,
32:15, 32:16,
51:12, 54:17,
69:7, 73:5,
73:7, 73:11,
73:17, 73:20,
74:3, 74:12,
81:15, 81:24,
144:1, 165:17,
205:11, 228:15,
230:23, 231:1,
231:5
**each**
8:16, 8:19,
25:18, 27:24,
40:6, 42:3,
42:6, 84:2,
86:23, 149:13,
151:21, 151:22,
184:10, 190:18,
190:19, 214:9,
293:2
**earlier**
59:7, 90:8,
124:3, 128:21,
167:12, 173:21,
175:1, 236:8,
237:21, 240:14,
244:15, 273:6,
289:12
**early**
38:17, 56:24
**earnest**
69:17, 102:4,
112:16
**easier**
43:21

WYLIE 580

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                        313

| | | | |
|---|---|---|---|
| **ebitda** | 15:15, 15:19, | **employee** | **enough** |
| 205:10 | 16:11, 65:18, | 32:24, 33:1, | 245:14, 279:4 |
| **edson** | 65:20, 65:22, | 33:16, 69:11, | **ensure** |
| 35:9, 35:10, | 65:25, 66:2, | 69:14, 69:19, | 12:11, 146:7 |
| 35:18, 35:20, | 67:18, 79:19, | 69:22, 69:23, | **enter** |
| 35:24, 37:18, | 79:22, 79:24, | 70:4, 70:7, | 76:7, 223:2 |
| 38:1, 44:22, | 91:2, 109:7, | 77:17, 84:2, | **entered** |
| 44:23, 44:25, | 115:19, 124:7, | 192:8, 242:4, | 100:12 |
| 45:2, 161:19 | 151:10, 191:14, | 242:10, 252:16, | **entice** |
| **effect** | 229:1, 229:3, | 252:17, 252:18, | 223:25 |
| 8:5, 197:19, | 229:16, 229:17, | 252:21 | **entire** |
| 201:11, 201:15, | 230:11, 246:2, | **employees** | 8:20, 60:1, |
| 225:25 | 246:20, 248:17, | 52:9, 52:10, | 102:9, 131:6 |
| **efforts** | 248:20, 249:7, | 58:5, 58:6, | **entities** |
| 26:3 | 249:8, 249:10, | 58:9, 69:17, | 22:21, 22:25, |
| **eight-hour** | 249:18, 250:8, | 76:15, 76:17, | 60:12, 112:12 |
| 149:19, 149:20 | 251:11, 251:19, | 77:9, 77:10, | **entity** |
| **ein** | 253:3, 253:5, | 83:23, 84:11, | 23:8, 53:12, |
| 104:19 | 259:2, 259:4, | 84:12, 97:21, | 54:2, 55:1, |
| **either** | 263:2, 269:7, | 97:24, 115:10, | 55:20, 56:12, |
| 98:22, 104:5, | 269:8, 269:14, | 174:24, 252:20, | 60:8, 60:15, |
| 128:10, 185:5, | 276:20, 278:8, | 252:24 | 61:20, 61:22, |
| 200:20, 255:11, | 278:14, 278:18, | **employment** | 67:4, 106:19, |
| 255:25, 256:12, | 278:20, 278:22, | 72:17, 72:20, | 119:15, 235:12, |
| 260:16 | 281:1, 283:21, | 76:18, 77:1, | 235:21 |
| **elaborate** | 284:8 | 84:1, 93:13, | **enumerated** |
| 149:4 | **emailed** | 93:14, 93:17, | 250:15 |
| **else** | 15:18 | 93:19, 94:1 | **equal** |
| 13:8, 13:10, | **emails** | **enablement** | 25:18, 56:4, |
| 13:12, 14:25, | 203:6, 280:7 | 25:1 | 56:19, 56:25, |
| 15:5, 49:15, | **embarrassing** | **end** | 126:22, 127:2, |
| 49:16, 49:19, | 274:24 | 36:14, 36:15, | 127:8 |
| 51:15, 75:9, | **emergency** | 37:23, 54:3, | **equipment** |
| 75:12, 76:5, | 183:15 | 162:13, 197:17, | 112:3 |
| 91:17, 92:1, | **emerson** | 198:5, 198:6, | **equities** |
| 100:14, 101:19, | 28:10, 32:23, | 253:17, 253:18, | 234:22 |
| 103:23, 108:6, | 32:24, 33:3, | 255:17 | **equity** |
| 108:15, 110:16, | 33:6, 33:10, | **ended** | 59:17, 59:22, |
| 110:23, 110:25, | 33:14, 33:16, | 36:15, 194:20 | 60:3, 70:9, |
| 115:6, 122:10, | 33:20, 34:3, | **ends** | 70:16, 70:19, |
| 123:24, 145:8, | 34:11, 34:17, | 251:19 | 102:2, 103:2, |
| 149:10, 152:12, | 34:19, 77:13 | **enforcing** | 103:7, 103:10, |
| 169:25, 209:6, | **emerson's** | 281:4 | 103:17, 234:23, |
| 276:15 | 33:13 | **engage** | 278:25, 279:5, |
| **elton** | **employed** | 66:10 | 279:12, 281:15, |
| 6:3 | 15:22, 77:18, | **engaged** | 284:2 |
| **email** | 131:1, 294:10, | 36:18, 47:7 | **error** |
| 15:13, 15:14, | 295:8 | **engineering** | 269:18, 276:11 |
| | | 42:11, 42:15 | |

WYLIE 581

Transcript of Matthew John McGinnis
Conducted on March 28, 2024
314

especially
63:9
espindola
35:9, 35:10,
35:19, 35:20,
35:24, 37:18,
38:1, 44:22,
44:23, 44:25,
45:2, 161:19
esquire
3:4, 3:5, 3:16,
3:17
essence
186:4
essentially
63:12, 235:6,
250:20
establish
253:14, 253:23,
254:8
established
204:4
estimate
89:5, 89:6,
89:11, 129:7,
130:22, 131:18,
133:14
estimated
205:9, 205:11
estimation
288:9, 291:17
evaluated
267:1
evaluation
128:9
eve
118:9
even
8:2
event
121:23, 172:9,
249:12
events
31:25
ever
5:20, 10:5,
10:10, 10:13,
10:16, 13:5,

39:8, 56:7,
60:7, 60:14,
61:19, 64:11,
68:15, 69:11,
73:4, 73:10,
76:7, 76:10,
77:5, 77:21,
78:1, 78:4,
78:12, 79:18,
81:19, 83:1,
83:9, 100:22,
123:23, 144:5,
152:20, 159:4,
161:5, 161:23,
162:3, 168:17,
173:15, 174:3,
184:4, 188:5,
195:23, 196:4,
196:5, 196:14,
197:10, 199:21,
205:2, 205:13,
205:16, 228:7,
228:19, 231:21,
256:18, 257:1,
278:2, 286:12,
292:13
every
9:23, 126:21,
199:4, 199:8,
292:13
everybody
76:5
everyone
188:18, 188:21,
285:10
everything
8:9, 44:17,
110:2, 116:12,
120:7, 120:17,
121:5, 122:10,
123:1, 131:14,
179:17, 256:25,
262:18
evidence
53:22, 53:25,
64:7, 210:2,
215:9, 273:8
evolving
183:16

exact
15:10, 33:18,
71:23, 79:17,
114:17, 180:11,
183:17, 183:18,
186:2, 193:7,
252:23, 288:6
exactly
32:20, 117:23
examination
4:13, 4:14,
5:14, 292:10
examined
5:13
example
143:23, 144:12,
149:6, 240:6
except
131:14
exchange
55:3, 59:22,
61:14, 65:18,
65:20, 65:22,
86:25, 87:17,
87:22, 88:8,
90:9, 229:1,
229:3
exchanged
86:22, 87:1,
90:12
excited
59:15
excuse
34:16, 76:15,
112:25, 177:11,
186:23, 235:14
executive
257:20
executives
214:14, 214:17,
214:21
exhibit
27:6, 27:8,
32:8, 40:5,
40:19, 62:2,
62:3, 62:5,
62:8, 62:18,
65:13, 65:14,

66:7, 208:8,
208:11, 208:16,
208:18, 215:23,
216:1, 227:25,
228:3, 228:25,
229:2, 229:16,
234:16, 234:19,
241:8, 245:19,
245:20, 245:24,
250:23, 250:25,
251:1, 252:2,
253:1, 266:4,
266:7, 269:3,
269:6, 275:20,
277:19, 277:22,
283:10, 283:13
exhibits
4:16, 293:9
exist
185:3, 185:5,
185:9, 259:11
existing
60:12, 226:3
exists
197:24
expand
24:25
expect
39:20, 181:8,
182:7
expecting
56:19, 181:9
expediency
50:11, 258:7
expedited
293:4
expended
288:5
expenditure
218:8
expenditures
98:7, 98:22
expenses
86:1, 105:12,
200:14, 200:16,
200:18, 200:19,
200:22, 200:25,
218:1, 219:4,

WYLIE 582

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

232:14, 232:17,
233:14, 234:11
**expensive**
44:8, 44:14,
107:21
**experience**
59:6
**experienced**
259:17
**expert**
287:2
**expertise**
31:7, 123:12,
146:12, 168:4
**expiration**
265:3, 265:5
**expiring**
263:6, 265:7
**explain**
77:15
**explicit**
102:1
**explore**
66:8
**explored**
80:17
**exploring**
81:13
**express**
231:21
**extent**
40:21, 206:2,
206:12, 209:22,
210:10, 267:3,
288:15, 290:5,
291:12, 291:21
**extreme**
126:15
**eyes**
1:26

**F**

**facebook**
160:12
**fact**
34:23, 59:25,
65:1, 126:3,
127:15, 128:1,

182:12, 191:13,
191:15, 204:18
**facts**
12:11, 64:19
**fail**
164:12, 166:2
**failed**
166:6
**failing**
189:9
**fair**
291:18
**fairly**
121:10, 247:5
**false**
65:2
**familiar**
275:3
**family**
10:19, 13:11,
13:12, 255:4,
256:8, 260:22,
284:1, 285:16
**family's**
259:6
**far**
3:19, 43:19,
43:20, 50:16,
82:10, 121:19,
177:13, 262:3,
270:8, 270:15,
276:13, 290:25,
291:7
**father**
98:5, 98:15,
99:1, 99:6,
102:20, 174:7,
174:15, 239:24,
240:8, 282:6,
282:22, 283:6,
284:1, 284:18,
284:25, 285:17,
285:23, 286:21
**fe**
69:4
**february**
53:7, 65:23,
79:1, 79:2,

79:9, 79:24,
80:4, 85:9,
86:19, 104:5,
112:15, 261:19,
261:21
**federal**
10:8, 11:10,
182:8, 182:16,
203:11
**fee**
219:7, 235:7
**feel**
117:5, 181:25,
229:23, 254:5
**feeling**
59:15, 59:19
**fees**
40:20, 40:22,
41:8, 41:15,
41:23, 43:25,
48:17, 104:9,
104:19, 104:20,
104:21, 104:23,
105:2, 111:18,
217:4, 219:2,
219:5, 236:3,
236:25, 239:8,
288:4, 288:9
**felt**
39:5, 117:9,
188:24, 264:18,
264:21
**feras**
3:17
**few**
167:13, 217:22,
279:6
**fewer**
43:20
**fiduciary**
6:24, 40:17,
41:3, 41:6,
41:9, 41:15,
163:21, 163:24,
192:13, 192:15,
192:16, 192:19,
192:22, 192:25,
193:4, 193:9,

193:12, 193:16,
193:18, 193:23,
193:24, 194:4,
194:5, 194:7,
194:8, 194:11
**fight**
184:23
**figure**
42:23, 43:14,
238:2, 247:20,
249:3, 288:11
**figured**
271:2
**file**
50:12, 60:2,
180:20, 258:6,
286:10, 286:21
**filed**
40:19, 40:24,
49:8, 53:9,
71:6, 71:24,
72:1, 72:4,
83:1, 83:9,
83:14, 83:15,
158:1, 160:7,
181:8, 183:21,
186:9, 186:24,
187:4, 187:25,
188:10, 188:17,
189:25, 190:6,
190:25, 191:2,
212:10, 212:12
**filing**
46:15, 50:11,
183:5, 183:11,
183:13, 183:19,
185:22, 185:25,
186:7, 188:18,
188:25, 233:17,
289:12, 289:14,
290:17
**filings**
104:9, 104:11,
104:16, 219:3
**filled**
109:21
**final**
18:1, 18:3,

WYLIE 583

18:5
**finalized**
12:24
**finance**
84:25, 289:11
**financial**
12:9, 12:12,
26:14, 51:21,
84:18, 84:22,
84:23, 85:1,
85:6, 85:8,
85:14, 85:19,
85:22, 85:23,
85:24, 86:3,
86:11, 86:13,
87:9, 87:11,
87:23, 90:21,
91:4, 91:11,
102:9, 116:15,
117:6, 118:4,
209:11, 226:3,
226:6, 226:7,
253:8, 255:3,
255:17, 256:7,
263:13, 294:11,
295:9
**financially**
117:9, 229:21
**financing**
254:20, 279:1,
279:2, 279:6,
281:16, 281:17,
289:9
**find**
53:13, 53:22,
248:11, 250:20,
252:15, 254:8,
260:19, 290:20
**fine**
9:5
**finish**
8:20, 71:13,
71:17, 248:3
**finished**
12:23, 71:12
**fire**
48:1, 48:3
**firm**
46:12, 48:12,

48:13, 49:17,
49:18, 150:1,
169:23, 170:16,
266:9
**firms**
169:21
**first**
5:11, 10:3,
16:4, 28:4,
28:17, 28:19,
30:1, 30:5,
30:25, 31:20,
33:23, 33:24,
46:15, 47:4,
53:2, 53:5,
53:13, 53:20,
53:22, 54:1,
56:22, 79:3,
79:14, 101:22,
102:3, 104:1,
105:24, 105:25,
106:2, 106:12,
106:19, 106:24,
107:2, 107:7,
107:15, 107:17,
108:3, 108:13,
109:9, 109:10,
110:19, 111:6,
111:13, 111:14,
111:23, 113:4,
113:9, 113:12,
113:16, 113:20,
113:21, 114:6,
114:7, 114:15,
114:19, 114:22,
115:1, 115:6,
115:12, 116:1,
116:5, 116:21,
119:3, 124:8,
146:8, 157:24,
170:9, 170:14,
171:4, 171:12,
172:19, 177:12,
198:23, 199:24,
208:20, 209:9,
216:15, 219:14,
225:10, 225:12,
229:9, 230:15,

238:25, 245:9,
257:6, 261:21,
266:24, 270:12,
270:13, 282:21
**fit**
231:17
**five**
16:19, 133:3,
133:5, 133:12,
200:3, 222:21
**five-minute**
287:17
**fix**
124:12, 196:13,
261:2
**fixed**
249:12
**flexible**
256:22
**flip**
62:17, 182:7
**flow**
35:7, 289:18,
291:1
**flowed**
146:9
**focus**
71:9
**focusing**
13:1
**follow**
169:2, 289:5
**followed**
34:9, 119:6,
122:14, 196:20,
196:21
**following**
29:7, 29:11,
29:16, 58:15,
64:5, 84:14,
112:22, 210:20
**follows**
5:13
**font**
37:7, 145:6,
145:20
**food**
30:2, 30:6,

46:19, 231:16
**forced**
64:6, 188:24
**foregoing**
294:3, 294:5,
295:5
**forgetting**
71:23
**formal**
90:25, 92:20,
128:9, 152:14,
183:25
**formally**
170:16
**formation**
38:18, 49:12,
49:19, 49:24,
74:1, 80:11,
80:13, 84:14,
103:8, 130:15,
130:23, 215:4,
215:15, 279:14
**formatting**
145:19
**formed**
24:24, 29:11,
49:10, 51:10,
52:4, 52:6,
52:24, 167:13,
221:8
**forming**
53:3, 53:10,
54:15, 54:25
**forms**
77:3, 77:4,
77:5
**forth**
125:15
**forward**
26:23, 120:5,
122:17, 122:18,
124:7, 125:10,
184:7, 246:7,
246:23, 248:9,
248:12, 249:24,
254:16, 254:25,
255:1, 256:21,
256:22, 261:2,

WYLIE 584

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

317

263:11, 289:11
**forwarded**
249:25, 251:12
**forwarding**
250:8
**found**
64:7, 66:3
**foundation**
30:2, 30:7
**founder**
13:2, 24:10,
56:21, 58:3,
79:10
**founder's**
55:12
**founders**
220:20, 220:22,
224:6, 253:10
**four**
264:22
**framework**
44:21
**fraud**
6:22
**free**
79:25, 80:12,
80:17, 80:22,
89:14, 256:19
**freelance**
13:22, 31:22,
31:24
**fresh**
37:10
**friday**
278:21
**friend's**
10:17
**front**
8:3, 42:22,
43:24, 72:16,
93:16, 104:24,
105:6, 164:10,
186:25, 225:16,
288:6
**frost**
112:14, 112:22,
200:1, 245:15
**frustrated**
195:7

**frustration**
196:19
**fulfill**
164:18, 195:5
**fulfillment**
51:24, 103:22,
146:4, 149:9,
164:3, 164:19
**full**
9:14, 50:9,
107:22, 109:19,
179:22, 249:17,
249:19, 249:20,
272:16
**full-time**
32:24, 252:23
**fully**
146:17, 147:7,
294:5
**functionality**
44:22, 157:10,
159:11
**functioning**
147:7, 160:9
**functions**
230:18, 230:21
**fund**
232:10
**fundamentals**
40:2
**funding**
45:17, 50:12
**funds**
107:5, 109:16,
111:23, 111:25,
112:5, 227:22,
231:22, 232:2,
232:5, 238:24
**further**
7:9, 7:20,
209:24, 254:19,
276:21, 292:21
**furthermore**
35:5
**future**
59:18, 217:13,
259:6

---

**G**

**g-u-e-v-e-r-a**
13:20

**gave**
11:14, 90:9,
90:10, 103:14,
234:10, 235:18,
236:9, 239:25,
240:4
**generally**
93:17, 145:24,
260:12
**getting**
55:3, 144:14,
164:5, 166:24,
173:10, 184:15,
224:19, 248:8,
254:19, 254:20,
279:2, 280:2,
281:19, 282:10,
282:13
**give**
8:14, 8:16,
9:14, 11:13,
42:22, 81:19,
235:4, 246:14,
255:15, 272:16,
280:20, 283:14,
287:5, 287:12,
292:7
**given**
9:25, 10:5,
10:11, 45:7,
55:20, 58:14,
98:20, 155:11,
170:22, 216:25,
217:3, 217:6,
221:7, 222:13,
226:23, 271:12,
273:2, 282:22
**giving**
27:11, 56:4
**glorieni**
3:5
**go**
5:21, 5:23,
7:9, 7:20, 9:5,
13:14, 21:19,
22:5, 24:11,
40:14, 41:11,
50:11, 55:14,

58:11, 58:17,
78:22, 79:4,
84:20, 105:25,
111:13, 116:16,
134:13, 146:5,
158:20, 177:18,
179:14, 196:23,
212:25, 218:1,
219:18, 238:12,
239:4, 244:24,
246:19, 252:6,
256:19, 256:23,
272:12, 273:22,
278:23, 281:11
**goal**
257:6
**god**
287:14
**godaddy**
179:22, 179:23,
201:21
**goes**
82:10
**going**
8:15, 11:13,
14:14, 17:4,
17:11, 18:2,
18:19, 19:3,
21:19, 27:5,
40:5, 44:16,
46:6, 47:22,
55:15, 59:4,
65:13, 67:17,
71:16, 86:25,
87:19, 87:23,
109:8, 110:1,
125:17, 134:17,
144:22, 147:20,
158:6, 172:5,
177:5, 184:13,
184:14, 184:22,
184:23, 200:2,
206:1, 206:4,
206:14, 206:15,
207:23, 210:9,
210:12, 214:4,
221:9, 230:22,
234:18, 240:21,

WYLIE 585

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

318

245:15, 245:18,
250:7, 250:23,
255:11, 255:20,
260:20, 267:7,
277:24, 279:11,
282:4, 282:8,
288:14, 288:15,
288:16, 288:25,
290:4, 290:5,
291:11, 291:14,
291:20
**goldberg**
156:22, 156:24
**gone**
5:20, 287:12
**good**
5:16, 5:17,
9:25, 15:7,
18:12, 27:22,
59:3, 59:17,
59:20, 103:14
**goods**
29:17
**google**
160:12
**governance**
250:18
**graphic**
52:8, 103:12,
131:21
**great**
8:18, 8:23,
63:2, 66:8,
255:4, 256:8,
260:22
**greatly**
163:20, 165:8
**green**
216:5
**greenlee**
1:39, 295:3,
295:13
**gregory**
115:3, 264:12
**ground**
7:21, 71:13
**group**
3:6, 273:25,

274:2
**grouping**
156:13
**grow**
86:2, 230:18
**growing**
59:18
**grown**
230:22
**growth**
202:7, 254:21
**guarantee**
259:12
**guarantor**
108:2, 108:6,
108:12, 108:15,
108:22, 108:24,
108:25, 109:1,
113:25, 114:5,
116:24, 117:2,
118:7, 118:14,
118:17, 118:24,
119:16, 120:4,
120:9, 120:12,
120:18, 122:9,
172:23, 196:16,
226:6, 226:8,
246:25, 247:2,
247:3, 247:10,
247:18, 247:20,
247:23, 248:5,
248:7, 248:19,
250:14, 255:2,
255:11, 255:25,
256:13, 260:16,
261:2, 261:6,
262:3, 262:7,
262:10, 262:14,
262:22, 263:17
**guarantors**
261:16
**guess**
249:18
**guesstimate**
288:12
**guevera**
13:18, 15:14,
15:16, 15:17

**guidance**
57:17, 66:12,
66:17, 67:5,
67:19
**gunckel**
77:14
**guys**
55:25, 56:2,
219:13, 251:19

**H**

**hajjar**
46:11, 46:12,
46:14, 46:18,
47:4, 47:8,
47:12, 47:16,
48:1, 48:3,
48:5, 48:8,
48:10, 49:14,
50:7, 52:23,
53:3, 60:2,
76:19, 83:15
**half**
59:13, 64:15
**hand**
62:1, 234:18
**handed**
228:25, 245:24
**handing**
27:5, 65:12,
208:10, 215:25,
228:2, 269:5,
277:21, 283:12
**handle**
33:9, 231:6,
279:19
**handled**
57:23, 169:4,
250:18
**handles**
33:4, 33:6
**hands**
189:9, 247:10
**happen**
106:3, 117:21,
117:22, 118:23,
123:4, 154:12,
235:24, 255:16

**happened**
124:3, 161:5,
165:25
**happening**
196:9, 198:22,
270:8, 270:10,
270:15, 276:14
**happy**
9:2, 254:18
**hard**
43:2, 55:8,
259:4, 263:8
**harm**
263:5
**head**
105:17
**hear**
273:23, 286:19
**heard**
34:4, 56:18
**hearing**
11:7, 11:10,
118:21
**hearings**
11:14
**heated**
122:13, 122:18,
122:20
**held**
2:2, 25:16,
25:18, 45:17,
109:24, 186:18,
197:14, 198:8,
198:11, 198:14,
199:19, 235:17,
235:22
**hello**
270:14
**help**
16:23, 24:24,
30:15, 34:5,
47:13, 58:14,
58:21, 85:21,
86:1, 98:15,
102:8, 102:9,
103:20, 124:11,
254:21, 264:24,
271:12

WYLIE 586

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                319

| | | | |
|---|---|---|---|
| **helped**<br>51:13, 131:13, 154:10<br>**helping**<br>86:18, 103:15<br>**helps**<br>34:23<br>**here**<br>6:10, 8:2, 19:2, 19:5, 19:10, 20:23, 21:3, 32:6, 63:22, 66:17, 67:4, 67:17, 67:23, 84:20, 173:6, 195:9, 217:13, 220:20, 221:25, 235:22, 251:16, 253:20, 256:4, 256:6, 260:10, 263:16, 270:15, 270:21, 273:8, 276:9, 282:10, 284:14, 284:15, 285:16<br>**hereby**<br>294:4, 295:3<br>**heroku**<br>74:19, 74:25, 75:1, 129:2, 146:10, 148:10, 179:24<br>**herself**<br>19:10, 68:17, 68:19, 68:22, 122:7, 173:9, 218:19<br>**hey**<br>66:1, 66:7, 66:8, 87:6, 87:8, 261:24<br>**hi**<br>278:23<br>**high**<br>107:21<br>**high-level**<br>223:25<br>**high-powered**<br>243:20 | **highly**<br>128:5, 144:7<br>**hijjar**<br>278:16<br>**hire**<br>15:25, 46:21, 47:2, 48:18, 58:6, 76:15, 207:21, 254:21, 264:23<br>**hired**<br>16:2, 30:16, 35:11, 35:12, 35:22, 36:3, 46:22, 46:24, 84:11, 84:18, 84:21, 85:7, 85:8, 85:11, 85:13, 85:20, 85:21, 124:14, 207:17<br>**hiring**<br>15:22, 57:23, 58:5, 58:9, 58:16, 85:17<br>**historic**<br>201:16<br>**historical**<br>201:21<br>**hold**<br>24:7, 45:14, 61:24, 66:9, 113:19, 113:21, 197:14, 247:11<br>**holders**<br>23:14<br>**holding**<br>126:7, 222:22, 222:24, 237:10<br>**home**<br>252:15<br>**hope**<br>18:3, 18:5, 236:20, 254:25, 259:25<br>**hoped**<br>56:13, 205:10, 290:19 | **hopefully**<br>257:6<br>**hoping**<br>257:3<br>**hostage**<br>45:18, 109:24, 126:7, 257:24, 258:22<br>**hostile**<br>94:1<br>**hour**<br>16:16, 133:15, 240:22, 256:20<br>**hourly**<br>16:13, 16:14, 16:15, 22:8, 22:12<br>**hours**<br>130:22, 131:7, 131:18, 131:19, 131:21, 150:5, 257:13<br>**how's**<br>116:14, 252:13<br>**however**<br>24:10, 58:24, 66:22, 70:24, 109:24, 111:17, 133:19, 144:7, 149:24, 151:2, 247:10, 255:1, 272:16, 279:11, 290:20<br>**huge**<br>229:24<br>**huh-huh**<br>8:14<br>**hunter**<br>240:3<br><br>**I**<br>**idea**<br>66:8, 66:14, 176:22<br>**ideal**<br>246:7<br>**ideas**<br>103:15 | **ideation**<br>38:18<br>**identification**<br>27:8, 62:3, 65:14, 208:8, 215:23, 227:25, 234:16, 245:20, 266:4, 269:3, 277:19, 283:10<br>**identify**<br>35:24, 51:22, 51:23<br>**identifying**<br>51:11, 176:21<br>**imagery**<br>131:12<br>**immediacy**<br>184:2<br>**immediate**<br>267:25<br>**immediately**<br>196:22, 280:1<br>**impair**<br>9:18<br>**impartial**<br>124:10<br>**impasse**<br>124:9<br>**impede**<br>164:4<br>**impeded**<br>165:8<br>**implement**<br>151:25, 154:10<br>**implemented**<br>35:2<br>**implementing**<br>84:9<br>**implying**<br>14:22<br>**important**<br>8:19, 9:21, 250:1, 256:4<br>**improper**<br>280:19, 280:20, 280:22, 281:8<br>**improve**<br>168:4 |

WYLIE 587

Transcript of Matthew John McGinnis
Conducted on March 28, 2024                                            320

| | | | |
|---|---|---|---|
| **in-person**<br>109:6, 124:6<br>**inaccuracy**<br>64:23<br>**inception**<br>133:13, 134:6,<br>170:6, 172:13<br>**include**<br>258:5<br>**included**<br>177:14, 217:14,<br>238:21, 251:13<br>**including**<br>28:8, 31:15,<br>52:7, 60:5,<br>81:24, 125:10,<br>186:14, 209:12,<br>212:15, 213:3,<br>217:21, 253:11<br>**income**<br>216:22, 217:10,<br>217:22, 217:23,<br>219:19, 219:24<br>**inconvenient**<br>280:14<br>**incorporate**<br>50:8, 60:8,<br>66:12, 66:18,<br>66:20, 67:5,<br>67:20, 81:16,<br>257:25<br>**incorporated**<br>16:24, 22:18,<br>23:5, 24:15,<br>25:24, 32:11,<br>32:25, 49:25,<br>63:5, 63:22,<br>69:16, 69:18,<br>85:10, 116:17,<br>227:23, 231:3<br>**incorporates**<br>173:24<br>**incorporating**<br>55:16, 61:9,<br>64:2, 68:7<br>**incorporation**<br>53:9, 80:16,<br>80:18, 80:20, | **81:7, 81:12,**<br>81:17, 200:4<br>**incorrect**<br>64:9, 64:10,<br>81:9, 120:23,<br>126:19, 126:24,<br>127:3, 127:5,<br>127:10, 174:12,<br>187:20, 187:22,<br>190:8, 276:2<br>**increase**<br>127:17, 128:2,<br>279:14<br>**increased**<br>223:23<br>**incredibly**<br>195:7<br>**incurred**<br>200:25, 232:15<br>**indeed**<br>274:22<br>**independent**<br>29:9, 29:10,<br>288:20, 288:22<br>**independently**<br>277:16<br>**indicated**<br>223:21<br>**indicates**<br>275:20<br>**individual**<br>7:12, 7:16,<br>11:4, 27:24,<br>226:20, 285:8<br>**individually**<br>48:21, 105:3,<br>226:14<br>**individuals**<br>52:3, 92:2,<br>264:15<br>**industry**<br>31:5, 31:6,<br>31:8, 39:24,<br>85:25, 102:7,<br>103:20, 128:15,<br>168:3<br>**inform**<br>226:1 | **informal**<br>8:3<br>**information**<br>14:4, 27:25,<br>32:7, 39:5,<br>39:21, 65:2,<br>75:1, 134:19,<br>144:15, 146:8,<br>163:12, 169:20,<br>180:17, 181:15,<br>182:9, 182:25,<br>204:24, 226:23<br>**informed**<br>123:24, 160:5,<br>226:13, 258:5<br>**informing**<br>79:19<br>**infringe**<br>163:3<br>**infringement**<br>6:20, 266:9<br>**infringing**<br>267:18<br>**initial**<br>27:20, 37:8,<br>49:6, 49:24,<br>51:16, 53:4,<br>54:23, 74:1,<br>98:3, 103:7,<br>103:23, 104:21,<br>104:22, 105:2,<br>113:18, 174:6,<br>185:25, 239:12<br>**initially**<br>47:12, 47:16,<br>50:17, 50:22,<br>51:4, 51:10,<br>51:19, 52:4,<br>52:6, 76:21,<br>98:2, 98:9,<br>101:24, 102:11,<br>103:1, 109:5,<br>109:23, 110:2,<br>112:14, 167:13,<br>170:22, 188:10<br>**initiate**<br>55:11, 124:4,<br>182:15, 186:15, | **233:1**<br>**initiated**<br>106:16, 181:25,<br>182:12, 182:18,<br>182:20, 187:14,<br>188:2, 190:10,<br>232:25, 233:4,<br>269:14<br>**injection**<br>105:9, 155:14<br>**injections**<br>104:2, 104:4<br>**injunction**<br>62:11, 160:7,<br>180:4, 182:20<br>**inner**<br>275:4<br>**inoperable**<br>201:17, 201:18,<br>201:22, 202:1,<br>202:12, 202:15<br>**input**<br>50:25, 56:11,<br>57:16, 58:14,<br>58:16, 59:5,<br>128:13, 128:14,<br>131:21, 209:1<br>**inspection**<br>40:8, 168:7<br>**install**<br>80:12, 144:4,<br>146:5<br>**installed**<br>80:22, 128:25<br>**installing**<br>146:18<br>**installments**<br>73:8<br>**instance**<br>260:7<br>**instant**<br>47:17, 49:4,<br>113:9, 113:12,<br>114:20, 114:23,<br>115:12, 115:22,<br>116:8, 182:19,<br>185:9, 185:23,<br>185:25 |

WYLIE 588

**instead**
278:25, 281:15
**instruct**
14:15, 19:22,
47:23, 184:14,
206:14, 267:7,
288:16, 290:5,
291:12, 291:20
**instructed**
50:2, 289:4
**instructing**
14:7, 17:15,
19:20, 153:21,
214:1, 267:18,
289:2
**instruction**
206:16, 206:18,
206:25
**instructions**
207:4
**instrumental**
35:5, 56:14
**insufficient**
253:8
**insurance**
108:9, 108:10,
108:17, 109:1,
262:2, 262:6,
262:9, 262:13
**integral**
164:15
**integrate**
272:14
**integrations**
144:8
**integrity**
202:7
**intellectual**
161:24, 173:16,
267:19
**intend**
100:22, 100:25,
279:22
**intended**
186:17
**intends**
286:17
**intent**
182:3, 228:12,

230:18, 267:21
**intention**
100:24, 189:7,
189:8, 245:12,
258:5, 282:15,
282:21, 285:10,
286:3
**intentional**
224:25
**intentionally**
224:8
**interaction**
292:13
**interest**
23:14, 50:16,
61:25, 106:9,
106:10, 107:19,
107:20, 165:12,
167:21, 168:1,
170:2, 224:20,
243:5, 294:11,
295:9
**interested**
54:19, 60:4,
63:7
**interesting**
275:13
**internal**
206:24
**internet**
181:10
**interpreted**
67:25
**interrupt**
81:5
**interruptions**
150:23
**interviews**
58:10, 58:11,
58:13
**intimate**
32:9, 32:12,
39:3
**inventory**
35:7, 144:9
**investigations**
226:4
**investment**
284:2

**investor**
205:21, 205:22
**invited**
186:10, 186:12,
186:16, 197:10,
198:7, 198:25,
199:4, 199:8,
199:12, 199:17,
199:18, 199:22
**invoice**
88:21, 89:1,
89:23, 90:1
**invoiced**
88:20, 89:20,
235:23
**invoices**
148:4, 209:12,
210:15, 210:16,
210:21
**involved**
34:20, 38:17,
41:21, 41:25,
49:12, 49:19,
49:22, 50:6,
85:17, 92:1,
109:3, 109:6,
109:10, 148:15,
161:17, 169:19,
208:23, 209:1,
209:3, 209:7,
259:14, 262:10
**involvement**
148:12
**io**
74:19, 129:2,
146:19, 148:2,
148:11, 179:24,
269:9, 272:17
**ip**
273:16
**issuance**
171:24, 242:4
**issue**
68:21, 171:21,
246:25, 247:8,
251:17, 261:25
**issued**
43:10, 50:4,

153:6, 170:6,
170:11, 170:13,
170:16, 171:18,
221:12, 235:20,
242:9, 242:11,
242:21, 243:1,
243:9, 243:16,
244:2, 247:13,
279:18
**issues**
39:25, 259:21,
259:22
**it'd**
264:9
**item**
42:6, 218:9,
236:2, 238:14,
239:7, 239:19,
273:14
**items**
127:14, 177:14,
236:18, 237:10,
240:6, 240:16,
273:15
**itself**
274:6

---
**J**
---

**j-e-l-e-n-a**
85:5
**jacquelyn**
283:23, 284:11
**january**
47:5, 47:7,
53:5, 53:14,
53:23, 54:4,
54:10, 58:24,
64:8, 198:24,
198:25
**jelena**
85:3, 85:5,
85:14, 85:24,
86:15, 87:5,
87:20, 87:23,
88:4, 88:8,
89:2, 89:8,
89:20, 89:24,
90:9, 90:20,

WYLIE 589

91:1, 205:7,
205:24, 206:11
**job**
1:35, 264:22
**john**
1:27, 2:1,
4:12, 5:10,
5:19, 5:22
**join**
224:1
**joined**
30:25, 170:9,
170:14, 171:12,
199:5
**joining**
92:7, 198:3
**joint**
56:8, 258:2
**joseph**
24:18, 25:8,
25:10, 38:4,
38:5, 38:8,
38:9, 38:10,
38:13, 38:15,
38:17, 38:25,
39:3, 39:11,
39:20, 51:1,
60:5
**journalist**
13:13, 13:17,
15:1
**judge**
8:3, 203:11
**judges**
273:3
**july**
36:5, 36:13,
79:17, 99:14,
99:24, 99:25,
154:13, 161:13,
161:18, 162:21,
163:6, 167:8,
167:9, 205:5,
220:8, 220:9,
221:25, 223:18,
269:13, 271:17,
272:24, 277:2,
278:21

**june**
12:23, 35:20,
79:17, 90:17,
128:16, 162:21,
162:22, 163:6,
170:16, 220:7,
220:9, 221:25,
223:18, 268:4,
272:24
**junior**
115:10
**jury**
8:5, 77:15,
155:20

### K

**kareem**
49:14, 53:2,
278:16, 278:23
**keep**
189:8, 217:13,
252:15, 252:16,
252:17
**keeping**
27:13
**keith**
115:8, 264:12
**kept**
151:10, 151:11
**keri**
28:10, 32:23,
32:24, 33:3,
33:6, 33:10,
33:13, 33:14,
33:16, 33:20,
33:21, 33:24,
34:3, 34:11,
34:17, 34:19,
34:21, 77:12
**key**
192:9
**kind**
16:7, 23:8,
31:12, 33:1,
37:1, 56:11,
69:5, 69:23,
70:3, 74:23,
75:21, 79:4,

80:8, 87:1,
102:2, 109:8,
125:20, 145:24,
146:12, 176:21,
235:24
**kinds**
150:22
**kirby**
3:33
**knew**
12:11, 169:3,
188:18
**know**
6:17, 7:22,
9:21, 18:18,
18:23, 20:4,
20:24, 21:18,
29:24, 33:18,
49:16, 55:22,
55:23, 59:25,
105:7, 105:17,
106:9, 113:17,
115:20, 118:21,
119:4, 119:25,
121:13, 123:12,
130:6, 145:10,
145:12, 145:13,
145:15, 149:17,
164:9, 164:21,
164:24, 165:24,
169:12, 169:13,
169:17, 171:1,
176:3, 176:6,
176:9, 179:15,
180:19, 181:19,
182:3, 183:17,
186:2, 186:6,
201:11, 202:17,
202:23, 203:4,
210:25, 211:2,
211:16, 211:25,
212:8, 212:24,
213:11, 214:6,
227:14, 230:2,
237:18, 238:22,
249:2, 252:1,
254:16, 254:23,
261:19, 261:24,

265:5, 265:12,
265:13, 269:25,
271:16, 274:19,
274:22, 274:25,
280:19, 287:14,
287:15, 288:14
**knowing**
126:7, 129:9,
129:12, 129:15,
129:18, 144:5
**knowledge**
32:9, 32:13,
35:1, 39:4,
41:14, 54:3,
157:16, 157:17,
180:7, 203:2,
206:23, 207:2,
210:10, 231:16,
258:19, 258:21,
263:5, 277:14,
294:9, 295:6
**known**
15:20, 20:6,
27:23, 28:15,
28:16, 29:23,
31:17, 31:18,
33:20, 33:21,
35:18, 38:9,
46:18, 248:21,
248:22
**kollin**
2:11, 294:3,
294:15
**kristen**
77:13
**kristin**
77:13

### L

**label**
220:3, 227:1,
250:24, 252:25,
262:24
**labeled**
244:5, 245:18
**lane**
6:3
**langston**
77:11

WYLIE 590

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

**larger**
166:24, 279:5
**largest**
218:8
**last**
115:4, 115:9,
219:18, 219:19,
226:25, 263:5,
290:3, 291:4
**lataye**
77:13
**late**
15:21, 29:5,
53:7, 54:10,
56:24, 58:24,
152:24, 270:14
**lately**
107:21
**later**
13:5, 50:14,
86:19, 93:10,
148:25, 184:23,
202:21, 240:10,
258:7, 279:18
**launch**
51:17, 54:17
**launched**
76:22, 218:10
**launching**
34:4
**lauren**
1:13, 3:13,
3:34, 6:9, 6:14,
8:10, 13:2,
13:14, 14:2,
28:4, 39:9,
45:3, 48:23,
50:24, 51:3,
51:7, 52:2,
53:11, 53:16,
54:1, 54:14,
55:16, 56:7,
60:6, 60:7,
65:20, 65:25,
67:3, 67:18,
69:22, 70:4,
85:18, 87:19,
88:7, 88:18,

88:21, 88:23,
89:7, 89:11,
91:16, 91:19,
98:4, 98:11,
99:1, 99:10,
99:18, 100:6,
100:9, 100:13,
100:22, 101:4,
101:12, 101:18,
103:6, 109:5,
109:12, 109:23,
110:3, 113:24,
114:4, 116:18,
125:4, 134:22,
174:19, 197:10,
208:20, 219:12,
236:14, 237:3,
237:4, 237:9,
237:13, 237:15,
237:24, 238:3,
238:4, 238:6,
239:20, 240:4,
240:13, 241:23,
278:16, 282:9,
283:24, 284:11,
285:19, 285:23,
286:9
**lauren's**
239:24, 282:22,
286:21
**law**
3:6, 40:21,
46:12, 48:12,
48:13, 48:14,
48:15, 48:17,
48:20, 48:22,
48:24, 49:2,
49:16, 49:18,
169:21, 169:23,
170:15, 194:9,
266:9
**lawsuit**
6:13, 7:2, 7:3,
32:19, 40:24,
166:5, 180:7,
180:20, 181:9,
181:15, 182:1,
182:8, 183:5,

183:11, 183:13,
183:19, 183:20,
183:24, 184:5,
184:8, 184:16,
184:25, 186:8,
186:9, 186:24,
187:4, 187:14,
187:25, 188:2,
188:10, 188:17,
188:25, 190:1,
190:6, 190:10,
190:25, 191:2,
213:19, 233:4,
233:18, 286:21,
290:17
**lawsuits**
180:15, 180:18,
182:15
**lay**
7:21
**layout**
131:13
**lead**
102:10, 115:8,
210:1, 215:8,
289:5
**learn**
46:13
**learned**
202:21
**least**
133:14
**leave**
260:20
**leaving**
81:21, 131:16
**led**
124:5, 164:17
**ledgers**
209:16, 212:17
**left**
59:19, 76:24,
82:24, 110:5,
148:18
**legal**
11:18, 13:7,
13:8, 41:16,
104:9, 119:5,

123:8, 123:15,
180:10, 209:5,
209:6, 218:22,
219:1, 236:2,
236:25, 239:8,
242:12, 287:2,
288:4, 290:6
**legality**
123:9, 123:11
**lema**
3:16, 6:8,
20:22
**lender**
225:24, 226:1
**less**
43:19, 221:7,
257:13, 290:15
**lessie**
3:4, 18:10,
18:19, 18:21,
20:10, 21:7,
21:20, 46:6,
150:20, 251:2,
277:23, 280:11,
280:24, 281:3
**lessie@gilstrapl-**
**awgroup**
3:11
**let's**
42:14, 55:14,
58:17, 66:9,
78:22, 79:4,
87:1, 99:16,
105:25, 109:9,
111:13, 116:16,
124:2, 143:23,
144:16, 144:19,
145:24, 158:4,
158:20, 161:4,
196:23, 212:25,
218:1, 221:24,
229:18, 238:12,
241:9, 247:20,
254:7, 259:22,
287:17
**letter**
153:10, 154:1,
154:3, 157:19,

WYLIE 591

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

324

158:2, 267:14,
267:17, 267:22,
268:5
**letter's**
267:20
**level**
146:8, 191:11,
256:15
**liabilities**
234:22, 234:23
**liability**
226:20
**liable**
194:6
**licensed**
79:1, 129:1,
146:3, 155:3,
156:6, 156:25,
273:2, 273:15,
274:8, 275:18
**licensing**
58:1, 78:1,
79:7, 79:9
**lieu**
249:6, 282:4
**life**
108:9, 108:10,
108:17, 108:25,
131:6, 262:2,
262:6, 262:9,
262:13
**likely**
27:24, 131:7,
217:18, 227:12,
233:20, 247:6
**limited**
28:9, 157:7,
160:2, 209:12,
213:3
**line**
19:13, 21:5,
42:6, 107:2,
107:13, 107:18,
108:13, 110:19,
111:5, 111:24,
112:5, 116:1,
116:4, 144:5,
177:14, 181:10,

181:21, 217:23,
218:8, 236:13,
236:17, 238:14,
239:7, 239:19,
244:11, 250:19,
262:2, 270:12,
270:13
**lines**
79:23, 106:20,
106:25, 107:4,
108:20, 244:12
**link**
74:17, 145:12
**linked**
74:9, 145:11
**linking**
74:16
**links**
144:9
**liquidity**
121:22, 172:8
**list**
179:22, 250:13,
256:22
**listed**
32:6, 50:20,
72:12, 83:16,
83:19, 243:8,
245:8, 261:16,
262:21, 262:23
**listen**
14:9
**lists**
213:4, 213:5,
261:12
**literally**
257:13, 264:23
**litigation**
10:22, 13:6,
32:7, 34:18,
34:25, 38:16,
38:20, 39:1,
47:17, 48:17,
48:23, 48:24,
48:25, 49:4,
101:3, 105:12,
111:18, 111:20,
113:8, 113:9,

113:12, 113:15,
114:2, 114:3,
114:20, 114:23,
115:12, 115:15,
115:17, 115:22,
115:25, 116:8,
182:9, 182:13,
182:19, 182:22,
185:9, 185:23,
186:1, 186:15,
214:8, 223:2,
226:1, 226:4,
226:14, 226:16,
226:22, 232:14,
232:17, 232:24,
233:1, 233:13,
233:21, 234:11,
286:7, 289:9,
289:11, 289:19
**litigation@lloyd-
mousilli**
3:22
**little**
13:4, 29:2,
148:24, 195:3,
195:11, 195:12,
195:14, 236:19,
245:5, 280:10,
280:23
**live**
162:20, 163:6
**lives**
264:12
**llc**
23:2, 23:12,
23:17, 23:20,
23:24, 24:1,
24:3, 24:15,
24:18, 24:23,
25:6, 25:11,
25:15, 25:22,
26:2, 26:6,
30:24, 38:6,
46:16, 60:12
**lloyd**
3:18
**llp**
46:12, 46:14,

46:18, 47:5
**loaned**
282:7, 282:8,
282:9
**loans**
105:19, 105:21,
105:23, 106:18,
107:24, 108:21,
109:4, 112:9,
112:19, 113:5,
115:23
**locked**
164:21, 164:25,
179:22, 180:1,
191:2, 195:8,
204:2, 204:5
**locking**
164:15
**lodged**
214:10
**lodges**
213:8
**logo**
163:15
**long**
6:4, 15:20,
16:17, 28:15,
29:23, 31:17,
33:20, 34:13,
35:18, 38:9,
195:20, 200:6,
225:24, 225:25,
257:20, 281:2
**longer**
38:1, 43:9,
48:9, 148:20,
148:21, 148:22,
153:17, 157:8,
160:12, 165:3,
180:22, 242:9,
247:8, 269:21,
270:1, 272:15
**look**
27:6, 79:23,
79:24, 131:23,
214:4, 214:6,
216:10, 220:4,
221:24, 241:9,

WYLIE 592

241:12, 251:1,
251:6, 277:25
**looking**
50:11, 145:18,
241:8, 247:19,
278:4, 280:6
**looks**
65:24, 251:4,
251:18, 251:20,
280:7
**looming**
265:7
**lose**
195:1, 195:15
**losing**
194:20
**loss**
165:11, 174:22,
209:14, 212:1,
212:4, 212:16,
216:16, 216:20
**losses**
174:21
**lost**
195:2, 201:16
**lot**
51:1, 134:3,
150:7, 150:9,
150:10, 176:23,
235:6, 279:13
**lots**
261:18
**low**
112:4, 176:1
**lower**
43:19, 50:13,
247:6
**lying**
185:5

**M**

**m-e-d-i-c**
85:5
**macbook**
240:6
**machine**
156:22, 156:24
**made**
30:18, 56:10,

57:6, 58:15,
62:12, 79:23,
79:25, 86:10,
86:12, 89:5,
100:5, 100:23,
101:4, 105:9,
117:24, 120:25,
121:1, 121:4,
121:9, 126:21,
128:10, 167:21,
173:9, 181:24,
185:12, 195:23,
196:18, 208:5,
232:16, 233:7,
247:25, 248:4,
250:15, 252:14,
267:23, 268:2,
285:3, 285:5,
285:6, 291:5
**magazine**
13:23
**mail**
153:3
**main**
63:10
**maintain**
43:21, 75:5,
133:20, 154:19,
190:3, 191:11
**maintained**
149:11
**maintains**
34:21
**majority**
150:10
**make**
7:14, 7:22,
8:23, 17:9,
18:2, 40:8,
55:6, 57:4,
58:14, 61:22,
120:24, 126:16,
181:25, 222:22,
230:16, 243:21,
247:22, 250:7,
254:6, 254:8,
255:16, 267:25,
279:24

**makes**
33:11
**making**
7:18, 73:14,
150:8, 181:14,
256:20, 258:1,
263:16
**manage**
35:7, 148:23,
164:14, 191:23,
192:5, 204:14
**managed**
148:25, 151:13,
151:14, 151:17
**management**
25:2, 31:15,
33:5, 129:14,
131:15, 132:7,
132:10, 132:13,
132:17, 132:19,
132:24, 133:1,
133:5, 133:7,
133:8, 133:9,
133:12, 133:17,
133:20, 133:25,
144:9, 148:16,
148:19
**manager**
33:3, 33:14,
33:25
**manages**
34:21
**many**
46:20, 50:22,
92:11, 92:18,
132:24, 171:21,
251:16, 259:21
**mar**
189:7
**march**
1:29, 5:3, 6:1,
49:11, 52:24,
53:8, 53:9,
55:15, 58:12,
63:5, 79:2,
79:9, 79:11,
100:2, 104:5,
113:18, 113:24,

116:18, 117:25,
124:20, 172:19,
197:17, 197:18,
198:5, 198:6,
246:4, 252:23,
259:3, 263:3
**mark**
1:21, 3:14,
24:19, 25:12,
25:14, 28:9,
29:20, 29:21,
29:24, 30:6,
30:13, 30:16,
30:18, 30:25,
31:4, 39:22,
51:1, 52:15,
52:18, 60:5,
75:15, 75:16,
75:17, 77:11,
91:21, 91:24,
92:6, 92:8,
92:10, 93:4,
103:9, 103:17,
103:19, 159:25,
167:14, 183:8,
222:3, 243:25,
246:4, 248:23,
249:8, 249:10,
249:21, 250:5,
251:11, 251:13
**marked**
27:6, 27:8,
62:1, 62:3,
62:18, 62:22,
65:13, 65:14,
208:8, 208:10,
215:23, 216:1,
227:25, 228:3,
234:16, 234:19,
245:20, 245:24,
266:4, 269:3,
269:5, 277:19,
277:21, 283:10,
283:12
**market**
25:1, 51:22,
102:5, 170:25
**marketing**
15:24, 16:2,

WYLIE 593

16:11, 16:20,
17:1, 18:15,
22:2, 22:12,
22:18, 23:2,
23:3, 23:5,
23:9, 23:15,
23:17, 23:21,
23:24, 24:3,
24:4, 24:5,
24:10, 26:16,
26:19, 29:9,
29:12, 29:14,
29:18, 30:15,
30:16, 46:16,
46:25, 56:16,
63:11, 69:6,
80:13, 80:23,
83:6, 83:13,
85:12, 85:13,
86:16, 87:5,
87:8, 87:14,
88:22, 88:23,
89:1, 90:2,
90:10, 90:19,
90:20, 91:1,
91:4, 91:12,
105:12, 105:21,
108:8, 108:16,
108:24, 218:2,
218:6, 227:20,
228:8, 228:10,
228:14, 228:16,
228:20, 228:22,
229:4, 229:9,
229:10, 229:18,
229:24, 230:1,
230:18, 230:21,
231:1, 231:6,
231:10, 231:22,
232:3, 232:7,
232:13, 232:16,
233:3, 233:13,
234:10, 235:14,
236:6, 236:9,
239:15, 244:20,
244:25, 245:8,
262:21
**markup**
89:4

**marring**
189:1
**material**
131:15, 226:2
**materially**
226:6
**materials**
12:2, 12:3,
209:25
**matt**
1:20, 3:14,
5:21, 5:22,
5:24, 24:19,
27:21, 28:9,
77:12, 83:18,
83:21, 109:12,
177:2, 183:9,
215:3, 237:14,
237:21, 240:18,
249:21, 263:3,
270:14, 280:5
**matt@bigthirst**
15:18
**matter**
59:2, 288:8
**matters**
31:5, 48:6,
48:18, 48:20
**matthew**
1:27, 2:1,
4:12, 5:10,
5:19, 5:22, 5:24
**maybe**
54:5, 259:25,
279:16
**mcginnis**
1:20, 1:21,
1:27, 2:1, 3:14,
4:12, 5:10,
5:19, 5:21,
5:22, 6:8, 7:20,
12:1, 18:14,
21:25, 24:19,
27:5, 27:16,
27:21, 28:9,
28:12, 28:13,
40:20, 51:2,
52:7, 52:16,

52:18, 53:15,
60:5, 61:2,
62:7, 64:25,
65:12, 65:17,
66:5, 66:21,
67:6, 73:10,
75:21, 75:25,
77:12, 78:12,
79:13, 81:2,
83:18, 83:21,
91:21, 91:22,
92:14, 92:15,
92:21, 103:9,
103:10, 103:12,
109:12, 120:16,
122:1, 122:11,
127:25, 130:1,
131:22, 143:10,
159:4, 167:15,
169:8, 177:2,
183:9, 185:8,
197:7, 202:10,
205:1, 215:3,
215:25, 221:25,
228:2, 228:7,
241:6, 243:12,
243:16, 243:25,
250:4, 252:5,
266:1, 269:6,
273:6, 273:18,
278:2, 278:13,
281:11, 283:20,
287:4, 288:1,
292:12
**mean**
12:18, 36:8,
42:15, 50:19,
72:5, 108:19,
114:10, 117:8,
118:2, 132:17,
143:22, 149:4,
156:20, 159:17,
160:13, 176:22,
179:14, 180:8,
200:8, 204:19,
220:1, 234:24,
235:25, 242:7,
246:11, 247:16,

249:1, 249:15,
250:25, 251:25,
254:4, 256:16,
269:20, 272:4,
282:17
**meaning**
36:9, 143:23,
157:7, 283:2
**means**
114:11, 118:3,
160:14, 220:2,
242:8, 269:21,
282:18
**meant**
204:22, 236:23,
266:21
**measure**
257:24
**measures**
126:15
**mechanism**
107:4
**media**
31:25, 133:9
**mediation**
117:25, 119:6,
122:17, 124:2,
124:4, 124:5,
124:18, 125:1,
125:8, 128:20
**mediator**
124:15, 124:16,
125:15
**mediators**
124:13
**medic**
85:3, 85:5,
85:14, 85:24,
86:15, 88:4,
88:8, 89:2,
89:8, 89:20,
89:24, 90:9,
90:20, 91:1,
205:7, 205:24,
206:11
**medications**
9:17
**meet**
28:17, 30:1,

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

327

31:7, 31:20,
33:23, 122:15,
124:18, 164:12,
183:4, 183:10,
254:18
**meeting**
38:11, 53:5,
66:11, 183:7,
184:10, 186:6,
186:14, 186:16,
186:18, 187:11,
198:10, 198:13,
198:23, 199:1,
199:4, 199:8,
199:18, 199:21,
199:22, 234:14,
247:11, 289:19,
290:3
**meetings**
52:22, 102:6,
103:20, 109:6,
109:7, 116:11,
124:6, 125:15,
183:15, 184:25,
185:22, 186:10,
186:11, 186:13,
188:5, 197:11,
197:13, 197:15,
197:16, 197:25,
198:3, 198:5,
198:7, 198:9,
198:16, 198:17,
198:19, 198:20,
198:21, 199:13,
199:14, 199:17,
214:25
**member**
187:8, 187:15,
199:19, 223:2,
279:20, 279:25
**members**
24:1, 24:2,
24:16, 58:16,
183:8, 184:21,
221:22, 221:23,
222:21, 223:7,
223:25, 243:22,
243:23, 243:24,

279:12, 279:18,
279:22, 289:25
**membership**
25:16, 161:3
**memory**
9:18
**mention**
56:7
**mentioned**
59:7, 72:13,
244:15
**mentions**
264:1
**mentors**
128:14
**merge**
231:15
**message**
153:13, 153:16,
251:12, 256:18,
257:1, 270:3,
270:4
**met**
11:18, 11:21,
15:21, 16:4,
28:18, 28:20,
30:2, 30:5,
31:21, 31:25,
33:24, 35:20,
35:21, 38:10,
53:2, 125:13,
183:15, 183:19,
186:3, 250:14,
257:21, 257:25,
258:10, 292:14
**mid-may**
157:11, 201:7
**middle**
225:22, 283:25
**might**
9:4, 9:17,
32:7, 41:17,
237:17, 250:9,
292:16
**million**
144:2, 170:13,
170:19, 171:5,
171:12, 173:22,

205:12, 220:18,
220:25, 223:15,
223:22, 223:24,
241:21, 279:15
**millions**
144:12
**mind**
38:22, 62:20,
118:21, 122:10,
263:17
**mine**
224:16
**minimum**
253:14, 253:23
**minute**
263:5
**minutes**
185:13, 185:15,
214:25, 234:14,
245:4
**missed**
106:22
**misspoke**
143:17
**misstated**
64:18, 223:11
**misstatement**
203:16, 203:20
**mistaken**
271:8
**misunderstand**
229:20
**misunderstanding**
240:11
**mode**
280:1
**model**
231:18
**moderating**
253:20
**modify**
82:6, 82:9,
82:13
**moment**
122:14, 208:12,
216:10, 246:14
**momentarily**
203:2

**monetary**
101:19, 102:12,
128:11, 173:7,
174:3, 174:6,
189:11
**money**
54:21, 121:23,
122:6, 172:9,
172:12, 217:25,
218:18, 233:6,
233:21, 235:17,
238:23, 240:16,
245:14, 248:9,
258:21, 278:25,
279:13, 281:15,
282:4
**monies**
111:15
**month**
163:1, 176:13,
177:8, 177:12,
177:13, 220:11,
247:7
**monthly**
43:25, 44:11,
106:9, 290:25
**months**
104:9, 118:10,
169:18, 200:3,
264:9, 279:6
**more**
9:2, 43:20,
43:25, 44:8,
44:13, 44:14,
54:20, 59:11,
64:5, 66:11,
100:9, 102:1,
102:20, 102:22,
102:24, 111:21,
122:16, 144:2,
146:6, 148:24,
149:25, 168:14,
176:24, 200:3,
211:3, 211:5,
220:2, 221:7,
221:20, 224:15,
224:20, 243:22,
243:23, 248:7,

WYLIE 595

248:12, 248:14,
248:18, 251:5,
252:8, 253:12,
254:10, 262:3,
273:14
**moreover**
210:2
**morning**
5:16, 5:17
**mortgaging**
259:6
**most**
16:15, 250:20
**mostly**
24:10, 112:4
**mouth**
194:21
**move**
120:5, 164:20,
184:7, 186:4,
229:21, 229:22,
248:9, 254:16,
255:1, 256:22,
261:2, 262:18,
280:1
**moved**
29:8, 51:12
**moving**
26:23, 43:20,
263:11
**much**
68:24, 88:18,
89:1, 98:20,
104:22, 105:13,
106:5, 107:6,
107:11, 108:10,
111:19, 129:4,
129:7, 129:10,
129:13, 129:16,
129:19, 130:12,
130:20, 131:3,
131:17, 132:6,
133:11, 133:17,
133:25, 134:7,
149:13, 149:18,
149:25, 150:2,
151:21, 151:22,
179:25, 189:22,

218:12, 218:20,
236:16, 236:21,
237:1, 238:6,
239:10, 263:12,
264:24, 288:4,
288:25, 290:25
**multiple**
243:20
**multiples**
205:10
**must**
40:7
**myself**
24:9, 202:6,
252:19, 262:3,
277:24

## N

**nailed**
66:13
**name**
5:18, 5:19,
5:20, 5:23, 6:8,
13:18, 22:21,
27:23, 46:15,
71:6, 77:10,
83:3, 83:5,
84:23, 115:4,
115:9, 256:25,
285:8
**named**
115:8
**national**
15:10
**nature**
54:16, 218:25
**navigation**
131:14, 163:13
**near**
266:16, 279:8
**necessarily**
250:1
**necessary**
33:11, 40:2,
113:17, 279:25
**need**
9:20, 18:21,
19:6, 19:7,

19:15, 19:18,
19:22, 20:15,
20:16, 20:19,
27:9, 65:6,
87:6, 87:9,
87:11, 158:10,
158:16, 162:25,
184:2, 238:11,
247:14, 248:8,
248:25, 249:3,
249:11, 264:2,
279:5, 279:6,
279:16, 293:2,
293:3, 293:4
**needed**
7:5, 34:5,
34:10, 44:13,
44:14, 186:3,
195:4, 224:10,
231:18, 235:7,
242:13, 243:21,
245:10, 248:9,
250:14, 250:17,
264:18, 264:21,
264:23, 264:24
**needs**
210:3, 230:16
**negative**
194:21, 219:21,
219:24
**negotiate**
125:18, 257:7
**negotiated**
290:16
**negotiating**
109:3, 109:11
**negotiations**
243:19
**neighborhood**
33:19, 68:25
**neither**
69:21, 209:25,
294:10, 295:7
**net**
219:19, 219:23
**never**
35:21, 46:3,
65:2, 101:5,

126:25, 129:6,
149:16, 150:25,
172:12, 196:20,
242:15, 242:17,
242:20, 242:25,
261:22, 277:12
**new**
10:2, 10:3,
16:24, 33:10,
34:5, 35:2,
35:25, 37:10,
43:7, 43:14,
43:18, 44:19,
44:21, 53:18,
57:9, 60:13,
105:11, 131:12,
149:6, 149:11,
154:13, 161:10,
161:14, 161:17,
162:20, 163:2,
163:5, 189:12,
204:23, 223:6,
229:18, 229:25,
243:18, 247:6,
247:14, 248:11,
248:25, 249:3,
249:4, 249:5,
261:17
**news**
20:9
**next**
104:8, 105:9,
160:6, 187:23,
187:24, 187:25,
217:22, 218:15,
220:3, 225:4,
236:2, 238:1,
239:7, 241:12,
254:20, 259:1
**nobody**
20:3, 242:22
**noncompete**
72:23, 83:22,
84:1, 84:4,
84:10, 93:20,
97:22
**none**
250:22, 286:2

WYLIE 596

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

**nonetheless**
240:13
**nonmonetary**
194:16
**nonresponsive**
44:17, 67:15,
70:1, 70:14,
78:10, 80:25,
89:17, 110:2,
120:14, 126:9,
133:22, 155:24,
169:6, 173:12,
202:8, 211:8,
228:17, 255:20,
273:4, 274:9
**nonspirits**
231:17
**nonverbal**
9:24, 68:9,
285:12
**noresponsive**
101:9
**normal**
293:8
**north**
288:7
**notary**
2:12, 294:1,
294:15
**nothing**
5:12, 64:19,
123:5, 126:16,
253:9, 274:24,
280:22
**notice**
197:22, 266:9
**notices**
226:1
**november**
37:13, 37:22,
54:5, 112:25
**number**
27:24, 30:14,
33:18, 42:4,
42:8, 42:10,
43:13, 55:23,
59:4, 62:21,
104:24, 120:4,

176:1, 176:3,
176:7, 221:11,
221:14, 225:16,
227:2, 244:2,
247:12, 253:15,
253:23, 254:8,
279:14, 288:6
**numbers**
42:21, 42:23,
42:24, 43:4,
43:6, 43:24,
59:24, 237:5,
237:19, 238:8
**numeral**
273:14
**numerous**
26:2, 29:1,
29:7, 52:21,
102:6, 122:15,
122:18, 131:21,
164:17, 183:15,
273:14

**O**

**o'brien**
77:13
**oath**
7:22, 19:25,
61:3, 134:21,
197:8, 241:6,
266:2, 288:2
**object**
9:5, 41:19,
44:16, 45:15,
45:22, 46:1,
46:8, 67:14,
110:1, 120:14,
184:13, 206:1,
210:9, 211:7,
255:20, 273:12
**objection**
10:23, 17:2,
17:5, 17:11,
17:13, 17:22,
18:2, 18:16,
18:20, 19:19,
22:3, 22:7,
22:16, 22:23,

23:1, 23:11,
23:16, 23:22,
24:8, 24:22,
26:5, 26:12,
26:18, 38:21,
39:2, 39:14,
39:19, 41:10,
42:9, 43:5,
44:10, 45:5,
45:15, 45:25,
47:22, 48:2,
54:8, 57:2,
64:21, 65:4,
65:9, 68:2,
68:11, 70:1,
70:5, 70:11,
70:14, 70:18,
71:4, 73:13,
73:19, 77:24,
78:6, 78:10,
80:21, 80:25,
81:8, 81:22,
82:8, 82:19,
84:7, 87:25,
88:9, 88:14,
89:10, 89:16,
89:25, 91:6,
91:13, 92:3,
98:13, 99:4,
101:9, 101:14,
102:18, 102:23,
104:3, 117:3,
119:11, 119:18,
120:2, 120:4,
120:10, 120:20,
121:2, 121:8,
121:21, 122:5,
122:12, 122:23,
123:3, 123:10,
123:17, 123:20,
126:9, 126:18,
127:19, 129:21,
131:5, 132:9,
132:15, 132:21,
133:22, 134:2,
143:12, 152:8,
153:1, 153:15,
153:23, 154:17,

155:24, 156:4,
156:11, 159:19,
161:25, 162:5,
163:4, 163:10,
163:23, 164:8,
165:1, 165:7,
165:23, 166:10,
166:18, 168:2,
169:6, 170:4,
170:24, 171:6,
171:13, 172:1,
172:7, 172:16,
172:17, 172:24,
173:12, 173:17,
174:8, 174:17,
175:6, 175:12,
175:13, 175:14,
175:19, 175:24,
176:5, 176:11,
176:17, 176:19,
179:8, 179:13,
180:9, 181:16,
182:2, 182:14,
185:11, 187:9,
187:16, 187:19,
189:3, 189:17,
191:6, 191:9,
191:22, 192:2,
192:7, 192:18,
192:24, 193:19,
193:25, 194:12,
194:18, 196:1,
196:7, 196:17,
199:6, 201:19,
202:3, 202:8,
202:13, 202:19,
202:25, 203:8,
203:13, 203:17,
203:21, 204:7,
204:12, 204:21,
213:14, 213:20,
214:23, 221:10,
222:9, 222:15,
223:5, 224:4,
224:14, 225:1,
226:21, 228:17,
229:7, 230:7,
231:11, 231:24,

WYLIE 597

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

330

232:20, 233:5,
233:15, 233:19,
234:12, 240:2,
247:18, 248:11,
249:16, 250:6,
252:10, 255:13,
256:2, 256:14,
257:5, 257:11,
258:3, 258:13,
260:5, 261:11,
263:19, 263:22,
264:20, 266:19,
266:25, 268:7,
268:25, 269:15,
269:24, 270:22,
271:10, 271:20,
272:2, 272:9,
272:25, 273:4,
273:12, 273:22,
274:5, 274:9,
274:13, 274:16,
274:21, 275:2,
275:9, 275:16,
276:1, 276:17,
277:4, 277:8,
277:13, 280:13,
280:15, 280:17,
280:19, 282:25,
285:1, 286:14,
286:23, 287:1,
287:7, 287:13,
290:18, 291:11,
292:18
**objections**
17:5, 19:8,
208:19, 213:9,
214:10, 215:18,
281:8
**objects**
9:6, 209:21,
209:24, 210:2,
214:15
**obligation**
115:22
**obligations**
57:11, 57:19,
57:20, 289:19
**obtain**
112:10, 116:22,

165:21, 224:21
**obtained**
105:19, 105:22,
113:2, 113:6,
225:12, 225:13
**obtaining**
114:7, 116:23
**obviously**
107:20, 249:21
**occur**
58:12, 166:9
**occurred**
186:6
**october**
12:24, 51:17,
76:22, 112:25,
113:1, 170:17,
200:11, 241:17
**off-the-shelf**
74:16, 74:17,
143:11, 143:18,
143:21
**offended**
258:17, 258:24,
258:25
**offer**
117:23, 117:24,
119:6, 120:3,
262:13, 291:2,
291:4, 291:7
**offered**
117:11, 117:13,
118:15, 118:18,
119:10, 120:11,
122:17, 124:13,
125:11, 290:21,
291:3
**offering**
125:10
**offerings**
118:19
**offers**
208:5
**office**
153:8
**officer**
29:22, 30:19,
45:7, 45:8,

51:5, 52:1,
57:14, 57:21,
78:8, 186:13,
186:22, 192:14,
192:15, 192:20,
199:9, 199:12,
253:15, 253:24,
254:3, 294:3
**officers**
72:7, 163:25,
214:14, 214:16,
214:21, 264:16
**offices**
2:2, 157:20
**official**
214:24
**officially**
24:14, 26:4,
26:7
**often**
9:23, 29:13,
235:24
**oh**
181:8, 228:5,
287:14
**ohio**
264:12
**old**
161:15
**onboard**
34:23, 268:17
**onboarding**
33:4
**onboards**
33:10
**once**
50:14, 55:2,
66:13, 68:18,
69:16, 101:3,
168:14, 279:25
**one**
15:5, 21:1,
21:4, 21:8,
29:17, 36:22,
37:10, 38:14,
42:3, 43:19,
43:23, 44:1,
44:2, 44:5,

44:8, 59:15,
60:12, 64:4,
76:2, 107:7,
120:4, 123:8,
123:15, 124:13,
144:3, 148:19,
155:1, 161:15,
206:10, 208:12,
209:8, 211:5,
218:8, 218:15,
220:10, 228:4,
237:15, 238:22,
238:23, 244:12,
249:25, 250:8,
250:15, 251:3,
256:21, 259:12,
259:13, 259:21,
261:13, 264:13,
267:1, 273:14,
280:10, 286:8,
290:20
**ones**
260:25
**ongoing**
33:12, 34:11
**online**
36:25, 37:1,
37:3, 37:4,
37:15, 37:19,
103:14, 144:2
**only**
1:26, 14:4,
17:5, 17:13,
21:1, 21:4,
21:8, 36:20,
69:8, 75:23,
76:2, 76:5,
82:16, 82:22,
89:7, 91:20,
115:17, 143:11,
143:17, 145:10,
164:6, 192:6,
192:8, 194:6,
198:8, 229:8,
232:4, 247:20,
248:10, 261:3,
261:7
**open**
222:22, 222:25

WYLIE 598

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

331

| | | | |
|---|---|---|---|
| **operate** 76:3, 154:18, 165:17, 180:1, 180:5, 180:22, 190:3, 254:22 **operated** 7:5 **operating** 29:21, 30:18, 32:14, 32:15, 45:7, 51:5, 52:1, 57:14, 57:21, 184:3, 200:7, 200:8, 219:19 **operation** 25:21, 25:23, 26:17, 26:20, 57:12 **operational** 103:13 **operations** 7:6, 57:19, 57:21, 111:17, 112:3, 112:4, 112:8, 148:25, 149:3, 149:5, 149:22, 150:3, 151:6, 166:20, 168:4, 180:2, 188:11, 200:10, 254:24 **opinion** 20:18, 192:1, 192:4 **opinions** 20:15 **opportunities** 118:22, 119:12 **opportunity** 59:15 **opposed** 32:21, 154:7 **opposing** 158:18 **opt** 255:4, 256:8, 260:22 | **optimistic** 59:19 **order** 145:9, 145:22, 183:11, 188:12, 240:5, 286:18 **orders** 35:6, 51:12, 74:7, 146:4, 164:16, 164:17, 188:12, 195:5, 293:1 **oregon** 6:7 **organization** 30:8, 49:6, 50:15, 50:25 **organizing** 50:25 **original** 34:20, 52:11, 62:10, 62:18, 62:23, 228:12, 239:18 **originally** 221:12 **other** 5:20, 5:23, 8:19, 16:21, 22:11, 24:7, 37:7, 41:5, 43:1, 48:18, 50:10, 51:7, 52:3, 55:4, 60:4, 63:8, 66:24, 66:25, 68:13, 71:2, 74:11, 74:13, 75:16, 84:12, 86:1, 90:15, 91:2, 91:20, 93:1, 93:8, 105:19, 105:21, 106:18, 107:24, 112:19, 113:5, 115:9, 117:24, 122:6, 127:22, 145:10, 152:16, | 167:25, 190:18, 190:19, 195:15, 195:17, 196:22, 198:5, 198:6, 198:17, 205:10, 205:19, 205:23, 206:9, 240:16, 247:21, 247:22, 250:17, 259:22, 260:25, 261:14, 261:16, 270:16, 287:4, 287:11, 290:7, 292:16 **otherwise** 20:3, 294:12, 295:9 **ourselves** 69:17 **out** 19:13, 21:5, 34:8, 50:9, 50:14, 55:24, 57:10, 109:21, 120:3, 128:13, 134:14, 134:23, 164:16, 164:19, 164:22, 164:25, 179:22, 180:1, 180:23, 191:3, 197:22, 204:2, 204:5, 221:9, 234:10, 247:10, 247:20, 249:3, 255:4, 256:8, 256:24, 260:3, 260:10, 260:22, 261:1, 263:8, 271:2, 286:13, 291:7 **outcome** 294:12, 295:9 **outings** 31:25 **outlined** 163:25, 254:17, 279:23 **outlines** 279:21 | **outside** 49:18, 147:9, 147:10 **outstanding** 107:25, 239:18 **outstrip** 48:17, 146:24 **outstripped** 146:14, 146:16, 147:6, 147:14 **over** 7:3, 8:19, 29:1, 46:7, 59:4, 64:15, 79:1, 86:2, 104:8, 125:18, 148:17, 148:19, 181:10, 190:17, 190:19, 232:8, 249:6, 251:6, 261:18, 280:16, 287:12 **overall** 153:13, 153:16 **overly** 209:21, 209:24, 215:7 **oversaw** 149:3, 149:5 **owe** 193:12, 193:17, 193:24, 194:11 **owed** 164:7, 192:12, 232:6 **owes** 100:9, 286:9 **own** 13:3, 23:20, 73:9, 104:12, 104:15, 116:17, 120:1, 165:12, 165:18, 165:19, 166:12, 229:22, 231:14, 260:16, 277:16 **owned** 23:18, 72:8, |

WYLIE 599

77:19, 119:15,
224:20
**owner**
50:20, 83:16,
83:19, 103:13,
105:8, 121:16,
144:4, 247:9,
247:23, 248:1,
248:5, 248:6,
248:13, 248:15,
248:19, 255:5,
255:12, 255:18,
255:25, 256:9,
256:13, 258:6,
260:23
**owners**
113:18, 224:6,
243:20
**ownership**
7:4, 50:9,
117:11, 117:13,
118:5, 121:24,
128:12, 155:4,
172:3, 221:16,
221:19, 223:4,
224:2, 224:9,
224:12, 224:24,
247:11, 249:3,
255:3, 256:7,
259:20

**P**

**page**
4:2, 27:23,
40:5, 62:20,
62:22, 216:15,
225:4, 225:21,
225:23, 226:25,
227:5, 227:6,
229:17, 234:19,
241:11, 252:25,
259:1
**pages**
1:37, 62:23,
211:3, 251:16,
281:2, 283:16
**paid**
44:25, 45:2,

68:17, 88:15,
88:18, 88:19,
89:7, 89:19,
90:16, 90:20,
104:9, 104:11,
104:20, 105:3,
111:21, 122:6,
148:4, 161:21,
172:13, 173:10,
174:18, 200:16,
200:19, 200:25,
217:19, 218:19,
232:13, 235:7,
235:16, 239:2,
252:22, 282:18,
283:2, 283:6,
283:7
**pain**
265:1
**painful**
264:25
**panoply**
58:2, 74:19,
74:20, 74:21,
129:2, 146:9,
148:10, 155:11,
156:25, 179:25,
269:9, 269:21,
270:7, 270:14,
271:4, 271:5,
271:9, 271:13,
271:18, 272:17,
274:6, 274:11,
274:19, 274:25,
275:4, 275:21,
275:23, 276:5,
276:6, 276:7,
276:22, 277:1,
277:7
**paper**
242:16
**papers**
53:9, 196:16,
255:11, 255:25
**paperwork**
116:13, 247:4
**paragraph**
63:3, 63:4,

253:19, 256:6
**paramount**
224:17
**pardon**
45:18, 278:19
**parenthetical**
253:17
**park**
235:7, 238:24
**parking**
235:6
**part**
40:22, 57:18,
57:24, 58:4,
60:12, 74:2,
101:11, 133:16,
133:24, 155:4,
155:6, 155:12,
160:17, 164:15,
236:11, 240:12,
252:2, 252:9,
271:25, 272:6,
278:10
**part-time**
15:23
**partial**
278:6
**particular**
164:15
**particularly**
74:24, 235:25,
263:12
**parties**
45:23, 46:9,
60:5, 158:15,
207:15, 208:5,
237:16, 258:14,
281:6, 281:9,
294:11, 295:8
**partner**
25:7, 25:11,
25:15, 30:23,
38:5, 56:19,
56:25, 70:9,
70:16, 126:23,
127:2
**partners**
25:18, 29:17,

51:23, 56:2,
66:25, 68:13,
70:19
**partnership**
24:18, 29:12,
29:13, 55:1
**parts**
43:20, 44:13,
79:1, 79:7
**party**
40:7, 123:8,
123:15, 124:10,
180:13, 184:22,
207:22
**pass**
292:9, 292:19
**pass-through**
217:24
**passwords**
165:3, 179:21
**past**
29:1
**path**
59:20, 246:6,
246:23, 247:13,
247:21, 248:25,
254:25
**path-forward**
249:11
**paths**
125:10
**pay**
16:12, 68:19,
79:13, 88:23,
99:14, 105:12,
111:18, 174:23,
230:1, 232:5,
232:17, 233:6,
233:21, 282:21
**paycheck**
68:21, 172:19
**paying**
86:20, 100:22,
101:1, 282:20
**payment**
86:10, 99:14,
100:10, 100:13,
144:8, 188:13,

WYLIE 600

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

333

| | | | |
|---|---|---|---|
| 213:4, 219:6 | **permitted** | **piece** | **plans** |
| **payments** | 40:21 | 192:9, 263:11, | 86:3 |
| 99:22, 100:5, | **perpetually** | 280:10 | **platform** |
| 148:8, 164:20 | 195:22 | **pieces** | 35:2, 54:18, |
| **paypal** | **person** | 242:16 | 81:24, 144:1, |
| 81:25, 82:5, | 32:6, 82:16, | **pitching** | 219:6, 230:24 |
| 164:19, 179:23 | 82:22, 83:14, | 150:11 | **platforms** |
| **pending** | 130:1, 151:21, | **place** | 32:15, 188:15 |
| 9:22, 158:10, | 151:22, 217:15, | 15:8, 40:2, | **played** |
| 264:22 | 227:9, 254:18, | 76:20, 76:21, | 255:22 |
| **penny** | 260:13 | 77:2, 122:21, | **pleadings** |
| 45:11, 121:18, | **person's** | 254:9, 259:19, | 13:16 |
| 122:2 | 167:21 | 259:23, 280:1, | **please** |
| **people** | **personal** | 280:3 | 5:18, 8:19, |
| 31:7, 46:20, | 108:12, 108:22, | **placed** | 8:25, 9:21, |
| 50:22, 50:25, | 200:23, 201:2, | 165:12 | 11:21, 17:14, |
| 52:5, 91:20, | 240:7, 253:13, | **placeholder** | 18:7, 21:20, |
| 102:6, 128:14, | 253:22, 262:3 | 37:9 | 22:5, 66:6, |
| 144:13, 167:13 | **personally** | **placement** | 67:12, 71:9, |
| **people's** | 6:21, 259:12 | 145:7 | 71:12, 81:5, |
| 168:1 | **perspective** | **plaintiff** | 85:4, 91:8, |
| **percent** | 55:12 | 1:8, 3:3, 11:1, | 115:4, 132:10, |
| 25:19, 55:10, | **peters** | 214:14, 214:17, | 134:23, 152:4, |
| 55:12, 220:15, | 46:11, 46:12, | 215:4, 292:10 | 190:20, 193:6, |
| 220:21, 220:22, | 46:14, 46:18, | **plaintiff's** | 254:16, 255:21, |
| 220:23, 221:4, | 47:4, 47:8, | 209:11, 213:2 | 279:10, 279:23, |
| 221:6, 224:11, | 47:12, 47:16, | **plakas** | 280:24, 281:3, |
| 224:20, 244:24, | 48:1, 48:3, | 28:10, 31:9, | 281:7, 287:18, |
| 248:2, 248:7, | 48:5, 48:8, | 31:10, 31:14, | 293:12 |
| 248:13, 248:15, | 48:10, 49:14, | 31:18, 31:22, | **plenty** |
| 248:19, 249:6, | 50:7, 52:23, | 32:1, 32:3, | 103:15 |
| 250:16 | 60:2, 76:19, | 32:9, 32:14, | **pllc** |
| **percentage** | 83:15 | 32:20, 34:19, | 3:18 |
| 52:12, 171:15, | **petition** | 43:2, 77:12 | **pocket** |
| 221:3, 221:5 | 62:18, 62:23 | **plan** | 45:11, 121:18, |
| **percentages** | **phantom** | 51:20, 51:21, | 122:2 |
| 259:22, 259:25 | 118:1, 119:7, | 85:22, 85:23, | **point** |
| **perfectly** | 125:10, 247:22, | 86:1, 87:9, | 61:21, 121:6, |
| 123:7, 123:15 | 255:15 | 87:11, 88:3, | 160:16, 238:22, |
| **performed** | **phase** | 102:8, 102:9, | 250:2, 280:2, |
| 205:6, 205:19, | 254:21 | 287:5, 287:12 | 289:10, 289:20, |
| 205:24, 206:9 | **phone** | **planet** | 289:22 |
| **period** | 2:8, 15:12, | 3:33 | **point-of-view** |
| 73:24, 76:9, | 59:14, 109:6, | **planned** | 125:12 |
| 91:18, 101:21, | 124:6 | 186:5 | **policies** |
| 130:14, 253:18 | **phrase** | **planning** | 103:21 |
| **permanent** | 214:16 | 54:17, 249:11 | **policy** |
| 62:10 | **physical** | **plano** | 108:9, 108:10, |
| | 242:10 | 264:13 | |

WYLIE 601

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

334

| | | | |
|---|---|---|---|
| 109:1 | precluded | 35:8, 43:19, | privilege |
| pool | 43:10 | 43:23, 44:2, | 47:24, 134:12, |
| 220:20, 220:22 | precluding | 61:24, 203:23, | 184:15, 206:5 |
| populate | 164:4 | 292:8 | privileged |
| 144:4 | predicated | previously | 267:8 |
| populated | 61:23, 254:22 | 11:6, 22:1, | pro |
| 74:10, 146:9, | preferred | 37:5, 40:19, | 240:7 |
| 149:8 | 84:25, 85:1, | 58:23, 63:20, | probably |
| portion | 85:6, 85:8, | 64:1, 68:6, | 112:25, 281:2 |
| 111:17, 155:1, | 85:13, 85:19, | 84:21, 84:22, | problem |
| 232:6 | 91:4, 91:11 | 86:24, 204:4, | 271:3, 271:5 |
| portions | preliminary | 250:15, 283:19 | procedures |
| 1:26, 230:2 | 58:10 | price | 169:3 |
| portland | premoney | 86:22 | proceed |
| 6:7 | 205:9 | primarily | 288:25 |
| position | prepare | 13:22, 23:4, | proceeding |
| 30:21, 32:22, | 11:16, 85:21, | 57:22, 111:16, | 295:5 |
| 34:6, 34:7, | 150:21 | 112:3, 112:8, | proceedings |
| 34:10, 249:3, | prepared | 115:3, 146:8, | 5:2, 226:5, |
| 259:10 | 9:10, 42:2, | 230:23 | 293:15, 294:4, |
| positive | 42:5, 85:25, | primary | 294:5, 294:6, |
| 209:1 | 125:9, 255:1, | 26:2, 50:24, | 294:8, 295:6 |
| possibility | 279:20, 295:4 | 57:15, 57:20, | proceeds |
| 196:19, 289:13, | preparing | 149:25, 151:24, | 240:8, 240:16, |
| 289:16, 289:17 | 39:7 | 161:19, 188:11, | 245:13, 256:24, |
| possible | prepay | 248:10 | 288:8 |
| 54:10, 58:24, | 235:11 | printed | process |
| 60:17, 161:15, | present | 242:8, 242:11 | 26:11, 35:6, |
| 271:2, 290:16, | 3:32, 181:5, | prior | 39:7, 53:3, |
| 290:22 | 181:6, 183:7, | 6:6, 11:14, | 74:7, 76:17, |
| possibly | 245:10 | 28:24, 30:9, | 188:12, 261:15 |
| 279:16 | presented | 30:10, 30:21, | processed |
| potential | 76:21, 76:24 | 35:21, 43:11, | 164:16, 195:6 |
| 51:22, 223:1 | presently | 53:10, 53:17, | processing |
| potentially | 6:2 | 54:25, 55:15, | 32:16, 51:12, |
| 55:3 | preservation | 55:16, 61:7, | 219:6 |
| pow-wow | 224:16 | 61:9, 76:19, | produce |
| 261:25 | president | 80:13, 80:16, | 150:14 |
| powerhouse | 24:6, 24:11, | 80:20, 81:11, | produced |
| 229:24 | 30:8, 38:13 | 81:20, 82:1, | 40:19, 40:22, |
| pre-suit | pressure | 82:5, 84:13, | 42:25, 86:6, |
| 266:9 | 118:13 | 112:11, 131:16, | 86:8, 205:16, |
| preceded | pretty | 149:24, 154:15, | 210:19, 210:21, |
| 80:11 | 45:20, 81:2, | 183:13, 185:22, | 210:23, 210:25, |
| precipitated | 113:1, 179:25, | 200:19, 203:25, | 211:2, 211:12, |
| 188:3 | 243:20, 259:4 | 215:4, 215:14, | 211:14, 211:21, |
| preclude | previous | 249:10, 290:17, | 211:23, 212:4, |
| 173:9, 180:2 | 32:21, 35:4, | 291:3 | 212:7, 212:20, |

WYLIE 602

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

335

**212:22, 215:13,**
**215:17**
**product**
29:17, 103:14
**production**
208:21, 209:9,
213:1, 214:2,
214:5, 214:7,
214:12, 215:2,
215:20
**productive**
257:19
**products**
37:3, 144:5,
149:7
**professional**
218:23, 219:1
**profit**
175:7, 175:10,
175:15, 175:20,
209:13, 212:1,
212:4, 212:15,
216:16, 216:20
**profits**
175:3, 175:9,
175:11, 175:17
**program**
155:10
**project**
36:15, 36:20,
36:22, 36:24,
37:12, 37:14,
56:8, 133:1,
133:7, 146:17,
235:10, 238:25,
258:2
**projection**
87:24, 88:3
**projections**
85:25, 90:21
**projects**
29:7
**promise**
59:18
**promised**
43:8, 157:7,
160:11, 160:13,
174:16, 195:19

**promises**
55:6, 213:4
**promptly**
226:1
**proof**
132:1, 285:15
**proper**
8:13, 17:17,
45:24, 94:2,
254:5
**properly**
146:9
**property**
161:24, 173:16,
240:7, 267:19
**proportional**
210:3
**proposal**
117:25
**proprietor**
258:7
**proprietorship**
23:18, 23:24,
50:8, 50:13,
50:18, 50:19,
60:2, 119:9,
196:15
**prospecting**
150:10, 150:11
**protect**
202:6
**protected**
262:1
**prototype**
79:3, 79:5,
79:11, 79:15,
79:16, 79:19,
80:3, 80:5,
80:6, 80:10
**provide**
14:3, 14:4,
16:23, 39:21,
43:8, 43:9,
47:10, 86:21,
87:23, 88:7,
89:13, 103:11,
103:18, 103:23,
185:15, 231:1,

279:11
**provided**
24:24, 25:24,
29:9, 29:18,
31:4, 31:6,
47:12, 52:7,
58:14, 77:2,
78:9, 89:12,
101:25, 103:12,
103:19, 104:4,
127:22, 131:20,
168:25, 205:13,
213:11, 213:15,
217:4, 227:13,
253:13, 253:20,
253:21
**provides**
31:14
**providing**
23:3, 23:5,
26:20, 56:16,
63:7, 69:6,
86:17, 112:18,
169:22, 202:5,
267:4
**provisions**
254:17
**public**
2:12, 13:15,
133:8, 180:15,
180:16, 180:18,
181:9, 181:15,
182:8, 182:25,
188:18, 188:20,
294:1, 294:15
**publication**
13:21
**publications**
31:24
**pulls**
74:21
**punish**
173:2
**punished**
172:23
**purchase**
37:3, 174:23,
208:6, 279:7

**purchased**
43:3, 228:8,
228:20
**purchases**
32:16, 217:5
**purpose**
24:20, 73:23,
74:3, 222:24,
270:3, 275:24,
276:5
**purposely**
126:25
**purposes**
205:21, 205:23
**pursuant**
2:11
**pursue**
110:6, 224:11
**put**
18:19, 79:25,
108:11, 113:19,
113:21, 232:21,
235:22, 262:6,
262:9
**putting**
262:2

**Q**

**qualified**
245:12, 294:7
**qualify**
245:10, 245:14
**quantified**
149:16
**quarter**
177:13
**quarterly**
198:19
**question**
7:8, 8:16,
8:20, 8:25, 9:5,
9:6, 9:8, 9:22,
14:15, 14:19,
14:20, 15:2,
15:4, 17:8,
17:16, 20:12,
22:6, 38:23,
47:23, 64:25,

WYLIE 603

66:6, 67:10,
67:12, 67:17,
71:10, 71:12,
71:13, 71:17,
79:14, 81:2,
84:21, 87:4,
91:8, 120:13,
123:14, 125:24,
127:4, 127:25,
130:3, 133:2,
144:25, 147:3,
147:17, 150:16,
150:24, 152:3,
155:23, 158:10,
163:1, 164:24,
166:4, 171:3,
173:11, 179:10,
182:4, 183:2,
187:13, 193:6,
193:15, 193:20,
193:22, 206:21,
207:24, 208:2,
211:4, 211:6,
211:7, 233:9,
234:8, 242:23,
248:4, 255:20,
255:21, 255:22,
265:10, 265:11,
289:3, 289:5,
290:10, 291:24,
292:2
**questioning**
7:15, 181:2,
181:4, 181:11,
181:22
**questionnaires**
58:13
**questions**
8:24, 9:10,
9:14, 21:2,
21:6, 21:9,
21:10, 21:11,
130:18, 150:18,
177:19, 279:13,
292:22
**quick**
113:1
**quickbooks**
236:18, 237:11

**quickly**
122:14, 183:16,
186:4
**quintero**
284:14
**quit**
58:7, 58:8,
195:3
**quitting**
32:22, 35:4
**quote**
143:11, 182:7

**R**

**rainbow**
195:2, 195:9
**raise**
279:5
**raising**
278:25, 281:15
**rarely**
235:25
**rate**
16:14, 16:15,
106:9, 106:10
**rate's**
107:19
**rates**
107:20
**rather**
59:8, 86:20,
284:2
**rationale**
245:7
**reach**
25:1, 34:8,
291:7
**reached**
52:20, 52:21
**read**
5:6, 40:14,
63:2, 63:20,
65:24, 66:1,
128:14, 209:17,
210:5, 213:6,
213:7, 214:9,
237:5, 246:12,
246:19, 249:13,

255:6, 255:21,
259:8, 259:15,
259:16, 260:1,
260:2, 260:11,
263:14, 263:15,
265:24, 278:22,
284:4
**reading**
62:9, 66:6,
164:10, 231:13,
269:22
**ready**
58:11, 146:5,
246:17, 259:19
**realistic**
291:9, 291:10
**really**
20:13, 123:12,
188:14, 248:9,
252:5, 274:19
**reason**
9:13, 11:12,
60:1, 113:3,
117:4, 242:12,
245:7
**reasonably**
209:25, 215:8
**reasons**
26:2
**reassess**
279:5
**rebuild**
174:24
**rebuilding**
43:14
**recall**
15:10, 72:15,
73:14, 79:17,
79:18, 79:21,
79:22, 79:24,
114:17, 115:9,
115:19, 153:12,
168:6, 168:11,
168:13, 168:22,
168:23, 175:25,
196:2, 196:14,
266:12, 266:14
**receipt**
232:5, 244:10

**receipts**
42:3, 42:6,
42:11, 42:25,
253:13, 253:22
**receive**
33:15, 45:16,
52:14, 52:15,
52:16, 69:19,
69:23, 70:4,
100:13, 112:20,
121:23, 128:18,
128:19, 152:25,
161:3, 168:10,
173:3
**received**
14:1, 69:21,
69:24, 70:12,
88:5, 98:5,
98:18, 104:2,
105:11, 109:16,
109:19, 121:18,
122:2, 123:1,
153:2, 153:20,
154:1, 154:3,
157:19, 158:2,
162:9, 171:4,
172:18, 173:7,
173:18, 173:21,
220:2, 227:16,
242:15, 242:17,
242:20, 242:25,
243:4
**receiving**
168:6, 266:12,
266:14, 267:22
**recent**
16:15
**recess**
21:22, 60:22,
158:24, 197:2,
240:25, 265:19,
287:21
**recognize**
42:21, 62:5,
62:7, 65:16,
208:11
**recollection**
54:9, 186:3

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

recommendation
50:12, 291:15,
291:24
recommendations
103:13, 103:15,
279:24
recommended
124:10, 282:4
recommending
55:12, 56:21
reconcile
63:19
reconciled
228:11
reconfiguring
35:6
reconnected
270:4, 277:16
record
5:5, 5:18,
14:4, 20:24,
21:20, 60:20,
60:24, 61:2,
123:8, 123:16,
127:11, 150:12,
151:5, 157:21,
158:17, 158:18,
158:20, 158:21,
158:22, 159:1,
159:2, 183:12,
196:25, 197:5,
241:3, 242:13,
265:17, 265:22,
287:19, 287:23,
292:23, 293:1,
293:14, 294:9,
295:6
recorded
8:15, 119:4,
123:23, 123:25,
125:21, 126:4,
126:8, 126:11,
294:6
recording
5:5, 125:25,
294:8, 295:4
records
12:4, 12:9,

12:13, 12:16,
12:18, 116:15,
151:9, 168:7,
168:20, 168:25,
169:1, 169:10,
169:15, 169:16,
170:3, 208:15,
213:4
recover
40:20
recruit
171:19, 223:6
recruited
30:7, 34:2
redacted
1:24
reduce
195:18, 224:8,
247:12
reduced
163:20, 172:2,
195:20, 294:6
refer
125:21, 125:24,
183:12
reference
217:2
referenced
198:1
referred
24:9, 44:5,
46:20, 67:22,
113:4, 125:22,
128:21
referring
26:24, 35:16,
37:15, 44:3,
44:6, 67:24,
104:16, 159:14,
161:1, 243:25,
250:5, 250:12
refers
67:7
reflected
56:13, 170:2,
185:13, 234:13,
245:14
reflecting
209:11, 213:2,

214:13, 214:16,
214:21
reflective
274:7
reflects
218:21
refrain
166:2, 166:6,
267:18
refuse
125:18
refused
113:25, 114:4,
117:1
regain
188:11
regard
63:21
regarding
32:7, 49:22,
55:7, 55:19,
57:7, 99:20,
184:25, 185:9,
214:2, 251:13,
253:10
regardless
259:24
regards
243:12, 280:5,
291:18
regions
112:22, 113:4
registered
26:7, 53:7,
104:18
reimbursements
99:22
reissued
114:12
rejected
112:17
rejection
112:22
related
10:8, 34:24,
110:11, 110:14,
110:17, 132:19,
148:4, 152:14,

181:15, 182:9,
209:10, 213:1,
214:8, 214:13,
294:10, 295:7
relating
133:20, 214:21,
214:25, 290:13
relations
133:9, 149:14,
151:13, 151:15,
151:18
relationship
16:25, 17:1,
18:15, 22:1,
22:11, 58:17,
59:3, 213:2
relationships
33:4, 102:8,
127:21, 150:7,
150:9
relevant
39:5, 39:21,
209:25, 210:7,
213:19, 214:7,
215:10
relies
210:10, 291:21
rely
147:10, 169:2,
213:21, 291:13,
291:14, 292:2,
292:5, 292:7,
292:8
relying
288:15, 291:23
remains
170:12, 225:25
remedy
180:12
remember
11:7, 11:10,
59:14, 71:13,
180:24, 181:1,
181:3, 181:4,
181:7, 181:10,
181:12, 181:13,
181:18, 181:21,
182:1, 182:6

WYLIE 605

remove
166:11
removing
160:3
rendered
201:17, 201:18,
201:22, 202:1,
202:12, 202:15
repaid
100:13, 174:3,
284:21, 284:25,
286:22
repay
174:16, 286:1
repaying
286:4
repayment
101:6, 105:16
repayments
106:8
repeat
91:7, 106:22
rephrase
9:1
replace
145:13, 161:6
replaced
44:9, 163:8
replacement
161:4, 217:5
replacing
117:25
replied
34:10, 122:16
reply
230:11, 230:13
report
210:2
reporter
5:7, 8:8, 8:15,
190:19, 292:25,
293:5, 293:7,
293:9, 293:13,
294:1
reports
157:10, 209:13,
211:18, 211:20
represent
6:9, 43:4,

43:6, 47:19,
48:5, 60:7,
208:18
representations
56:10, 57:6,
160:21, 258:1
representatives
28:8
represented
47:16, 160:19,
223:17
representing
48:21, 48:22,
48:25, 49:3,
169:21, 215:19,
220:25
represents
220:18
reputation
127:21, 189:1,
189:8, 194:20
request
13:13, 13:14,
62:10, 62:12,
73:4, 73:6,
73:10, 73:15,
162:8, 168:18,
185:18, 208:14,
208:21, 209:9,
209:21, 209:23,
209:24, 210:3,
210:7, 211:5,
212:14, 212:25,
213:18, 214:6,
214:7, 214:12,
214:15, 215:2
requested
12:4, 12:5,
62:13, 124:6,
125:12, 162:1,
162:6, 168:24,
169:9, 169:14,
169:20, 185:17,
210:24, 213:16,
242:1, 255:22,
268:16
requests
122:14, 168:19,

214:2, 214:5,
215:20
require
247:11
required
43:7, 146:11,
245:9, 245:16,
255:5, 256:9,
260:23
requires
14:6, 17:13,
206:13
research
39:4, 102:6
reside
6:2, 6:6
resided
6:4
resides
274:12
resign
155:17, 179:5,
186:20
resigned
109:25, 154:23,
155:9, 155:19,
156:1, 156:10,
156:18, 157:5,
157:11, 157:14,
160:1, 160:18,
167:10, 167:18,
167:20, 179:7,
179:12, 186:17,
186:20, 186:22,
187:5, 187:10,
188:1, 189:13,
190:23, 191:8,
191:13, 191:15,
191:21, 192:17,
192:23, 193:1,
193:4, 193:9,
193:13, 195:24,
196:12, 199:16,
199:19, 201:4,
204:11, 242:4,
273:8, 273:10,
275:7, 275:14
resolution
125:17, 183:23,

183:25, 184:5
resolutions
184:12, 185:2,
185:9, 196:22,
290:12, 290:14
resolve
101:3, 124:11,
186:17, 250:9,
250:11
respect
57:12
respond
168:17, 168:21,
276:21
responded
13:13, 13:15,
15:13, 15:19,
250:19, 253:21
responding
66:2, 67:2,
124:9
response
8:16, 9:24,
28:4, 28:7,
40:12, 40:13,
40:15, 62:6,
66:19, 68:9,
94:2, 114:23,
117:10, 117:12,
117:18, 180:3,
190:25, 191:2,
196:11, 209:20,
214:14, 215:7,
249:7, 249:22,
251:12, 251:15,
253:5, 253:20,
260:10, 260:12,
260:15, 260:21,
266:17, 266:23,
267:13, 268:5,
270:6, 270:14,
275:13, 276:13,
285:12
responses
208:19, 208:20,
208:24, 208:25,
209:4, 209:7,
209:15

WYLIE 606

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

responsibilities
51:7, 51:16,
57:12, 60:4
responsibility
75:3, 75:6,
75:8, 75:11,
148:17, 151:20
responsible
51:6, 58:5,
58:9, 75:10,
82:23, 110:8,
110:20, 111:7
responsive
209:23
rest
249:17, 289:9,
289:11
restate
84:21, 152:4,
166:4, 179:9
restating
38:22
restrict
17:5
restricted
17:11
restructure
109:25, 118:25,
119:2, 120:11
restructured
114:11
resubmit
247:3
result
128:20, 128:22,
202:14, 205:8
resulted
7:4
results
156:24, 157:2
retail
31:6, 51:23,
103:22, 164:18
retailer
217:24
retailers
40:1, 150:8,
164:20, 217:19,

280:2, 280:3
retain
252:14
retained
84:20
retainer
233:7
retribution
166:24
return
7:6
returns
209:14, 212:9,
212:10, 212:16
reveal
14:7
revenue
86:1, 112:18,
113:3, 176:1,
176:9, 176:12,
176:22, 177:3,
177:4, 177:6,
177:7, 177:15,
200:12, 217:11,
229:20, 245:11
revenues
175:22, 176:4,
176:15, 176:21,
177:9, 177:12,
200:14
review
11:25, 12:10,
42:17, 64:6,
110:25, 111:9,
208:12, 279:23
reviewed
11:18, 12:2,
12:8, 208:25,
215:20, 215:21
revise
247:11, 258:7
revised
131:10
revision
132:4
revisited
64:22
revolver
279:3, 281:21

reward
255:17
rewritten
163:20
rewrote
114:8, 114:9
rice
77:13
rich
28:10, 31:9,
31:10, 31:14,
31:18, 31:22,
32:1, 32:3,
32:9, 32:14,
32:20, 34:19,
43:2, 77:12
richly
45:9
right
7:15, 19:17,
19:19, 55:17,
65:8, 67:2,
83:1, 91:19,
125:21, 158:12,
181:5, 183:2,
216:24, 218:14,
218:22, 219:8,
229:23, 239:3,
249:24, 252:6,
258:10, 264:4,
264:24, 270:19,
276:11, 278:7,
278:11, 284:18,
291:4, 292:12
rights
75:14, 75:16,
273:2
risk
255:3, 256:7,
260:21, 263:13
risks
255:3, 256:7
role
10:22, 11:1,
31:1, 31:2,
38:7, 38:8,
51:3, 51:18,
51:20, 56:15,

56:16, 173:22,
173:24, 247:14,
248:25
roles
252:24
rolling
66:16
room
94:1, 125:13,
177:17
rooms
125:14
rough
293:5
roughly
219:23
round
279:1, 281:16
route
164:18
routes
51:22, 146:4
routing
164:17
row
241:15
royal
66:24
rube
156:22, 156:24
rule
40:8
rules
7:21, 18:8,
18:10, 71:14,
158:7, 281:5
ruling
273:1
run
35:3, 103:16
running
50:25, 182:21,
186:5, 279:4
rush
264:2, 264:18,
293:2, 293:4,
293:5

---
**S**
---
s
29:5

WYLIE 607

s-a-i-l-o-r
13:20
**said**
14:1, 14:3,
20:3, 37:25,
46:2, 46:3,
54:19, 54:20,
59:8, 79:5,
86:25, 87:5,
87:8, 87:14,
89:12, 90:8,
111:24, 113:20,
143:15, 153:24,
158:10, 167:12,
173:21, 182:6,
185:21, 206:8,
228:23, 240:13,
247:21, 248:24,
256:19, 274:2,
292:2, 294:7,
294:8, 295:5
**sailor**
13:18, 15:14,
15:16
**salaried**
33:16
**salaries**
69:21
**salary**
33:15, 33:17,
69:20, 252:22,
252:23
**sales**
25:1, 38:14,
63:11, 74:24,
157:10, 164:4,
280:1
**same**
8:5, 8:21,
15:19, 86:22,
106:19, 106:24,
107:17, 112:21,
113:3, 116:3,
118:4, 170:17,
221:11, 221:14,
245:16, 252:22,
253:1, 255:16,
255:17

**sanctions**
286:8, 286:18
**santa**
69:4
**saturday**
15:9
**saw**
8:9, 8:13,
79:15, 79:16
**say**
8:9, 11:20,
14:2, 15:1,
17:13, 17:22,
18:2, 18:4,
18:6, 18:20,
18:22, 19:19,
26:23, 35:15,
36:7, 37:14,
37:17, 42:14,
44:2, 44:19,
52:17, 56:4,
56:18, 59:22,
66:20, 66:25,
67:13, 67:19,
78:18, 90:18,
93:18, 108:18,
114:9, 114:18,
124:23, 143:21,
144:11, 147:20,
149:5, 153:11,
159:13, 160:13,
177:3, 200:2,
230:17, 243:24,
247:19, 248:14,
248:17, 248:20,
250:11, 256:6,
261:3, 261:24,
270:10, 273:23,
274:2, 275:11,
278:19, 280:15,
281:25, 285:5,
285:16, 286:19
**saying**
13:15, 44:7,
63:22, 76:23,
79:22, 134:18,
147:13, 170:18,
185:4, 199:7,

230:14, 230:15,
231:18, 238:1,
250:21, 252:17,
254:4, 254:6,
256:12, 274:24
**says**
27:23, 40:6,
56:23, 66:1,
66:3, 66:6,
66:17, 67:4,
67:6, 67:21,
216:22, 216:24,
218:2, 218:15,
218:22, 219:19,
220:12, 225:5,
225:23, 229:17,
234:23, 236:13,
237:15, 238:14,
239:19, 239:22,
241:14, 241:15,
241:21, 241:23,
241:25, 243:8,
244:6, 246:6,
246:22, 253:3,
253:7, 254:15,
263:3, 276:9,
276:20, 281:13,
281:17, 281:19,
281:23, 282:10,
284:1
**sba**
58:12, 105:23,
106:20, 106:25,
112:21, 224:11,
224:21, 225:10,
245:9, 251:13,
252:5, 254:17,
255:2, 259:3,
259:18, 262:10,
263:6, 264:2,
264:17, 279:3,
281:20, 282:14,
282:16, 282:19,
282:20, 283:2,
283:5, 284:3
**schedule**
99:14, 105:17
**scheduled**
198:19

**scoped**
79:8
**seat**
222:5, 222:7,
222:13
**seats**
222:21, 222:25,
250:17
**second**
28:7, 107:13,
111:5, 112:5,
114:15, 116:4,
219:16, 219:18,
225:21, 229:17,
230:17, 241:14
**secretary**
104:18
**secrets**
134:18
**section**
40:9, 218:1,
241:25
**secured**
53:8
**security**
117:5
**see**
27:22, 28:1,
28:2, 40:6,
40:9, 40:11,
40:13, 62:18,
62:25, 145:18,
190:13, 190:15,
209:17, 209:19,
215:5, 215:6,
215:11, 215:12,
216:17, 217:12,
218:2, 225:17,
229:23, 230:4,
230:5, 234:20,
237:23, 241:14,
241:17, 243:9,
249:25, 256:21,
259:23, 270:8,
270:15, 276:13,
278:10
**seed**
279:1, 281:16,

WYLIE 608

282:4
**seek**
40:20, 98:14,
166:24
**seeking**
180:12, 188:9,
189:11, 189:22
**seeks**
40:16, 209:22,
209:25
**seem**
125:20
**seemed**
124:8, 181:13
**seems**
123:12, 253:11
**seen**
27:16, 180:18,
208:16, 216:13,
275:17, 278:2,
283:19
**segment**
197:4, 241:2,
265:21
**select**
124:13
**selected**
131:12
**selections**
58:15
**self-dealing**
166:3, 166:6,
166:9, 166:14
**send**
88:21, 197:22
**sending**
79:18
**senior**
115:8
**sense**
17:9, 230:16
**sent**
13:14, 15:13,
55:10, 56:20,
65:25, 89:23,
89:24, 90:1,
191:14, 250:13,
266:9

**sentence**
230:15, 230:17
**separate**
125:14, 231:14,
232:9, 232:11,
232:12
**separately**
117:20, 124:22,
124:25, 228:14,
231:7
**september**
36:16, 154:14
**served**
30:7
**service**
86:18, 86:21,
279:21
**services**
16:23, 23:3,
23:6, 24:24,
25:23, 26:20,
29:14, 29:18,
47:2, 47:7,
47:10, 47:12,
63:8, 69:3,
69:5, 69:6,
86:12, 86:14,
86:25, 87:17,
87:22, 88:8,
89:13, 90:4,
90:6, 101:25,
127:22, 128:4,
128:5, 128:8,
148:4, 148:13,
164:5, 218:23,
219:1, 228:9,
228:20, 231:1,
231:2, 231:6
**set**
45:16, 47:13,
47:14, 57:21,
71:14, 113:23,
146:5, 148:7,
148:9, 149:7,
149:11, 150:8
**sets**
33:10
**setting**
8:3

**settlement**
286:8, 290:20,
291:18
**setup**
32:4, 32:17,
148:15, 219:3
**seven**
157:9, 195:17
**several**
22:21, 31:24,
115:9, 132:3,
132:16, 169:18,
186:3, 212:14,
215:16, 252:14
**several-month**
169:13
**shake**
128:13
**shape**
102:8, 102:9,
103:15, 103:20
**share**
13:16, 25:18,
59:17, 60:3,
117:11, 128:13,
134:20, 166:24,
220:7, 230:1,
259:20, 259:22
**shared**
261:20
**shareholder**
50:21, 197:11,
198:4, 198:6,
198:8, 198:10,
198:13, 198:16,
199:12, 199:14,
250:16
**shareholders**
12:19, 23:23,
70:20, 197:14
**shares**
7:4, 12:15,
13:1, 13:2,
23:21, 45:9,
50:3, 50:4,
52:7, 52:14,
52:15, 52:16,
54:22, 55:3,

55:7, 55:8,
55:20, 55:22,
55:23, 57:9,
59:9, 59:18,
59:21, 59:24,
61:18, 69:25,
70:13, 72:7,
92:10, 92:11,
92:17, 92:18,
117:13, 117:25,
118:1, 121:17,
121:23, 125:10,
127:8, 127:17,
128:2, 128:6,
128:18, 128:19,
170:5, 170:10,
170:11, 170:12,
170:13, 170:19,
170:22, 171:5,
171:8, 171:12,
171:18, 171:19,
171:21, 171:23,
171:25, 172:3,
172:9, 173:18,
173:22, 220:13,
220:16, 220:25,
221:12, 221:14,
221:20, 221:22,
222:1, 222:4,
222:14, 222:17,
222:23, 223:10,
223:14, 223:20,
223:23, 224:16,
242:1, 242:8,
243:17, 243:22,
243:23, 244:3,
247:12, 247:22,
249:6, 260:16,
279:12, 279:15
**sharing**
144:14
**sheet**
216:5, 216:16,
216:20, 234:7,
234:14
**sheets**
209:16, 212:17
**shell**
257:12

WYLIE 609

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

342

| | | | |
|---|---|---|---|
| **shilling** 1:21, 3:14, 24:19, 25:12, 28:9, 29:20, 29:21, 29:24, 30:16, 30:18, 30:25, 31:4, 39:22, 51:1, 52:15, 52:18, 60:6, 75:15, 75:16, 75:17, 75:20, 75:21, 77:11, 91:21, 91:24, 92:6, 92:8, 92:10, 93:4, 103:9, 103:17, 103:19, 159:25, 167:14, 183:8, 222:3, 243:25, 246:4, 249:8, 251:11 **shilling's** 25:14, 249:10, 250:5 **shipping** 149:9, 217:4, 217:10, 217:12, 217:20, 217:22 **shipstation** 81:25, 82:5, 128:25, 145:11, 146:3, 148:10, 152:13, 164:16, 179:24, 195:6 **shocked** 257:12 **shopify** 66:3, 73:5, 73:7, 73:8, 73:11, 73:18, 73:21, 74:4, 74:5, 74:12, 74:24, 79:25, 80:9, 80:12, 80:18, 80:23, 81:13, 81:24, 82:4, 128:25, 143:23, 144:1, | 144:12, 144:24, 145:4, 145:9, 145:16, 145:22, 146:3, 146:8, 148:10, 152:13, 164:16, 269:17, 269:22, 270:5, 271:4, 271:24, 276:10, 277:16 **shopping** 74:6 **short** 196:24, 241:5, 266:2, 288:1 **shorthand** 250:15 **shortly** 199:19 **should** 72:7, 172:8, 185:2, 247:5, 259:18 **shoulder** 251:7 **shoulders** 262:4 **shouldn't** 100:13, 292:4 **show** 132:3, 132:4 **showed** 12:14 **showing** 198:3 **shut** 125:19, 159:5, 159:10, 159:18, 159:23, 164:14, 166:19, 172:19, 203:23, 203:25 **shutting** 165:18, 180:23 **sic** 158:8 **sidebar** 19:6, 19:15, 41:19, 46:1 **sign** 70:25, 72:14, | 76:17, 77:21, 78:1, 118:24, 119:15, 120:9, 120:18, 122:9, 196:16, 255:11, 259:18, 265:24, 285:9 **signature-5tm1q** 295:11 **signature-b7fzp** 294:13 **signed** 36:5, 36:7, 36:9, 58:1, 71:5, 71:24, 77:5, 77:7, 79:10, 92:25, 97:22, 97:24, 160:25, 227:5, 227:6, 227:8, 227:9, 227:10, 227:14, 228:12, 228:14, 229:9 **significant** 32:18, 34:17, 38:15, 38:19, 38:25, 111:17, 200:18 **significantly** 127:16 **signing** 58:2, 58:12, 110:20, 111:7, 118:16 **signs** 230:24, 230:25, 255:25 **similar** 37:4, 56:15, 86:22, 226:5, 263:7 **similarly** 112:7 **simple** 247:23 **simply** 72:12, 146:4, 245:13 | **simultaneous** 233:11 **since** 34:15, 41:22, 64:18, 111:20, 131:11, 199:5, 254:19, 260:9, 292:14 **sincerely** 290:19 **single** 45:11, 199:4, 199:8 **sit** 173:6 **site** 73:5, 73:7, 73:11, 73:17, 73:21, 73:23, 74:3, 74:11 **sites** 73:8, 74:7 **situation** 101:7, 124:13, 183:16, 186:17, 249:12, 250:4, 263:4 **six** 33:21 **six-month** 168:23, 169:9 **size** 145:6, 145:20 **skills** 294:9, 295:7 **skip** 218:14 **slate** 58:11 **slightly** 157:1, 278:24, 281:12 **slimy** 123:12, 125:22, 126:1 **small** 144:4, 244:6 **snippet** 280:23 |

WYLIE 610

social
133:9
software
7:5, 42:12,
43:2, 58:1,
74:16, 74:17,
79:10, 129:17,
134:7, 134:10,
134:11, 143:18,
144:12, 144:18,
144:23, 146:3,
149:9, 154:9,
155:3, 156:6,
157:1, 165:17,
166:12, 174:23,
180:5, 209:13,
211:17, 211:20,
212:15, 273:2,
273:15, 274:8,
275:18, 277:17
sold
63:13, 103:14,
160:14
sole
23:18, 23:24,
50:8, 50:13,
50:17, 50:19,
50:20, 60:2,
75:11, 119:9,
196:15, 247:17,
258:6, 260:25
solidified
12:19
solutions
84:25, 85:1,
85:6, 85:8,
85:14, 85:19,
91:5, 91:11
solve
264:25
some
7:21, 16:11,
66:12, 66:17,
67:4, 67:19,
112:3, 146:14,
169:3, 236:20,
240:15, 247:22,
249:11

somebody
59:16
somehow
181:14, 181:24
someone
123:24, 134:20,
150:25
something
59:19, 79:22,
100:14, 144:3,
154:20, 249:23,
258:21, 261:17,
263:7, 290:21,
291:8
sometime
79:11
somewhere
224:19
soon
34:10, 63:5
sorry
17:4, 37:17,
66:5, 66:23,
67:8, 75:21,
87:4, 90:10,
105:19, 106:22,
113:20, 114:14,
116:17, 124:23,
125:24, 143:16,
151:14, 151:16,
157:17, 158:5,
158:16, 162:25,
183:2, 200:24,
223:12, 234:8,
234:23, 235:9,
237:6, 238:10,
248:3, 262:9,
270:14, 280:24,
283:14, 284:23,
287:8, 287:15
sotto
158:3, 177:20,
216:3, 234:15,
245:17, 251:9,
252:3, 265:14,
266:5, 277:18,
278:5, 283:17,
287:16

sought
112:14, 180:4,
258:16, 258:18,
258:20, 258:23
sounded
131:23, 254:6,
254:12
source
66:9, 129:20,
129:22, 130:7,
130:8, 143:11,
271:18, 274:11,
277:6, 277:10,
277:12, 277:15
sources
74:22, 146:7,
177:4
speak
151:23
speaker
60:17
speaking
19:7, 73:25,
76:9, 280:19,
281:8
specific
15:25, 42:21,
176:23
specifically
9:7, 73:6,
160:8
specifics
59:14, 144:22
speculate
39:15, 57:3,
68:3, 181:20,
275:10
spell
13:19, 85:4,
115:4
spend
129:4, 129:10,
129:13, 129:16,
129:19, 130:12,
130:20, 131:17,
132:6, 133:14,
133:17, 133:25,
134:3, 134:9,

240:5
spent
42:12, 98:6,
129:8, 131:3,
131:7, 133:11,
134:7, 149:14,
150:13, 151:6,
220:2, 235:19,
240:15
spirit
230:24, 230:25
spirits
23:6, 69:4,
218:10, 219:15,
219:17, 231:4
spite
166:20, 166:22,
166:23
split
52:12, 55:12,
56:21
spoke
246:24
spoken
13:7
sponsorship
218:9
spreadsheet
42:2, 42:5,
42:16
spring
79:12, 102:5
st
3:7
stack
44:4, 44:24,
45:3, 51:6,
78:5, 78:8,
78:13, 78:17,
78:25, 80:16,
80:19, 81:3,
81:4, 81:20,
82:7, 82:10,
82:17, 146:1,
152:17, 152:21,
153:22, 153:24,
153:25, 154:4,
154:6, 154:8,

WYLIE 611

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

344

155:5, 155:6,
155:21, 156:2,
156:13, 189:12,
189:15, 271:25,
272:4, 272:14,
272:18, 272:20,
272:23, 273:7,
273:9, 273:14,
273:16, 273:20,
273:23, 274:3
**stacked**
273:15
**stacks**
61:12, 157:25,
268:6
**staff**
43:22
**staffing**
35:11, 36:10,
45:1, 150:1
**stand**
214:11, 215:17,
215:21
**standalone**
60:13, 74:12,
277:17
**standard**
5:5
**staples**
27:12
**start**
54:21, 66:6,
66:15, 84:9,
100:25, 151:16,
162:23, 184:15,
198:21
**started**
24:25, 29:8,
29:16, 37:8,
37:12, 51:11,
81:3, 111:20,
112:15, 149:23,
163:2, 188:4,
200:1, 265:23
**starting**
7:11, 37:11,
53:18, 59:20,
252:23, 253:19,

261:14
**startup**
89:15, 90:6,
98:15, 112:18,
278:24, 281:12
**state**
2:12, 5:18,
10:8, 11:7,
12:20, 12:24,
26:7, 49:9,
71:6, 71:25,
72:1, 72:5,
104:18, 118:21,
170:16, 182:22,
219:3, 242:14,
264:13, 264:14,
294:16
**stated**
58:23, 117:4,
134:20, 149:24,
186:2, 261:14,
273:21
**statement**
120:23, 120:25,
121:1, 121:4,
121:9, 187:22,
189:6, 190:12,
214:9, 214:18,
253:19
**statements**
195:24, 209:12,
209:13, 209:14,
209:15, 211:10,
211:11, 212:2,
212:5, 212:15,
212:16, 217:13
**states**
1:1, 259:4,
270:14
**stating**
71:23, 72:6
**status**
117:6, 209:11
**stay**
228:15
**step**
134:23
**steps**
64:11, 64:13,

285:25, 289:21
**stick**
264:22
**still**
25:20, 26:16,
26:20, 36:17,
47:19, 48:5,
61:3, 74:2,
121:16, 152:17,
158:17, 170:18,
187:7, 187:14,
190:1, 191:4,
192:20, 193:12,
197:8, 236:10,
241:6, 242:11,
242:13, 266:2,
268:23, 272:23,
276:4, 279:11,
286:10, 288:2
**stipulation**
5:6
**stitched**
44:4, 44:12,
129:1
**stock**
69:25, 70:13,
119:7, 121:17,
128:6, 241:15,
241:17, 242:20,
242:25, 243:1,
243:5, 243:17,
255:16, 279:7,
279:18, 279:23
**stocks**
242:17
**stop**
19:18, 19:19,
20:19, 21:15,
151:1, 152:20,
153:21, 157:25,
162:3, 162:8,
162:15, 162:16,
162:18, 165:5,
190:17, 217:21,
257:14, 268:6,
268:11, 273:19,
274:3, 280:25,
281:3, 281:7

**stopped**
124:8, 155:20,
269:17, 273:7,
276:10
**store**
36:25, 37:1,
37:2, 37:5,
37:9, 37:15,
37:19, 73:9,
74:5, 74:12,
80:7, 80:8,
80:9, 81:15,
149:7
**stores**
144:2
**straight**
155:16, 237:17
**straightforward**
145:19, 247:5
**strategies**
31:14
**strategy**
51:21, 102:7
**stream**
249:18, 278:10
**street**
3:7
**strike**
105:19, 262:18
**stripe**
179:24, 219:5,
219:6
**strong-arm**
257:9
**structure**
49:6, 49:23,
50:9, 50:10,
50:14, 51:24,
53:6, 118:4,
120:1, 126:6,
247:12, 249:4
**structured**
50:16
**stuck**
164:17, 195:6
**subject**
55:9
**submit**
12:3

WYLIE 612

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

345

| | | | |
|---|---|---|---|
| submitted<br>12:2, 12:20,<br>43:1, 129:6,<br>208:21, 227:8<br>subordinated<br>279:3, 281:20,<br>282:14, 282:16,<br>283:2<br>subscriptions<br>148:7, 148:9,<br>160:15<br>substance<br>54:13, 184:11,<br>184:16, 184:24<br>substantial<br>121:24<br>successful<br>116:23<br>sued<br>11:3<br>suffer<br>174:21<br>suffered<br>194:16, 194:19<br>sufficient<br>127:17, 128:2,<br>289:18<br>suggested<br>54:22<br>suggestion<br>117:19<br>suite<br>2:6, 3:8<br>summer<br>79:3, 79:12,<br>171:19, 171:22,<br>220:11<br>support<br>29:9, 31:16,<br>56:17, 146:25,<br>147:9, 147:11,<br>147:12, 147:14,<br>147:22, 147:25<br>supposed<br>167:2, 239:4,<br>281:25<br>sure<br>7:15, 7:18, | 7:22, 8:23,<br>38:25, 126:16,<br>126:21, 132:17,<br>143:25, 150:8,<br>179:20, 193:8,<br>208:13, 222:22,<br>240:23, 245:6,<br>246:12, 246:15,<br>267:8<br>surprise<br>261:22<br>surrounding<br>126:13<br>suzanne<br>1:20, 3:14,<br>28:9, 28:12,<br>28:13, 51:2,<br>52:7, 52:16,<br>52:18, 60:5,<br>75:14, 75:25,<br>77:12, 91:21,<br>91:22, 92:14,<br>92:15, 92:21,<br>103:9, 103:10,<br>103:12, 131:22,<br>167:14, 183:9,<br>221:25, 243:12,<br>243:25<br>swath<br>272:16<br>sweat<br>59:17, 59:22,<br>102:2, 103:2,<br>103:7, 103:10,<br>103:17<br>sworn<br>5:6, 5:11,<br>7:24, 10:5,<br>10:11, 63:16,<br>294:5<br>system<br>129:14, 131:15,<br>132:7, 132:11,<br>132:13, 132:19,<br>133:7, 133:8,<br>133:9, 144:9<br>systems<br>132:24, 133:1, | 133:6, 133:10,<br>133:12, 133:17,<br>133:20, 133:25,<br>134:10, 134:11,<br>148:16, 180:23<br>**T**<br>t-a-b-r-o-n<br>115:5<br>table<br>223:21<br>tabron<br>115:3<br>tag<br>18:24, 19:1<br>take<br>6:11, 9:20,<br>9:22, 9:23,<br>15:8, 27:6,<br>46:7, 60:18,<br>64:11, 120:7,<br>120:16, 121:4,<br>122:10, 150:22,<br>158:4, 158:6,<br>158:11, 188:12,<br>196:24, 208:4,<br>214:4, 216:10,<br>240:22, 246:13,<br>247:7, 257:24,<br>258:6, 263:8,<br>263:12, 265:15,<br>287:17, 290:9,<br>292:25<br>takedown<br>7:4, 43:10,<br>272:17<br>taken<br>21:22, 60:22,<br>64:13, 123:2,<br>123:5, 158:24,<br>180:12, 197:2,<br>201:20, 229:25,<br>231:9, 240:25,<br>265:19, 285:25,<br>286:13, 287:21,<br>289:21, 294:4<br>takes<br>146:3 | taking<br>8:8, 9:17,<br>17:19, 20:21,<br>20:25, 229:10,<br>258:21, 290:6<br>talk<br>8:19, 11:21,<br>19:16, 21:16,<br>61:19, 61:21,<br>99:16, 109:9,<br>124:2, 145:24,<br>150:24, 158:11,<br>161:4, 196:4,<br>196:5, 206:7,<br>231:18, 259:21,<br>259:22<br>talked<br>13:5, 40:3,<br>61:11, 63:23,<br>64:1, 67:3,<br>68:6, 175:1,<br>236:8<br>talking<br>19:2, 20:19,<br>21:13, 21:14,<br>55:15, 61:7,<br>93:25, 104:7,<br>113:21, 176:21,<br>181:2, 190:17,<br>190:19, 272:22,<br>273:24, 290:6<br>tax<br>209:14, 212:9,<br>212:10, 212:16<br>team<br>11:18, 13:7,<br>13:8, 18:24,<br>19:1, 171:20,<br>209:5, 209:6,<br>254:21<br>tech<br>44:4, 44:24,<br>45:3, 51:6,<br>61:12, 78:5,<br>78:7, 78:13,<br>78:17, 78:25,<br>80:15, 80:19,<br>81:3, 81:4, |

WYLIE 613

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

81:20, 82:6,
82:9, 82:17,
146:1, 146:25,
147:12, 152:17,
152:21, 153:22,
153:24, 153:25,
154:4, 154:6,
154:8, 155:5,
155:6, 155:20,
156:2, 156:13,
157:25, 189:12,
189:15, 268:6,
271:25, 272:4,
272:14, 272:18,
272:20, 272:22,
273:7, 273:9
**technical**
40:3, 56:17,
57:22, 63:8,
129:5, 129:8,
129:25, 130:13,
146:12, 148:5,
272:6, 273:20,
274:3, 274:4,
275:7, 275:14,
275:24
**technically**
85:12
**technologies**
32:10, 35:25,
51:11, 56:15,
74:9, 155:2,
156:14, 188:12,
191:3
**technology**
16:23, 61:12,
161:11, 173:24,
192:9
**telephone**
27:24, 115:16
**tell**
7:24, 9:1,
17:21, 17:24,
29:2, 32:12,
59:11, 63:6,
76:12, 78:4,
78:13, 78:15,
86:14, 90:15,

107:2, 118:23,
133:5, 151:1,
206:8, 214:5,
228:7, 228:19,
245:25, 253:6
**telling**
43:14, 62:20,
150:23, 155:16,
155:20, 181:7,
196:14, 255:10
**tells**
9:7
**temp**
15:22
**template**
37:6
**temporarily**
155:10, 235:17
**temporary**
62:10, 155:14,
160:7, 180:4,
182:20
**term**
18:24, 101:5,
176:22, 180:8,
180:10, 279:8
**terms**
91:4, 91:11,
92:6, 92:13,
93:14, 99:12,
99:13, 100:16,
100:18, 101:2,
105:15, 105:16,
106:7, 106:8,
107:17, 145:25
**testified**
5:13, 143:10,
146:14, 273:6,
292:12
**testify**
5:11, 39:13,
39:16, 39:18,
184:24, 290:7,
292:17
**testimony**
10:5, 10:11,
11:13, 11:14,
82:16, 98:12,

105:5, 115:11,
130:10, 199:3,
268:14, 287:5,
287:11
**texas**
1:2, 1:28, 2:7,
2:12, 3:9, 3:20,
6:3, 26:8, 29:8,
30:3, 123:7,
123:15, 264:8,
264:17, 264:19,
294:16
**text**
256:18, 257:1,
257:2, 257:4
**th**
5:4, 53:14,
58:12, 113:24,
117:25, 124:20,
158:2, 180:25,
186:6, 186:23,
187:6, 192:20,
193:1, 193:7,
193:9, 193:13,
194:10, 201:8,
201:10, 242:9,
246:4, 252:23,
256:20, 263:3,
266:11, 269:13,
271:17, 272:24,
277:2, 283:21,
284:8
**thank**
5:8, 8:18,
21:25, 65:12,
81:19, 151:3,
216:2, 216:8,
245:22, 280:4,
280:18, 293:13
**thematic**
131:21
**theme**
37:6, 163:12
**thereafter**
294:6
**therefore**
201:17, 204:17
**thing**
104:10, 145:10,

196:18, 235:24,
270:16
**things**
12:4, 12:5,
58:2, 66:10,
66:15, 86:1,
122:16, 144:10,
153:18, 169:4,
169:5, 176:23,
179:25, 195:7,
196:9, 196:13,
212:14, 219:4,
236:20, 255:16,
260:3, 260:10,
292:16
**think**
17:10, 19:9,
39:12, 54:20,
68:1, 79:9,
88:19, 105:7,
145:25, 146:2,
146:11, 149:13,
186:7, 231:12,
240:11, 250:1,
252:18, 291:8
**thinking**
73:9, 181:19
**third**
124:10, 195:10,
207:15, 207:21,
208:5
**third-party**
84:15, 207:3,
207:8
**thirst's**
133:12, 145:5,
145:22, 157:13,
157:17, 175:3,
175:9, 175:11,
175:17, 175:22,
197:11, 198:17,
200:4, 208:22,
229:25, 240:5,
267:23
**thoroughly**
64:6
**thought**
39:7, 59:16,

WYLIE 614

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

144:17, 204:4,
225:14, 229:18,
248:10, 271:3
**thousand**
239:13
**thread**
249:20
**threat**
118:20, 119:24,
120:24, 122:11
**threaten**
118:16
**threatened**
119:8, 119:14,
120:7, 120:16,
226:3
**three**
25:18, 86:2,
105:23, 108:17,
108:18, 108:21,
183:8, 195:14,
250:16, 256:21,
256:24
**three-year**
85:22, 85:23,
86:3, 87:23,
88:3
**through**
7:10, 12:21,
15:22, 28:18,
30:2, 31:25,
35:11, 42:7,
46:15, 62:13,
62:17, 83:15,
102:19, 105:24,
105:25, 106:19,
106:24, 107:15,
110:19, 112:14,
112:22, 116:5,
116:12, 146:9,
154:10, 167:9,
188:25, 192:20,
194:22, 195:6,
196:21, 216:10,
229:19, 231:19,
234:25, 242:1,
252:6, 256:23,
264:13, 264:14,

288:25
**throughout**
261:15
**thursday**
1:29
**ti**
155:12, 155:15
**tier**
157:7, 157:8,
159:12, 160:14,
160:15, 195:18,
195:20, 195:21
**time**
5:4, 5:5, 9:4,
10:3, 16:21,
17:20, 18:1,
18:4, 18:6,
31:22, 34:5,
42:11, 42:15,
48:12, 48:19,
50:3, 50:5,
50:17, 52:7,
52:9, 52:10,
53:2, 56:22,
59:23, 60:3,
60:10, 69:8,
73:9, 73:24,
75:8, 75:17,
76:1, 76:9,
79:1, 79:14,
91:18, 93:2,
93:9, 101:21,
104:1, 114:3,
114:19, 116:3,
121:13, 125:12,
125:16, 126:21,
129:4, 129:7,
129:10, 129:13,
129:16, 129:19,
130:12, 130:14,
130:16, 130:20,
130:25, 131:3,
131:17, 132:6,
133:11, 133:17,
133:25, 134:3,
134:7, 134:9,
149:13, 149:18,
149:23, 150:2,

150:12, 151:6,
151:22, 151:23,
151:24, 154:3,
157:11, 157:24,
159:4, 169:9,
169:14, 169:15,
174:23, 186:4,
187:7, 194:7,
204:11, 217:15,
242:11, 242:12,
247:17, 248:11,
257:20, 262:22
**timeframe**
51:9
**timeline**
66:13, 67:5,
67:20, 155:15,
169:4, 169:12,
264:22
**times**
29:1, 102:17,
122:15, 127:16,
128:1, 183:15,
186:3, 232:4
**timesheet**
129:6, 149:17
**timesheets**
43:1
**timing**
39:6, 66:15
**title**
24:4, 24:5,
25:4, 25:6,
25:8, 25:10,
25:13, 25:14,
33:13, 45:7,
51:25, 71:23,
223:11
**titled**
259:2
**titles**
24:7
**toad**
195:3, 195:11,
195:13, 195:14
**today**
9:11, 9:15,
11:13, 35:3,

115:11, 130:10,
130:15, 130:24,
131:3, 132:8,
133:13, 134:6,
170:7, 170:12,
170:18, 170:23,
171:5, 172:14,
173:6, 175:18,
189:10, 199:3,
199:5, 208:16,
244:17, 249:11,
268:14, 287:6,
287:12, 292:13
**today's**
5:3, 11:17
**together**
29:6, 44:5,
44:13, 60:9,
60:15, 61:20,
61:22, 67:4,
68:7, 74:16,
74:18, 116:18,
125:13, 129:1,
156:23, 158:17
**told**
7:9, 14:5,
14:12, 14:18,
14:25, 19:24,
54:18, 63:20,
64:1, 78:16,
118:25, 152:20,
157:9, 157:25,
162:3, 203:11,
225:14, 238:9,
255:15, 255:24,
259:17, 260:15,
271:5, 273:3
**tomlinson**
283:23, 284:11
**tons**
19:16
**took**
122:21, 126:15,
148:17, 148:19,
158:19, 202:1,
202:6, 234:10,
288:1
**tools**
132:17

WYLIE 615

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

348

| | | | |
|---|---|---|---|
| **top** 65:24, 66:1, 105:17, 216:22, 220:12, 225:5, 244:6, 246:6, 246:22, 253:3, 266:10, 281:13 **top-notch** 171:20 **topic** 55:5 **topics** 11:19 **toptal** 42:25, 45:1 **total** 111:20, 172:2, 176:1, 177:4, 177:7, 177:9, 217:8, 218:4, 220:12, 220:15, 223:10, 223:13, 223:20 **totality** 164:9, 173:23 **tow** 195:12 **toward** 89:15, 98:6 **towards** 225:22, 254:14, 283:25, 289:21 **track** 35:6, 184:3, 217:18 **trade** 86:12, 86:13, 86:14, 86:20, 134:18 **trademark** 46:15, 46:17, 83:7, 83:9, 83:12, 83:20 **traffic** 10:15 **transcribed** 1:39 **transcriber** 295:1 | **transcript** 293:1, 295:4, 295:5 **transcriptionist** 294:7 **transcripts** 293:10 **transfer** 232:7, 232:10, 238:23 **transferred** 201:3, 201:24, 202:10 **transferring** 201:11, 203:4 **travel** 219:8, 219:13 **traveling** 264:8, 264:11, 264:13, 264:17, 264:19 **trial** 287:5, 287:12, 288:8, 288:25, 292:17 **tried** 116:22, 181:25 **trip** 68:7 **triple** 229:13, 229:14, 229:15 **tro** 273:1 **trucks** 231:17 **true** 64:20, 191:21, 225:18, 252:11, 252:13, 260:24, 261:9, 273:11, 273:13, 294:8, 295:5 **truly** 247:20 **trusted** 59:16 **truth** 5:12, 7:25 | **try** 8:21, 9:22, 124:11, 256:22 **trying** 124:12, 157:2, 196:12, 250:20, 251:15, 254:9, 257:9, 271:23, 272:23 **tuesday** 66:12 **turmoil** 194:22 **turn** 119:8, 119:14, 225:21, 226:25, 252:25, 262:24 **twice** 131:10 **twin** 195:2, 195:9 **two** 15:9, 18:23, 19:4, 26:3, 45:17, 45:18, 59:13, 59:17, 64:15, 64:17, 64:18, 65:1, 92:2, 106:20, 106:25, 127:13, 167:24, 197:14, 197:25, 198:4, 224:6, 243:18, 244:12, 244:23, 250:16, 251:5, 255:16, 256:23, 259:13, 261:12, 264:15, 269:17, 270:23, 276:10, 279:13, 279:20, 283:15, 283:16, 286:9 **type** 57:25, 104:9, 112:21 **types** 219:3 **typewriting** 294:7 | **typo** 281:23 **U** **ubiquitous** 144:3 **uh-huh** 8:14, 28:3, 102:13, 117:15, 216:12, 219:10, 236:4, 238:13, 241:10, 241:19, 241:22, 243:13, 253:2, 254:2, 269:10 **unable** 190:9, 190:13 **unallocated** 222:6, 222:17 **unaware** 64:23, 65:5, 129:22 **uncomfortable** 177:16 **unconscionable** 256:21, 259:7 **under** 7:22, 19:25, 31:23, 40:8, 61:3, 107:17, 134:21, 197:8, 219:8, 222:13, 234:22, 236:13, 241:6, 266:2, 273:1, 288:2 **underlying** 161:11 **underneath** 40:11 **understand** 6:10, 6:12, 6:15, 6:23, 7:1, 8:24, 9:1, 11:3, 22:20, 37:25, 40:24, 41:8, 49:2, 61:5, 115:11, 115:21, 117:8, 134:15, |

WYLIE 616

144:11, 152:3,
156:12, 177:2,
185:21, 189:10,
197:8, 230:8,
230:13, 233:9,
266:21, 267:16,
267:17, 276:4,
286:17, 286:20,
286:25, 287:9,
292:4, 292:6
**understandably**
118:12
**understanding**
10:21, 10:25,
39:24, 39:25,
40:1, 77:16,
77:17, 115:14,
145:23, 157:12,
180:11, 194:9,
272:13, 273:24,
274:15, 274:17
**understands**
19:21, 32:20
**understood**
22:20, 82:15,
114:25, 143:17,
267:20
**underwritten**
247:5
**unexpected**
269:18, 276:11
**unicorn**
195:2
**unidentified**
60:17
**unified**
156:13, 156:19,
156:20, 272:18,
272:19, 273:24,
274:2
**unilaterally**
153:17, 158:8,
158:19
**united**
1:1
**units**
25:16
**unless**
9:7

**unnecessarily**
21:15
**unnecessary**
263:9, 263:10
**until**
51:17, 55:9,
58:6, 79:16,
100:13, 120:8,
120:17, 121:6,
121:14, 130:15,
130:23, 131:3,
132:7, 133:13,
134:6, 134:18,
154:10, 157:11,
170:18, 170:23,
171:5, 172:13,
199:5, 200:11,
235:7, 261:22
**update**
154:19, 204:14,
204:18
**updates**
16:9
**updating**
204:23
**uphold**
164:3
**upset**
118:6, 118:8,
118:11, 118:12,
125:20, 126:3,
126:11, 126:13,
127:12, 257:16
**usable**
43:21
**usage**
219:7
**use**
32:10, 37:6,
43:11, 51:12,
63:11, 63:12,
77:22, 78:5,
78:13, 80:17,
81:13, 82:4,
89:14, 98:5,
124:14, 126:6,
143:23, 144:7,
144:13, 144:23,

145:5, 145:22,
152:5, 152:12,
152:15, 153:18,
154:22, 154:25,
155:6, 156:2,
156:16, 156:24,
161:15, 163:2,
165:18, 166:12,
174:22, 180:5,
204:22, 230:2,
235:8, 245:12,
272:18, 273:2,
273:9, 276:7,
277:1, 277:6,
277:9
**useful**
204:17
**user**
82:5
**uses**
132:13, 132:16,
143:11, 143:18,
152:13
**using**
42:24, 43:19,
44:13, 152:17,
152:20, 153:21,
153:25, 154:4,
154:5, 154:7,
154:11, 154:16,
155:20, 157:25,
161:23, 162:3,
162:8, 162:15,
162:16, 162:18,
162:23, 220:6,
268:6, 268:8,
268:11, 268:23,
273:7, 273:15,
273:16, 273:19,
274:4, 279:5

---
**V**
---

**vague**
55:21, 214:17
**valid**
112:18
**valley**
195:2, 195:9

**valuable**
59:19
**valuation**
128:7, 205:6,
205:8, 205:9,
205:24
**valuations**
205:2, 205:13,
205:16, 205:19,
205:21, 205:23,
206:9, 206:24,
207:3, 207:8,
207:11, 207:14
**value**
170:21, 170:25,
171:1, 171:3,
171:10, 171:11,
171:24, 172:2,
189:15, 205:12,
208:1, 254:23
**valued**
59:5, 59:6,
128:4, 128:5,
128:11, 252:8
**valueless**
192:5
**variable**
106:10, 107:19
**variety**
154:9
**various**
16:10, 31:7,
31:25, 32:4,
74:16, 74:21,
132:5, 146:7,
150:9, 188:15,
272:14, 273:9
**vendor**
57:25, 213:5
**vendors**
57:23, 84:15
**venture**
63:6
**verbal**
8:16, 99:3,
99:9, 99:16,
99:17, 100:11,
100:20, 126:23

WYLIE 617

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

350

**verbally**
78:4, 78:12,
115:18, 127:9
**verbatim**
153:12
**versa**
30:15, 232:7
**version**
79:25, 80:18,
80:23
**via**
153:3, 268:20
**viable**
26:16, 26:20
**vice**
30:15, 38:13,
232:7
**video**
144:20
**videographer**
3:33, 5:3,
21:21, 60:20,
60:24, 158:22,
159:1, 196:25,
197:4, 240:24,
241:2, 265:17,
265:21, 287:19,
287:23, 292:23
**videotaped**
1:27, 2:1
**view**
75:23, 75:25,
76:5, 159:18,
159:22, 159:25,
190:5, 190:9,
190:22
**viewer**
81:25
**viewing**
75:14, 159:14,
160:4, 160:10,
204:5
**virtually**
253:9
**visibility**
157:22
**voce**
158:3, 177:20,

216:3, 234:15,
245:17, 251:9,
252:3, 265:14,
266:5, 277:18,
278:5, 283:17,
287:16
**vodka**
195:2
**voice**
124:10
**vote**
118:4, 255:17
**votes**
184:7
**vulnerable**
117:9

---
### W
---

**wait**
8:20, 11:20,
14:14, 27:3,
27:9, 71:13,
71:16, 81:5,
119:18, 162:25,
172:16, 184:13,
200:6, 267:3,
278:4
**waiting**
100:10
**walk**
42:7, 256:24,
259:21
**wanda**
1:39, 295:3,
295:13
**want**
7:21, 7:22,
8:23, 19:17,
39:18, 41:17,
59:8, 66:10,
116:23, 118:6,
134:14, 134:20,
150:21, 150:22,
150:24, 155:15,
158:20, 177:19,
187:11, 220:4,
222:22, 243:21,
246:13, 249:2,

259:21, 263:9,
265:24, 270:16,
276:15, 280:2,
289:1, 293:9
**wanted**
7:14, 79:8,
88:8, 124:14,
154:11, 166:23,
188:14, 231:15,
235:11, 238:24,
252:1, 252:5,
254:6, 254:10,
260:3, 260:9,
264:25
**wanting**
55:10
**wants**
151:2, 231:1,
231:5
**way**
35:3, 74:5,
122:17, 126:7,
129:9, 129:12,
129:15, 129:18,
144:7, 155:2,
156:21, 156:23,
156:25, 157:2,
169:4, 204:13,
210:20, 217:16,
228:11, 232:10,
235:20, 247:19,
247:22, 248:12,
249:4, 251:20,
252:24, 254:8,
257:18, 257:19,
258:25, 276:8,
289:10
**ways**
122:18, 124:7,
247:21, 250:9,
252:15, 255:15,
256:21, 260:19
**we'll**
9:22, 13:4,
66:12, 66:14,
66:17, 67:4,
67:19, 87:16,
122:10, 134:13,

148:24, 208:4,
280:2
**we're**
5:5, 8:2,
18:25, 19:2,
19:5, 21:19,
21:20, 55:14,
60:20, 60:24,
61:2, 100:2,
101:7, 158:6,
158:17, 158:22,
177:13, 196:25,
197:5, 197:7,
210:20, 222:22,
224:19, 229:9,
237:10, 240:24,
241:3, 241:5,
262:1, 265:17,
265:21, 266:1,
282:10, 284:2,
287:19, 292:23,
293:13
**we've**
20:6, 41:22,
42:2, 214:2,
240:21, 275:17,
280:16
**web**
63:8
**website**
16:1, 16:9,
31:15, 32:3,
32:14, 37:4,
51:14, 54:19,
55:4, 56:14,
58:21, 59:6,
80:1, 80:13,
80:23, 86:17,
86:21, 87:6,
87:20, 88:7,
88:13, 89:2,
89:8, 89:20,
89:21, 129:3,
129:11, 130:21,
131:4, 131:7,
131:9, 131:10,
131:11, 131:17,
131:24, 149:8,

WYLIE 618

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

162:9, 162:16,
162:19, 162:20,
163:2, 163:5,
163:8, 163:9,
202:23, 203:1,
267:24, 268:1,
268:3
**wednesday**
246:24, 259:3
**week**
150:5, 247:1
**weekly**
34:12
**weeks**
15:9, 269:18,
276:10
**weight**
262:4
**went**
39:4, 40:2,
45:11, 111:18,
113:1, 114:18,
116:11, 125:15,
128:7
**weren't**
181:9, 196:9,
200:8, 224:21,
267:2, 272:24
**western**
1:2, 17:13
**whatever**
252:1
**whereby**
107:5
**whereupon**
5:9
**whether**
60:11, 115:19,
183:20
**whiskey**
13:23
**whole**
5:12, 245:7,
247:22
**wholly**
119:15
**wife**
28:14

**willing**
58:21, 124:8,
125:19, 254:16
**wind**
26:4
**winding**
26:10
**wine**
30:2, 30:6,
33:25
**winery**
34:1
**withdraws**
247:2
**within**
49:16, 157:2,
173:23, 195:4,
231:2
**without**
112:18, 118:4,
119:4, 123:24,
144:5, 147:8,
164:10, 173:5,
188:6, 191:23,
192:4, 249:19,
255:2, 255:18,
257:21, 258:1,
258:11, 258:20,
259:11, 259:18,
260:20, 290:8
**witness(es**
294:4
**witnesses**
4:10
**women's**
15:10
**word**
194:21
**wording**
37:7, 180:11
**words**
46:4, 246:9,
254:1, 284:6
**work**
15:24, 15:25,
16:7, 16:12,
16:17, 16:20,
16:21, 28:18,

28:23, 29:11,
29:13, 31:12,
35:12, 36:11,
36:14, 37:21,
37:23, 39:23,
46:17, 46:19,
48:15, 51:1,
54:22, 55:3,
55:23, 57:15,
59:5, 59:8,
59:17, 61:15,
61:23, 68:22,
77:19, 80:19,
81:3, 84:16,
85:2, 88:12,
115:1, 115:6,
121:19, 122:3,
127:21, 133:19,
145:16, 146:6,
146:11, 147:15,
149:25, 150:10,
152:5, 172:6,
173:8, 235:22,
259:20, 260:3,
260:10, 261:1,
264:24, 272:6,
274:4, 274:7,
275:7, 275:14,
279:7
**work-for-hire**
73:1, 76:8,
76:12, 76:14,
76:16, 76:23,
77:8, 77:16,
86:20, 93:20,
97:25
**worked**
28:24, 29:3,
29:6, 29:10,
30:9, 34:13,
34:15, 49:17,
50:9, 50:14,
50:22, 52:3,
52:5, 52:6,
57:10, 60:3,
76:2, 115:10,
116:18, 118:9,
122:3, 124:14,

146:22, 149:19,
149:21, 153:18,
157:8, 275:25
**working**
28:24, 30:9,
30:10, 34:12,
36:1, 39:22,
46:14, 48:11,
48:13, 51:13,
59:3, 59:16,
69:16, 78:23,
79:3, 80:15,
81:6, 81:11,
91:20, 102:4,
120:8, 120:17,
121:5, 123:2,
146:19, 148:2,
149:21, 150:8,
190:2, 190:4,
191:4, 191:11,
191:20, 192:8,
254:19, 257:20,
269:17, 270:1,
270:24, 276:10
**workings**
275:4
**works**
77:22, 156:23,
250:22, 273:18,
274:19, 274:25,
275:1
**worksheet**
112:2, 112:7,
220:6
**world**
144:3
**worth**
68:24, 171:8,
172:9, 243:21
**worthless**
191:24, 192:10
**wouldn't**
9:13, 120:12,
196:16, 256:16,
261:24, 264:8
**wound**
26:7
**wrapped**
26:13

WYLIE 619

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

352

**write**
256:18, 257:1,
257:2
**writer**
13:22, 31:24,
269:18, 276:11
**writers**
31:23
**writing**
13:23, 67:18,
115:15, 126:17,
160:21, 226:2,
249:8, 253:9
**written**
53:14, 70:22,
71:2, 71:5,
71:10, 71:18,
71:21, 71:22,
71:24, 72:1,
72:4, 72:10,
72:13, 72:20,
76:18, 90:25,
91:3, 91:10,
92:24, 93:3,
93:19, 98:18,
98:25, 100:18,
109:13, 127:7,
151:5, 210:20,
222:20, 234:5,
234:9, 249:7,
262:15, 262:17,
285:7, 285:9
**wrong**
65:2, 235:21,
237:5, 254:13,
270:21
**wrote**
126:25, 131:12,
132:4, 214:19,
235:21, 249:11,
255:8
**wylie**
1:13, 3:13,
3:34, 6:9, 13:2,
13:14, 14:2,
28:5, 39:9,
48:23, 50:24,
60:6, 65:21,

66:1, 66:7,
66:8, 67:1,
76:19, 85:18,
86:17, 89:12,
98:4, 99:10,
109:5, 109:12,
109:23, 113:25,
114:4, 131:22,
174:19, 208:20,
219:12, 240:3,
241:23, 246:25,
249:12, 250:4,
251:13, 278:17,
282:3, 282:9,
283:24, 285:19,
286:9
**wylie's**
253:19, 284:1,
285:2, 285:17,
285:22

**Y**

**yeah**
10:4, 19:12,
20:5, 87:3,
212:18, 220:10,
230:5, 232:22,
237:20, 238:25,
244:16, 246:22,
248:3, 249:25,
251:6, 253:17,
260:12, 267:6,
290:4
**year**
162:22, 163:1,
163:2, 168:15,
170:17, 201:9,
216:21
**years**
6:5, 16:19,
28:16, 29:1,
29:25, 30:14,
31:19, 33:22,
59:4, 59:13,
64:15, 64:17,
64:18, 65:1,
86:2, 212:10,
212:12, 217:22

**yep**
11:23, 229:15,
238:25, 239:6
**yes-or-no**
8:14, 144:25,
193:22
**yesterday**
7:9, 8:9, 8:11,
8:13, 17:12,
46:2, 146:14,
181:1
**yourself**
49:19, 101:25,
102:12, 119:15,
167:14, 209:3

**Z**

**zero**
227:21, 237:6,
238:20, 244:25
**zoom**
198:3

**$**

**$1,800**
88:19, 89:19
**$10,287**
218:4
**$100,000**
105:14, 105:20,
279:4
**$150,000**
222:1, 222:3
**$1500**
69:1, 105:7
**$2,000**
219:11
**$2,500**
86:23, 89:20,
90:10, 90:23
**$20,000**
176:13
**$250,000**
107:7
**$257,000**
227:16
**$300,000**
111:21, 288:7

**$350,000**
106:6, 106:14,
108:11
**$38,707**
236:17
**$4**
205:12
**$400,000**
107:14, 112:6,
244:17
**$41,593**
43:13
**$41,593.39**
40:16
**$42,000**
161:21, 175:1
**$43,000**
98:6, 98:24
**$46,000**
177:12
**$5,100**
98:4, 98:8,
104:7
**$50**
281:23
**$50,000**
98:19, 98:20,
279:2
**$55,000**
33:19
**$58**
217:8
**$7,500**
218:13
**$79,491.14**
236:22
**$80,000**
100:10
**$85**
16:15

**.**

**.2100**
2:8

**0**

**0001**
216:16

WYLIE 620

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

353

**0004**
220:3, 223:17
**0005**
225:4
**000567**
254:15
**000568**
259:2
**000574**
262:25
**0006**
225:22
**0010**
227:1, 227:3
**0029**
234:20
**0035**
241:12
**0039**
244:6
**00467**
1:10
**0059**
3:21
**06**
1:30, 5:2, 5:4
**08**
158:23, 158:24
**09**
265:18, 265:19

---
**1**
---
**1**
158:23, 158:24,
158:25, 159:2,
197:1, 197:2
**1,000**
50:4, 52:15,
52:16, 92:12,
92:19
**1,800**
88:24
**1,825**
88:20
**10**
4:27, 4:29,
60:21, 60:22,
60:23, 60:25,

102:17, 118:9,
127:16, 128:1,
201:8, 223:15,
223:23, 269:3,
269:6, 275:20,
279:15, 295:14
**100**
105:18, 220:15,
236:8, 239:13,
244:24, 281:20
**11**
4:14, 4:28,
62:22, 186:23,
192:20, 193:1,
193:7, 193:9,
193:13, 194:10,
256:20, 266:11,
277:19, 277:22
**1100**
69:1
**111**
2:5
**12**
4:29, 29:25,
31:18, 53:14,
158:25, 159:2,
180:25, 186:6,
187:6, 215:2,
215:5, 283:10,
283:13
**134**
4:5
**14**
4:20, 220:18,
223:22, 223:24
**143**
4:6
**15**
4:13, 60:21,
60:22
**150,000**
222:1, 222:5,
222:8, 222:13
**16**
4:24, 240:24,
240:25, 242:1,
259:3, 265:20,
265:22

**17**
58:12, 113:24,
172:19, 252:23
**1700**
218:21
**177**
4:7
**179**
4:8
**18**
246:4, 263:3
**1800**
89:8
**1801**
3:7
**19**
4:4, 4:28,
197:3, 197:5,
201:10, 242:9,
243:9
**19.29**
221:6
**1969**
6:1
**1998**
28:18
**1:-cv--rp**
1:10
**1st**
36:6, 161:13,
161:18

---
**2**
---
**2**
197:3, 197:5,
213:1
**2,500**
89:3
**2,700,000**
45:9, 52:15,
69:25, 70:12,
121:16, 128:6,
128:19, 170:12,
173:18
**2.7**
170:13, 170:19,
171:4, 171:11,
173:21, 241:21

**20**
4:25, 224:10,
224:20, 248:2,
248:6, 248:13,
248:15, 248:19,
249:6, 271:17,
272:24, 281:2
**20,000**
177:8, 177:13,
240:15
**2010**
30:3
**2011**
239:16
**2012**
31:22
**2015**
38:10
**2016**
15:21, 15:23,
16:4, 59:5,
292:14
**2020**
24:15, 46:23,
54:4, 54:5,
54:6, 54:11,
56:24, 58:25,
86:16, 102:5,
272:24
**2021**
12:24, 12:25,
16:22, 34:4,
47:6, 47:7,
49:11, 51:17,
52:24, 53:8,
53:14, 53:23,
54:4, 54:10,
55:9, 56:20,
58:24, 63:5,
65:23, 79:12,
79:17, 80:4,
85:9, 88:6,
90:16, 90:17,
90:21, 104:5,
112:16, 112:17,
113:1, 116:18,
128:16, 175:4,
175:23, 175:25,

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

354

176:4, 176:7,
198:14, 200:2,
200:11, 205:5,
212:13, 216:21,
217:8, 217:14,
218:18, 241:18,
242:2, 245:15,
254:20, 284:9
**2022**
34:16, 35:21,
36:6, 36:16,
37:13, 37:22,
37:24, 58:13,
84:12, 88:20,
106:4, 106:16,
108:4, 113:14,
113:18, 113:24,
114:14, 115:13,
124:20, 152:24,
154:14, 154:15,
155:18, 161:13,
161:18, 162:24,
163:6, 167:8,
170:16, 171:19,
171:22, 172:19,
175:9, 176:10,
176:13, 179:6,
192:17, 192:23,
193:5, 193:10,
193:13, 194:10,
198:11, 198:24,
198:25, 201:10,
204:3, 212:13,
220:8, 220:9,
220:11, 222:1,
223:18, 225:13,
232:22, 242:9,
243:9, 246:5,
252:23, 259:3,
266:11, 268:4,
269:13, 271:17,
277:2
**2023**
25:23, 29:8,
30:20, 34:16,
99:15, 99:25,
167:9, 168:16,
175:11, 176:16,

177:7, 177:11,
197:17, 198:5
**2024**
1:29, 5:4,
100:2, 168:16,
175:17, 177:10,
177:12, 197:18,
198:6, 263:3,
295:14
**2062**
3:10
**208**
4:21
**21**
4:7, 6:5, 78:21
**2101**
6:3
**215**
4:22
**22**
1:10, 36:13,
109:14, 109:17,
110:6, 111:14,
271:17
**227**
4:23
**23**
4:22
**23.57**
221:4
**234**
4:24
**24**
4:5, 283:21,
284:8
**245**
4:25
**25**
4:23, 21:21,
21:22, 90:9,
269:13
**250**
111:24, 279:3,
281:20, 282:14,
282:17, 283:5
**250,000**
107:11, 225:15,
284:3

**2500**
89:8
**257,800**
225:17, 225:19
**26**
21:23, 28:16,
29:1, 60:23,
60:25, 65:23,
158:2
**266**
4:26
**269**
4:27
**27**
4:18
**277**
4:28
**28**
1:29, 5:4,
277:2
**283**
4:29
**29**
117:25, 124:20
**292**
4:14
**295**
1:37, 3:8
**2nd**
6:1, 53:8,
159:9

**3**

**3**
4:8, 4:19,
4:27, 240:24,
240:25, 241:1,
241:3
**3,000**
211:3
**3,300,000**
52:14, 128:18
**30**
130:22, 131:18,
131:19, 284:2
**32**
241:1, 241:3
**33**
25:19

**33,000**
219:21, 219:24
**34**
40:8
**350**
109:10
**3500**
105:1
**365**
3:8
**38,000**
238:5
**38,707.89**
237:2, 238:7,
239:23

**4**

**4**
4:3, 4:26,
63:4, 265:18,
265:19, 265:20,
265:22, 287:20,
287:21, 287:22,
287:24, 292:24,
293:15
**4,000**
171:18, 171:23
**4.1**
144:2
**40**
174:25, 287:20,
287:21
**400**
107:22, 116:5
**42**
220:22
**42,000**
189:16, 189:20
**42.86**
220:23
**43**
98:11
**43,000**
240:14
**4400**
3:19
**45**
150:5, 287:22,

WYLIE 622

Transcript of Matthew John McGinnis
Conducted on March 28, 2024

355

287:24
**48**
257:13
**4th**
261:21

**5**

**5**
4:13, 214:12
**5,100**
101:17
**5,150**
237:13, 237:21,
240:19
**50**
55:10, 55:12,
56:21, 101:18,
150:5, 239:25,
240:14, 250:16,
281:19, 282:1,
282:2, 282:5,
282:13, 282:22,
283:6, 284:24,
285:22, 292:24
**50,000**
240:4, 243:9,
243:17, 243:23,
284:1, 285:16
**500**
2:6
**51**
3:7, 293:15
**512**
3:10, 3:21
**512.855**
2:8
**526597**
1:35
**53**
197:1, 197:2
**561**
250:24
**567**
252:25
**571**
251:19, 251:24
**572**
251:23

**574**
262:24
**585**
250:24

**6**

**60**
131:7
**609**
3:21
**62**
4:19
**65**
4:20
**6th**
200:11

**7**

**76**
236:24
**76,000**
236:23, 237:9
**76,491**
235:3
**76,491.14**
239:11
**78701**
2:7
**78723**
3:9
**78731**
3:20
**7th**
155:18, 179:6,
186:22, 188:4,
204:3, 268:13

**8**

**8**
4:6, 4:18, 4:21
**813**
3:10
**8th**
49:11, 52:24,
53:9, 55:15,
112:16, 268:16

**9**

**9**
1:30, 5:2, 5:4,

21:21, 21:22,
21:23
**90**
29:5
**94**
4:3
**97**
4:4
**9th**
278:21

WYLIE 623